# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAT THANH LUONG, et al., <br> Plaintiffs, <br> v. <br> ALAMEDA COUNTY, et al., <br> Defendants. | Case No. 17-cv-06675-EMC <br><br> **ORDER GRANTING IN PART AND DENYING IN PART HOSPITAL DEFENDANTS' MOTION TO DISMISS** <br><br> Docket No. 33 |

Plaintiffs in this case are (1) the successors in interest to decedent Dat Thanh Luong (namely, his wife and minor son); (2) Mr. Luong's wife, Ai Qiong Zhong; (3) Mr. Luong's minor son, W.L; and (4) Mr. Luong's mother, Mai Chai. As alleged in Plaintiffs' complaint, Mr. Luong was diagnosed with schizophrenia and with psychotic disorder NOS in or about 2011. *See* Compl. ¶ 23. In January 2016, he was arrested and booked into Alameda County's Santa Rita Jail. *See* Compl. ¶ 24. In August 2016, a state court ordered that Mr. Luong be committed to a state hospital because he was mentally incompetent within the meaning of California Penal Code § 1368. *See* Compl., Ex. A (order). By September 2016, Mr. Luong still had not been transferred to a state hospital, thus prompting a state court judge to issue an order to transport Mr. Luong or show cause re contempt. *See* Compl. ¶¶ 65-66 & Ex. B (order). Despite the court orders, Mr. Luong was never transferred. Pending the transfer that never came, he was killed in jail in October 2016, apparently after his cellmate strangled him. *See* Compl. ¶¶ 23, 73.

Plaintiffs have sued two groups of defendants: (1) the County Defendants, consisting of the County and County employees who worked at the Jail, including those who provided medical treatment to Mr. Luong, and (2) the Hospital Defendants, consisting of the California Department of State Hospitals ("DSH"), Pam Ahlin (the director of DSH), Napa State Hospital ("Napa

Hospital"), and Dolly Matteucci (the director of Napa Hospital).[1] According to Plaintiffs, Defendants were deliberately indifferent to Mr. Luong's medical needs as well as to his physical safety. While many of the claims asserted by Plaintiffs are on Mr. Luong's behalf, they have also asserted claims on their own behalf (*i.e.*, their own rights were violated because of Mr. Luong's wrongful death).

Currently pending before the Court is the Hospital Defendants' motion to dismiss. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the Hospital Defendants' motion.

## I. FACTUAL & PROCEDRUAL BACKGROUND

The main allegations in Plaintiffs' complaint that implicate the Hospital Defendants are as follows.

Mr. Luong was diagnosed with schizophrenia and with psychotic disorder NOS in or about 2011. *See* Compl. ¶ 23. On or about January 26, 2016, he was arrested; the incident that gave rise to the arrest indicated that he was suffering from a serious mental illness. On January 26, Mr. Luong was also booked into Alameda County's Santa Rita Jail. *See* Compl. ¶ 24.

At the time he was booked, Mr. Luong underwent a behavioral health screening. The counselor who performed the screening noted, *inter alia*, that Mr. Luong had schizophrenia, as stated in a psychiatric admission from October 2015 for an involuntary confinement. The counselor also noted that Mr. Luong was noncompliant with treatment or prescriptions. *See* Compl. ¶ 25.

Shortly after he was booked, Mr. Luong's sister contacted the Jail and indicated that he was taking antipsychotic drugs for his mental impairments. The sister also informed the Jail that he had a pattern of taking his medications and then stopping. *See* Compl. ¶¶ 28, 31.

---

[1] Per the DSH website, DSH "was created by Governor Jerry Brown's 2012-13 Budget, which eliminated the Department of Mental Health by transferring its functions to other departments." http://www.dsh.ca.gov/About_Us/default.aspx (last visited March 28, 2018). DSH "manages the California state hospital system, which provides mental health services to patients admitted into DSH facilities," and oversees five state hospitals, including Napa Hospital. *Id.*

2

According to Plaintiffs, the County Defendants were deliberately indifferent to Mr. Luong's medical needs. For example, the County Defendants initially failed to prescribe him medications. *See* Compl. ¶ 30. Also, although they subsequently issued prescriptions, they failed to ensure that Mr. Luong was actually taking the medications – even when his condition was clearly deteriorating (with Mr. Luong even being transported to a psychiatric hospital for emergency psychiatric care in June 2016). *See, e.g.*, Compl. ¶¶ 30, 32-35, 38, 42-43.

