MICHAEL J. HADDAD (State Bar No. 189114)
JULIA SHERWIN (State Bar No. 189268)
MAYA RODRIGUEZ SORENSEN (State Bar No. 250722)
TERESA ALLEN (State Bar No. 264865)
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, California 94612
Telephone: (510) 452-5500
Facsimile: (510) 452-5510

Attorneys for Plaintiffs
AI QIONG ZHONG, W.L., and MAI CHAU

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAT THANH LUONG, DECEASED, through his Co-Successors in Interest, AI QIONG ZHONG, Individually and as mother and Next Friend for W.L., a minor, and MAI CHAU, individually,<br><br>Plaintiffs,<br><br>vs.<br><br>ALAMEDA COUNTY, a public entity; SHERIFF GREG AHERN; JAIL COMMANDER THOMAS MADIGAN; DR. RINATA WAGLE, M.D.; ESTATE OF MOHINDER KAUR, M.D.; JACKSON & COKER LOCUMTENENS, LLC; BONNIE COOK, MFT; DEPUTY BRANDEN MCBRIDE; SHERIFF'S TECHNICIAN ROBERT LUEBKER; SHERIFF'S TECHNICIAN BRITANNI MARTINEZ; SHERIFF'S TECHNICIAN KARL ENZMANN; DEPUTY SCOTT BRYNING; DEPUTY SHAWN CHRISTIANSEN; NAPA STATE HOSPITAL, CALIFORNIA DEPARTMENT OF STATE HOSPITALS, a public entity; PAM AHLIN; DOLLY MATTEUCCI; PATRICIA TYLER, M.D.; CINDY BLACK; and DOES 10-20, Jointly and Severally,<br><br>Defendants. | No: 3:17-cv-06675-EMC<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; AND DEMAND FOR JURY TRIAL** |

Plaintiffs, by and through their attorneys, HADDAD & SHERWIN, LLP, for their Second Amended Complaint against Defendants, state as follows:

**JURISDICTION**

1. This is a civil rights wrongful death/survival action arising under 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act (“ADA”) – 42 U.S.C. § 12132 and 28 C.F.R. §35, et seq., the Rehabilitation Act (“RA”) – 29 U.S.C. § 794, et seq., and the laws and Constitution of the State of California. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, to hear and decide claims arising under state law. The amount in controversy herein, excluding interest and costs, exceeds the minimum jurisdictional limit of this Court.

**INTRADISTRICT ASSIGNMENT**

2. A substantial part of the events and/or omissions complained of herein occurred in the County of Alameda, California, and this action is properly assigned to the Oakland or San Francisco Division of the United States District Court for the Northern District of California.

**PARTIES AND PROCEDURE**

3. Plaintiff W.L. is the son of Decedent DAT LUONG and a resident of the State of California. Plaintiff W.L. by and through his mother and Next Friend AI QIONG ZHONG, brings these claims individually for wrongful death and violation of his personal rights, and as co-successor in interest for Decedent DAT LUONG pursuant to California Code of Civil Procedure §§ 377.10 et seq. He brings these claims under state and federal law.

4. Plaintiff AI QIONG ZHONG was the wife of DAT LUONG and is a resident of the State of California. Plaintiff AI QIONG ZHONG brings these claims individually for wrongful death and violation of her personal rights, and as co-successor in interest for Decedent DAT LUONG pursuant to California Code of Civil Procedure §§ 377.10 et seq. She brings these claims under state and federal law.

5. Plaintiff MAI CHAU is the mother of decedent, DAT LUONG, and a resident of the State of California. Plaintiff MAI CHAU brings these claims individually for wrongful death and for violation of her personal rights. Plaintiff MAI CHAU is 78 years old. At the time of Decedent’s

death, Plaintiff MAI CHAU was dependent on the Decedent, her son, relying on Decedent for financial and other support.

6. Plaintiffs AI QIONG ZHONG and W.L. brings these claims pursuant to California Code of Civil Procedure §§ 377.20 et seq., which provides for survival actions. All Plaintiffs also bring claims pursuant to California Code of Civil Procedure §§ 377.60 et seq. for wrongful death. All Plaintiffs also bring claims for violations of their personal federal constitutional rights to familial association. All Plaintiffs bring their claims individually, and Plaintiffs AI QIONG ZHONG and W.L. also bring claims on behalf of Decedent DAT LUONG, on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, federal and state civil rights law, and California law. Plaintiffs also bring these claims as Private Attorneys General, to vindicate not only their rights, but others' civil rights of great importance.

7. Defendant NAPA STATE HOSPITAL (NSH), is a public entity and a department of the Defendant STATE OF CALIFORNIA DEPARTMENT OF STATE HOSPITALS (STATE HOSPITALS), and each was responsible for supervising the NSH conduct, policies, and practices, as well as the hiring, retaining, and training of employees and agents of the NSH, including Defendants DOLLY MATTEUCCI, PAM AHLIN, CINDY BLACK, PATRICIA TYLER, M.D., and certain DOE DEFENDANTS, and all of its members, agents and employees. The entity Defendants, NSH and STATE, are sued under the Americans with Disability Act ("ADA"), Rehabilitation Act ("RA"), and state law. PAM AHLIN, director of STATE HOSPITALS, DOLLY MATTEUCCI, CINDY BLACK, PATRICIA TYLER, M.D., and DOE DEFENDANTS are sued in their Individual Capacities. At all material times, these individual Defendants held titles and participated generally as follows in this matter:

a. PAM AHLIN, as Director of STATE HOSPITALS and highest policymaking official of STATE HOSPITALS, was responsible for the oversight, management, policies, procedures, provision of mental health care services, and compliance with Court orders requiring placement of patients to STATE HOSPITALS, including NSH. She acted in a tortious and/or constitutionally violative fashion in her screening and decisions concerning Decedent, and her handling of the Court Order

discussed below,[1] that ordered and required her to admit DAT LUONG to STATE HOSPITALS, including NSH, for restorative treatment; and, she acted in concert with Defendants MATTEUCCI, BLACK, TYLER, and certain DOE DEFENDANTS.

b. DOLLY MATTEUCCI was at all relevant times the Executive Director and highest policymaking official of NSH, responsible for the oversight, management, policies, procedures, provision of mental health care services, compliance with Court orders requiring placement of patients at NSH, and supervision of all employees and agents at NSH. She acted in a tortious and/or constitutionally violative fashion in her screening and decisions concerning Decedent, and her handling of the Court Order (Exhibit A), that ordered and required her to admit DAT LUONG to NSH for restorative treatment; and, she acted in concert with Defendants AHLIN, BLACK, TYLER, and certain DOE DEFENDANTS.

c. CINDY BLACK was at all relevant times the Clinical Administrator, responsible for making the initial determination that the patient referred to NSH is appropriate for hospitalization and can be admitted to NSH. She acted in a tortious and/or constitutionally violative fashion in her screening and decisions concerning Decedent, and her handling of the Court Order (Exhibit A), that ordered and required her to admit DAT LUONG to NSH for restorative treatment; and, she acted in concert with Defendants AHLIN, TYLER, and MATTEUCCI, and certain DOE DEFENDANTS. Defendant BLACK is being substituted in for Defendant DOE 6.

---

[1] The California Superior Court for the County of Alameda, in Case No. 259871, issued an Order of Commitment, after "HEARING ON RECOMMENDATION REGARDING PLACEMENT AND COMMITMENT [PURSANT TO] PENAL CODE SECTION 1370", declaring again that MR. LUONG had been determined to be "a Mentally Incompetent Person within the meaning of Penal Code Section 1368; and the matter having been referred to the COUNTY Mental Health Director for a report and recommendation regarding placement;" and **ordering that he be "committed to the Department of Mental Health at the Napa State Hospital at Napa, California or any other hospital**, pursuant to Penal Code [§] 1370." The Order is attached as **Exhibit A**.

d. PATRICIA TYLER, M.D. was at all relevant times Chief Psychiatrist and the California Department of Corrections and Rehabilitation Safety and Medical Director at Napa State Hospital, responsible for administering the admission and discharge of patients, including those patients committed by court order as incompetent to stand trial under Penal Code 1370, including DAT LUONG; and she acted in concert with Defendants AHLIN, MATTEUCCI, and BLACK. DEFENDANT TYLER is being substituted in for Defendant DOE 7.

e. Certain DOE DEFENDANTS were also responsible for arranging and effecting the admission of DAT LUONG to NSH or another appropriate facility, and for providing care and treatment for his serious medical needs, including pursuant to Court Order, and failed to do so.

8. All or part of the wrongful acts and omissions complained of herein against NSH, STATE HOSPITALS, PAM AHLIN, DOLLY MATTEUCCI, CINDY BLACK, PATRICIA TYLER, M.D., and certain DOE DEFENDANTS, on information and belief, occurred in Napa County and Alameda County, California.

9. Defendant COUNTY OF ALAMEDA ("COUNTY") is a municipal corporation, duly organized and existing under the laws of the State of California, and is the employer of the individual COUNTY defendants, as well as certain DOE DEFENDANTS. Under its authority, the COUNTY operates the Alameda County Sheriff's Office (ACSO).

10. Defendant, Sheriff GREG AHERN ("AHERN"), at all times mentioned herein was employed by Defendant COUNTY as Sheriff for the COUNTY, and was acting within the course and scope of that employment at such times. He is being sued in his individual capacity as Sheriff for the COUNTY. At all material times, Defendant AHERN was the final policy making official for the COUNTY OF ALAMEDA Sheriff's Office and Santa Rita Jail, and he was ultimately responsible for all policies, procedures, supervision, and training for the ACSO and at the jail.

11. At all times mentioned herein, Defendant COMMANDER THOMAS MADIGAN was employed by Defendant COUNTY as COMMANDER of the Detentions and Corrections Division, including Santa Rita Jail, for the COUNTY, and was acting within the course and scope

of that employment at such times. He is being sued in his individual capacity as Jail Commander for the COUNTY. At all material times, Defendant MADIGAN was a policy making official for the COUNTY OF ALAMEDA Sheriff's Department and Santa Rita Jail, and on information and belief, Defendant Sheriff AHERN had delegated to Defendant MADIGAN the power and authority to oversee the day-to-day supervision, training, policies, and procedures in place at the Santa Rita Jail.

12. Defendant, DR. RINATA WAGLE, M.D. was at all times herein mentioned employed by Defendant COUNTY's Behavioral Health Care Services and Criminal Justice Mental Health program as a psychiatrist and health care provider, and was acting within the course and scope of that employment.

13. Defendant BONNIE COOK, MFT was at all times herein mentioned employed by Defendant COUNTY's Behavioral Health Care Services and Criminal Justice Mental Health program as a Marriage and Family Therapist, and was acting within the course and scope of that employment.

14. Defendant DEPUTY BRANDEN MCBRIDE was at all times herein mentioned employed by Defendant COUNTY's Santa Rita Jail as a correctional deputy, and was acting within the course and scope of that employment.

15. Defendant SHERIFF'S TECHNICIAN ROBERT LUEBKER was at all times herein mentioned employed by Defendant COUNTY's Santa Rita Jail as a technician, and was acting within the course and scope of that employment.

16. Defendant SHERIFF'S TECHNICIAN BRITANNI MARTINEZ was at all times herein mentioned employed by Defendant COUNTY's Santa Rita Jail as a technician, and was acting within the course and scope of that employment. Defendant MARTINEZ is being substituted in for Defendant DOE 8.

17. Defendant SHERIFF'S TECHNICIAN KARL ENZMANN was at all times herein mentioned employed by Defendant COUNTY's Santa Rita Jail as a technician, and was acting within the course and scope of that employment. Defendant ENZMANN is being substituted in for Defendant DOE 9.

18. Defendant, DEPUTY SCOTT BRYNING was at all times herein mentioned employed by Defendant COUNTY's Santa Rita Jail as a correctional deputy, and was acting within the course and scope of that employment. .

19. Defendant DEPUTY SHAWN CHRISTIANSEN was at all times herein mentioned employed by Defendant COUNTY's Santa Rita Jail as a correctional deputy, and was acting within the course and scope of that employment.

20. Defendant JACKSON & COKER LOCUMTENENS, LLC ("JACKSON & COKER") at all material times was a Georgia corporation licensed to do business in California. On information and belief, JACKSON & COKER at all material times provided physicians on a contract basis to Santa Rita Jail and employed and/or was responsible for Defendant MOHINDER KAUR, M.D., Deceased -- now named as Defendant ESTATE OF MOHINDER KAUR, M.D. -- and Defendant DOE psychiatrists and healthcare providers. Under common law, Defendant JACKSON & COKER LOCUMTENENS, LLC is vicariously liable for the acts and omissions of its employee, MOHINDER KAUR, M.D., within the course and scope of that employment.

21. Defendant, ESTATE OF MOHINDER KAUR, M.D. succeeds for MOHINDER KAUR, M.D. after her death. MOHINDER KAUR, M.D. was at all times herein mentioned employed as a psychiatrist and health care provider by Defendant JACKSON & COKER and was acting within the course and scope of that employment.

22. Certain DOE DEFENDANTS, at all material times, were employees and agents of Defendant COUNTY OF ALAMEDA responsible for the transfer of DAT LUONG to NAPA STATE HOSPITAL, or another appropriate inpatient facility, including as required by a July 22, 2016 Court Order (Exhibit A) requiring such transfer, and failed or refused to do so; and/or these DOE DEFENDANTS were responsible for assigning MR. LUONG to appropriate and safe housing and housing classification, with appropriate observation and protection given his vulnerability to assault by other inmates. In doing the acts or omissions hereinafter described, certain DOE DEFENDANTS acted within the course and scope of their employment with Defendant COUNTY OF ALAMEDA and acted under color of state law. The individually named Defendants and certain DOE DEFENDANTS were either Correctional Officers, jail staff, Sheriff's Deputies, Sergeants, Captains, Lieutenants, or other Peace Officers, Doctors, Psychiatrists, Psychologists, Social

Workers, Mental Health Professionals, and/or civilian employees and/or agents who were responsible for the care, housing, observation, and safety of inmates, including DAT LUONG, and/or the transfer of MR. LUONG for inpatient psychiatric care and treatment, including but not limited to pursuant to Court Order.

