MICHAEL J. HADDAD (State Bar No. 189114)
JULIA SHERWIN (State Bar No. 189268)
MAYA RODRIGUEZ SORENSEN (State Bar No. 250722)
TERESA ALLEN (State Bar No. 264865)
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, California 94612
Telephone: (510) 452-5500
Facsimile: (510) 452-5510

Attorneys for Plaintiff
W.L., AI QIONG ZHONG, and MAI CHAU

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

DAT THANH LUONG, DECEASED, through his
Co-Successors in Interest, AI QIONG ZHONG,
Individually and as mother and Next Friend for W.L.,
a minor, and MAI CHAU, individually,

        Plaintiff,

vs.

ALAMEDA COUNTY, a public entity; SHERIFF
GREG AHERN; JAIL COMMANDER THOMAS
MADIGAN; DR. RINATA WAGLE, M.D.;
ESTATE OF MOHINDER KAUR, M.D.;
JACKSON & COKER LOCUMTENENS, LLC;
BONNIE COOK, MFT; DEPUTY BRANDEN
MCBRIDE; SHERIFF'S TECHNICIAN ROBERT
LUEBKER; DEPUTY SCOTT BRYNING;
DEPUTY SHAWN CHRISTIANSEN; NAPA
STATE HOSPITAL, CALIFORNIA
DEPARTMENT OF STATE HOSPITALS, a public
entity; PAM AHLIN; DOLLY MATTEUCCI;
PATRICIA TYLER, M.D.; CINDY BLACK; and
DOES 10-20, Jointly and Severally,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No: 3:17-cv-06675-EMC (LB)

**PLAINTIFFS' NOTICE AND
MOTION FOR PARTIAL
SUMMARY JUDGMENT
AGAINST ALL STATE
DEFENDANTS; BRIEF IN
SUPPORT**

Hearing Date: August 29, 2019
Time: 1:30 p.m.

Hon. Edward M. Chen
Courtroom 5, 17th Fl.

Trial Date: December 2, 2019

# NOTICE AND MOTION FOR PARTIAL SUMMARY JUDGMENT

**TO:** **ALL DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

Please take notice that on August 29, 2019, at 1:30 pm, in Courtroom 5, 17th Floor, United States District Court, 450 Golden Gate Avenue, San Francisco, California, Plaintiffs will move the court for partial summary judgment against Defendants Napa State Hospital, California Department of State Hospitals, Pam Ahlin, Dolly Matteucci, Patricia Tyler, M.D., and Cindy Black (all "State Defendants") pursuant to Fed. R. Civ. P. 56. Specifically, Plaintiffs will seek partial summary judgment as follows:

1. A declaration and finding, as a matter of law, that Dat Thanh Luong's due process rights to timely restorative treatment and to be free from punitive incarceration as a pretrial detainee found incompetent to stand trial were violated when within seven (7) days of his commitment to the California Department of State Hospitals for restorative treatment by order of the Alameda County Superior Court dated July 22, 2016, he was not admitted to Napa State Hospital or any other hospital as ordered; or alternatively,

2. A declaration and finding, as a matter of law, that Dat Thanh Luong's due process rights to timely restorative treatment and to be free from punitive incarceration as a pretrial detainee found incompetent to stand trial were violated when he was not admitted to Napa State Hospital or any other hospital, and instead remained incarcerated in the Alameda County Santa Rita Jail for 81 days until he died in jail following his commitment to the California Department of State Hospitals and Napa State Hospital for restorative treatment by order of the Alameda County Superior Court dated July 22, 2016.

This motion is based on the Memorandum of Points and Authorities that follows, the declaration of Michael J. Haddad with exhibits filed in support of the motion, all documents and records filed in the court file including documents that will be associated with Defendants' motion for summary judgment, and on such further written and/or oral argument and evidence as may be submitted.

# MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

NOTICE AND MOTION FOR PARTIAL SUMMARY JUDGMENT ..........................................1

TABLE OF CONTENTS..............................................................................................................i

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ....................................................................................................................1

STATEMENT OF FACTS ........................................................................................................3

STANDARD OF REVIEW .....................................................................................................13

ARGUMENT ..........................................................................................................................13

 I. Dat Thanh Luong's Due Process Rights to Timely Restorative Treatment and to Be Free from Punitive Incarceration After Being Declared Incompetent to Stand Trial Were Violated When He Was Not Admitted to Napa State Hospital Within Seven Days of His Commitment Order, or Alternatively, for 81 days Until He Died.......13

  A. Holding incapacitated criminal defendants in jail for weeks or months violates their due process rights.................................................................13

  B. The State has no legitimate interest in holding incapacitated defendants in jail, while depriving them of necessary, court-ordered restorative treatment ...................................................................................................................20

RELIEF REQUESTED.............................................................................................................22

Federal Cases

*Advocacy Ctr. for Elderly and Disabled v. Louisiana Dep't of Health and Hosp.*,
    731 F. Supp. 2d 603 (E.D. La. Aug. 9, 2010) ........................................................19, 20, 22

*Ammons v. State Dep't of Soc. & Health Servs.*,
    648 F.3d 1020 (9th Cir. 2011) ...................................................................................20, 21

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..........................................................................................................13

*Anderson v. Siskiyou County and NSH, et al.*,
    N.D. Cal. No. C-10-1428-SBA ........................................................................................10

*Atayde v. Napa State Hospital*,
    255 F.Supp.3d 978 (E.D. Cal. 2017)................................................................................16

*Atayde v. NSH, et al.*,
    E.D. Cal. No. 1:16-cv-00398-DAD ..................................................................................10

*Baker v. McCollan*,
    443 U.S. 137, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979)..................................................15

*Buffin v. City & County of San Francisco*,
    N.D. Cal. Case No. 15-cv-04959-YGR ...........................................................................16

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..........................................................................................................13

*Coleman v. Brown*,
    E.D. Cal. No. 2:90-cv-00520 KJM ....................................................................................6

*County of Sacramento v. Lewis*,
    523 U.S. 833, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998).............................................21

*Disability Law Center v. Utah*,
    180 F. Supp. 3d 998 (D. Utah 2016)............................................................................19, 22

*Estate of Vargas v. Binnewies*,
    No. 1:16-cv-01240-DAD-EPG,
    2017 U.S. Dist. LEXIS 80576; 2017 WL 2289357 (E.D. Cal. May 25, 2017) ..................16

*Foucha v. Louisiana*,
    504 U.S. 71 (1992)............................................................................................................15

*Gordon v. County of Orange*,
    888 F.3d 1118 (9th Cir. 2018) ..........................................................................................21

*Hernandez v. Sessions*,
　　872 F.3d 976 (9th Cir. 2017) ................................................................15

*Lopez-Valenzuela v. Arpaio*,
　　770 F.3d 772 (9th Cir. 2014) ............................................................15, 20

*Ohlinger v. Watson*,
　　652 F.2d 775 (9th Cir. 1980) ............................................................15, 22

*Oregon Advocacy Center v. Mink*,
　　322 F.3d 1101 (9th Cir. 2003) .......................................................passim

*Oviatt ex rel. Waugh v. Pearce*,
　　954 F.2d 1470 (9th Cir. 1992) ...............................................................15

*Sharp v. Weston*,
　　233 F.3d 1166 (9th Cir. 2000) ...............................................................15

*Terry v. Hill*,
　　232 F.Supp.2d 934 (E.D. Ark 2002) .....................................................19

*Trueblood v. Washington State Dep't of Soc. & Health Servs.*,
　　73 F.Supp.3d 1311 (W.D. Wash. 2014)........................................17, 18, 20

*Trueblood v. Wash. State Dep't of Soc. & Health Servs.*,
　　101 F.Supp.3d 1010 (W.D. Wash. 2015)...........................................17, 18

