# EXHIBIT 14

**In the Matter Of:**

DAT THANH LUONG vs ALAMEDA COUNTY, et al.,

---

**DANA WHITE**

*June 03, 2019*

---

**Court Reporters, Videography, Trial Preparation**

**Videoconference Center**

Oakland ◆ San Francisco ◆ San Jose

Sacramento ◆ Irvine ◆ Los Angeles

877.451.1580

www.aikenwelch.com



1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    ---oOo---

4  DAT THANH LUONG, DECEASED, through
   his Co-Successors in Interest, AI
5  QIONG ZHONG, Individually and as
   mother and Next Friend for W.L., a
6  minor, and MAI CHAU, individually,

7          Plaintiff,

8  vs.                          No. 3:17-cv-06675-EMC

9  ALAMEDA COUNTY, a public entity;
   SHERIFF GREG AHERN; JAIL COMMANDER
10 THOMAS MADIGAN; DR. RINATA WAGLE,
   M.D.; ESTATE OF MOHINDER KAUR, M.D.;
11 JACKSON & COKER LOCUMTENENS, LLC;
   BONNIE COOK, MFT; DEPUTY BRANDEN
12 MCBRIDE; SHERIFF'S TECHNICIAN ROBERT
   LUEBKER; DEPUTY SCOTT BRYNING; DEPUTY
13 SHAWN CHRISTIANSEN; NAPA STATE HOSPITAL,
   CALIFORNIA DEPARTMENT OF STATE HOSPITALS,
14 a public entity; PAM AHLIN; DOLLY MATTEUCCI;
   CINDY BLACK; and DOES 1-20, Jointly and Severally,

15

16          Defendants.

17 _____/

18    VIDEOTAPED DEPOSITION OF DANA WHITE

19    Taken before MICHELE J. LUCAS

20    CSR No. 4017

21    June 3, 2019

22

23    Aiken Welch Court Reporters
      One Kaiser Plaza, Suite 250
      Oakland, California 94612
24    (510) 451-1580/(877) 451-1580
      Fax:  (510) 451-3797
25    www.aikenwelch.com

Page 2

```
1              I N D E X
2                                           PAGE
3  EXAMINATION BY MS. SHERWIN               8,78
4  EXAMINATION BY MS. ADDAMS                76
5
6              E X H I B I T S
7  NUMBER                                   PAGE
8  Exhibit 1    Deposition subpoena          6
9  Exhibit 2    Ataydc Order rc Stipulation Rc  6
               Confidential Document Production
10
   Exhibit 3    White binder: Luong Direct    6
11              Admission Waiting List
12 Exhibit 4    Ramirez State Production Waiting  6
               List Materials
13
   Exhibit 5    List 11/2018-5/2019           9
14              DSH 000539550
15 Exhibit 6    2-Page Direct Admission Waiting  15
               List No. 7529-7558
16
   Exhibit 7    2-Page Direct Admission Waiting  32
17              List No. 5999-6028
18 Exhibit 8    1-Page Direct Admission Waiting  43
               List 4949-4978 Prout
19
   Exhibit 9    1-Page Direct Admission Waiting  45
20              List 3149-3178 Morua
21 Exhibit 10   1-Page Direct Admission Waiting  46
               List 4619-4648 Shipley
22
   Exhibit 11   1-Page Direct Admission Waiting  49
23              List 962-991
24 Exhibit 12   2-Page Direct Admission Waiting  51
               List 2159-2188
25
```

Page 3

```
1              E X H I B I T S
2  NUMBER                                   PAGE
3  Exhibit 13   2-Page Direct Admission Waiting  53
               List 2099-2128
4
   Exhibit 14   Other Types of County Designated  56
5               Facilities
6  Exhibit 15   E-mail chain dated Oct 11-12,   63
               2016 DSH 000054
7
   Exhibit 16   E-mail dated 7/11/2017          65
8               DSH 000059
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              DEPOSITION OF DANA WHITE
2
3        BE IT REMEMBERED, that pursuant to Notice, and
4   on the day 3rd of June 2019, commencing at the hour of
5   10:13 a.m., in the offices of Haddad & Sherwin, 505
6   17th Street, Oakland, California 94612, before me,
7   MICHELE J. LUCAS, a Certified Shorthand Reporter, State
8   of California, personally appeared DANA WHITE, produced
9   as a witness in said action, and being by me first duly
10  sworn, was thereupon examined as a witness in said
11  cause.
12              ---oOo---
13 APPEARANCES
14 For the Plaintiff:
15      JULIA SHERWIN
        MAYA SORENSEN
16      Haddad & Sherwin
        505 17th Street
17      Oakland, CA 94612
        510-452-5500
18      Michael.julia@haddadsherwin.com
        Maya@haddadsherwin.com
19
20 For the Defendants Napa State Hospital, California
   Department of State Hospitals:
21
        JENNIFER C. ADDAMS
22      Deputy Attorney General
        455 Golden Gate Avenue, Suite 11000
23      San Francisco, CA 94102-7004
        415-510-3363
24      Jennifer.addams@doj.ca.gov
25
```

