1  MICHAEL J. HADDAD (State Bar No. 189114)
2  JULIA SHERWIN (State Bar No. 189268)
   MAYA RODRIGUEZ SORENSEN (State Bar No. 250722)
   TERESA ALLEN (State Bar No. 264865)
3  HADDAD & SHERWIN LLP
   505 Seventeenth Street
4  Oakland, California 94612
   Telephone:    (510) 452-5500
5  Facsimile:    (510) 452-5510

6  Attorneys for Plaintiffs

7

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11  DAT THANH LUONG, DECEASED, through his Co-      )   Case No. 3:17-cv-06675-EMC
12  Successors in Interest, AI QIONG ZHONG,          )
    Individually and as mother and Next Friend for W.L., a )
13  minor, and MAI CHAU, individually,              )

14                                                   )
                    Plaintiffs,                      )   DECLARATION OF RICHARD
15  vs.                                              )   HAYWARD, PH.D.

16  ALAMEDA COUNTY, a public entity; SHERIFF        )   Date:  August 30, 2019
17  GREG AHERN; JAIL COMMANDER THOMAS               )   Time:  1:30 p.m.
    MADIGAN; DR. RINATA WAGLE, M.D.; ESTATE         )   Place: Courtroom 5, 17th Floor
18  OF MOHINDER KAUR, M.D.; JACKSON & COKER         )
    LOCUMTENENS, LLC; BONNIE COOK, MFT;             )
19  DEPUTY BRANDEN MCBRIDE; SHERIFF'S               )
20  TECHNICIAN ROBERT LUEBKER; SHERIFF'S            )
    TECHNICIAN BRITANNI MARTINEZ; SHERIFF'S         )
21  TECHNICIAN KARL ENZMANN; DEPUTY SCOTT           )
    BRYNING; DEPUTY SHAWN CHRISTIANSEN;             )
22  NAPA STATE HOSPITAL, CALIFORNIA                 )
23  DEPARTMENT OF STATE HOSPITALS, a public         )
    entity; PAM AHLIN; DOLLY MATTEUCCI;             )
24  PATRICIA TYLER, M.D.; CINDY BLACK; and          )
    DOES 10-20, Jointly and Severally,              )
25                                                   )
26                  Defendants.                      )
    _____)

27

28

STATE OF CALIFORNIA                    )

COUNTY OF SAN MATEO                    )

I, Richard Hayward, PhD, declare as follows:

     1.     I am an expert in clinical, correctional, and forensic psychology, and was retained by Plaintiffs' counsel in this matter.  My qualifications are set forth in my Curriculum Vitae included with **Exhibit A**.

     2.     Attached hereto as **Exhibit A** is a true and correct copy of my complete expert report in compliance with Federal Rule of Civil Procedure 26.  My report sets forth a complete statement of my findings and opinions in this case, and the basis and reasons for them.

     3.     The facts and opinions stated in my report are based on my own personal knowledge and if called to testify to same, I am competent to do so.

     I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct and that this Declaration was executed on August   6  , 2019, in Redwood City, California.

 

Richard Hayward Ph.D.

No. 3:17-cv-06675-EMC: DECLARATION OF RICHARD HAYWARD, PH.D.

2

# EXHIBIT A

Julia Sherwin, Attorney at Law
Haddad & Sherwin
505 17th St.
Oakland, CA 94612

July 30, 2019

Dear Ms. Sherwin:

Based on my review and analysis of the materials identified in this report regarding the death of Dat Luong on October 11, 2016, I have provided a statement of opinions, with supporting information regarding this case. This report has been provided pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

1. **The data considered by the witness in forming the opinions:**

   1) Luong Second Amended Complaint
   2) Deposition of Pam Ahlin dated June 27, 2019
   3) Court Order appointing evaluators of Mr. Luong filed on March 15, 2016
   4) Sections 1367-1370 of the California Penal Code
   5) Case Information Sheet regarding Dat Thang Luong
   6) Institute for Medical Quality Accreditation Standards
   7) Court Order appointing evaluators of Mr. Luong filed on March 24, 2016
   8) Court Order for evaluation on April 6, 2016 and due on May 10, 2016
   9) Order Appointing Martin Blinder, M.D. per 1368 filed on April 7, 2016
   10) County of Alameda Clerk's Docket and Minutes dated May 13, 2016
   11) June 2, 2016 P.C. 1367 Court Order appointing David M. Echeandia PhD
   12) Court Order of July 8, 2016 finding Mr. Luong IST
   13) U.S. District Court, Eastern District of CA OSC in Coleman v. Brown
   14) Declaration of Pam Ahlin in Support of Response to the Nov 17, 2016 OSC
   15) July, 2016 Report of the Dept. of State Hospitals Incompetent to Stand Trial
   16) Deposition of Cindy Black dated June 7, 2019
   17) Notice of Depositions of Dana White, Cindy Black, Patricia Tyler, M.D., Pam Ahlin, Dolly Matteucci and the Person Most Knowledgeable
   18) Plaintiff's Request for Production of Documents to NSH and DSH
   19) Incompetent to Stand Trial Admissions Process under Title 9
   20) Department of State Hospitals-Napa Administrative Directive
   21) Forensic Admissions Directive; Effective Date: August 18, 2015
   22) Title 15 of the California Code of Regulations
   23) CONREP Policy & Procedure Manual Section 1210: IST P.C. 1370
   24) County of Alameda Order to Transport Defendant or to Show Cause re: Contempt
   25) May 9, 2019 news summary of the California budget proposal
   26) Department of State Hospitals Direct Admission Wait List June – Dec, 2014
   27) Oregon Advocacy Center v. Bobby Mink, Director, in the U.S. Court of Appeals for the Ninth Circuit
   28) Trueblood v. Washington: U.S. District Court, December 22, 2014

29) Deposition of Patricia Tyler, M.D. dated June 17, 2019

30) The Loma Linda University Physician's Oath

31) State Answer to 2nd Amended Complaint for Damages and Declaratory Relief

32) Amended Re-Notice of Deposition of Fed. R. Civ. Proc. 30(b)(6) Witness

33) Order Granting in Part Petition for Writ In County of Alameda, March 15, 2019 re: Stephanie Stiavetti, et al v Pamela Ahlin

34) Dec of Bruce C. Gage, M.D. in Support of Plaintiff's Motion for Peremptory Writ of Mandate prepared for a hearing on March 29, 2018

35) Deposition of George Maynard dated July 10, 2019

36) Order Appointing Alienists, P.C. 1368: Judge Dan Grimmer, County of Alameda filed on March 15, 2016

37) Order Appointing Alienists, P.C. 1368: Judge Dan Grimmer, County of Alameda filed on March 24, 2016

38) Order Appointing Alienists, P.C. 1368 by Judge Dan Grimmer, County of Alameda filed on April 7, 2016

39) Order Appointing Alienists, P.C. 1368 by Judge Dan Grimmer, County of Alameda filed on June 2, 2016

40) Superior Court, County of Alameda: Dat Luong found IST; referred to CONREP for placement report, July 8, 2016; hearing scheduled for July 22, 2016

41) Order committing Dat Luong to the Department of Mental Health at Napa State Hospital or any other hospital pursuant to P.C. 1370, by Judge Dan Grimmer, County of Alameda dated July 22, 2016

42) Deposition of Cindy Black in Atayde v. Napa State Hospital dated November 14, 2018

43) Deposition of Dana White dated June 3, 2019

44) Deposition of Dana White in Atayde v. Napa State Hospital dated October 25, 2018

45) Deposition of Dolores Matteucci dated July 18, 2019

46) Solitary, by Terry Allen Kupers, M.D.

**2.  The compensation to be paid for the study of documents and testimony:**

The compensation which has been agreed upon is at the rate of Three Hundred Dollars ($300) per hour for document review and consultation. My fees for deposition and/or trial testimony and court standby time are Four Hundred Dollars ($400) per hour.