On July 8, 2016, a state court judge found that Mr. Luong was mentally incompetent to stand trial within the meaning of California Penal Code § 1368 and ordered that Mr. Luong be referred to the County Conditional Release Program for an examination and recommendation for placement under § 1370. *See* Compl. ¶ 44. Subsequently, a different state court judge issued a commitment order which provided, *inter alia*, as follows:

(1) Mr. Luong was committed to Napa Hospital "or any other Hospital pursuant [to California] Penal Code [§] 1370."

(2) The Alameda County Sheriff was to "deliver [Mr. Luong] to said Hospital."

(3) Within ninety days of commitment, the executive director of the hospital was to "make a written report to this Court and [others] concerning [Mr. Luong's] progress toward recovery of [his] mental competence."

(4) The hospital could "administer antipsychotic medication to [Mr. Luong] involuntarily[,] when and as prescribed by a treating physician," because he "has been charged with a serious crime against persons or property; involuntary administration of antipsychotic medication is substantially likely to render [him] competent to stand trial; [etc.]"

Comp.., Ex. A (Order at 1-2). The commitment order was dated July 22, 2016, but it was not signed and filed until August 2, 2016.

Plaintiffs allege, on information and belief, that the August 2 commitment order "was timely provided within days to all named Defendants herein, both [the County Defendants and the Hospital Defendants]." Compl. ¶ 46. In other words, all Defendants, including the Hospital Defendants, were given notice of the state court's order. This is consistent with California Penal

3

Code § 1370(a)(3) which provides that,

> [w]hen the court orders that the defendant be committed to a State Department of State Hospitals facility or other public or private treatment facility, the court shall provide copies of the following documents prior to the admission of the defendant to the State Department of State Hospitals or other treatment facility where the defendant is to be committed:
>
> (A) The commitment order, including a specification of the charges.

Cal. Pen. Code § 1370(a)(3).

By July 27, 2016, Mr. Luong's condition had deteriorated even further and he was transported to a psychiatric hospital for an involuntary commitment. *See* Compl. ¶ 50. On August 2, 2016, he was returned to the Jail. *See* Compl. ¶ 52. Upon his return to the Jail, he received multiple psychiatric evaluations but nothing was done to ensure that Mr. Luong was taking his medications. *See, e.g.*, Compl. ¶¶ 53, 55, 57, 59.

By September 6, 2016, Mr. Luong was still at the Jail and had not been transferred to Napa Hospital. As alleged by Plaintiffs,

> [b]y September 6, 2016 – in violation of the Court's July 22nd commitment and transportation order, Defendant COUNTY had failed to deliver MR. LUONG to a hospital, or to the custody of Defendant [the California Department of State Hospitals ("DSH")]. *Alternatively, or concurrently, Defendant [DSH] had refused to accept MR. LUONG as a patient despite, on information and belief, meeting all prerequisites for timely admission.*

Compl. ¶ 65 (emphasis added); *see also* Compl. ¶ 67 (alleging the same).

Plaintiffs add that, if the Hospital Defendants did not actually deny admission to Mr. Luong, they at the very least unduly delayed admission. *See, e.g.*, Compl. ¶ 93 ("The listed Defendants ignored, delayed, or denied to MR. LUONG urgently needed medical and psychiatric care and treatment."). Plaintiffs allege, on information and belief, that "Defendant [Napa Hospital], through Executive Director . . . DOLLY MATTEUCCI, and Defendant [DSH], through its Executive Director . . . PAM AHLIN . . . have a well-known history and pattern of failing to allow timely admission of IST pretrial detainees to [Napa Hospital] and other STATE HOSPITALS, in violation of state court commitment orders and with deliberate indifference to the rights and safety of IST pretrial detainees." Compl. ¶ 82. According to Plaintiffs, "[t]his history

4

and pattern has been recognized in other . . . cases." Compl. ¶ 82 (listing five cases, two of which are still ongoing).[2] Plaintiffs also note that, in an October 2017 hearing to dismiss Mr. Luong's criminal case (presumably, because of his death), a state court judge commented that "'the judges of many counties are frustrated in that it seems that the Department of State Hospitals is underserving the people that are in need of their services, that they languish in our county jails and sometimes don't get there for months after the order is made.'" Compl. ¶ 81.