23. The true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as DOES 10 through 20 are unknown to Plaintiffs, who therefore sue said Defendants by said fictitious names. Plaintiffs will amend this Complaint to show said Defendants' true names and capacities when the same have been ascertained. Plaintiffs are informed, believe, and thereon allege that all Defendants sued herein as DOES are in some manner responsible for the acts, omissions, and injuries alleged herein.

24. Plaintiffs allege, on information and belief, that each of the Defendants sued herein was wrongfully, deliberately indifferently, unreasonably, negligently, and/or otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiffs and/or Decedent. Further, one or more DOE Defendants was at all material times responsible for the hiring, training, supervision, and discipline of other defendants, including both the individually named and DOE Defendants.

25. Plaintiffs are informed, believe, and thereon allege that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of that relationship. Plaintiffs are further informed, believe, and thereon allege that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may hereinafter be otherwise, specifically alleged. At all material times, each Defendant was an integral participant, jointly and fundamentally engaged in constitutionally violative, unlawful, and/or tortious activity, resulting in the deprivation of Plaintiffs' and Decedent's constitutional rights and other actionable harm.

26. The acts and omissions of all individual Defendants, except those directly employed by NAPA STATE HOSPITAL and/or STATE HOSPITALS, were at all material times pursuant to the actual customs, policies, practices, and/or procedures of the COUNTY OF ALAMEDA.

27. At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California.

28. A proper and timely tort claim was presented to the COUNTY OF ALAMEDA and the STATE OF CALIFORNIA on behalf of Plaintiffs and Decedent, pursuant to Government Code § 910 et seq., and this action was thereafter timely filed within all applicable statutes of limitation.

29. This complaint may be pled in the alternative, pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

## GENERAL ALLEGATIONS

30. DAT LUONG was 56 years old (he was born on March 4, 1960) at the time of his death, on October 11, 2016. He was 5 feet, 4 inches tall and weighed approximately 132 pounds. Approximately fifteen years prior to his death, he had been diagnosed with schizophrenia and with psychotic disorder, NOS ("not otherwise specified"), *inter alia*. His history of mental illness was well known by Defendants COUNTY, the individual Defendants working in COUNTY's Jail, Defendant DRs. WAGLE and KAUR, MFT COOK, and others; indeed, on two separate occasions during his incarceration at Santa Rita Jail prior to his death, Defendant COUNTY'S Sheriff's deputies transported Mr. LUONG to John George Psychiatric Hospital for evaluation under California Welfare & Institutions Code § 5150, and he was admitted "for grave disability and danger to self." However, with appropriate medication, MR. LUONG enjoyed close relationships with his siblings, his mother, for whom he provided care, and his wife and son.

31. On or about January 26, 2016, at about 3:17 p.m., Union City Police officers arrested MR. LUONG, who was then booked into Defendant Alameda County's Santa Rita Jail at about 9:46 p.m. The incident that gave rise to MR. LUONG's arrest indicated he was suffering from a serious mental illness.

32. On or about January 26, 2016, at about 8:30 p.m., Josalyn Harris, Psy.D, Rehabilitation Counselor II, performed Defendant COUNTY'S Behavioral Health Screening on MR. LUONG. She noted that MR. LUONG had a flat, blank expression, had Schizophrenia, Undifferentiated, per an October 25, 2015 psychiatric admission pursuant to California Welfare and Institutions Code § 5150 on October 25, 2015, was non-compliant with treatment or prescriptions, needed follow-up, and he had significant impairment requiring intervention. Rehabilitation

Counselor Harris further found that MR. LUONG'S Global Assessment of Functioning (GAF) was 38, meaning he had impaired reality testing or communication, or major impairment in several areas, such as judgment, thinking or mood. The portion of the form requiring the psychiatrist to indicate his or her concurrence with the diagnosis was left blank and no psychiatrist signed the form.

33. At all relevant times, ALAMEDA COUNTY, through its Behavioral Health Care Services, was responsible for providing mental health care to pretrial detainees at Santa Rita Jail, including to MR. LUONG.

34. Currently unidentified deputies, jail administrators, mental health personnel, and/or law enforcement officers (DOES), knew and/or had reason to know that MR. LUONG was a mentally ill and emotionally disturbed person, with immediate and serious medical needs, yet they failed to respond appropriately or lawfully. Defendant DOES were deliberately indifferent to MR. LUONG'S immediate and serious medical needs, including mental illness[es] and emotional disturbance. Further, Defendant DOES recklessly disregarded his safety by failing to properly and adequately monitor and care for Mr. LUONG, and Defendants failed to accommodate his mental illness and disability(ies).

35. On or about February 1, 2016, MR. Luong's sister, Mai Luong, called COUNTY'S Behavioral Health Care Services to let them know that MR. LUONG "has current psych medication" and provided the contact information MR. LUONG'S psychiatrist.

36. On or about February 2, 2016, Elva Mouton, MFT-INTERN saw MR. LUONG. Ms. Mouton noted that MR. LUONG had auditory hallucinations, was possibly delusional regarding the incident that resulted in his arrest, was noncompliant with treatment and prescriptions, and had Schizophrenia, Undifferentiated. Ms. Mouton spoke with DAT LUONG'S sister, Mai Luong, and Ms. Luong informed Defendants that MR. LUONG had been prescribed Ziprasidone by his psychiatrist. At no time during DAT LUONG'S detention in the COUNTY's jail did the COUNTY or its Behavioral Health Care Services department ever provide Ms. Mouton with appropriate and required clinical supervision. Instead, the COUNTY allowed her to work independently, and provide unsupervised evaluations and treatments to inmate patients, including DAT LUONG.

37. On or about February 3, 2016, for the first time since his booking into the Santa Rita Jail, MR. LUONG saw a psychiatrist through COUNTY's Behavioral Health Care Services, DR. RINATA WAGLE, M.D., who diagnosed MR. LUONG with "Psychosis NOS," and noted that he had a 10-year history of hearing voices, which he had heard as recently as February 2, 2016, and he was disabled due to hearing voices. DR. WAGLE noted that MR. LUONG had been punched in the left eye recently (by another inmate). Despite MR. LUONG'S need for psychiatric medication and documented noncompliance with his required medications, DR. WAGLE did not prescribe any medications because MR. LUONG was "not interested in medications today." Defendant WAGLE merely planned to have a follow-up appointment with MR. LUONG nearly three weeks later, on or about February 23, 2016. She also planned to "R/O [rule out] false reports of symptoms."

38. On or about February 9, 2016, Mai Luong again called Alameda County's Behavioral Health Care Services to state that Mr. LUONG "should be on medication" and he had a pattern of taking his medication for a while and then stopping. Ms. Luong also informed Defendants that, when DAT LUONG'S psychotic disorder is most prevalent, he will "get angry, fight, talk to himself, and difficult to be with." Mai Luong spoke to Ms. Mouton. Ms. Luong also emailed Mr. LUONG'S prescription, dated January 21, 2016, for the antipsychotic drug Saphris. Defendants did not provide Mr. LUONG his prescribed medication. Instead, they had Mouton conduct an unsupervised appointment with him, confirm he continued to be possibly delusional regarding the incident that resulted in his arrest, assess him with Psychotic Disorder NOS, note that he met with the psychiatrist but was not prescribed medication, and take him off intensive observation after consulting with DEFENDANT BONNIE COOK, MFT, and clinician Neher. Ms. Mouton scheduled an appointment for DAT LUONG with Defendant WAGLE on February 17, 2016.

39. On or about February 17, 2016, MR. LUONG saw Defendant WAGLE, who prescribed Risperdal, another antipsychotic drug. MR. LUONG reported he continued to hear voices and he saw a psychiatrist in San Jose for at least ten years. Defendant WAGLE noted bruising around MR. LUONG'S neck but appears to have requested no medical follow-up. During the appointment, MR. LUONG reported he was hearing voices of people talking. Defendant WAGLE assessed MR. LUONG with Psychosis NOS and rule out Schizophrenia, prescribed

Risperdal 1 mg at bedtime for three days then increasing to 2 mg at bedtime for 60 days, and planned a follow-up appointment with him on March 8, 2016. MR. LUONG'S GAF was still a severely impaired 38. The prescription was not transmitted to the nurse.

40. On or about February 25, 2016, Ms. Mouton saw MR. LUONG, who claimed he had not been prescribed any medication, and Ms. Mouton noted that the nurse did not receive the prescription order from the COUNTY Defendants.

41. When MR. LUONG next saw Defendant WAGLE, on or about March 8, 2016, MR. LUONG admitted that he had not been taking his Risperdal, and that he did not come out of his cell for pill call. Despite Defendants having been advised of MR. LUONG's history of noncompliance with his medications due to his mental illness, Defendant WAGLE did nothing to ensure that MR. LUONG actually receive the prescribed medications. Instead, Defendant WAGLE told MR. LUONG he should come out of his cell for pill call, but did nothing else, acting with deliberate indifference to MR. LUONG's serious medical needs and safety. DOE DEFENDANT corrections deputies and supervisors also knew that MR. LUONG was not taking his necessary, prescribed antipsychotic medication yet did nothing, in deliberate indifference to MR. LUONG's serious medical needs and safety.

42. From March to June, 2016, MR. LUONG'S mental health declined. MR. LUONG refused to eat and drink because he thought that he was being poisoned and that people were after him, and he refused his medications and medical treatment. Again, DOE DEFENDANT corrections deputies and supervisors, and on information and belief DEFENDANTS WAGLE, KAUR, COOK and DOE DEFENDANTS, knew of these facts yet did nothing, in deliberate indifference to MR. LUONG's serious medical needs and safety.

43. On or about May 29, 2016, at about 4:23 p.m., Sharmaine Roberts, LCSW received a call from the nurse that MR. LUONG was refusing to eat and drink, and upon observation of him it appeared he had been refusing to eat and drink for at least 48 to 72 hour and "NO one appears to be tracking the I/M's [inmate's] consumption." (Emphasis in original). MR. LUONG was guarded, delusional, responding to internal stimuli, not responding to Ms. Roberts, and talking about Ms. Roberts in another language. When Ms. Roberts began speaking to MR. LUONG, he walked away from the door and stood on top of the toilet. The nurse's report stated MR. LUONG had done this

multiple times. The deputy reported to Ms. Roberts that MR. LUONG said he was not eating because his food was poisoned. Ms. Roberts initiated safety cell protocols and a Welfare and Institutions Code § 5150 inpatient hospital transfer to John George Psychiatric Pavilion for MR. LUONG due to his refusal to eat and drink and appearing psychotic, a danger to himself, and gravely disabled. Ms. Roberts had the nurse research the medication administration record and found it did not follow him in his housing unit, and it was unclear when MR. LUONG had last received medication. MR. LUONG was not transferred for inpatient emergency psychiatric care.

44. On or about May 30, 2017 at about 6:52 p.m., Paul Wensley, LCSW spoke to MR. LUONG through the cuffing port of his cell door. Mr. Wensley noted, "a 5150 WAS WRITTEN ON CLIENT LAST NIGHT BUT WAS TO BE CANCELLED IF HE ATE. THIS MORNING HE WAS IN OPHU SAFETY CELL." Mr. Wensley later noted that MR. LUONG was again standing on his toilet, and scheduled an appointment for MR. LUONG to see a medical doctor in the clinic on June 1, 2016.

45. On or about June 1, 2016, at about 9:37 a.m., Kathleen Rietta-Wong, MFT, saw MR. LUONG and noted his arm was dark purple in color and swollen. MR. LUONG informed Ms. Rietta-Wong that his arm was broken, and he refused an x-ray. Ms. Rietta-Wong noted MR. LUONG had a history of medication non-compliance, not eating or drinking, standing on the toilet, responding to internal stimuli, and refusing treatment of scabies. Further, she noted MR. LUONG refuses medication and food as he feels it is poisoned. Ms. Rietta-Wong inquired about his recent medication compliance, but the nurses said his medication administration record for May had been filed and was not available. Ms. Rietta-Wong issued another 5150 transfer for Mr. Luong for emergency psychiatric care, due to his danger to self, grave disability, refusal of treatment, possible fractured arm, refusing food, water and medication, and standing on top of the toilet. Defendants finally did transfer MR. LUONG to the John George Psychiatric Pavilion for emergency psychiatric care. On or about June 1, 2016, Defendant COUNTY Sheriff's deputies transported MR. LUONG to John George Psychiatric Hospital for evaluation under California Welfare & Institutions Code § 5150, and he was admitted "for grave disability and danger to self." Then, on or about June 11, 2016 MR. LUONG was returned to Santa Rita Jail with 14 days of a medication bridge from John

George Psychiatric Pavilion including Risperidone 4 mg at bedtime, Risperidone 3 mg every morning, Lorazepam 1 mg at bedtime, Benadryl 50 mg at bedtime.

46. On June 13, 2016, Shefayee Said, M.D. evaluated MR. LUONG's medication, found he was stable on the medications prescribed by John George Psychiatric Pavilion, and continued the Risperidone and Benadryl prescriptions, with a plan to follow up for medications on June 27, 2016.

47. On or about June 14, 2016, Sharmaine Roberts, LCSW saw MR. LUONG, who stared at her with flat affect, continued to have mild delusions and limited insight and judgment. Ms. Roberts cleared him to return to his housing unit and discontinued the intensive observation log for him, planning for him to see DEFENDANT BONNIE COOK, MFT, on June 21, 2016.

48. On or about June 22, 2016, DEFENDANT COOK saw MR. LUONG at his cell door. MR. LUONG said he is not taking his medication and only wants to see a Chinese doctor. MR. LUONG informed DEFENDANT COOK that his arm was broken, and he had a sling made out of a t-shirt. She was informed by Deputy Cummins that deputies had difficulty getting MR. LUONG out of his cell to take him to John George Psychiatric Pavilion and they "injured his arm." Deputy Cummins also informed DEFENDANT COOK that MR. LUONG usually spends all day sitting on his bunk. DEFENDANT COOK's only plan was to schedule a follow-up appointment for MR. LUONG with her on July 7, 2016.