*Trueblood v. Wash. State Dep't of Soc. & Health Servs.*,
　　822 F.3d 1037 (9th Cir. 2016) ...............................................................18

*Trueblood v. Wash. State Dep't of Soc. & Health Servs.*,
　　NO. C14-1178-MJP,
　　2016 U.S. Dist. LEXIS 108637; 2016 WL 4268933 (W.D. Wash. Aug. 15, 2016)............19

*United States v. Salerno*,
　　481 U.S. 739 (1987)................................................................................16

*United States v. Zapata-Herrera*,
　　No. 14-cr-3639-GPC,
　　2015 U.S. Dist. LEXIS 107444; 2015 WL 4878319 (S.D. Cal. Aug. 14, 2015).................17

*Willis v. Wash. State Dep't of Social & Health Servs.*,
　　No. C16-5113 RBL,
　　2017 U.S. Dist. LEXIS 40682, 2017 WL 1064390 (W.D. Wash. Mar. 21, 2017) ........16, 20

*Youngberg v. Romeo*,
　　457 U.S. 307 (1982)......................................................................15, 20, 21

## Federal Statutes

18 U.S.C. § 4241 ...........................................................................................................17

Americans with Disabilities Act, 42 U.S.C. § 12131 et seq ...........................................2

Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794 .........................2

Federal Rule of Civil Procedure 30(b)(6) .......................................................................5

Federal Rule of Civil Procedure 56(a) .............................................................................1


## California Cases

*In re Grimes*,
     208 Cal.App.3d 1175 (1989) .............................................................................22

*In re Mille*,
     182 Cal. App. 4th 635, 105 Cal. Rptr. 3d 859 (2010)...................................14, 19

*Pederson v. Superior Court*,
     105 Cal.App.4th 931 (2003) ..............................................................................22

*Stiavetti v. Ahlin*,
     Alameda Co. Sup. Ct. No. RG15779731 .....................................................11, 12


## California Statutes

California Civil Code § 52.1.............................................................................................2

California Penal Code § 1370.......................................................................................5, 6

California Welfare & Institutions Code § 5150 ...............................................................3


## Other Authorities

Oregon Revised Statutes § 161.370...............................................................................14

# INTRODUCTION

This civil rights action arises from the California and Napa State Hospital Defendants' deliberate violation of court orders requiring them to admit Dat Thanh Luong for restorative treatment after he was determined incompetent to stand trial ("IST"), resulting in his wrongful incarceration, lack of access to necessary psychiatric care, and his death in Alameda County's Santa Rita jail on October 11, 2016.

Mr. Luong had been incarcerated at Santa Rita since his arrest on January 26, 2016, and according to jail records, had been routinely bullied and injured by other inmates at the jail. On July 8, 2016, the Alameda County Superior Court determined him to be IST within the meaning of Cal. Penal Code §§ 1368 and 1370. And, on July 22, 2016, the Superior Court ordered Mr. Luong "committed to the Department of Mental Health [now, Department of State Hospitals] at the State Hospital in Napa, California, or any other Hospital pursuant to Penal Code 1370." On September 7, 2016, when Mr. Luong still had not been admitted to a hospital as ordered, the Superior court issued an Order to Show Cause to Pam Ahlin, Director of the California Department of State Hospitals, to show why she and DSH should not be held in contempt of court for "having failed to comply with this order to deliver the defendant to the state hospital in a timely manner."

According to the policies and practices of the Department of State Hospitals ("DSH") and Napa State Hospital ("NSH"), as created and administered by Defendants Pam Ahlin (Executive Director of DSH), Dolly Matteucci (Executive Director of NSH), Patricia Tyler, M.D. (Medical Director of NSH), and Cindy Black (then Clinical Administrator, now Executive Director, of NSH), once Mr. Luong was committed to DSH, he was placed on a waiting list as of July 22, 2016, and denied timely admission to NSH or any other hospital, without any triage, psychiatric acuity review, or substantive review of his medical and jail records.

Predictably, Mr. Luong's serious psychiatric illness and incompetence went untreated at the Santa Rita Jail where he languished and continued to be victimized by other inmates due to his mental illness and inability to care for himself. On October 11, 2016 – 81 days after the Court committed him to Defendants' care – Mr. Luong was beaten and strangled to death by his cell mate, another mentally ill man in the Behavioral Health Unit of the jail. Other IST inmates have died in jails while waiting for their court-ordered admissions to a state hospital, but Defendants claim not to keep track of such deaths.

More than 13 years before this tragedy, the Ninth Circuit had declared that a state hospital violates the substantive due process rights of IST inmates when it "refuses to admit them in a timely manner." *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1121-22 (9th Cir. 2003). More specifically, "[h]olding incapacitated defendants in jail for weeks or months violates their due process rights …." *Id.* at 1122. *Mink* affirmed a 7-day deadline for admission of IST inmates to the Oregon State Hospital for timely restorative treatment. *Id.* at 1122. Since that time, pursuant to *Mink* and the Due Process Clause, the State of Washington also has been ordered to admit IST inmates to the state hospital within seven days. And, the State of California has agreed and been ordered to admit to a state hospital convicted prisoners with acute psychiatric needs within ten days. However, DSH, NSH, and their administrators, continue to deny IST pretrial detainees their rights to timely restorative treatment and freedom from punitive incarceration.

Currently pending in this case are claims by the Plaintiffs, Mr. Luong's wife and son, against Defendants Pam Ahlin, Dolly Matteucci, Patricia Tyler, M.D., and Cindy Black, individually and as supervisors, for violation of Mr. Luong's substantive due process rights, (1) to receive timely care for his serious psychiatric needs; (2) to receive timely restorative treatment after being found IST; and (3) to be free from punitive incarceration once criminal charges have been suspended. Plaintiffs also claim that these individual defendants also violated Plaintiffs' First and Fourteenth Amendment rights to familial association, as well as the Bane Act, Cal. Civil Code § 52.1. Finally, Plaintiffs bring a claim against DSH and NSH for violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794.

Plaintiffs' remaining claims against all Alameda County and Jail Defendants have been settled. The claims of Mr. Luong's mother, Mai Chau, against these State Defendants have been voluntarily dismissed.

At this time, Plaintiffs do not seek a declaration and finding from this Court that any of the State Defendants personally violated Mr. Luong's rights with deliberate indifference, lack of objectively reasonable professional judgment, or other appropriate level of individual culpability, as those standards would require a jury to weigh each individual's culpability and responsibility for the violation of Mr. Luong's due process rights. However, pursuant to *Mink* and the other authorities cited herein, Plaintiffs

seek a finding and declaration from this Court that Mr. Luong's due process rights were violated when, after he was committed to DSH, he was denied admission to a state or other hospital for more than seven days after the commitment order, or alternatively, when he was denied admission to a state or other hospital for 81 days until he died in jail.

Such a finding will be necessary for this Court to make at trial before instructing the jury as to individual culpability and causation standards. Based on undisputed facts and well-established law, this Court should decide these issues of law now.

<u>**STATEMENT OF FACTS**</u>

Dat Luong was a devoted husband to Plaintiff Ai Qiong Zhong (age 47) and father to now-seventeen-year-old "W.L." Around the fall of Saigon, he had escaped South Vietnam in a harrowing journey with his sister, eventually settling in the United States, bringing over his mother and other sisters, earning a degree from San Jose State University, working in the tech field, and putting his sisters through college. (Ex. 1, Mai Luong Dep. 17:20-18:9; Ex. 2, Nina Luong Dep. 17:20-18:4; 24:11-24). Approximately fifteen years before his death, Mr. Luong had been diagnosed with schizophrenia and with psychotic disorder, NOS ("not otherwise specified"), *inter alia*. (Ex. 2, Nina Luong Dep. 27:21-28:15). With proper medication, he maintained close relationships with his family, and although he was disabled from working, he was the primary caregiver for both his mother and his son. (*Id.* at 63:20-64:11; Ex. 3, Ai Zhong Dep. 51:13-52:24). At the time of his death, Mr. Luong was 56 years old, stood 5 feet, 4 inches tall, and weighed approximately 132 pounds. (Ex. 4, Autopsy Report p. 1).