Page 5

```
1  For the Defendant Department of State Hospitals:
2       SHELISE (SHELLEY) MUZIO
        State of California
3       Department of State Hospitals
        1600 9th Street, Room 350
4       Sacramento, CA 95814
        916-651-9729
5       Shelise.muzio@dsh.ca.gov
6
   VIDEO OPERATOR:  Philip Knowles
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  (Exhibits 1-4 were marked for identification.)
2
3       THE VIDEOGRAPHER:  Good morning, Counsel.
4  Here begins media No. 1 of the deposition of Dana
5  White vs. -- sorry -- deposition of Dana White,
6  Volume One.  The caption of this case is Luong vs.
7  Alameda County, et al., in the United States
8  District Court for the Northern District of
9  California, and the case number is
10  3:17-CV-06675-EMC.
11      Today's date is Monday, June 3rd, 2019,
12  and the time is approximately 10:14 a.m.  This
13  deposition is taking place at 505 17th Street in
14  Oakland, California, 94612.
15      The videographer and court reporter are
16  both appearing on behalf of Aiken Welch Court
17  Reporters in Oakland, California.
18      Would counsel please voice identify
19  yourselves and state whom you represent.
20      MS. SHERWIN:  This is Julia Sherwin along
21  with Maya Rodriguez Sorensen for the Plaintiffs.
22      MS. ADDAMS:  Jennifer Addams on behalf of
23  the State Defendants, and I am here with Shelley
24  Muzio.
25      THE VIDEOGRAPHER:  Thank you, Counsel.

1       The court reporter will now swear in the
2  witness, and we can begin.
3
4              DANA WHITE,
5         sworn as a witness,
6         testified as follows:
7
8       MS. SHERWIN:  Before we proceed, I just
9  want to note for the record that the parties have
10  had a discussion off the record, and the State has
11  produced some documents in this case that also were
12  produced in the Atayde case against the State as
13  well.
14      And I will just note for the record we've
15  marked as Exhibit 2 to the deposition the order in
16  the Atayde case, Lucy Atayde vs. Napa State
17  Hospital, et al., Eastern District of California
18  case No. 1:16-CV-00398-DAD-SAB, document No. 141,
19  filed May 23rd, 2019.
20      That stipulation and order removes the
21  confidentiality provision -- designations of the
22  documents that we will be -- the waiting list
23  documents, including Ms. White's direct admission
24  waiting list, that will be discussed today, and so
25  we have marked that as Exhibit 2 to the deposition.

1       As Exhibit 1, we have the subpoena to
2  testify in this deposition, which requested some
3  documents from the witness.
4  EXAMINATION BY MS. SHERWIN:
5       Q.  Ms. White, can you take a look at
6  Exhibit 1.  Let me pull it out for, and you let me
7  know if you have seen that document before today.
8       A.  Yes.
9       Q.  Okay.  And did you take a look at the list
10  of documents that we asked you to produce, which is
11  Attachment A, and gather all the documents and
12  information that you could?
13      A.  Yes.
14      Q.  Okay.  So I understand from your counsel
15  that you have brought some documents with you both
16  on CDs and in paper copies and that the State
17  requires permission from some director in order to
18  produce a thumb drive.
19      So at this time, in lieu of the thumb
20  drive you are producing CDs, and I guess the thumb
21  drive permission is pending, correct?
22      MS. ADDAMS:  That's right.  We will have
23  that thumb drive.
24      MS. SHERWIN:  Okay.  So can I see those,
25  please.  Thank you.

1       And then, just for the record, the CD ROM
2  has Bates numbers 292 to 550 on it.
3       And what is contained on this CD-ROM?
4       MS. ADDAMS:  I can speak for her.
5       MS. SHERWIN:  Oh, okay.  Sure.
6       MS. ADDAMS:  It has her database.  It's
7  responsive -- I'm sorry.  I don't have the --
8       MS. SHERWIN:  Exhibit 3, the direct
9  admission waiting list?
10      MS. ADDAMS:  Could I -- sorry.
11      MS. SHERWIN:  Sure.
12      MS. ADDAMS:  It is responsive to the
13  subpoena, No. 1, which is a database that Dana
14  White had been accumulating.
15  BY MS. SHERWIN:
16      Q.  Okay.  And then, Ms. White, you have
17  produced some paper copies identified DSH 539
18  through 550, and what are these paper documents?
19      A.  It looks like the waiting list through --
20  it starts at 11-8-18 to, through, 5-17-19.
21      Q.  Okay.  Can I see that, please?
22      We will mark that as Exhibit 5 to the
23  deposition.
24      (Exhibit 5 was marked for identification.)
25  ///

1  BY MS. SHERWIN:
2      Q.  And, Ms. White, is this paper copy
3  responsive to our request for a paper copy of your
4  complete direct admission waiting list from
5  October 17th, 2018, to the present?
6          Do you want to look at it again?
7          Okay.  So just going back to reorient you,
8  on our request for documents Attachment A, item
9  No. 3, we requested a paper copy of your complete
10  direct admission waiting list from October 17,
11  2018, to the present.
12     A.  Oh, it looks like -- no.  This is from
13  11-8-18.
14         MS. ADDAMS:  I apologize.  It looks like
15  it's missing a page.  I can get that to you.
16  BY MS. SHERWIN:
17     Q.  Okay.  And then it goes until May 17th you
18  said?
19     A.  Yeah.  May 17th of this year.
20     Q.  Okay.  Do you know why it ends at
21  May 17th?
22     A.  I ended.
23     Q.  And why did you end it at May 17th?
24     A.  I'm not -- I wasn't there anymore.
25     Q.  Oh, you stopped working at the State?

1      A.  I haven't been at work since then.
2      Q.  Since May 17th?
3      A.  Yes.
4      Q.  Okay.  And so I have deposed you a couple
5  of times, and just so I don't have to go over
6  everything we went over in your previous two
7  depositions, would you say that your testimony
8  under oath in both the Atayde case and the Matthew
9  Anderson case was truthful?
10     A.  Yes.
11     Q.  Okay.  So if I were to ask you the exact
12  same questions today as I asked you in the Atayde
13  case or the Anderson case, you would testify
14  consistently with your depositions in those cases,
15  right?
16     A.  I hope so.
17     Q.  And I understood from your deposition in
18  the Atayde case that you had been the direct
19  admissions coordinator for Napa State Hospital for
20  many years, correct?
21     A.  Yes.
22     Q.  How many years were you the direct
23  admissions coordinator?
24     A.  More than 15.
25     Q.  And you started doing that, job was it in

1  July of 2003?
2      A.  Yes.
3      Q.  Okay.  When did you stop doing that job?
4      A.  I think -- when did I leave?  I think the
5  21st of May was my last day on duty.
6      Q.  Okay.  Did you go to another role within
7  the Department of State Hospitals?
8      A.  I could have, and I chose not to.
9      Q.  Okay.  Are you working someplace else
10  right now?
11     A.  No.
12     Q.  Did you decide to retire?
13     A.  I will retire eventually, but I can't
14  retire now until December 30th.
15     Q.  Are you currently employed by the
16  Department of State Hospitals?
17     A.  Yes.
18     Q.  But you are not working?
19     A.  I am on leave.
20     Q.  Oh, I see.
21     A.  I had too much time, and I was unable to
22  retire.  I wanted to retire soon, and my timekeeper
23  was against that.
24     Q.  Okay.  So you are on leave?
25     A.  For six months.

1      Q.  All right.  And then at the end of the six
2  months, you will be retired; is that right?
3      A.  Yes.  Starting December 31st.
4      Q.  Okay.  Do you know who took over your
5  position as the direct admissions coordinator?
6      A.  I do not.
7      Q.  Okay.  So the documents that you brought
8  today that were your updated direct admissions
9  waiting lists, that goes until May 17th of 2019
10  because you stopped adding patients to the list --
11     A.  Yes.
12     Q.  -- before you left on --
13     A.  The 21st.
14     Q.  -- May 21st.  Okay.
15         And then I understand from the State's
16  response to our subpoena that you don't have any --
17  well, strike that.
18         I understand from the State's response to
19  our subpoena you don't have any documents regarding
20  any other person who died in custody while waiting
21  admission to Napa State Hospital.
22         Is that right?
23     A.  That's true.
24     Q.  And you also don't have other waiting
25  lists -- well, strike that.

Page 14

1  When you were actively working in Napa
2 State Hospital, you also did not have any other
3 e-mails, documents, or correspondence regarding
4 anyone else who had died while waiting for
5 admission to Napa State Hospital; is that right?
6  **A. That's correct.**
7  Q. And then at the time you left your active
8 employment, you also did not have any other
9 electronic copies of any waiting lists for
10 admission other than your direct admission waiting
11 lists that you produced in this case and the Atayde
12 case, right?
13  **A. That's true.**
14  Q. When did you first get your RN license?
15  **A. September 1991.**
16  Q. And before that you were a site tech,
17 right?
18  **A. Yes.**
19  Q. When did you get your psych tech license?
20  **A. I think it was January or February of**
21 **1977.**
22  Q. When did you first start working at Napa
23 State Hospital in any capacity?
24  **A. April 1st, 1977.**
25  Q. So you have worked at Napa State Hospital

Page 15

1 for over 40 years; is that right?
2  **A. That's correct.**
3  Q. And the direct admission waiting list that
4 is Exhibit 3 to your deposition is something that
5 you created in the course of your job as the direct
6 admissions coordinator for Napa State Hospital,
7 right?
8  **A. Yes.**
9  Q. And you created each of the entries on the
10 direct admission waiting list, right?
11  **A. Yes, I did.**
12  Q. And it was your regular practice to keep
13 track of all of the folks who were placed on
14 waiting list at Napa State Hospital when you were
15 actively working at the hospital, right?
16  **A. Yes.**
17  MS. SHERWIN: So let's mark this as the
18 next in line.
19  (Exhibit 6 was marked for identification.)
20 BY MS. SHERWIN:
21  Q. For the record, Exhibit 6 are the pages
22 from your direct admission waiting list that have a
23 listing for Dat Luong as patient No. 7552 on the
24 waiting list, and I have highlighted it for your
25 convenience.

Page 16

1  Is my representation correct?
2  **A. Yes.**
3  Q. Okay. And did you -- in the first column
4 on the left-hand side, it says just No. 1.
5  Did you basically put people on the list,
6 and they have their own individual number in the
7 order in which you have them on the list?
8  **A. Oh, you are talking about 7552, the**
9 **number --**
10  Q. Right. That column.
11  **A. The computer makes that number.**
12  Q. Okay.
13  **A. Like he was just the next one I put in**
14 **there, and the computer gives him that number.**
15  Q. Okay. And then in column A, it says:
16 "Complete." What does that refer to?
17  **A. That I thought that when the, when the**
18 **packet arrived, it was complete. I didn't have to**
19 **do like a lot of calling around begging people for**
20 **things, that I probably had everything I thought I**
21 **needed.**
22  Q. Okay. So that column "complete," you are