**3.  The Qualifications of the witness, including a list of all publications authored by the Witness within the preceding ten years:**

My qualifications as a witness in this case are listed in my curriculum vitae, which have been previously submitted to you.  In summary my qualifications include, but are not limited to, the following:

I have worked as a licensed clinical psychologist in correctional settings since 1979, including 14 years as the Manager of Correctional Mental Health and Chemical Dependency Services for San Mateo County, California. I developed the acute psychiatric inpatient treatment unit at the

Maguire Correctional Facility in 1993 and I was the manager of the unit through 1996. I also developed correctional suicide prevention training programs based on my experience with suicide and suicide attempts by inmates and on my review of the professional literature.  My suicide prevention training program was included as a Power Point presentation and became the basic training course for the training package entitled "On Your Watch," which I helped to develop in 2002-2003 as a member of the Forensic Committee of the California Mental Health Director's Association. This DVD and CD-ROM package has been used to train correctional training teams for most of the correctional facilities in California. The "Train the Trainers" workshops were sponsored by the California Board of Corrections (now renamed the Board of State and Community Corrections) in 2003 and 2004 for the purpose of training selected security and health care staff from each facility to use the DVD and CD-ROM package to provide effective suicide prevention training to all correctional and health care staff in the facilities.  I have also provided correctional mental health and suicide prevention training for California Jail Managers Training workshops sponsored by the California Association of Sheriffs, and I have provided six workshops at correctional health conferences since 1999.

Additional qualifications include my work for the Corrections and Detentions Committee of the California Institute for Medical Quality since 2002.  I participate on survey teams that assess correctional facilities to determine if they meet the criteria for accreditation by the Institute for Medical Quality.  This work has provided numerous opportunities to review the mental health services programs in many California correctional facilities.

In 2008 through 2018 I worked as a Psychologist for the California Board of Parole Hearings. I evaluated lifer inmates in the California Department of Corrections and Rehabilitation (CDCR) and prepared more than 900 risk assessments for the Board of Parole Hearings. I completed interviews at many of the CDCR prisons in Northern California, which included the correctional treatment facility at San Quentin State Prison and the correctional treatment center at the California Health Care Facility at Stockton.

I have not published any books or articles in professional journals during the last ten years.

4. **A listing of any other cases in which I have testified as an expert at a trial or by deposition in the last four years:**

I testified as an expert witness in the following cases in the last four years:

- Testimony was provided in a deposition on November 8, 2018 regarding my 2013-2014 review of mental health services at the Monterey County correctional facility.
- James Neuroth v. Mendocino County, et al., United States District Court, Northern District of California, Case No. 3:15-CV-03226-RS (NHJV) Testimony was provided in a deposition on January 22, 2018.
- Aurora Vasquez et al v. County of Santa Clara, United States District Court, Northern District of California, Case No. 16-CV-05436 EJD. Testimony was provided in a deposition on August 15, 2017.
- Bremer v. Contra Costa County, United States District Court, Northern District of California, Case No. C15-01895 JSC. Testimony was provided in a deposition on October 4, 2016.

- Estate of Joshua Claypole v. County of Monterey et al., United States District Court, Eastern District of California, Case No. 2:10-CV-00826-JAM KJM. Testimony was provided in depositions on October 16, 2015 and January 26, 2016.
- A.H., et al. v. St. Louis County, et al., United States District Court, Case No. 4:14-CV-2069 CEJ. Testimony was provided in a deposition on February 9, 2016.
- Court testimony was provided on August 19, 2015 for the litigation of Moses v. Maricopa County, Case No. CV2011-017724.

### 5. Opinions to be expressed with supporting bases and foundations:

Mr. Dat Luong had an extensive history of a serious mental disorder in Alameda County. He was a stay-at-home father to his 14-year-old son and he also provided care for his mother. Mr. Luong was arrested on January 26, 2016. He was diagnosed as suffering from schizophrenia. He reportedly remained untreated in the community until he was arrested on serious felony assault charges. This is an example of the criminalization of the mentally ill, which has been well documented for several decades. A lack of sufficient mental health treatment resources in the community has contributed to increasing rates of incarceration of individuals suffering from chronic and severe mental disorders.

The following opinions address the factors that contributed to the death of Dat Luong, who suffered from a severe and chronic mental disorder:

**Opinion #1: Dat Luong had a history of a chronic and severe mental disorder. He repeatedly displayed substantial psychotic symptoms in the Alameda County jail following his arrest on felony charges on January 26, 2016. Although he was transferred to the John George Psychiatric Pavilion twice while incarcerated, he refused treatment with psychiatric medications when he was returned to the jail. He remained psychotic and vulnerable to being victimized until his death by strangulation on October 11, 2016. Mr. Luong was found to be Incompetent to Stand Trial (IST) on July 8, 2016 but he was never transferred to a state hospital for treatment prior to his death. The State of California and the California Department of State Hospitals contributed to his death by failing to provide Mr. Luong with prompt treatment after he was found to be IST on July 8.**

Dat Luong had a history of a serious mental disorder that included experiencing auditory hallucinations for at least 10 years. He had been diagnosed as suffering from schizophrenia and he had been prescribed ziprasidone, but he typically was noncompliant with treatment recommendations. His initial psychiatric evaluation at the county jail occurred on February 3, 2016. He was seen by Rinata Wagle M.D. who noted that Mr. Luong had recently been punched in the left eye by another inmate. Mr. Luong declined psychiatric medications and Dr. Wagle did not prescribe any. Dr. Wagle's diagnosis was Psychosis, NOS and she noted that Mr. Luong had been suffering from hearing voices for 10 years. Mr. Luong's sister Mai Luong called on February 9, 2016 and informed staff that Mr. Luong should be on medication and that when suffering from psychotic symptoms he will "get angry, fight, talk to himself, and [is] difficult to be with." She also emailed his January 21, 2016 prescription for the antipsychotic drug Saphris. On

4

February 17, 2016 Mr. Luong saw Dr. Wagle who prescribed Risperdal. Mr. Luong reported he continued to hear voices. Dr. Wagle noted bruising around his neck but apparently requested no medical follow-up. Mr. Luong next saw Dr. Wagle on March 8, 2016 and admitted he had not been taking the Risperdal and that he did not come out of his cell for pill call.

Mr. Luong's mental health continued to decline. He refused to eat because he thought he was being poisoned and that people were after him, and he refused psychiatric medication and medical treatment. On June 1, 2016 the MFT saw Mr. Luong and noted his arm was dark purple in color and swollen. The MFT initiated a W&I 5150 and Mr. Luong was transferred to the John George Psychiatric Pavilion. He was discharged on June 11 with 14 days of medication including risperidone, lorazepam and Benadryl.

On July 8, 2016 Judge Michael Gaffey found that Mr. Luong was mentally incompetent pursuant to California P.C. 1368 and referred him to the Conditional Release Program (CONREP) for a placement report. On July 22, 2016 Judge Dan Grimmer ordered Mr. Luong committed to Napa State Hospital or any other hospital pursuant to P.C. 1370. The court also ordered that within 90 days of this commitment the Executive Director of the hospital shall provide a report to the Court and the County concerning Mr. Luong's progress toward recovery of his mental competence. Involuntary treatment with psychiatric medication also was ordered. However, with rare exceptions California statutes authorize administration of involuntary psychiatric medication only in a hospital or a designated LPS unit such as a psychiatric health facility.

Mr. Luong was evaluated by MFT Castro on July 23, 2016 and the MFT observed that Mr. Luong displayed no affect, had impoverished speech, made no eye contact and stood still without any motor activity. Mr. Luong saw psychiatrist Anthony Coppola on July 25, 2016 and Mr. Luong would not speak to the doctor. Mr. Luong was transported to John George Psychiatric Pavilion a second time on July 27, 2016. By August 1, 2016 he was not improved and he was discharged on August 2. Dr. Kaur prescribed Risperdal and Benadryl on August 3, 2016 and decided that Mr. Luong was fit to move to the housing unit. Mr. Luong was seen by Dr. Wagle on August 9, 2016 and she prescribed Risperdal. He was not compliant with the prescribed psychiatric medications and he was seen by Dr. Wagle again on August 25.