On September 7, 2016, a state court judge issued an order – directed to Ms. Ahlin of DSH

---

[2] Those cases are as follows:

(1) *Anderson v. County of Siskiyou*, No. C-10-1428 SBA (N.D. Cal.). Like Plaintiffs here, the plaintiffs were represented by the Haddad law firm. The plaintiff sued, *inter alia*, Napa Hospital. The case was transferred to the Eastern District (No. C-11-0117 GEB-CKD (E.D. Cal.)). The plaintiffs alleged that the hospital defendants had willfully disobeyed a state court order requiring placement and treatment of the decedent at Napa Hospital. *See Anderson*, No. C-11-0117 GEB-CKD (E.D. Cal.) (Docket No. 67) (SAC ¶ 6). In January 2012, the hospital defendants settled. The claims against the hospital defendants were dismissed in June 2012.
(2) *Atayde v. Napa St. Hosp.*, No. C-16-0398 DAD (E.D. Cal.). Like Plaintiffs here, the plaintiff was represented by the Haddad law firm. The plaintiff sued, *inter alia*, Napa Hospital. According to the plaintiff, in spite of a state court order requiring the transfer of decedent to Napa Hospital, the hospital defendants actively denied his admission. The plaintiff's claims against the hospital defendants largely survived a motion to dismiss. *See Atayde v. Napa St. Hosp.*, 255 F. Supp. 978 (E.D. Cal. 2017). The case is still ongoing.
(3) *M.S. v. County of Ventura*, No. C-16-3084 BRO (C.D. Cal.). The plaintiffs sued, *inter alia*, Ms. Ahlin. The case is still ongoing. The operative complaint alleges that Ms. Ahlin "has been personally involved in the decision-making concerning Patton[] [Hospital's] one-in, one-out policy that has caused unconstitutional delays in the provision of mental health and restorative mental health treatment to IST inmates from Ventura County." *M.S.*, No. C-16-3084 BRO (C.D. Cal.) (Docket No. 125) (4AC ¶ 22).
(4) *In re Mille*, 182 Cal. App. 4th 635 (2010). In *Mille*, a state trial court had ordered that the petitioner – who had been found incompetent to stand trial – be transferred from a Los Angeles county jail to a state mental hospital (Patton Hospital). The state appellate court indicated that it was improper for there to be an 84-day delay in transfer, particularly in light of the initial 90-day evaluation period provided for in 1370(b)(1). The court stated: "When a defendant arrives . . . on day 84 of the 90-day period, there is no meaningful opportunity for the defendant to make progress toward recovery of mental competence, let alone for the medical director of the hospital to make a written report to the court concerning such progress by the defendant." *Mille*, 182 Cal. App. 4th at 649-50.
(5) *In re Loveton*, 244 Cal. App. 4th 1025 (2016). In *Loveton*, criminal defendants were found incompetent to stand trial and asked to be transferred to Napa Hospital within four weeks of the commitment order. The appellate court held that the trial court's order of a 60-day deadline for transfer was acceptable; "[a]lthough transferring IST defendants in less than 60 days after commitment should of course remain the goal," "the court's finding that a 60-day deadline satisfies IST defendants' due process rights, provides sufficient time for DSH to place each defendant, and allows for timely preparation of the 90-day status report pursuant to section 1370, subdivision (b)(1)." *Id.* at 1047.

5

United States District Court
Northern District of California

specifically – to transport Mr. Luong or to show cause re contempt because he had not been transferred to a hospital. *See* Compl. ¶¶ 65-66 & Ex. B (order); *see also Mille*, 182 Cal. App. 4th at 649-50 (where trial court ordered that petitioner – who had been found incompetent to stand trial – be transferred from county jail to a state mental hospital, indicating that it was improper for there to be an 84-day delay, particularly in light of the initial 90-day evaluation period provided for in 1370(b)(1)). In spite of the order, Mr. Luong remained in jail.

Mr. Luong was still in jail when he died on October 11, 2016. *See* Compl. ¶ 72. According to Plaintiffs, at that time, Mr. Luong had already been attacked by a cellmate on at least four prior occasions (February, April, July, and August 2016). *See* Compl. ¶¶ 63-64. On October 11, he was attacked for a fifth time, this time by a cellmate who also had a mental illness and who had been arrested for battery. The cause of death was asphyxiation due to strangulation. *See* Compl. ¶¶ 73-74.

Plaintiffs have filed § 1983 claims, both on Mr. Luong's behalf as well as on their own behalves. In addition, Plaintiffs have asserted, apparently on Mr. Luong's behalf, a claim for violation of California Civil Code § 52.1(b), a claim for violation of the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"), a claim for violation of California Government Code § 845.6, and a negligence claim.