49. On or about June 27, 2016, Defendant MOHINDER KAUR, M.D. saw MR. LUONG for evaluation. Due to his mental illness, MR. LUONG stated he has no problems and does not want to take medications. He did inform DEFENDANT KAUR that he has a history of being noncompliant with his medications and was admitted to John George Psychiatric Pavilion for being a danger to himself and being gravely disabled. DEFENDANT KAUR knew that MR. LUONG had a history of medication non-compliance, and had been diagnosed with schizophrenia, and had a 10-day psychiatric hospitalization due to his grave disability and being a danger to himself. DEFENDANT KAUR, with deliberate indifference to MR. LUONG'S serious medical needs, discontinued all but MR. LUONG'S Risperdal but chose to reduce the dose to a subtherapeutic dose of 2 mg at bedtime, and none in the morning, and scheduled a follow-up visit for a month later, July 25, 2016. Defendant JACKSON & COKER is vicariously liable for the actions and omissions of DEFENDANT KAUR under the doctrine of respondeat superior.

50. On or about July 7, 2016, DEFENDANT BONNIE COOK, MFT saw MR. LUONG at his cell door because he refused his appointment. DEFENDANT COOK noted that MR. LUONG had a court date scheduled for the following day, July 8, 2016. MR. LUONG was pointing at random places in his cell, and told DEFENDANT COOK that today was "January 3, 2017." Despite knowing of MR. LUONG'S grave psychiatric history and condition, DEFENDANT COOK only noted MR. LUONG'S refusal of medications and encouraged him to take medications, and scheduled a follow-up visit with him almost a month later, on August 4, 2016. Despite knowing that MR. LUONG had a court date on July 8, 2016, DEFENDANT COOK made no plan for anyone to follow-up on the results of that court proceeding.

51. During the course of the criminal proceedings against MR. LUONG, doubt arose as to his competency to stand trial. On or about July 8, 2016, Judge Michael Gaffey, of the California Superior Court for the County of Alameda, found that MR. LUONG was "mentally incompetent within the meaning of [California] Penal Code section 1368." The Court ordered that Mr. LUONG be referred to the COUNTY'S Conditional Release Program for an examination and recommendation for placement under California Penal Code § 1370.

52. From July 7, 2016 to July 22, 2016, while MR. LUONG remained incarcerated at Santa Rita Jail, no one from Defendant COUNTY'S Behavioral Health Services, including DEFENDANTS WAGLE, KAUR, COOK, DOE DEFENDANTS, nor any other mental health clinician or worker provided ***any*** mental health treatment or evaluation to Mr. LUONG, despite their knowledge that he had obvious and serious medical needs, with deliberate indifference to his serious medical needs.

53. On or about July 22, 2016, Judge Dan Grimmer, of the California Superior Court for the County of Alameda, ordered Mr. LUONG, pursuant to California Penal Code § 1370, to be **"committed to the Department of Mental Health at the Napa State Hospital at Napa, California or any other hospital**, pursuant to Penal Code [§] 1370." (emphasis added). The Court further ordered COUNTY'S Sheriff to deliver Mr. LUONG to "said Hospital." The Court further ordered that "within ninety (90) days of this commitment" "the Executive Director of the hospital," Defendant DOLLY MATTEUCCI, provide a report to the Court and the COUNTY "concerning the defendant's progress toward recovery of the defendant's mental competence." The Court also

ordered that the treatment facility may administer antipsychotic medication to MR. LUONG involuntarily, and as prescribed by a treating physician, pursuant to Cal. Penal Code §1370(a)(2)(B)(iii), finding that involuntary administration of antipsychotic medication would be "substantially likely to render MR. LUONG competent to stand trial" and "is in the patient's best medical interest in light of [his] medical condition." On information and belief, this order was timely provided within days to all named Defendants herein, both at the COUNTY and STATE.

54. In the event that the COUNTY OF ALAMEDA and NSH disobeyed the Court Order for MR. LUONG's admission, then pursuant to Due Process Clause of the Fourteenth Amendment to the U.S Constitution, California Penal Code § 1600, and other authorities, the COUNTY OF ALAMEDA, Sheriff GREG AHERN, and the individually named Defendants herein, nonetheless, remained responsible for the care, treatment, and medical needs of their pretrial detainee, DAT LUONG, to provide such necessary care and/or secure such care from any other available public or private treatment facility approved by the community program director that would promote MR. LUONG's speedy restoration to mental competence, or have him placed on outpatient status, as specified in Penal Code § 1600.

55. On or about July 23, 2016, Leonicia A. Castro, MFT, was asked by Deputy Stavert to check on MR. LUONG because MR. LUONG rarely comes out of his cell for pod time, does not speak, stands at the door or at a single point for a long time, and makes no eye contact. When Ms. Castro went to speak with MR. LUONG, he simply turned around as though he were being handcuffed, and Deputy Stavert had to turn him around to speak with Ms. Castro. MR. LUONG had no affect whatsoever, had impoverished speech, made no eye contact, and stood still without any motor activity. Ms. Castro alerted DEFENDANT BONNIE COOK, MFT about MR. LUONG's grave mental status, and DEFENDANT COOK chose not to send MR. LUONG for emergency psychiatric care under California Welfare & Institutions Code § 5150. Instead, she instructed Ms. Castro to have COUNTY deputies move MR. LUONG to a new cell for ***deputies*** to more closely monitor him, and scheduled an appointment with DEFENDANT COOK for four days later, July 27, 2016.On or about July 25, 2016, Anthony Coppola, MD, saw MR. LUONG for Defendant DR. KAUR. MR. LUONG was unresponsive, staring upward, resting on the top bunk bed. Dr. Coppola noted that "Per deputy he can do ok with an Asian cellie, also at times will yell."

MR. LUONG would not speak to Dr. Coppola. Dr. Coppola noted that MR. LUONG was “not on meds. Would likely benefit from atypical and benzo. Will alert therapist.”

56. On or about July 27, 2016, Defendant BONNIE COOK, MFT saw MR. LUONG and noted that both Leonicia Castro, MFT, and Dr. Coppola had seen MR. LUONG on July 23 and 25 respectively, and he appeared catatonic to them, made no eye contact, and would not speak or follow directions, and both of those clinicians had suggested he be considered for grave disability. DEFENDANT COOK was already put on notice of MR. LUONG’S grave disability at least by Ms. Castro on July 23, 2016, and appears to have been the one who decided not to send him for necessary emergency psychiatric care at that time. Now on July 27, 2016, DEFENDANT COOK saw that MR. LUONG was catatonic, would not respond to DEFENDANT COOK, continued to refuse medication, and his eyes appeared to be darting back and forth. His toilet was completely clogged with trash, and there was a foul odor in his cell. He did not speak or make any facial expressions, and Defendant COOK now admitted MR. LUONG was gravely disabled and had decompensated since she last actually saw him on July 7, 2016. She planned to have him transferred to John George Psychiatric Pavilion (Hospital) for § 5150 emergency psychiatric treatment due to his grave disability.

57. By July 27, 2016, MR. LUONG had been “not on meds” for some time, despite having “psychosis” and “catatonic features.” On or about July 27, 2016, Defendant COUNTY’S Sheriff’s deputies again transported MR. LUONG to John George Psychiatric Hospital under California Welfare & Institutions Code § 5150. MR. LUONG was involuntarily committed pursuant to California Welfare & Institutions Code § 5150.

58. By August 1, 2016, however, MR. LUONG had not improved; he did not recognize his disability, and he refused support and medications. MR. LUONG, not a medical doctor, told John George staff that he was “a doctor in China. I did brain surgery.” When asked if he heard voices, MR. LUONG replied: “By the satellite system. By the internet. Long distance that people are talking to me.” Nevertheless, MR. LUONG was discharged the next day, August 2, 2016, and he was returned to Defendant COUNTY Sheriff’s custody.

59. On or about August 2, 2016, Josalyn Harris, Psy.D. saw MR. LUONG for an intake screening upon his return to the jail from the psychiatric hospital. MR. LUONG was lying on his mattress on the cell floor and singing or talking to himself.

60. On or about August 3, 2016, DEFENDANT MOHINDER KAUR, M.D. saw MR. LUONG after his return to jail from John George Psychiatric Hospital. DR. KAUR noted that MR. LUONG was "known to this writer" and DR. KAUR had done a full evaluation on him on June 27, 2016. MR. LUONG was responding to internal stimuli and singing while facing the wall and sitting on his bed. He reported hearing voices in the room speaking to each other. MR. LUONG was disoriented, saying he was waiting for breakfast and coffee when he had already eaten. His affect was flat, his thought process was very slow and sometimes tangential. DR. KAUR prescribed Risperdal 2 mg in the morning and 3 mg at bedtime, and Benadryl 50 mg at bedtime. DR. KAUR discontinued the intensive observation log on MR. LUONG and decided that he was "fit to move" to the housing unit. DEFENDANT DR. KAUR planned to see MR. LUONG in the housing unit on August 8, 2016.

61. Also on or about August 3, 2016, Joan Cairns, MFT, saw MR. LUONG less than three hours after DR. KAUR, and noted that MR. LUONG was internally preoccupied and had poor concentration, attention span, insight and judgment, and he had "an odd wide grin." Ms. Cairns discontinued the intensive observation log for MR. LUONG at DR. KAUR's instruction.

62. On or about August 9, 2016, Defendant RINATA WAGLE, M.D., saw MR. LUONG, who asked to get off his medications. Despite the fact that MR. LUONG had been found incompetent to stand trial and a court order had been entered for his involuntary medication, DEFENDANT WAGLE allowed MR. LUONG to go off Benadryl. While DR. WAGLE continued to prescribe Risperdal 2 mg in the morning and 3 mg at bedtime, she did absolutely nothing to make sure he actually took the prescribed medication, even though she knew about his psychosis, serious medical needs for psychiatric medication, and long history of refusing to take his prescribed medications. DEFENDANT WAGLE planned to follow-up with MR. LUONG on August 25, 2016.

63. On or about August 11, 2016, Defendant BONNIE COOK, MFT again saw MR. LUONG. He was "somewhat confused," oriented to the month but not the date, and asked

DEFENDANT COOK to give him food and get money out of his bank account. Defendant COOK simply encouraged MR. LUONG to take his medications and scheduled an appointment with him for September 2, 2016. She did nothing to confirm that he was actually taking his prescribed medication.

64. Defendant WAGLE saw MR. LUONG on or about August 25, 2016. He did not come out of his cell for the appointment, and claimed he did not need psychotropic medications. The nurse informed DEFENDANT WAGLE that MR. LUONG had been refusing to take his medications off and on. He was also delusional, telling DR. WAGLE that he was going to be released from jail that day. By this time, MR. LUONG had for some time been "non-compliant with his medications." Despite this fact, and the fact that there was a court order requiring involuntary medication of MR. LUONG due to his serious mental illness, psychosis, and grave disability, DEFENDANT WAGLE again did nothing to make sure MR. LUONG actually take his prescribed medication. She scheduled a follow-up appointment for MR. LUONG with her for September 14, 2016.

65. On or about September 2, 2016, Defendant BONNIE COOK, MFT saw MR. LUONG, who had a black eye, the result of his cell mate hitting him. MR. LUONG again wanted to stop taking his medications and said it made him hungry. DEFENDANT COOK encouraged MR. LUONG to take his medications and to discuss his concerns with the M.D., and scheduled a follow-up visit with herself for four weeks later, September 30, 2016.

66. On or about September 14, 2016, DEFENDANT WAGLE saw MR. LUONG and claimed he was responding well to his medications, although she did nothing to confirm that he was actually taking medication, despite the Court Order requiring his involuntary medication and finding that MR. LUONG was incompetent. DEFENDANT WAGLE simply scheduled a follow-up appointment for a month later, October 13, 2016.

67. On or about October 4, 2016, DEFENDANT WAGLE received a message that Plaintiff AI QIONG ZHONG, MR. LUONG'S wife, was concerned that he had a rash. DEFENDANT WAGLE examined MR. LUONG and noted that he had macular-papular pruritic rash with excoriations on his shoulders, abdomen, back, and thighs. DEFENDANT WAGLE spoke with the nurse, who scheduled a medical appointment to rule out scabies.

68. At no time before MR. LUONG's death did Defendants COUNTY, SHERIFF AHERN, WAGLE, KAUR, COOK, or DOE DEFENDANTS ever comply with the Order to transport him for inpatient psychiatric hospitalization and restoration of competency, to provide him involuntary medications, or to transfer him to another suitable psychiatric hospital for inpatient treatment, with deliberate indifference to his serious medical needs.

69. On information and belief, all Defendants knew and/or had reason to know that MR. LUONG, given his mental illness[es], was at risk of being assaulted by other pretrial detainees or inmates. Jail and medical personnel, including Defendants MCBRIDE, LUEBKER, MARTINEZ, and ENZMANN failed to properly and appropriately assess and classify MR. LUONG and his serious medical needs. Additionally, on information and belief, Defendants, including Defendants MCBRIDE LUEBKER, BRYNING, CHRISTIANSEN, MARTINEZ, and ENZMANN failed to provide safe and adequate housing for MR. LUONG, including placing him on constant observation in a safe room, without a cellmate.

70. On information and belief, MR. LUONG had been assaulted by his cellmates in or around February 2016, April 2016, and then on July 15, 2016, when his cellmate punched MR. LUONG in the face repeatedly. He was seen by a nurse at COUNTY'S Santa Rita Jail for this beating and the nurse noted right eyelid swelling and bruising. He was given an icepack and analgesics. Then, on or about August 21, 2016, MR. LUONG was involved in another "altercation" and was hit in the right side of his head by another cellmate. He was again seen by a nurse at COUNTY'S Santa Rita Jail for this beating, and the nurse noted that MR. LUONG had right eyelid discoloration and bruising and scabbed lesions on his right upper eyelid from a previous beating. MR. LUONG was given a new cellmate.