On January 26, 2016, Union City Police officers arrested Mr. Luong and booked him into Santa Rita jail. (Ex. 5, Arrest Report p. 34). He was off his medication and had chased a person while holding a mallet. (*Id.*). Several different service providers who initially treated Mr. Luong at the jail observed that he had a blank stare, auditory hallucinations, and found that he had a global assessment function (GAF) of 38, meaning that he had reality testing or communication impairment. (Ex. 6, Behavioral Mental Health ("BMH") Records PLF000637-638). In the course of his incarceration, County deputies transported Mr. Luong to John George Psychiatric Hospital on two separate occasions for evaluation under California Welfare & Institutions Code § 5150 where he was admitted "for grave disability and danger to self." (Ex. 7, John George Records PLF000716, 000758). Mr. Luong was not taking his

necessary medications for most of the time that he was at the jail. (Ex. 6, BMH Records at PLF000616-689). On occasions, he would not eat or drink for days. (*Id.* at PLF000641, 646, 650).

Due to his inability to care for himself, his grave disability including delusions and paranoia, his age, and small stature, he was repeatedly victimized by other inmates at the jail, even though he was held in isolation for significant periods of time. His jail medical records reveal numerous instances where he was bullied, beaten, and injured at the jail. Other jail records, readily available to the State Defendants upon request, detailed even more incidents of abuse at the hands of fellow inmates. For example, Mr. Luong's medical and jail records documented his injuries on multiple occasions including bruising around his neck (on February 17, 2016) (Ex. 6, BMH Records PLF000626), swollen and black eye (April 25, 2016) (Ex. 8, Classification Narrative, p. 3), dark purple, swollen arm, possibly broken (June 1, 2016) (Ex. 6, BMH Records PLF000646), facial bruising from being punched in the face (July 15, 2016) (Ex. 8, Classification Narrative, p. 1; Ex. 9, CFMG Jail Medical Records PLF000207), right eye discoloration and bruising, scabbing on eyelid from beatings by cell mate (August 20, 2016) (Ex. 9, CFMG Jail Medical Records PLF000204), dried blood observed on his face and clothing after beating by new cell mate (August 30, 2016) (Ex. 8, Classification Narrative, p. 1), black eye (September 2, 2016) (Ex. 6, BMH Records PLF000680).

By March 7, 2016, doubts had arisen about Mr. Luong's competency, and the Alameda County Superior Court ordered the first of several "alienist" mental health evaluations of him. (Ex. 10, Court Records, p. DSH 551). On July 8, 2016, the Superior Court held a hearing on Dat Luong's mental competence, and issued an order on that day finding him "mentally incompetent within the meaning of Penal Code Section 1368." (Ex. 11, 7/8/16 Order). The Court referred Mr. Luong to the State of California's Conditional Release Program ("CONREP") for an examination and recommendation for placement under Penal Code Section 1370. *Id.*

By July 22, 2016, the Superior Court had received the CONREP and psychiatric reports and held a hearing from which it issued its "Commitment" order, including *inter alia*:

- That Mr. Luong "be committed to the Department of Mental Health [now called Department of State Hospitals] at the **Napa State Hospital at Napa, California or any other Hospital** pursuant to Penal Code 1370" (emphasis in original);

- That the Executive Director of the Hospital shall immediately certify to the Court when she determines that Mr. Luong has regained his mental competence;

- "[T]hat within ninety (90) days of his commitment and thereafter at no less than six months intervals, the Executive Director of the Hospital or facility where the defendant is housed shall make a written report to this Court and the Community Program Director of this County, or the Director's designee, concerning the defendant's progress toward recovery of the defendant's mental competence;"

- That "the treatment facility may administer antipsychotic medication to the defendant involuntarily," because, among other reasons, "involuntary administration of antipsychotic medication is substantially likely to render defendant competent to stand trial" and "less intrusive treatments are unlikely to have substantially the same results, and antipsychotic medication is in the patient's best medical interest in light of his/her medical condition."

(Ex. 12, 7/22/16 Commitment Order). Pursuant to Penal Code § 1370(a)(1)(B), the pending criminal charges against him were suspended upon the finding of his mental incompetence.

Defendant Cindy Black, the NSH Clinical Administrator at that time, responsible for determining "that a bed at the appropriate level of care is available for the patient," agrees that the Order dated July 22, 2016, is the "Commitment Order." (Ex. 13, Cindy Black Dep. 72:2-25, 66:24 – 67:20). Even though that order is file stamped August 2, 2016, Ms. Black's subordinate and designee, Dana White, as the Direct Admissions Coordinator for NSH, states that NSH considered the operative date of the Commitment Order to be July 22, 2016. (Ex. 14, Dana White Dep. 17:14-20, 22:20 – 23:7).

As required by Cal. Penal Code § 1370(a)(3), the Court provided voluminous documentation to NSH, including, among other things, the Commitment Order, Court-ordered psychiatric reports, the CONREP report, medical records, Arrest Report, and other "records of a finding of mental incompetence." NSH received Mr. Luong's complete admission packet by August 22, 2016, and Ms. White placed Mr. Luong on the waiting list for admission to NSH as of July 22, 2016. (*Id*. at 23:21 – 25:19, 31:12 – 32:11). The "Direct Admission Waiting List" maintained by Dana White shows Mr. Luong was committed to NSH on July 22, 2016. (Ex. 15, excerpt). Both Cindy Black and George Maynard, the State of California's Fed. Rule Civ. Proc. 30(b)(6) designee concerning waiting lists and wait times for admission to a State Hospital, confirm that DSH places IST inmates on the waiting lists

based on their date of commitment; not when their admission packet is complete.  (Ex. 16, Cindy Black Dep (Atayde case) 121:8 – 122:10; Ex. 17, PMK Maynard Dep. 63:1-11).

The State Defendants all admit that they do no triage or psychiatric acuity review of all IST inmates to admit the most acutely ill patients first.  (Ex. 18, Ahlin Dep. 108:13 – 109:7; Ex. 19, Dr. Tyler Dep. 161:18 - 162:23; Ex. 13, Cindy Black Dep. 47:21 – 48:13; Ex. 17, PMK Maynard Dep. 63:1-21; Ex. 20, Matteucci Dep. 93:15-21).  It's a **"first come first served"** system based on the arbitrary date of each inmate's commitment order.  (Ex. 18, Ahlin Dep. 168:12-15).

As NSH Medical Director, Dr. Tyler did a few psychiatric acuity reviews every month for certain IST inmates, but only upon specific request from a jail psychiatrist or clinical worker, or sometimes from the inmate's defense attorney.  (Ex. 19, Dr. Tyler Dep. 166:14 – 167:8, 171:4-20).[1]  Neither DSH nor NSH ever informed the county jails or courts on a statewide or regular basis that a pre-admission acuity review could be done upon request.  (Ex. 19, Dr. Tyler Dep. 172:8-21; Ex. 18, Ahlin Dep. 106:13-21).  The State never initiated an acuity review on its own.  (Ex. 20, Matteucci Dep. 92:25 – 93:9).  On the rare occasion that an acuity review was done for a particular patient, if that patient were found to be psychiatrically acute, he could be given the next available bed.  (Ex. 19, Dr. Tyler Dep. 166:3-7).