23 indicating whether or not the patient's admissions
24 packet was complete, correct?
25  **A. Yes.**

Page 17

1  Q. And Dat Luong's admission packet was
2 complete, right?
3  **A. Yes.**
4  Q. And the next column, column C, says
5 "date," and there is a date of August 22nd, 2016.
6  What does that date refer to?
7  **A. The date that his -- he went on the**
8 **waiting list.**
9  Q. Okay. So for each of the patients who are
10 listed on the waiting list, the date always refers
11 to the date that they go on the waiting list for
12 admission to Napa State Hospital?
13  **A. Yes.**
14  Q. Are you the person who put Dat Luong on
15 the waiting list, or did somebody else put him on
16 the waiting list?
17  **A. I did.**
18  Q. That was your role as the direct
19 admissions coordinator?
20  **A. Yes.**
21  Q. That was your job going back to 2003,
22 right?
23  **A. Yes.**
24  Q. The Alameda County, that's the county that
25 ordered him to Napa State Hospital right?

Page 18

1   A.  Yes.
2   Q.  And then you have a section entitled
3  "legal," and for Dat Luong you have 1370.  What
4  does that refer to?
5   A.  The type of commitment.
6   Q.  And then the next column says "admitted,"
7  and it has a date of October 11th of 2016.  What
8  does that refer to?
9   A.  Well, he wasn't really admitted, but that
10  was probably the date, maybe, that I found out that
11  he died in custody because over in H it says:
12  "Died in custody."
13  Q.  Right.
14  A.  So that's probably the date.
15  Q.  That's the data you learned that Dat Luong
16  died in Santa Rita Jail while he was awaiting
17  admission to Napa State Hospital?
18  A.  That's probably the date there or close to
19  the date.
20  Q.  Okay.  And we met last -- for the second
21  time last October for your deposition, and I was
22  reading your deposition yesterday and just noted
23  it's fairly common for you to answer my question
24  when I am in the middle of the question.
25  A.  Oh, I'm sorry.

Page 19

1   Q.  So I would just ask you to be mindful of
2  that and be patient with me.  I have to talk in a
3  very boring, slow way to get the court reporter to
4  get my whole question on the record before you
5  answer it.  Okay?
6   A.  Okay.
7   Q.  Thank you.
8       So October 11, 2016, was the date that you
9  were informed that Dat Luong died, correct?
10  A.  Yes.
11  Q.  And then it says: "Approved August 30th
12  of 2016."  What does that mean?
13  A.  That means that the CCRAs, probably, they
14  go over the packet after I do, and they redact
15  everything.  They copy it, and then the packet gets
16  sent to the admissions suite.
17      So if they find that everything's right,
18  which they probably did on 8-30, then they redact
19  it, copy it, and it gets sent to the suite, and
20  that's -- we consider that our approval date.
21  Q.  Okay.  When the admissions packet gets
22  sent to the admissions suite, correct?
23  A.  Yes.
24  Q.  And you said CCRAs.  What does that refer
25  to?

Page 20

1   A.  Correctional case records analyst.
2   Q.  Okay.  So before the packet gets sent to
3  the admissions suite, the people who review the
4  packet are you as the direct admissions coordinator
5  when you performed that job and then also the
6  CCRAs; is that correct?
7   A.  Yes.
8   Q.  And then the column H says:  "Died in
9  custody."
10      Where would you have gotten the
11  information that Dat Luong died in custody?
12  A.  I heard about it from the suite.
13  Q.  Who told you?
14  A.  A nurse in the suite received a phone
15  call.
16  Q.  Do you know who the nurse was that
17  informed you?
18  A.  No.  But there's been a lot of change-up
19  over there over time.  People have either quit and
20  moved on or retired.
21  Q.  Okay.  You mean from the admissions suite?
22  A.  Yes.
23  Q.  And then looking at the next page, at the
24  top of the second column, it says:  "OSC BWA."
25      What does that mean?

Page 21

1   A.  Oh, that's like -- let me think.
2       I'm not sure what the initials mean, but a
3  lot of times counties will file an OSC before they
4  mail the packet.
5   Q.  Okay.  And so when you say OSC, you are
6  talking about an order to show cause why the
7  Department of State Hospitals should not be held in
8  contempt for disobeying a commitment?
9   A.  Right.  And people were filing them before
10  they even dropped the packet in the mail to the
11  hospital.
12  Q.  Okay.  And do you know what BWA stands
13  for?
14  A.  I don't -- I can't recall.
15  Q.  The next column says:  "Med ruling," and
16  for Dat Luong it says:  "IMD."  What does that
17  refer to?
18  A.  Involuntary medication determination.
19  Q.  What does that mean?
20  A.  That means that medications were ordered
21  involuntarily.
22  Q.  Why was it important for you to note that
23  on your direct admission waiting list?
24  A.  The treatment teams want to know the
25  minute somebody arrives if they can medicate.

Page 22

1    Q.  And so for you keeping track of the
2  medication ruling, is that information that you
3  provide to the treatment team?
4    **A.  Sometimes I get calls from doctors because**
5  **they'll read the commitment order, and they'll go:**
6  **What does that mean?  What did the judge mean by**
7  **that?**
8         **Sometimes when English isn't the first**
9  **language spoken, they are not sure.  So they'll**
10 **call just to confirm something.**
11   Q.  Okay.  And then you tell the doctor that
12 that language in the commitment order means that
13 the patient needs to get involuntary medication,
14 correct?
15   **A.  Yes.**
16   Q.  And that's a medical necessity for the
17 patient that the court has found and ordered,
18 right?
19   **A.  Yes.**
20   Q.  Looking at the next column, you have the
21 date committed, and for Dat Luong you have
22 July 2nd, 2016.
23        What does that refer to?
24   **A.  The date on the commitment order.**
25   Q.  So that's the date that the court ordered

Page 23

1  the patient to be committed to Napa State Hospital
2  for restorative treatment, correct?
3    **A.  Yes.**
4    Q.  So for Dat Luong, the court ordered him to
5  be committed at Napa State Hospital for restorative
6  treatment on July 22nd of 2016, right?
7    **A.  Yes.**
8    Q.  In the course of your work with the State
9  of California, have you understood that when a
10 person is charged with a crime and found
11 incompetent to stand trial and ordered to --
12 committed to a state hospital, he has a
13 constitutional right to prompt restorative
14 treatment?
15   **A.  Yes.**
16   Q.  And you have been trained about that by
17 the State of California, correct?
18   **A.  Yes.**
19   Q.  So I note that you approved -- or strike
20 that.
21        I note that Napa State Hospital approved
22 Dat Luong for admission 39 days after the court
23 ordered him committed to the Napa State Hospital,
24 or on October 30th of 2016.
25        Is that right?

Page 24

1    **A.  Yes.**
2    Q.  Why did it take 39 days to approve Dat
3  Luong for admission to Napa State Hospital when the
4  court ordered his commitment on July 22nd, 2016?
5    **A.  It takes some time for the court to**
6  **actually generate the packet and mail it to us.**
7    Q.  Do you put the patient on the waiting list
8  after their packet is complete?
9    **A.  When it's mailed to us?**
10   Q.  Right.  After you have received the
11 packet.
12   **A.  Yes.**
13   Q.  Okay.  So you received the packet, the
14 admissions packet, for Dat Luong on August 22nd,
15 2016, right?
16   **A.  And put it on the waiting list.**
17   Q.  Then why would it have taken eight days
18 from the time you received the packet for Dat's
19 admission to Napa State Hospital to be approved?
20   **A.  Do you see the rest of the waiting list**
21 **there?**
22   Q.  I do see the rest of the waiting list.
23   **A.  Okay.  There's a few people in that office**
24 **to do all of this work.**
25   Q.  When you say, "There's a few people in

Page 25

1  that office to do all of this work," what do you
2  mean?
3    **A.  I mean you have -- at that time in 2016,**
4  **you had a few CCRAs to do all of this.  Plus they**
5  **do other jobs other than approve these packets.**
6  **They have other duties as well.**
7    Q.  Okay.  And were you the only person --
8  well, strike that.
9         I assume a CCRA doesn't have any sort of
10 nursing license.
11        Is that correct?
12   **A.  Yes.**
13   Q.  They are technicians, right?
14   **A.  They are -- yeah.  They are analysts.**
15   Q.  Okay.  So are you the only person in Napa
16 State Hospital, when you worked there actively, who
17 would review the patient's admissions packet before
18 it went to the CCRAs?
19   **A.  Yes.**
20   Q.  During the entire time that you have
21 worked at Napa State Hospital as the direct
22 admissions coordinator, have they ever had anyone
23 else also doing the same work that you do,
24 reviewing the admissions packets?
25   **A.  They did for a short time in about 2005,**

1  and it didn't work out.  She went home with a
2  headache and never came back and quit and left her
3  keys in the boss's mailbox.
4       It was a weird situation, but she didn't
5  like the job, and when she left, my supervisor
6  said:  "Okay.  Well, you'll just be doing the
7  whole" -- we were splitting up the counties.
8       And at that time, my boss said:  "Well,
9  that didn't work out very well.  You'll just be
10 doing all of the counties, and I will just get you
11 a bigger office, and you'll do all of these
12 counties."
13      And then I took over from there doing all
14 of the counties.
15 Q.  All of the counties in the State of
16 California?
17 A.  Well, no, because Atascadero and Patton
18 and Metro do the more southerly counties, but we do
19 mostly Northern California.  I think there is like
20 30 or 40 counties or so.
21 Q.  So at one time in 2005, there was another
22 person helping you review the admissions packets?
23 A.  Yes.
24 Q.  How long did that person work there?
25 A.  Six months around so.

1  Q.  And then she just, sounds like, walked off
2  the job, right?
3  A.  She hated the job.
4  Q.  Was your supervisor at that time Diane
5  Mond?
6  A.  My supervisor was Chris Goodman.
7  Q.  So at that time in 2005 -- is Chris
8  Goodman a man or a woman?
9  A.  A woman.
10 Q.  Okay.  Ms. Goodman informed you that you
11 would be reviewing all the packets for the counties
12 in Northern California where people are referred to
13 Napa State Hospital?
14 A.  Yes.
15 Q.  And then from 2005 until you left just
16 less than two weeks ago, that was -- you were the
17 only person who reviewed the admissions packets for
18 Napa State Hospital?
19 A.  Yes.
20 Q.  Did you ever feel like you didn't have
21 enough time to do your job as quickly as it should
22 be done?
23 A.  I worked hard every day full-time and
24 overtime sometimes.
25 Q.  Okay.  I am just --

1  A.  And they are just -- I just did the best
2  job I could every day.  I worked, came early, ate
3  lunch at my desk, and sometimes went home late.  So
4  I did a lot of work every day.
5  Q.  I understand that, but I am asking
6  actually a bit of a different question.
7       It seems -- well, strike that.
8       In any given week, when you were actively