The MFT noted that Mr. Luong had a black eye on September 2, 2016 as the result of his cellmate hitting him. Mr. Luong was assaulted by other inmates on multiple occasions and four assaults were documented. Following the assaults Mr. Luong was given new cellmates.

By September 6, 2016 Mr. Luong had not been transported to Napa State Hospital in violation of the July 22 commitment order. On September 7, 2016 Judge Grimmer issued an order to Pam Ahlin, Director of State Hospitals to transport Mr. Luong to the state hospital or to Show Cause why DSH should not be held in Contempt. A hearing was scheduled for September 12, 2016 to show cause.

Despite the Order to Show Cause Mr. Luong had not been transported to the state hospital by early October. Inmate Aref Popal was assigned to Mr. Luong's cell on October 7, 2018. Both men suffered from serious mental disorders. Mr. Popal was much larger and more aggressive than Mr. Luong and had a history of assaultive behavior at the jail. After being assaulted Mr. Luong died on October 11, 2016. Two correctional officers found Mr. Luong on the floor of his cell beaten and strangled at 8:50 a.m. The Sheriff-Coroner noted the cause of death was asphyxiation due to strangulation.

The information presented above documents that Mr. Luong remained psychotic during his incarceration from January 26, 2016 until his death on October 11, 2016. Although he had two brief episodes of treatment at the John George Psychiatric Pavilion he refused antipsychotic medication when he was returned to the Alameda County jail. As is the case with the vast majority of California county jails, the Alameda County jail had no statutory authorization to involuntarily treat Mr. Luong even after the court had issued an involuntary medication order. With rare exceptions, only a designated LPS facility such as a psychiatric health facility or a hospital has the statutory authority to administer involuntary medication. For Mr. Luong the state hospital remained the only resource that could provide the involuntary antipsychotic medication necessary to reduce his psychotic symptoms. Also, the state hospital would be the only option that could provide the necessary therapeutic milieu including daily access to mental health clinicians in addition to linguistic competence and multiple treatment resources. Thus, Mr. Luong continued to suffer from a severe psychosis in the Alameda County jail that could not be treated unless he was transported to a state hospital. Since it is known that he was beaten repeatedly by other inmates it is apparent that his psychotic symptoms annoyed the other inmates and caused them to become aggressive and assaultive toward Mr. Luong. This resulted in his death on October 11, 2016.

**Opinion #2: the State of California and the California Department of State Hospitals contributed to Mr. Luong's death by failing to expand bed capacity for IST's at the state hospitals since at least 2005. California and the California Department of State Hospitals deprived Mr. Luong and other individuals with a serious mental disorder of the right to speedy treatment to restore competence following a finding of IST by the court. This resulted in the common practice of allowing IST's with serious mental disorders to be housed in security units in the county jails without access to treatment for weeks and often months.**

There is documentation that Napa State Hospital and the other state hospitals have typically maintained a wait list for IST beds since at least 2004. The California Department of State Hospitals (DSH) has developed various plans to reduce the size of the wait lists for IST beds at the state hospital for many years. However, these plans failed to produce any substantial reduction of the IST wait lists. The Report of the Department of State Hospitals Incompetent to Stand Trial dated July 2016 documents that IST referrals increased by more than 10% annually in 2013-2016. DSH administrators also were aware of perpetual wait lists for IST hospital beds dating back to at least 2005. Despite this awareness there are no indications that DSH officials ever considered the

6

only solution that would effectively eliminate the wait lists: building a new hospital or a substantial addition to an existing state hospital that would provide several hundred IST beds. It is noted that the California Department of Corrections and Rehabilitation (CDCR) built a new hospital at the Stockton campus of the California Health Care Facility and opened the facility several years ago. There is more than sufficient space available on this campus to build a new IST hospital within the secure perimeter fence. The Stockton campus also is within the greater San Francisco Bay area, which would facilitate staffing a new facility with the necessary mental health and other healthcare professionals. It is difficult to avoid the conclusion that the failure to construct a new IST hospital was primarily due to financial considerations and indifference by DSH officials.

Jail Based Competency Treatment (JBCT) units have been developed over the past few years as part of efforts to provide competency treatment in the county jails and thereby reduce the number of IST referrals to the state hospitals. There is no evidence that DSH has made substantial efforts to evaluate the effectiveness of these programs. It is obvious that these jail based programs cannot replace the comprehensive competency restoration and therapeutic milieu treatment provided at a state hospital. It is noted that none of the JBCT units are actual hospital units and their services are not comparable to those offered at the state hospitals. Expansion of the JBCT units in the county jails is likely to be impaired by multiple obstacles and the result of expanding these programs is likely to be insufficient IST competency treatment for many inmate-patients.

**Opinion #3: the State of California has encoded into Penal Code 1370 a requirement for all IST defendants to be evaluated by the Community Program Director or a designee. The Community Program Directors and designees almost always recommend treatment in a state hospital IST bed except for several counties that have a Jail-Based Competency Treatment unit. The evaluation and recommendation of the Community Program Director is redundant and serves no critical purpose. It results in an additional delay of at least two to three weeks before the defendant can be committed and transported to an IST bed for initiation of treatment. This delay further deprives IST defendants of their right to begin treatment for restoration of competency within a brief period of time following the court's determination of IST. The California legislature should modify the P.C. 1370 statute to eliminate the unnecessary evaluation by the Community Program Director or designee.**

The primary goal of the evaluation by the Community Program Director is presumably to provide additional information that would guide the court during the process of completing the commitment order, in addition to clinical information that might be useful to the state hospital. However, much of this information could be provided by the psychiatrists and psychologists that complete the PC 1368 evaluations and the rest of it could be attained by the state hospital staff that review the information packets provided by the county that is referring the IST inmate-patient. The information packets are likely sufficient for a preliminary risk assessment to be completed prior to transfer of the IST inmate-patient to the hospital. An additional risk assessment can be completed by clinical

staff as soon as the IST inmate-patient arrives at the hospital. It is not likely that the additional risk assessment would indicate a need for placement at an alternate state hospital. However, on the rare occasions that an alternate state hospital is indicated it would be a simple process to transport the inmate-patient to the most appropriate placement.

DSH might claim that the Community Program Director or designee provides an additional opportunity to identify defendants that are malingering symptoms in an attempt to obtain access to a state hospital bed. However, there is no current evidence that the additional evaluations completed by the Community Program Directors or designees have identified a significant number of malingering defendants. The problem of identifying IST's that are malingering symptoms would be better addressed by providing the P.C. 1368 psychiatrists and psychologists with improved access to jail healthcare records and other county healthcare records.

The current PC 1370 commitment process suffers from unnecessary bureaucratic policies and procedures that contribute to delaying the initiation of treatment and provide limited benefit. The California DSH could and should develop a task force to streamline the process and eliminate all unnecessary delays to the initiation of competency treatment.