Currently pending before the Court is a motion to dismiss filed by the Hospital Defendants – *i.e.*, DSH and its director, Ms. Ahlin, and Napa Hospital and its director, Ms. Matteucci. The specific claims asserted against the Hospital Defendants are as follows:

- Claim 1: Violation of § 1983 (individual liability) by Ms. Ahlin and Ms. Matteucci.
- Claim 2: Violation of § 1983 (supervisory liability) by Ms. Ahlin and Ms. Matteucci.
- Claim 3: Violation of the ADA and RA by DSH and Napa Hospital.
- Claim 4: Violation of California Civil Code § 52.1(b) by Ms. Ahlin and Ms. Matteucci.
- Claim 6: Negligence by Ms. Ahlin and Ms. Matteucci.

## II. DISCUSSION

A. Legal Standard

To survive a [12(b)(6)] motion to dismiss for failure to state a claim

6

after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), [a plaintiff's] factual allegations [in the complaint] "must . . . suggest that the claim has at least a plausible chance of success." In other words, [the] complaint "must allege 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"

. . . . [The Ninth Circuit has] settled on a two-step process for evaluating pleadings:

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014). Notably, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

> The Ninth Circuit has held that the *Iqbal*/*Twombly* plausibility standard does not prevent a plaintiff from pleading facts alleged upon information and belief. But while facts may be alleged upon information and belief, that does not mean that conclusory allegations are permitted. A conclusory allegation based on information and belief remains insufficient under *Iqbal*/*Twombly*. An allegation made on information and belief must still be "based on factual information that makes the inference of culpability plausible," although a court may take into account whether "facts are peculiarly within the possession and control of the defendant."

*Menzel v. Scholastic, Inc.*, No. 17-cv-05499-EMC, 2018 U.S. Dist. LEXIS 44833, at *5 (N.D. Cal. Mar. 19, 2018).

B.  <u>Section 1983 Claims: Individual Liability and Supervisory Liability</u>

Plaintiffs have asserted two § 1983 claims against the individual Hospital Defendants, Ms. Ahlin (DSH) and Ms. Matteucci (Napa Hospital). The first § 1983 claim is predicated on individual liability. The second § 1983 claim is predicated on supervisory liability. The gist of both claims is that the individual defendants were deliberately indifferent to Mr. Luong's serious medical needs in violation of due process. *See Gordon v. Cty. of Orange*, No. 16-56005, 2018

U.S. App. LEXIS 10977, at *11 (9th Cir. Dec. 8, 2017) (noting that "the medical care claims brought by pretrial detainees . . . 'arise under the Fourteenth Amendment's Due Process Clause, rather than under the Eighth Amendment's Cruel and Unusual Punishment Clause'").

> A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. . . . A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."

*McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

Plaintiffs have adequately pled a § 1983 claim based on individual liability. They have alleged that Mr. Luong had serious medical needs, which is supported by the fact that (a) the state court found him incompetent to stand trial, and be committed to a state hospital, and (b) the state court's order specified that he could be given antipsychotic drugs involuntarily. In addition, Plaintiffs allege that Ms. Ahlin and Ms. Matteucci were aware of Mr. Luong's serious medical needs because they were given notice of the state court's commitment order. That the individual defendants were given notice of the commitment order is plausible in light of California Penal Code § 1370(a)(3), which essentially requires that notice be given to the state hospital of the commitment order.[3] *See* Cal. Pen. Code § 1370(a)(3) (providing that, "[w]hen the court orders that the defendant be committed to a State Department of State Hospitals facility . . . , the court shall provide copies of the [commitment order as well as medical records] prior to the admission of the defendant to the State Department of State Hospitals"). Finally, Plaintiffs have alleged that Ms. Ahlin and Ms. Matteucci denied Mr. Luong admission in spite of the state court's commitment order, or at the very least delayed his admission in spite of the order. *See* Compl. ¶¶ 65, 67, 93. Alternatively, Plaintiffs suggest that Ms. Ahlin and/or Ms. Matteucci failed to take steps to help effect his transfer in spite of the August 2 commitment order and/or the order to show

---

[3] That Ms. Ahlin and Ms. Matteucci in particular were given notice is plausible in light of the fact that they are the directors of DSH and Napa Hospital, respectively. *See also* Compl. ¶ 7(a)-(b) (alleging that the individual defendants are responsible for compliance with court orders requiring placement).