71. The manner in which Defendants jailed MR. LUONG constituted dangerous conditions. Defendant COUNTY'S deputies and officials, including Defendants MCBRIDE, LUEBKER, BRYNING, CHRISTIANSEN, MARTINEZ, and ENZMANN had a duty to protect MR. LUONG from violence at the hands of other inmates. Given MR. LUONG'S having been attacked by his cellmates on at least ***four*** separate occasions prior to his death (which was caused by a ***fifth*** beating by a cellmate), Defendants ***knew*** that MR. LUONG faced a substantial risk of serious

harm, and yet they recklessly disregarded that risk by failing to take reasonable measures to abate it, instead intentionally placing him in a cell with other inmates who assaulted him.

72. By September 6, 2016—in violation of the Court's July 22nd commitment and transportation order—Defendant COUNTY had failed to deliver MR. LUONG to a hospital, or to the custody of Defendant STATE OF CALIFORNIA-DEPARTMENT OF STATE HOSPITALS. Alternatively, or concurrently, Defendant STATE OF CALIFORNIA-DEPARTMENT OF STATE HOSPITALS had refused to accept MR. LUONG as a patient despite, on information and belief, meeting all prerequisites for timely admission. Because of these failures, MR. LUONG'S public defender moved the California Superior Court for the County of Alameda to hold Defendant STATE OF CALIFORNIA-DEPARTMENT OF STATE HOSPITALS in contempt for failing to comply with the Court's July 22nd commitment and transportation order. Plaintiffs are informed and believe, and thereon allege that Defendant BLACK, as the "Clinical Administrator" at NSH, was responsible for determining whether DAT LUONG would be "appropriate for hospitalization" at NSH. On information and belief, DSH and NSH policy at the time provided that the Clinical Administrator is responsible for making the initial determination that the patient referred is appropriate for hospitalization and meets the low to medium security risk requirement and that a bed at the appropriate level of care is available for the patient, and that that may be done in consultation with the Executive Director Defendant DOLLY MATTEUCCI or Medical Director Defendant DR. PATRICIA TYLER. On information and belief, Defendant BLACK prevented Mr. LUONG's hospitalization.

73. The next day, September 7, 2016, Judge Dan Grimmer, of the California Superior Court for the County of Alameda, issued an "Order to Transport Defendant or to Show Cause Re: Contempt" to "PAM AHLIN, DIRECTOR, CALIFORNIA DEPARTMENT OF STATE HOSPITALS." That "Show Cause" Order stated, "(1) A valid court order having been issued on **July 22, 2016**, directing that," pursuant to California Penal Code § 1320(a)(1)(B)(i), MR. LUONG "be committed to the Department of Mental Health at the State Hospital in Napa, California, for treatment that will 'promote [Mr. LUONG's] speedy restoration to mental competence;'" and "(2) In accordance with *In re Mille* (2010) 182 Cal.App.4th 635, 649-50, which requires that mentally incompetent defendants be delivered to the state hospital soon after the

commitment order so that the hospital has sufficient time to examine and treat the defendant, and document the defendant's progress within 90 days of the commitment order;" and "(3) Your departments having failed to comply with this order to deliver the defendant to the state hospital in a timely matter, YOU ARE HEREBY ORDERED to comply with the heretofore mentioned order **forthwith** or to appear before the above-titled court on **September 12, 2016 at 9:00 a.m.** to show cause why you should not be held in contempt." (emphasis in original) (See Exhibit B).

74. In violation of the Court's July 22nd and September 7th orders, Defendants ALAMEDA COUNTY, SHERIFF GREG AHERN, JAIL COMMANDER MADIGAN, DR. RINATA WAGLE, M.D., DEFENDANT KAUR, M.D., NAPA STATE HOSPITAL, CALIFORNIA DEPARTMENT OF STATE HOSPITALS, PAM AHLIN, DOLLY MATTEUCCI, PATRICIA TYLER, M.D., CINDY BLACK and DOES 10-20, allowed MR. LUONG, a person found incompetent to stand trial, to languish in jail—for **eighty-one days** after the Court found him incompetent to stand trial—without the restorative treatment to which he was constitutionally required, and in deliberate indifference to his mental incapacity and serious medical needs, including mental illness(es). With deliberate indifference to MR. LUONG'S serious medical needs and his court-adjudged incompetency, Defendants ALAMEDA COUNTY, SHERIFF GREG AHERN, JAIL COMMANDER MADIGAN, DR. RINATA WAGLE, M.D., DEFENDANT KAUR, M.D., NAPA STATE HOSPITAL, CALIFORNIA DEPARTMENT OF STATE HOSPITALS, PAM AHLIN, DOLLY MATTEUCCI, PATRICIA TYLER, M.D., CINDY BLACK, and DOES 10-20, on information and belief, failed and refused to admit, and actively denied admission of, MR. LUONG to Defendant NAPA STATE HOSPITAL for restorative treatment, in violation of the Court's orders and their Constitutional Duties. Alternatively, or concurrently, Defendant ALAMEDA COUNTY, SHERIFF GREG AHERN, and JAIL COMMANDER MADIGAN failed to transport MR. LUONG to the custody of the STATE OF CALIFORNIA-DEPARTMENT OF STATE HOSPITALS, including to NAPA STATE HOSPITAL or to another appropriate hospital to provide him with the timely restorative treatment required by Court order, California law, and the U.S. Constitution.

75. Both the Due Process Clause of the Fourteenth Amendment and California statutory law mandate that a criminal defendant who, because of a mental disorder or developmental

disability, lacks the ability to assist counsel and to understand the nature of the criminal court proceedings cannot be tried or sentenced for a crime. *Indiana v. Edwards*, 554 U.S. 164, 169-170 (2008); Cal. Pen. Code § 1367(a). If, after a trial or by stipulation, a defendant is found mentally incompetent or developmentally disabled, the trial court must suspend criminal proceedings and either order that the defendant be admitted to a treatment facility to "promote the defendant's speedy attainment of mental competence," or place the defendant on outpatient status. Cal. Pen. Code §§ 1370(a)(1)(B), 1370.1(a)(1)(B).

76. Criminal defendants who have been found incompetent to stand trial ("IST") have a Constitutional right to treatment to restore them to competency so that they may proceed to trial or otherwise have their charges adjudicated. Under the Due Process Clause of the Fourteenth Amendment, "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972); *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1120(9th Cir. 2003) ("Incapacitated criminal defendants have a high risk of suicide, and the longer they are deprived of treatment, the greater the likelihood they will decompensate and suffer unduly.").

77. It is widely known by government officials at both the local and state levels, and on information and belief all named Defendants herein knew, that IST "defendants usually get worse the longer they wait for admission to a Mental Health hospital." Sen. Rules Com., Off. Of Sen. Floor Analyses, analysis of Sen. Bill No. 568 (2007-2008 Reg. Sess.). In a 2013 County of Napa position paper on legislation relating to NSH, Napa County explained that one of the most severe consequences of housing incompetent defendants in county jails is the "decompensation they exhibit when moved to the jail and the deterioration in their condition when they are kept in a segregated, non-clinical environment."

78. It is widely recognized that providing an IST pretrial detainee with antipsychotic medication alone is not the equivalent of treatment in a state hospital, where each patient has a treatment team of a psychiatrist, psychologist, nurse, social worker, and psychiatric technician, and receives both pharmacological and nonpharmacological treatment.

79. Based upon interrogatories sent to the COUNTY OF ALAMEDA Defendants, the two people involved in the decision to house DAT LUONG with Aref Popal were Defendants MCBRIDE and LUEBKER. Defendant MCBRIDE classified LUONG and Popal and assigned them to Housing Unit 9. Defendant LUEBKER assigned MR. LUONG to his pod and cell on August 3, 2016 and assigned Popal to MR. LUONG'S cell on October 7, 2018. On information and belief, at the time they assigned Mr. LUONG and Mr. Popal to Housing Unit 9 and to the same cell together, both Defendants MCBRIDE and LUEBKER knew or should have known that (1) both men were gravely mentally ill; (2) Mr. LUONG had been determined IST by the Court, and had not yet been admitted to NSH as the Court had ordered; (3) that Mr. LUONG had serious medical needs that were not being met in jail; (4) that, due to his uncontrolled mental illness, Mr. LUONG had a long a detailed history at the jail of being assaulted and beaten by his cell mates and others, and was at grave risk for further assaults and injuries; (5) that at a minimum, Mr. LUONG needed to be housed by himself, without a cell mate, and with close observation and adequate medical/psychiatric care; (6) that, on information and belief, Mr. Popal had a history of assaultive behavior at the jail and elsewhere, was also known to be mentally ill and mentally unstable, was much larger and more aggressive than Mr. LUONG, and posed a serious risk of harm to Mr. LUONG if housed together. Plaintiffs are informed and believe, and thereon allege that further classification records are being withheld.

80. At the time he died, on October 11, 2016, Mr. LUONG shared a 6' x 10' cell in a maximum-security cell block in House Unit 9 at the Santa Rita Jail in pod B, cell 14, for maximum security mental health inmates with Aref Popal. On information and belief, Defendants, including MCBRIDE and LUEBKER, understood—given the past assaults Mr. LUONG had suffered at the hands of other inmates, his small stature, and his uncontrolled mental illness—that placing Mr. LUONG with an aggressive, combative, or mentally disturbed cellmate like Mr. Popal, especially with inadequate monitoring, would be substantially likely to cause Mr. LUONG to suffer serious injury or death. Yet with deliberate indifference to MR. LUONG'S safety, Defendant MCBRIDE assigned MR. LUONG to Housing Unit 9 instead of a unit that allowed MR. LUONG to have his own cell.

81. Then, on October 7, 2016, Defendant LUEBKER assigned Aref Popal (PFN #BLF620) as Mr. LUONG'S cellmate. On information and belief, Mr. Popal had been arrested for battery and making threats and he too suffered from mental illness. On information and belief, all ALAMEDA COUNTY DEFENDANTS, including Defendant LUEBKER, should have known that Mr. Popal was much bigger and stronger than MR. LUONG, and was capable of inflicting serious injuries on MR. LUONG. Pursuant to longstanding custom and procedure at the jail, the jail and its Classification Unit did not provide Defendant LUEBKER any information about DAT LUONG's history of abuse in the jail or about Aref Popal's recent history of violence including repeatedly battering police officers who had arrested him days earlier. Defendant LUEBKER could have investigated and reviewed such information kept in jail files, but pursuant to general jail procedures, he did not. Defendant LUEBKER was aware that DAT LUONG had been housed alone without a cellmate for approximately one month already, but he made no inquiry why that was being done. DEFENDANT LUEBKER knew that mentally ill inmates like MR. LUONG and Mr. Popal are at greater risk of harm and of unpredictable or violent behavior than other inmates. Ignoring the risk of serious harm to MR. LUONG from other inmates for at least the fifth time, Defendant LUEBKER and other DOE Defendants intentionally placed MR. LUONG and Mr. Popal—two seriously mentally ill men—into the same 6' x 10' cell with no cameras, knowing that Mr. Popal suffered from mental illness and had recently been segregated from other inmates due to his agitated and aggressive behavior, and that MR. LUONG was vulnerable to attacks by other inmates. Further, all ALAMEDA COUNTY DEFENDANTS, including MCBRIDE and LUEBKER, knew or must have known that jail staff were not adequately or lawfully monitoring Mr. LUONG and Mr. Popal in the manner and frequency required by law.

82. Throughout the night of October 11, 2016, inmates reported hearing banging and shouting from MR. LUONG and Mr. Popal's cell. According to ACSO reports and witness statements, Mr. LUONG and Mr. Popal could be heard fighting in the early morning hours leading up to Mr. LUONG's death. One inmate who was housed in the pod B, cell 13 immediately to the left of Mr. LUONG's cell described hearing "a lot of thumping and banging" coming from Mr. LUONG's cell beginning around 1:30 a.m. on October 11, 2016. He informed jail personnel that he heard this three times over the next few hours. The third time, he heard Mr. LUONG say "hey man

stop." When asked why he did not push the emergency call button, he stated that he had heard commotion in the cell multiple times since Mr. Popal moved into MR. LUONG's cell, about four days earlier. Another inmate also described banging noises coming from Mr. LUONG's cell sometime after 3:45 a.m. on October 11, 2016.

83. Defendants BRYNING and CHRISTIANSEN were on duty between the hours of 5:00 a.m. and 5:00 p.m. on October 11, 2016. It was their job to care for inmates in Housing Unit 9 during that time. Defendants BRYNING and CHRISTIANSEN were also mandated to check MR. LUONG'S cell every half hour at irregular intervals, yet failed to do so. After Mr. LUONG's death, Defendant BRYNING informed investigators that, while he was supposed to check on the unit where Mr. LUONG was housed four different times, each of those four times, he failed to perform the required walk through. At 6:55 a.m., he signed the general observation log (GOL) "and intended to start [his] walk through of the housing unit" but got distracted by a nurse. Then at 7:22 a.m., he again signed the GOL "with the intention of starting [his] walk through but was diverted" by an inmate who was misbehaving. At 7:50 a.m., he again signed the GOL with the intention of doing a walkthrough, but was distracted by another unruly inmate. Finally, at 8:38, he was supposed to do a walkthrough but "became distracted by looking over information about another report." Defendant CHRISTIANSEN claims that at 8:10 a.m., he performed a welfare check "of the inmates through the cell door window." On information and belief, this statement is false, or alternatively, the check was not performed up to the standards required by the policy and by law.