Defendants claim that across-the-board pre-admission triage or acuity reviews for IST inmates – who are all pretrial detainees whose criminal charges have been suspended per Penal Code § 1370(a) – would not be feasible, even though it takes Dr. Tyler only about an hour to do one on an ad hoc basis.  (Ex.19, Dr. Tyler Dep. 171:21 – 172:6, 172:15 – 173:17).  Yet, in *Coleman v. Brown*, E.D. Cal. No. 2:90-cv-00520 KJM, the Department of State Hospitals, through the Attorney General's Office, has stressed that convicted prisoner-"patients are not placed in inpatient beds on a 'first-come, first-served' basis, but are instead triaged based on their mental health acuity level."  (Ex. 21, *Coleman* Doc. 5522, Response to OSC, p. 3:12-16).  Pam Ahlin filed a declaration in *Coleman* stating that exact same quote.  (Ex. 22,

---

[1] Around 2017, DSH got new regulations enacted for itself, providing for psychiatric acuity review, but limiting the circumstances under which DSH or NSH will do a pre-admission acuity review of an IST patient to when such review is specifically requested by a jail's "clinician" -- psychiatrist or clinical worker.  Defendant Tyler now refuses to do a psychiatric acuity review if requested by anyone other than the jail's clinician, telling jail administrators and defense lawyers they should have the jail's clinician contact her if they want a psychiatric acuity review on the patient.  No longer may a defense attorney or jail staff request an acuity review.  (Ex. 19, Dr. Tyler Dep. 166:8 – 167:8).

*Coleman* Doc. 5522-1, Pam Ahlin Decl., p. 3:21-25).  In an Order to Show Cause, Eastern District of California Judge Kimberly J. Mueller notes that under the stipulated "Program Guide" in that case, psychiatric prisoner-patients with acute needs must be admitted to a State hospital within 10 days, and intermediate prisoner-patients must be transferred within 30 days; and that DSH had recently agreed to even shorter timelines for convicted prisoners.  (Ex. 23, *Coleman* Doc. 5519, OSC, p. 2:13-21).

Had an acuity review been done on Mr. Luong, he would have been determined to be acute during times that he was not eating or drinking.  (Ex. 19, Dr. Tyler Dep. at 163:21 – 165:20).  Defendants define "psychiatric acuity" as "an individual's mental illness is leading to complications which put the individual at risk of death or serious injury when awaiting admission."  (*Id*. at 161:18 – 162:2).  IST patients like Mr. Luong, having involuntary medication orders, are likely to sustain serious harm to their physical or mental health from "a variety of mechanisms" if not properly medicated as ordered.  (*Id*. at 137:14 – 138:19).  Depending "upon how the jail is housing the severely mentally ill patients," psychotic IST inmates – like Mr. Luong – can be targets for aggression or predation by other inmates.  (*Id*. at 57:25 – 58:19).  Defendant Matteucci agrees that "a schizophrenic patient who's not on medication and is confined with other inmates is at an increased risk of aggression or predatory behavior at the hands of another."  (Ex. 20, Matteucci Dep. 42:11-17).  Mr. Luong's persistent refusal of medication, grave disability including catatonia at times, and history of victimization at Santa Rita would have been easily available to Defendants had they done an acuity review for him, or had someone substantively review his medical records when he was ordered into their custody on July 22, 2016.  Based on these multiple factors, Mr. Luong's psychiatric needs were acute.

 In his report to the Court (and NSH), David Echeandia, Ph.D., found Mr. Luong to be not competent for trial, and concluded, "treatment with antipsychotic medications is both medically appropriate and necessary to restore the defendant's mental competence, given the evidence of his acutely psychotic behavior during the interview."  (Ex. 24, Dr. Echeandia Report, bates 17-22).  Psychiatrist, Martin Blinder, M.D., agreed in his report to the Court, and warned, "so long as he continues to take his medication, he constitutes little danger to self or others."  (Ex. 25, Dr. Blinder Report, bates 23-25).

But Defendants were on notice that he was not taking his medications in the jail.  The CONREP report received by NSH states, in part:

Mr. Luong has a serious mental illness, Schizophrenia. … Mr. Luong generally does well when he takes his anti-psychotic medications which are used to treat his auditory hallucinations and paranoid, as well as grandiose, delusions. It appears that Mr. Luong was not taking his medications at the time of the alleged offenses. … **[A]lthough his [jail] psychiatrist has prescribed an anti-psychotic medication, Risperdal, Mr. Luong is currently refusing to take it** …. Mr. Luong lacks insight into his serious mental illness and need for consistent treatment to keep his psychotic symptoms under control. Without such treatment, Mr. Luong is at high risk for deterioration.

… [T]he court is encouraged to authorize the use of involuntary anti-psychotic medication …. Without such treatment, it is unlikely that Mr. Luong's serious mental illness will improve and remain stable.

(Ex. 26, 7/19/16 CONREP Report) (emphasis added).

NSH Medical Director, Patricia Tyler, M.D., has known for 20 years that county jails do not provide adequate psychiatric treatment to severely mentally ill inmates. (*Id.* at 88:8-20). Jails, in general, do not provide restoration to competency treatment. (Ex. 20, Matteucci Dep. 104:12-14).

When Mr. Luong was placed on NSH's waiting list on August 22, 2016, he had already had to wait a month in jail since the July 22 Commitment Order was entered, and over five months since the first psychiatric evaluation of him was ordered. Defendant Dr. Tyler admits it is common for IST patients to wait in jail for three months or more before being admitted to NSH pursuant to a commitment order. (Ex. 19, Tyler Dep. 85:16-20). Defendant Black estimates that at the time of Mr. Luong's commitment order, the average wait time for admission was likely more than 60 days. (Ex. 13, Cindy Black Dep. 33:3 – 34:11).

By September 7, 2016, when DSH/NSH still had not admitted Mr. Luong to a hospital for restorative treatment, the Superior Court issued an Order to Show Cause to DSH Director Pam Ahlin: "(1) a valid court order having been issued on **July 22, 2016**, directing that … the above named defendant be committed to the Department of Mental Health at the State Hospital in Napa, California, for treatment that will 'promote the defendant's *speedy* restoration to mental competence'; (2) In accordance with *In re Mille* (2010) 182 Cal.App.4th 635, 649-50, which requires that mentally incompetent defendants be delivered to the state hospital *soon* after the commitment order so that the hospital has sufficient time to examine and treat the defendant, and document the defendant's progress within 90 days of the commitment order; and (3) Your departments having failed to comply with this order to deliver the defendant to the state hospital *in a timely manner*, YOU ARE HEREBY ORDERED to comply with the

heretofore mentioned order **forthwith** or to appear before the above-entitled court on **<u>September 12,</u>** **<u>2016 at 9:00 a.m.</u>** to show cause why you should not be held in contempt."  (Ex. 27, OSC) (italics emphasis added).

For at least the last five or six years, NSH has received orders to show cause why it should not be held in contempt for disobeying court orders to admit patients for treatment "all the time."  (Ex. 19, Dr. Tyler Dep. 130:14 – 131:16).  George Maynard, the State of California PMK re: number of Orders to Show Cause for disobeying a court order of commitment for the period January 1, 2014, to the present, produced a one-page document showing the number of OSCs "for disobeying a court order of commitment" for fiscal year 2016: **1,975**.  (Ex. 28, Maynard Dep. Ex. 42).  In July, 2016, DSH issued a report stating that DSH had received 768 OSC's for fiscal year 2015/16 for violation of IST commitment orders.  (Ex. 29, DSH IST Report, July, 2016, p. 1).