9  working, about how many admissions packets did you
10 have to review for people who were sent to Napa
11 State Hospital?
12 A.  Anywhere from 20 to 40.
13 Q.  And some of those packets were very
14 voluminous, right?
15 A.  Yes.
16 Q.  In addition to reviewing packets, what
17 other things did you do?  What other job duties did
18 you have?
19 A.  I mostly just tried to stick to that
20 because that is extremely time-consuming, and, you
21 know, to search out to make sure that nobody that's
22 escaped gets into Napa, and to read through all of
23 these things, it takes a lot of concentration.
24 Q.  Okay.  And then I understand from your
25 deposition in the Atayde case that you would have

1  to read perhaps 500 to 600 pages a day, and then
2  you would be pretty well shot, right?
3  A.  Yes.
4  Q.  And then in the course of your work as the
5  direct admissions coordinator, did that reading
6  workload for you, 5- to 600 pages per day, was that
7  pretty consistent?
8  A.  Yes.
9  Q.  Okay.  Did you -- strike that.
10      Did Napa State Hospital or the Department
11 of State Hospitals, other than this six-month
12 period in 2005, ever offer to get you any help, for
13 example, hire another direct admissions coordinator
14 or two?
15 A.  They got me a secretary for quite a few
16 years.  So that when I ran out of things like
17 paper, I didn't have to worry about ordering
18 things, and I didn't have to go pick up the ink for
19 my printer, and she did all of those things, kept
20 everything dialed in, which was nice.
21 Q.  How many years did you have the secretary?
22 A.  Probably seven or eight years.
23 Q.  And how many -- strike that.
24      When did you -- when did that secretary
25 leave?  When was she no longer working with you?

1    A.  She left early this year.

2    Q.  Okay.  So back in 2016, you had the

3 secretary?

4    A.  Yes.

5    Q.  Did anyone at Napa State Hospital, other

6 than hiring you a secretary, did anyone in the

7 State hospital or the Department of State Hospitals

8 offer to have somebody else working alongside you

9 in the same position, for example, hire and train

10 another direct admissions coordinator or two direct

11 admissions coordinator so you would be able to --

12 the whole department would be able to get through

13 admissions packets more quickly?

14    A.  No.

15    Q.  During the entire time that you've been

16 the direct admissions coordinator for Napa State

17 Hospital, have you always been the only person

18 performing that job with the exception of that

19 woman who worked for about six months in 2005?

20    A.  Yes.

21    Q.  How many CCRAs did Napa State Hospital

22 have in August of 2016?

23    A.  I'm trying to think back then.  Maybe

24 about four or five.

25    Q.  And so the delay in approving Dat Luong

1 for admission to Napa State Hospital was basically

2 a lack of people who had time to work on the

3 paperwork; is that right?

4    MS. ADDAMS:  Objection.  That misstates

5 her prior testimony.

6    THE WITNESS:  People are working

7 constantly.  So, but there is many packets.  So,

8 and they have many other jobs.

9 BY MS. SHERWIN:

10    Q.  The CCRAs have many other jobs too?

11    A.  Yes, they do.

12    Q.  Okay.  How long -- back in 2016, how long

13 it would typically take you to get a packet to

14 review after the packet comes in?

15    A.  Usually we would start reviewing the same

16 day.

17    Q.  When you say "we," does that include the

18 CCRAs reviewing the packet along with you?

19    A.  If I could pass it off to them.

20    Q.  Do you make any notation anywhere of when

21 you pass the packet off to the CCRAs?

22    A.  The 22nd would be the date that I passed

23 it off to them.

24    Q.  Okay.  So August 22nd is the date that you

25 put Dat Luong on the waiting list and passed his

1 admissions packet off to the CCRAs, right?

2    A.  Yes.

3    Q.  And then the delay in actually approving

4 him for admission would be something that happens

5 with the CCRAs after you passed the packet off to

6 them on August 22nd; is that right?

7    MS. ADDAMS:  Objection.  Misstates her

8 former testimony.

9    THE WITNESS:  Yes.  It could be a lot of

10 redacting that needed to be done.  Anything can

11 hold something up.  Because we do redact.

12 BY MS. SHERWIN:

13    Q.  Now, for Dat Luong you recorded that he

14 died in custody.

15    Is that something that you always did when

16 you learned a patient died in custody while

17 awaiting admission to Napa State Hospital?

18    A.  Yeah.  I kind of keep records.  That's why

19 I have the information over there, just what --

20 just if they don't come, or sometimes if somebody's

21 canceled, I will put that they were canceled over

22 there.

23    Q.  Okay.  Well, we'll look at another entry

24 from the list then.

25    (Exhibit 7 was marked for identification.)

1 BY MS. SHERWIN:

2    Q.  Exhibit 7 is the direct admission waiting

3 list referring to -- highlighted referring to my

4 client Richard Ramirez.

5    And you understand that you are a

6 defendant in the federal civil rights case that

7 Richard's mom filed after Richard committed suicide

8 in the Merced County Jail while waiting for

9 transfer according to court order to Napa State

10 Hospital, right?

11    A.  Yes.

12    Q.  Okay.  So looking at your notation, you

13 have Richard Ramirez being -- well, the program has

14 said Richard Ramirez was waiting list patient

15 No. 6007, right?

16    A.  Yes.

17    Q.  And his packet was complete, right?

18    A.  Yes.

19    Q.  And it says that he was approved for

20 admission on November 10th of 2014, correct?

21    A.  Yes.

22    Q.  And you put him on the waiting list on

23 October 31st of 2014, right?

24    A.  Yes.

25    Q.  But there's no indication that Richard was

Page 34

1  admitted to Napa State Hospital, right?
2      A.  Right.
3      Q.  And there's also no indication that
4  Richard died while in custody, correct?
5      A.  Correct.
6      Q.  Why would you not have written the
7  information that Richard Ramirez either committed
8  suicide or died in custody on your direct admission
9  waiting list?
10     A.  It probably got by me because I see
11 No. 6024 I don't have anything for that one either.
12 So every now and again something does slip past me.
13     Q.  So the fact that Richard Ramirez committed
14 suicide while waiting for Napa State Hospital to
15 comply with the order to admit him for restorative
16 treatment would have slipped by you?
17         Is that what you saying?
18     A.  I'm saying keeping up this list and doing
19 all my other work, sometimes the list gets put to
20 the wayside.
21     Q.  Did you ever ask anyone at Napa State
22 Hospital or the Department of State Hospitals to
23 hire some help, either another direct admissions
24 coordinator or some other folks, to review packets?
25     A.  No.

Page 35

1      Q.  Did you ever think it would be helpful to
2  have some other folks in the office doing the same
3  job that you were doing so that the packets could
4  be processed more quickly?
5      A.  Well, when I had the woman in 2005
6  helping, it wasn't helpful.
7      Q.  Why not?
8      A.  She didn't try to learn the job, and
9  things were messed up when she left.
10     Q.  Okay.  Well, she, as you said, hated the
11 job and basically walked off the job after six
12 months, right?
13     A.  Right.
14     Q.  Did you ever have any thought that the
15 State could hire someone who might not hate the job
16 and actually help speed up the review of the
17 admissions packets so folks get approved and
18 admitted earlier?
19         MS. ADDAMS:  Objection.  Misstates her
20 prior testimony.
21         THE WITNESS:  We can only admit when
22 there's a bed open.  So people were waiting for
23 beds.
24         We didn't -- he didn't -- when a bed's
25 open, we fill the beds, but I think lack of bed

Page 36

1  spaces would be more of an issue than the packet
2  getting approved.
3  BY MS. SHERWIN:
4      Q.  Well, I understand from the depositions
5  last October and November that Napa State Hospital
6  and the Department of State Hospitals typically did
7  not try to place the patient in a different
8  facility -- for example, a psychiatric health
9  facility or a public hospital or jail based
10 treatment program -- while they were on the waiting
11 list.
12         Is that correct?
13     A.  We would try to look for beds in other
14 hospitals.
15     Q.  Other state hospitals?
16     A.  Yes.
17     Q.  But not outside the Department of State
18 Hospitals, correct?
19     A.  No.  And we still don't.
20     Q.  Right.  That was going to be my next
21 question.  So, and, actually, the answer was a
22 little vague.
23         So is it correct to say that as long as
24 you have worked for the Department of State
25 Hospitals, that no nobody within the department, as

Page 37

1  far as you know, would look for placement, beds for
2  placement, for patients outside the Department of
3  State Hospitals?
4      A.  The people are committed to DSH.  So, no,
5  we don't.
6      Q.  Okay.  Did you understand that both
7  Richard Ramirez and Dat Luong were committed to
8  Napa State Hospital or any other appropriate
9  hospital?
10     A.  They're committed to the Department of
11 State Hospitals.
12     Q.  Do you understand that the Department of
13 State Hospitals has the ability to find a placement
14 for a patient in either a psychiatric health
15 facility or an LPS certified jail or public or
16 private hospital that's not a Department of State
17 Hospitals hospital?
18     A.  LPS is for an LPS patient.  They are not
19 LPS.
20     Q.  Well, some of the patients are LPS
21 patients, right?
22     A.  Mr. Ramirez is definitely not.
23     Q.  Well, an LPS patient is somebody who,
24 because of their mental illness, is either a danger
25 to themselves or others or gravely disabled.

1        You understand that as a registered nurse,
2  right?
3      **A.  I do understand that, but he is beyond --**
4  **Mr. Ramirez was committed to the Department of**
5  **State Hospitals.  So he wouldn't go to an LPS**
6  **facility.**
7      Q.  And as long as you've worked -- in the
8  over 40 years that you've work for the Department
9  of State Hospitals, is it correct that the
10 Department of State Hospitals has never attempted
11 to place a patient who's on a waiting list for
12 admission to the state hospital in either an LPS
13 facility, a jail based treatment program that is
14 lapses certified, or a public or private
15 psychiatric hospital that is not one of the DSH
16 facilities; is that correct?
17     **A.  That's correct.**
18     Q.  And I understood from the depositions last
19 October and November that the Department of State
20 Hospitals and Napa State Hospital do not review the
21 psychiatric acuity of every patient the courts
22 commit to the hospital.
23        Is that correct?
24     **A.  What do you mean by that?**
25     Q.  Okay.  Well, is it correct that neither

1  the Department of State Hospitals nor Napa State
2  Hospital do a psychiatric acuity review on the
3  patient before putting them on the waiting list?
4      **A.  We have medical records before they go on**