**Opinion #4: Since at least 2005, California and the California Department of State Hospitals (DSH) have been in violation of Section 1370 of the California Penal Code. P.C. 1370 (B) states "if the defendant is found mentally incompetent, the trial, the hearing on the alleged violation, or the judgment shall be suspended until the person becomes mentally competent." 1370(B)(i) mandates that "The court shall order that the mentally incompetent defendant be delivered by the sheriff to a State Department of State Hospitals facility, as defined in Section 4100 of the Welfare and Institutions Code, as directed by the State Department of State Hospitals, or to any other available public or private treatment facility, including a community-based residential treatment system established pursuant to Article 1 (commencing with Section 5670) of Chapter 2.5 of Part 2 of Division 5 of the Welfare and Institutions Code if the facility has a secured parameter or a locked and controlled treatment facility, approved by the community program director that will promote the defendant's speedy restoration to mental competence, or placed on outpatient status as specified in Section 1600." Additionally, the Oregon Advocacy Center v. Mink case decided by the Ninth Circuit Court of Appeals on March 6, 2003 set a standard of seven days for the initiation of competency treatment following the court's determination that a defendant is IST. Trueblood v. Washington prescribed the same standard of seven days in a 2014 ruling. California and the California Department of State Hospitals (DSH) have been in violation of P.C. 1370(B)(i) by failing to provide IST beds that would allow the county sheriffs to deliver IST defendants to a state hospital.**

It is noted that the P.C. 1370 phrase "that will promote the defendant's speedy restoration to mental competence" has codified the standard that IST inmate-patients have a right to

timely transfer to treatment services that will support restoration of competency. There is considerable documentation that the California DSH has substantially failed to meet this standard since at least 2004. There should be no waitlist. It is noted that on June 27, 2016 there were 464 IST referrals on the waitlist for a state hospital IST bed. DSH published a report in 2016 documenting that extensive wait lists for IST beds had become common. The Report of the Department of State Hospitals Incompetent to Stand Trial dated July, 2016 notes that IST referrals increased by more than 10% annually in 2013-2016. The report summarizes multiple court rulings regarding IST admissions and also analyzes multiple factors contributing to the increase in IST's. The report notes that 444 IST beds were added since 2013 including 336 state hospital beds and 108 jail-based competency treatment beds. Also, the IST length of stay in the hospital was reduced by 24% over several years. The IST waitlist was 168 in 2012, 383 in 2013, 426 in 2014, 379 in 2015 and 464 in June, 2016. Although the addition of 444 IST beds confirms that DSH has been attempting to address the waitlist problem, the length of the IST waitlists since 2012 indicates that DSH efforts have fallen substantially short of the necessary additional beds.

It has become common for IST inmate-patients to wait several months in the county jail for a state hospital bed after the court has found the defendant to be Incompetent to Stand Trial. The vast majority of these IST inmate-patients remain untreated in the jails due to the absence of statutory authority to administer involuntary medication in the county jails. Also, most jails have no capability of providing a supportive therapeutic environment similar to that in the state hospital.

There is also documentation of substantial numbers of Orders to Show Cause (OSC) issued by the courts after the California Department of State Hospitals failed to provide IST inmate-patients with a bed in a reasonable amount of time following IST commitment orders by the courts. In his deposition on July 10, 2019 DSH administrator George Maynard provided data on the number of OSC's beginning in 2014: 2014 was 146; 2015 was 819; 2016 was 1975; 2017 was 2344; and 2018 was 2,810. The OSC's document that the California Superior Courts have been acutely aware of the violation of defendants' due process rights resulting from the extensive IST wait times prior to admission to a state hospital bed. The perpetual and extensive IST wait lists document that since at least 2004 California and the DSH have continued to violate the P.C. 1370 statute and also the federal court standards established in Oregon Advocacy Center v. Mink and Trueblood v. Washington.

California and the California DSH additionally violate P.C. 1370 by failing to provide hospital beds for IST inmate-patients in sufficient time to allow for a 90 day progress report as required by the statute. Many IST inmate-patients have remained untreated in the county jail more than 90 days after a court finding of Incompetent to Stand Trial.


**Opinion #5: California and the California Department of State Hospitals (DSH) need to add a sufficient number of state hospital beds to reduce the wait time for an IST hospital bed to no more than one week following the court determination that a defendant is Incompetent to Stand Trial. Meeting the one week standard would**

**reduce the suffering of these inmate-patients and also reduce the risk of suicide and assaults or victimization by predatory inmates.**

It is common knowledge in the mental health field that individuals suffering from serious thought disorders including schizophrenia often refuse voluntary treatment for various reasons. Many patients are fearful of the medications and also wish to avoid the onerous side effects of antipsychotic medication. Since these individuals often continue to display psychotic symptoms they frequently are isolated from the general population in the jails to protect them from aggressive and predatory inmates and to reduce the risk that they might antagonize or assault other inmates. As a result, individuals with a severe mental disorder often are housed in security units where they are locked in a cell 22 to 23 hours per day. It is thoroughly documented in the scientific literature that this level of isolation does not promote restoration of mental health and is likely to exacerbate psychotic symptoms. The Institute for Medical Quality (IMQ) in California offers accreditation of county jail health and mental health programs. IMQ has addressed the problem of isolation of individuals with a serious mental disorder by requiring that the jails attempt to provide some type of socialization service such as weekly support groups to these individuals. In order to receive IMQ accreditation the jail must provide a socialization service or documentation of multiple efforts to treat these individuals that are housed in isolated security units. A majority of the county jails in California do not meet the IMQ accreditation standards and do not even attempt to seek IMQ accreditation.

The vast majority of county jails in California have always lacked the capacity to provide significant mental health treatment to inmates suffering from a major mental disorder such as schizophrenia. There are approximately six county jails that have sufficiently large populations and criminal justice resources to provide an LPS level of mental health treatment in designated health care units within the jail. The LPS designation allows these facilities to provide involuntary mental health treatment pursuant to the Welfare and Institutions (W&I) 5150-5350 codes. The other 40 plus California county jails have no LPS capacity to provide involuntary treatment within the jail and thus all the mental health treatment is voluntary. Some counties have a contract with an LPS facility that allows the sheriff to transport inmates with a serious mental disorder to the facility for temporary involuntary treatment pursuant to W&I 5150-5350. However, these counties have no LPS authority to continue involuntary treatment in the jail following discharge from the LPS facility. Even when the inmate-patient is stabilized at the LPS facility he or she often refuses psychiatric medication soon after returning to the jail. Most correctional facilities in California also lack a suitable housing unit that could be converted to provide mental health treatment. Except for the six counties that have been able to establish LPS treatment programs within the jail, there is no possibility of providing this level of mental health treatment services to inmate-patients with a serious mental disorder. As a result,

these inmate-patients often suffer for months in isolated jail units without mental health treatment.

To appreciate the suffering experienced by inmate-patients with a severe mental illness it is important to consider what it would be like to be locked in a room that is approximately 6' x 10' for at least 22 hours every day. Although there may be minimal natural light from a very small window these cells usually have no view of the outside world. Typically, there are minimal opportunities to interact with other human beings, and these include only the very brief interactions with correctional officers and nursing staff that come to offer medications. There are no televisions in the cell to reduce the endless boredom and most inmate-patients have no opportunity to listen to music. The typical IST inmate-patient will sit in the cell alone for weeks and usually for months. Since he does not understand the IST process he has no idea how long he will be confined to this isolation. He may begin to feel hopeless that his current environment will ever change or improve. As a result, he may begin to feel suicidal. Terry Kupers, M.D. has provided extensive descriptions of the psychological impact of this type of isolation in his book *Solitary*.

Many county jails in California do not have a sufficient number of high-security cells to maintain inmate-patients in a single cell. Classification officers will often house similar inmate-patients together so the cellmate typically will also suffer from a serious mental disorder. Although this reduces the isolation it also increases the risk of assaultive behavior since these two inmate-patients are now suffering together for at least 22 hours a day in a 6' x 10' cell.  It is well known within the mental health and correctional communities that inmate-patients with mental disorders are at significantly increased risk of being subjected to violence, aggression, and predatory behavior at the hands of other inmates, and that inmate-patients with serious mental disorders are often housed together, greatly increasing the risk of violence and aggression. This violence is especially foreseeable when both cellmates have a history of serious mental disorders and aggressive behavior. This was clearly the case when Aref Popal was placed in the cell with Dat Luong on October 7, 2016.