8

cause (addressed to Ms. Ahlin). *See Atayde*, 255 F. Supp. 3d at 992 (concluding that § 1370(a)(3) and (b)(1) "establish that treatment facilities have certain custodial duties under the Fourteenth Amendment with respect to these detainees, which attach at the time the state court commitment order is issued" and therefore holding that "[hospital defendants] owed a duty of care to decedent for Fourteenth Amendment purposes, and are properly subject to suit under § 1983 for failing to take steps to effect decedent's transfer to [Napa Hospital]").

The above is sufficient to support Plaintiffs' § 1983 claim based on individual liability. Admittedly, the facts of this case are different from the main case on which Plaintiffs rely, *Atayde*, *see* Reply at 1-2 (noting that "*Atayde* involved a pretrial detainee's suicide brought about by a serious mental illness while awaiting re-admission to Napa State Hospital" and that, "[i]n its order committing the decedent, the court specifically noted that if the decedent's mental disorder was not treated with antipsychotic medication, 'it is probable that serious harm to the physical or mental health of the patient will result'"); however, that does not mean that there is not a plausible basis for individual liability in this case. Even if Plaintiffs are not ultimately able to hold the individual defendants liable for Mr. Luong's death (*e.g.*, because Mr. Luong was killed by a cellmate in contrast to the plaintiff in *Atayde* who killed himself, a result plausibly related to his mental illness), that does not mean that that the individual defendants could not still be held liable for any foreseeable pain and suffering he experienced prior to his death due to the denial of or delay in transfer to Napa Hospital.[4]

The § 1983 claim based on supervisory liability presents a closer call; nevertheless, here as well the Court concludes that such a claim has been adequately pled. As an initial matter, the Court notes that, presumably, Plaintiffs have made a claim for supervisory liability in case their

---

[4] To the extent the Hospital Defendants argue that Ms. Ahlin and Ms. Matteucci have qualified immunity for the individual liability claim, the argument lacks merit. At the time of their alleged misconduct, it was clearly established that deliberate indifference to a serious medical need of a prisoner was not constitutionally permissible. *See, e.g.*, *Atayde*, 255 F. Supp. 2d at 995 (denying motion to dismiss based on qualified immunity grounds; taking note that "'the general law regarding the medical treatment of prisoners was clearly established' and 'it was also clearly established that [prison staff] could not intentionally deny or delay access to medical care'"). The alleged facts here, if proven, are sufficiently specific to inform any reasonable person that failure to respond to Mr. Luong's serious medical need would violate his constitutional rights.

9

claim for individual liability does not pan out – *e.g.*, if Ms. Ahlin and Ms. Matteucci were not the individuals who expressly denied or delayed Mr. Luong's admission to Napa Hospital, then their subordinates did so. Supervisory liability, however, has limits.

> Liability under section 1983 arises only upon a showing of personal participation by the defendant. A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under section 1983.

*Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (emphasis added).

Paragraph 101 of the complaint relates to supervisory liability but contains only conclusory allegations (applicable to all individual defendants, including the County Defendants):

> Each of these supervising Defendants either directed his or her subordinates in conduct that violated Decedent's rights, OR set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known would deprive Decedent of rights, OR knew his or her subordinates were engaging in acts likely to deprive Decedent of rights and failed to act to prevent his or her subordinate from engaging in such conduct, OR disregarded the consequence of a known or obvious training deficiency that he or she must have known would cause subordinates to violate Decedent's rights, and in fact did cause the violation of Decedent's rights.

Compl. ¶ 101 (citing 9th Cir. Model Civil Jury Instruction No. 9.4).

That being said, there are other allegations in the complaint that implicate supervisory liability with respect to the individual Hospital Defendants – *e.g.*, ¶ 82, which alleges that the individual defendants have a "history and pattern of failing to allow timely admission of IST pretrial detainees to [Napa Hospital] and other STATE HOSPITALS"; ¶ 81, which alleges that a state court judge in Mr. Luong's criminal case commented that "'the judges of many counties are frustrated in that it seems that the Department of State Hospitals is underserving the people that are in need of their services, that they languish in our county jails and sometimes don't get there for months after the order is made,'" Compl. ¶ 81; and ¶¶ 65-66, which allege that Ms. Ahlin of DSH was issued an order to transport Mr. Luong or to show cause re contempt because he had not been transferred to a hospital. *See* Compl. ¶¶ 65-66 & Ex. B (order).