84. On the morning of October 11, 2016, a third inmate who was housed in cell B-4, which is downstairs and to the left of Mr. LUONG's cell, described hearing loud shouting at some point "after breakfast." (Breakfast had been served at approximately 3:45 a.m.). He heard two different people inside the pod where Mr. LUONG and Mr. Popal were housed yelling "Shut up, fuck shut up" and "shut up! Go to sleep!" Then, sometime before 8:50 a.m., the same inmate who heard yelling and banging throughout the night, saw Mr. Popal standing over Mr. LUONG with his hands around Mr. LUONG's neck. This inmate then ran downstairs to inform the deputies. He also told the inmate in cell B-4 who heard fighting after breakfast that Mr. Popal beat up MR. LUONG. The inmate from cell B-4 then walked upstairs and looked inside of Mr. LUONG's cell and saw Mr. LUONG face down on the floor. A fourth inmate from cell B-8 stated to investigators that he

looked inside MR. LUONG'S cell between 8:30 a.m. and 8:45 a.m. and saw Mr. Popal on top of Mr. LUONG. He said that Mr. Popal was covering MR. LUONG'S nose and mouth and there was water flooding the cell. A fifth inmate from cell B-9 told investigators that he heard "man down," walked over to MR. LUONG'S cell, and found Mr. Popal sitting on top of MR. LUONG. Defendant BRYNING finally discovered DAT LUONG on the floor of his cell at 8:50 a.m. beaten and strangled. Medical staff were on scene at 8:53 a.m. and his skin was cold to the touch.

85. All deputy defendants including BRYNING, CHRISTIANSEN, and DOES 10-20 would have heard the banging and yelling throughout the early morning of October 11, 2016. Yet with deliberate indifference and reckless disregard for the safety of MR. LUONG, they ignored the brutal beating of MR. LUONG by failing to perform the proper and required checks of cell 14 until he was already dead.

86. At the time of MR. LUONG'S death, each cell in Housing Unit 9 was equipped with an emergency intercom that inmates could use to alert one of the technicians on duty of a problem. Technicians, however, can "lock out" the intercom, turning the sound off so that only a light flashes. Technician Defendant MARTINEZ, whose shift lasted from 6:00 p.m. on October 10, 2016 until 6:00 a.m. on October 11, 2016, had locked out MR. LUONG'S cell intercom shortly before 3:15 a.m. on the morning that he was murdered. Defendant MARTINEZ did this because Mr. Popal had pressed the intercom button and when she picked up, he recited random numbers to her. Defendant MARTINEZ never turned the intercom back on. Defendant MARTINEZ testified that she noticed that light flashing a few times over the next hours, says she listened in on the cell for a few seconds, hearing nothing, but failed to communicate with the inmates in the cell or let a deputy know. Defendant Martinez admitted that the intercom is a critical means for inmate safety, and the only way for an inmate to summon help in between the thirty-minute cell checks.

87. When technician Defendant ENZMANN took over for his shift at 6:00 a.m. the morning of MR. LUONG'S death, he knew the intercom was off, but assumed that Defendant MARTINEZ had turned it off for a good reason, never asked her about it, and never turned it on. Defendant ENZMANN did see the light flashing several times from MR. LUONG'S cell during the morning. He listened into the cell, but did not hear anything out of the ordinary and chose to not communicate with the occupants of that cell or ask a deputy to check on the cell. (Mr. Popal later

stated in his Mirandized interview that while he and MR. LUONG were "fighting," MR. LUONG tried to use the cell intercom several times.)

88. By disabling the intercom system and only listening into the cell briefly for a few seconds over several crucial hours prior to MR. LUONG'S death, Defendants MARTINEZ and ENZMANN prevented MR. LUONG from alerting the deputies of his impending demise, in deliberate indifference to, and with reckless disregard for, MR. LUONG'S rights and safety.

89. On October 11, 2016, all Defendants' deliberate indifference to DAT THANH LUONG'S serious medical needs and all ALAMEDA COUNTY Defendants' conscious and reckless disregard for the risk of harm to DAT LUONG from other inmates, as well as all Defendants' other wrongful conduct described herein, including their failure to comply with the Court's commitment order of July 22, 2016, were a proximate cause of DAT THANH LUONG'S murder by Mr. Popal. According to Defendant ALAMEDA COUNTY'S Sheriff-Coroner, Mr. LUONG'S cause of death was "asphyxiation due to strangulation."

90. DAT LUONG and Aref Popal were left in their cell unmonitored for an extended period of time during which the altercation that resulted in Mr. LUONG's death occurred. Defendant COUNTY deputies, including BRYNING and CHRISTIANSEN, failed to respond, ignoring the shouting and banging that came from MR. LUONG's cell over several hours and Defendants MARTINEZ and ENZMANN "locked out" the intercom system in MR. LUONG'S cell that would have alerted them that he was in danger

91. The brutal beating suffered by MR. LUONG was perpetrated by an inmate in the jail while he was in the custody of the COUNTY, and the beating occurred because of the deliberate indifference, gross negligence, or reckless disregard of the defendants to the safety and security of MR. LUONG.

92. The COUNTY deputies and staff including MCBRIDE, LUEBKER, BRYNING, CHRISTIANSEN, MARTINEZ, ENZMANN and DOES 10-20 recklessly and with deliberate indifference, failed to appropriately classify and monitor inmates with severe mental health needs, failed to maintain audio or visual surveillance of maximum security mental health inmates, failed to immediately and appropriately respond to an altercation which erupted into a brutal attack, and allowed the altercation and attack to continue for an extended period of time, causing MR. LUONG

to suffer not only contusions and abrasions to his face and head, but also strangulation resulting in his death.

93. All Defendants' deliberate indifference for MR. LUONG's serious medical needs, their denial of necessary and appropriate medical and psychiatric care, their failure to provide competent mental health care and treatment, their failure to transfer MR. LUONG for inpatient psychiatric hospitalization in direct violation of a court order and/or their failure to admit him to NSH or another appropriate hospital, their reckless disregard for his high risk of being subjected to brutal assaults and beatings by other inmates on at least five separate occasions, two of which required medical attention and the last of which resulted in his death, their intentional decision to place him in a cell with a dangerous, aggressive, mentally disturbed inmate without adequate monitoring of the cell, and their failure to take any reasonable available measures to abate the risk to MR. LUONG of being assaulted yet again by a fellow inmate, and Defendants' other tortious, unconstitutional, and/or otherwise wrongful conduct caused MR. LUONG to be beaten and asphyxiated to death in his jail cell.

94. While MR. LUONG was incarcerated as a pretrial detainee from January 26, 2016 to October 11, 2016, the individually named Defendants and DOES 10-20, including SHERIFF GREG AHERN, JAIL COMMANDER MADIGAN, deputies/Correctional Officers ("COs"), jail administrators, mental health personnel, and/or other law enforcement officers and/or other COUNTY employees knew and/or had reason to know that MR. LUONG was a mentally ill and emotionally disturbed person, with immediate and serious medical needs. The individually named and DOE Defendants further knew and/or had reason to know that MR. LUONG was at substantial risk and highly vulnerable to attacks by fellow inmates and, as such, knew MR. LUONG was at a substantial risk of serious bodily injury or death. Despite knowing this, Defendants recklessly disregarded the risk of serious bodily injury and death to MR. LUONG, and were deliberately indifferent to his immediate and serious medical needs, including mental illness, and emotional disturbance.

95. With reckless and callous disregard for his safety, the individually named COUNTY Defendants, Defendant KAUR, WAGLE, COOK, MCBRIDE, LUEBKER, other Jail and mental health personnel, and DOES 7-10 failed or tolerated that failure to properly and appropriately assess

and classify MR. LUONG and with deliberate indifference failed to ensure that jail staff and administrators properly assessed and classified his serious medical needs.

96. Additionally, the COUNTY Defendants, including MCBRIDE, LUEBKER, BRYNING, CHRISTIANSEN, MARTINEZ, ENZMANN and DOES 10-20, failed to provide safe and adequate housing for MR. LUONG, with reckless disregard for his rights and safety, by intentionally housing him in an environment that was unsafe for a mentally ill person of small stature, who was vulnerable to beatings, and then failing to take reasonable available measures to observe and check on MR. LUONG's welfare as required by law and regulations. All ALAMEDA COUNTY DEFENDANTS, including SHERIFF GREG AHERN, and JAIL COMMANDER MADIGAN failed to have working video surveillance of Mr. LUONG's cell for his safety, protection, and medical needs – all as required by law, regulations, and generally accepted standards. The jail and cells in which the COUNTY Defendants placed MR. LUONG also constituted unreasonably dangerous conditions. All ALAMEDA COUNTY DEFENDANTS, including MCBRIDE, LUEBKER, BRYNING, CHRISTIANSEN, MARTINEZ, ENZMANN, and DOES 10-20, were deliberately indifferent to the enhanced risk and danger to Mr. LOUNG from these dangerous conditions in and around his jail cell.

97. All ALAMDA COUNTY Defendants, including MCBRIDE, LUEBKER, BRYNING, CHRISTIANSEN, MARTINEZ, ENZMANN, and DOES 10-20, failed to properly and adequately monitor and care for MR. LUONG's safety to abate the risk of assault, despite the fact that a reasonable officer in such circumstances would have appreciated the high risk to MR. LUONG given his four prior beatings by other cellmates, his severe, untreated mental illness, his small stature, his age, and his other risk factors.

98. In addition, Defendants PAM AHLIN, DOLLY MATTEUCCI, DR. PATRICIA TYLER, CINDY BLACK and other DOE Defendants, with deliberate indifference to MR. LUONG's serious medical needs, failed and/or refused to comply with the July 22, 2016, Court Order for his transfer and admittance to NAPA STATE HOSPITAL, and then again refused to comply with the September 7, 2016 Order to Transport him, admit him to a qualified hospital, or Show Cause why they should not be held in contempt of court for their refusal to do so. Defendants AHLIN, MATTEUCCI, TYLER, and BLACK refused to allow Mr. LUONG's admission to NSH

or another STATE HOSPITAL without due cause, and set in motion his continued confinement in the ALAMEDA COUNTY Santa Rita Jail for almost 13 weeks after issuance of the Court Order that required his timely admission to NSH, until he was beaten to death in the Jail where their conduct had caused him to remain.

99. On October 17, 2017, Judge Michael Gaffey of the Alameda County Superior Court opined in a hearing to dismiss DAT LUONG's criminal case "the judges of many counties are frustrated in that it seems that the Department of State Hospitals is underserving the people that are in need of their services, that they languish in our county jails and sometimes don't get there for months after the order is made."

100. On information and belief, Defendant NSH, through Executive Director, Defendant DOLLY MATTEUCCI, and Defendant CALIFORNIA DEPARTMENT OF STATE HOSPITALS, through its Executive Director, Defendant PAM AHLIN, Medical Director, DR. PATRICIA TYLER, and possibly other DOE Defendants employed by NSH and/or the State of California, have a well-known history and pattern of failing to allow timely admission of IST pretrial detainees to NSH and other STATE HOSPITALS, in violation of state court commitment orders and with deliberate indifference to the rights and safety of IST pretrial detainees. This history and pattern has been recognized in other civil rights cases against NSH and other State of California psychiatric hospitals, including but not limited to: *Anderson v. Siskiyou County and NSH, et al.*, N.D. Cal. No. C-10-1428-SBA, *Atayde v. NSH, et al.*, E.D. Cal. No. 1:16-cv-00398-DAD, and *M.S. v. County of V entura, et al.*, C.D. Cal. No. C-16-3084-BRO; as well as published court decisions, including but not limited to: *In re Mille*, 182 Cal.App.4th 635 (2010) and *In re Loveton*, 244 Cal.App.4th 1025 (2016).

101. On information and belief, Defendant CALIFORNIA DEPARTMENT OF STATE HOSPITALS, through Executive Director MATTEUCCI, Defendant NSH, through Executive Director AHLIN, Medical Director, Defendant TYLER, Clinical Administrator, Defendant BLACK, and possibly other DOE Defendants employed by NSH and/or the State of California Department of State Hospitals placed IST inmates on admissions waiting lists to State hospitals, if no beds were available, in the order of their commitment date, without any assessment of the patient's psychiatric acuity.

102. When NSH received the conditional release program ("CONREP") referral on August 22, 2016, which contained Dr. David Echeandia's psychological evaluation, the psychiatric examination by Dr. Martin Blinder, and the July 22, 2016 minute order, NSH and Defendants AHLIN, MATTEUCCI, TYLER, and BLACK would have known that MR. LUONG was clearly psychotic, not on medication, and was a danger to himself or others.

103. On information and belief, Defendant NSH admitted IST patients on a one-for-one exchange, meaning one inmate had to be returned to the jail before Defendant NSH would accept another inmate from the waitlist, despite the patient's psychiatric acuity.

104. Defendants CALIFORNIA DEPARTMENT OF STATE HOSPITALS, NSH, MATEUCCI, AHLIN, TYLER, and BLACK failed to inform the Court, prosecutor, or defense counsel of the delay in admitting IST detainees to State hospitals in compliance with Court Orders. On average, Defendant NSH delayed admission to IST inmates 60-90 days, according to the sworn testimony of a nurse who screens admittees, and up to a year according to others. On information and belief, NSH had a practice of not admitting inmates until the committing Court issued an Order to Show Cause why the Department of State Hospitals should not be held in contempt of court for failing to comply with a commitment order.

105. On information and belief, had Defendant COUNTY notified NSH that MR. LUONG needed priority admission based on his psychiatric acuity, MR. LUONG could have been moved to the top of the waiting list and admitted to NSH within hours. Priority admission had to be approved by NSH Medical Director, Defendant TYLER. None of the COUNTY Defendants nor jail staff ever requested a priority admission for MR. LUONG despite their inability to properly treat him in the jail.

106. MR. LUONG was committed to NSH, or *other appropriate facility*. On information and belief, NSH never searched for an open bed at another State Hospital, a Lanterman-Petris-Short Act ("LPS") inpatient psychiatric health facility, or a private psychiatric hospital, in deliberate indifference to MR. LUONG'S serious medical needs.