DSH Director Ahlin had seen that DSH OSC report in the course of her work and has no reason to dispute those figures.  (Ex. 18, Ahlin Dep. 188:19 – 190:2).  "[T]he order to show causes were to our department of why we didn't admit by a specific date the court wanted."  (*Id*. at 190:25 – 191:16). Director Ahlin says she never sees the OSC's that are directed to her or her department.  (*Id*. at 41:2 - 43:18).  "I understand we get order to show causes to transfer patients, but they go directly into my legal department."  (*Id*. at 43:2-4).  Ms. Ahlin never appears for any OSC despite the court order that she appear: "My attorneys show up for me."  (*Id*. at 194:11-20).

After receiving Orders to Show Cause why they should not be held in contempt of court for disobeying court orders committing an IST inmate to their custody, NSH sometimes engaged in *ex parte* communications with the Superior Court judge who issued the commitment order, to "make a deal" allowing Defendants to admit the patient later.  (Ex. 14, White Dep. 72:17 – 75:9).

Mr. Luong continued to be incarcerated in the Santa Rita jail, without adequate psychiatric care for his court-determined serious psychiatric needs.  The NSH Direct Admission Waiting List reflects that Mr. Luong was finally going to be admitted to NSH on October 11, 2016 – 81 days after his commitment. (Ex. 15, Direct Admission Waiting List excerpt, Ex. 14, White Dep 18:6-19).  Sadly, it was too late.  Mr. Luong was killed by his mentally ill cellmate earlier that morning.  He "Died in custody."  *Id*.

Defendant DSH claims not to know how many IST inmates have died in jail while waiting to be admitted to a State Hospital. (Ex. 30, DSH's Answers to Interrog. No. 1). Plaintiffs' counsel alone have handled two other civil rights cases arising from the suicide deaths of IST inmates Matthew Anderson and Richard Ramirez while on the wait list for Napa State Hospital. See *Anderson v. Siskiyou County and NSH, et al.*, N.D. Cal. No. C-10-1428-SBA and *Atayde v. NSH, et al.*, E.D. Cal. No. 1:16-cv-00398-DAD.

Anecdotally, the complete "Direct Admission Waiting List" maintained by Dana White from 2004-2018 shows four more inmates who died on the waiting list: Inmates 3150, 4636, 4952, and 7725. (Ex. 31, complete Direct Admission Waiting List). That list is incomplete, because it fails to note that Richard Ramirez (#6007) died before being admitted to NSH, and it fails to include Matthew Anderson at all even though his commitment order required NSH to admit him "on or before April 3, 2009" and he died on April 9, 2009 still in jail.

The complete NSH Direct Admission Waiting List also reveals many IST inmate-patients have had to wait inordinately long periods of time for their court-ordered admissions to a State Hospital, often in the hundreds of days. Attached is a summary of some of the longest wait times from that list. (Ex. 32, Data Summary: "Longest Waits on Direct Admission Wait List"). Inmate-patient number 4636 died after waiting 563 days for admission to NSH. Patient number 7043 had to wait 586 days, patient number 4989 had to wait 468 days, and patient 5039 had to wait 384 days. (*Id.*).

At NSH, Cindy Black briefed Executive Director, Defendant Matteucci, on the status of the waiting list weekly. (Ex. 20, Matteucci Dep. 69:25 – 70:12). "[A]s of June 27, [2016] DSH ha[d] 464 IST referrals on its waitlist." (Ex. 29, DSH IST Report, July, 2016, p. 1). NSH did not inform judges, courts, District Attorneys or defense attorneys of the length of its waiting list. (Ex. 20, Matteucci Dep. 110:19 – 11:5, 120:7-14). Additionally, Defendants never informed the courts, DA's, or criminal defense counsel how long the patient was expected to have to wait before the Defendants would admit him to a hospital. (Ex. 18, Ahlin Dep. 122:1 – 122:17; Ex. 20, Matteucci Dep. 110:19 – 111:5; Ex. 13, Black Dep. 75:18 – 77:14).

And, no Defendant informed herself of the constitutional limits on their decisions to make IST inmates wait for treatment. None of them knew about the Ninth Circuit's binding decision in the *Mink*

case issued thirteen years before Dat Luong's death. (Ex. 18, Ahlin Dep. 140 :12-19; Ex. 20, Matteucci Dep. 127 :5-19; Ex. 19, Tyler Dep. 206:23 – 207:9; Ex. 13, Black Dep. 91:15 – 92:6).

While Ms. Matteucci was Executive Director of NSH for eight years, the State never trained her about *Oregon Advocacy Center v. Mink* or about the due process rights of IST inmates. (Ex. 20, Matteucci Dep. 125:2-11; 127:5-19). As NSH Director, she was aware at least that holding IST inmates in jail for "for weeks or months violates their due process rights." (*Id*. at 138:8 – 139:8). Since becoming the Superintendent of Oregon State Hospital ("OSH"), she now knows about *Mink* and knows more about State Hospitals' due process obligations. (*Id*. at 127:10 – 129:2). In her current capacity, Superintendent Matteucci works to ensure that OSH admits IST inmates within seven days, as required by *Mink*. (*Id*. at 128:20 – 129:20).

At NSH, Ms. Matteucci was concerned that the patients' due process rights were being violated by the long delays in admitting them to the State Hospital, causing a delay in competency restoration and causing them to remain in jail after being declared IST. (*Id*. at 78:12-17, 104:22 – 107:1).

Plaintiffs also submit the declarations of two jail psychiatric and administration experts from *Stiavetti v. Ahlin*, Alameda Co. Sup. Ct. No. RG15779731, Terry Kupers, M.D., M.S.P. and Bruce C. Gage, M.D., who will be disclosed in this case. In *Stiavetti*, as here, these experts were asked to opine on mental health treatment and conditions in California jails and how they differ from those in state hospitals, and the reasonable length of time to admit IST inmates to DSH facilities.

Dr. Kupers is a board-certified psychiatrist and an expert on correctional mental health issues. He was also an expert in *Trueblood v. Washington*. See (Ex. 33, Decl. of Terry Kupers, M.D., M.S.P., pp. 1-4). Dr. Kupers' opinions include the following:

- Adequate competency restoration treatment can only occur in a setting conducive to mental health treatment.
- Jail is not a setting conducive to mental health treatment nor to competency restoration treatment, absent major alterations in milieu, staffing, and programming. Jail crowding, the threat of violence, the culture of punishment that permeates the facilities, and the relative inadequacy of programs and treatment have a very detrimental effect on the mental status of incompetent prisoners, and on the ability to participate effectively in competency restoration.

- Jails are violent places. Prisoners with serious mental illness are disproportionately victims of violence, or lose control of their temper and get involved in altercations.
- It is my understanding that the Department of State Hospitals, partly in response to litigation, has been attempting to reach a 60-day limit to the wait for patients to be transferred from jails to a state hospital. But sixty days is far too long for incompetent individuals to remain in harmful jail conditions with limited mental health treatment.
- Because of crowding, violence, isolation, the frequent use of force by staff and relatively inadequate mental health treatment and rehabilitation programs, individuals with serious mental illness are at risk of harm while incarcerated in the jail.
- I conclude to a reasonable degree of medical certainty that the longer an individual suffering from serious mental illness is consigned to jail, likely including time in isolation, and is not provided adequate mental health treatment, the worse his or her condition, disability and prognosis, and therefore the less likely there will be a restoration of competence (or, in a certain proportion of cases, the longer it will take for competence to be restored).

(Ex. 33, Dr. Kupers Decl., pp. 31-34).

As Dr. Gage explains, DSH can do much better. Dr. Gage served as the Chief of Psychiatry for the Washington State Department of Corrections since 2008. (Ex. 34, Decl. of Bruce C. Gage, M.D., pp. 5-6). For *Stiavetti*, Dr. Gage did a thorough audit of the State of California's provision of mental health services to jail inmates and criminal defendants. He concluded that with specific, practical reforms, DSH should soon be able to admit non-acute IST patients to a State Hospital within fourteen days of receiving necessary information for admission (and the admission packets must be streamlined and DSH must be proactive with counties to obtain necessary information, such that all necessary information should be received within days of a commitment order). Psychiatrically acute patients, defined as posing a danger to self or others or gravely disabled, "should be considered emergencies and promptly admitted" to a State Hospital within one day. (Ex. 34, Dr. Gage Decl., pp. 6-10).