5  **the waiting list.  So if anything sticks out in**
6  **those medical records that call to us to ask the**
7  **jail for further information, we do call the jail.**
8      Q.  Okay.  And you say if anything sticks out,
9  that would be anything that sticks out to you,
10 correct?
11     **A.  To me, to a nurse in the admissions suite,**
12 **because they also read through that medical**
13 **information.**
14        **Usually -- sometimes, to me, I'll read**
15 **something and think:  Wow, this person needs to get**
16 **in a hospital now.**
17        **And then I'll ask the suite to make a**
18 **phone call to the jail to see if they are suicidal**
19 **right now or if things have changed or how the**
20 **person's doing now, right that moment.**
21     Q.  Okay.  And that's just something that
22 might jump out at you while you are doing a review
23 to see if the packet is complete, right?
24     **A.  And the medical that they sent with it.**
25     Q.  Right.

1      **A.  Yes.**
2      Q.  But there's never been any requirement
3  during the over 40 years that you have worked for
4  the Department of State Hospitals that some
5  qualified medical or healthcare professional review
6  every patient's medical records substantively for
7  psychiatric acuity; is that correct?
8      **A.  We do it every day.  We review it.  I**
9  **review it.**
10     Q.  Right.
11     **A.  The admission suite nurse reviews it.  If**
12 **we see something, yes, we do call the jail.**
13     Q.  All right.  But I understood from the
14 testimony in the Atayde case that a psychiatric
15 acuity review is something that gets prompted when
16 the jail medical or mental health provider requests
17 the Department of State Hospitals to do a
18 psychiatric acuity review, and then Dr. Tyler, the
19 medical director, will review the patient's medical
20 records.
21        Is that right?
22     **A.  She can.**
23     Q.  Then the person who does the psychiatric
24 acuity review and makes the determination about the
25 patient's psychiatric acuity is the medical

1  director of Napa State Hospital who is currently
2  Dr. Tyler, right?
3      **A.  She'll say whether they can come.**
4      Q.  Right.  And it is her job to determine
5  whether or not the patient is psychiatrically
6  acute, correct?
7      **A.  Yes.**
8      Q.  Okay.  So is it correct, is my
9  understanding correct, that during the entire time
10 you worked for the Department of State Hospitals,
11 there had not been an automatic psychiatric acuity
12 review of every patient?
13     **A.  By Dr. Tyler?**
14     Q.  By any physician.
15     **A.  That's correct.**
16     Q.  You might notice in your review of the
17 packet, when you are determining whether it's
18 complete or not, that the patient seems to have
19 serious psychiatric problems that would require
20 their immediate admission, right?
21     **A.  Right.**
22     Q.  And then sometimes you might not notice
23 that, correct?
24     **A.  Could be.**
25     Q.  During the entire time that you have

Page 42

1  worked for the Department of State Hospitals, has
2  there ever been any discussion within the
3  department that you are aware of about doing a
4  psychiatric acuity review on every patient who has
5  been ordered committed to the state hospital before
6  the patient gets put on the waiting list?
7      **A.  No.**
8      Q.  During the entire time you have worked for
9  the Department of State Hospitals, has there ever
10  been any discussion that you are aware of of the
11  Department of State Hospitals informing the court,
12  the committee court, the district attorney, or
13  criminal defense attorney about the delay that
14  patient will have to endure before being admitted
15  to the state hospital?
16      **A.  They go to court all the time to advise**
17  **them of the delay.**
18      Q.  Who is "they"?
19      **A.  The lawyers for DSH do show up in court.**
20      Q.  Okay.  Do they show up in court in
21  response to an order to show cause why the
22  Department of State Hospitals should not be held in
23  contempt?
24      **A.  Or transfer orders or just the court**
25  **wanting some advisement, they will show up.**

Page 43

1      Q.  I understand from your testimony last
2  October that the current waiting time back then for
3  a patient who is ordered committed to Napa State
4  Hospital was about 60 to 90 days.
5      Is that correct?
6      **A.  It was at that time, yes.**
7      Q.  And what is the current wait time as of
8  May of 2019, when you left?
9      **A.  Probably about 60 days.**
10      Q.  And that's an estimate that you're making
11  just based on your work experience with Napa State
12  Hospital, correct?
13      **A.  When I left, we were at about 60 days.**
14      Q.  Were there any documents kept by Napa
15  State Hospital during the time you actively worked
16  there in which the hospital or Department of State
17  Hospitals kept track of how long a patient was
18  going to have to wait on average?
19      **A.  There probably are, but it is not**
20  **something -- it would be above me.  I don't keep**
21  **that stuff.**
22      MS. SHERWIN:  We will mark this as the
23  next exhibit in line.
24      (Exhibit 8 was marked for identification.)
25  ///

Page 44

1  BY MS. SHERWIN:
2      Q.  Exhibit 8 is a portion of your direct
3  admission waiting list, and I have highlighted
4  patient No. 4952, and he was placed on the waiting
5  list on August 1st of 2013; is that correct?
6      **A.  Yes.**
7      Q.  And he was approved for admission to the
8  hospital on August 28th of 2013, correct?
9      **A.  Yes.**
10      Q.  And then it says, quote, "admitted," end
11  quote, July 13th of 2014; is that right?
12      **A.  June 13th.**
13      Q.  I'm sorry.  June 13th, 2014.
14      **A.  Yes.**
15      Q.  But you also note that he was deceased per
16  the court.  What does that mean?
17      **A.  The court told us he had died.**
18      Q.  And so that June 13th, 2014, date would
19  be, like with Dat Luong, the day that you were
20  informed that patient No. 4952 died, right?
21      **A.  Yes.**
22      Q.  It does not mean that he was actually
23  admitted to the hospital, correct?
24      **A.  That's correct.**
25      Q.  So that patient had to wait over eight and

Page 45

1  a half months on the waiting list before he died in
2  custody, right?
3      MS. ADDAMS:  Objection.  That misstates
4  her testimony.
5      **THE WITNESS:  I'm not sure if he was in**
6  **custody or not.**
7  BY MS. SHERWIN:
8      Q.  Okay.  Well, he had to wait over eight and
9  a half months on the waiting list before he died,
10  right?
11      **A.  That's correct.**
12      Q.  Let's look at the next exhibit.
13      (Exhibit 9 was marked for identification.)
14  BY MS. SHERWIN:
15      Q.  Okay.  On Exhibit 9 we have highlighted
16  patient No. 3150, and he was placed on the waiting
17  list on February 16th of 2011, right?
18      **A.  Yes.**
19      Q.  He was approved for admission on
20  February 18th of 2011, correct?
21      **A.  Yes.**
22      Q.  And then you were informed on
23  February 24th of 2011 that he died, right?
24      **A.  Yes.**
25      Q.  And both patient No. 4952 and patient 3150

Page 46

1  that we've just discussed are folks who died while
2  waiting for admission to Napa State Hospital,
3  right?
4      A. Yes.
5          (Exhibit 10 was marked for identification.)
6  BY MS. SHERWIN:
7      Q. Now, looking at Exhibit 10, I have
8  highlighted patient No. 4636 who also died while
9  waiting for admission to Napa State Hospital; is
10 that correct?
11     A. Yes.
12         MS. ADDAMS: Objection. That misstates
13 the prior testimony.
14 BY MS. SHERWIN:
15     Q. And you put this patient on the waiting
16 list on March 22nd of 2013, right?
17     A. Yes.
18     Q. And then he was not approved for admission
19 until September 16th of 2014, correct?
20     A. Yeah. I think he may have been out of
21 custody.
22     Q. Okay. Do you have a specific memory of
23 this patient No. 4636 from March and October --
24 March of 2013 and October and September of 2014?
25     A. I don't think we were sure that he was

Page 47

1  coming, actually. Orange County is not a county
2  that we normally serve. So we were doing somebody
3  else a favor.
4      Q. Do you have a specific recollection of
5  that patient No. 4636?
6      A. He wasn't in custody.
7      Q. How do you know he wasn't in custody?
8      A. I remember this case.
9      Q. Do you remember -- well, strike that.
10         You did not remember the Richard Ramirez
11 case when I took your deposition last October, did
12 you?
13     A. This guy was out of custody, this man
14 here.
15     Q. Okay. Why did it take almost a year and a
16 half to approve him for admission to the hospital?
17     A. Do you see where it says "complete" in A?
18     Q. Yes. I see that.
19     A. And it says "no"?
20     Q. I see that.
21     A. Okay. It wasn't complete. The packet was
22 not complete. We couldn't get a complete packet.
23 He was out of custody, and then we weren't sure if
24 he was going to come. He was elderly.
25     Q. How old was he?

Page 48

1      A. I do not remember that, but he wasn't in
2  good shape, and he was elderly, and he wasn't in
3  very good shape, and we weren't sure if he was
4  going to come.
5          And when we finally did get the packet
6  together, we finally got them to send us stuff.
7  Then he died before he got here.
8      Q. Okay. The hospital would have approved
9  him after they received the packet, right?
10     A. Yeah. But it took us -- we didn't approve
11 the packet until a year later.
12     Q. Actually, almost a year and a half later?
13     A. Yes. Because we couldn't get the
14 information.
15     Q. Okay. But by the time that patient
16 No. 4636 was approved on September 16th of 2014,
17 his packet was complete, right?
18     A. Right.
19     Q. And then you were informed that he died
20 while awaiting admission to Napa State Hospital
21 on --
22     A. This man was in a hospital --
23     Q. Excuse me, ma'am. I'm sorry. You need to
24 let me get the question into the record. Okay?
25         So you approved him for admission on

Page 49

1  September 16th, 2014, and then were informed that
2  he died while awaiting transfer to Napa State
3  Hospital on October 6th of 2014; is that correct?
4      A. No. He was in a hospital; therefore, we
5  had the bed. He could not come, and he died in a
6  hospital.
7      Q. When did you have the bed available for
8  him?
9      A. Before he could come.
10         The packet was approved. We couldn't get
11 him, and then he was in a hospital, and he died in
12 a hospital. He was elderly, and this is probably a
13 case where this man should have never been referred
14 to us because he was old and not the kind of work
15 we do at the state hospital.
16         MS. SHERWIN: Okay. We will look at the
17 next exhibit in line.
18         (Exhibit 11 was marked for identification.)
19 BY MS. SHERWIN:
20     Q. And I have highlighted for you patient
21 No. 980 who you placed him on the waiting list on
22 June 7th of 2006, correct?
23     A. Yes.
24     Q. And he was ordered committed to Napa State
25 Hospital by the Sacramento County Superior Court,

Page 50