There is substantial agreement that IST inmate-patients suffer disproportionately in the county jails while waiting for a state hospital bed. This suffering also has been noted by the federal courts. The opinion in the Oregon Advocacy Center v. Mink case by the United States Court of Appeals for the Ninth Circuit that was filed on March 6, 2003 notes that "the disciplinary system in the jails used to control inmates is ineffective for, and possibly harmful to, incapacitated criminal defendants. Because of their unpredictable or disruptive behavior, they are often locked in their cells for 22 to 23 hours a day, which further exacerbates their mental illness. Incapacitated criminal defendants have a high risk of suicide, and the longer they are deprived of treatment, the greater the likelihood they will decompensate and suffer unduly."

Additionally, in Trueblood v. Washington the United States District Court for the Western District of Washington noted on December 22, 2014: "While any incarceration can be harmful to people with serious mental illness, some detainees are held in solitary

confinement- isolated for 22 to 23 hours per day- because city and county jails are ill equipped to handle the challenges posed by mentally ill detainees. For many, solitary confinement exacerbates mental illness and increases the chance of suicide." The opinion also noted that "because jails are inherently punitive and not therapeutic institutions, the mental health of detainees further erodes with each additional day of wait time, especially when those detainees are held in solitary confinement."

It would obviously be humane for California to adopt the standard of beginning competency treatment within seven days of a finding of Incompetent to Stand Trial. This standard also would result in ending the California DSH's current practice of depriving IST inmate-patients of their due process rights under the U.S. Constitution. Both Oregon and Washington have successfully adopted the seven-day standard following determination by the federal courts that they had been violating the due process rights of IST inmate-patients. Dolores Matteucci was the Executive Director of Napa State Hospital from 2011 until she moved to Oregon in 2018 to assume a similar position for the Oregon State Hospital system. In her July 18, 2019 deposition Ms. Matteucci acknowledged she had awareness as the Executive Director of Napa that holding IST's in jail for weeks or months violates their due process rights. She explained that "Oregon, like many, many states, has seen a steady increase in individuals that are ordered to the state hospital under aid and assist [IST] orders. And over the years has built capacity to meet that need." She also noted: "I don't recall hearing of the Mink case prior to moving to Oregon. The [Oregon] hospital had been organized around complying with that order since 2003." She added that currently about half of the IST's in Oregon are admitted to the hospital within seven days.

The State of Washington also has adopted a seven-day standard as a result of the Trueblood v. Washington ruling by the United States District Court for the Western District of Washington on December 22, 2014. The District Court noted that the wait times for Court-ordered competency evaluation and restoration services violated the Due Process Clause of the 14th Amendment. The court also noted that "lack of funds, staff or facilities, however, cannot justify the State's failure to provide [such persons] with the treatment necessary for rehabilitation." The Court concluded that "the in-jail wait time experienced by Plaintiffs and class members today is far beyond any constitutional boundary. The Court finds that Defendants' failure to provide timely competency evaluation and restoration services to Plaintiffs and class members has caused them to languish in city and county jails for prolonged periods of time, and that this failure violates their right to substantive due process under the 14th Amendment. It is clear to the Court that wait times of less than seven days comport with due process, and that anything beyond seven days is suspect. The Court finds, however, that determination of the precise outer boundary permitted by the Constitution depends on facts to be proven at trial."

There are no compelling reasons why California cannot adopt the same seven day standard to begin treatment of IST inmate-patients that is now followed in Oregon and Washington. It would be prudent for California to adopt the standard prior to a federal court finding that current practices fail to meet constitutional requirements. The standard also would initiate potential relief for the several hundred IST inmate-patients that

currently suffer unfairly in the county jails for weeks or months while they wait for an IST hospital bed. It is likely that California has more resources than Oregon or Washington to develop the additional IST hospital beds to meet the seven-day standard. The primary requirement is a commitment at the top level of California government.

As noted above, the evaluation and report of the Community Program Director or designee is essentially redundant and is not a critical component of the IST procedure. All of the information provided by this report could be obtained prior to or following the court finding of Incompetent to Stand Trial. This would be an essential step in meeting the seven-day standard. It is apparent that the most critical step is adding several hundred IST hospital beds. Building a new state hospital is costly but as noted in Trueblood v. Washington: "lack of funds, staff or facilities, however, cannot justify the State's failure to provide [such persons] with the treatment necessary for rehabilitation."

It should be noted that the California State Hospitals also provide treatment to prison inmates in the California Department of Corrections and Rehabilitation (CDCR) when the inmate-patients are in need of acute mental health services. As a result of the Ralph Coleman versus Edmond G Brown, Jr. litigation the Department of State Hospitals agreed in 2016 to admit acute inmate-patients from CDCR within no more than 10 days after receiving a request for a bed. Litigation was required to ensure these acute inmate-patients could access an acute care bed within 10 days. It would be prudent and humane for California to provide timely access to IST state hospital beds without the necessity of litigation.

It is time for California and the DSH to seriously address the IST problem and begin the necessary steps to fix it. Doing so will reduce the incidence of future episodes of suffering and death that was experienced by Dat Luong in 2016. As noted above, Mr. Luong was assaulted by other inmates on multiple occasions and four assaults were documented. This tragic loss could have been prevented by the addition of state hospital IST beds and also by streamlining the P.C. 1370 system.

**Opinion #6: There is no evidence that DSH ever attempted to routinely assess psychiatric acuity of IST's in the county jails that were waiting for a state hospital bed. Acuity was not assessed unless some advocate at the county jail knew to contact the state hospital and request a priority admission. There often are no advocates for county jail inmates suffering from a significant mental disorder. There were recurrent indications that Mr. Luong displayed a high level of psychiatric acuity for many months while housed in the Alameda County Jail. A routine assessment of psychiatric acuity by DSH would have flagged Mr. Luong as psychiatrically acute and in need of a priority admission.**

California DSH administrators acknowledge that IST inmate-patients typically remain untreated for weeks or months in the county jails while waiting for a state hospital bed. It is noted on page 88 of her June 17, 2019 deposition that Dr. Tyler has been aware for 20 years that county jails do not provide adequate psychiatric treatment to severely ill

inmates. On page 56 of the same deposition Dr. Tyler was noted to acknowledge a risk that IST patients will continue to deteriorate in jail while waiting for admission; and that some experience an increase in suicidality.

DSH has allowed the California county jails to request a priority admission to state hospital IST beds for IST inmate-patients displaying acute symptoms, but does nothing to inform them of the ability to request a priority admission and psychiatric acuity review. Additionally, Dr. Tyler has limited the class of persons from whom she will accept a request for priority admission and psychiatric acuity review to only county jail clinicians, informing jail staff and defense lawyers who request priority admission for a patient that they must ask the jail clinician to make the request. Dr. Tyler also acknowledged the problem with IST waitlists resulting in numerous Orders to Show Cause in her June 17 deposition, stating that Napa has received OSC's "all the time" over the past five or six years. Despite having a procedure for priority admission for acute IST inmate-patients DSH has never attempted to routinely assess the psychiatric acuity of these individuals while they are waiting for weeks or months to be transferred to a state hospital bed. There are many ways that the psychiatric acuity of the IST inmate-patients could have been assessed to allow for the most acutely psychotic to obtain a priority admission. They could have hired several clinicians to routinely visit the IST's in the jails to evaluate their acuity level. They also could have used the jail's telepsychiatry equipment to conduct a remote evaluation of the inmate-patients.  Even one or two clinicians might have been sufficient to phone the jail mental health clinicians to request current information about the IST inmate-patients' clinical status. In most cases this would provide sufficient information for a decision regarding a priority admission. This procedure most likely would have alerted the Napa staff that Mr. Luong was acutely psychotic and in need of a priority admission long before his death on October 11, 2016.