The Court is dubious of the allegations in ¶ 82. The five cases cited by Plaintiffs do not

clearly establish a history and pattern. *See* note 2, *supra* (reflecting that two cases are still ongoing and that two of the cases do not involve Napa Hospital). However, ¶ 82 does not stand alone and the collective allegations in ¶¶ 82, 81, and 65-66 are sufficient to support supervisory liability. For example, as to Ms. Ahlin, the director of DSH, the allegations support the inference that she was both broadly aware of delays in admission to the state hospitals and that she was specifically aware of the delay in Mr. Luong's case but failed to act (particularly because of the order to show cause, which was specifically directed to her).

As for Ms. Matteucci, admittedly, she was not the recipient of the order to show cause. Nevertheless, the Court finds that there is a sufficient basis for supervisory liability. At this stage, there need only be a reasonable inference that Ms. Matteucci knew of the constitutional violations of her subordinates and failed to act. Given that Ms. Matteucci had notice of Mr. Luong's commitment order and that she is the director of Napa Hospital, it is a reasonable inference that she knew Mr. Luong had not been transferred despite the order. *Cf. Menzel*, 2018 U.S. Dist. LEXIS 44833, at *5 (noting that "an allegation made on information and belief must still be 'based on factual information that makes the inference of culpability plausible,' although a court may take into account whether "facts are peculiarly within the possession and control of the defendant").

The Court therefore shall allow the supervisory liability claim to proceed against both Ms. Ahlin and Ms. Matteucci.

C. ADA and RA Claim

The other federal claim asserted by Plaintiffs is a claim for violation of the ADA and RA. Plaintiffs maintain this claim, on Mr. Luong's behalf, against DSH and Napa Hospital only.

Title II of the ADA and § 504 of the RA are "similar in purpose and scope." *Cal. Council of the Blind v. Cty. of Alameda*, 985 F. Supp. 2d 1229, 1234 (N.D. Cal. 2013).

- Title II provides in relevant part: "[N]o qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added).

11

- Similarly, § 504 of the RA provides in relevant part: "No otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (emphasis added).

Essentially, § 504 extends the protections of Title II to programs or activities receiving federal financial assistance. *See Atayde*, 255 F. Supp. 3d at 1000; *see also Weinreich v. L.A. Cty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997) (listing the elements of a claim under Title II and the elements of a claim under § 504).

Discrimination under the ADA and RA includes not only, *e.g.*, a denial of benefits but also a failure to provide a reasonable accommodation (also known as reasonable modification) for an individual's disability. *See id.* at 978 n.1 (noting that "the ADA language requiring 'reasonable accommodations' appears in Title I of the ADA and applies only to *employers*[;] [t]he language applicable to public services, benefits and programs is found in the regulations implementing Title II of the ADA" and "[t]hese regulations require 'reasonable modifications' to public services and programs that discriminate on the basis of disability unless such modifications would fundamentally alter the nature of the service or program") (emphasis in original); *see also* 28 C.F.R. § 35.130(b)(7). Notably, even where a plaintiff's theory is a failure to provide a reasonable accommodation, the plaintiff must still prove a discriminatory intent – *i.e.*, "[t]he duty to provide 'reasonable accommodations' . . . arises only when a policy discriminates *on the basis of disability*." *Weinreich*, 114 F.3d at 978 (emphasis in original).

The ADA and RA simply "prohibit[] discrimination because of disability, not inadequate treatment for disability." *Simmons v. Navajo County*, 609 F.3d 1011, 1021-22 (9th Cir. 2010). "[T]he mere provision of inadequate medical care does not state a claim [for relief]." *Anderson v. Cty. of Siskiyou*, No. C 10-01428 SBA, 2010 U.S. Dist. LEXIS 99927, at *15 (N.D. Cal. Sep. 13, 2010). As the First Circuit has emphasized:

> "[A] plaintiff's showing of medical unreasonableness . . . must be framed within some larger theory of disability discrimination. For example, a plaintiff may argue that her physician's decision was so

12

>   unreasonable – in the sense of being arbitrary and capricious – as to imply that it was pretext for some discriminatory motive, such as animus, fear, or apathetic attitudes. Or, instead of arguing pretext, a plaintiff may argue that her physician's decision was discriminatory on its face, because it rested on stereotypes of the disabled rather than an individualized inquiry into the patient's condition – and hence was unreasonable in that sense."

*Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284-85 (1st Cir. 2006). A discriminatory intent could also be inferred if there were disparate treatment of similarly situated disabled and nondisabled persons. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (noting that proof of discriminatory motive "can in some situations be inferred from the mere fact of differences in treatment").

In the instant case, Plaintiffs' ADA/RA claim seems to be predicated on two theories: (1) that Mr. Luong was denied benefits and services by not being admitted to Napa Hospital and (2) that he was denied reasonable accommodation for his mental disabilities by not being admitted.[5] *See* Compl. ¶ 118. The basic dispute between the parties is whether Plaintiffs have alleged that the denial of admission was *because of* Mr. Luong's disability.

The allegations in the complaint regarding discriminatory intent are fairly conclusory. *See, e.g.*, Compl. ¶ 117. However, Plaintiffs have essentially alleged that Mr. Luong was *completely denied* medical services for his mental disability, and so one could reasonably infer that that denial was so arbitrary and capricious given Mr. Luong's serious medical need that there must have been a discriminatory motive.

Notably, at least two California district courts have reached the latter conclusion based on the same basic allegations as Plaintiffs have made here in support of the ADA/RA claim. For example, in *Anderson*, the plaintiff sued, *inter alia*, Napa Hospital because a state court had ordered that the decedent be committed to the hospital but that the hospital denied him admission; the decedent later committed suicide while still in jail. Judge Armstrong denied the defendants'

---

[5] Plaintiffs also suggest a disparate treatment theory but allege no facts demonstrating disparate treatment relative to others similarly situated. *See* Compl. ¶ 117 (alleging that, "by reason of Decedent's mental disabilities, STATE and COUNTY Defendants did not afford him an opportunity to participate in or benefit from the aid, benefits, and services that are equal to those afforded to other, non-disabled individuals by Defendants").

13

motion to dismiss the ADA/RA claim, noting as follows: "The ADA may be violated where there is an 'outright denial of medical services' because the complete lack of access to services may be 'so unreasonable as to demonstrate that they were discriminating against [plaintiff] because of his disability.'" *Anderson*, 2010 U.S. Dist. LEXIS 99927, at *15 (quoting *Kiman*, 451 F.3d at 285, 287). In support of this conclusion, Judge Armstrong cited *Kiman*, where the First Circuit held that,

> Unlike the defendants' decisions regarding the diagnosis and treatment of [plaintiff's] ALS, the defendants' failure to give him access to his medications is not, on these facts, a medical 'judgment' subject to differing opinion – it is an outright denial of medical services. . . . Given the defendants' acknowledgment of [plaintiff's] serious disability and his acknowledged need for these medications, [plaintiff] may have demonstrated a triable issue of fact as to whether some corrections officers and prison medical officials failed to provide him with access to his prescription medications in violation of Title II of the ADA.

*Kiman*, 451 F.3d at 287. Under those circumstances, a complete denial is inconsistent with any claim of the exercise of reasonable medical judgment.

In *Atayde*, the plaintiff likewise made the same basic allegations as Plaintiffs do here (*i.e.*, the decedent died in jail after being denied admission to a state hospital, even though committed to the hospital by a state court), and the district court also denied the defendants' motion to dismiss the ADA/RA claim. The district court acknowledged that some courts have held that no discriminatory intent may be inferred simply because of failure to provide medical treatment for a disability. But the court stated that it did not have to address that specific issue because the situation before it involved a total denial of medical services. *See Atayde*, 255 F. Supp. 3d at 1001 & n.11 (citing, *inter alia*, *Anderson* and *Kiman*). Given the allegation of a total denial of medical services, the court found that the plaintiff had

> adequately pled facts supporting a failure to accommodate claim under the ADA and RA. Plaintiff has alleged that all of the defendants had knowledge of decedent's disability, and were aware of the state court order mandating decedent's transfer to NSH [Napa Hospital] for restorative treatment. Plaintiff has also alleged that, as a result of defendants' failure to admit decedent to NSH, decedent was excluded from participating in NSH's mental health services and given no possibility of access to those programs. The court concludes that these allegations are sufficient to plead that decedent

14

was excluded from participation in a public entity service or program, and that such exclusion was by reason of his disability.

*Id.* at 1003.

D. Section 52.1(b) Claim

California Civil Code § 52.1(b) provides:

> Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured, including appropriate equitable and declaratory relief to eliminate a pattern or practice of conduct as described in subdivision (a).