107. Had MR. LUONG been timely admitted to NSH in accordance with the Commitment Order, an individual treatment plan would have been created for him, he could have been placed under appropriate observation, received involuntary medication, and had a team of

physicians, psychiatrist, psychologist, and social workers caring for his medical needs, as well as non-pharmacological treatment, such as group activities. However, he was denied access to these treatment opportunities in deliberate indifference to his severe medical needs. Further, the COUNTY, the STATE OF CALIFORNIA DEPARTMENT OF STATE HOSPITALS, and NAPA STATE HOSPITAL, failed to accommodate MR. LUONG's mental illness and disability and Defendants' wrongful conduct herein was done at least in part because of MR. LUONG's disability and/or psychiatric condition.

108. All Defendants' actions and omissions and the manner and duration in which MR. LUONG was incarcerated was contrary to law and generally accepted practices and jail procedures, causing the wrongful death of MR. LUONG.

109. At all material times and, alternatively, the actions and omissions of each Defendant were intentional, and/or wanton and/or willful, and/or conscious shocking, and/or reckless, and/or callous, and/or malicious, and/or deliberately indifferent to Plaintiffs' and Decedent's rights, and/or grossly negligent, and/or negligent.

110. As a direct and proximate result of each Defendants' acts and/or omissions as set forth above, all Plaintiffs sustained the following injuries and damages, past and future, including, but not limited to:

a. Wrongful death of DAT LUONG;

b. Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support;

c. Emotional distress from the violations of their personal Constitutional rights, including grief, sorrow, anxiety, sleeplessness, humiliation, and indignity;

d. Loss of enjoyment of life;

e. All other legally cognizable special and general damages;

f. Violations of state and federal constitutional rights; and,

g. All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, California Civil Code §§ 52 and 52.1, and as otherwise allowed under California and United States statutes, codes, and common law.

111. As a direct and proximate result of each Defendants' acts and/or omissions as set forth above, Plaintiffs W.L. and AI QIONG ZHONG, as co-Successors in Interest of Decedent DAT LUONG, sustained the following injuries and damages, past and future, including, but not limited to:

a. Hospital and medical expenses incurred by DAT LUONG;

b. Coroner's fees, funeral, and burial expenses;

c. DAT LUONG'S loss of life, pursuant to federal civil rights law;

d. DAT LUONG'S conscious pain and suffering, pursuant to federal civil rights law; and,

e. All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, California Civil Code § 52, and as otherwise allowed under California and United States statutes, codes, and common law.

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983)**
**PLAINTIFF AGAINST DEFENDANTS PAM AHLIN, DOLLY MATTEUCCI, CINDY BLACK, DR. PATRICIA TYLER, SHERIFF AHERN, JAIL COMMANDER MADIGAN, DR. RINATA WAGLE, ESTATE OF DR. MOHINDER KAUR, JACKSON & COKER LOCUMTENENS LLC, BONNIE COOK, MFT, DEPUTY BRANDEN MCBRIDE, SHERIFF TECHNICIANROBERT LUEBKER, SHERIFF TECHNICIAN BRITANNI MARTINEZ, SHERIFF TECHNICIAN KARL ENZMANN, DEPUTY SCOTT BRYNING, DEPUTY SEAN CHRISTIANSEN, AND DOES 10-20**

112. Plaintiffs re-allege and incorporate by reference each and every allegation contained in this complaint, as though fully set forth here.

113. By the actions and omissions described above, Defendants PAM AHLIN, DOLLY MATTEUCCI, CINDY BLACK, DR. PATRICIA TYLER, SHERIFF AHERN, JAIL COMMANDER MADIGAN, DR. RINATA WAGLE, DR. MOHINDER KAUR, JACKSON & COKER LOCUMTENENS LLC, BONNIE COOK, MFT, DEPUTY BRANDEN MCBRIDE, SHERIFF TECHNICIAN ROBERT LUEBKER, SHERIFF TECHNICIAN BRITANNI MARTINEZ, SHERIFF TECHNICIAN KARL ENZMANN, DEPUTY SCOTT BRYNING, DEPUTY SEAN CHRISTIANSEN and DOES 10-20, acting under the color of state law in their individual capacities, deprived DAT LUONG of the right to be free from an unreasonable ongoing seizure as a pretrial detainee in the Alameda County Jail, as secured by the Fourth and Fourteenth

Amendments, and deprived MR. LUONG as a pretrial detainee of the rights, privileges, and immunities secured by the Fourteenth Amendment by subjecting him, or through their deliberate indifference, allowing others to subject him, to delay and denial of access to medical or mental health care for a serious, but treatable, medical or mental health condition, and by subjecting him, or through their reckless disregard, allowing others to subject him, to serious bodily injury and death.

114. The listed Defendants knew or must have known that LUONG's medical condition and medical, including psychiatric, needs were serious, but treatable, and knew or must have known that, pursuant to the Court Order, he required access and delivery to urgently needed medical/mental health care; Defendants further had a duty to provide LUONG reasonable security and safe, appropriate housing and monitoring to accommodate his mental health condition and his vulnerability to abuse and assaults by other inmates.

115. The listed Defendants knew or must have known that a Court of competent jurisdiction had ordered that LUONG be delivered to – and admitted to – NSH for treatment and care for his serious, but treatable, medical and mental health conditions, which all Defendants knew or must have known that, if not treated, would worsen and cause LUONG harm or death.

116. The listed Defendants further knew or must have known that MR. LUONG was vulnerable to injury, suffering, and attacks by other inmates, and that if reasonable measures were not taken to abate that risk, MR. LUONG would suffer serious bodily injury (as had happened at least four times prior to the incident resulting in his death) or death.

117. The listed Defendants ignored, delayed, or denied to MR. LUONG urgently needed medical and psychiatric care and treatment. Defendants SHERIFF AHERN, JAIL COMMANDER MADIGAN, DR. RINATA WAGLE, DR. MOHINDER KAUR, JACKSON & COKER LOCUMTENENS LLC, BONNIE COOK, MFT, DEPUTY BRANDEN MCBRIDE, SHERIFF TECHNICIAN ROBERT LUEBKER, SHERIFF TECHNICIAN BRITANNI MARTINEZ, SHERIFF TECHNICIAN KARL ENZMANN, DEPUTY SCOTT BRYNING, DEPUTY SEAN CHRISTIANSEN, and DOES 10-20, further knew of and disregarded the risk to MR. LUONG of placing him with violent inmates, in dangerous cells, without protection, and without proper and lawful monitoring for his safety. As a result of the Defendants' deliberate indifference to both MR. LUONG's need for medical care and treatment and his mental condition, and as a result of

Defendants' reckless disregard for MR. LUONG's physical safety and well-being, Plaintiffs suffered damages and deprivation of constitutional rights, as described herein.

118. By the actions and omissions described above, the individually named Defendants violated 42 U.S.C. § 1983, depriving Plaintiffs and Decedent of the following well-settled constitutional rights that are protected by the First, Fourth, and Fourteenth Amendments to the U.S. Constitution:

a. The right to be free from an unreasonable ongoing seizure as a pretrial detainee declared by a court to be Incompetent to Stand Trial ("IST"), as secured by the Fourth and Fourteenth Amendments;

b. The right to be free from deliberate indifference to LUONG's serious medical needs while in custody and confined in jail as a pretrial detainee/IST inmate, as secured by the Fourth and Fourteenth Amendments;

c. The right to be free from reckless disregard for the substantial risk of serious harm to LUONG's personal, physical safety while in custody and confined in jail as a pretrial detainee/IST inmate, as secured by the Fourth and Fourteenth Amendments;

d. The rights and liberty interests, as an IST inmate, to freedom from incarceration and to timely, restorative treatment, as secured by the Fourteenth Amendment;

e. The right to be free from wrongful government interference with familial relationships and Plaintiff's right to companionship, society, and support, as secured by the First and Fourteenth Amendments.

119. The listed Defendants' failure to intervene, prevent, or stop the constitutional violations by others, of which each listed Defendant knew or must have known, and when each listed Defendant was in a position to so intervene when such violations were occurring, also renders such Defendant(s) liable for these violations.

120. All Defendants subjected Plaintiffs to their wrongful conduct, depriving Plaintiffs and Decedent of the rights described herein, knowingly, maliciously, and with deliberate indifference and conscious and reckless disregard for whether the rights and safety of Plaintiffs (Individually and on behalf of DAT LUONG) and others would be violated by their acts and/or omissions.

121. As a proximate result of the foregoing wrongful acts and/or omissions, Plaintiffs sustained injuries and damages, as set forth above, in ¶¶ 110-111. Plaintiffs are therefore entitled to general and compensatory damages in an amount to be proven at trial.

122. In committing the acts alleged above, the individually named Defendants and DOE Defendants acted maliciously, oppressively, and/or with reckless disregard for the rights, safety, and well-being of Plaintiffs and Decedent, and by reason thereof, Plaintiffs are entitled to punitive damages and penalties allowable under 42 U.S.C. § 1983, California Code of Civil Procedure §§ 377.20 et seq, and other state and federal law against these individual Defendants; no punitive damages are sought directly against the municipal Defendants.

123. Plaintiffs are also entitled to reasonable costs and attorney's fees under 42 U.S.C. § 1988 and other applicable California codes and laws.

**SECOND CAUSE OF ACTION**
**(42 U.S.C. § 1983 – *Monell* and Supervisory Liability)**
**AGAINST DEFENDANTS COUNTY OF ALAMEDA, SHERIFF AHERN, JAIL COMMANDER MADIGAN, STATE HOSPITALS EXECUTIVE DIRECTOR PAM AHLIN, NSH EXECUTIVE DIRECTOR DOLLY MATTEUCCI, NSH MEDICAL DIRECTOR DR. PATRICIA TYLER and DOES 10-20**

124. Plaintiffs re-allege and incorporate by reference each and every allegation contained in this complaint, as though fully set forth herein.

125. As supervisors, Defendants SHERIFF AHERN, JAIL COMMANDER MADIGAN, STATE HOSPITALS EXECUTIVE DIRECTOR PAM AHLIN, NSH EXECUTIVE DIRECTOR DOLLY MATTEUCCI, NSH MEDICAL DIRECTOR DR. PATRICIA TYLER, and DOES 10-20, despite the fact that the each knew or must have known that Mr. LUONG's serious medical needs were not being lawfully addressed, and that Defendants SHERIFF AHERN and JAIL COMMANDER MADIGAN further knew or must have known that Mr. LUONG was at grave risk of harm from other inmates for the reasons described herein, each failed to properly supervise and train other Defendants, hospital staff, and jail staff who were responsible to properly address Mr. LUONG's medical needs and safety, and each permitted and failed to prevent the unconstitutional acts of other Defendants and individuals under their supervision and control, with deliberate

indifference to the rights and serious medical needs of MR. LUONG. Each of these supervising Defendants either directed his or her subordinates in conduct that violated Decedent's rights, OR set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known would deprive Decedent of rights, OR knew his or her subordinates were engaging in acts likely to deprive Decedent of rights and failed to act to prevent his or her subordinate from engaging in such conduct, OR disregarded the consequence of a known or obvious training deficiency that he or she must have known would cause subordinates to violate Decedent's rights, and in fact did cause the violation of Decedent's rights. (See, Ninth Circuit Model Civil Jury Instruction 9.4). Furthermore, each of these supervising Defendants is liable in their failures to intervene in their subordinates' apparent violations of Decedents' rights.

126. Plaintiffs allege, upon information and belief, the unconstitutional actions and/or omissions of the individually named COUNTY OF ALAMEDA Defendants were pursuant to the following customs, policies, practices and/or procedures of the COUNTY OF ALAMEDA, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policy making officials for the COUNTY and its Sheriff's Department including, but not limited to, Defendants AHERN, MADIGAN, and DOES 10-20:

a. To deny inmates at the COUNTY'S jail access to appropriate, competent, and necessary care for serious medical and psychiatric needs, including, as described herein, their failure to provide appropriate and competent medical care, and their failure to transfer MR. LUONG for inpatient psychiatric hospitalization;

b. To fail to properly classify, house, and/or monitor inmates suffering from mental health disabilities, including placement in separate cells with lawful in-person monitoring, with adequate video and audio monitoring, and with legally required cell alarms, including failing to consider in any way the clear and obvious danger of placing inmates in cells with dangerous and violent inmates and without the frequent, logged observation required by law;

c. To fail to institute proper procedures and training to coordinate inmate assessment, placement, protect inmates from assault, transfer to NSH or other psychiatric facilities, and care with the jail physician, jail psychiatrist, court, and jail corrections staff where there was an obvious need for such to prevent transfer debacles of the type that happened here;

d. To fail to institute, require, and enforce proper and adequate training, supervision,

policies, and procedures concerning the appropriate classification of inmates, handling, housing, and caring for mentally ill and/or emotionally disturbed inmates at the COUNTY Jail, including alternatives to placing such ill and disturbed inmates with other ill and disturbed inmates without adequate monitoring and protection resulting in serious bodily injury and death;

e. To fail to provide timely restorative treatment to IST criminal defendants;

f. To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (e) above, when the need for such was obvious, with deliberate indifference to the rights and safety of Plaintiffs, Decedent, and the public, and in the face of an obvious need for such policies, procedures, and training programs.

127. In the alternative, upon information and belief, Defendant COUNTY OF ALAMEDA may have instituted policies or training addressing some or all the topics listed above, but with deliberate indifference to citizens' rights, failed to properly oversee, enforce, and/or properly carry out such policies and/or training.

128. The above-described customs, policies, practices, and/or procedures of the COUNTY were a moving force and/or a proximate cause of the deprivations of Plaintiffs' and Decedent's constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above in Count 1.

129. Defendant COUNTY is also liable for the violations of Plaintiffs' and Decedent's rights by their final policy makers, including SHERIFF AHERN and JAIL COMMANDER MADIGAN, as described above. (See, Ninth Circuit Model Civil Jury Instruction 9.6).