This one-day target for admission of acute patients is feasible, as NSH Medical Director Dr. Tyler admits, on the rare occasions that she has done a one-hour acuity review and found the patient to be psychiatrically acute, he is given the next available bed. (Ex. 19, Dr. Tyler Dep. 166:3-7). That generally means "the next day." (Ex. 35, Dana White Dep. (Atayde Case), 50:9 – 51:13).

## STANDARD OF REVIEW

A party may move for summary judgment of a claim or defense, or "part of" a claim or defense. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court may not weigh the evidence and must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* at 322-23. However, on an issue for which its opponent will have the burden of proof at trial, the moving party can prevail merely by "pointing out to the District Court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the moving party meets its initial burden, the opposing party must then "set forth specific facts showing that there is a genuine issue for trial" in order to defeat the motion. *Anderson*, 477 U.S. at 250.

## ARGUMENT

I.  **Dat Thanh Luong's Due Process Rights to Timely Restorative Treatment and to Be Free from Punitive Incarceration After Being Declared Incompetent to Stand Trial Were Violated When He Was Not Admitted to Napa State Hospital Within Seven Days of His Commitment Order, or Alternatively, for 81 days Until He Died**

   A.  **Holding incapacitated criminal defendants in jail for weeks or months violates their due process rights**

In 2003, *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1121-22 (9th Cir. 2003) became the leading precedent in the Ninth Circuit concerning the due process rights of IST inmates. The State of California has refused to follow this controlling law, leading to inmates' needless suffering, violations of rights, injury and death.

In *Mink*, the Ninth Circuit was tasked with reviewing an injunction, granted after trial, that required Oregon State Hospital ("OSH") to admit IST defendants within seven days of an order determining their incapacity to proceed to trial. *Id*. at 1005. Oregon's IST statute and procedures at that time were very similar to California's. *Id*. at 1005-06. For instance, Mr. Luong's commitment order, under California law, required the NSH Director to report to the court within 90 days *of commitment* concerning the "defendant's progress toward recovery of the defendant's mental competence;" under Oregon law, the OSH Superintendent was required to report to the court within 60 days *of the defendant's admission* to OSH "whether there is a substantial probability that in the foreseeable future, the defendant will have the capacity to stand trial," and within 90 days *of the defendant's admission* whether the defendant has been restored to competency, and if not whether there is a substantial probability that the defendant will gain or regain capacity in the foreseeable future. *Id*. (citing ORS § 161.370 (3), (4), and (5)) (emphasis added).

The district court found that IST inmates were having to wait an average of "about one month" in county jails, and sometimes as long as two, three or even five months before being admitted to OSH. *Id*. at 1006. The court also described a number of harms that delayed admissions cause to IST defendants – which apply equally to California – including that such defendants can be disruptive in jails, often decompensate rapidly if they refuse their medications, and that jails tend to exacerbate their mental illness. *Id*. at 1006-07. Similar to Director Matteucci and Dr. Tyler's testimony and Dr. Kupers' opinions here, the court found "[u]nlike the county jails, OSH has the capacity to treat a person's mental illness." *Id*. at 1007. "This population has a high suicide risk, and psychosis can be an emergency requiring immediate treatment." *Id*. "Depriving [persons deemed unfit to proceed] of necessary medical treatment increases the likelihood that they may decompensate and suffer unduly." *Id*. [2]

Reviewing the validity of the injunction on the merits was not merely a matter of interpreting state statutes; it required the Ninth Circuit to consider the IST Defendants' due process rights. *Id*. at 1119. First, the *Mink* Court "reject[ed] OSH's claim that the deliberate indifference standard governs the due process rights of incapacitated criminal defendants," noting "[p]retrial detainees have not been convicted

---

[2] See also *In re Mille*, 182 Cal. App. 4th 635, 645-49, 105 Cal. Rptr. 3d 859 (2010) (even if jails have power to administer antipsychotic medication, that is no substitute for transfer of an IST inmate to a DSH facility or program).

of any crime." *Id.* at 1120. "'Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.'" *Id.* at 1120 (quoting *Youngberg v. Romeo,* 457 U.S. 307, 321-22 (1982)). The Ninth Circuit refused "to relegate incapacitated criminal defendants to the same level of treatment afforded to convicted prisoners, a result *Youngberg* rejected." *Id.*

"Incapacitated criminal defendants have liberty interests in freedom from incarceration and in restorative treatment." *Id.* at 1121. The Court explained:

> Because incapacitated criminal defendants have not been convicted of any crime, they have an interest in freedom from incarceration.[3] They also have a liberty interest in receiving restorative treatment. We have held that civilly committed persons must be provided with mental health treatment that gives them "a realistic opportunity to be cured or improve the mental condition for which they were confined." *Sharp v. Weston, 233 F.3d 1166, 1172 (9th Cir. 2000)* (citing *Ohlinger v. Watson, 652 F.2d 775, 779 (9th Cir. 1980)).* **"Lack of funds, staff or facilities cannot justify the State's failure to provide [such persons] with [the] treatment necessary for rehabilitation."** *Ohlinger, 652 F.2d at 779.*

*Id.* at 1121 (emphasis added).

Rather than a deliberate indifference test, "[w]hether the substantive due process rights of incapacitated criminal defendants have been violated must be determined by balancing their liberty interests in freedom from incarceration and in restorative treatment against the legitimate interests of the state. *See Youngberg, 457 U.S. at 321.* We conclude that such a balance favors the mentally ill defendants awaiting trial." *Id.* at 1121.

Although *Mink* did not explicitly state it was applying heightened scrutiny, it is "beyond dispute" that the right to liberty is a fundamental right. *Hernandez v. Sessions*, 872 F.3d 976, 993 (9th Cir. 2017). Freedom from imprisonment is "at the 'core of the liberty protected by the Due Process Clause.'" *Id., quoting Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). Restrictions on the liberty interests of pretrial detainees must pass heightened scrutiny, and therefore must be "narrowly tailored to serve a compelling state interest." *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780-781 (9th Cir. 2014) (citing *United States v.*

---

[3] The Court previously explained: "'The Supreme Court has recognized that an individual has a liberty interest in being free from incarceration absent a criminal conviction.'" *Id.* (quoting *Oviatt ex rel. Waugh v. Pearce,* 954 F.2d 1470, 1474 (9th Cir. 1992) (citing *Baker v. McCollan,* 443 U.S. 137, 144, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979))).

*Salerno*, 481 U.S. 739, 748-51 (1987). *See also, Buffin v. City & County of San Francisco*, N.D. Cal. Case No. 15-cv-04959-YGR (March 4, 2019 Order Granting Plaintiffs' Motion for Summary Judgment, 2019 U.S. Dist. LEXIS 34253, * 32) (applying strict scrutiny to find San Francisco's use of its bail schedule a violation of due process).

Noting that (as Defendants also admit here) IST defendants detained in jail do not receive care giving them a realistic opportunity of becoming competent to stand trial, the *Mink* Court concluded that OSH "violates the substantive due process rights of incapacitated criminal defendants when it refuses to admit them in a timely manner." *Id.* at 1121-22.

The Court explained what it meant by "in a timely manner:"

> **Holding incapacitated criminal defendants in jail <u>for weeks or months</u> violates their due process rights** because the nature and duration of their incarceration bear no reasonable relation to the evaluative and restorative purposes for which courts commit those individuals.