```
1   correct?
2       A.  Yes.
3       Q.  You also -- strike that.
4           The Napa State Hospital also approved him
5   for admission and admitted him on June 7th of 2006,
6   correct?
7       A.  Yes.
8       Q.  Why would Napa State Hospital have
9   approved patient No. 980 and admitted him on the
10  same date?
11      A.  I can't remember that case.
12      Q.  Okay.  I notice on your direct admission
13  waiting list there were a lot of patients from
14  Sacramento who were ordered admitted by Sacramento
15  Superior Court who were admitted on the same day
16  their packet was approved.
17          Do you know why that is?
18      A.  Back in, I think, '05 and '06 -- I'm not
19  sure of the years, really, it has been so long
20  ago -- Sacramento used to just drop people off, and
21  they were admitted the same day.
22          And I'm not sure -- there was some
23  agreement with DSH, and I'm not sure when that
24  ended or how long it went on for.
25      Q.  Do you recall if the practice of
```

Page 51

```
1   Sacramento dropping people off at Napa State
2   Hospital and them being admitted the same day was
3   something that went on for years?
4       A.  I don't think it went on for years, but at
5   least a year.
6       Q.  Well, it looked to me like there were a
7   lot of folks admitted from Sacramento on the same
8   day that they were approved until about June of
9   2012 when I reviewed your direct admission waiting
10  list.
11      A.  Really?  Okay.
12      Q.  But people admitted on the same day as
13  their packet being approved from Sacramento was
14  because Sacramento County would drop the patient
15  off directly at Napa State Hospital; is that right?
16      A.  Yes.
17      Q.  Let's look at the next exhibit.
18          (Exhibit 12 was marked for identification.)
19  BY MS. SHERWIN:
20      Q.  In this exhibit I have highlighted patient
21  2159 who was placed on the waiting list and
22  approved for admission on May 28th of 2009, right?
23      A.  Yes.
24      Q.  And then he was admitted just five days
25  later, on June 2nd of 2009, correct?
```

Page 52