Rather than acknowledge that DSH had at least a shared responsibility for monitoring and supporting the clinical status of IST inmate-patients ordered into their custody while they waited in the county jails for an IST bed at the hospital, the DSH administrators have consistently claimed that they had no clinical responsibility for these inmate-patients prior to their arrival at the state hospital. DSH Director Pam Ahlin claimed on page 35 of her June 27, 2019 deposition that "I did not have responsibility for their care if they were not inside our facilities or under a program in which we maintained and supervised." She also stated: "That's their responsibility until they get to our door." Later in her deposition Ms. Ahlin acknowledged that she had minimal understanding of the treatment resources for IST patients in the county jails while they were waiting for a state hospital bed. She was not aware of IST decompensation in the county jails and there is no indication that she attempted to obtain any information despite being the top administrator of the State Hospital system. It is noted that although she was the Executive Director of the California State Hospital system Ms. Ahlin had no history of clinical training or expertise and no knowledge or appreciation of what IST inmate-patients were experiencing in the county jails prior to their arrival at a state hospital.

On page 118 of her July 18, 2019 deposition, Napa Executive Director Dolores Matteucci also denied having any responsibility for an IST inmate-patient prior to admission to

Napa State Hospital. Ms. Matteucci additionally had no history of education or training in mental health. On page 94 of her deposition she acknowledged that Napa would not know that an IST inmate-patient in the county jail was acute unless someone from the jail requested a priority admission; and that Napa never reviewed admission documents to look for acuity.

On page 121 of her deposition Ms. Matteucci also acknowledged that the California DSH never looked for hospital beds outside of the state hospitals and did not attempt to provide treatment in any county jail for an IST. They also did not keep a list of IST inmate-patients that died while waiting for a bed. Rather than deny having any responsibility for IST inmate-patients prior to their arrival at the state hospital, DSH could have made an attempt to actually support the clinical status of these inmate-patients while they were waiting in the county jails for the state hospital bed. Any efforts to clinically connect with the IST inmate-patients that were waiting in jails would have substantially increased the likelihood that acute inmate-patients such as Mr. Luong would come to DSH attention as needing a priority admission. It is probable that a psychiatric acuity review would have prompted a priority admission for Mr. Luong, and priority admission would have prevented his death on October 11, 2016.

The California DSH certainly shares responsibility for the care of IST inmate-patients after the court makes an order that commits the IST to the state hospital. Even the simple act of reviewing county records during the process of approving an IST admission demonstrates that the hospital is accepting a degree of responsibility for the care of the IST inmate-patient. DSH should acknowledge that the hospitals share responsibility for these inmate-patients prior to their arrival at the hospital. DSH could have hired clinicians to evaluate IST inmate-patients and support their clinical care in the county jails during the long waits for an IST hospital bed. Although this would be a costly option it would demonstrate good faith on the part of DSH to attempt to ameliorate both the suffering and the violation of due process rights of IST inmate-patients as they wait for weeks or months without treatment in the county jails, and would provide for priority admission for the most acute inmate-patients.

**Opinion #7: California and the California Department of State Hospitals (DSH) failed to provide training to the top administrative staff from DSH regarding the constitutional rights of defendants found to be Incompetent to Stand Trial. This lack of training allowed the administrators to continue managing the state hospitals for years without any sense of urgency regarding the expansion of IST beds. Adequate training would have encouraged the top administrators to insist that the State provide the necessary funding to expand IST beds and meet constitutional standards for timely treatment.**

In her June 27 deposition DSH Director Pam Ahlin acknowledged on Page 95 that she does not understand due process rights and was never trained regarding her obligations regarding patients' due process rights. On Page 138 she indicates that she had no training regarding constitutional obligations to IST inmate-patients. She reported on Page 140 that

15

she had never heard of the Oregon Advocacy Center versus Mink case decided by the Ninth Circuit Court of Appeals on March 6, 2003. She acknowledged on Page 142 that she was never trained regarding IST's having the right under substantive and procedural due process to reasonably timely transport to a treatment facility. She indicated on Page 147 that she followed California state laws and was not informed regarding federal constitutional law.

In a July 18, 2019 deposition Napa Executive Director Dolores Matteucci acknowledges that DSH was violating the due process rights of IST inmate-patients due to the long wait lists for a bed at Napa (Page 105). However, on Page 125 she adds that she was never trained by the state regarding the due process rights of IST's. On Page 128 she states: "I don't recall hearing of the Mink case prior to moving to Oregon."

These top DSH administrators were not provided with training regarding the constitutional due process rights of IST inmate-patients once they were determined by the court to be IST. Both directors acknowledged that they were not aware of the 2003 Oregon Advocacy Center v. Mink case although Ms. Matteucci explained that she learned about the case in 2018 when she became the Director for the Oregon State Hospitals. It is noted in the depositions that none of the California DSH administrators expressed any urgency regarding the excessive waits for IST beds that frequently continued for many months. If these administrators had received training regarding Oregon Advocacy Center v. Mink in 2003 and Trueblood v. Washington in 2014 they likely would have had substantial concerns regarding the DSH violations of the IST inmate-patients' due process rights. In the absence of substantial concerns they neglected to advise the California legislature of the urgent need to build additional IST hospital beds.

**Discussion and Conclusion**

Mr. Luong suffered from a severe mental disorder and he was unable or unwilling to accept mental health treatment in the community. His mental disorder contributed to his arrest on felony charges on January 26, 2016. While incarcerated he continued to display significant psychotic symptoms and also to refuse mental health treatment. His psychotic symptoms contributed to recurrent beatings by cellmates or other inmates and at least four of these were documented by jail staff. Unfortunately, he was victimized by other inmates for months before he was evaluated pursuant to P.C. 1368 and found to be Incompetent to Stand Trial on July 8, 2016. Following a subsequent evaluation by a CONREP clinician he was committed to Napa State Hospital on July 22, 2016. Due to the extensive wait list for an IST bed at Napa he was not transported to the hospital. On September 6, 2016 he still had not been transported to Napa State Hospital in violation of the July 22 commitment order. On September 7, 2016 Judge Grimmer issued an order to Pam Ahlin, Director of State Hospitals to transport or to Show Cause Re: Contempt. A hearing was scheduled for September 12, 2016 to show cause. The waitlist remained extensive and Mr. Luong was never transported to Napa State Hospital. On October 11, 2016 Mr. Luong died after being beaten and strangled by his cellmate.

This unfortunate case highlights multiple failures in the State of California and the California Department of State Hospitals system for treating inmate-patients that are found to be Incompetent to Stand Trial. The most glaring failure is the continuing lack of state hospital beds for IST inmate-patients. Despite having extensive wait lists dating back to at least 2004, the state has failed to build a hospital with the necessary several hundred IST beds. Any informed observer would recognize this as the only viable solution to provide sufficient IST bed capacity. However, the State has lost valuable time while pursuing plans to provide competency treatment within the county jails that could never duplicate the comprehensive competency treatment in the state hospital or provide a sufficient number of IST beds.

Federal court decisions including the Oregon Advocacy Center v. Mink in 2003 and Trueblood v. Washington in 2014 have established a standard of seven days for beginning competency treatment following a court finding of Incompetent to Stand Trial. The California DSH currently falls far short of this standard. It is common for IST inmate-patients to wait for months until a state hospital bed is available. This not only violates the due process rights of the IST inmate-patients but also causes them to suffer for months without treatment in the county jails. It is time for the State of California to make a firm commitment to meet the seven-day standard by building several hundred additional state hospital beds and by reorganizing the processing of IST inmate-patients by modifying the P.C. 1370 statutes. As noted above, the currently required evaluation and report by the Community Program Director is redundant and is not a critical component of the system. A reorganization of the PC 1370 statutes and current procedures could eliminate the additional two or three weeks of delay following a court finding of IST. The necessary records can now be transported electronically in seconds. There are no insurmountable obstacles to meeting the seven-day IST treatment standard in California.

Additionally, the California DSH needs to develop a system for tracking the IST inmate-patients prior to their admission to a state hospital and for projecting the increasing numbers of IST's in future years. This should be part of a DSH quality improvement system that ensures a sufficient number of IST hospital beds to provide prompt initiation of competency treatment as the number of IST inmate-patients continues to increase.