Cal. Civ. Code § 52.1(b).

Section 52.1(a), in turn provides as follows:

> If a person or persons, whether or not acting under color of law, interferes *by threat, intimidation, or coercion*, or attempts to interfere *by threat, intimidation, or coercion*, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured.

*Id.* § 52.1(a) (emphasis added).

Thus, a claim under § 52.1(b) requires interference or attempted interference with a protected right by threat, intimidation, or coercion. *See, e.g.*, *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015) (stating that "[t]here are two distinct elements for a section 52.1 cause of action[:] A plaintiff must show (1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion"). According to the Hospital Defendants, Plaintiffs have failed to allege threat, intimidation, or coercion in the instant case. The Court agrees.

In reaching this conclusion, the Court bears in mind that there is a dispute in the case law as to whether the threat, intimidation, or coercion must be "independent" of that inherent in the

15

rights violation. *Compare, e.g.*, *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947, 959 (2012) ("conclud[ing] that where coercion is inherent in the constitutional violation alleged, i.e., an overdetention in the County jail, the statutory requirements of 'threats, intimidation, or coercion' is not met[;] [t]he statute requires a showing of coercion independent from the coercion inherent in the wrongful detention itself"), *with Cornell v. City & County of San Francisco*, 17 Cal. App. 5th 766, 801-02 (2017) (holding that, "where . . . an unlawful arrest is properly pleaded and proved, the egregiousness required by Section 52.1 is tested by whether the circumstances indicate the arresting officer had a specific intent to violate the arrestee's right to freedom from unreasonable seizure, not by whether the evidence shows something beyond the coercion 'inherent' in the wrongful detention"), *and Reese v. County of Sacramento*, No. 16-16195, 2018 U.S. App. LEXIS 10130, at *26-27 (9th Cir. Apr. 23, 2018) (following *Cornell* in the context of an excessive force claim; noting that, for an excessive force claim under the Bane Act, there is no requirement that "the 'threat, intimidation or coercion' element of the claim . . . be transactionally independent from the constitutional violation alleged" but there is a requirement that there be "'a specific intent to violate the arrestee's right to freedom from unreasonable seizure'").

But in the instant case, the Court need not weigh in on that specific dispute because the instant case has materially distinguishable facts from, *inter alia*, the cases cited above. In the above cases, there was an actual detention of the plaintiff by the defendant(s), and it was the fact of detention that gave rise to coercion. In the instant case, there is no allegation of detention on the part of the Hospital Defendants – rather, it was the County Defendants who had custody of Mr. Luong. In the absence of detention by the Hospital Defendants, there is no apparent basis for a claim of coercion.

The cases on which Plaintiffs rely are not to the contrary. For example, in *Atayde v. Napa State Hospital*, No. 1:16-cv-00398-DAD-SAB, 2016 U.S. Dist. LEXIS 126639 (E.D. Cal. Sept. 16, 2016), the district court stated that "'threats, coercion, and intimidation are inherent in a deliberate indifference [to medical need] claim,'" *id.* at *23, but the district court made that statement vis-à-vis the county defendants who had custody of the decedent. *Cf. id.* at *23-24 (stating that, "because a plaintiff alleging a Bane Act violation based upon deliberate indifference

16

is required to allege and show affirmatively culpable conduct on the part of prison officials, such a plaintiff does not rely solely on the inherently coercive nature *of detention* in establishing his claim") (emphasis added). Similarly, in *M.H. v. County of Alameda*, 90 F. Supp. 3d 889 (N.D. Cal. 2013), the § 52.1 claim was brought against medical providers who provided care at the county jail where the decedent was detained.

Accordingly, the Court grants the Hospital Defendants' motion to dismiss the § 52.1 claim. Plaintiffs have leave to amend so that they may make additional allegations (if they can do so in good faith) to correct the deficiency.

### III. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the motion to dismiss. The motion is granted with respect to the § 52.1(b) claim but is otherwise denied. Plaintiffs have leave to amend the § 52.1 claim. Because the Court's CMC order already gives Plaintiffs leave to amend their complaint by July 17, 2018, *see* Docket No. 53 (Order at 2), the Court shall give Plaintiffs leave to amend here by July 17 as well.

This order disposes of Docket No. 33.

**IT IS SO ORDERED**.

Dated: May 1, 2018

_____
EDWARD M. CHEN
United States District Judge

17