130. The unconstitutional actions and/or omissions of the individually named Defendants, DOES 10-20, other Sheriff's Department and COUNTY personnel, were approved, tolerated, and/or ratified by policy making officers for the COUNTY OF ALAMEDA, including, but not limited to, former Sheriff AHERN and Commander MADIGAN. Plaintiffs are informed and believe, and thereupon allege, the details of this incident have been revealed to the authorized policy makers within the COUNTY OF ALAMEDA and the Alameda County Sheriff's Department, and that such policymakers have direct knowledge of the fact that DAT LUONG was unlawfully denied protection from violent assaults, necessary care for his serious medical needs, and timely restorative treatment due to their and their subordinates' misconduct and violations of Decedents' rights.

Notwithstanding this knowledge, the authorized policymakers within the COUNTY and its Sheriff's Department have approved of the individually named Defendants' and DOES 10-20's conduct and decisions in this matter to the extent such individuals were under their supervision and oversight, and have made a deliberate, conscious and affirmative choice to endorse and ratify such conduct and decisions, and the basis for them, which resulted in the death of DAT LUONG. By so doing, the authorized policymakers within the COUNTY and its Sheriff's Department have shown affirmative agreement with the conduct of individual Defendants and other employees/agents under their supervision, and have ratified the unconstitutional acts of these individual Defendants, employees, and agents.

131. The aforementioned choices, customs, policies, practices, and procedures; the failure to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and, the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants COUNTY OF ALAMEDA, AHERN, MADIGAN, AHLIN, MATTEUCCI, TYLER, and DOES 10-20 were a moving force and/or a proximate cause of the deprivations of Plaintiffs' and Decedent's clearly established and well-settled constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above in ¶ 118.

132. As a direct and proximate result of the foregoing unconstitutional actions, omissions, customs, polices, practices, and/or procedures of Defendant COUNTY OF ALAMEDA, AHERN, AHLIN, MATTEUCCI, TYLER, and DOES 10-20, or the lack of adequacy thereof, Plaintiffs sustained serious and permanent injuries and damages and are entitled to damages, penalties, costs, and attorneys' fees, as set forth above, in ¶¶ 120-123 and punitive damages against Defendants AHERN, MADIGAN, AHLIN, MATTEUCCI, TYLER, and DOES 10-20, in their individual capacities.

**THIRD CAUSE OF ACTION**
**(VIOLATION OF ADA (Title II and III) and REHABILITATION ACT)**
**(42 U.S.C. § 12132 &29 U.S.C. § 794)**
**PLAINTIFFS AGAINST DEFENDANTS COUNTY OF ALAMEDA,**
**CALIFORNIA STATE HOSPITALS, and NAPA STATE HOSPITAL**

133. Plaintiffs re-allege and incorporates by reference the allegations contained in this complaint, as though fully set forth herein.

134. At all material times, including, but not limited to prior to – and between – January 26, 2016 and October 11, 2016, LUONG was a "qualified individual" with a mental illness and disability and medical impairments that limited and/or substantially limited his ability to care for himself and control his mental, medical, or physical health condition as defined under the ADA, 42 U.S.C. § 12131 (2), and under Section 504 of the Rehabilitation Act ("RA") of 1973, 29 U.S.C. § 794, 28 C.F.R. 42.540 (k); as such, LUONG qualified as an individual with a mental and physical disability under California law and LUONG met the essential eligibility requirements of STATE and COUNTY programs to provide access to medical and mental health care services for its detainee/inmate patients in COUNTY's jails while they are in custody.

135. Defendants STATE, NSH, and COUNTY's jail and mental health services are places of public accommodation and are covered entities for purposes of enforcement of the ADA, 42 U.S.C. §12181 (7)(F), and the Rehabilitation Act, 29 U.S.C. § 794, as explicated by the regulations promulgated under each of these laws. Further, on information and belief, Defendant STATE and Defendant COUNTY and its jail receive federal assistance and funds.

136. Defendants CALIFORNIA STATE HOSPITALS and NAPA STATE HOSPITAL and Defendant COUNTY's Jail, as a state, local government, and/or department or agency thereof, both fall within the definition of "program or activity" covered by the Rehabilitation Act, 29 U.S.C. Section 794(b). STATE and COUNTY are also within the mandate of the RA that no person with a disability may be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." 29 U.S.C. § 794.

137. Under the ADA, Defendants STATE and COUNTY are mandated to "develop an effective, integrated, comprehensive system for the delivery of all services to persons with mental disabilities and developmental disabilities . . . " and to ensure "that the personal and civil rights" of persons who are receiving services under its aegis are protected.

138. Congress enacted the ADA upon a finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101 (a)(2).

139. Defendants STATE and COUNTY are mandated under the ADA not to discriminate against any qualified individual "on the basis of disability in the full and equal enjoyment of the

goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182 (a).

140. The ADA, 42 U.S.C. § 12182(b)(1)(A)(iii), provides in pertinent part that: "[i]t shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual licensing, or other arrangements, with a good, service, facility, privilege, advantage, or accommodation *that is different or separate* from that provided to other individuals." *Id*. (emphasis added).

141. Defendants CALIFORNIA STATE HOSPITALS, NAPA STATE HOSPITAL ("STATE") and COUNTY violated the ADA, RA, and discriminated against MR. LUONG and Plaintiffs, violating their ADA, RA, and state protected rights by: (a) STATE creating and maintaining a number of programs and services to protect the mentally disabled that operate in conjunction with STATE's designated mental health hospitals such as NSH and facilities for persons who qualify under Penal Code § 1370 (a)(2) or Welfare and Institutions Code 5150; and (b) STATE failing to provide services or to accommodate LUONG with access to the programs and services of NSH or State designated mental health hospitals and facilities for persons who qualify for access and services under Penal Code § 1370 (a)(2) or Welfare and Institutions Code 5150; (c) COUNTY failing to provide services or accommodate MR. LUONG as indicated and with appropriate classification, housing, and monitoring for a person in their sole and exclusive custody who they knew was mentally disabled, at risk for assault, and was found by the Superior Court to be mentally incompetent; (d) COUNTY failing to provide reasonable accommodations to people in custody with mental disabilities at their hospitals, clinics, and jails and, instead, providing a quality of care and service that is different, separate, inferior, and worse than the service provided to other individuals with the same disabilities; (e) STATE and COUNTY denying MR. LUONG, a qualified individual with a disability, the opportunity to participate in or benefit from the aid, benefit, or services of the STATE and COUNTY, in violation of 28 C.F.R. § 35.130(b)(1)(i); (f) by reason of Decedent's mental disabilities, STATE and COUNTY Defendants did not afford him an opportunity to participate in or benefit from the aid, benefits, and services that are equal to those afforded to other, non-disabled individuals by Defendants, in violation of 28 C.F.R. § 35.130(b)(1)(ii); (g) on the basis of MR. LUONG'S disability, STATE and COUNTY Defendants

failed to provide him an aid, benefit, or service that was as effective in affording equal opportunity to obtain the same result, to gain the same benefit, and to reach the same level of achievement as provided to other individuals in the same situation, in violation of 28 C.F.R. §35.130(b)(1)(iii); (g) STATE and COUNTY limited MR. LUONG, a qualified individual with a disability, in the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others receiving the aid, benefit, or service of which MR. LUONG was denied, in violation of 28 C.F.R. §35.130(b)(1)(vii). Further, by refusing or obstructing Mr. LUONG's admission to NSH or another qualified hospital in violation of the court order finding that his serious medical needs required such treatment to be provided in a timely manner, Defendants STATE and COUNTY deprived him of ***all*** court-ordered and necessary medical treatment for his serious medical needs.

142. MR. LUONG was denied the benefits of the services, programs, and activities of the STATE and COUNTY, and was denied accommodation for his disabilities, which deprived him of safety, necessary care, and mental health and medical health programs and services, which would have provided planning and delivery of treatment, follow-up, and supervision. This denial of accommodation, programs, and services was the result of his disability in that he was discriminated against because he was mentally ill, at risk of assault by other inmates, and gravely disabled, in that he suffered from conditions in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter and is unable to advocate for himself; and, RAMIREZ had mental impairments that substantially limited one or more of his major life activities.

143. As a result of the acts and misconduct of the Defendants STATE and COUNTY complained of herein, MR. LUONG died, and Plaintiffs have suffered, are now suffering, and will continue to suffer damages and injuries as alleged above. Plaintiffs has suffered loss of love and society and claim damages for the wrongful death of their son, husband, and father in an amount not yet ascertained, but to be proven. Plaintiffs sustained serious and permanent injuries and are entitled to damages, penalties, costs, and attorneys' fees as set forth in the ADA and RA and above, in ¶¶ 121-123.

**FOURTH CAUSE OF ACTION**
**(VIOLATION OF CIVIL CODE § 52.1 (b))**
**PLAINTIFF AGAINST DEFENDANTS PAM AHLIN; DOLLY MATTEUCCI; DR. PATRICIA TYLER; CINDY BLACK; ALAMEDA COUNTY; SHERIFF GREG AHERN; JAIL COMMANDER MADIGAN; DR. RINATA WAGLE, M.D.; ESTATE DR. MOHINDER KAUR, M.D.; JACKSON & COKER LOCUMTENENS LLC; BONNIE COOK, MFT; DEPUTY BRANDEN MCBRIDE; SHERIFF TECHNICIAN ROBERT LUEBKER; SHERIFF TECHNICIAN BRITANNI MARTINEZ, SHERIFF TECHNICIAN KARL ENZMANN DEPUTY SCOTT BRYNING, DEPUTY SEAN CHRISTIANSEN and DOES 10-20**

144. Plaintiffs re-allege and incorporates by reference the allegations contained in this complaint, as though fully set forth herein.

145. By their acts, omissions, customs, and policies, Defendants AHLIN, MATTEUCCI, TYLER, BLACK, COUNTY, AHERN, MADIGAN, WAGLE, KAUR, COOK, JACKSON & COKER LOCUMTENENS LLC, MCBRIDE, LUEBKER, MARTINEZ, ENZMANN, BRYNING, CHRISTIANSEN and DOES 10-20 acting in concert/conspiracy, as described above, and with threat, intimidation, and/or coercion, violated Plaintiffs' and Decedent's rights under California Civil Code § 52.1 and the following clearly established rights under the United States Constitution and California Constitution and law:

a. Decedent's right to be free from an unreasonable ongoing seizure as a pretrial detainee, as secured by the Fourth and Fourteenth Amendments to the United States Constitution and the California Constitution, Article 1, Sections 7 and 13;

b. Decedent's right to be free from deliberate indifference to his serious medical needs while in custody as a pretrial detainee, as secured by the Fourth and Fourteenth Amendments to the United States Constitution and the California Constitution, Article 1, Sections 7 and 13;

c. Decedent's right to be free from reckless disregard for protection from brutal assaults by other inmates resulting in serious bodily injury and death, as secured by the Fourth and Fourteenth Amendments to the United States Constitution and the California Constitution, Article 1, Sections 7 and 13;

d. Decedent's rights and liberty interests, as an incapacitated criminal defendant, to freedom from incarceration and to timely, restorative treatment, as secured by the Fourteenth Amendment to the United States Constitution and the California Constitution, Article 1, Section 7;

e. Plaintiffs' right to be free from wrongful government interference with familial relationships and Plaintiffs' right to companionship, society, and support of each other, as secured by the First and Fourteenth Amendments;

f. The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, Section 1;

g. Decedent's right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43; and

h. Decedent's right to immediate medical care as required by California Government Code § 845.6.

146. Defendants' violations of Plaintiffs' and Decedent's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.[2] Alternatively, separate from, and above and beyond, Defendants' attempted interference, interference with, and violation of Plaintiffs' and Decedent's rights, Defendants violated Plaintiffs' and Decedent's rights by the following conduct, among other conduct, constituting threat, intimidation, or coercion:

a. Intentionally and with deliberate indifference, depriving and/or preventing LUONG from receiving necessary, life-saving medical and/or psychiatric care and treatment;

b. Intentionally and with deliberate indifference, ordering, causing, and/or continuing LUONG's punitive housing in a segregated and/or disciplinary cell, under conditions of dangerous confinement for long stretches of time, without necessary, life-saving medical and/or psychiatric care and treatment;

c. Intentionally causing LUONG's ongoing seizure as described herein and his continued incarceration after he was found IST, after the criminal proceedings against him were suspended and he was required to be provided timely restorative treatment, and despite court orders requiring his transfer and treatment in an appropriate medical/psychiatric facility, with deliberate indifference to his serious psychiatric and medical needs, and while LUONG was powerless to provide for such needs himself;

f. Intentionally and with deliberate indifference, causing LUONG to languish in jail without necessary medical/psychiatric/pharmacological care, or even the required

---

[2] See *Atayde v. Napa State Hosp.*, No. 1:16-cv-00398-DAD-SAB, 2016 U.S. Dist. LEXIS 126639, at *23 (E.D. Cal. Sept. 16, 2016) (citing *M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013); see also, *Cornell v. City and County of San Francisco*, Nos. A141016, A142147, 2017 Cal. App. LEXIS 1011 at *58, f.n. 32 (Cal. Ct. App. Nov. 16, 2017) (approving *M.H.*, *supra.*); *Reese v. County of Sacramento*, 888 F.3d 1030, 1043-44 (9th Cir. 2018) (following *Cornell*); *Rodriguez v. County of L.A.*, 891 F.3d 776, 799, 802 (9th Cir. 2018) (following *Cornell*).

treatment plan, when he was obviously unable to care for his own needs, and after a court had determined he was unable to care for his own needs and was in grave danger;

g. Intentionally and with deliberate indifference, causing LUONG to be subject to ongoing seizure under dangerous conditions, including both physical characteristics of his cell(s) and cell assignments with obviously dangerous individuals;

h. Intentionally and with deliberate indifference, doing and/or permitting subparagraphs (a) – (g) when it was also obvious that in doing so, Decedent's life was likely to end needlessly, and Plaintiffs' rights also would be violated;

i. Violating LUONG's rights to be free from multiple violations of rights, including by causing his prolonged seizure in jail after being determined IST and ordered to NSH, denying him necessary medical and psychiatric care both at NSH and at jail, and denying him safe conditions of confinement at jail. [3]

147. The threat, intimidation, and coercion described herein were not necessary or inherent to any legitimate and lawful law enforcement activity.