*Id.* at 1122 (emphasis added). Thus, the Court affirmed the district court's seven-day deadline for the Oregon State Hospital to admit IST inmates for restorative treatment. *Id.*

Importantly, the *Mink* Court also rejected Oregon's argument that the seven-day period should begin to run from the date OSH *receives* a commitment order rather than the date the order is issued: "The interest of an incapacitated criminal defendant in obtaining timely treatment accrues at the moment that defendant is declared unfit, not at the moment the fact of unfitness is communicated to OSH." *Id.* at 1122, n. 13.

*Mink* has been consistently followed by district courts: *Atayde v. Napa State Hospital*, 255 F.Supp.3d 978, 999 (E.D. Cal. 2017) ("The length of decedent's detention following the issuance of the court order of commitment—two months—is comparable to the length of detention in other cases where Fourteenth Amendment violations have been identified."); *Willis v. Wash. State Dep't of Social & Health Servs.*, No. C16-5113 RBL, 2017 U.S. Dist. LEXIS 40682, 2017 WL 1064390, at *6 (W.D. Wash. Mar. 21, 2017) ("Although *Mink* did not establish a bright line rule, it held that 'weeks or months' was too long where the plaintiffs were detained for an average of one month. The nature and duration of [plaintiff's] ninety-one day detention . . . bears no reasonable relation to the evaluative and restorative purpose for which he was committed."); *Estate of Vargas v. Binnewies*, No. 1:16-cv-01240-DAD-EPG, 2017 U.S. Dist. LEXIS 80576 at *19; 2017 WL 2289357 (E.D. Cal. May 25, 2017) (denying Defendants Pamela

Ahlin's and Dolly Matteucci's motion to dismiss where IST inmate died while waiting thirty days for admission to NSH ("[T]he requirement that state hospitals issue a report regarding the detainee's progress ninety days from the date of the commitment order—not the date of detainee's admission to the hospital—obligates the state hospitals to, at the very least, ensure that detainees are transferred to the state hospital within sufficient time to be evaluated, to be prescribed treatment, and for progress to be reported to the state court no more than ninety days from the date of the commitment order."); *United States v. Zapata-Herrera*, NO. 14-cr-3639-GPC, 2015 U.S. Dist. LEXIS 107444; 2015 WL 4878319 (S.D. Cal. Aug. 14, 2015) ("Although 18 U.S.C. § 4241 does not set a limit on the amount of time that criminal defendants can be incarcerated while awaiting court-ordered competency services, courts within this circuit have held that seven days is the maximum period of incarceration permitted by the United States Constitution.") (citing *Mink, supra,* and *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 101 F.Supp.3d 1010 (W.D. Wash. 2015)).

Following *Mink*, the State of Washington now also adheres to a seven-day deadline to admit IST defendants to a state hospital. In *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 73 F.Supp.3d 1311 (W.D. Wash. 2014), the district court granted the plaintiffs' motion for summary judgment "on the question of whether current in-jail waiting times for court-ordered competency evaluation and restoration services violate the Due Process Clause of the Fourteenth Amendment." *Id*. at 1312. The court found that Washington state hospitals had been unable to admit IST inmates for restorative treatment within the seven-day timeframe suggested by the state legislature, and in-jail waiting times ranged from two weeks to almost two months. *Id.*

*Granting the exact same motion for partial summary judgment at issue here*, the court wrote:

The Due Process Clause protects the liberty interests of individuals to be free from incarceration absent a criminal conviction, and to receive restorative treatment when they are being incarcerated due to mental incompetence. Defendants' failure to provide timely services to these detainees has caused them to be incarcerated, sometimes for months, in conditions that erode their mental health, causing harm and making it even less likely that they will eventually be able to stand trial. Because this failure violates the due process rights of criminal defendants who are mentally ill or suspected to be mentally ill, **the Court grants Plaintiffs' motion and declares that Defendants have violated their constitutional rights. At trial, the Court will hear facts to determine what amount of time detainees can be made to wait without violating their due process rights, and will fashion a remedy accordingly.**

*Id.* at 1313 (emphasis added).  The court further explained:

> Like the *Mink* court, this Court can discern no legitimate state interest in "keeping mentally incapacitated criminal defendants locked up in county jails for weeks or months." *Mink*, 322 F.3d at 1121. Defendants argue they have a "legitimate interest in <u>reasonable</u> delays before provision of competency services." (Dkt. No. 95 at 13) (emphasis in original). The Court disagrees. As discussed above, the state has a legitimate interest in an efficient, cost-effective competency services apparatus, and the functioning of that apparatus may require the passage of a certain amount of time before services are provided. There is, however, no legitimate independent interest in delays within the system because delays undermine the state's "primary governmental interest" of bringing the accused to trial.

*Id.* at 1315-16.

After trial, the *Trueblood* district court entered a permanent injunction requiring the State of Washington to provide competency services within seven days:

> By failing to provide competency evaluation and restoration services within seven days of a court order, the State fails to provide both the substantive and procedural due process required by the Constitution. Our jails are not suitable places for the mentally ill to be warehoused while they wait for services. Jails are not hospitals, they are not designed as therapeutic environments, and they are not equipped to manage mental illness or keep those with mental illness from being victimized by the general population of inmates. Punitive settings and isolation for twenty-three hours each day exacerbate mental illness and increase the likelihood that the individual will never recover.
>
> *        *        *
>
> The mentally ill are deserving of the protections of the Constitution that our forefathers so carefully crafted. The rights protected can be difficult and sometimes costly to secure; however, the Constitution is a guarantee to all people, and is not dependent upon a price tag. The State must honor its obligations under the law.

*Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 101 F. Supp. 3d 1010, 1013 (W.D. Wash. 2015).

The State of Washington did not appeal the seven-day deadline to begin restorative treatment on IST inmates. *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 822 F.3d 1037, 1042 (9th Cir. 2016).  In reaffirming the principles articulated in *Mink*, the Ninth Circuit quoted *Mink's* "weeks or months" standard for assessing due process violations.  822 F.3d at 1043.  The Ninth Circuit explained, "In *Mink*, all of the detainees had been found incompetent and had a distinct 'liberty interest[] in freedom from incarceration' so they could receive restorative treatment." 322 F.3d at 1121.  The state had no legitimate interest in keeping them 'locked up in county jails for weeks or months' following an incompetency determination." *Trueblood*, 822 F.3d at 1044 (quoting *Mink*, 322 F.3d at 1121).

The Ninth Circuit reversed only the district court's deadline for the state to conduct competency *evaluations*, not the deadline for commencing restorative treatment. *Id*. at 1046. It remanded the case back to the district court to reconsider the evaluation deadline in light of recent legislative changes mandating a fourteen-day deadline for competency evaluations. *Id.* On remand, the district court ordered Washington to conduct in-jail competency evaluations within fourteen days of an order for same. *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, NO. C14-1178-MJP, 2016 U.S. Dist. LEXIS 108637 at **41, 50-51; 2016 WL 4268933 (W.D. Wash. Aug. 15, 2016).

Besides Oregon and Washington, the State of Louisiana has been ordered to admit IST inmates for restorative treatment within 21 days of a court order. See *Advocacy Ctr. for Elderly and Disabled v. Louisiana Dep't of Health and Hosp.*, 731 F. Supp. 2d 603, 623-24 (E.D. La. Aug. 9, 2010) (ordering that all IST inmates be admitted to state hospital within 21 days of court order; "[T]he evidence presented indicates that the decision to keep the Detainees in parish jail is an economic one and not one made out of concern for their mental-health treatment. The Court therefore cannot find that the state's interest outweighs the Detainees' liberty interests under the *Youngberg* inquiry."). See also *Disability Law Center v. Utah*, 180 F. Supp. 3d 998, 1012 (D. Utah 2016) (finding that the plaintiff stated a cognizable substantive due process claim against a state hospital for detaining incompetent pretrial detainees in jails for extended periods after a court order of commitment; "And there is no suggestion that the length of their detention, or the lack of adequate treatment, is the product of professional judgment."); *In re Mille*, 182 Cal. App. 4th at 649-50 (2010) (delivery of a pretrial detainee to a California state mental hospital eighty-four days after the issuance of a commitment order is untimely and unreasonable).