```
1       A.  Yes.
2       Q.  And then you have in your information
3   section that this patient made two suicide attempts
4   in jail, right?
5       A.  I don't know where they were made, but
6   yes.
7       Q.  Well, if you look at the next page of that
8   exhibit, it says "in jail," right?
9       A.  Oh, okay.  Yes.
10      Q.  Where would you have gotten the
11  information that this patient made two suicide
12  attempts in jail?
13      A.  From the jail.
14      Q.  Okay.  And would you have been the person
15  that decided that this patient required priority
16  admission?
17      A.  Well, I would have probably -- I am just
18  guessing now because this was 2009.
19          I would have probably called Diane at the
20  suite and asked her to -- could he come.
21      Q.  When you say Diane, you're talking about
22  Diane Mond?
23      A.  Yes.
24      Q.  And you are not guessing.  You are just
25  basing your testimony on your practice, correct?
```

Page 53

```
1       A.  Yes.
2       Q.  So this is a patient, as you discussed
3   earlier, who may have jumped out at you when you
4   reviewed his records and the fact that he had made
5   two suicide attempts in the jail meant that he
6   really needed to get to Napa State Hospital on a
7   priority basis, right?
8       A.  Yes.
9           MS. SHERWIN:  Okay.  We will take a quick
10  break for our court reporter.
11          THE VIDEOGRAPHER:  This marks the end of
12  DVD one to the deposition of Dana White.  The time
13  is now 11:20 a.m.  We are going off the record.
14          (Recess taken)
15          THE VIDEOGRAPHER:  We are now going on the
16  record.  This marks beginning of DVD two in the
17  deposition of Dana White, and the time is
18  11:30 a.m.
19          MS. SHERWIN:  This is the last example
20  from your waiting list that I want to ask you
21  about.
22          (Exhibit 13 was marked for identification.)
23  BY MS. SHERWIN:
24      Q.  On Exhibit 13, we have highlighted
25  information regarding two patients, both of whom
```

Page 54

1 have a notation with their numbers of, quote, "high
2 SRA," end quote.
3 If you look at the second page, I've
4 highlighted that.
5 Does that refer to the person being a high
6 suicide assessment?
7 **A. No.**
8 Q. What is the high SRA?
9 **A. Security.**
10 Q. Oh, okay. Security risk assessment.
11 So that means that the person cannot go to
12 a Metropolitan State Hospital?
13 **A. And they couldn't stay at Napa it means.**
14 Q. So they would have to go to either
15 Atascadero or Patton?
16 **A. When that happens, we always send it to**
17 **Atascadero.**
18 Q. Are the patients who are a high security
19 risk assessment patients who can go to Patton, and
20 you just always send them to Atascadero?
21 **A. If they are male, we send them to**
22 **Atascadero. If they are female, we send them to**
23 **Patton.**
24 Q. What makes a patient a high security risk
25 assessment?

Page 55

1 **A. Escape from anywhere locked.**
2 Q. So that could even be from a locked
3 psychiatric facility, right?
4 **A. Yes. It could be escape from custody.**
5 Q. And then for each of these patients, you
6 note in the "information" section, it says:
7 "Mailed to ASH."
8 The packet was mailed to Atascadero State
9 Hospital; is that right?
10 **A. Yes.**
11 Q. Then I noted in your direct admissions
12 waiting lists that starting in about 2016 you have
13 notations for patients being sent to JBCT.
14 What does that refer to?
15 **A. Jail based competency treatment.**
16 Q. When did Napa State Hospital start sending
17 people to jail based competency treatment?
18 **A. I think around that time.**
19 Q. Around 2016?
20 **A. Yes.**
21 Q. What is jail based competency treatment?
22 **A. The jails have 90-day treatment centers**
23 **for people they think can get competent in 90 days.**
24 Q. And does the Department of State Hospitals
25 oversee that treatment that's provided in the

Page 56

1 jails?
2 **A. No. They are under DSH, but there is**
3 **employees at the jails that do that work.**
4 Q. So the restoration of competency treatment
5 is done exclusively within the jail, but the
6 patient is still in the custody of the Department
7 of State Hospitals; is that right?
8 **A. I think so. I don't quite understand it,**
9 **but I think that most of the jail based treatment**
10 **centers are under DSH. They also have AES, and**
11 **there's a few different ones, but they are all**
12 **under DSH now.**
13 Q. And the DSH being Department of State
14 Hospitals?
15 **A. Yes.**
16 Q. We will take a look at the next exhibit in
17 line.
18 (Exhibit 14 was marked for identification.)
19 BY MS. SHERWIN:
20 Q. This is a document we discussed at your
21 deposition in the Atayde case, which is a list of
22 jail treatment facilities that was provided by the
23 State of California on its correctional healthcare
24 web site.
25 As you sit here today, do you know which

Page 57

1 counties have jail based competency treatment?
2 **A. Kern. It's called AES.**
3 Q. What does AES stand for?
4 **A. I'm not sure.**
5 Q. Okay. So that Kern County has a jail
6 based treatment facility?
7 **A. Small one.**
8 Q. Okay.
9 **A. Kern is a small county.**
10 Sacramento, you have that one. Sonoma has
11 one. Stanislaus has one.
12 Q. Does Los Angeles County have a jail based
13 treatment facility?
14 **A. I think they do. I don't deal much with**
15 **L. A. because it's not a county we serve as a rule.**
16 **Every now and again we will take somebody as a**
17 **favor because they need to get up here to be near**
18 **family or some other such thing. They need a SNF**
19 **bed, we'll take them.**
20 Q. What's a SNF bed?
21 **A. Skilled nursing.**
22 Q. Oh, I see.
23 It looks like, at least on your waiting
24 list, that Napa State Hospital started sending
25 people to jail based treatment, competency

1 treatment programs, in about February of 2016.

2     When you started sending folks to jail

3 based competency treatment programs, what counties

4 were available to you to send people to?

5     A.  They had one jail based treatment center

6 in Sac and one in San Bernardino.  Those were the

7 first -- Sac was the first one to start.

8     Q.  Sacramento?

9     A.  Yes.

10     Q.  Okay.

11     A.  San Bernardino started the next one, and

12 it's been slow starting the others.

13     Q.  Do you know whether or not the Department

14 of State Hospitals has had any role in starting

15 those jail based competency treatment programs?

16     A.  I think they do have a role in it.  I'm

17 not sure about that though.

18     Q.  Does Santa Clara County have a jail based

19 competency treatment program?

20     A.  I don't think they do.

21     Q.  What was your role with respect to finding

22 folks placement within a jail based competency

23 treatment program once the State hospital started

24 doing that?

25     A.  I'd talk to them and see if they needed

1 patients and see if they could take people back and

2 forth.

3     Q.  Okay.  When did you start doing that?

4     A.  In 2016.

5     Q.  How often would you talk to the jail based

6 competency treatment program to see if they could

7 take patients?

8     A.  We talk briefly.

9     Q.  How would --

10     A.  Just over the -- you know, we either call

11 back and forth.  We talk.

12     Q.  Who would you call?

13     A.  The people at the -- I think it was Sylvia

14 Costa in Sac, and I forget the woman's name in

15 San Bernardino.  I don't think she is there anymore

16 now, but, you know, if they needed patients.

17     And it's a fine balancing act.  Can they

18 get them in quicker than we can, or they only

19 want -- it was hard for me to figure out their

20 criteria for admission because they have a

21 different criteria than we have.

22     Q.  Did you ever see admission criteria in

23 writing from any jail based competency treatment

24 program?

25     A.  They were just starting up, and nobody

1 really wanted to share that.  It was kind of

2 strange.

3     Q.  Did you ask for admissions criteria from

4 these counties, and they refused to give it to you?

5     A.  Absolutely.  They just talked around it.

6 They said it is still in the works.  We would hear

7 that kind of thing from them.

8     I know they don't want -- I know what they

9 don't want though:  Anybody too violent, anybody

10 that's acted out in the jail setting, anybody that

11 has an intellectual disability, anybody that has

12 too many medical problems, and anybody they feel

13 cannot get competent in 90 days.

14     Q.  Did you have any written guidance from the

15 State of California about when you should look for

16 jail based competency treatment for a patient?

17     A.  No.  It was all brand-new.

18     Q.  That was something that you did on your

19 own?

20     A.  Well, it was kind of part of my job to

21 look for a bed and see if somebody could get in

22 sooner, or did they have open space in Sac.  I just

23 tried to do my best there.

24     Q.  Okay.  But there wasn't any written

25 policies or procedures or guidelines provided to

1 you by anyone within the State of California about

2 when you should look for jail based competency

3 treatment for a patient who's on the waiting list?

4     A.  No.

5     Q.  That's correct?

6     A.  That's correct.

7     Q.  That's been the case from the time jail

8 based competency treatment first started until you

9 stopped being actively employed on the job a couple

10 weeks ago; is that correct?

11     A.  No.

12     Q.  That's not correct?

13     A.  That's not correct.

14     Q.  Okay.  When did you receive any policies,

15 procedures, or guidelines in writing about when you

16 should try to find jail based competency treatment

17 for a patient?

18     A.  About -- let's see.  When was this -- 19

19 or 2000 -- probably sometime in 2017 maybe, late

20 2017, they have the patient management unit up in

21 Sacramento, and they kind of sift off who goes to

22 the jail based treatment and who goes to the state

23 hospital now.  They took that over.

24     Q.  Okay.  And what information do you provide

25 to the patient management unit in Sacramento?

Page 62

1      A.  I don't.

2      Q.  Do you know what information they get

3  before they decide who to sift off to jail based --

4      A.  No.

5      Q.  -- competency treatment?

6      A.  I am not involved in that.

7      Q.  Do you know by profession what types of

8  people are doing that sifting off?  So, for

9  example, registered nurses or psychologists or

10 psychiatrists?

11     A.  They are mostly analysts.

12     Q.  And that would be people like CCRAs?

13     A.  No.  They're SSAs.

14     Q.  What is that?

15     A.  I don't know.  It's some -- it's just an

16 analyst.  I'm not sure what that really stands for,

17 but it is some state classification.  They are

18 called SSAs.

19     Q.  So beginning in late 2017, there have been

20 some analysts in the case management unit in

21 Sacramento who would decide who goes to a jail

22 based competency treatment program, right?

23     A.  Yes.

24     Q.  But as far as you are aware, there is

25 still no consideration about whether the patient

Page 63

1  should go someplace such as a public or private

2  hospital that is not a DSH facility; is that

3  correct?

4      A.  That's correct.

5      Q.  Back in October of 2016, what hours did

6  you typically work?

7      A.  I don't know.  6:30 to 3:00 maybe.

8      Q.  What hours did you work when you left your

9  active employment with the department?

10     A.  About that same kind of hours.

11     Q.  Was that Monday through Friday?

12     A.  Yes.

13         MS. SHERWIN:  Okay.  We will mark this as

14 the next in line.

15     (Exhibit 15 was marked for identification.)

16 BY MS. SHERWIN:

17     Q.  Exhibit 15 is some e-mail correspondence

18 that we received from Department of State

19 Hospitals, Bates stamped page 54 that shows e-mail

20 from Sandra Darvison with the Alameda County

21 Sheriffs Office to you and then you forwarding the

22 e-mail to someone within the Department of State

23 Hospitals.

24         Do you recall receiving this e-mail from

25 Ms. Darvison informing you that Dat Luong had died

Page 64

1  on October 11th of 2016?

2      A.  No.  Not until I just saw it.  No.

3      Q.  Okay.  And then you forwarded the e-mail

4  to someone within the Department of State

5  Hospitals.

6         Who did you -- with a notation:  "This is

7  the e-mail I received yesterday."

8         Who did you forward the e-mail to?

9      A.  I think he's a lawyer.

10     Q.  Do you know why you were forwarding

11 Ms. Darvison's e-mail to him?

12     A.  He must have been a -- I don't know why.

13     Q.  Do you know who Robert du Ruyter is?  I

14 probably mispronounced his name.

15     A.  He is a lawyer at DSH, or he was.  I guess

16 he is still up there.

17     Q.  Was Sandra Darvison your contact person at

18 the Alameda County Sheriff's Office for patients

19 who were ordered by Alameda County courts to be

20 transferred to Napa State Hospital?

21     A.  Yes.

22     Q.  How long was she your contact person?

23     A.  Always.

24     Q.  During the entire time you were the direct

25 admissions coordinator?

Page 65

1      A.  Yes.

2      Q.  After Dat Luong's death, as far as you

3  know, did the Department of State Hospitals conduct

4  any internal investigation about what role it may

5  have had in his death?

6      A.  I don't know.

7      Q.  Did anyone talk to you, anyone from the

8  Department of State Hospitals, talk to you about

9  Dat Luong after he died?

10     A.  I don't think so.

11     Q.  Did anyone ask you to give any statement

12 about Napa State Hospital's involvement in Dat

13 Luong's case before he died?

14     A.  No.

15         MS. SHERWIN:  Let's mark this next in

16 line.

17     (Exhibit 16 was marked for identification.)

18 BY MS. SHERWIN:

19     Q.  Exhibit 16 is an e-mail correspondence

20 between you and Sandra Darvison at the Alameda

21 County Sheriffs Office dated July 11th, 2017, and

22 bearing a Bates stamp No. DSH 59.

23         So on July 11th, Ms. Darvison asked you if

24 you had any paperwork on Dat Luong who was killed

25 on October 11th, right?

Page 66

1    A.  Yes.
2    Q.  And she wanted to see if you had any
3  paperwork regarding his commitment and the order to
4  transport him to you, right?
5    A.  Right.
6    Q.  And then what was your response to
7  Ms. Darvison in your e-mail?
8    A.  That we don't keep records when somebody
9  isn't coming to us.
10    Q.  You told her you don't have anything
11  because, quote:  "We don't keep records when
12  somebody isn't coming to us," end quote, correct?
13    A.  Yes.
14    Q.  When you said "we don't keep records," who
15  were you referring to?
16    A.  In my office.
17    Q.  What do you do with the records on people
18  who are not coming to Napa State Hospital?
19    A.  It goes into the confidential shredding.
20    Q.  Do you have confidential shredding in your
21  office?
22    A.  Yes.  It's picked up, but there's a blue