It is my opinion that the multiple deficiencies of the State of California and the California Department of State Hospitals described above contributed substantially to Mr. Luong's death on October 11, 2016. This was a preventable death that resulted from multiple failures by the State of California and the California Department of State Hospitals to provide timely treatment of defendants found to be Incompetent to Stand Trial.

Respectfully submitted,

Richard Hayward, Ph.D.
Clinical and Forensic Psychology
License #PSY 4972

17

Richard Hayward, Ph.D.
1296 Woodside Road
Redwood City, CA 94061
(650) 556-1942

EDUCATION
_____

UNIVERSITY OF MICHIGAN
B.S. IN PSYCHOLOGY

UNIVERSITY OF COLORADO
M.S. IN CLINICAL PSYCHOLOGY
PH.D. IN CLINICAL PSYCHOLOGY

THE WRIGHT INSTITUTE
POST-DOCTORAL INTERNSHIP, COMMUNITY MENTAL HEALTH EDUCATION AND
CONSULTATION

CALIFORNIA PSYCHOLOGIST LICENSE: PSY 4972


EXPERIENCE

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION BOARD OF PAROLE
HEARINGS, FORENSIC ASSESSMENT DIVISION: December 2, 2008 to June 30, 2018.

This was a staff psychologist position providing psychological assessments of inmates
with parole eligibility for the Board of Parole Hearings.

COUNTY OF SAN MATEO BEHAVIORAL HEALTH AND RECOVERY SERVICES, SAN MATEO
August 2008 through November, 2008.

This interim position included professional consultation to the Psychiatric Emergency
Services and Acute Care Inpatient Services at the San Mateo Medical Center. The focus
was the development of co-occurring disorder staff and system competencies and
inclusion of the Wellness and Recovery model in the treatment program.

COUNTY OF SAN MATEO CORRECTIONAL MENTAL HEALTH AND CHEMICAL DEPENDENCY
PROGRAMS, REDWOOD CITY
Manager, 1996 to July, 2008.

Responsibilities included budget and program development, financial administration,
recruitment and training, development and monitoring of contracts, risk management,
supervision of mental health and chemical dependency programs, supervision of research
and program evaluation projects, personnel management, supervision of the intern

program, development of Outcome Based Management evaluation metrics and program coordination with multiple county and community agencies.  This position also was responsible for supervising evaluations for the Courts and the Probation Department, including felony and misdemeanor Competency to Stand Trial assessments. Developed and provided training to correctional officers regarding prevention of suicide and positive approaches to managing mentally ill inmates. Health Department responsibilities included collaboration with the San Mateo Medical Center and all health divisions to ensure communication and a continuum of client health care services.

COUNTY OF SAN MATEO CORRECTIONAL TREATMENT CENTER, REDWOOD CITY
Director, 1994 to 1996.

Responsibilities included designing, opening, staffing and managing a new acute care, 10 bed psychiatric unit providing W&I 5150-5350 treatment in the Maguire Correctional Facility in Redwood City, California.  This included development of the budget and treatment program, policies and procedures, recruitment, training, supervision of mental health and nursing staff, and management of the treatment program. Clinical responsibilities included evaluation, diagnosis and development of treatment plans for complex clinical cases. Also responsible for contracting out the clinical services in 1996 when the unit was closed as part of a fiscal reduction.

COUNTY OF SAN MATEO DUAL DIAGNOSIS TEAM, SAN MATEO
Senior Psychologist, 1990-1993

Responsibilities in this half time position included intensive case management services to chemically dependent mental health clients. The primary focus was to help these clients access treatment and supportive services. Training for this position included multiple workshops with a focus on the assessment and treatment of chemical dependency, plus team trainings on co-occurring disorders and chemical dependency.

COUNTY OF SAN MATEO FORENSIC MENTAL HEALTH SERVICES, REDWOOD CITY
Senior Psychologist, 1979-1994

Responsibilities included crisis intervention, evaluation, treatment, case management and suicide prevention services for inmates in the correctional facilities of the San Mateo County Sheriffs Office, suicide prevention and mental health training for correctional officers, evaluation and consultation services for the Courts, Sheriffs Office and Probation Department, training and supervision of interns and nursing staff.


PROFESSIONAL ACTIVITIES AND AWARDS

2002 to present: Appointed to Institute for Medical Quality Committee on Corrections and Detentions Health Care. Responsibilities include surveys of correctional mental health care including treatment and suicide prevention throughout California to determine if the services meet IMQ accreditation standards.  Provide training to new surveyors.

April 26-27, 2011: Mental health consultant to the California Title 15 Regulation Revision Committee, Sacramento, California.

2002-2008:  Chair of the Forensic Evaluators Advisory Board.  This group included the District Attorney, the Private Defender Program, the Court Administrator and representatives of the panel of professional evaluators. The board develops policy and procedure recommendations and monitors evaluation quality for the Presiding Judge.

1997 to 2008: Member of the California Mental Health Directors Association Forensic Committee. Developed and completed a survey of California forensic mental health programs in 1998.  The committee has promoted and provided training on suicide prevention and managing mentally ill inmates.  This work included the development of a DVD/CD ROM training package entitled "On Your Watch" for training correctional facilities on current best practices in suicide prevention. Training was provided to Sheriff's Training staff throughout California in collaboration with the Board of State and Community Corrections in 2003 and 2004.

2006-2008:  Collaborated with the Courts, District Attorney, Private Defender Program, Probation, the Mental Health Director and mental health managers to develop the Pathways Mental Health Court.

2006-2008:  Collaborated with the Courts, District Attorney, Private Defender Program, Probation and Behavioral Health Services managers to develop and implement the Pathways for Women M.I.O.C.R. proposal.  This was funded by the State of California through the Board of State and Community Corrections to provide intensive case management services to female inmates in need of multiple system services.

2004 to 2008:  Worked with the Presiding Judge and the Criminal Presiding Judge to develop and maintain procedures for evaluation and treatment of defendants with misdemeanor charges who are not competent to stand trial.

September, 2007: Mental health consultant to the California Title 15 Regulation Revision Committee, Sacramento, California.

2006-2007: Chair of Phase Two Re-entry Committee, which coordinated re-entry programs and planning between multiple county and community agencies including the Courts, District Attorney, Probation, Private Defenders, Mental Health, Alcohol and Other Drug Services, Housing, Service League, the County Manager and the Board of Supervisors.

2004 to 2008:  Worked with the Criminal Presiding Judge, the District Attorney and the Private Defender Program to develop procedures and the relevant court orders for Involuntary Treatment of Penal Code 1370 defendants pursuant to the Sell decision.

1999-2008: Collaborated with the Pre-Trial Release Program to collect and analyze recidivism data for inmates participating in the Choices chemical dependency treatment program.

2006-2008:  Collaborated with the Emergency Services Manager, the Mental Health Director and other Health Department Managers to plan services, implement and train the S.M.A.R.T. team of paramedics who provide crisis intervention to seriously mentally ill and/or drug intoxicated citizens in the community.

2006 to 2008:  Collaborated on the Co-occurring Disorders Project, a strategic plan to develop a fully integrated behavioral health services treatment system to facilitate treatment access for individuals with mental health and chemical dependency disorders.

2006: Recipient of the Christine M. West Award at the annual conference of the Forensic Mental Health Association of California.

September, 2005: Mental health consultant to the California Title 15 Regulation Revision Committee, Sacramento, California.

2002 -2004: Chair, Law Enforcement/Mental Health Task Force. This group included police officers from the local law enforcement agencies, a Deputy District Attorney, Probation, State Parole, Human Services, Behavioral Health and multiple community agencies, collaborating with the goal of engaging the homeless mentally ill in treatment and housing assistance.