148. Further, all of Defendants' violations of duties and rights, and coercive conduct described herein, were volitional acts; none was accidental or merely negligent. Further, each Defendant violated Plaintiffs' and Decedent's rights with the specific intent and purpose to deprive them of their enjoyment of those rights and of the interests protected by those rights.

149. To the extent this claim is based on a violation of Decedent's rights, it is asserted as a survival claim. To the extent that the violations of rights were done to Plaintiffs, it is asserted as a personal claim. To the extent the violations were done to both Decedent and Plaintiffs, it is asserted as both.

150. Defendant COUNTY is vicariously liable pursuant to Cal. Gov. Code section 815.2.

151. As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Plaintiffs' and Decedent's rights under the United States and California Constitutions and law, Plaintiffs sustained injuries and damages, and against each Defendant named in this Count is entitled to relief as set forth above, in ¶¶ 120-123, and punitive damages against all individual Defendants, including all damages and penalties allowed by California Civil Code §§ 52 and 52.1 and California law, three times actual damages, and attorneys' fees.

---

[3] See *Bender v. Cnty. of Los Angeles*, 217 Cal. App. 4th 968 (2013).

**FIFTH CAUSE OF ACTION**
**(VIOLATION OF CALIFORNIA GOVERNMENT CODE § 845.6)**
**PLAINTIFF AGAINST DEFENDANTS COUNTY, AHERN, MADIGAN, WAGLE, ESTATE OF KAUR, JACKSON & COKER LOCUM TENENS LLC, COOK, MCBRIDE, LUEBKER, MARTINEZ, ENZMANN, BRYNING, CHRISTIANSEN and DOES 10-20**

152. Plaintiffs re-allege and incorporate by reference the allegations contained in this complaint, as though fully set forth herein.

153. DEFENDANTS COUNTY, AHERN, MADIGAN, WAGLE, KAUR, JACKSON & COKER LOCUMTENENS LLC, COOK, MCBRIDE, LUEBKER, MARTINEZ, ENZMANN, BRYNING, CHRISTIANSEN and DOES 10-20 knew or had reason to know that DAT LUONG was in need of immediate and a higher level medical and psychiatric care, treatment, and observation and monitoring, that he required special housing and security for his own safety and well-being, and each Defendant failed to take reasonable action to summon and/or to provide him access to such medical care and treatment and/or provide him housing accommodations necessary for him under such circumstances. Each such individual Defendant, employed by and acting within the course and scope of his or her employment with Defendant COUNTY knowing and/or having reasons to know this, failed to take reasonable action to summon and/or provide MR. LUONG access to such care, treatment, and medically appropriate housing in violation of California Government Code § 845.6.

154. As a proximate cause of the aforementioned acts and omissions of – and attributable to the COUNTY under Government Code sections 845.6 and 815.2 to – all Defendants, Plaintiffs were injured as set forth above and are entitled to all damages allowable under California law. Plaintiffs sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorneys' fees as set forth above, in ¶¶ 120-123.

**SIXTH CAUSE OF ACTION**
**(NEGLIGENCE)**
**PLAINTIFF AGAINST DEFENDANTS**
**COUNTY, AHERN, MADIGAN, AHLIN, MATTEUCCI, TYLER, BLACK MCBRIDE, LUEBKER, MARTINEZ, ENZMANN, BRYNING, CHRISTIANSEN and DOES 10-20**

155. Plaintiffs re-allege and incorporates by reference the allegations contained in this complaint, as though fully set forth herein.

156. At all material times, Defendants COUNTY, AHERN, MADIGAN, AHLIN, MATTEUCCI, TYLER, BLACK, MCBRIDE, LUEBKER, MARTINEZ, ENZMANN, BRYNING, CHRISTIANSEN and DOES 10-20, owed MR. LUONG the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

157. At all material times, each Defendant owed MR. LUONG the duty to act with reasonable care.

158. These general duties of reasonable care and due care owed to MR. LUONG by all Defendants include, but are not limited, to the following specific obligations:

a. To provide, or have provided, prompt and timely access to court ordered restorative treatment, including transportation and admission to NSH for DAT LUONG;

b. To provide safe and appropriate jail custody for DAT LUONG, including reasonable classification, monitoring, and housing, including placing him in an adequately monitored cell away from violent and combative inmates;

c. To obey and execute the two separate orders of the Superior Court, issued on July 22, 2016, which ordered MR. LUONG to be committed to the trial competency program at Napa, pursuant to Penal Code section 1370, and again on September 7, 2016, which ordered either transport of MR. LUONG to NSH or to show cause why Defendant AHLIN should not be held in contempt of court;

d. To obey and execute the Order and Commitment of Person Determined to be Mentally Incompetent Under the Provisions of Section 1370 of the California Penal Code in Case No. 259871, issued on July 22, 2016, which “ORDERED that . . . [LUONG] be committed to the Department of Mental Health at the [NAPA STATE HOSPITAL] OR ANY OTHER Hospital pursuant to Penal Code 1370” and “FURTHER ORDERED that the Sheriff of ALAMEDA COUNTY deliver [MR. LUONG] to said Hospital.”;

e. To obey Court Orders for the care and safety of inmates, such as DAT LUONG;

f. To summon necessary and appropriate medical care for MR. LUONG;

g. To use generally accepted law enforcement and jail procedures that are reasonable and appropriate for Plaintiffs’ status as a mentally ill and/or emotionally disturbed person;

h. To refrain from abusing their authority granted to them by law; and,

i. To refrain from violating Plaintiffs' and Decedent's rights guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

159. By the acts and omissions set forth more fully in the paragraphs above, Defendants acted negligently and breached their duty of due care owed to MR. LUONG, which foreseeably resulted in the suffering of damages by MR. LUONG and Plaintiffs.

160. Defendants, through their acts and omissions, breached the aforementioned duties owed to MR. LUONG and Plaintiffs.

161. Defendant COUNTY is vicariously liable pursuant to California Government Code section 815.2.

162. As a proximate result of Defendants' negligence, Plaintiffs sustained injuries and damages, and against each listed Defendant in this Count is entitled to the relief described above, in ¶¶ 120-123. Plaintiffs also seek punitive damages against such individual Defendants in their individual capacities. Plaintiffs do not seek punitive damages against the municipal Defendants.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief against each and every Defendant herein, jointly and severally:

1. Declaratory relief, finding that Defendants violated Plaintiffs' and Decedent's rights, to serve the purposes of 42 U.S.C. § 1983, 42 U.S.C. § 12132, 29 U.S.C. § 794, and Cal. Civil Code §§ 52 and 52.1, including for vindication of those rights as "Private Attorneys' General," elucidation of those rights for the courts, the public, and government officials, and to deter similar wronging by the Defendants and other officials;

2. Compensatory damages in an amount according to proof, which is fair, just, and reasonable;

3. Punitive damages under 42 U.S.C. § 1983, federal law, and California law, in an amount according to proof and which is fair, just, and reasonable against all Defendants except the municipal Defendants;

4. All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; the ADA; the RA; California Civil Code §§ 52 et seq., 52.1; and as otherwise may be allowed by California and/or federal law;

5. For such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs hereby respectfully demand a jury trial in this action, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: May 10, 2019

HADDAD & SHERWIN LLP

*/s/ Michael J. Haddad*
MICHAEL J. HADDAD

Attorneys for Plaintiffs

**EXHIBIT A:**

Order and Commitment of Person Determined to be Mentally Incompetent Under the Provisions of Section 1370 of the California Penal Code in Case No. CRL012151

**EXHIBIT B:**

ORDER TO TRANSPORT DEFENDANT OR TO SHOW CAUSE RE: CONTEMPT

# EXHIBIT A

259871
1370CMM
Commitment to State Hospital pursuant PC
63126

FILED
ALAMEDA COUNTY
AUG 0 9 2016
CLERK OF THE SUPERIOR COURT
By USSA [signature]
Deputy

**SUPERIOR COURT OF C[ALIFORNIA, COUNTY OF ALA]MEDA** Dept. No. 513

Date: **July 22, 2016** Hon. Dan Grimmer, Judge Oxsen/Matagi, Dep.Clk.
Steinbach, Reporter

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA<br>Plaintiff | Counsel appearing for Plaintiff | Tom Burke, Deputy District Attorney |
| vs. | Counsel appearing for Defendant | Richard Ortega Public Defender |
| **DAT THANH LUONG**<br>Date of Birth: March 4, 1960<br>Defendant | | |

Nature of Proceedings: **HEARING ON RECOMMENDATION REGARDING PLACEMENT AND COMMITMENT PENAL CODE SECTION 1370**

Case No. **259871**
PFN: **BKX532**
CEN: **6284802**

The defendant is present.

Said matter having been previously submitted and the Court having found the defendant to be a Mentally Incompetent Person within the meaning of Penal Code Section 1368; and the matter having been referred to the County Mental Health Director for a report and recommendation regarding placement;

IT IS HEREBY ORDERED that pursuant to Section 1370 of the Penal Code of the State of California, the defendant be committed to the Department of Mental Health at the **Napa State Hospital at Napa, California or any other Hospital** pursuant Penal Code 1370.

IT IS FURTHER ORDERED that the Sheriff of Alameda County deliver the defendant to said Hospital.

IT IS FURTHER ORDERED that when the Executive Director of the Hospital or Facility determines that the defendant has regained his/her mental competence, the Executive Director shall immediately certify the fact to the Court, the Sheriff and District Attorney of this County and defendant's attorney of record, and the defendant shall be returned to this Court for further proceedings.

IT IS FURTHER ORDERED that within ninety (90) days of this commitment and thereafter at no less than six months intervals, the Executive Director of the Hospital or facility where defendant is housed shall make a written report to this Court and the Community Program Director of this County, or the Director's designee, concerning the defendant's progress toward recovery of the defendant's mental competence.

IT IS FURTHER ORDERED that pursuant to Penal Code section 1370(c)(1), the maximum period of commitment is:

☐ Three (3) years;
☒ 8 years, **0** months at 85% (maximum term for most serious offense charged);
☒ The defendant is entitled to **179** days of actual custody credit.

THE COURT FURTHER FINDS that pursuant to Penal Code section 1370(a)(2)(B)(i):

☐ Defendant, with advice from counsel, consents to the administration of antipsychotic medication as prescribed by a treating psychiatrist. If defendant withdraws consent for antipsychotic medication, after the treating psychiatrist complies with the provisions of Penal Code section 1370(a)(2)(C), the defendant will be returned to court for a hearing in accordance with Penal Code section 1370(a)(2)(B)(i) regarding whether antipsychotic medication shall be administered involuntarily.

In the alternative, THE COURT ORDERS that the treatment facility may administer antipsychotic medication to the defendant involuntarily when and as prescribed by a treating physician pursuant to Penal Code section 1370(a)(2)(B)(iii) based upon the following finding:

☐ Defendant lacks capacity to make decisions regarding antipsychotic medication and that defendant's mental disorder requires medical treatment with antipsychotic medication and that, if not so treated, it is probable that serious harm to the physical or mental health of the patient will result.

☐ Defendant is a danger to others in that defendant has inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm on another either while in custody or such that it resulted in his being taken into custody, and defendant presents, as a result of mental disorder or defect, a demonstrated danger of inflicting substantial physical harm on others.

☒ Defendant does not meet the requirements of either of the two preceding paragraphs but has been charged with a serious crime against persons or property; involuntary administration of antipsychotic medication is substantially likely to render defendant competent to stand trial; the medication is unlikely to have side effects that interfere with defendant's ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner; less intrusive treatments are unlikely to have substantially the same results; and antipsychotic medication is in the patient's best medical interest in light of his/her medical condition.

List of Charges: Penal Code 245(a)(1) G U, Penal Code 245(A)(1) U

Dated: 7/22/16
and signed: 8/2/16

JUDGE OF THE SUPERIOR COURT

DAN GRIMMER

(Original: Signed by Judge, file stamped, place in file)
(Two Certified Copies: Use the judge's line stamp, endorse file, to Sheriff's Transportation Unit, QIC 80501, with copies of Criminal Justice Mental Health report; Charging Document--Complaint, Indictment and/or Information; Certification and/or Holding Order; CII Rap Sheet; Arrest Report; Doctor's Reports)
(One Certified Copy: Conditional Release Program (CONREP), QIC 43401 for felonies ***or*** Mental Health Director, County of Alameda, QIC 80501 for misdemeanors)

# EXHIBIT B

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

The People of the State of California,

Plaintiff,

v.

**DAT LUONG,**

Defendant.

Dept. No. 513

No. 259871

**ORDER TO TRANSPORT DEFENDANT OR TO SHOW CAUSE RE: CONTEMPT**

TO: PAM AHLIN, DIRECTOR, CALIFORNIA DEPARTMENT OF STATE HOSPITALS

**1.** A valid court order having been issued on **July 22, 2016**, directing that, pursuant to Section 1370(a)(1)(B)(i) of the Penal Code of the State of California, the above named defendant be committed to the Department of Mental Health at the State Hospital in Napa, California, for treatment that will "promote the defendant's speedy restoration to mental competence;" and

**2.** In accordance with *In re Mille* (2010) 182 Cal.App.4th 635, 649-50, which requires that mentally incompetent defendants be delivered to the state hospital soon after the commitment order so that the hospital has sufficient time to examine and treat the defendant, and document the defendant's progress within 90 days of the commitment order; and

**3.** Your departments having failed to comply with this order to deliver the defendant to the state hospital in a timely manner,

YOU ARE HEREBY ORDERED to comply with the heretofore mentioned order **forthwith** or to appear before the above-entitled court on **September 12, 2016 at 9:00 a.m.** to show cause why you should not be held in contempt.

DATED: 9/7/16

Judge of the Superior Court DAN GRIMMER