And, like the district court in *Trueblood,* an Arkansas district court granted the same motion for summary judgment now brought by Mr. Luong's wife and son, holding that "lengthy and indefinite periods of incarceration, without any legal adjudication of the crime charged, caused by the lack of space at ASH, is not related to any legitimate goal, is purposeless and cannot be constitutionally inflicted upon the members of the class. While the Court will await the remedy phase of this litigation to attempt to determine what length of wait is constitutionally permissible, the length of wait experienced by inmates today is far beyond any constitutional boundary." *Terry v. Hill*, 232 F.Supp.2d 934, 943-44 (E.D. Ark 2002).

**B. The State has no legitimate interest in holding incapacitated defendants in jail, while depriving them of necessary, court-ordered restorative treatment**

As *Mink* explains, "[w]hether the substantive due process rights of incapacitated criminal defendants have been violated must be determined by balancing their liberty interests in freedom from incarceration and in restorative treatment against the legitimate interests of the state." *Mink*, 322 F.3d at 1121 (citing *Youngberg,* 457 U.S. at 321). Infringement of a due process liberty interest requires heightened scrutiny. See *supra, e.g., Lopez-Valenzuela v. Arpaio*, 770 F.3d at 780-781.

Numerous courts addressing this issue have found the state has no legitimate interest in holding incapacitated defendants in jail, while depriving them of necessary, court-ordered restorative treatment. See *Mink*, *supra*, 322 F.3d 1121-22 ("We conclude that such a balance favors the mentally ill defendants awaiting trial." … The state hospital "violates the substantive due process rights of incapacitated criminal defendants when it refuses to admit them in a timely manner."); *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 73 F.Supp.3d at 1315-16 ("Like the *Mink* court, this Court can discern no legitimate state interest in 'keeping mentally incapacitated criminal defendants locked up in county jails for weeks or months.'" … "There is, … no legitimate independent interest in delays within the system because delays undermine the state's 'primary governmental interest' of bringing the accused to trial."); *Willis, supra*, 2017 U.S. Dist. LEXIS 40682, 2017 WL 1064390, at *6 ("The nature and duration of [plaintiff's] ninety-one day detention . . . bears no reasonable relation to the evaluative and restorative purpose for which he was committed."); *Advocacy Ctr. for Elderly and Disabled v. Louisiana Dep't of Health and Hosp.*, 731 F. Supp. 2d at 623-24 ("[T]he evidence presented indicates that the decision to keep the Detainees in parish jail is an economic one and not one made out of concern for their mental-health treatment. The Court therefore cannot find that the state's interest outweighs the Detainees' liberty interests under the *Youngberg* inquiry.").

Furthermore, even though Plaintiffs do not at this time seek summary judgment for liability against the individual Defendants, no objectively reasonable professional judgment was behind the decisions that caused Mr. Luong to languish in jail for 81 days without court-ordered rehabilitative treatment until he died. As the Ninth Circuit explained in *Ammons v. State Dep't of Soc. & Health Servs.*, 648 F.3d 1020, 1027 (9th Cir. 2011), the standard that applies for a due process claim for injury to an

involuntarily committed person against a hospital administrator in these circumstances is the *Youngberg* objectively reasonable professional judgment test:

> According to *Youngberg*, the Constitution requires that hospital officials, in order to protect a patient's right to safe conditions, exercise professional judgment. [*Youngberg*, 457 U.S.] at 321-22. The Court explained that liability may be imposed for failure to provide safe conditions "when the decision made by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. *Youngberg*, then, created a standard whereby whether a hospital administrator has violated a patient's constitutional rights is determined by whether the administrator's conduct diverges from that of a reasonable professional. We refer to this as the "*Youngberg* professional judgment standard."

*Ammons*, 648 F.3d at 1027 (footnote omitted).

*Ammons* was careful to point out that the *Youngberg* professional judgment standard is an objective standard, requiring more than that the official exercised *any* professional judgment. "[T]he official must exercise judgment that comports with an objective standard." *Id.* at n. 5 (citing *Youngberg*, 457 U.S. at 322-23).[4]

> In distinguishing this standard from the "deliberate indifference" standard used in Eighth Amendment cruel and unusual punishment cases, the *Youngberg* Court noted that "[p]ersons who have been involuntarily committed are entitled to *more considerate treatment and conditions of confinement* than criminals whose conditions of confinement are designed to punish." [*Youngberg*, 457 U.S.] at 321-22 (emphasis added). The Court approvingly cited the *Youngberg* professional judgment standard in *County of Sacramento v. Lewis*, 523 U.S. 833, 852 n.12, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998), noting that "[t]he combination of a patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare."

*Ammons*, 648 F.3d at 1027 (emphasis in original). See also *Id.* at 1029 (discussing that "the *Youngberg* professional judgment standard is 'necessarily an *objective* test.'") (emphasis in original).

**In the present case, there is no evidence that *anyone*, including the individual Defendants, exercised any objective professional judgment in the decisions to hold Mr. Luong in jail for 81 days after his criminal charges were suspended, without restorative treatment, in violation of the commitment order and *Mink*, until he died.** The only rationale that Defendants have given is

---

[4] This objective standard is consistent with the current objective deliberate indifference standard for a pretrial detainee's medical needs claim. See *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

economic, or that they just followed their normal procedures. However, lack of funds is not an exercise of professional judgment. And, "[l]ack of funds, staff or facilities cannot justify the State's failure to provide [such persons] with [the] treatment necessary for rehabilitation." *Mink*, 322 F.3d at 1121 (citing *Ohlinger,* 652 F.2d at 779). See also *Pederson v. Superior Court*, 105 Cal.App.4th 931, 941 (2003) (saving money or shifting costs from the state to counties are not compelling state interests where the state action or inaction is subject to strict scrutiny); *In re Grimes*, 208 Cal.App.3d 1175, 1183 (1989) ("Neither administrative inconvenience nor lack of resources can provide justification for deprivation of constitutional rights.").

Other courts have found a total lack of exercise of any professional judgment in similar cases. See *Disability Law Center v. Utah*, 180 F. Supp. 3d at 1012 ("And there is no suggestion that the length of their detention, or the lack of adequate treatment, is the product of professional judgment."); *Advocacy Ctr. for Elderly and Disabled v. Louisiana Dep't of Health and Hosp.*, 731 F. Supp. 2d at 623-24 ("[T]he evidence presented indicates that the decision to keep the Detainees in parish jail is an economic one and not one made out of concern for their mental-health treatment.").

### **RELIEF REQUESTED**

Because the State of California, and the State Defendants, had no legitimate interest to keep Mr. Luong in jail for 81 days after his criminal charges were suspended, without restorative treatment, until he died, in violation of the commitment order and *Mink*, Mr. Luong's due process liberty interests in freedom from incarceration and in receiving restorative treatment were violated. Plaintiffs therefore seek partial summary judgment by means of a declaration and finding by this Court that Mr. Luong's right to due process was violated when he was not admitted to a State Hospital within seven days of his commitment order, or alternatively, within the 81 days until he died in jail.

Whether the individual Defendants are personally responsible for that violation of rights can remain an issue for trial.

Respectfully Submitted,

Dated: July 25, 2019                HADDAD & SHERWIN LLP


*/s/ Michael J. Haddad*
MICHAEL J. HADDAD
Attorneys for Plaintiffs