23  bin in there.
24    Q.  How long after you learn that the person
25  is not coming to Napa State Hospital do you shred

Page 67

1  that person's records?
2    A.  I dump it immediately.  They are not
3  coming.
4    Q.  So when you learned on October 11th of
5  2016 that Dat Luong had been killed in Alameda
6  County Jail, you shredded the records regarding
7  him; is that correct?
8    A.  Yes.  I didn't shred them, but I did get
9  rid of them.
10    Q.  You dumped them in the confidential
11  shredding bin?
12    A.  Yes.
13    Q.  On the same day that you learned that he
14  had been killed, correct?
15    A.  Yes.
16    Q.  Does the Department of State Hospitals
17  have any written policies, procedures, or
18  guidelines for maintenance of records?
19    A.  On patients that are admitted, yes.
20    Q.  There are written policies and procedures
21  and guidelines on maintaining records on patients
22  who are admitted to Napa State Hospital?
23    A.  Yes, there are.
24    Q.  What do those documents provide?
25    A.  I'm not sure.  We have people that take

Page 68

1  care of the records in medical records, and that is
2  their job, their sole job, and they are up on all
3  the records maintenance.
4       And they keep all the records there, and
5  when people want records from a former visit to the
6  hospital or any kind of release of records on
7  somebody that's been there or is there, they know
8  how to legally release records.
9    Q.  Has anyone within the State of California
10  ever provided you with any training about any legal
11  requirements with respect to maintenance of medical
12  records on patients regardless of whether or not
13  they are actually admitted to the hospital?
14    A.  We have confidential and HIPAA training.
15    Q.  And have you received any training about
16  any legal requirements for maintaining records on a
17  patient who hasn't come to Napa State Hospital, for
18  example, Dat Luong who was killed before he arrived
19  at the hospital?
20    A.  No.
21    Q.  Has anyone within the State of California
22  instructed you to destroy records on patients once
23  you learn they are not coming to Napa State
24  Hospital?
25    A.  If their case is dropped or vacated, the

Page 69

1  order's vacated, or for any reason somebody doesn't
2  come to the state hospital, we do not keep those
3  records.
4    Q.  Okay.  And has the State of California or
5  any of your supervisors within the State of
6  California instructed you that you should destroy
7  the records on patients who don't come to the
8  hospital?
9    A.  It's always been our way of doing.  I
10  don't know that they have instructed me, but it's
11  how we do it.
12    Q.  Okay.  So the entire time you've worked
13  for the State of California the State has always
14  destroyed the records for patients it has been
15  ordered to admit pursuant to a commitment order if
16  the patient is not admitted -- does not physically
17  arrive at the state hospital; is that correct?
18       MS. ADDAMS:  Objection.  Misstates her
19  testimony.
20       THE WITNESS:  If the order is vacated, if
21  for any reason the patient -- the judge just
22  changes their mind, or the lawyer changes his mind
23  about the patient coming, we don't keep that
24  commitment order in that packet.  We have no need
25  for it because they will not be coming.

Page 70

1  BY MS. SHERWIN:
2      Q.  Okay.  Is it correct -- I just want to
3  make sure my understanding is correct.  Okay?
4          Is it correct that as long as you have
5  worked for the State of California the State has
6  always destroyed documents relating to patients who
7  die in jail custody while they are awaiting
8  transfer pursuant to an order of commitment to one
9  of the state hospitals?
10         MS. ADDAMS:  Objection --
11         THE WITNESS:  I can't --
12         MS. ADDAMS:  Way beyond the scope of what
13  this witness would know.
14         THE WITNESS:  I don't know.
15  BY MS. SHERWIN:
16      Q.  Okay.  But have you always -- has it
17  always been your understanding of the practice as
18  long as you have worked at Napa State Hospital that
19  you should dump the records into the confidential
20  shredding bin for patients who die in custody while
21  they are awaiting transfer to a state hospital?
22      A.  I only keep the record if I am asked to
23  keep the record.  If no one asks me to keep it,
24  then -- my office is about this big (indicating).
25          I wouldn't have room to save everything

Page 71

1  for everyone that didn't come.  So I don't save all
2  the packets for people that don't come.
3      Q.  Okay.  What I am trying to understand,
4  Ms. White, is this practice of shredding the
5  records when you are informed that the patient died
6  in jail custody while they are awaiting Napa State
7  Hospital to comply with an order to admit the
8  patient for restorative treatment, is this your own
9  practice of shredding the records, or is it a
10  practice that you have been given by the State of
11  Cal or any of your supervisors?
12         MS. ADDAMS:  Objection.  Misstates her
13  prior testimony.
14         THE WITNESS:  I don't know.
15  BY MS. SHERWIN:
16      Q.  You don't know one way or the other?
17      A.  I don't keep records when people aren't
18  coming.  I don't.
19      Q.  Okay.  So when you learned that Dat Luong
20  died in custody while he was waiting for Napa State
21  Hospital to comply with the court order to admit
22  him for restoration of competency, you had his
23  records dumped in the confidential shredding bin,
24  correct?
25      A.  That's correct.

Page 72

1      Q.  And that's been your practice as long as
2  you have been the direct admissions coordinator; is
3  that right?
4      A.  Yes.  We don't keep those paper copies.
5      Q.  I note from your deposition last fall that
6  in July of 2012 your plan was to send all transport
7  orders, orders to show cause, and potential orders
8  to show cause to other hospital if a deal can't be
9  negotiated.
10         We discussed that at your deposition.  Do
11  you recall having that as your intention during
12  your employment with the State of California?
13         MS. ADDAMS:  Objection.  Vague and
14  ambiguous.  If you understand the question.
15         THE WITNESS:  I don't --
16  BY MS. SHERWIN:
17      Q.  I will show you what was marked as
18  Exhibit 32 to your deposition in the Atayde case,
19  and I am just -- we are not going to mark it here
20  because it's a document that you appear to have
21  filled out in connection with your own individual
22  development.
23         But the document says that your plan is
24  to:  Mail away all packets that can go to Metro.
25  Send all transport orders, OSCs, and potential OSCs

Page 73

1  to other hospital if a deal can't be negotiated.
2          I will just show that to you.
3      A.  Oh, this is my goal for the year in 2012.
4      Q.  Right.
5      A.  Okay.  Okay.
6      Q.  Okay.  And the deal that you were talking
7  about was a deal with the judge who ordered the
8  patient's commitment to Napa State Hospital, right?
9      A.  Yes.
10      Q.  And you would call the judge personally
11  and ask the judge if he or she would allow you to
12  admit the person later, correct?
13      A.  Yes.
14      Q.  As far as you know, did anyone else within
15  the State of California or Department of State
16  Hospitals make telephone calls like that to judges
17  who have ordered a patient to be committed?
18         MS. ADDAMS:  Outside the scope of what
19  this witness could testify to.
20  BY MS. SHERWIN:
21      Q.  Well, the first sentence -- the first
22  beginning of that question is:  As far as you know.
23      A.  I have no idea.  I did it regularly.  I
24  don't know if anybody else did it.
25      Q.  Okay.  When you say, "I did it regularly,"

Page 74

1 you regularly would make calls to the judge who
2 ordered a patient committed to Napa State Hospital
3 to see if the judge would make a deal with you to
4 let the patient come in later, correct?
5    **A.  Yeah.  Maybe by a day or two if we**
6 **couldn't meet the date of the OSC.**
7    Q.  Did you let anyone within the State of
8 California know that you were making these calls to
9 judges?
10    **A.  My supervisor.**
11    Q.  Diane Mond?
12    **A.  Yes.**
13    Q.  Have you made these calls to judges during
14 the entire time that you were the direct admissions
15 coordinator at Napa State Hospital?
16    **A.  I haven't made them lately.**
17    Q.  When is the last time you recall having
18 made one of these calls to a judge?
19    **A.  Probably 2014.  I haven't done it in a**
20 **long time.**
21    Q.  Do you know whether anyone else within the
22 Department of State Hospitals made telephone calls
23 to judges to see if the judge would let them take
24 the patient later than the judge had ordered?
25    **A.  I don't know.**

Page 75

1    Q.  Did you ever let the patient's criminal
2 defense lawyer know that you were making these
3 personal calls to the judges who had ordered Napa
4 State Hospital to take the patient?
5    **A.  No.**
6    Q.  Did you ever let any prosecutor or
7 district attorney know that you were making these
8 direct calls to judges?
9    **A.  No.**
10    Q.  Did Diane Mond ever tell you not to call
11 the judge directly?
12    **A.  No.**
13    Q.  Did Diane Mond ever express any concerns
14 to you that you might be violating rules against
15 ex parte communications with the court by calling a
16 judge directly and not informing the district
17 attorney or the patient's criminal defense lawyer?
18       MS. ADDAMS:  Objection.  Calls for a legal
19 opinion.
20       **THE WITNESS:  No.  Sometimes a judge would**
21 **call me.  So if the judge called me, I would talk**
22 **to her.**
23 BY MS. SHERWIN:
24    Q.  Okay.  But nobody within the Department of
25 State Hospitals ever expressed a concern that with

Page 76

1 you making telephone calls to judges to see if you
2 could make a deal for the patient to be admitted
3 later, you might be violating rules against
4 ex parte communications with the court; is that
5 correct?
6    **A.  No one ever said anything.**
7       MS. SHERWIN:  Okay.  I have no further
8 questions.  Thank you.
9       MS. ADDAMS:  I have a few questions.
10       Before we go off the record, do you need a
11 break before?  Okay.  Great.
12 EXAMINATION BY MS. ADDAMS:
13    Q.  I wanted to ask you about the exhibits
14 that are in front of you, 6, 7, 8, 9, 10, 11, 12,
15 and 13.
16       Were these -- these are pages from what
17 has been referred to here as a waiting list,
18 correct?
19    **A.  Yes.**
20    Q.  Was this an official DSH waiting list?
21    **A.  No.**
22    Q.  What was it?
23    **A.  Just like a record of my work.  I just**
24 **keep track of every patient I work on and put their**
25 **name down and a little something about them because**

Page 77

1 **then later on hopefully I can remember things.  It**
2 **might jog my memory and dates and just to help**
3 **myself a little bit.**
4    Q.  Were you asked by anybody, any supervisor
5 or anyone, to make this list?
6    **A.  No.**
7    Q.  Were you asked to continue the list
8 throughout your employment at Napa State Hospital?
9    **A.  No.**
10    Q.  Does this list constitute IST and other
11 admission, potential admitees, for Napa State
12 Hospital?
13    **A.  Yes.  And some at other places.**
14    Q.  Does it list Napa State Hospital only or
15 all hospitals?
16    **A.  It was -- these were just all packets that**
17 **I worked on at some point, and then maybe they**
18 **ended up going somewhere else.**
19    Q.  But you wouldn't be receiving -- you
20 wouldn't be adding things to this list, adding
21 people to this list, that came, say, to L. A.
22 County?
23    **A.  No.  Not unless we were taking them as a**
24 **favor for somebody or -- not normally.  It was**
25 **mostly just our catchment area.**

Page 78

1    Q.  And did you share this database with
2    anyone?
3    **A.  Not really.  People could look at it.**
4    **It's on a shared database, but mainly I just used**
5    **it.**
6    Q.  And did you use it to track what went on
7    at county jails in any way?
8    **A.  Not really, no.**
9    MS. ADDAMS:  Could we take a quick break
10   before we conclude?
11   MS. SHERWIN:  Sure.  And I will have a
12   couple follow-up questions.
13   THE VIDEOGRAPHER:  The time is now
14   12:09 p.m.  We are going off the record.
15   (Recess taken)
16   THE VIDEOGRAPHER:  We are now going on the
17   record.  The time is 12:14 p.m.
18   MS. ADDAMS:  I don't have any more
19   questions.
20   EXAMINATION BY MS. SHERWIN:
21   Q.  Okay.  I just have a couple of follow-up
22   questions.
23   Ms. White, going back to your direct
24   admission waiting list that you've created, you
25   created that list in the course of your job at Napa

Page 79

1    State Hospital and the Department of State
2    Hospitals, right?
3    **A.  Yes.**
4    Q.  And that was something that you did
5    actually after learning when you first assumed the
6    position that someone else had kept a list like
7    that, and it would be a good idea for you to keep a
8    list like that so you can keep everyone in one
9    place, right?
10   **A.  Yes.**
11   Q.  And you found that list helpful in your
12   work, and you've used it in your work with Napa
13   State Hospital and the Department of State
14   Hospitals since you first started keeping it in
15   2004, correct?
16   **A.  Yes.**
17   Q.  And that document is kept on a shared file
18   in your work computer system at Napa State
19   Hospital, right?
20   **A.  Yes.**
21   Q.  That's not something that you keep on your
22   own home computer or anything like that, right?
23   **A.  Right.**
24   MS. SHERWIN:  Okay.  I have no further
25   questions.  Thank you.

Page 80

1    THE VIDEOGRAPHER:  This marks the end of
2    DVD two of two and concludes today's deposition of
3    Dana White.
4    The time is now 12:15 p.m.  We are going
5    off the record.  Thank you, Counsel.
6
7    (At 12:15 p.m. the foregoing deposition concluded.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 81

1    REPORTER'S CERTIFICATE
2
3    I, MICHELE J. LUCAS, a Shorthand Reporter,
4    State of California, do hereby certify:
5    That DANA WHITE, in the foregoing deposition
6    named, was present and by me sworn as a witness in the
7    above-entitled action at the time and place therein
8    specified;
9    That said deposition was taken before me at
10   said time and place, and was taken down in shorthand by
11   me, a Certified Shorthand Reporter of the State of
12   California, and was thereafter transcribed into
13   typewriting, and that the foregoing transcript
14   constitutes a full, true and correct report of said
15   deposition and of the proceedings that took place;
16   That the deponent's review and signature was
17   not requested;
18   IN WITNESS WHEREOF, I have hereunder
19   subscribed my hand this 5th day of June, 2019.
20
21
     MICHELE J. LUCAS  CSR NO. 4017
22   State of California
23
24
25