1998-2003: Collaborated with the Sheriff, Courts, District Attorney, Chief of Probation, Private Defender Program, Mental Health Director and consumers to develop the grant proposal for the Options Project.  This was funded by the California MIOCR act to provide intensive case management and co-occurring disorder treatment to mentally ill offenders.  Remained on the steering committee and served as project manager 2002 to 2003.

1998-2002: Collaborated with Alcohol and Other Drug Treatment Services to develop the Post Incarceration Treatment proposal.  This project received a three year federal grant from C.S.A.T. to provide 15 beds at Project 90 and a treatment coordinator. This included serving on the oversight committee of this successful capacity expansion program.

1999-2003: Collaborated with the County Health Officer, the Medical Director and addiction specialist Barry Rosen, M.D. to develop and implement the Brief Intervention grant proposal. This project received a federal grant from C.S.A.T. to provide training to physicians and nurses in the primary care clinics on brief interventions for chemically dependent patients, and funding for case managers to assist patients with accessing treatment services.  Provided training to physicians, nurses and support staff, plus grant operations oversight.

4

1995-2005:  Member of the Sheriff's Advisory Committee on Chemical Dependency. This committee developed a Peer Support program and a Critical Incident Response Debriefing project for Deputy Sheriffs and Correctional Officers.  The committee also developed a wellness project designed to divert officers with substance use problems into treatment.

1996 to 2004:  Member of the Health Department Substance Use Policy Group, chair from 2003-2004.  This committee collaborated with AOD services to develop and coordinate chemical dependency treatment services.  The group also provided chemical dependency training to health services staff until it was replaced by the Co-occurring Disorders project.


PROFESSIONAL TRAINING PROVIDED

November 1999, Sacramento: Trained California Detention Facility Managers on Suicide Prevention and Managing Mentally Ill Inmates

March 2000, Asilomar: Provided a workshop on Correctional Suicide Prevention at the California Forensic Mental Health Association Annual Conference.

September 2000, Sacramento: Provided a workshop on Chemical Dependency Treatment in Corrections at the American Correctional Health Services Association Western Conference.

March 2001, Asilomar: Provided a workshop on Chemical Dependency Treatment at the California Forensic Mental Health Association Annual Conference.

September 2002, Sacramento: Invited to present a workshop on Suicide Prevention in Corrections at the American Correctional Health Services Association Western Conference.

April 2003, Baltimore: Invited to present a workshop on Correctional Suicide Prevention at the national conference of the American Correctional Health Services Association.

June 2003 and September 2004 , Sacramento and Redding, CA:  Provided three eight hour 'Train the Trainers' workshops for California correctional facility training teams using the "On Your Watch" suicide prevention training DVD and CD ROM package, sponsored by the California Board of State and Community Corrections.

2003, San Mateo, CA: Provided training workshops on Co-occurring Disorders to the Mental Health Services staff of San Mateo County.

March 17, 2004, Asilomar, CA: Provided a workshop on Suicide Prevention at the California Forensic Mental Health Association Annual Conference.

April 1, 2005, Sacramento:  Provided a workshop on the use of restraints, safety cells and behavior management plans at the American Correctional Health Services Association national conference.

March 16, 2006, Seaside, CA: Participated as a panel member in a training workshop on the use of Inmate Behavior Management Plans at the California Forensic Mental Health Association annual conference.

March 15, 2007, Seaside, CA: Panel member in a training workshop on Cognitive Impairment at the California Forensic Mental Health Association annual conference.

March 20 2008, Seaside, CA: Co-presenter of a workshop on the validity and utility of a suicide risk assessment instrument at the California Forensic Mental Health Association annual conference.

April 7, 2009: Training workshop on Substance Abuse Assessment and Diagnoses for staff of the Forensic Assessment Division of the California Board of Parole Hearings.

November 24, 2009: Training for San Mateo County Psychiatrists on Strategies for Weight Reduction and Diabetes Prevention for mental health clients.

LEGAL CONSULTATION REGARDING CORRECTIONAL MENTAL HEALTH SERVICES

June, 2019-present: Consultation to attorney regarding a 2016 death in Alameda County.

September, 2018- present: Consultation to attorney regarding a 2014 correctional suicide in Merced County.

November, 2018: Deposition on November 8, 2018 regarding my 2013-2014 review of mental health services at the Monterey County correctional facility.

March, 2018- present: Consultation to attorney regarding a correctional suicide in Eldorado County, California.

March, 2018- present: Consultation to attorney regarding a correctional suicide in Monroe County, Illinois.

August, 2017-2018: Consultation to attorney including expert witness testimony on January 22, 2018 regarding the correctional death of a mentally ill inmate in Mendocino County, California.

February, 2017-2018: Consultation to attorney including expert witness testimony in a deposition on August 15, 2017 regarding a correctional suicide in Santa Clara County, California.

December, 2016- July, 2017: Consultation to attorney representing Contra Costa County, California, regarding a correctional suicide.

August, 2016: Consultation to attorney regarding a correctional suicide in Kern County, California.

March, 2016- January, 2017: Litigation consultation to attorney including expert witness testimony on October 4, 2016 regarding a Contra Costa County correctional death alleged to be a suicide.

February, 2016- January, 2017: Litigation consultation to attorney in Indianapolis, Indiana including preparation for expert witness testimony regarding a juvenile correctional suicide.

November, 2015- present: Litigation consultation to attorney in St. Louis, Missouri, including expert witness testimony in a deposition on February 9, 2016 regarding a correctional suicide.

July, 2014- March, 2016: Litigation consultation to Monterey County, California, including expert witness testimony in depositions on October 16, 2015 and January 26, 2016 regarding a correctional suicide.

June, 2014- August, 2015: Litigation consultation to Maricopa County, Arizona, including expert witness testimony on August 19, 2015 regarding sufficiency of correctional mental health services (Moses v. Maricopa County).

May- August, 2015: Consultation to San Bernardino County, California regarding development of an acute care psychiatric treatment program within the West Valley Detention Facility.

March- September, 2015: Consultation to Contra Costa County, California regarding mental health services in a planned new correctional facility.

August-September, 2014: Litigation consultation to Anthony Boskovich, Attorney at Law, San Jose, California, including preparation for expert witness testimony regarding a correctional suicide.

September 2013-March, 2014: Review of sufficiency of Maricopa County, Arizona Correctional Mental Health Services as a consultant regarding class action litigation. Expert witness testimony was provided in court on February 26, 2014.

August, 2013-August, 2014: Review of sufficiency of Monterey County, California Correctional Mental Health Services as a consultant regarding class action litigation.

7

May-July, 2013: Review of sufficiency of Fresno County Correctional Mental Health Services as a consultant regarding class action litigation.

2012-June, 2013: Litigation consultation to Lynn S. Walsh, Attorney at Law, Portland, Oregon, including preparation for expert witness testimony regarding sufficiency of correctional mental health services.

2012-2013: Litigation consultation to attorney in Tallahassee, Florida, including preparation for expert witness testimony regarding a female correctional suicide.

2011-July, 2013: Litigation consultation including expert witness testimony in a deposition on June 14, 2012 regarding a correctional suicide (Estate of Baljit Singh v. County of Sacramento).

2009: Litigation consultation to Lynn S. Walsh, Attorney at Law, Portland, Oregon, including preparation for expert witness testimony regarding sufficiency of correctional mental health services.

2009: Litigation consultation and preparation for expert witness testimony regarding sufficiency of correctional mental health services; Cabral vs. Glenn County et al.

2008-2009: Litigation consultation and expert witness testimony regarding a correctional suicide, for The Smith Firm in Sacramento, California.

2007: Litigation consultation to Peter Bertling, Attorney at Law, for Kings County, California regarding sufficiency of correctional mental health services.

2005-2007: Litigation consultation to Stewart Katz, Attorney at Law, Sacramento, California, including expert witness testimony regarding a correctional suicide.

1994-2008: Consultation to San Mateo County, California Courts including expert witness testimony.

8