# EXHIBIT A

1  MICHAEL J. HADDAD (State Bar No. 189114)
   JULIA SHERWIN (State Bar No. 189268)
2  MAYA RODRIGUEZ SORENSEN (State Bar No. 250722)
   TERESA ALLEN (State Bar No. 264865)
3  HADDAD & SHERWIN LLP
   505 Seventeenth Street
4  Oakland, California 94612
   Telephone:    (510) 452-5500
5  Facsimile:    (510) 452-5510

6  Attorneys for Plaintiffs

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11 DAT THANH LUONG, DECEASED, through his Co-  )
   Successors in Interest, AI QIONG ZHONG,        )   Case No. 3:17-cv-06675-EMC
12 Individually and as mother and Next Friend for W.L., a )
   minor,                                          )
13                                                  )
14              Plaintiffs,                         )
                                                    )   **DECLARATION OF BRUCE C.**
15 vs.                                              )   **GAGE, M.D.**
                                                    )
16 ALAMEDA COUNTY, a public entity; SHERIFF        )
   GREG AHERN; JAIL COMMANDER THOMAS              )
17 MADIGAN; DR. RINATA WAGLE, M.D.; ESTATE        )
   OF MOHINDER KAUR, M.D.; JACKSON & COKER        )
18 LOCUMTENENS, LLC; BONNIE COOK, MFT;            )
   DEPUTY BRANDEN MCBRIDE; SHERIFF'S              )
19 TECHNICIAN ROBERT LUEBKER; SHERIFF'S           )
   TECHNICIAN BRITANNI MARTINEZ; DEPUTY           )
20 SCOTT BRYNING; DEPUTY SHAWN                    )
   CHRISTIANSEN; NAPA STATE HOSPITAL,             )
21 CALIFORNIA DEPARTMENT OF STATE                 )
   HOSPITALS, a public entity; PAM AHLIN; DOLLY   )
22 MATTEUCCI; PATRICIA TYLER, M.D.; CINDY         )
   BLACK; and DOES 10-20, Jointly and Severally,  )
23                                                  )
24              Defendants.                         )
                                                    )
25                                                  )
                                                    )
26                                                  )
                                                    )
27 _____  )

28

STATE OF WASHINGTON )

COUNTY OF PIERCE          )

I, Bruce C. Gage, M.D., declare as follows:

      1.      I was retained as an expert witness by counsel for Plaintiffs in *Stiavetti v. Ahlin, et al.,* Alameda County Case No. RG15779731.

      2.      Attached hereto is a true and correct copy of my declaration dated March 9, 2018, with a true and correct copy of my expert report dated January 25, 2018, submitted to the Court in *Stiavetti v. Ahlin.* My report contains my qualifications, opinions, information reviewed, and the basis for my opinions. The contents of my report are true and correct, and I could testify to the facts and opinions stated in my report if called to do so.

      3.      The facts stated herein are based on my own personal knowledge and if called to testify to same, I am competent to do so.

      I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct and that this Declaration was executed on August 7, 2019, in Lakewood, Washington.

Bruce C. Gage, M.D.

Scanned by CamScanner

1  Michael Temple Risher (SBN 191627)
   mrisher@aclunc.org
2  Micaela Davis (SBN 282195)
   mdavis@aclunc.org
3  American Civil Liberties Union
   Foundation of Northern California, Inc.
4  39 Drumm Street
   San Francisco, CA 94111
5  Telephone:  (415) 621-2493
   Facsimile:  (415) 255-8437
6
   Peter J. Eliasberg (SBN 189910)
7  peliasberg@aclusocal.org
   American Civil Liberties Union
8  Foundation of Southern California
   1313 West 8th Street
9  Los Angeles, CA 90017
   Telephone:  (213) 977-9500
10
   Laura K. Oswell (SBN 241281)
11 oswelll@sullcrom.com
   Sullivan & Cromwell LLP
12 1870 Embarcadero Road
   Palo Alto, California 94303
13 Telephone:  (650) 461-5600
   Facsimile:  (650) 461-5700
14

15 *Attorneys for Plaintiffs*

16                    SUPERIOR COURT OF CALIFORNIA

17                       COUNTY OF ALAMEDA

18

19 STEPHANIE STIAVETTI, *et al.*,          CASE NO.:  RG15779731

20                      Plaintiffs,        ASSIGNED FOR ALL PURPOSES TO
                                           JUDGE WINIFRED SMITH
20                                         DEPARTMENT 21
21         v.

22 PAMELA AHLIN, AS DIRECTOR OF THE        **DECLARATION OF BRUCE C. GAGE,**
   CALIFORNIA DEPARTMENT OF STATE          **M.D. IN SUPPORT OF PLAINTIFFS'**
22 HOSPITALS, *et al.*,                    **MOTION FOR PEREMPTORY WRIT OF**
                                           **MANDATE**
23                     Defendants.
                                           Hearing Date:   March 29, 2018
24                                         Hearing Time:   9:00 A.M.
                                           Judge:          Winifred Smith
25                                         Department:     21
                                           RES ID:         R-1929086
26
                                           Action Filed:   July 29, 2015
27

28

_____
DECLARATION OF BRUCE C. GAGE, M.D., CASE NO. RG15779731

1      I, BRUCE C. GAGE, M.D., declare as follows:

2          1.      I was retained by counsel for Plaintiffs in this action to provide expert opinions. I

3   submit this Declaration in support of Plaintiffs' Motion for Peremptory Writ of Mandate. I have

4   personal knowledge of the facts set forth in this Declaration and, if called upon, could testify to those

5   facts.

6          2.      Attached hereto is a true and correct copy of my Expert Report dated January 25,

7   2018, which was filed with the Court on January 25, 2018 as Exhibit 43 to the Declaration of Michael P.

8   Murtagh in Support of Plaintiffs' Motion for Peremptory Writ of Mandate.  My qualifications,

9   assignment, and opinions and the basis for my opinions are detailed in my expert report.  The contents of

10   my expert report are true and correct and, if called upon, I could testify to the facts and opinions

11   contained therein.

12          I declare under penalty of perjury under the laws of the State of California that the

13   foregoing is true and correct.

14          Executed this 7th day of March, 2018 in *LAKEWOOD, WASHINGTON*

15

16                                                    _____

17                                                    Bruce C. Gage, M.D.

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# Expert Report of Bruce C. Gage, M.D.

## I.    EXECUTIVE SUMMARY

The first essential finding of this report is that both DSH and DDS have unwieldy admissions processes that demand excessive information from the counties and other local entities.  These processes are causing delay of admissions to DDS.

The second essential finding is that while these processes are not currently causing delay in DSH, this is only because DSH capacity to treat this population is so limited that the delays caused by lack of capacity mask the inefficiencies of the admission process.  It is important to add that DDS is running near capacity at present, so any increases in referrals of the incompetent to stand trial (IST) are likely to quickly result in re-emergence of lengthy waits that were present prior to the Porterville Developmental Center (PDC) expansion of 2015.

The report also finds that length of stay (LOS) for competency restoration in DSH is comparable to LOS in the literature.  Thus, improvements in treatment services, assessment of progress towards restoration to competency, and forensic evaluation are unlikely to achieve more than incremental reductions in LOS and will not address the capacity shortage.  Such improvements should nonetheless be sought both to achieve those incremental gains and to maximize success at competency restoration.

The report explains that articulation of a preference for treatment in the least restrictive setting and expansion and improvement of community-based services in DDS and CONREP are needed.

An additional opinion is that it is premature to rely on JBCT for the mentally ill and would be inappropriate to treat the intellectually disabled (ID) in this setting.  Emphasis on cost reduction over the welfare and treatment of these patients is misguided.  If such programs are to be used for the mentally ill, their use should be limited to short term treatment to restore competency of the mentally ill and their use precluded for the acutely ill and ID.

Along similar lines, it is unreasonable for PDC (and DDS in general) to refuse to treat any ID patients that need treatment to restore competency.  DDS has the skill and wherewithal to treat the ID; further, duplication of services in other settings is inefficient and costly.

The report provides some recommendations for improving and streamlining the admissions process and encourages standardization and evidence-based approaches to admission, treatment, and evaluation.

Lastly, the report describes the inadequacy of DSH and DDS data systems and quality management.  Centralization of data processes and development of a sound quality management system that extends into the facilities and the community are essential to sound reporting and optimization of performance.

The body of the reports provides concise and essential information; more detailed reviews of the performance of DSH and DDS and the relevant literature are in APPENDICES C and D,

respectively.  In addition, the methodology and findings of the analysis of DSH and DDS data is provided in APPENDIX B.

# TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY ..................................................................................................... 1

II.   BACKGROUND ................................................................................................................. 5

    A.   Assignment .............................................................................................................. 5

    B.   Author's Experience................................................................................................. 5

    C.   Compensation .......................................................................................................... 6

III.  SUMMARY OF OPINIONS ................................................................................................. 6

    A.   DSH, CONREP, and DDS Data Systems and Quality Management are inadequate..... 6

    B.   Routine Admissions Should Occur within Two Weeks of Receiving the information
       necessary for admission.  Acute Admissions Should Occur within One Day for
       Those in the Community and One Working Day from Jails to Hospitals and PDC..... 6

    C.   The IST Population Suffers Disproportionately........................................................ 10

    D.   JBCT is not a preferred approach for the IST defendants who are mentally ill; it
       should not be used for the ID population. ................................................................. 10

    E.   Competency Restoration Services Should be Improved and Standardized. ............. 11

    F.   Evaluation of Progress and Forensic Evaluation Should be Improved and
       Standardized. ........................................................................................................... 12

    G.   Refusal to Admit Certain ID Patients to PDC is Unreasonable............................... 13

    H.   DDS Needs to Expand Community-Based Commitment Capacity. ............................ 14

    I.   DSH Needs More Capacity for IST Treatment........................................................ 14

IV.   ANALYSIS OF DATA PROVIDED BY CALIFORNIA ........................................................... 15

    A.   DSH.......................................................................................................................... 15

    B.   DDS ........................................................................................................................ 18

V.    INCREASING DEMAND FOR FORENSIC AND IST SERVICES IN THE U.S. AND
    CALIFORNIA ................................................................................................................... 19

VI.   BED UTILIZATION AND DELAYED IST ADMISSIONS IN CALIFORNIA ............................ 19

    A.   DSH IST Bed Utilization and IST Waiting List...................................................... 19

    B.   DSH Wait Times for Those Pending Admission ..................................................... 21

    C.   JBCT Program Beds ............................................................................................... 21

    D.   DDS Bed Utilization and IST Waiting List............................................................. 22

    E.   DDS Wait Times ..................................................................................................... 22

VII.  ADMISSION PROCESS...................................................................................................... 23

|  | A. | Admission Screening | 23 |
|  | B. | Those Accepted for Admission | 25 |
| VIII. | | ADMISSION OF THE IST IN CALIFORNIA | 25 |
|  | A. | DSH Admission Procedures | 25 |
|  | B. | DDS Admission Procedures | 30 |
|  | C. | DDS Does Not Accept All ID IST Referrals | 33 |
| IX. | | TREATMENT TO RESTORE COMPETENCY | 33 |
|  | A. | Model Program | 33 |
|  | B. | Medications Are Effective | 34 |
|  | C. | Psychoeducation Is Likely Effective | 34 |
| X. | | ADEQUACY OF IST TREATMENT SERVICES IN CALIFORNIA | 34 |
| XI. | | LENGTH OF STAY & RESTORABILITY | 35 |
|  | A. | Average Length of Treatment for Restoration | 35 |
|  | B. | CA Statute Requires Opinion on Restorability at 90 Days | 35 |
|  | C. | LOS and Restorability | 36 |
| XII. | | LENGTH OF STAY AND SUCCESSFUL RESTORATION IN CALIFORNIA | 37 |
| XIII. | | OTHER POTENTIAL SOURCES OF ADMISSION DELAY IN CALIFORNIA | 38 |
|  | A. | Forensic Evaluations | 38 |
|  | B. | Unused Community-Based Restoration Capacity | 39 |
|  | C. | Unused JBCT Capacity | 40 |
|  | D. | Delays in Securing Involuntary Medication Hearings | 40 |
|  | E. | Delays in Transport to Court | 41 |
|  | F. | Unfilled Beds | 41 |
|  | G. | Inadequate Data | 42 |
| APPENDIX A | | | |
| APPENDIX B | | | |
| APPENDIX C | | | |
| APPENDIX D | | | |
| APPENDIX E | | | |

# II.   BACKGROUND

## A.   Assignment

I was retained in light of my experience in forensic hospitals and correctional settings and familiarity with the relevant literature.  I was asked to provide my expert opinion regarding the reasonable length of time to admit the incompetent to stand trial (IST) to Department of State Hospitals (DSH) and Department of Developmental Services (DDS) facilities for treatment to restore competence, to analyze DSH and DDS data regarding competency restoration (including wait list times), to analyze the reasons for any delays in admission, and to provide recommendations about how to remediate any identified problems.

I was assisted in the analysis of the DSH and DDS data by Cornerstone Research, who worked under my direction.

The materials underlying my opinion are listed in APPENDIX E.

My work on this matter is ongoing.  I reserve the right to supplement my report if any new analyses, discovery, or testimony become available.

## B.   Author's Experience

I receive and Bachelor of Science degree in chemistry from MIT and then attended medical school at the University of Washington.  Following a one-year fellowship in physiology at the University of Washington, I completed my internship and psychiatric residency at Cambridge Hospital, a Harvard University program.

After completing my psychiatry residency, I spent two years at the Sepulveda Veteran's Administration Hospital in California where I was an attending psychiatrist on a psychiatric admission ward serving acutely ill patients, most of whom were under civil commitment. For the following 18 years, until 2008, I worked in various capacities related to forensic psychiatry at the Center for Forensic Services at Western State Hospital, The Washington Institute for Mental Health Research and Training, and the University of Washington. Those pertinent to this report included:  forensic psychiatrist on a competency restoration ward, forensic evaluator, Program Director, Supervising Psychiatrist, and Program Director of the UW/WSH Forensic Psychiatry Fellowship.  While working on the competency restoration ward, I admitted and treated patients found incompetent to stand trial.  As a forensic evaluator, I conducted competency, sanity, and dangerousness evaluations of criminal defendants.  As Program Director and Supervising Psychiatrist, I was directly involved in setting policy and procedure and in managing the screening and admission of those found incompetent to stand trial (IST).  I worked with jails and courts to coordinate this process.

From 2008 until the present, I have been the Chief of Psychiatry for the Washington State Department of Corrections.  During my career, I have also maintained a private forensic practice; for the last 10 years, the focus of my private work has been the assessment and court monitoring of jail and prison mental health services.  This has included evaluation and court monitoring of mental health treatment in several California jail systems over the last five years.  I have also been deposed in two malpractice cases involving patients housed in California jails.  In addition, I was the mental health subject matter expert

monitoring the California Juvenile Justice system and have provided consultation to the California Department of Corrections and Rehabilitation.  I have not visited any DSH state hospitals but have heard numerous reports about the state hospitals from colleagues and have learned a great deal about them through the documents that formed the basis for this report.

A more complete description of my experience can be found in the curriculum vitae in APPENDIX 5.

### C.    Compensation

Consistent with ethical standards, my payment is not contingent on provision of specific opinions or on the outcome of the litigation.  My hourly rate for preparing this report and any associated testimony is $300.

# III.   SUMMARY OF OPINIONS

### A.    DSH, CONREP, and DDS Data Systems and Quality Management Are Inadequate.

Lack of relevant information and inadequate analyses are a recurrent theme in this report. DDS collects very little data systematically.  DSH collects some data but it is poorly organized and analyzed.

Good data are critical for quality management.  I saw no evidence of sound quality management structures in any of the materials from these organizations.  The closest thing to a quality management approach that characterized a problem, looked for root causes, and set forth a plan of improvement was the Department of State Hospitals: Bed Utilization Study, which was not done by DSH.  [AG000013833.]  These organizations must develop robust data infrastructure, data analytics, and quality management approaches.  There must be a formal central quality management program for each organization and related quality management programs at the facilities and community settings.

A detailed description is beyond the scope of this report but there is an abundant literature on quality management in healthcare organizations.

### B.    Routine Admissions Should Occur within Two Weeks of Receiving the Information Necessary for Admission.  Acute Admissions Should Occur within One Day for Those in the Community and One Working Day from Jails to Hospitals and PDC.

The admissions processes of DDS, DSH, and the Conditional Release Program (CONREP) are excessively bureaucratic, include vague and clinically unnecessary requirements that do or may introduce delay, unnecessarily burden the counties, and are not sufficiently standardized.  The necessary elements of the admissions process are provided and discussed in the section ADMISSION PROCESS followed by a review of the admissions in California in the section ADMISSION OF THE IST IN CALIFORNIA, sections VII and VIII below.

The initial CONREP Program Director Screening needs to be standardized and include specific recommendations regarding the appropriate setting for competency restoration treatment.

For referrals to DDS, the same applies; there needs to be a standardized initial screening that addresses placement.

Once placement is determined, two weeks gives ample time to conduct medical and short-term risk assessment, communicate with the jails for clarification of packet information, identify the appropriate facility, provide the information to the receiving facility, and arrange transportation.  To accomplish this most efficiently, central control of the admissions process is essential.  Standardization of admission screening is also essential.

Risk assessments need to be standardized and evidence-informed.  Clinical information must focus on what is clinically necessary for admission and not expand into what is desirable for the receiving facilities.

Because the clinical needs of the acutely ill patient should outweigh forensic needs and institutional convenience, acute admissions should be handled differently, as recognized by current policy but poorly implemented and tracked.  Only information essential to safely admit the patient should be required; additional packet information can be obtained subsequently.  Acute illness can be operationally defined as danger to self, danger to others, or grave disability due to a mental illness.

It bears noting that while DSH and DDS must rely on the counties to produce admission information, they must also take an active role in seeking out admission information to facilitate prompt admission.  In my experience, counties can deliver necessary information in less than a week and any delay longer than that should prompt a reminder to the county.

<u>CONREP Program Director Screening</u>

Criteria for admission to each type of setting – state hospitals, JBCT programs, and community-based treatment – should be established, determine the content of the CONREP Program Director screening process, and drive placement decisions.  The main focus should be elimination of multiple layers of screening and review.  Criteria must be limited to the what is necessary to effect admission in line with the content outlined in the section ADMISSION PROCESS, section VII, below.  The focus should be on risk assessment and level of clinical need.  There should be no need to consult JBCT program directors once these programs are standardized as Mark Grabau reported is intended [Deposition of Mark Grabau, p. 91]; even if there is some variation, this should be addressed in the screening and placement assessment.

These should be done by psychologists with training in psychometrics to properly conduct and evaluate risk assessments; these professionals will also have the skill to interpret clinical materials in records and forensic evaluations.

Standardization of the CONREP Program Director assessment to address admission criteria for each setting limits the need for each organization or facility to collect additional information.  Alternatively, this function could be served by a different entity or organization, even the forensic evaluators (alienists).

Risk assessment should be formal and based on known risk factors. CONREP utilizes the HCR-20 for at least some populations; this is a sufficient tool. [Deposition of Mark Grabau, p. 58.] With the addition of information on criminal charges that drive placement (which, if present, obviate the need for the long-term risk assessment as this already drives placement in a higher security setting) and escape convictions, this is sufficient for all long-term risk assessment purposes related to admission to any setting. As noted previously, short-term risk is related to current mental status and recent behavior. The presence of hostility, agitation, paranoia, threats, assaults, non-adherence to treatment, and similar indicators of imminent danger to others can be obtained from review of the mental status examination and behavioral problems in the past week, such as dangerousness necessitating restraint and recent rule violations reflecting dangerousness.

Clinical need should be based on a review of the medical records and forensic evaluation with a focus on current clinical status and treatment engagement as these are the primary considerations in terms of identifying the appropriate treatment setting. It is reasonable to conduct an interview when the clinical status and/or needs of the patient are unclear or the HCR-20 (or other evidence-based risk assessment tool, if adopted) cannot be completed without an interview.

The only additional information required would be whether the patient has housing and is receiving community treatment, which are important considerations in determining whether community-based restoration is indicated.

Once a court has determined the setting for restoration based on the CONREP Program Director Report as described above, little additional information should be needed by DSH or community settings if criteria for each program are properly established and addressed in these reports.

See the subsection CONREP Assessment in ADMISSION OF THE IST IN CALIFORNIA, under section VIII.A, below for a review of the current CONREP procedures.

### DSH

Admissions processes are not currently delaying admissions to DSH; the lack of capacity in the system is the primary driver of the wait lists. Because wait times are so long (average of 75 days for 2016 per an analysis of data DSH provided) [Distribution of Wait Times for Admission for IST Inmates at DSH: Commitment to Admission for 2016, APPENDIX B, B-15], it is easy for DSH to complete the admission process prior to admission, except for collecting recent information needed just prior to admission. As noted in the body of this report, DSH has stated it is able to complete admissions screening within 7-10 days of getting a referral. Thus, admission within 14 days should be achievable in routine cases even with the current unwieldy and burdensome process. However, analysis of the DSH data indicates that once packets are received, they are taking an average of 22 days to approve an admission. [Summary of Wait Times for DSH Facilities at Stages of Commitment Process, APPENDIX B, B-12.] The time from receiving packet to admission has increase from an average of 38.88 days in 2015 to 64.11 days in 2017. [Distribution of Wait Times for IST Inmates at DSH: Packet Received to Admission, 2015 & 2017, APPENDIX B, B-18; B-20.] Thus, once capacity is increased, the admission process will become a source of delay. Note also that once DSH can promptly accommodate admissions, the

counties will likely decrease the time it takes to get a packet to DSH because their processes, rather than DSH processes, will become the barrier to prompt admission. While some counties take longer, Los Angeles County gets admissions materials to DSH in a median of 5 days. [Summary of Time From Commitment to Packet Received at DSH Facilities, by County, APPENDIX B, B-44].

If the CONREP Program Director Report conforms to the above recommendations, DSH should have little need to do additional screening prior to admission. There should be no need for additional security screening or long-term risk assessment. General medical information should already be included in the CONREP Report since that drives placement options. The only information that should be required is updating current clinical status (medical and psychiatric) and short-term risk. In almost all cases, this will only require obtaining medical records and specific information on restraint, any violent acting out, and self-harm since the CONREP Report.

There is no reason to delay admissions to redact material in the admission packet as currently required prior to admission. It is also not clear why redaction is necessary at all. If the concern is that the patient may get access to certain information in the packet, redaction can be done when there is a records request. Since it is rare for patients to request their records, this would also be a significant cost savings.

If jail medical screening reveals no problems, this is sufficient information for admission unless DSH is aware that the patient has existing medical problems not detected by the jail screening. Jails have standards for admission screening and to ask them to do more is unreasonable.

Once all admissions are coordinated by the Patient Management Unit, it will be critical to standardize and streamline the admission process in coordination with CONREP and JBCT programs, eliminating multiple layers of review.

Those in the community or jails who represent a danger to self or others, or are gravely disabled, should be considered emergencies and promptly admitted. Treatment cannot be delayed by clinically unnecessary admissions processes; the clinical needs of the acutely ill must be prioritized over the forensic issues and hospital convenience. If prompt admission necessitates admission to a secure facility and subsequent transfer to a lower security setting, then that process should be instituted. The information necessary for an acute admission is the nature of the acute condition, current medications and treatments, medical alerts (such as allergies), current problem list (medical and psychiatric diagnoses), mobility needs, most recent laboratory results, the most recent mental status and physical examinations, and confirmation that the patient has no known medical conditions requiring hospital level care. Hospitals routinely admit patients within hours of presentation; those in the community should be admitted within 24 hours and those in jails within one working day.

The current DSH risk assessment process is not evidence-based. Further, there is no need to do multiple risk assessments; the HCR-20 used by CONREP, if completed before the commitment order, is sufficient for this purpose with the addition of information on charges and convictions for escape noted above. If the court determines that hospitalization is necessary, that risk assessment can be used to determine the level of

security needed.  As previously noted, the short-term risk assessment may need to be repeated as these assessments are stale within a matter of days.

DDS

Admissions processes are likely delaying DDS admissions.  Unlike DSH, DDS has been able to reduce the waiting list (see section IV.B, below), suggesting that bed availability is not presently the primary problem.  Thus, it is likely the admissions process itself that is currently driving wait times.

After receiving the necessary admissions material, DDS should admit patients within two weeks as well.  The opinions above regarding risk assessment apply here as well.  A risk assessment must be done to determine whether the individual qualifies for community-based restoration.  DDS should adopt a standardized, evidence-based risk assessment as CONREP has done with the HCR-20.  In general, the process outlined above for CONREP should be adopted by DDS.  As noted in the body of the report, much of the content of 4418.7 assessments and other forms used by DDS are clinically unnecessary for admitting IST patients and should be eliminated.  The screening done for the court to determine placement should include all essential materials for determining placement within the boundaries articulated in the section ADMISSION PROCESS.  The only additional information that would be important for DDS is IQ.

Admission packet screening should also parallel that outline above for DSH, including reduction in multiple layers of review and standardization across the system.

The opinions above regarding acute admission apply to the intellectually disabled (ID) IST population as well.

## C.     The IST Population Suffers Disproportionately.

The document Weekly Pending Placement Report, dated 1/5/15 [AG000041861-62] is a table of all of the different types of commitments to DSH and the numbers awaiting placement for each type.  It shows that the vast majority of those awaiting placement in DSH hospitals are those committed for competency restoration.  Specifically, as of the date of the report, 389 of 535 (73%) people on the waiting list were IST defendants.  The DSH System Wide Weekly Pending Placement Report, dated 9/25/17, shows that on September 25, 2017, 713 out of 882 (80%) pending DSH admissions were IST defendants; 555 out of 724 pending DSH hospital admissions were IST defendants [AG000063384-85].  This data demonstrates that the IST population is disproportionately affected by DSH's capacity issues, given that IST defendants constitute only 1307/5868 = 22% of state hospital patients under 1370 IST status in the state hospitals as of 9/25/17 [AG00063709-10].

## D.     JBCT Is Not a Preferred Approach for The IST Defendants Who Are Mentally Ill; It Should Not Be Used for the ID Population.

As the California legislature found when introducing AB 720: "Jails are not therapeutic environments and were not intended or designed to be mental health facilities." [AB-720 section 1(c).] While early research demonstrates some degree of efficacy of jail-based competency programs, further study is necessary to determine the efficacy of different types of programs, which elements are essential for efficacy, and what populations can be

effectively treated.  Further, none of the few existing studies on jail-based competency programs examined other issues of concern such as use of force, restraint, patients incurring infractions or additional charges, access to and sufficiency of medical care, violence, and victimization.  Without such information, it is premature to build out and overly rely on such programs to address the clinical needs of this population.  See the subsection Jail-Based Competency Restoration in APPENDIX D RESTORATION SERVICES for a detailed discussion of these issues.

In deciding whether to utilize JBCT programs, it is important to consider the quality of the treatment environment rather than focusing on cost.  There is a reason that jail settings are less expensive that is directly related to the treatment environment and treatment services. JBCT programs do not have to meet the same standards as hospitals and so can reduce costs by not meeting hospital certification requirements that address many factors related to quality of treatment including environmental conditions, use of force, staffing, and a variety of ancillary services.  It is disconcerting that cost is being placed ahead of the welfare and good treatment of this mentally ill population.

It is also important not to use JBCT in place of developing community services for populations that could be served in the community.

If JBCT programs are to be utilized, clear standards for transfer to a hospital or the community must be developed.  For example, those in jails who meet civil commitment criteria of danger to self, danger to others, or grave disability [Cal. Welf. & Inst. Code, sec. 5000 et seq.] should be immediately transferred to a DSH hospital.  DSH must have enough capacity to reliably admit such acute patients within one working day at most.  Those not readily restored in JBCT programs should also be transferred to a hospital.  While there is no simple way to determine what this time should be, given that the literature demonstrates most are restored within 90 to 120 days [Melton 2007; Gowensmith et al. 2016, p. 294], it would be reasonable to use 90 days as a cutoff as that also corresponds to the first required report to the court.  [Penal Code Section 1370(b)(1).]

JBCT should not be an option for the ID.  JBCT focuses on rapid restoration which clearly relies on response to medication.  The ID population will not be restored to competence with medications and require specialized educational approaches.  The ID also do poorly in correctional settings as they have difficulty understanding and responding to directives, resulting in frequent infractions, and are readily victimized.  If the patient is also mentally ill, they can be provided medications in the DDS program.

### E.    Competency Restoration Services Should be Improved and Standardized.

In general, services should conform to those listed in the section TREATMENT TO RESTORE COMPETENCY below (see APPENDIX C RESTORATION SERVICES for a detailed discussion of the literature on treatment for competency restoration in different settings). The competency-specific elements should be specifically identified and formally structured using evidence-based approaches and best practices identified in the literature.

Improvement in restoration services should be pursued to reduce treatment time and to maximize restoration to competence to stand trial.  The limited available data indicates

competency restoration rates are lower than they should be, indicating the need for improvement.  See LENGTH OF STAY AND SUCCESSFUL RESTORATION IN CALIFORNIA below for a general discussion of the state's performance in restoring competency.

Competency-specific treatment modules, resources, and procedures should be largely uniform between hospitals, JBCT programs, and community restoration programs, promoting successful continuation of treatment upon transfer.  Specific restoration program curricula should be adopted and implemented.

Specific restoration approaches and resources for special populations for the ID should be adopted and implemented in all settings serving the ID.

Since there is no reliable data on LOS for DDS, it is unclear how much impact improvement in services might have.  Focusing on detecting unrestorable patients is more likely to be an effective approach to reducing LOS as a large proportion of ID patients are unrestorable—in fact, the majority in most studies (see APPENDIX D SUMMARY OF RESEARCH ON RESTORABILITY).

DSH LOS is near published averages (see APPENDIX D RESTORATION SERVICES) so it is unlikely that there will be substantial reductions in LOS, especially if IST commitments continue to last for up to three years, the statutory maximum for commitment for competency restoration in California [Penal Code 1370(c)(1) & 1370.1(c)(1)].  This is because long-stay patients contribute disproportionately to average LOS.  Reduction of maximum time provided for restoration will reduce the number that might be restored, but the fraction restored diminishes steadily, dropping off rapidly after 18 months, and is near zero by three years.  It is also important not to overemphasize reductions in LOS as that is likely to sacrifice the restoration of some patients who may be restored with longer treatment periods and will push the system to declare patients incompetent prematurely.

Thus, for DSH, substantial reductions in LOS are unlikely and would not be expected to solve the wait list problem without reduction to the maximum duration of commitment for restoration.

## F.    Evaluation of Progress and Forensic Evaluation Should be Improved and Standardized.

Forensic evaluation services are substandard (see subsection Forensic Evaluations in section OTHER POTENTIAL SOURCES OF ADMISSION DELAY).  All settings should adopt standard procedures for evaluating progress towards restoration to competency and assure readily available, quality forensic evaluations.

Explicit review of progress towards restoration should be done monthly, at least for the first six months.  Elements of the review should be standardized to assure that relevant elements are considered.  The approach developed at Metropolitan State Hospital is a sound approach that could be emulated to the extent that it is not yet implemented in other settings.

A uniform process for requesting a re-evaluation of competency should also be developed. Treatment teams should be able to secure a competency evaluation promptly whenever

they find that a patient is likely restored to competence to stand trial.  This should include all those IST patients in jail, whether in a JBCT program or not.

Formal forensic evaluations of competence to stand trial should be conducted by non-treating forensic experts, consistent with the ethical standards of forensic psychiatry and psychology.  This provides greater expertise and reliability and improves objectivity. Evaluations should include a determination of appropriateness for community-based restoration for those in jails, PDC, and state hospitals.

Forensic evaluations must address all relevant issues.  In addition to the elements addressed in the studies by McDermott [quoted in Incompetent to Stand Trial – Meeting the Demand, AG00063070, at AG00063090–125], restorability generally, rather than only the likelihood of medications restoring competence, also needs to be addressed.  This is especially important with regard to the cognitively impaired and chronically mentally ill (primarily those with refractory psychoses) who are known to have a lower probability of being restored.

Training and certification are needed for California forensic evaluators (alienists) that is based on professional standards for forensic evaluation [e.g., Mossman, et al., 2007].

Here again, although incremental reductions in LOS may be realized, they are unlikely to substantially reduce overall LOS.

## G.      Refusal to Admit Certain ID Patients to PDC is Unreasonable.

Refusing to admit the ID to PDC (for those requiring inpatient level of service) either results in their remaining jails (contributing to criminalization of ID), forces them to be treated at state hospitals that lack the expertise of DDS, or necessitates development of community settings on a case-by-case basis.  This also necessitates duplication of services, which is inefficient and unnecessary.  It also introduces delay as it necessitates finding an alternative setting and going through an additional review process.

Those not already a consumer with a regional center are refused admission to Porterville. [Deposition of Dawn Percy, p. 34.]  Refusing to admit those defendants who are not consumers of a regional center (the "unenrolled") is unreasonable.  DDS should be expected to provide IST treatment for the ID regardless of their status of enrollment with a regional center.  It is reasonable to have a process for determining that an individual is ID.  In most cases, this is straightforward and does not require extensive evaluation.  Exclusion of those who pose a danger to other program participants is also unreasonable.  Again, DDS has the needed expertise.  While specialized community placement may be retained as an option, it is unreasonable to delay admission of someone that disturbed while awaiting such placement arrangements; the plan can be developed after admission to a safe clinical setting.  See the subsection DDS Does Not Accept All ID IST Referrals in the section ADMISSION OF THE IST IN CALIFORNIA, section VIII.C, below, for background.

Should these populations be admitted to PDC and their numbers are anything but negligible, it is likely that increased capacity will be necessary.  Even without this addition, PDC is running near enough to capacity that any increase in referrals will quickly lead to the re-emergence of waiting lists.

### H.     DDS Needs to Expand Community-Based Commitment Capacity.

DDS also treats very few IST in the community (see the subsection Unused Community-Based Restoration Capacity in the section OTHER POTENTIAL SOURCES OF DELAY), section XIII.B, below) and should increase this capacity, which will also reduce the need to expand facility beds if IST referrals continue to grow.

Clinical and risk-related criteria for recommending community restoration should be more explicit and address the level of care DDS can provide.

### I.     DSH Needs More Capacity for IST Treatment.

Since the admission process is not currently impacting wait times, LOS is unlikely to be substantially reduced, and there is not significant unused capacity in the system (see OTHER POTENTIAL SOURCES OF DELAY subsections on capacity) section XIII.B-C below), additional capacity is required to address the DSH waiting list.  As JBCT is not the preferred approach and limitations need to be placed on the populations served by such programs, hospital and community capacity need to be increased.

Addition of forensic bed capacity to state hospitals has been shown to dramatically decrease admission delays [Christy, et al., 2010].  Increasing bed capacity will eliminate the waiting list, unless the IST are simply not admitted to available beds.  Bed capacity is also needed to be able to reliably and promptly admit the acutely ill.

A preference for community-based restoration, as the least restrictive setting, should be articulated.

#### Community-Based Restoration

Community-based competency restoration is underutilized and poor quality.  Data on the poor performance of CONREP is included in the body of the report (see the subsection Unused Community-Based Restoration Capacity in the section OTHER POTENTIAL SOURCES OF DELAY, section XIII.B, below, and APPENDIX C, section CONREP LOS and Additional Performance Data).  It treats very few and has poor outcomes.  Greater oversight and standardized approaches to treatment and monitoring must be developed and implemented across vendors and settings.

Clinical and risk-related criteria for recommending community restoration should be more explicit and address the level of care CONREP can provide.

Services should include:

- Housing
- Individual and group competency restoration services of a specified type and frequency. The content should be the same or highly similar to that provided in the hospital and JBCT programs for the mentally ill and in DDS for the ID.
- Medication management
- Case management

- Coordination of competency-related matters such as screens of progress on competency restoration, facilitating formal competency evaluations, coordinating court appearances, etc.
- Ancillary services as needed (e.g., substance abuse treatment)
- Other services as clinically indicated.

### State Hospitals

The state should increase bed-capacity until the waiting list is eliminated and then use sound quantitative methods to predict future need. It is important to note that IST treatment can occur in any hospital unit. There is also no reason the state could not use beds currently dedicated to other patient populations.

Once the waiting list is cleared, the state could focus on development of community-based capacity in order to either close beds or help to address any continued increase in IST referrals.

# IV.   ANALYSIS OF DATA PROVIDED BY CALIFORNIA

The state provided raw data on admissions of the IST for both DSH and DDS. No data was provided from CONREP or the JBCT programs. Analysis of the raw data provided additional information. The results of these analyses are included in APPENDIX B. It is not clear why the state itself does not conduct such analyses.

I understand from plaintiff's attorneys that DDS and DSH did not provide information on average wait times and instead provided raw data. The following is an analysis of that data.

## A.   DSH

The data produced by DSH had numerous problems. First and foremost, as noted above, there is no data dictionary defining what the fields are supposed to contain and mean. There were many duplicate cases, likely created by the processes DSH used to pull data from its databases. Many data fields were sparsely populated and some were completely empty. Some fields were populated by different kinds of data, e.g., dates for some cases and county names for other cases. Data entry errors were common. This necessitated cleaning and filtering the data prior to analysis to assure that only complete data without evident inaccuracies were included.

Analyses of cases from the beginning and the end of the data set are shown separately because these cases would otherwise skew the results. Those from the beginning would include only cases with long waiting times from commitment date to admission because cases that were admitted prior to the cut-off of January 1, 2015 (short wait times) would not be included, thus making the wait times appear longer than they actually were. The data pull included cases with any dates in any fields up to October 25, 2017. Cases at the end of the data would exclude those with commitment orders but not yet admitted (long wait times), making the wait times appear shorter than they actually were. The cut-off date

for those at the end of the data period was the last quarter where all complete cases with court commitments had been admitted:  Q2 2017.

The analyses looked at the averages across the whole data set and changes in the wait times across time.  The latter are of greatest value and are summarized below.  Other analyses are included in APPENDIX B.

### Admission Wait Times

The analyses explored time from the commitment order to receiving that packet of admission information from the counties, time from receiving the packet of information from the counties to acceptance for admission, and time from acceptance of admission to admission.  Total time between the commitment order and admission was also analyzed.

The most important finding is that DSH wait times between commitment order and admission have increased from 2015 (mean of 58.13 days) to 2016 (mean of 75.73) to 2017 (mean of 83.63) [See the graphs Distribution of Wait Times for Admission for IST Inmates at DSH: Commitment to Admission for each of those years, APPENDIX B, at B-14-B16.]  The table DSH Facilities Commitment to Admission Wait Time by Quarter, All State Hospitals:  Q1 2015-Q2 2017 shows that median wait times have doubled to 90 days in Q2 2017, [APPENDIX B, B-23.].  Since the median is higher than the mean, this demonstrates that most cases are taking longer to admit than the average wait of 87 days in that same quarter.  And as the medians in recent quarters are always higher than the means, we can be confident that the means are not being driven up by outlier cases.

The analyses also showed different patterns for each hospital.  Though all show increases in wait times, the most substantial increases were at Atascadero and Metropolitan.  Given that these hospitals are, respectively, the most secure and the least secure, there is a disproportionate effect on these populations.

Analyses by county did not show any clear trend by size of county or geography.

For the analysis of when packets were received, there were fewer complete cases once the data set was cleaned; the data are summarized in the table DSH Facilities Wait Time by Quarter, All State Hospitals:  Q1 2015-Q2 2017, [APPENDIX B, B-23].  These data show that the time from court commitment to DSH receiving packets has varied somewhat but has hovered around two weeks.  The time from DSH receiving the packet to approval for admission has increased steadily from 16 days at the beginning of 2015 to 37 days at the end.  The increase of 21 days does not account for all the increase in total wait times from commitment to admission.

Analysis of the time from commitment to receiving the packet for each hospital for Q1 2015- Q2 2017 demonstrated that Napa waited substantially longer (median of 19 days) than Patton (6 days) and Metropolitan (7 days) with Atascadero in the middle (10 days) [Summary of Time from Commitment to Packet Received at DSH Facilities, by Hospital: Q1 2015-Q2 2017, [APPENDIX B, B-46].  Analysis of this same time-period by county demonstrated wide variation.  For those counties with higher numbers of admissions, time from commitment to receipt of packet tended to be near the overall median of two weeks (with the exception of San Bernardino, Sacramento, and Riverside), suggesting that those counties that more regularly commit IST patients to DSH do a better job of providing

admission packets in a timely manner. [Summary of Time From Commitment to Packet Received at DSH Facilities, by County: Q1 2015–Q2 2017, APPENDIX B, B-47.]

The Date Completed field was also examined. This date is the date that an admission packet is declared complete. George Maynard testified that it "means that all the components of the referral packet had been received, all the packet entries had been entered into PaRTS, and it's deemed to be a completed packet." [Deposition of George Maynard p. 257]. Thus, this is not the actual date that the complete information was received but the date the information was determined to be complete by DSH. Examination of the data shows that most Date Completed dates are very close to Approval Date. Only 25% are found to be complete by 5 days and many are pending completion for months. [Date Packet Completion Analysis, 11/5/13-10/5/17, APPENDIX B, B-71.] Since it is unlikely that only a small minority of packets are complete upon submission and the dates for Date Completed and Approval Date are often similar, this verifies that this date is not a good measure of when completed information was received. Consistent with this analysis, Michael Barsom stated in deposition that packets are typically completed within 1-2 weeks [Deposition of Michael Barsom 11/30/17, pp. 48-49] and are not a source of delay [Deposition of Michael Barsom 11/1/17, pp. 181-182]. Thus, completion of admission packets is not a substantial source of delay.

Analysis of the time DSH received packets to approval for admission for each hospital for Q1 2015- Q2 2017 revealed a significant difference between Napa (average of 14 days) to Atascadero (30 days) and Metropolitan (28 days) with Patton midway (20 days). [Summary of Time From Packet Received to Approved at DSH Facilities, by Hospital: Q1 2015–Q2 2017, APPENDIX B, B-52.] Their maximum wait times are similar, making it unlikely that outliers account for this difference. Analysis of this same data by county showed wide variation but no clear pattern related to population or geography. [Summary of Time From Packet Received to Approved at DSH Facilities, by County: Q1 2015–Q2 2017, APPENDIX B, B-53.]

Analysis of the time from approval of admission to admission for each hospital shows that Napa has a very long wait time (average of 42 days) compared to Atascadero and Metropolitan (20 and 22 days respectively) with Patton midway (30 days). [Summary of Time from Approval to Admission at DSH Facilities, by Hospital: Q1 2015-Q2 2017, [APPENDIX B, 58.] Their maximum wait times are similar, making it unlikely that outliers account for this difference. Analysis of this same data by county again shows wide variation but no clear pattern related to population or geography. [Summary of Time From Approval to Admission at DSH Facilities, by County: Q1 2015–Q2 2017, APPENDIX B, B-59.]

Note that when the means of the various stages of the admission process (17 for commitment order to packet receipt, 22 for packet receipt to approval, and 30 for approval to admission) are added together, the sum of 79 is very close to the mean time from commitment to admission for the last complete year's data (2016): 75.73. [Distribution of Wait Times for Admission for IST Inmates at DSH Commitment to Admission: 2016, APPENDIX B, B-15.] This gives confidence that, even though the complete data set for

analyzing the various stages was smaller than that for the commitment to admission data, it is nonetheless representative.

These data demonstrate the DSH delays, as opposed to any delays in getting admission information from the counties, account for most of the time from commitment to admission:  22 + 30 = 52 days.  Note that this is using the lower of the median and mean so is the most generous to DSH.  However, as noted above in the explanation of the field Completed Date, it is not clear how much of the 22 days between receiving the packet and approving admission is due to waiting for additional information to complete the packet, but the deposition testimony cited indicates this is not a significant source of delay.

### Length of Stay (LOS)

The discharge date includes both transfers and returns to court, regardless of whether the patient came back on the same case, so LOS based on these data will underestimate actual length of stay.  However, it is sufficient to establish general trends of LOS and an approximate, if low, LOS.

Analysis of all cases with an admission and discharge date revealed that the average LOS was 111 days and the median 91.  [Summary of Time from Admission to Discharge at DSH Facilities, by Hospital: 11/19/14-10/16/17, APPENDIX B, B-61.]  There was some variation between hospitals with Patton and Napa having shorter LOS than Atascadero and Metropolitan.  The maximum LOS for all facilities was just short of two years.  [Summary of Time from Admission to Discharge at DSH Facilities, by Hospital: 11/19/14-10/16/17, APPENDIX B, B-61.]

These findings are slightly lower than what DSH provided in its own analyses but are in the typical range for LOS in published studies.

## B.    DDS

DDS data was much more limited and did not allow an analysis of the stages of the admission process or of LOS.  As with the above, cases at the beginning and end of the data set are shown separately to assure that only complete cases were included in the analysis, i.e., all cases have both a commitment date and admission date.

### Admission Wait Times

The graph Porterville Developmental Center:  Wait Time for Admission by Commitment Date – 7/31/12-9/20/17 demonstrates clearly that PDC admission wait times decreased significantly from Summer of 2014 to the end of 2015.  The table Porterville Developmental Center:  Wait Time for Admission by Quarter – Q1 2015-Q2 2017 shows that from 2015 Q1 to 2016 Q4 the median wait time decreased from 210 days to about 50.  During that time, 41 additional beds were added.  [Deposition of Dawn Percy, pp. 150, 157.]  Since then admission wait times have remained stable at above 50 days: 53 days in the 1st Quarter of 2017, 54 in the 2d Quarter.

The numbers admitted from many counties are too small to draw any conclusions about differences in wait times by county size or geography.

# V.   INCREASING DEMAND FOR FORENSIC AND IST SERVICES IN THE U.S. AND CALIFORNIA

it is well-known that forensic patients have been steadily increasing in the U.S. for over 20 years [Lutterman, et al., 2017].

The Department of State Hospitals: Incompetent to Stand Trial - July, 2016 Memo reported that between FY 2009-10 and FY 2013-14, there was a 36% increase in annual IST referrals during this period in Los Angeles County, representing an increase from 816 to 1112. Annual IST referrals from San Diego County increased IST 46% from 153 to 224 and other counties increased 31%. [AG00043162, at AG00043164.]

The California Department of State Hospitals 2016 Annual Report documents a steady increase in IST admissions, a subset of the forensic population, from 1,981 in 2011-2012 to 2,991 in 2015-2016.  [Deposition of Michael Barsom, Exhibit 8, p. 17.]  The Department of State Hospitals: Incompetent to Stand Trial - July, 2016 Memo stated that DSH began collecting data on IST referrals in 2013. [p. 1.]  In 2013-14 there were 2789 referrals, in 2014-15 there were 3085, and in 2015-16 there were 3,398. [p. 1.]  Presumably these numbers are different from the California Department of State Hospitals Annual Report 2016 because these are referrals while the others are admissions.  The difference almost certainly reflects the waiting list for admission.

Consistent with the preceding, the presentation entitled Incompetent to Stand Trial – Meeting the Demand, reported that there was a 22% increase in IST referrals from 232 per month in FY 2013-2014 to 284 per month in FY 2016-17.  [AG00063070, at AG00063081.]

The document Department of State Hospitals Clinical Staffing Study, Staffing Methodology Proposal, Forensic Services Department dated September 2015 showed an increase in the forensic population of state hospitals from about 4000 to 7000 from 1995 to 2015 and The California Department of State Hospitals Annual Report 2016 demonstrates that the increase has been steady since that time.  [AG000 13155, at AG00013; Deposition of Michael Barsom, Exhibit 8, p. 6.]  This trend can thus come as no surprise to the state.

# VI.   BED UTILIZATION AND DELAYED IST ADMISSIONS IN CALIFORNIA

Delayed admission of the IST has been a long-standing problem.  In the following, some historical and trend data are reviewed to provide a sense of the trajectory of the problem.

## A.    DSH IST Bed Utilization and IST Waiting List

DSH has five state hospitals:  Napa, Coalinga, Metropolitan, Patton, and Atascadero [DSH Bed Utilization Study, 2016, AG00013833, at AG00013846.]  Coalinga does not serve the IST population.  [DSH Bed Utilization Study, 2016, AG00013833, at AG00013855.]  Patton has the largest number of IST patients.  [DSH Bed Utilization Study, 2016, AG00013833, at AG00013855–56.]  Atascadero is the most secure facility, but Patton is also secure.  The four that serve the IST population have dedicated competency restoration units, though there are some mixed units (e.g., female IST patients are mixed with other females at

Metropolitan and Napa and admissions units at Patton are also mixed populations).  [DSH Bed Utilization Study, 2016, AG00013833, at AG00013872–73.]

DSH documents speak both to beds designated for the IST and beds actually occupied by the IST.  It is only bed occupancy that is relevant to this part of the report, not what DSH reports as the number of beds designated for the IST.  As such, the following is a summary of actual bed usage.

The DSH 2015-16 November Estimate reported that on June 30, 2014, 1380 of 6846 patients (20%) in the hospitals were IST and that over the 2013-14 budget year, there was an average of 1265 IST patients out of a total average census of 6474 (20%).  [AG0009358, at AG0009358, AG00009362.]

The DSH Bed Utilization Study from 2016 found that in 2014-2015, the average daily census of all hospitals was 6700 of which 1355 (20%) were IST.

The California Department of State Hospitals Annual Report 2016 reported that IST patients comprise 21% of the state hospital population which was "approximately 6800." [Deposition of Michael Barsom, Exhibit 8, p. 5, 13.]  Thus, about 1428 beds were being used for IST patients.  This demonstrates a modest increase of about 1428 – 1265 = 163 beds used for this population from 2013-14 to 2016.

The Declaration of George Maynard in Support of DSH's Brief RE *Loveton* Decision from April 2016 explicitly states that each of the DSH hospitals "… has reached its maximum licensing or statutory capability."  [AG00009733, at AG00009734.]  Mr. Maynard also stated that DSH is "… still not able to guarantee admission of a referred IST defendant from any particular County within a seven or even thirty-day period from the commitment order." [AG00009733, at AG00009734.]

Despite bed increases, the number on the IST waiting list has increased steadily.  The number of defendants with felony charges on the waiting list leading up to a 2012 California legislative analyst report was 200-300 [Taylor, 2012, p. 3.]  Per the Department of State Hospitals: Incompetent to Stand Trial - July, 2016 Memo, on June 27, 2016 there were 464 IST on waiting list.  [AG00043162, at AG00043166.]  This was up from 168 for December 2012, 383 for December 2013, 426 for December 2014, and 379 for December 2015.

In line with these numbers, the presentation entitled Incompetent to Stand Trial – Meeting the Demand reported that there was a 51% increase in the waiting list from an average of 343 in FY 2013-14 to 520 in FY 2016-17.  [AG00063070, at AG00063081.]

On September 25, 2017, there were 713 on the pending admission list.  555 were awaiting a state hospital bed, 143 awaiting a JBCT program bed, and 15 yet to be assigned.  The breakdown by hospital was:  Atascadero 147, Metropolitan 72, Napa 152, and Patton 184 [DSH System Wide Weekly Pending Placement Report, dated 9/25/17, AG00063384].  This document did not report pending wait times.

According to a document filed in Alameda County Superior Court on September 1, 2017, a defendant awaiting admission to a state hospital was expected to be admitted "on or about November 10, 2017"; the commitment order had issued on July 5, 2017.  [Response to Order to Show Cause and Request for Extension of Time dated 9/1/17, *People v. Zanders*,

Alameda County Superior Court, Case No. 17-MH-012444, Deposition of George Maynard, Exhibit 13, p. 1.].  In deposition, George Maynard reported that "approximately 758" were on the waiting list in early October of 2017.  [Deposition of George Maynard p. 66]

## B.    DSH Wait Times for Those Pending Admission

It is critical to recognize that the data on pending admissions is not the same as actual average wait time before admission.  Since these cases are all "pending" admission, it includes many just placed on the waiting list.  Thus, the average of pending admissions is a gross underestimate of the actual average wait times before admission.  The information provided by the state did not show average wait times; in deposition, Janna Lowder-Blanco was not aware of DSH tracking this important data and further explained that it would require manual analysis of the Patient Reservation Tracking System (PaRTS) database [Deposition of Janna Lowder-Blanco, pp. 47-48].  She also confirmed that there are no formal definitions of fields in the PaRTS database, only a list of fields.  [Deposition of Janna Lowder-Blanco, p. 77]

The document Department of State Hospitals IST - Pending Placement List Analysis, Data as of January 5, 2015 showed 389 IST on the pending placement list with an average time on the list of 45.25 days.  The maximum pending duration was 218 days.  [AG00039848.]  Average pending times varied a little, from a low of 34.5 days at Atascadero to 50.8 days at Napa.  [AG00039848.]  The document Department of State Hospitals IST Pending Admission Analysis, Patient Data as of August 8, 2016 showed 519 defendants on the pending list with an average pending time of 56.81 days.  The maximum days on the list was 329.  [AG00012150.]  This shows an increase in pending times as well as numbers on the pending list.

This last document from 2016 showed that over half were on the waiting list for Patton.  Average wait times for pending admissions showed more variation between hospitals: 33.66 days at Atascadero, 56.26 days at Patton, 58.47 at Napa, and 71.51 days at Metropolitan.  There was also evidence of variation between counties.  Two counties, San Bernardino and Shasta, had average wait times of over 100 days for their IST defendants.  Several counties had wait times of under 30 days: Imperial, Lake, San Luis Obispo, Siskiyou, and Stanislaus.  Larger counties tended to have longer average wait times.  There was no clear geographic variation, but many counties were not represented on this list.  [AG00012150.]  In the only study to examine the impact of geography on waiting times, remoteness from state hospitals was not associated with delays in admission in the Florida state hospital system [Christy, et al., 2010, p. 712]

## C.    JBCT Program Beds

The Department of State Hospitals 2014-15 May Revision Estimate: Future Fiscal Issues reported that DSH increased JBCT program beds by 108 (76 in the San Bernardino jail and 32 in the Sacramento jail).  In the presentation entitled Incompetent to Stand Trial – Meeting the Demand (from October, 2017), public defenders noted that JBCT beds increased by 188 since FY 2012-13 (the current total of JBCT beds).  [AG00063070, at AG00063083.]  As is evident from preceding statistics, these increases have also not reduced the waiting list.

Matthew Garber testified in deposition that wait lists for JBCT programs were "negligible" prior to 6-12 months before his October 2017 deposition.  DSH began tracking waiting lists at that time but Mr. Garber did not know the numbers or the waiting time [Deposition of Matthew Garber, p. 149].  Liberty Healthcare data indicated wait times of 2-3 weeks up to November 2015 (see JBCT Program LOS, section XIX.D, below for details).  On September 25, 2017, 143 were pending admission to JBCT programs but pending wait times were not reported [DSH System Wide Weekly Pending Placement Report, dated 9/25/17, AG00063384.]  I understand that plaintiffs' counsel requested pending wait list data for JBCT programs, but defendants declined to provide it.

### D.    DDS Bed Utilization and IST Waiting List

The intellectually disabled that are admitted for restoration by DDS go only to Porterville Developmental Center (PDC).  They are admitted to the 211-bed Secure Treatment Program; about half these beds are occupied by those committed under WIC 6500 for being a danger to self or others [Deposition of Dawn Percy, DDS Coordinator of Program Operations, p. 43-44.]  The bed capacity was increased from 170 to 211 in 2015. [Deposition of Dawn Percy, p. 150.]

John Doyle confirmed that in 2014 the wait list was "approximately 50." [Deposition of John Doyle, p. 57.]  On July 22, 2016, the wait list had 14 patients.  [Deposition of Dwayne LaFon, p. 212.]  Dwayne LaFon did not know what it was at the time of his deposition on September 29, 2017 [Deposition of Dwayne LaFon, Deputy Director for DDS's Developmental Centers Division, pp. 212-213.]  Mr. Doyle testified it was "under 15" as of December 6, 2017 [Deposition of John Doyle, pp. 57-58.]

### E.    DDS Wait Times

In the document Defendant Santi Rogers' Amended Responses to Plaintiff's Request for Admission (Set One) regarding Alameda County Superior Court Case No. RG15779731, the state refuses to answer questions regarding how long incompetent defendants had been waiting for admission, frequently citing a lack of data.  A representative statement was: "…DDS did not begin tracking IST admissions until after July 1, 2012.  Thus, DDS does not have sufficient information to calculate or compare data on admission timeframes from 2010 onward and is unable to admit the matter."  [Defendant Santi Rogers' Amended Responses to Plaintiff's Request for Admission (Set One), at 8.]

The document PDC 4418.7 Referral Process & Templates (attached to a May 27, 2016 email) includes a template letter that states:  "The wait list at Porterville developmental Center is currently up to six months."  [AG00036962, at AG00036963.]  The document Porterville Regional Project Statewide DCL Meeting Minutes, dated August 15, 2016 reported a waiting list of "2-4 months." [AG00030237.]

The spreadsheet AG00012522-R showed that of those not yet admitted, the average wait time was 53 days.  The document is undated but the most recent dates on the document are from September 2016.  Here again, this is not the average wait before admission, which is longer.

# VII.  ADMISSION PROCESS

In this section, I describe what is necessary for admission to a psychiatric hospital or other treatment facility for competency restoration.  It is important to recognize that the pace of the admission process depends on the needs of the patient.  The more acutely ill the patient, the more rapid the admission process must be.  Elective admissions may be planned over days or weeks while emergent and urgent admissions must be done within hours or days.

In the case of emergent psychiatric admissions from the community (not just those found IST), hospitals provide necessary care using whatever information is at hand, often just an emergency room screening to rule out acute medical problems.  For elective admissions, there is time to collect general information regarding the medical status of the patient as well as specific information related to the purpose of the elective admission but even this need not take more than one to two weeks.

Those mentally ill representing a danger to themselves or others or who are gravely disabled need to be promptly treated to prevent morbidity and mortality.  It is also important to recognize that failure to treat serious mental illness (especially psychosis) is associated with worsening illness and poorer response to medications – the longer the delay, the greater the risk, especially for the first episode of psychosis [Anderson, et al., 2007; Chang, et al., 2013; Lieberman, et al., 2007; Marshall, et al., 2005; Perkins, et al., 2005.]  The majority of those found incompetent to stand trial have serious mental illnesses [Gerbasi & Scott, 2004, at 83].

Those hospitalized to restore competency to stand trial are typically transferred from jails to state hospitals.  Jails have limited capacity to care for those with medical or mental illnesses, even those with licensed units (Correctional Treatment Centers).  Those patients needing hospital-level services or institutional care for intellectual disability should be promptly transferred to an appropriate level of care.  Hospitals and institutions charged with providing treatment to a specific population, such as the incompetent to stand trial defendants, must have the capacity and wherewithal to promptly admit the acutely ill and to admit routine cases within two weeks.  The effect of extended delays in admission is to keep patients who are acutely ill in jail settings even though they have already been directed to a hospital level of care.

## A.     Admission Screening

For admission to a psychiatric hospital, prior medical screening to assure that the patient's medical condition(s) can be managed at the psychiatric hospital is standard.  The depth of the screening may vary depending on the acuity of the patient; those who are more acutely ill need to be expedited so screening is limited to assuring the patient does not require admission to a medical hospital.  To expedite screenings of the acutely ill, it is prudent to have a physician conduct the screening to minimize layers of screening that can cause delay.

For routine cases, the depth of screening needed depends on the complexity of the case.  A nurse can screen routine cases.  More complex cases require physician review.  Physician review is unnecessary when there are no active medical problems or current medical

problems are minor and stable; such as hypertension, asthma, diabetes and a host of other common problems.

The materials routinely requested for medical screening must be readily available.  In this regard, it is important to note that jails are expected to screen admissions for medical problems [e.g., National Commission on Correctional Health Care, 2014].  If the screening is negative, no further assessment is required of jails unless a problem arises subsequently. When negative, this medical screening should be sufficient for admission to a hospital or treatment facility, with the addition of readily available information such as vital signs and demographics.  It is also reasonable to ask for current medications and treatment plans, even though not directly related to screening.  It adds additional information useful to receiving hospital or facility, limits the number of times the referring facility (jail) must access information, and allows the receiving hospital or facility to prepare.  Similarly, information about medical alerts (e.g., allergies) and medical decision-making (e.g., conservatorship, advance directives, court ordered treatment) may be requested but not demanded as the information might not be readily available.

In cases where the jail medical screening is not negative, it is reasonable to ask for the progress notes and laboratory results for the last month, the current and last month medication administration record, active treatment plans (whether medical or psychiatric), the most recent physical examination, the most recent mental status examination, and any formal medical or psychiatric assessments or consultations from the last three months.

If a receiving institution is aware of known problems that would be expected to still be active (e.g., diabetes mellitus), it is reasonable to request information on the patient's current clinical status.

It is also reasonable to ask about observations regarding salient functional deficits including the patient's ability to perform essential activities of daily living (eating, bathing, toileting, ambulation) and communication limitations.

From my experience as a forensic hospital clinician and administrator, I am aware that consideration of security issues may be germane to placement; but any hospital designated to handle those committed for danger to others, danger to self, or grave disability should be able to manage any committed patient.  It is reasonable to direct higher risk patients to more secure settings but that must not delay admission.  Any risk assessment used to determine placement must be evidence-based to maximize reliability and consistency and be able to be completed with readily available information.

Long-term risk of violence can be adequately assessed using information readily available and reasonably related to the purpose of admission:  competency to stand trial. Information on criminal history and demographic variables are sufficient to provide a foundation for a formal long-term risk assessment.  Short-term risk is primarily related to current mental status which can be obtained from the recent jail medical record.  Custody rule violations and restraint within up to a week of the assessment are reflective of mental status and short-term risk.  Both are readily available as well.  Escape risk may be estimated by a criminal history of escape and from other readily available records regarding escape from institutions, including DSH and DDS databases.

Once screening materials are available, an admission decision should be made within a day for those that represent an imminent danger (especially those in a setting without supervision), one working day for those that are acutely ill but not an imminent danger, and one week for routine cases.

In some cases, additional information may be necessary; the screening clinician must promptly contact the sending facility's clinical staff to obtain that information.

### B.    Those Accepted for Admission

Once accepted, patients should be transported promptly to the hospital, absent exigent circumstances (e.g., a special security transport is required).  Coordination of routine transport and admission may reasonably take 2-3 working days for routine cases.

Jails retain a responsibility to treat serious conditions until the patient is admitted to the hospital, but once committed to the state hospital by the court, the presumption should be that hospital-level services are indicated.  If the patient is acutely ill, admission must be expedited by whatever means are necessary.  In such cases, special transport may be indicated.  There is no reason this should take longer than a day following acceptance. Hospitals are, or should be, able to admit patients 365 days per year.

In summary, after materials are received from the referring facility or court, two weeks is a reasonable period to screen routine cases for admission, determine placement, and admit the patient.  This allows some extra time for challenging cases or unusual circumstances.  In acute cases, screening should be done within one working day and admission the next working day or one calendar day if an imminent danger.

# VIII. ADMISSION OF THE IST IN CALIFORNIA

Admitting procedures may introduce delays to admission.  Admission procedures for both DSH and, especially, DDS are excessive and bureaucratic.

### A.    DSH Admission Procedures

#### CONREP Assessment

Per Penal Code Section 1370(a)(2)(A), the CONREP Program Director or designee is charged with providing a recommendation to the court regarding the site of treatment to restore competency:  community-based treatment program (under CONREP) or a DSH facility (which includes JBCT programs).  Owing to statutory change, as of July 1, 2017 DSH has discretion to assign IST patients to JBCT or state hospitals after the court commits the patient to a DSH facility.

With regard to recommending community placement, Chief Psychologist of DSH Mark Grabau stated in deposition that this was "totally based on psychiatric stability, as well as risk, violence risk."  [Deposition of Mark Grabau, p. 34.]  The assessment includes review of the forensic mental health evaluation (alienist report), medical records, classification summary, criminal history, jail information, and may include an interview of the patient, though Grabau did not know how often this was done.  [Deposition of Mark Grabau, p. 34-35, 61-62].  He also noted that the person conducting these evaluations may be a

psychologist, social worker, or marriage and family therapist. [Deposition of Mark Grabau, p. 36.]

Risk assessment tools include the HCR-20 and something Grabau called "an individual risk profile." [Deposition of Mark Grabau, p. 58.] The latter is "in more narrative form." [Deposition of Mark Grabau, p. 58.] He stated this had clinical value but did not comment on its validity as a risk assessment tool. [Deposition of Mark Grabau, p. 58.] How these are used to make a recommendation to the court was not clear. [Deposition of Mark Grabau, p. 58.]

Mark Grabau stated in deposition that recommendations for JBCT programs are done by the directors of these programs and their staff at the same time that CONREP is reviewing the defendant for a placement recommendation. [Deposition of Mark Grabau, p. 91]. The factors considered included psychiatric acuity, medication compliance, history of rapid response to treatment, and lack of suicidal or homicidal ideation. [Deposition of Mark Grabau, p. 93]. Those who are highly acute, non-compliant (though he stated some jails administer involuntary medications), have a history of poor treatment response, or are homicidal or suicidal are referred to state hospitals. [Deposition of Mark Grabau, p. 91-93]. However, this was not reflected in any other documentation regarding JBCT program admission criteria. George Maynard confirmed in deposition that different JBCT programs have different admission criteria [Deposition of George Maynard p. 86].

<u>State Hospital Admission Process</u>

Screening patients for admission is covered under California Code of Regulations TITLE 9. DIVISION 1 CHAPTER 16. Section 4712(a) specifies the medical records to be provided to DSH before admission is considered. [Cal. Code Regs. Tit. 9 CCR § 4712(a).] Some of what is included is unnecessary and unreasonable for admission, especially acute admission. Despite this, Michael Barsom stated in deposition that packets are typically completed within 1-2 weeks [Deposition of Michael Barsom 11/30/17, pp. 48-49] and are not a source of delay [Deposition of Michael Barsom 11/1/17, pp. 181-182].

The requirements are also vague and thus open to broad interpretation and often lack timeframes. They are overbroad, as only recent information is essential in almost all cases. Examples of the requirements and their overbreadth include:

- "Compliance with current or previous medication." [Cal. Code Regs. Tit. 9, § 4712(a)(3).] Only recent compliance is relevant. This can be met by sending the current and previous month's medication administration record.

- "Laboratory results and consultations." [Cal. Code Regs. Tit. 9, § 4712(a)(4).] Absence of a timeframe is problematic. Any labs or consultations older than a month are not needed prior to admission.

- "Records or incidences [sic] of self-injurious behavior, suicide watch, or use of safety cell." [Cal. Code Regs. Tit. 9, § 4712(a)(6).] To the extent that this is available from the jail medical record of the current admission, this is reasonable. If it requires production of materials outside the medical record, such as custody logs, then it is unreasonable.

- Any consent forms for treatment."  [Cal. Code Regs. Tit. 9, § 4712(a)(9).]  This is unnecessary as the providers at the receiving facility must secure their own consent.

After materials are received by DSH, 4713 provides that screening is first done by a "triage nurse in the admissions unit of the state hospital."  The nurse then consults with a physician "to determine whether the particular hospital is able to provide the necessary care or services to the individual."  [Cal. Code Regs. Tit. 9, § 4713(c).]

Presumably, this process will change when all admissions are coordinated by the Patient Management Unit, which has not been implemented for all counties as yet [Deposition of George Maynard p. 98].

Section 4716 adds that "the Medical Director or designee of each state hospital under consideration for the individual's placement has the final authority to determine whether the individual shall be placed at that particular state hospital.  If the Executive Director or designee determines that the individual is not appropriate for placement at that particular state hospital, the Department's Director or designee shall determine the appropriate facility for the individual's placement."  However, George Maynard stated in deposition that the state hospital medical director "makes the final admission decision" [Deposition of George Maynard p. 88].  This would be appropriate as non-clinicians should not be making decisions regarding clinical matters; 4716 should be changed to reflect this.

In her Declaration of Amy Prothero in Support of DSH's Brief on Remand in Response to Courts Questions, *In re Osburn*, Superior Court of Sacramento County, Case No. 05F09064 (dated May 4, 2016), Ms. Prothero detailed somewhat different information to be collected. Medical information is to include "the last 30 days of medical and psychiatric information, current medication list, and any continuing medical needs."  [AG0009737, at AG0009738.] As a statement of principle, this is reasonable.  A 30-day period is a realistic time frame, as long as it is understood that those jailed less than 30 days need only convey information for the current incarceration.  This timeframe, however, is not specified in controlling documents.

Prioritization of the acutely ill is necessary for efficiency and serving the clinical needs of the population.  DSH has reasonably provided for more prompt admission of defendants with more acute psychiatric needs in 4717.  The provision put the onus on the clinician in the referring county to contact the medical director of DSH and to provide: "[a]ny notes on use of safety cell; [c]urrent medication and dosage or lack of medication; [m]edical laboratory results; or any [a]dditional treatment records from local health care providers." [Cal. Code Regs. Tit. 9, § 4717(d)(1-4).]  It allows three business days for the DSH medical director to make the determination; the phraseology is unclear but may permit longer than three business days "sufficient documentation" is not obtained within that time.  [Cal. Code Regs. Tit. 9, § 4717(e).]  This is both vague and unreasonable in terms of timeframe; admissions can be done within a day when urgent.  The notes regarding safety cell usage may be logs, medical records, and a variety of other potentially voluminous and difficult to secure information; for safety cell usage, only the medical record notes (progress notes)

are necessary. "Any additional treatment records" is vague and overly inclusive. [See Cal. Code Regs. Tit. 9, § 4717(d)(4).] DSH does not collect data on usage of this provision for acute admission; George Maynard estimated in deposition that it was used "once, twice per year" but there was no indication of the time between referral by the jail clinician and admission. [Deposition of George Maynard, at p. 77.] Consistent with Section 4717, he also reported that admission packet requirements may be reduced in such cases [Deposition of George Maynard at pp. 77-78].

DSH also conducts a risk assessment prior to admission. The elements of the Security Risk Assessment are specified in Section 4714. It does not specify a formal risk assessment or indicate how this information is to be used to generate the specified risk categories of low, moderate, or high. Accordingly, DSH noted that it did not rely on "any technical, theoretical or empirical studies, reports, or documents related to these regulations." [Initial Statement of Reasons for adopting Article 7, Sections 4700, 4710, 4711, 4712, 4713, 4714, 4715, 4716, and 4717, p. 5.] Note that if the patient will be admitted to a high security setting by virtue of their charge, there is no need to conduct a long-term risk assessment. Why this is needed in addition to the CONREP Program Director risk assessment is not clear.

The following are the formal elements of the security screening with comments on those that are unreasonable. Many elements are beyond the basic elements needed discussed above. These include:

- Whether, within 30 days prior to the completion of the Department's assessment, the Department receives "new or additional information about the individual, including but not limited to change in commitment status, divorce by spouse, death of a family member, or birth of the individual's child." [Cal. Code Regs. Tit. 9, § 4714(b)(2).] There is no evidence that these variables are related to security risk or risk of violence.

- "Whether the individual has a DSM-5 diagnosis of an antisocial, borderline, or narcissistic personality disorder." [Cal. Code Regs. Tit. 9, § 4714(b)(4).] These conditions together represent a small risk factor, though often present patient management problems. Further, these conditions are so common in this population that they are of little value in assessing security risk. It is not clear whether the jails are asked to formally determine in every case whether such conditions are present; the diagnoses present in the medical record are sufficient.

- "The individual's pending criminal charges and the maximum exposure the individual is facing for each pending charge, at the time of assessment." [Cal. Code Regs. Tit. 9, § 4714(b)(6).] As these are IST defendants who have not been convicted or sentenced, this makes no sense. If the issue is their potential sentence, there is no evidence this has relevance to risk.

- "The individual's current medical condition." [Cal. Code Regs. Tit. 9, § 4714(b)(7).] This is not related to security risk unless it is intended to diminish risk by virtue of incapacitation. Here again, the diagnoses present in the jail medical record are sufficient.

In the Declaration of Amy Prothero in Support of DSH's Brief on Remand in Response to Courts Questions, *In re Osburn*, Superior Court of Sacramento County, Case No. 05F09064 (dated May 4, 2016)], Ms. Prothero reported that Dana White "determines if the IST defendant poses any security risk precluding admission to DSH-Napa, which does not have an electrified fence and is not permitted to provide care to high-security patients." [Declaration of Amy Prothero in Support of DSH's Brief on Remand in Response to Courts Questions, dated 8/15/16, *In re Osburn, et seq.*, Case No. 0509064, Sacramento County superior court, AG00009737, at AG0009738.]  She further reported:

> "The Criminal Records Case Analyst staff must review each document in the packet thoroughly to: a. Verify the indicated identifying and factual information (names, dates and the like) is correct, b. Review the patient's suitability for DSH -Napa placement in terms of any criminal record for escape, a Penal Code section 290 sexual-based conviction requiring registration offense, or current parole status (cannot admit as PC 1370 if the only offense is under Penal Code sections 3000.08 and 3455). c. Determine whether the patient has been previously placed at a DSH facility and if so, check the security status for that admission. If the patient was on high security status in a previous admission, the packet must be returned to Dana White for consideration of placement in a DSH high- security facility, such as DSH -Atascadero or DSH- Patton. d. Redact all of victim/witness /third party protected health information, such as name, birthdate (leaving in age if age is a part of the specific offense charged), phone number, social security number, driver's license number, credit card number, and any other personal information. e. Remove line-up photos. f. In addition to victims and witnesses, redact staff names with exception of hospital police involved in the investigation who are not witnesses or victims." [Declaration of Amy Prothero, at AG0009738-39.]

There is no need for two people to do security screening.  Further, it is not clear why all of this must be done prior to admitting a patient.  Much of this can be done later and may not need to be done at all, especially the redaction.  Ms. Prothero reported that once a packet is complete, the security review can be completed within 7 days.  [Declaration of Amy Prothero, at AG0009739.]  The packet is then sent to "the Admissions Suite" for review of healthcare issues.  Ms. Prothero stated that "the entire review process takes, on average, seven to ten days…."  [Declaration of Amy Prothero, at AG0009739.]  Her deposition testimony regarding the whole process was consistent with the preceding [Deposition of Amy Prothero, pp. 22-42].  This is an extremely bureaucratic process that could be easily streamlined but, if Ms. Prothero is correct, should not preclude admission within 14 days of receiving the packet, at least for Napa.  She also testified that both Napa and the Patient Management Unit (PMU) receive packets; the PMU forwards them to Napa for review for cases being directed to Napa [Deposition of Amy Prothero, pp. 23-25].

Per the Declaration of George Maynard in Support of DSH's Brief RE Loveton Decision, "DSH is working to develop a centralized admissions process for implementation across all DSH facilities statewide without any particular transfer timelines set on a county-by-county basis. Once implemented, patients will be placed and prioritized on a centralized statewide list by date of commitment and admitted upon receipt of a completed admissions package.

The statewide list will also include additional relevant information, such as commitment date, referring county, and any criminal charges excluding placement at certain facilities. Each hospital will review daily bed availability and prioritize placement options, including consideration of patient acuity." After beginning with a pilot in October, 2015, the Patient Management Unit is supposed to be reviewing all admissions by spring 2018 [Deposition of George Maynard p. 99]. This centralization is a necessary change; it is unclear why it is taking so long to implement as the Statewide Patient Management Unit was legislatively established in 2014. Mr. Maynard noted that implementation of the Patient Management Unit would reduce sources of delay including mailing physical documents [Deposition of George Maynard pp. 154-156].

### JBCT Program Admission Procedures

Review of seven redacted Jail Psychiatric Services Jail Based Competency Treatment Program Screening Assessments from Sacramento County in October 2015 showed that they required far more information than is necessary for admitting a patient to the program, including asking for up to six months of medical records (not only from the jail but from community providers), six months of disciplinary write-ups, one year of information on placement in restraint chairs, classification review, and other details unnecessary for the admission process. [AG00014786-92.] Some of the information would be useful in determining the best location of treatment but this should be done by the CONREP program director as part of the initial evaluation for placement under 1370.

A redacted San Bernardino County Sheriff Department Jail-Based Competency Treatment (JBCT) Program IST Transfer and Admission Assessment includes a reasonable list of necessary information, except for requesting "PREA concerns requiring treatment" as all jails must attend to PREA issues. [AG00014406.]

Matthew Garber stated in deposition that the time to screen admissions packets "varies by county" but did not know how much or why [Deposition of Matthew Garber, p. 66]. He also stated that the JBCT programs ask for additional information that DSH does not, referring to "their most recent medical and custody information" [Deposition of Matthew Garber, p. 67] and that each JBCT program had its own screening criteria based on contracts [Deposition of Matthew Garber, p. 81-82].

There is clearly no standardization and multiple layers of review have been introduced into the process. This can delay admissions but no data are analyzed by CONREP, DSH, or DDS that would allow assessment of these procedures.

## B.    DDS Admission Procedures

Once a court finds a defendant incompetent to stand trial and makes a finding that they have a developmental disability, the court orders the regional center to make a placement recommendation. [Penal Code Section 1370.1(a)(1)(B).] Per Penal Code 1370.1, this is due within 15 days of the court making the request of the regional center. [Penal Code Section 1370.1(a)(2).] The statute specifies only that the following information be provided: criminal history information, arrest reports, and any documents concerning a sex offense if applicable; these documents are to be taken to the facility with the patient. [Penal Code Section 1371.1(a)(3).] No other documents are required by the IST statutes. The statutes

do not specify a WIC 4418.7 report or any other information, though the 4418.7 report is required prior to admission of any patient to PDC by WIC 4418 and 7505.

Porterville Regional Project (PRP), the unit at Porterville that coordinates IST admissions, learns of potential admissions when it receives the commitment order or is informed by the Regional Center of a potential commitment [Deposition of Sherrie Molina, Community Liaison Representative with PRP, pp. 47-52].  Once aware of the potential commitment, staff begin collecting documents to prepare for admission.  [Deposition of Sherrie Molina p. 47-48.]

PRP staff collect a broad array of documents and information prior to admission [Deposition of Sherrie Molina pp. 82-85].

Ms. Molina reported she requested "the felony complaint, rap sheet, and police reports in regards to the incident; the competency evaluations that were done, and any past psychological evaluations that were done; the individual program plan; individual education plan, if the individual is under 22 years of age and is still requiring educational services.  I would request any birth certificate, Medi-Cal card, or any copy of that that they would have.  I would request ID if they have it.  Let's see, psychologicals, felony complaint. The social intake assessment, regional center recommendations to the court.  The 4418 should be included in the packet." [Deposition of Sherrie Molina, pp. 77-78].  This is again excessive.

The documents specified on DDS's "Information Checklist and Referral for Placement Services for Persons with Developmental Disabilities," also require unnecessary and irrelevant information, for example, client income and assets, provision for payment for goods and services, health insurance information, and burial arrangements.  [AG0003196, 198; AG00031402-04]

PRP staff also complete a 4418.7 report as required under statute for anyone who is to be admitted to Porterville.  [Deposition of Sherrie Molina, p. 32].

Information collected in the 4418.7 report exceeds what is needed for admission for competency restoration.  As Ms. Percy testified in deposition, "[T]hey weren't just completed for individuals on 1370.1 charges, so it really was to capture the essence of their past history of who that person was we could assess their needs."  [Deposition of Dawn Percy, p. 129.]  She goes on to describe elements including what the defendant might want for housing.  She also offered, "I would be expecting again the most recent psychological eval [sic].  If there was some psychiatric components [sic] to that individual, I would expect to see a psychiatric evaluation.  I would expect to see placement history, to be able to see where these people have lived in the past, social worker history to find out just their background, socially, did they live with their parents, having lived with siblings, any educational information.  As I stated, for us, it is about the 1370.1 competency training, but we also do other treatment, and we want to be able to serve all components of that individual, so that gives us a perspective of the whole person." [Deposition of Dawn Percy, p. 195].  This is entirely unnecessary for IST admissions, especially considering that the individual may be incarcerated.

PRP also requires an interview of the defendant as part of the defendant's assessment [Deposition of Dawn Percy, p. 39].  However, there is also no reason to require an interview

of the defendant since they have already had a forensic evaluation by a licensed mental health practitioner.  Further, interview is not required by 4418.7 but only "if appropriate." Welfare and Institutions Code section 4418.7(b).  Ms. Molina testified that it takes one to two weeks or longer to get a court order permitting visitation of the IST defendant in jail in order to conduct the interview.  [Deposition of Sherrie Molina, pp. 55-56].  It then takes "a week or less – or, I mean, there are times it could be more" to get PRP staff in to do the interview after receiving the visitation order; about 75% of the time it takes less than a week, but rarely do they make it in within 4 days [Deposition of Sherrie Molina, pp. 67-68]. After the interview is complete, it generally takes PSP staff anywhere from a few days to a week to complete the 4418.7 report (Ms. Molina, who does about half the assessments generally completes her reports within 3 days; other PSP staff generally take up to a week). [Deposition of Sherrie Molina, pp. 75-76].

Sometimes the Regional Center includes many of the necessary documents at the time of referral to Porterville Regional Project but sometimes they send very few; the information may also come for other sources including the court and the District Attorney [Deposition of Sherrie Molina p. 79].

In my opinion, screening information related to suitability for community placement is unnecessary for those already committed to PDC.  Any such information collected prior to admission, e.g., through the 4418.7 process, should not be required for the PDC admission screening process.  This information can be collected after admission for those patients who may qualify for community placement from PDC subsequent to admission.

Theresa Billeci confirmed much of the content above in her deposition [Deposition of Theresa Billeci, p. 65-66].  Review of five redacted PDC admission packets suggests the information was primarily obtained by local regional center staff.  [AG00030274; AG00031069; AG00058836; AG00049103 AG00056866.]  They are very lengthy consisting of 59, 112, 104, 96, and 52 pages.

Once completed by the field evaluator, the assessment is reviewed and amended at DDS headquarters.  [Deposition of Dawn Percy, p. 139].  Such review and amendment are unnecessary and bureaucratic.  Sherrie Molina reported sending the packet to the Executive Director's office that then facilitated review by clinical staff [Deposition of Sherrie Molina pp. 48-49].  Theresa Billeci stated in deposition that this material is used to determine "which housing unit the individual would be placed on upon admission, whether or not we could safely serve them, clinically what are we looking at in terms of services and supports, are we the right place for them." [Deposition of Theresa Billeci, p. 61].  Then it is returned to the Executive Director's office, who must sign off.  Ms. Molina then arranges admission.  [Deposition of Sherrie Molina, pp. 48-51].

The Clinical Director may be asked to review packets to determine if defendants can be accepted for admission.  In one case, a packet was sent to a Clinical Director on 11/18/14 but was not accepted for admission until February 2015 [Deposition of Dawn Percy, pp. 102-103].  There is no reason a clinical review should take more than one working day.

Sherrie Molina stated that she is "trying to keep our admissions within 60 days … [b]ecause [she] was directed to [by] Dawn Percy." [Deposition of Sherrie Molina, pp. 61-62].

Sherrie Molina also stated there is no provision for acute admission to PDC that would allow prompt admission of those who are in imminent danger or gravely disabled [Deposition of Sherrie Molina, p. 193].

### C.    DDS Does Not Accept All ID IST Referrals

Those not already a consumer with a regional center are refused admission to Porterville. [Deposition of Dawn Percy, p. 34.]  Ms. Percy did not know whether any of these ID IST defendants were subsequently enrolled.  [Deposition of Dawn Percy, p. 35.]  However, one document reviewed during her deposition indicated that a defense attorney was seeking enrollment for a client [Deposition of Dawn Percy, p. 118].

Ms. Percy clarified that by "safely serve the individual" she meant that the individual did not pose a danger to other program participants.  When asked, "What would make someone unsafe to serve at the secure treatment program?" she testified:  "It would be putting others at risk that we currently have at Porterville secure treatment area, perhaps they might take advantage of individuals, and we have individuals that are less capable and this person has exhibited that they have harmed individuals in the community or they have some behaviors that would indicate our individuals currently would be vulnerable, then we would raise that is a safe-to-serve concern."  [Deposition of Dawn Percy, p. 185.]  She went on to say that she was "unaware of other areas besides our areas in DDS" that are able to safely serve a person who is not safe for PDC [Deposition of Dawn Percy, p. 185-186].  John Doyle testified that he knew of one such IST patient that had been placed in the community [Deposition of John Doyle, pp. 96-97].

# IX.   TREATMENT TO RESTORE COMPETENCY

This section outlines the essential components of treatment to restore competency regardless of setting.  A thorough review of the relevant literature, including differences related to setting, is included in APPENDIX D RESTORATION SERVICES.

### A.    Model Program

The American Academy of Psychiatry and the Law has identified elements of a competence restoration program [Mossman, et al., 2007 at S57-S58; see also Noffsinger, 2001]:

- Systematic competence assessment - assessments should "identify the specific deficits or problems that result in incompetence."
- An individualized treatment program.
- A treatment plan to address identified problems and deficits.
- Multimodal, experiential competence restoration education experiences. "Defendants are best able to learn when teachers present the material in multiple learning formats."  Specific recommendations include:  lectures, discussions, readings, and videos.  It adds that "mock trials and role-playing also enhance learning."

- Education about the legal process to include: "charges and their severity, sentencing, pleas and plea bargaining, roles of courtroom personnel, adversarial nature of the trial process, and understanding and evaluating evidence."
- Anxiety reduction - to help defendants manage pretrial and courtroom anxiety.
- Additional educational components for defendants with low intelligence – primarily by providing additional and repeated exposure to educational materials, including "individual instruction using simplified terminology."
- Periodic reassessment of competence – to promote prompt return for those found competent and to provide feedback to treatment team regarding whether additions to the treatment plan are needed.
- Medication – this is essential for most psychotic and mood disorders.  "For many incompetent defendants, attempting restoration without providing proper antipsychotic or mood-stabilizing medication is an exercise in futility."
- Capacity assessments and involuntary treatment – to assess competence to give consent to medications and other forms of treatment and utilize local statutes and policies regarding involuntary treatment of the incompetent.

### B.    Medications Are Effective

45-65% of those found IST suffer from schizophrenia and other psychotic disorders [Gerbasi & Scott, 2004].  Research demonstrates the efficacy of antipsychotics, including when involuntarily administered [Cochrane, et al., 2013] and that reduction in psychotic symptoms is associated with competency restoration [Advokat, et al., 2012].  Medications are likely the most effective tool in restoration [Carbonell, et al., 1992].  However, they are not effective for cognitive deficits such as dementia and intellectual disability.

### C.    Psychoeducation Is Likely Effective

Legal psychoeducation programs, group and individual, are also likely effective but research does not clearly demonstrate a preferred program [see Zapf & Roesch, 2011 and Zapf, 2013 for reviews].  The data are sound enough that these services are recommended by experts in the field.  In addition, they provide information to the treatment teams regarding progress towards restoration to competence.  It is the only reasonably effective approach for those with ID.

# X.    ADEQUACY OF IST TREATMENT SERVICES IN CALIFORNIA

If restoration services are inadequate, this will increase length of stay, thereby reducing overall system bed availability and, if there are insufficient beds to compensate for this, delay admissions.  This calls for examination of the treatment services in state hospitals, PDC, community treatment facilities, and CONREP in light of the elements needed to restore competency detailed in the model program above.  This contemplates not only the content of the programs but their capacity, for even if the program elements are present, if

there are not enough seats in the classrooms or staff to meet the demand, length of stay will be increased.

There was no evidence in the materials that any setting had a formal model of treatment for competency restoration.  From documents and deposition, it is clear that some competency-specific psychoeducation is provided at DSH hospitals, JBCT programs, CONREP community-based settings, and PDC.  The capacity of these programs and the actual dosage and type of treatment was not specified except in a study of the San Bernardino JBCT program [Rice & Jennings, 2014].  Thus, for almost all settings it is only possible to say that some degree of competency-specific treatment is occurring.

General treatment services are available at each setting sufficient to meet national accreditation standards (Joint Commission on Accreditation of Healthcare Organizations) at DSH hospitals and state licensure for PDC.  General outpatient services are available through CONREP and DDS but the data are not sufficient to determine the quality or dosage of these services. JBCT program contracts provide for basic mental health treatment.  See APPENDIX C CALIFORNIA TREATMENT SERVICES for details.

# XI.   LENGTH OF STAY & RESTORABILITY

This section reviews the literature on length of stay for the IST and the factors that predict restoration to competency to stand trial.

## A.     Average Length of Treatment for Restoration

Average length of treatment (the LOS, for those in institutional settings) to restore competency varies depending on the type of setting as discussed above.  Looking across studies and settings, it takes "...an average of 90 to 120 days for most persons to be restored" [Gowensmith, et al., 2016, p. 294 citing a large meta-analytic study by Pirelli & Zapf following up their 2011 study that was presented on March 20, 2015 at the annual meeting of the American Psychology – Law Society, San Diego, CA.].  This general time frame for restoration has been a consistent finding in the literature.

Note that average LOS is not the same as time to restoration as some patients are returned to court as unrestorable or have reached the statutory maximum for commitment.

## B.     CA Statute Requires Opinion on Restorability at 90 Days

Limiting commitment times for the unrestorable is important to reduce unproductive use of resources and to ensure that commitment bears a reasonable relationship to the purpose of the commitment, in this cases restoration to competency.  Exploration of the literature demonstrates that there is converging research on factors associated with unrestorability. [Colwell & Gianesini, 2011; Rotter, 2011.]  Forensic evaluators should make recommendations regarding restorability using this information.

Clinical variables have larger effect than demographic or criminal justice variables [Colwell & Gianesini, 2011, at 297; Rotter, 2011, at 307.]  In general, older defendants, those with chronic psychoses, and those with intellectual disability are less likely to be restored.  For a more detailed discussion, see the Appendix.

### C.    LOS and Restorability

To understand the relationship between length of stay and restorability, it is important to observe that longer LOS (or duration of treatment) is associated with progressively lower success in restoration [Colwell & Gianesini, 2011, at 302, Morris & DeYoung, 2014, at 84.] But continued efforts to restore competency do continue to produce findings of competency [Nicholson, Barnard, Robbins, & Hankins, 1994, at 374] which may continue up to about 3 years, after which the possibility of restoration is increasingly small.  [Morris & DeYoung, 2014, at 84, 86.]  In a study of 455 IST patients in Indiana, 81.3% were restored within 6 months.  [Morris & DeYoung, 2014, at 83.]  The below graph shows the outcomes of the 81 of 455 that were not restored within six months.  [Morris & DeYoung, 2014, at 83.]  Ultimately, 93% of the 455 were restored.  The graph depicts the diminishing likelihood of restoration as length of stay increases.  The authors' analysis suggested that, from a mathematical perspective, 18 months was the optimal maximum time for competency restoration [Morris & DeYoung, 2014, at 83-84] [Note:  The upper line is those that the forensic examiner found competent to stand trial and the lower line are those actually adjudicated.]



# XII.  LENGTH OF STAY AND SUCCESSFUL RESTORATION IN CALIFORNIA

The average LOS is an indirect measure of adequacy of services; it should be comparable to other systems.  A more detailed discussion is included in APPENDIX C CALIFORNIA LOS AND RESTORATION.

A review of all studies shows variation, but mean LOS is typically 5-7 months [Renner, et al., 2017, at 23], though more recent studies tend to show shorter times.  For example, in a recent study of one system, the average LOS was 116.3 days [Colwell & Gianesini, 2011, at 302.]

State hospital LOS reported by DSH is similar but somewhat longer than reported above in the section ANALYSIS OF DATA PROVIDED BY CALIFORNIA.  The DSH: Incompetent to Stand Trial - July, 2016 Memo, at 1, reported that the average LOS for all IST patients in 2014-15 was 178.2.  It noted further that the average LOS decreased from 203.9 to 155.8 (24%) in the five years prior to July 2016.  [DSH: Incompetent to Stand Trial - July, 2016 Memo, p. 7.]

However, George Maynard stated in deposition that the "ADT" (Admission, Discharge, and Transfer) system tracks transfers and any release from a DSH hospital as a discharge [Deposition of George Maynard p. 73].  So, many who were counted as discharged were actually transferred and some may have gone back to jail and returned on the same case number, still incompetent.  As a result, the LOS data may slightly underestimate actual LOS.

DDS does not regularly collect data on LOS.  In his deposition, Dwayne LaFon stated that he did not know whether the LOS had changed from a sample of 35 IST patients reviewed prior to the expansion to 211 beds at PDC.  [Deposition of Dwayne LaFon, pp. 157-160.]  At that time, this sample showed an average LOS of 0.82 years (299.3 days) [Deposition of Dwayne LaFon, pp. 160].

CONREP performs more poorly than most other state's community-based competency restoration programs.  [Gowensmith, et al., 2016, at 299.]  Only 35% restored to competence compared to an average of 70%.  [Gowensmith, et al., 2016, at 299.]  12% were determined unrestorable, slightly lower than the average of 20.3%.  [Gowensmith, et al., 2016, at 299.].  The length of time to restoration was 320 days, much longer than the average of 149 days.  [Gowensmith, et al., 2016, at 299].

DSH, CONREP, and DDS do not collect regular data on the success rate of competency restoration treatment.  What limited studies exist suggest a slightly lower than average restoration rate.

The Sacramento JBCT program provided some data that was too limited and incomplete to interpret.  The email From Andrea Javist to Matthew Garber, et al. dated 1/5/16 and the associated Letter from Andrea Javist to Matthew Garber and Mark Grabau dated 1/5/16 includes a statement that the average LOS from admission to competency restoration for the Sacramento JBCT program was 44 days [AG00017794, at AG00017795]; however, inspection of the underlying data shows that of the 22 patients admitted 10/15-12/15, only 6 were restored, and their average LOS was 31 days.  [AG00017794, at AG00017794;

AG00017797, at AG00017797-98.]  But of the remaining 16, 8 already had a LOS of more than 60 days.  [AG00017797, at AG00017797-98.]  In short, it is not clear what the actual LOS is for this program.

The only interpretable data available for JBCT programs comes from San Bernardino and Riverside Counties.  A published study showed that 55% were restored in an average of 57 days [Rice & Jennings, 2014, at 64.]  However, 45% were referred to state hospitals, primarily those with psychotic disorders.

Liberty Healthcare Corp also produced a series of reports from Riverside and San Bernardino JBCT programs through November 2015 [AG00015944; AG00025808; AG00025736; AG00025798; AG00025773; AG00038337.]  The following table summarizes the findings:

| | San Bernardino | Riverside |
|---|---|---|
| Total number admitted to program | 416 | 166 |
| Number transferred to state hospital | 167 | 69 |
| Average daily population | 18 | 17 |
| Average time to receiving packet of information | 11 days | 10 days |
| Average time on wait list for JBCT program | 19 days | 15 days |
| Average LOS of those restored by the JBCT program | 58 days | 60 days |
| Average LOS in JBCT program prior to transfer (wait time from referral to transfer in parentheses) | 90 (32) days | 105 (44) days |
| Of those discharged, the percentage restored | 57% | 49% |
| Of those discharged, the percentage transferred to a state hospital | 43% | 51% |

From this table, about half of those admitted to the JBCT programs are not restored there but sent to a state hospital.  Of those restored, the average LOS is about two months.  Given that the average LOS prior to recommending transfer is about the same, it is clear that the more difficult to restore patients are being sent to the state hospital, artificially inflating the success rate of these programs.  But it is important to state that it is entirely appropriate for JBCT programs to transfer those that are not quickly restored; the point is that it is incorrect to say that these programs do a better job of restoring competence to stand trial than hospitals.

# XIII. OTHER POTENTIAL SOURCES OF ADMISSION DELAY IN CALIFORNIA

## A.    Forensic Evaluations

Forensic evaluations may contribute to increased LOS by not being done timely, in not providing feedback to guide treatment, and/or being poor quality.

Unfortunately, the state does not appear to track timeliness of forensic evaluations, so it is not possible to determine if this is contributing to LOS. The document DSH Clinical Staffing Study, Staffing Methodology Proposal, Forensic Services Department dated September 2015 addressed the staffing of forensic evaluators. [AG00013155.] It included an assumption in table 3.1 that forensic evaluations of those found IST will only be done every six months as required by statute, thus not providing for timely evaluation by a forensic evaluator (alienist). [AG00013155, at AG00013172.] Correspondingly, Michael Barsom noted in deposition that treating clinicians render opinions regarding competency restoration rather than forensic evaluators [Deposition of Michael Barsom 11/1/17, p. 19], which is inconsistent with best practice. [Mossman, et al., 2007.]

In DDS, Theresa Billeci stated that a psychologist made competency determinations [Deposition of Theresa Billeci, pp. 138-39]. It was not clear whether this was a treating psychologist or a forensic evaluator.

Periodic evaluation is a part of a comprehensive competency restoration program. Not only does it result in prompt return of those restored to competency, it also provides feedback to the treatment team on progress towards restoration and helps identify treatment targets. [Noffsinger, 2001, at 361; Mossman, et al., 2007, at 36.] DSH has begun to develop a process for treatment teams to evaluate progress monthly, beginning at Metropolitan and possibly intended for expansion to Patton, including use of a competency assessment instrument, often the Fitness Interview Test - Revised [e.g., Deposition of Michael Barsom 11/30/17, pp. 74-88, 104-05]. This is an important process but does not take the place of an independent, formal forensic evaluation.

Evaluations must address competency to stand trial, appropriateness of medications, whether medications are likely to restore competence, side effects of medications, alternative treatments, capacity to consent to medications, dangerousness, and unrestorability. In studies of forensic evaluations, quoted in Incompetent to Stand Trial – Meeting the Demand, a presentation given at the Head Public Defenders Meeting on October 27, 2017, Dr. Barbara E. McDermott found that forensic evaluations were often incomplete. [AG00063070, at AG00063103-12.]

For a detailed discussion of these issues, see APPENDIX C CALIFORNIA FORENSIC EVALUATIONS

## B.      Unused Community-Based Restoration Capacity

AB 2190, section 2 (2014) broadened court discretion to order community-based restoration in some circumstances.

Mark Grabau stated in deposition that of 630 to 650 patients enrolled in CONREP, only 25 to 35 are IST [Deposition of Mark Grabau, p. 33].

Further demonstrating underutilization of community-based restoration, a study of states' data indicated that CONREP treated 20-50 defendants per year for restoration to competency as of 2014 [Gowensmith, et al., 2016, at 297.]

CONREP serves IST and other commitment statuses and is underutilized for these populations, which both impacts bed capacity at the state hospitals that could be utilized for IST patients and reduces opportunities for the IST to be treated in community-based

settings.  The 2016 DSH Bed Utilization Study noted a shortage of housing as one reason CONREP is underutilized:  "The first bottleneck, reported by staff at Atascadero, Napa, Patton and Metro, concerned discharges to CONREP.  There is currently a delay in patients being discharged to the CONREP program despite having met CONREP readiness guidelines.  Patients who have been accepted by CONREP may remain in a state hospital past their scheduled discharge date while waiting for an appropriate community housing bed to become available.  Staff reported that it was not unusual for a patient to wait up to six months for a CONREP bed, with the longest wait time approximately nine months and the average around three to four months."  [AG00013833, at AG00013879.]  (pg. 45).  This is clearly a substantial problem.

DDS also treats very few in community-based settings.  In deposition, Sherrie Molina testified that only "about five a year" are referred from PDC for community-based treatment [Deposition of Sherrie Molina, pp. 17-18].  Theresa Billeci testified that when referral packets were sent for review that included a recommendation for community-based treatment, DDS would "…clinically look at the packet.  If there's agreement there, then we contact our legal team at DDS," [Deposition of Theresa Billeci, p. 101], presumably to facilitate court review.

## C.    Unused JBCT Capacity

The DSH: Incompetent to Stand Trial - July, 2016 Memo states:  "The 76-bed San Bernardino County JBCT expansion, activated on June 1, 2015, was created as a regional JBCT to treat ISTs from Los Angeles and other counties.  Until March 2016, it operated at an average census of approximately 40 patients.  Utilization of a JBCT bed for a county's IST defendants requires full cooperation and coordination among a county's stakeholders (Courts, Public Defenders, District Attorney, Sheriff, and Community Program Director).  DSH has experienced difficulty gaining full cooperation of regional county stakeholders regarding JBCT expansions due to multiple factors.  Processes must be established for transfer of screening documents and patient records between the feeder county and regional provider.  The court procedures for referral to the JBCT for screening and commitment must be coordinated with the JBCT as well.  In addition, patients are screened by the receiving county's sheriff and concurrent processes between the county sheriffs for custody screens (to screen out highly assaultive patients) and medical screenings must be established.  This has delayed full utilization of new JBCT programs.  Regional JBCT programs also require transportation agreements between the participating counties which make it difficult to expand regional programs to more distant counties."  [AG00043162, at AG00043170-71.]  It is clear from the foregoing that there is unused capacity here, though the number of unused beds is small and insufficient to address the unmet system need.

## D.    Delays in Securing Involuntary Medication Hearings

Securing involuntary medication for those who refuse is one of the most critical components for restoring competency given that medications are the most effective tool for restoration.  This necessitates timely assessment referral to court once the need is established.  Delays in securing involuntary medication orders are costly owing to excessive bed usage.  [Kelly, et al., 2002, at 181-82.]

A study done by UC Davis quoted in the Second Declaration of George Maynard in Support of Department of State Hospital's Renewed Motion to Set Aside Hofman Order found that upon admission, 72.2% of IST defendants had an involuntary antipsychotic order. [AG00063755, at AG00063758.]  This leaves a substantial potential pool with no order and a large number who may need another court hearing to continue involuntary treatment.

The document DSH Clinical Staffing Study, Staffing Methodology Proposal, Forensic Services Department dated September 2015 noted that DSH staffing models did not account for the time necessary to manage this workload.  [AG00013155, at AG00013157-58, AG00013160-61.]  The proposed staffing model would add substantial psychiatric and other staffing to support this function (59 total positions at the time of this study). [AG00013155, at AG00013178.]  This strongly suggests that there are deficiencies in this area, but again the magnitude of the problem in terms delay or bed usage is unknown.

## E.    Delays in Transport to Court

This is a known source of potential delay [Christy, et al., 2010, at 708-09, 714] over which the state has no direct control.  The county transports a defendant to the selected facility. [Deposition of Matthew Garber, p. 110; Deposition of George Maynard, p. 97.]  In deposition, Ms. Prothero and Mr. Maynard reported that timely transport was not a significant problem for scheduled admissions and thus cannot account for the waiting list [Deposition of Amy Prothero, pp. 47-48; Deposition of George Maynard p. 97.]

AB 2625 (2014) requires return to court of those deemed both restored and unrestorable within 10 days of determination and of those deemed unrestorable no later than 90 days prior to the expiration of the defendant's term of commitment.  The DSH: Incompetent to Stand Trial - July, 2016 Memo noted, "counties are generally picking up the IST defendants within the mandated 10-day timeframe."  [However, Patricia Tyler testified that it was not uncommon at Napa for there to be issues with counties picking up IST defendants within the 10-day timeframe and stated that at the time of deposition, there were "about 20 patients beyond the ten-day period," and that it can be "quite a number of months" until a defendant is picked up in some instances [Deposition of Patricia Tyler, p. 79.]

The 2016 DSH Bed Utilization Study similarly noted that "[h]ospital staff reported that there is often a delay in discharging IST patients.  Once a patient is restored to competency they are required to be taken back by the county within ten days, and this usually occurs. However, it was recently added to statute that counties must collect patients within ten days once they have been found unlikely to be restored, and counties are not always in compliance."  [AG00013833, at AG00013877.]  (pg. 42).  Given that the vast majority of IST patients are restorable, this is unlikely to consume substantial bed-days.

In summary, there is no evidence that delays in transport to court are a large contributor to LOS and thus the waiting list.

## F.    Unfilled Beds

The document DSH, 2015-16 November Estimate, Program Update, Population and Personal Services Adjustments projected a 10.09% increase in census between June 30, 2014 and June 30, 2015 and a 12.66% increase from June 30, 2014 to June 30, 2016. [AG00009352, The vast majority of this increase was projected to be due to the IST

population.  These were revised downward in the May Revision to 8.84% (435 beds needed by 6/30/15) and 10.83% (533 additional beds needed by 6/30/16).

Per the 2016 DSH Bed Utilization Study, DSH has 6916 licensed beds with 909 held open (e.g., for acute admissions) or closed, yielding a functional capacity of 6007 beds. [AG00013833, at AG00013841.]  Occupancy as of January 2016 was 95.6% of functional capacity.  [AG00013833, at AG00013841.]  This study stated that "[t]arget hospital occupancy is considered to be around 85%, above which negative patient outcomes have been demonstrated."  [AG00013833, at AG00013841.]  While the report did not indicate why this is so, it intimates that it is related large unit size (ranging from 38 to 53 beds). [AG00013833, at AG00013841.]  The report detailed the various populations' bed usage. As noted previously, 21% of beds are occupied by IST patients.  The report detailed a number of recommendations to improve bed utilization.  It is beyond the scope of this report to address these recommendations.  I saw nothing to suggest the report was not sound.

The table entitled DSH Bed Capacity Data as of April 1, 2016 showed that on that date, there were 7491 open state hospital beds of which 7071 were available (i.e., not closed or held) [note that this number is higher than the licensed beds reported above]. [AG00009259, at AG00009262.]  The census was 6803.  [AG00009259 , at AG00009262 .] Thus, there were 268 vacant available beds and 688 vacant open beds.  [AG00009259 , at AG00009262 .]  96.2% of available beds were filled.  [AG00009259 , at AG00009262 .]

Records reviewed in Dawn Percy's deposition demonstrated that PDC was under their census cap, at least at times.  For example, in August of 2016, the census was 206 with a cap of 211.  [Deposition of Dawn Percy, pp. 156-57].  If this data point is representative, this indicates that PDC is running very close to capacity and that there is little evidence of underutilization of beds.

In summary, while there may be some inefficiencies in bed usage, it appears that both PDC and DSH facilities are running near or over reasonable occupancy.

## G.    Inadequate Data

Throughout this report, I have noted missing information essential for evaluating the performance of the California programs for competency restoration.  This seriously hampers the ability of the state to determine where to apply its efforts and resources.

One thing is clear:  efforts thus far have not resulted in prompt admission of the incompetent to DSH and DDS facilities.

Indirect measures, such as average length of stay, provide some measure of the adequacy of treatment.  However, the lack of data on the rate of successful restoration limits the value of the LOS data.  The fact that no such data was reported is highly problematic.  It demonstrates a focus on limiting bed usage rather than accomplishing the mission.  This is especially concerning given that the literature clearly demonstrates that longer stays can restore competency for up to three years, albeit with progressively diminishing returns.

January 25, 2018                 Expert Report of Bruce C. Gage, M.D.                     Page 43

Respectfully submitted,

Bruce C. Gage, M.D.

# XIV  APPENDIX A

## Bruce C. Gage, M.D.
### *Curriculum Vitae*

Drug Enforcement Agency Number:  BG0377742, expires 9/30/19
National Provider Identifier:  1619942489
Specialty Certification: Board Certified in Adult Psychiatry, June 1989 (No. 32747) – no recertification required
   Board Certified in Forensic Psychiatry, initial certification October 1994, recertified 2003, 2013 (No. 078)

**Work:**        Chief of Psychiatry
        Washington State Department of Corrections, Health Services Department
        Clinical Associate Professor, University of Washington Department of Psychiatry and
           Behavioral Sciences
        Street: 7345 Linderson Way SW
           Tumwater, WA  98501
        Mail:  PO Box 41123  MS: 41123
           Olympia, WA  98504-1123
        (360) 725-8693 (DOC business)
        (360) 507-1374 (DOC cell)
        (360) 586-9060 (DOC FAX)
        bcgage@doc1.wa.gov (DOC business)
        gage@u.washington.edu (UW business)

        Private Practice of General and Forensic Psychiatry
        Puget Sound Mental Health PS, Inc. (EIN 46-4608592)
        6108 Community Place S.W., Suite 3
        Lakewood, WA  98499
        (253) 653-6683 (private practice)
        (253) 581-1425 (private practice FAX)
        Gage@PugetSoundMentalHealth.com (private practice)

**Previous employment:**
        The Center for Forensic Services at Western State Hospital
        The Washington Institute for Mental Illness Research and Training & University of
        Washington
        Tacoma, WA  98498-7213, 1990-2008
        Positions held:  Program Director, Center for Forensic Services (1990-2003);
           Director, Electrophysiology Laboratory (1992-2003); Program Director,
           UW/WSH Forensic Psychiatry Fellowship, University of Washington School
           of Medicine (1998-2008); Supervising Psychiatrist, CFS (2003-2006);
           Forensic Psychiatrist (2006-2008)

        UCLA and Sepulveda Veterans Administration Medical Center
        Los Angeles, California, 1988-1990
        Assistant Clinical Professor, Department of Psychiatry & Staff Psychiatrist

**Education:**    B.S. (Chemistry) 1979; Massachusetts Institute of Technology; Cambridge, MA
        M.D. 1983; University of Washington; Seattle, WA

January 25, 2018          Expert Report of Bruce C. Gage, M.D.          Page A-2

Postdoctoral Fellow 1983-1984; Cardiovascular Physiology; University of Washington; Seattle, WA

Medical Intern 1984-1985; Cambridge Hospital; Harvard Medical School; Cambridge, MA

Psychiatry Resident 1985-1988; Cambridge Hospital; Harvard Medical School; Cambridge, MA

Chief Psychiatric Resident 1987-1988; Metropolitan State Hospital; Waltham, MA; Instructor in Psychiatry; Harvard Medical School; Cambridge, MA

**Experience:**

Medical school thesis project on the impact of alexithymia on hypertension.  1982-1983

Post-doctoral research: influence of behavior on the CNS control of blood pressure.  1983-1984

Teaching Assistant for physiology and biophysics graduate course in neuroanatomy. 1983-1984

Research during residency on the prediction of violence and clinical criteria used for commitment.  Included grant writing and questionnaire development.  1987-1991

Forensic psychiatry evaluations of fitness for duty, dangerousness, disability, malpractice, competency, criminal responsibility (both insanity and *mens rea*), conditional release, and other matters: Cambridge Court Clinic, Metropolitan State Hospital, Western State Hospital, and private practice.  1987-present

Multi-center research project on the D2-selective antipsychotic savoxepine. 1989-1990

Research through the Washington Institute on assessment of violence and recidivism in the mentally ill offender population.  August 1990-2004

Neuropsychiatric and forensic consultant to the Alaska Psychiatric Institute and Harborview Developmental Center.  March 1991-1998

Private forensic practice in criminal, civil, and correctional matters.  1993-present

Psychiatric consultant to the Washington State Department of Corrections through a contract with the University of Washington.  1993-2003

Site Coordinator, MacArthur Foundation research project on competency to stand trial assessment instrument (MacCAT-CA).  1995-1997

Expert for APA Expert Opinion Survey of Psychiatric Evaluation of Adults.  2011

Mental Health Expert, Farrell v. Beard. 2011-2016

Mental Health Expert, US v. County of Los Angeles and Los Angeles County Sheriff Jim McDonnell.  February 2015-present

Mental Health Expert, Gray v. County of Riverside.  March 2015-present

Mental Health Consultant to Pew Charitable Trusts.  June 2016-October 2017

**Awards and Honors:**

Chapter author for <u>Confidentiality Versus the Duty to Protect</u>, Guttmacher award winner, 1991
Outstanding Employee Award, Department of Social and Health Services, 1994 & 1995
Newcomers Award, Community Action for the Mentally Ill Offender, 1996
Delbert M. Kole Outstanding Public Psychiatrist Award, Washington State Association of Community
Psychiatrists, 2002
Washington Governor's Award for Leadership in Management, 2010
Chapter author for <u>The Oxford Textbook of Correctional Psychiatry</u>, Guttmacher award winner, 2016
Fellow of the American Psychiatric Association, 2018

**Grants:**

Site Coordinator, HRSA grant: *Integrated Mental Health: IPE Infrastructure Development in DNP Education*, 2014-present

**Affiliations:**

American Psychiatric Association
American Academy of Psychiatry and the Law
  Psychopharmacology Committee member
  Grant reviewer
Washington Psychiatric Association

**Teaching Responsibilities:**

Conduct seminars for post-doctoral fellows in forensic psychiatry and psychology
Teach resident seminars in clinical, forensic, correctional, and emergency psychiatry

**Invited Lectures and Teaching Responsibilities:**

Degenerative Diseases of the Brain—UCLA medical student lectures, 1989-1990

A History of Psychological Theory from the Enlightenment to Freud—UCLA psychiatric residents' didactic, September 1989

Neuroanatomy of Cognition—UCLA geropsychiatry lecture series, February 1990

Forensic Psychiatry—Lecture for Community Psychiatry Seminar at the University of Washington and Alaska Psychiatric Institute, November 1991 and August 1992

Psychiatrists as Cops—Lecture for senior psychiatric residents at the University of Washington and students and faculty at Washington State University, February 1991, March 1992, December 1992, May 1993

Sub-Cortical Dementias—Alaska Psychiatric Institute/Harborview Developmental Center Continuing Medical Education, March 1991

Late Onset Schizophrenia—Alaska Psychiatric Institute Continuing Medical Education, August 1991

Character Disorders—Western State Hospital Continuing Medical Education, November 1991

Geriatric Psychopharmacology—Alaska Psychiatric Institute/Harborview Developmental Center

Continuing Medical Education, November 1991

Delirium—Western State Hospital and Alaska Psychiatric Institute/Harborview Developmental Center Continuing Medical Education, December 1991 and February 1992

The Right to Die—panel for Western State Hospital Continuing Medical Education, May 1992

Prediction of Dangerousness—lecture at the National Association of State Mental Health Attorneys Annual Conference, September 1992

Tourette's Syndrome—Alaska Psychiatric Institute/Harborview Developmental Center Continuing Medical Education, February 1993

Fetal Alcohol Syndrome—Alaska Psychiatric Institute/Harborview Developmental Center Continuing Medical Education, May 1993

Genetic Causes of Mental Retardation—Alaska Psychiatric Institute/Harborview Developmental Center Continuing Medical Education, August 1993

Monothematic Delusions: Phenomenology and Management—UW CME Lecture Series, October 1995

Risk Assessment/Risk Management—American Academy of Psychiatry and the Law annual meeting, October 1996

Forensic Mental Health Evaluations—Seattle University Law School, November 1998, October 1999

Mental Disease and Defect in Adults: Causation, Diagnosis, and Treatment—State Superior Court Judges' Conference, April 1999

Antisocial Behavior:  A Neuropsychiatric Perspective—DOC In-Service, November 1999

Mental Health Courts—Alaska Psychiatric Association annual meeting (with Judge Stephanie Rhoades), April 2000

Aesthetics and the Human Psyche—Alaska Psychiatric Association annual meeting, April 2000

Risk Assessment/Risk Management—Presentation to providers, judges, and law enforcement in Clatsop County, OR, September 2000

Basic Anatomy and Physiology of the Brain Related to the Dream State—Presentation to the American Academy of Forensic Sciences, February 2001

Risk Assessment—Presentation to the Washington State Bar Association (CLE), April 2001

Unusual Psychiatric Defenses—Presentation to the Washington State Bar Association (CLE), April 2001

Overview of DSM-IV—Presentation to case managers and masters clinicians, April 2001

Mental Health Experts in Criminal Cases, Including Commentary Relating to the Juvenile Court System—Presentation at the Washington Criminal Justice Institute (with Lynne Sullivan, Ph.D.), September 2001

Competency, Diminished Capacity, and Intentionality in Forensic Assessments—Presentation to Pacific Northwest Neuropsychological Society, September 2002

Integrating Risk Assessment/Risk Management Procedures into a Clinical Forensic Program—Presentation to National Association of State Mental Health Program Director's Forensic Division's annual meeting, September 2002

Competency to Stand Trial—Presentation to Alaska Public Defenders Training Conference, October 2002

Psychiatric and Psychological Issues & Neurological Issues—Presentations at "Through the Looking Glass: Mental Illness and the Law", a University of Washington Continuing Legal Education program, October 2002

Research Methodology—Presentation at the annual meeting of the American Academy of Psychiatry and the Law, October 2002

Civil Commitment—Presentation to the Seattle Forensic Institute, April 2003

How to Identify a Client with Mental Illness—Presentation at the Tenth Annual Washington Criminal Justice Institute, September 2003

Competency & Informed Consent; Legal Liabilities for the Professional—Presentation at Mental Health and the Law in Washington, January 2004

Primer on Conducting Involuntary Medication Hearings—Presentation at the Fall Conference of the Washington State Association of Municipal Attorneys (with Mike Finkle, J.D.), October 2004

Competency and Informed Consent:  The Law and the Role of the Clinician—CME for Franciscan Health System, June 2006

Is Evil Good for Psychiatry—Grand Rounds, UW Department of Psychiatry and Behavioral Sciences (with Lorna Rhodes, Ph.D.), June 2006

Competency and Informed Consent:  Passive Acceptors and Incompetent Refusal of Treatment—CME for Franciscan Health System, November 2007

Dim Rea:  Mental Health Evaluations of Diminished Capacity and *Mens Rea*—CLE, Department of Assigned Counsel, December 2007

Diminished Capacity:  Approaches to the Evaluation of *Mens Rea*—Presentation at the Symposium on Diminished Capacity Sponsored by The Washington Institute for Mental Health Research and Training, May 2008

Sentencing Policy for Mentally Ill Offenders—Panel at the National Association of Sentencing Commissions Annual Conference, August 2008

Youth in Corrections—Diverse Youth in Transition: Navigating a difficult Passage, presentation and Panel for the American Psychiatric Association's OMNA on Tour, September 2009

Correctional Psychiatry—Washington Department of Corrections Continuing Medical Education, October 2009

Leston Havens—for the Luminaries of Psychiatry lecture series sponsored by the University of Washington Department of Psychiatry and Behavioral Sciences, December 2009

Involuntary Psychotropic Administration:  The Harper Solution—American Correctional Health Services Association Professional Development Conference, March 2010

Securing the Body, Freeing the Mind:  Risk Oriented Treatment of the Mentally Ill Offender—Washington Behavioral Health Care Conference, May 2010

Risk Assessment—Co-Occurring Disorders and Treatment Conference, October 2010

Depression and Chronic Pain—Washington Department of Corrections Continuing Medical Education, October 2010

Effective Use of Older Psychotropic Medications—Washington Physician's Assistants Continuing Medical Education, November 2010

Changing Personality or Changing Behavior: Treating Cluster B Personality Disorder—Washington Behavioral Healthcare Conference (with Jude Bergkamp, PsyD, MA), June 2011

Interaction of Psychotherapy and Psychopharmacology—Washington Behavioral Healthcare Conference (with Bart Abplanalp, PhD & Julie Shinn, MA), June 2011

Delirium Is a Syndrome—Washington Department of Corrections Continuing Medical Education, September 2011

Setting Up an Involuntary Antipsychotic Administration Mechanism – The Harper Solution—National Correctional Health Care Conference, October 2011

Don't Panic: Panic Disorder in Medical Settings—Washington Department of Corrections Continuing Medical Education, September 2012

Reducing Liability When Using Physical and Chemical Restraint—Webinar for OmniSure Consulting Group, LLC, December 2012

Involuntary Administration of Antipsychotic Medication:  The Harper Solution—American Jail Association Annual Meeting, May 2013

Risk-Need-Responsivity and the Abandonment of the "One Size Fits All" Approach in Corrections and Offender Reentry—Panelist for Seattle University Criminal Justice Department conference entitled "Rethinking Criminal Justice and Mental Health: Evolving Policy in an Era of Risk Assessment and Evidence-Based Practice", May 2013

Personality Disorders—Washington Department of Corrections Continuing Medical Education (with Bart Abplanalp, PhD), September 2013

Personality Disorders—"HIV/AIDS in the Correctional Setting", continuing education sponsored by the Northwest AIDS Education and Training Center (with Bart Abplanalp, Ph.D.), February and March 2014

Working with the Potentially Violent Client—CLE for King County Public Defenders, July 2014

Competency and Informed Consent— Washington Department of Corrections Continuing Medical Education, October 2014

Personality Disorders:  A Developmental Perspective—Primary Care Conference CNE hosted by the University of Washington School of Nursing, October 2014

Prescribing Controlled Substances in Correctional Settings:  Ethics and the Standard of Care— American Academy of Psychiatry and the Law annual meeting, October 2014

Mental Health in the Washington Department of Corrections—NAMI Washington annual meeting, August 2015

Working with Challenging Personalities in the Primary Care Setting—Primary Care Conference CNE hosted by the University of Washington School of Nursing, November 2015

Borderline Personality Disorder in the Medical Setting:  Creating and Maintaining an Alliance— Primary Care Conference CNE hosted by the University of Washington School of Nursing, October 2016

Violence Risk Assessment—Washington State Psychiatric Association Fall University of Washington Series, September 2017

The Elderly in Correctional Settings—American Academy of Psychiatry and the Law annual meeting, October 2017

Annual didactics to fellows and residents on the following topics:  criminal responsibility, competency, risk assessment/risk management, right to treatment/right to refuse treatment, civil commitment, ethics, treatment of the violent patient, conditional release, psychopathy, correctional psychiatry and other topics.

**Publications:**

Refereed Journals:
Gage, B.C. and Egan, K.J. The Effect of Alexithymia on Morbidity in Hypertensives. Psychotherapy and Psychosomatics 41(3):136-144 (1984).

White, K.A.; Beck, J.C.; Gage, B.C. Emergency psychiatric assessment of violence.  American Journal of Psychiatry 148(11):1562-1565 (1991).

Kruh, I.P., Whittemore, K., Arnaut, G.L.Y., Manley, J., Gage, B., Gagliardi, G. The concurrent validity of the psychopathic personality inventory and its relative association with past violence in a sample of insanity acquittees. International J Forensic Mental Hlth 4(2):135-145 (2005).

Book Chapters:

Gage, B.C. The Violent Inpatient.  In Confidentiality Versus the Duty to Protect.  Beck, JC (Ed.). American Psychiatric Association press, Washington, D.C. (1991).

Gage, B.C. Working Inside the Walls.  In Oxford Textbook of Correctional Psychiatry. Trestman, R; Appelbaum, K; Mtezner, J (Eds.). Oxford University Press, New York (2015).

Other Publications:
Gage, B.C. and Smith, O.A.  Cardiovascular Responses to Microinjection of a Neuroexcitatory Amino Acid into Discrete Loci of the Rat Brain.  The Anatomical Record 208(3):58-59A (1984)

Gage, B.C. Book review:  Insanity:  The Idea and Its Consequences, Thomas Szasz.  Theoretical Medicine 12:183-185 (1991).

Gage, B.C., Harris, V., and Tomko, R.  Criminal Recidivism, Rehospitalization and Revocation of Release in Conditionally Released Insanity Acquittees.  AAPL Abstract, 10/95 meeting.

Kruh, I.P.; Arnaut; G.L. Y.; Gage, B.; Gagliardi, G. The psychopathic personality inventory:  a validation study with insanity acquittees. Presentation at the Biennial Conference of the American Psychology-Law Society meeting, 3/00.

Gage, B.C. Book review:  Principles and Practice of Forensic Psychiatry (2nd Ed.), Richard Rosner (ed.). Journal of Forensic Sciences 50(1):257 (2005).

Gage, B.C. The Growing Problem of Cognitive Disorders in Corrections. Iceberg 19(2) (2009). www.fasiceberg.org/newsletter.htm.

Gage, B.C.; Stern, M.  Setting Up an Involuntary Antipsychotic Administration Mechanism – The Harper Solution.  DVD through MHM production grant. 2010

Gage, B.C.  Reducing liability when using physical and chemical restraints.  Omnisure Risk Management Bulletin. 2014

# XV   APPENDIX B

This appendix includes a description of the methodology used to analyze the DSH and DDS data as well as the results of the analysis in graphs and tables.

## A.   METHODOLOGY

### DSH

The raw data for the analysis was provided by DSH in the spreadsheet AG00063723.xlsx which included all IST cases that had any date within the period 1/1/15-10/25/17. Presumably owing to the way the data was pulled from different DSH database views, there were multiple entries for the same individual, some of which were redundant while others had different information.  Data was pulled from the scheduling view as much as possible to minimize this problem.

The following are the fields (variables) in the spreadsheet and the definitions as understood from the depositions of George Maynard and Janna Lowder-Blanco.  Those marked with an asterisk were included in the analyses.  Values that were excluded are in parentheses, including a brief explanation of why.

Hospital* – name of admission hospital (only state hospitals admitting the IST were included)

Legal Class – only 1370 cases were in the spreadsheet

Controlling case number – "yes" means the number listed is the controlling

Program – programs internal to hospitals

Unit – units internal to hospitals

Exit Type – presumably the type of discharge or release; largely unpopulated

Person – name

Initiated – date the record initiated in the PaRTS database

Earliest Commitment Date* – the earliest commitment date for a case.  It was used to define a unique commitment for the person (only cases that had an earliest commitment date were included).

Scheduling Status* – marking whether a patient was admitted or not (only those cases that were marked as "admitted" were used for analysis)

Resident County – county of patient residence

Referring Source – this included other hospitals, presumably denoting transfers. This did not need to be used to exclude cases as referrals from other state hospitals were excluded by requiring a unique Scheduling ID for that admission.

Recommitment – presumably an indication of whether the patient had been previously committed

Date Completed* – date the admission packet noted to be completed

Approved Date* – date approved for admission

Scheduled Admission Date* – the date the patient was slated for admission.  This was used for the admission date because it proved more reliable than Admission Date because the Admission Date may have been connected to the wrong case

due to the way the data was pulled; Scheduled Admission Date came from the scheduling view.  Scheduled Admission Date and Admission Date were usually the same, differences were rarely more than a few days with the Scheduled Admission Date almost always earlier when different, as would be expected.

Previously Scheduled Date – presumably a scheduled admission date that was later changed; usually missing

Transport In By – not clear what this was as it was sometimes populated with dates and sometimes an entity

Packet Status – whether an admission packet was approved or in progress

Scheduling ID* – defines a unique commitment in the data.  One scheduling ID is one-to-one with person and commitment date in almost all cases.  (If there were multiple scheduling ID with one earliest commitment date, those cases were dropped - this is where hospital transfers were excluded.  This removed about 50 cases.)

Document Status – whether documents were in progress or collected

Accurate – presumably, the accuracy of the documents

Scheduling Packet – breakdown of scheduling ID perhaps allowing multiple packets for one scheduling ID

Court Case Number – unable to use because unable to assure that multiple admissions for the same court case was due to multiple commitments under one case number or an artifact of the table joining procedure to generate the spreadsheet

Date Received* – when admission packet information was received by state.  (This field came from Court Case view so many cases excluded by virtue of joining problem; could only be used when there was one commitment for a patient.  Decreases cases from 6400 to 2300 for analyses related to Date Received.)

Court – committing court

Commitment Date – similar to earliest commitment date but from court case view so created join problems.  Thus, analyses used Earliest Commitment Date as noted above.

Race – race

Out By Date – presumably, the potential discharge date; sparsely populated

Discharge Date* – date discharged from the hospital from scheduling view.  Comes from ADT database.  (For LOS analysis, cases were limited to those with a Discharge Date.)

Discharge County – presumably, the county where the patient would be released to; sparsely populated

Date Issued – from legal action view; not clear what this is

Hearing Date – from legal action view; presumably the date of any known pending court hearings

Admit By Date – from legal action view; presumably, the date by which a patient needed to be admitted

Admission Date – because from legal action view, this created joining problems so used Scheduled Admission Date as noted above.  It was very close (within a few days) to Scheduled Admission Date in cases where there are no join concerns.  This field was imported from the ADT database.

Response Due – unknown field; sparsely populated

Previous Hearing Date – unknown field; sparsely populated

Gender – gender

Committing County* – the county from which the patient was committed; used for by county analyses

With respect to the fields Date Received and Date Completed, Mr. Maynard noted that the former is the date any packet information is received by DSH and the latter is the date the packet is determined to be complete.  He noted that "[t]hey would always be different unless it's completed the same day." [Deposition of George Maynard p. 263].  Thus, the date completed could reflect either the date the complete information was received or the date on which it was reviewed and found to be complete.

Three primary analyses were conducted:  Time from court commitment to admission (time on the waiting list before admission), time from admission to discharge (LOS), and time from court commitment to packet received to packet approved (a measure of how long the admission screening process takes).  To identify the appropriate data for each of these analyses, the data were restricted and filtered as follows:

Step 1
- Scheduling Status = admitted
  - Assures that only those who were admitted were included in analyses
- Earliest Commitment Date not missing
  - Assures that there was a commitment order and associated date
- Only one Scheduling ID for each Commitment Date
  - Assures that admissions are assigned to the correct commitment

Step 2
- Remove duplicates until each Commitment Date has a unique value for Committing County and Hospital
  - Removes duplicate (redundant) cases (rows) for the variables analyzed – each of the remaining rows is now a unique commitment (case)

Step 3
- Extract from the cases from Step 1 all those unique commitments identified in Step 2
  - There were four cases excluded where Approved Date, Scheduled Admission Date, and/or Discharge Date were out of temporal order

Step 4
- Those with duplicate dates for Date Received were excluded

- This reduced the number of cases from about 6400 to about 2300 for the analyses of packet Date Received

Step 5

- Creates subsets of data for each of the following three analyses of interest:
  - Time from commitment to approval for admission to admission
    - Earliest Commitment Date, Approved Date, and Scheduled Admission Date must all be present (from Step 1) and in temporal order
  - LOS from admission to discharge
    - Scheduled Admission Date and Discharge Date must be present and in temporal order
  - Time from admission to receiving the packet to approval of admission
    - Earliest Admission Date, Date Received, and Approved Date must be present and in temporal order
    - An analysis of the temporal relationship between Date Received (the date packet information was first received), Packet Complete (the date the packet was declared complete), and Approved Date (the date the patient was approved for admission) was also conducted on this data set.

Analyses of the data sets produced by the above steps followed.

Step 1 – created subroutines providing analyses by county, by hospital, and total.

- These subroutines were then run for commitment to approval for admission, approval for admission to admission, admission to discharge, commitment to packet received, packet received to approval for commitment, and packet received to admission
- The commitment date was then restricted to remove the beginning and ending tails from the principle analyses as the tails skew the data.  The data from the tails are shown in separate graphs and tables.

  - Cases prior to 2015 were excluding, giving all complete cases from commitment to admission

    - Failure to exclude these cases would have made early cases appear to have longer wait times because cases from earlier quarters would have excluded short wait time cases whose commitment and admission date were prior to the date range of data pull while including cases with similar commitment dates but later admission dates that were in the date range of the data pull.

    - Note also that there were very small numbers of cases from Q4 2014 and earlier, making the completeness of this data suspect.

  - Late cases were included through Q2 of 2017 because the number of completed commitments cases dropped substantially in Q3 and Q4.  The numbers of cases for Q2 and Q1 of 2017 were similar so Q2 was retained.

- ▪ Failure to exclude these cases would have made late cases appear to have shorter wait times and LOS because long wait time and long LOS cases would have been excluded( i.e., cases still without admission or discharge dates at the time the data was pulled).

Step 2 – quarterly analysis
- Data were grouped by quarter to show changes over time
  - The tails were both included and excluded for completeness and to show the differences

  DDS

The raw data for the analysis was provided by DDS in the spreadsheet AG00065453.xlsx which included all IST cases from the inception of DDS spreadsheets used to track IST admissions.  The spreadsheet of cases prior to 7/1/12 were excluded because they used different variables than the later spreadsheet, included only 22 cases, and were remote in time.

The following are the fields (variables) in the spreadsheet and the definitions as understood from the field names and from the depositions of Dawn Percy and Theresa Billeci.  Those marked with an asterisk were included in the analyses.  Values that were excluded are in parentheses, including a brief explanation of why.

Admit Order –ordinal number according to admission date for all admitted patients
Pending – Unpopulated; outdated column; new tab in spreadsheet labeled "pending" where pending admissions are tracked
Order Pending – Unpopulated; outdated column; new tab in spreadsheet labeled "pending" where pending admissions are tracked
Name – patient name
RC – Regional Center
Date of order* – date of commitment order
Legal – statutory authority for admission (included only cases where this was 1370.1)
Current # Days on List (Pending) - Unpopulated; outdated column; new tab in spreadsheet labeled "pending" where pending admissions are tracked
Charges – charges for the pending court case; about half populated
Date of Arrest – date arrested for current case; sparsely populated
OSC Hearing Date – order to show cause hearing date
Date writ received – not clear what this is; only two cases have entries
County of Court Order* – committing court; more populated later in spreadsheet
Admission Date* - date of admission to PDC
Length on List Until Admission* – court order to admission date

The data were cleaned and filtered as follows. First, all redacted cases were removed.  All cases without an admission date were removed.  One case that was noted to have admission delayed due to health concerns (an outlier) was removed.  Once case that was

January 25, 2018          Expert Report of Bruce C. Gage, M.D.                    Page B-6

referred back to court because of a question whether the patient was incompetent was removed (also an outlier).  All cases with commitments after the earliest commitment date on the pending list were removed (except for the first case, an outlier with a notation on a competency dispute). This prevents bias that would be created by excluding cases not yet admitted which would have longer wait times than those already admitted.

## B.      RESULTS OF ANALYSES

January 25, 2018                              Expert Report of Bruce C. Gage, M.D.                                    B-7

# Porterville Developmental Center
## Wait Time for Admission by Commitment Date
### 7/31/12–9/20/17



Source:  DDS Data (AG00065453.xlsx)

Note:  Wait time is calculated as the number of days between the commitment date and the admission date to Porterville Developmental Center, "Date of Order" and "Admission Date (if applicable)," respectively.  Records for which commitment date entries or admission date are missing are excluded from the analysis.  Only data for inmates committed to Porterville between 7/31/12 and 9/20/17 are included.

# Porterville Developmental Center
# Wait Time for Admission by Quarter [1]
## Q1 2015–Q2 2017

| | 2015 | | | | | 2016 | | | | | 2017 [2] | | | Total [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | All | |
| Number of Commitments | 14 | 9 | 18 | 22 | 63 | 15 | 18 | 18 | 26 | 77 | 18 | 23 | 41 | 181 |
| Average Wait Time (days) | 212 | 169 | 129 | 87 | 139 | 74 | 71 | 64 | 60 | 66 | 54 | 53 | 53 | 89 |
| Median Wait Time (days) | 210 | 169 | 126 | 84 | 126 | 75 | 69 | 63 | 56 | 66 | 53 | 51 | 52 | 77 |
| Min Wait Time (days) | 169 | 151 | 83 | 37 | 37 | 42 | 15 | 34 | 14 | 14 | 13 | 25 | 13 | 13 |
| Max Wait Time (days) | 286 | 191 | 234 | 157 | 286 | 110 | 125 | 94 | 120 | 125 | 87 | 105 | 105 | 286 |

Source:  DDS Data (AG00065453.xlsx)

Note:

[1]  Wait time is calculated as the number of days between commitment date ("Date of Order") and admission date ("Admission Date (if applicable)") to Porterville Developmental Center.  Records for which commitment date or admission date are missing are excluded from this analysis.  Only defendants committed to Porterville between 7/31/12 and 9/20/17 are included.

[2]  The 2017 "All" column reflects data from Q1 and Q2 only.  The data also contained 9 completed commitments for Q3 2017, with a median wait time of 35 days.

[3]  The "Total" column reflects data between Q1 2015 and Q2 2017.

# Porterville Developmental Center
## Wait Time for Admission by Quarter for Front Tail of Data [1]
### Q3 2012–Q4 2014

| | 2012 [2] | | | 2013 | | | | | 2014 | | | | | Total [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q3 | Q4 | All | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | Q3 | Q4 | All | |
| Number of Commitments | 4 | 8 | 12 | 8 | 5 | 13 | 6 | 32 | 19 | 6 | 10 | 12 | 47 | 91 |
| Average Wait Time (days) | 246 | 251 | 249 | 316 | 276 | 327 | 339 | 318 | 323 | 391 | 315 | 247 | 310 | 305 |
| Median Wait Time (days) | 253 | 246 | 250 | 318 | 279 | 322 | 337 | 323 | 315 | 371 | 323 | 256 | 313 | 311 |
| Min Wait Time (days) | 223 | 223 | 223 | 290 | 247 | 241 | 329 | 241 | 301 | 345 | 287 | 162 | 162 | 162 |
| Max Wait Time (days) | 255 | 290 | 290 | 342 | 308 | 435 | 350 | 435 | 388 | 524 | 334 | 304 | 524 | 524 |

Source:  DDS Data (AG00065453.xlsx)

Note:
[1]  Wait time is calculated as the number of days between commitment date ("Date of Order") and admission date ("Admission Date (if applicable)") to Porterville Developmental Center.  Records for which commitment date or admission date are missing are excluded from this analysis.  Only defendants committed to Porterville between 7/31/12 and 9/20/17 are included.
[2]  Wait time data is not reported between 7/1 and 7/31 in Q3 2012.
[3]  The "Total" column reflects data between Q3 2012 and Q4 2014.

# Porterville Developmental Center
## Wait Time for Admission by County of Court Order [1]
### 7/31/12–9/20/17

| County | Number Admitted | Average Wait Time (days) | Median Wait Time (days) | Min. Wait Time (days) | Max. Wait Time (days) |
|---|---|---|---|---|---|
| Los Angeles | 77 | 150 | 101 | 10 | 379 |
| Sacramento | 19 | 134 | 82 | 34 | 369 |
| Contra Costa | 17 | 106 | 78 | 42 | 326 |
| Alameda | 12 | 124 | 92 | 42 | 324 |
| Riverside | 12 | 106 | 74 | 8 | 330 |
| San Diego | 9 | 108 | 82 | 63 | 334 |
| San Joaquin | 9 | 73 | 61 | 10 | 217 |
| San Bernardino | 8 | 109 | 66 | 20 | 312 |
| Lake | 7 | 186 | 62 | 49 | 388 |
| Butte | 5 | 142 | 124 | 68 | 278 |
| Tulare | 5 | 90 | 75 | 44 | 170 |
| Fresno | 4 | 91 | 52 | 42 | 82 |
| Marin | 4 | 57 | 53 | 25 | 143 |
| Orange | 4 | 69 | 37 | 21 | 264 |
| Solano | 4 | 157 | 144 | 35 | 304 |
| Sonoma | 4 | 60 | 57 | 14 | 111 |
| Ventura | 4 | 71 | 78 | 15 | 111 |
| San Mateo | 3 | 160 | 162 | 140 | 177 |
| Tehama | 3 | 121 | 62 | 43 | 259 |
| Humbolt | 2 | 66 | 66 | 51 | 80 |
| Kern | 2 | 233 | 233 | 215 | 250 |
| Placer | 2 | 65 | 65 | 54 | 76 |
| Toulumne | 2 | 60 | 60 | 27 | 93 |
| Yuba | 2 | 120 | 120 | 48 | 191 |
| Del Norte | 1 | 181 | 181 | 181 | 181 |
| El Dorado | 1 | 163 | 163 | 163 | 163 |
| Glenn | 1 | 81 | 81 | 81 | 81 |
| Imperial | 1 | 104 | 104 | 104 | 104 |
| Madera | 1 | 95 | 95 | 95 | 95 |
| Mariposa | 1 | 218 | 218 | 218 | 218 |
| Mendocino | 1 | 119 | 119 | 119 | 119 |
| Merced | 1 | 151 | 151 | 151 | 151 |
| Napa | 1 | 45 | 45 | 45 | 45 |
| San Francisco | 1 | 233 | 233 | 233 | 233 |
| Shasta | 1 | 66 | 66 | 66 | 66 |
| Sutter | 1 | 524 | 524 | 524 | 524 |
| County not provided [2] | 49 | 299 | 306 | 223 | 435 |
| **Total** [3] | **281** | **157** | **104** | **8** | **524** |

Source:  DDS Data (AG00065453.xlsx)

Note:
[1] Wait time is calculated as the number of days between commitment date ("Date of Order") and admission date ("Admission Date (if applicable)") to Porterville Developmental Center.  Records for which commitment date or admission date are missing are excluded from this analysis.  Only defendants committed to Porterville between 7/31/12 and 9/20/17 are included.
[2] Defendants with missing county information are aggregated under "County not provided."
[3] Total figures reflect all defendants with non-missing commitment and admission dates between 7/31/12 and 9/20/17.

# Summary of Wait Times for DSH Facilities
## at Stages of Commitment Process
## 11/5/13–10/5/17

| Stage | Sample Size | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Commitment to Admission | 6,413 | 74 | 69 | 1 | 719 |
| Commitment to Approval | 6,413 | 43 | 32 | 0 | 685 |
| Commitment to Packet Received | 2,311 | 17 | 10 | 0 | 444 |
| Packet Received to Approval | 2,311 | 22 | 15 | 0 | 209 |
| Approval to Admission | 6,413 | 30 | 22 | 0 | 243 |
| Packet Received to Admission | 2,311 | 53 | 49 | 1 | 320 |
| Admission to Discharge | 4,982 | 111 | 91 | 0 | 653 |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded for Commitment to Admission, Commitment to Approval, and Approval to Admission statistics. Inmates with missing "Discharge Date" are also excluded from Admission to Discharge statistics. Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded from Commitment to Packet Received, Packet Received to Approval, and Packet Received to Admission statistics.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded from Commitment to Packet Received, Packet Received to Approval, and Packet Received to Admission statistics.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded from all statistics.  Observations are limited to those with a "Scheduling Status" of Admitted.

# Summary of Wait Times for DSH Facilities
# at Stages of Commitment Process
## Q1 2015–Q2 2017

| Stage | Sample Size | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Commitment to Admission | 5,805 | 71 | 67 | 1 | 326 |
| Commitment to Approval | 5,805 | 42 | 31 | 0 | 278 |
| Commitment to Packet Received | 2,123 | 17 | 10 | 0 | 215 |
| Packet Received to Approval | 2,123 | 22 | 15 | 0 | 187 |
| Approval to Admission | 5,805 | 29 | 21 | 0 | 196 |
| Packet Received to Admission | 2,123 | 52 | 48 | 1 | 320 |
| Admission to Discharge [1] | 4,982 | 111 | 91 | 0 | 653 |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded for Commitment to Admission, Commitment to Approval, and Approval to Admission statistics. Inmates with missing "Discharge Date" are also excluded from Admission to Discharge statistics. Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded from Commitment to Packet Received, Packet Received to Approval, and Packet Received to Admission statistics.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded from Commitment to Packet Received, Packet Received to Approval, and Packet Received to Admission statistics.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded from all statistics.  Observations are limited to those with a "Scheduling Status" of Admitted.
[1]  The 75th percentile of Admission to Discharge times is 153 days and the 90th percentile of Admission to Discharge times is 217 days.

# Distribution of Wait Times for Admission for IST Inmates at DSH Commitment to Admission
## 11/5/13–10/5/17



Source:  PARTS DSH Data (AG00063723.xlsx)
Note: The wait time is calculated by subtracting the earliest commitment date from the scheduled admission date.  Wait times greater than 250 days are grouped into the 250 day bucket.  The dotted line represents the mean wait time.

# Distribution of Wait Times for Admission for IST Inmates at DSH
## Commitment to Admission
## 2015



Source:  PARTS DSH Data (AG00063723.xlsx)
Note: The wait time is calculated by subtracting the earliest commitment date from the scheduled admission date.  Wait times greater than 250 days are grouped into the 250 day bucket.  Year is the year of commitment.  The dotted line represents the mean wait time.

# Distribution of Wait Times for Admission for IST Inmates at DSH
## Commitment to Admission
## 2016



Source:  PARTS DSH Data (AG00063723.xlsx)
Note: The wait time is calculated by subtracting the earliest commitment date from the scheduled admission date.  Wait times greater than 250 days are grouped into the 250 day bucket.  Year is the year of commitment.  The dotted line represents the mean wait time.

# Distribution of Wait Times for Admission for IST Inmates at DSH Commitment to Admission
## 2017



Source:  PARTS DSH Data (AG00063723.xlsx)
Note: The wait time is calculated by subtracting the earliest commitment date from the scheduled admission date.  Wait times greater than 250 days are grouped into the 250 day bucket.  Year is the year of commitment.  The dotted line represents the mean wait time.  Data for 2017 is incomplete.  It does not contain commitments for inmates who had not been admitted at the time of the data pull in October 2017.

# Distribution of Wait Times for Admission for IST Inmates at DSH
## Packet Received to Admission
### 11/5/13–10/5/17



Source:  PARTS DSH Data (AG00063723.xlsx)
Note: The wait time is calculated by subtracting the packet received date from the scheduled admission date.  Wait times greater than 250 days are grouped into the 250 day bucket.  The dotted line represents the mean wait time.

# Distribution of Wait Times for Admission for IST Inmates at DSH
# Packet Received to Admission
## 2015



Source:  PARTS DSH Data (AG00063723.xlsx)
Note: The wait time is calculated by subtracting the earliest commitment date from the scheduled admission date.  Wait times greater than 250 days are grouped into the 250 day bucket.  Year is the year of commitment.  The dotted line represents the mean wait time.

# Distribution of Wait Times for Admission for IST Inmates at DSH
## Packet Received to Admission
## 2016



Source:  PARTS DSH Data (AG00063723.xlsx)
Note: The wait time is calculated by subtracting the earliest commitment date from the scheduled admission date.  Wait times greater than 250 days are grouped into the 250 day bucket.  Year is the year of commitment.  The dotted line represents the mean wait time.

January 25, 2018                                         Expert Report of Bruce C. Gage, M.D.                                         B-20

# Distribution of Wait Times for Admission for IST Inmates at DSH
# Packet Received to Admission
## 2017



Source:  PARTS DSH Data (AG00063723.xlsx)
Note: The wait time is calculated by subtracting the earliest commitment date from the scheduled admission date.  Wait times greater than 250 days are grouped into the 250 day bucket.  Year is the year of commitment.  The dotted line represents the mean wait time.  Data for 2017 is incomplete.  It does not contain commitments for inmates who had not been admitted at the time of the data pull in October 2017.

# DSH Facilities
# Median Commitment to Admission Wait Time by Hospital
## Q1 2015–Q2 2017



Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Wait time is calculated as the difference between the earliest commitment date and the scheduled admission date.  Records for which commitment, approval, or scheduled admission date are missing are excluded.  Median wait times have been calculated by quarter for each hospital.



## DSH Facilities
## Median Packet Received to Admission Wait Time by Hospital
## Q1 2015–Q2 2017

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Wait time is calculated as the difference between the packet received date and the scheduled admission date.  Records for which packet received, commitment, approval, or scheduled admission date are missing are excluded.  Median wait times have been calculated by quarter for each hospital.

# DSH Facilities
# Commitment to Admission Wait Time
# by Quarter, All State Hospitals
## Q1 2015–Q2 2017

| | **2015** | | | | | **2016** | | | | | **2017** [1] | | | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | All | |
| Number of Commitments | 522 | 615 | 568 | 405 | 2,110 | 530 | 674 | 718 | 617 | 2,539 | 615 | 541 | 1,156 | **5,805** |
| Average Wait Time (days) | 58 | 53 | 54 | 72 | 58 | 72 | 65 | 77 | 89 | 76 | 85 | 87 | 86 | **71** |
| Median Wait Time (days) | 49 | 45 | 46 | 68 | 49 | 64 | 57 | 76 | 92 | 76 | 88 | 90 | 89 | **67** |
| Max Wait Time (days) | 302 | 242 | 265 | 326 | 326 | 226 | 219 | 217 | 210 | 226 | 223 | 195 | 223 | **326** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.
[1]  The data also contained 220 completed commitments for Q3 2017, with a median wait time of 78 days, and 6 completed commitments for Q4 2017, with a median wait time of 14 days.

Expert Report of Bruce C. Gage, M.D.

# DSH Facilities
# Commitment to Admission Wait Time
# by Quarter, All State Hospitals
## Q4 2013–Q4 2014

| | 2013 | | 2014 | | | | |
|---|---|---|---|---|---|---|---|
| | Q4 | All | Q1 | Q2 | Q3 | Q4 | All |
| Number of Commitments | 4 | 4 | 1 | 11 | 70 | 296 | 378 |
| Average Wait Time (days) | 547 | 547 | 477 | 346 | 157 | 84 | 106 |
| Median Wait Time (days) | 534 | 534 | 477 | 313 | 162 | 73 | 79 |
| Max Wait Time (days) | 667 | 667 | 477 | 719 | 370 | 305 | 719 |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

Expert Report of Bruce C. Gage, M.D.

# DSH Facilities
# Commitment to Admission Wait Time
# by Quarter, Atascadero State Hospital
## Q1 2015–Q2 2017

|  | 2015 | | | | | 2016 | | | | | 2017 [1] | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | All |  |
| Number of Commitments | 101 | 95 | 128 | 107 | 431 | 111 | 144 | 191 | 110 | 556 | 114 | 53 | 167 | 1,154 |
| Average Wait Time (days) | 52 | 41 | 42 | 49 | 46 | 58 | 43 | 70 | 112 | 69 | 97 | 116 | 103 | 65 |
| Median Wait Time (days) | 48 | 39 | 36 | 47 | 41 | 55 | 37 | 65 | 112 | 62 | 91 | 119 | 98 | 57 |
| Max Wait Time (days) | 176 | 242 | 187 | 135 | 242 | 138 | 155 | 163 | 193 | 193 | 208 | 184 | 208 | 242 |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.
[1]  The data also contained 3 completed commitments for Q3 2017, with a median wait time of 117 days.

Expert Report of Bruce C. Gage, M.D.

# DSH Facilities
# Commitment to Admission Wait Time
# by Quarter, Metropolitan State Hospital
## Q1 2015–Q2 2017

| | 2015 | | | | | 2016 | | | | | 2017 [1] | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | All | |
| Number of Commitments | 101 | 130 | 101 | 92 | 424 | 194 | 168 | 141 | 144 | 647 | 115 | 95 | 210 | **1,281** |
| Average Wait Time (days) | 64 | 43 | 44 | 58 | 51 | 58 | 61 | 76 | 81 | 68 | 79 | 82 | 81 | **65** |
| Median Wait Time (days) | 55 | 39 | 41 | 46 | 44 | 38 | 45 | 79 | 86 | 62 | 84 | 90 | 88 | **55** |
| Max Wait Time (days) | 302 | 184 | 154 | 326 | 326 | 226 | 180 | 166 | 181 | 226 | 158 | 146 | 158 | **326** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.
[1]  The data also contained 42 completed commitments for Q3 2017, with a median wait time of 44 days, and 3 completed commitments for Q4 2017, with a median wait time of 14 days.

Expert Report of Bruce C. Gage, M.D.

# DSH Facilities
# Commitment to Admission Wait Time
# by Quarter, Napa State Hospital
## Q1 2015–Q2 2017

| | 2015 | | | | | 2016 | | | | | 2017 [1] | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | All | |
| Number of Commitments | 120 | 156 | 151 | 142 | 569 | 135 | 138 | 169 | 167 | 609 | 174 | 172 | 346 | **1,524** |
| Average Wait Time (days) | 52 | 52 | 76 | 95 | 69 | 89 | 68 | 81 | 97 | 84 | 91 | 92 | 92 | **80** |
| Median Wait Time (days) | 48 | 48 | 70 | 91 | 63 | 80 | 64 | 78 | 95 | 83 | 91 | 97 | 93 | **82** |
| Max Wait Time (days) | 209 | 153 | 188 | 259 | 259 | 223 | 156 | 162 | 210 | 223 | 194 | 195 | 195 | **259** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.
[1]  The data also contained 46 completed commitments for Q3 2017, with a median wait time of 109 days.

# DSH Facilities
# Commitment to Admission Wait Time
# by Quarter, Patton State Hospital
## Q1 2015–Q2 2017

| | 2015 | | | | | 2016 | | | | | 2017 [1] | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | All | |
| Number of Commitments | 200 | 234 | 188 | 64 | 686 | 90 | 224 | 217 | 196 | 727 | 212 | 221 | 433 | **1,846** |
| Average Wait Time (days) | 63 | 64 | 50 | 78 | 61 | 92 | 81 | 81 | 75 | 81 | 78 | 77 | 77 | **73** |
| Median Wait Time (days) | 48 | 59 | 38 | 67 | 49 | 87 | 78 | 83 | 64 | 78 | 64 | 73 | 71 | **64** |
| Max Wait Time (days) | 218 | 173 | 265 | 193 | 265 | 224 | 219 | 217 | 161 | 224 | 223 | 188 | 223 | **265** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.
[1]  The data also contained 129 completed commitments for Q3 2017, with a median wait time of 71 days, and 3 completed commitments for Q4 2017, with a median wait time of 36 days.

Expert Report of Bruce C. Gage, M.D.

# DSH Facilities
## Wait Time by Quarter, All State Hospitals
### Q1 2015–Q2 2017

| | 2015 | | | | | 2016 | | | | | 2017 [1] | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | All | |
| Number of Commitments | 187 | 200 | 237 | 159 | 783 | 195 | 247 | 259 | 225 | 926 | 231 | 183 | 414 | **2,123** |
| Average Commitment to Packet Received | 15 | 11 | 12 | 17 | 13 | 19 | 14 | 18 | 24 | 19 | 21 | 17 | 19 | **17** |
| Average Packet Received to Approval | 16 | 16 | 13 | 19 | 15 | 19 | 18 | 19 | 36 | 23 | 31 | 37 | 34 | **22** |
| Average Packet Received to Admission | 36 | 35 | 39 | 47 | 39 | 47 | 51 | 64 | 70 | 58 | 62 | 66 | 64 | **52** |

Source: PARTS DSH Data (AG00063723.xlsx)

Note: Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded. Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded. Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded. Inmates with conflicting Admission, Approved, or Discharge dates are excluded. Observations are limited to those with a "Scheduling Status" of Admitted.
[1] The data also contained 188 completed commitments for Q3 2017, with an average Commitment to Packet Received time of 12 days, an average Packet Received to Approved time of 23 days, and an average Packet Received to Admission time of 65 days.

# DSH Facilities
## Wait Time by Quarter, All State Hospitals
### Q4 2013–Q4 2014

| | 2013 | | 2014 | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Q4 | All | Q1 | Q2 | Q3 | Q4 | All |
| Number of Commitments | 1 | 1 | | | 19 | 81 | 100 |
| | | | | | | | |
| Average Commitment to Packet Received | 444 | 444 | | | 44 | 26 | 29 |
| Average Packet Received to Approval | 4 | 4 | | | 29 | 23 | 24 |
| Average Packet Received to Admisson | 12 | 12 | | | 100 | 62 | 69 |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded. Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# DSH Facilities
# Packet Received to Admission Wait Time
# by Quarter, All State Hospitals
# Q1 2015–Q2 2017

| | 2015 | | | | | 2016 | | | | | 2017 [1] | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | All | |
| Number of Commitments | 187 | 200 | 237 | 159 | 783 | 195 | 247 | 259 | 225 | 926 | 231 | 183 | 414 | 2,123 |
| Average Wait Time (days) | 36 | 35 | 39 | 47 | 39 | 47 | 51 | 64 | 70 | 58 | 62 | 66 | 64 | 52 |
| Median Wait Time (days) | 33 | 33 | 34 | 42 | 34 | 41 | 48 | 61 | 75 | 55 | 59 | 68 | 63 | 48 |
| Max Wait Time (days) | 154 | 161 | 132 | 320 | 320 | 204 | 144 | 138 | 198 | 204 | 170 | 131 | 170 | 320 |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.
[1]  The data also contained 87 completed commitments for Q3 2017, with a median wait time of 68 days.

# DSH Facilities
# Packet Received to Admission Wait Time
# by Quarter, All State Hospitals
## Q4 2013–Q4 2014

| | 2013 | | 2014 | | | | |
|---|---|---|---|---|---|---|---|
| | Q4 | All | Q1 | Q2 | Q3 | Q4 | All |
| Number of Commitments | 1 | 1 | | | 19 | 81 | 100 |
| Average Wait Time (days) | 12 | 12 | | | 100 | 62 | 69 |
| Median Wait Time (days) | 12 | 12 | | | 77 | 54 | 58 |
| Max Wait Time (days) | 12 | 12 | | | 210 | 223 | 223 |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

January 25, 2018                         Expert Report of Bruce C. Gage, M.D.                         B-33

# DSH Facilities
# Packet Received to Admission Wait Time
# by Quarter, Atascadero State Hospital
## Q1 2015–Q2 2017

| | 2015 | | | | | 2016 | | | | | 2017 [1] | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | All | |
| Number of Commitments | 28 | 25 | 33 | 33 | 119 | 33 | 43 | 50 | 56 | 182 | 42 | 23 | 65 | **366** |
| Average Wait Time (days) | 29 | 25 | 25 | 31 | 28 | 36 | 25 | 54 | 91 | 56 | 77 | 85 | 80 | **51** |
| Median Wait Time (days) | 27 | 28 | 20 | 31 | 25 | 36 | 26 | 53 | 93 | 48 | 77 | 93 | 80 | **42** |
| Max Wait Time (days) | 104 | 44 | 73 | 63 | 104 | 54 | 47 | 98 | 120 | 120 | 170 | 116 | 170 | **170** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.
[1]  The data also contained 2 completed commitments for Q3 2017, with a median wait time of 99 days.

Expert Report of Bruce C. Gage, M.D.

# DSH Facilities
# Packet Received to Admission Wait Time
# by Quarter, Metropolitan State Hospital
## Q1 2015–Q2 2017

| | 2015 | | | | | 2016 | | | | | 2017 [1] | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | All | |
| Number of Commitments | 49 | 64 | 61 | 39 | 213 | 70 | 47 | 55 | 41 | 213 | 55 | 44 | 99 | **525** |
| Average Wait Time (days) | 41 | 37 | 34 | 32 | 36 | 39 | 52 | 75 | 70 | 57 | 59 | 68 | 63 | **50** |
| Median Wait Time (days) | 39 | 34 | 34 | 20 | 34 | 22 | 32 | 85 | 74 | 53 | 49 | 71 | 60 | **42** |
| Max Wait Time (days) | 99 | 87 | 91 | 320 | 320 | 147 | 120 | 138 | 118 | 147 | 140 | 127 | 140 | **320** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.
[1]  The data also contained 13 completed commitments for Q3 2017, with a median wait time of 41 days.

Expert Report of Bruce C. Gage, M.D.

# DSH Facilities
# Packet Received to Admission Wait Time
# by Quarter, Napa State Hospital
# Q1 2015–Q2 2017

| | 2015 | | | | | 2016 | | | | | 2017 [1] | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | All | |
| Number of Commitments | 33 | 33 | 56 | 55 | 177 | 62 | 51 | 63 | 58 | 234 | 53 | 48 | 101 | **512** |
| Average Wait Time (days) | 30 | 37 | 58 | 67 | 52 | 54 | 47 | 52 | 72 | 56 | 70 | 74 | 72 | **58** |
| Median Wait Time (days) | 30 | 33 | 55 | 69 | 47 | 53 | 49 | 51 | 74 | 56 | 69 | 83 | 73 | **56** |
| Max Wait Time (days) | 63 | 112 | 105 | 202 | 202 | 124 | 116 | 75 | 198 | 198 | 159 | 131 | 159 | **202** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.
[1]  The data also contained 17 completed commitments for Q3 2017, with a median wait time of 83 days.

# DSH Facilities
# Packet Received to Admission Wait Time
# by Quarter, Patton State Hospital
## Q1 2015–Q2 2017

| | 2015 | | | | | 2016 | | | | | 2017 [1] | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | Q3 | Q4 | All | Q1 | Q2 | All | |
| Number of Commitments | 77 | 78 | 87 | 32 | 274 | 30 | 106 | 91 | 70 | 297 | 81 | 68 | 149 | **720** |
| Average Wait Time (days) | 38 | 37 | 35 | 48 | 38 | 63 | 64 | 71 | 52 | 63 | 52 | 52 | 52 | **51** |
| Median Wait Time (days) | 29 | 32 | 28 | 45 | 33 | 55 | 61 | 78 | 49 | 60 | 51 | 51 | 51 | **48** |
| Max Wait Time (days) | 154 | 161 | 132 | 84 | 161 | 204 | 144 | 133 | 118 | 204 | 112 | 127 | 127 | **204** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.
[1]  The data also contained 55 completed commitments for Q3 2017, with a median wait time of 65 days.

# Summary of Time From Commitment to Admission
# at DSH Facilities, by Hospital
## 11/5/13–10/5/17

| Hospital | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Atascadero | 1,274 | 70 | 60 | 4 | 667 |
| Metropolitan | 1,400 | 66 | 56 | 1 | 719 |
| Napa | 1,673 | 82 | 82 | 9 | 456 |
| Patton | 2,066 | 74 | 68 | 8 | 313 |
| **Total** | **6,413** | **74** | **69** | **1** | **719** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# Summary of Time From Commitment to Admission at DSH Facilities, by County
## 11/5/13–10/5/17

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Los Angeles | 1,812 | 66 | 56 | 1 | 719 |
| Fresno | 341 | 71 | 64 | 14 | 208 |
| Kern | 279 | 78 | 82 | 11 | 340 |
| San Diego | 254 | 90 | 84 | 13 | 612 |
| Riverside | 234 | 96 | 84 | 8 | 327 |
| Sacramento | 252 | 86 | 86 | 14 | 259 |
| Santa Clara | 215 | 63 | 55 | 10 | 237 |
| San Bernardino | 231 | 96 | 92 | 20 | 667 |
| Stanislaus | 181 | 63 | 58 | 11 | 184 |
| San Joaquin | 169 | 70 | 68 | 21 | 182 |
| Contra Costa | 167 | 64 | 59 | 14 | 134 |
| Solano | 160 | 68 | 65 | 15 | 184 |
| Sonoma | 141 | 78 | 77 | 33 | 182 |
| Alameda | 161 | 78 | 80 | 14 | 243 |
| Merced | 131 | 88 | 89 | 21 | 211 |
| San Francisco | 123 | 78 | 70 | 27 | 456 |
| Tulare | 107 | 70 | 70 | 16 | 132 |
| Monterey | 103 | 64 | 54 | 9 | 185 |
| Santa Barbara | 110 | 71 | 69 | 13 | 182 |
| San Mateo | 100 | 79 | 85 | 14 | 135 |
| Ventura | 88 | 84 | 87 | 24 | 181 |
| Orange | 95 | 70 | 62 | 8 | 370 |
| Butte | 84 | 73 | 70 | 25 | 180 |
| San Luis Obispo | 64 | 55 | 52 | 4 | 242 |
| Kings | 59 | 73 | 73 | 7 | 190 |
| Madera | 54 | 68 | 62 | 20 | 154 |
| Yolo | 63 | 66 | 62 | 19 | 161 |
| Placer | 54 | 77 | 82 | 15 | 126 |
| Shasta | 60 | 92 | 84 | 19 | 477 |
| Santa Cruz | 50 | 65 | 63 | 6 | 119 |
| Humboldt | 53 | 75 | 75 | 24 | 195 |
| Lake | 38 | 67 | 60 | 15 | 204 |
| Sutter | 35 | 91 | 85 | 24 | 259 |
| Imperial | 29 | 63 | 61 | 24 | 124 |
| Marin | 27 | 74 | 73 | 25 | 150 |
| Yuba | 28 | 81 | 86 | 28 | 146 |
| El Dorado | 24 | 75 | 73 | 23 | 121 |
| Mendocino | 28 | 71 | 62 | 17 | 180 |
| Napa | 35 | 69 | 71 | 9 | 150 |
| Calaveras | 20 | 81 | 86 | 24 | 116 |

# Summary of Time From Commitment to Admission
# at DSH Facilities, by County
## 11/5/13–10/5/17

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|--------|------------------|--------------------------|-------------------------|--------------------------|--------------------------|
| Siskiyou | 17 | 51 | 44 | 15 | 93 |
| San Benito | 15 | 61 | 61 | 13 | 105 |
| Trinity | 15 | 80 | 77 | 42 | 124 |
| Del Norte | 15 | 69 | 77 | 27 | 96 |
| Nevada | 15 | 70 | 72 | 10 | 121 |
| Tuolumne | 15 | 91 | 77 | 35 | 181 |
| Tehama | 11 | 73 | 79 | 31 | 98 |
| Glenn | 13 | 92 | 96 | 31 | 181 |
| Amador | 8 | 78 | 78 | 42 | 112 |
| Lassen | 7 | 95 | 60 | 41 | 189 |
| Mariposa | 9 | 103 | 107 | 39 | 168 |
| Colusa | 8 | 76 | 78 | 30 | 109 |
| Inyo | 2 | 65 | 65 | 59 | 71 |
| Mono | 1 | 94 | 94 | 94 | 94 |
| Sierra | 1 | 64 | 64 | 64 | 64 |
| County not provided | 2 | 30 | 30 | 19 | 40 |
| **Total** | **6,413** | **74** | **69** | **1** | **719** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

Expert Report of Bruce C. Gage, M.D.

# Summary of Time From Commitment to Admission
# at DSH Facilities, by Hospital
## Q1 2015–Q2 2017

| Hospital | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Atascadero | 1,154 | 65 | 57 | 4 | 242 |
| Metropolitan | 1,281 | 65 | 55 | 1 | 326 |
| Napa | 1,524 | 80 | 82 | 14 | 259 |
| Patton | 1,846 | 73 | 64 | 8 | 265 |
| **Total** | **5,805** | **71** | **67** | **1** | **326** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# Summary of Time From Commitment to Admission at DSH Facilities, by County

## Q1 2015–Q2 2017

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Los Angeles | 1,637 | 65 | 55 | 1 | 326 |
| Fresno | 300 | 72 | 62 | 14 | 208 |
| Kern | 266 | 77 | 82 | 11 | 149 |
| San Diego | 225 | 80 | 83 | 13 | 215 |
| Riverside | 203 | 86 | 75 | 8 | 265 |
| Sacramento | 231 | 88 | 86 | 14 | 259 |
| Santa Clara | 195 | 61 | 53 | 10 | 160 |
| San Bernardino | 200 | 95 | 94 | 20 | 302 |
| Stanislaus | 168 | 63 | 57 | 11 | 184 |
| San Joaquin | 161 | 70 | 68 | 21 | 182 |
| Contra Costa | 152 | 63 | 58 | 14 | 134 |
| Solano | 148 | 68 | 65 | 15 | 184 |
| Sonoma | 134 | 76 | 77 | 33 | 182 |
| Alameda | 141 | 75 | 78 | 14 | 165 |
| Merced | 118 | 82 | 84 | 21 | 147 |
| San Francisco | 107 | 71 | 69 | 27 | 120 |
| Tulare | 100 | 72 | 77 | 16 | 132 |
| Monterey | 94 | 62 | 53 | 9 | 157 |
| Santa Barbara | 104 | 71 | 69 | 13 | 182 |
| San Mateo | 89 | 76 | 84 | 14 | 113 |
| Ventura | 83 | 84 | 85 | 24 | 181 |
| Orange | 88 | 67 | 62 | 8 | 184 |
| Butte | 74 | 72 | 70 | 25 | 180 |
| San Luis Obispo | 52 | 54 | 31 | 4 | 242 |
| Kings | 55 | 72 | 74 | 7 | 144 |
| Madera | 50 | 69 | 62 | 20 | 154 |
| Yolo | 59 | 67 | 62 | 21 | 161 |
| Placer | 50 | 75 | 82 | 15 | 126 |
| Shasta | 51 | 80 | 79 | 19 | 194 |
| Santa Cruz | 45 | 66 | 65 | 6 | 119 |
| Humboldt | 49 | 74 | 74 | 24 | 195 |
| Lake | 36 | 67 | 60 | 15 | 204 |
| Sutter | 27 | 72 | 58 | 24 | 115 |
| Imperial | 28 | 65 | 62 | 24 | 124 |
| Marin | 25 | 73 | 71 | 25 | 150 |
| Yuba | 25 | 79 | 86 | 28 | 110 |
| El Dorado | 22 | 72 | 70 | 23 | 121 |
| Mendocino | 27 | 67 | 60 | 17 | 111 |
| Napa | 32 | 69 | 72 | 20 | 114 |
| Calaveras | 17 | 80 | 86 | 24 | 115 |

# Summary of Time From Commitment to Admission at DSH Facilities, by County
## Q1 2015–Q2 2017

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Siskiyou | 17 | 51 | 44 | 15 | 93 |
| San Benito | 15 | 61 | 61 | 13 | 105 |
| Trinity | 15 | 80 | 77 | 42 | 124 |
| Del Norte | 15 | 69 | 77 | 27 | 96 |
| Nevada | 13 | 65 | 69 | 10 | 104 |
| Tuolumne | 13 | 81 | 75 | 35 | 181 |
| Tehama | 10 | 72 | 75 | 31 | 98 |
| Glenn | 11 | 82 | 91 | 31 | 113 |
| Amador | 7 | 73 | 77 | 42 | 96 |
| Lassen | 6 | 81 | 58 | 41 | 189 |
| Mariposa | 6 | 86 | 90 | 39 | 119 |
| Colusa | 4 | 64 | 71 | 30 | 85 |
| Inyo | 2 | 65 | 65 | 59 | 71 |
| Mono | - | - | - | - | - |
| Sierra | 1 | 64 | 64 | 64 | 64 |
| County not provided | 2 | 30 | 30 | 19 | 40 |
| **Total** | **5,805** | **71** | **67** | **1** | **326** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# Summary of Time From Commitment to Packet Received
# at DSH Facilities, by Hospital
## 12/16/13–9/22/17

| Hospital | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Atascadero | 393 | 14 | 11 | 0 | 113 |
| Metropolitan | 561 | 15 | 7 | 0 | 120 |
| Napa | 560 | 24 | 19 | 0 | 444 |
| Patton | 797 | 16 | 6 | 0 | 215 |
| **Total** | **2,311** | **17** | **10** | **0** | **444** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# Summary of Time From Commitment to Packet Received at DSH Facilities, by County
## 12/16/13–9/22/17

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Los Angeles | 1,033 | 13 | 5 | 0 | 204 |
| Fresno | 50 | 16 | 13 | 2 | 56 |
| Kern | 6 | 22 | 18 | 4 | 48 |
| San Diego | 2 | 16 | 16 | 10 | 21 |
| Riverside | 78 | 24 | 15 | 1 | 167 |
| Sacramento | 1 | 24 | 24 | 24 | 24 |
| Santa Clara | 161 | 12 | 11 | 0 | 62 |
| San Bernardino | 6 | 56 | 29 | 10 | 215 |
| Stanislaus | 132 | 12 | 8 | 1 | 113 |
| San Joaquin | 70 | 19 | 15 | 2 | 71 |
| Contra Costa | 80 | 19 | 18 | 0 | 70 |
| Solano | 69 | 17 | 14 | 0 | 71 |
| Sonoma | 50 | 31 | 28 | 6 | 70 |
| Alameda | 81 | 31 | 28 | 9 | 117 |
| Merced | 19 | 35 | 27 | 13 | 150 |
| San Francisco | 55 | 30 | 19 | 1 | 444 |
| Tulare | 20 | 24 | 14 | 7 | 74 |
| Monterey | 29 | 27 | 15 | 4 | 135 |
| Santa Barbara | 39 | 22 | 17 | 4 | 66 |
| San Mateo | 15 | 26 | 22 | 6 | 71 |
| Ventura | 33 | 19 | 16 | 1 | 68 |
| Orange | 13 | 5 | 4 | 2 | 13 |
| Butte | 50 | 26 | 22 | 6 | 98 |
| San Luis Obispo | 9 | 9 | 7 | 2 | 26 |
| Kings | 3 | 72 | 22 | 14 | 180 |
| Madera | 5 | 12 | 13 | 5 | 19 |
| Yolo | 18 | 27 | 23 | 8 | 73 |
| Placer | 25 | 19 | 15 | 6 | 64 |
| Shasta | 22 | 29 | 26 | 7 | 62 |
| Santa Cruz | 8 | 21 | 12 | 6 | 49 |
| Humboldt | 23 | 38 | 33 | 0 | 129 |
| Lake | 23 | 10 | 7 | 0 | 52 |
| Sutter | 3 | 19 | 21 | 14 | 22 |
| Imperial | 8 | 17 | 14 | 6 | 35 |
| Marin | 12 | 22 | 20 | 8 | 38 |
| Yuba | 7 | 21 | 19 | 7 | 41 |
| El Dorado | 9 | 23 | 23 | 6 | 51 |
| Mendocino | 3 | 33 | 22 | 15 | 61 |
| Napa | 5 | 12 | 7 | 3 | 29 |
| Calaveras | 1 | 22 | 22 | 22 | 22 |

Expert Report of Bruce C. Gage, M.D.

# Summary of Time From Commitment to Packet Received at DSH Facilities, by County
## 12/16/13–9/22/17

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Siskiyou | 12 | 7 | 7 | 1 | 15 |
| San Benito | - | - | - | - | - |
| Trinity | 2 | 31 | 31 | 8 | 53 |
| Del Norte | 2 | 16 | 16 | 11 | 20 |
| Nevada | 4 | 35 | 32 | 14 | 63 |
| Tuolumne | 2 | 52 | 52 | 41 | 62 |
| Tehama | 6 | 29 | 25 | 22 | 42 |
| Glenn | 1 | 32 | 32 | 32 | 32 |
| Amador | 4 | 14 | 14 | 6 | 23 |
| Lassen | - | - | - | - | - |
| Mariposa | - | - | - | - | - |
| Colusa | 2 | 21 | 21 | 16 | 26 |
| Inyo | - | - | - | - | - |
| Mono | - | - | - | - | - |
| Sierra | - | - | - | - | - |
| County not provided | - | - | - | - | - |
| **Total** | **2,311** | **17** | **10** | **0** | **444** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# Summary of Time From Commitment to Packet Received
# at DSH Facilities, by Hospital
## Q1 2015–Q2 2017

| Hospital | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Atascadero | 366 | 14 | 10 | 0 | 113 |
| Metropolitan | 525 | 14 | 7 | 0 | 114 |
| Napa | 512 | 23 | 19 | 0 | 159 |
| Patton | 720 | 16 | 6 | 0 | 215 |
| **Total** | **2,123** | **17** | **10** | **0** | **215** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# Summary of Time From Commitment to Packet Received at DSH Facilities, by County
## Q1 2015–Q2 2017

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Los Angeles | 948 | 13 | 5 | 0 | 204 |
| Fresno | 40 | 16 | 14 | 2 | 39 |
| Kern | 6 | 22 | 18 | 4 | 48 |
| San Diego | 2 | 16 | 16 | 10 | 21 |
| Riverside | 72 | 23 | 15 | 1 | 167 |
| Sacramento | 1 | 24 | 24 | 24 | 24 |
| Santa Clara | 150 | 12 | 11 | 0 | 62 |
| San Bernardino | 6 | 56 | 29 | 10 | 215 |
| Stanislaus | 127 | 12 | 7 | 1 | 113 |
| San Joaquin | 69 | 19 | 15 | 2 | 71 |
| Contra Costa | 68 | 18 | 16 | 0 | 53 |
| Solano | 63 | 17 | 14 | 0 | 49 |
| Sonoma | 48 | 30 | 27 | 6 | 70 |
| Alameda | 74 | 30 | 27 | 9 | 90 |
| Merced | 18 | 28 | 25 | 13 | 54 |
| San Francisco | 47 | 23 | 20 | 6 | 65 |
| Tulare | 20 | 24 | 14 | 7 | 74 |
| Monterey | 26 | 25 | 14 | 4 | 135 |
| Santa Barbara | 39 | 22 | 17 | 4 | 66 |
| San Mateo | 10 | 23 | 18 | 6 | 55 |
| Ventura | 32 | 20 | 17 | 7 | 68 |
| Orange | 13 | 5 | 4 | 2 | 13 |
| Butte | 43 | 26 | 21 | 9 | 98 |
| San Luis Obispo | 9 | 9 | 7 | 2 | 26 |
| Kings | 1 | 22 | 22 | 22 | 22 |
| Madera | 5 | 12 | 13 | 5 | 19 |
| Yolo | 18 | 27 | 23 | 8 | 73 |
| Placer | 23 | 18 | 15 | 6 | 64 |
| Shasta | 19 | 29 | 28 | 7 | 62 |
| Santa Cruz | 8 | 21 | 12 | 6 | 49 |
| Humboldt | 21 | 38 | 32 | 0 | 129 |
| Lake | 22 | 10 | 7 | 0 | 52 |
| Sutter | 3 | 19 | 21 | 14 | 22 |
| Imperial | 8 | 17 | 14 | 6 | 35 |
| Marin | 12 | 22 | 20 | 8 | 38 |
| Yuba | 6 | 22 | 21 | 7 | 41 |
| El Dorado | 8 | 23 | 24 | 6 | 51 |
| Mendocino | 3 | 33 | 22 | 15 | 61 |
| Napa | 4 | 8 | 6 | 3 | 19 |
| Calaveras | 1 | 22 | 22 | 22 | 22 |

# Summary of Time From Commitment to Packet Received at DSH Facilities, by County
## Q1 2015–Q2 2017

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Siskiyou | 12 | 7 | 7 | 1 | 15 |
| San Benito | - | - | - | - | - |
| Trinity | 2 | 31 | 31 | 8 | 53 |
| Del Norte | 2 | 16 | 16 | 11 | 20 |
| Nevada | 3 | 40 | 44 | 14 | 63 |
| Tuolumne | 2 | 52 | 52 | 41 | 62 |
| Tehama | 5 | 27 | 23 | 22 | 42 |
| Glenn | 1 | 32 | 32 | 32 | 32 |
| Amador | 3 | 17 | 20 | 8 | 23 |
| Lassen | - | - | - | - | - |
| Mariposa | - | - | - | - | - |
| Colusa | - | - | - | - | - |
| Inyo | - | - | - | - | - |
| Mono | - | - | - | - | - |
| Sierra | - | - | - | - | - |
| County not provided | - | - | - | - | - |
| **Total** | **2,123** | **17** | **10** | **0** | **215** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

Expert Report of Bruce C. Gage, M.D.

# Summary of Time From Packet Received to Approved
# at DSH Facilities, by Hospital
## 12/16/13–9/22/17

| Hospital | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Atascadero | 393 | 30 | 22 | 0 | 209 |
| Metropolitan | 561 | 27 | 17 | 0 | 161 |
| Napa | 560 | 15 | 5 | 0 | 187 |
| Patton | 797 | 20 | 16 | 0 | 140 |
| **Total** | **2,311** | **22** | **15** | **0** | **209** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# Summary of Time From Packet Received to Approved
# at DSH Facilities, by County
## 12/16/13–9/22/17

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Los Angeles | 1,033 | 24 | 16 | 0 | 209 |
| Fresno | 50 | 41 | 25 | 0 | 113 |
| Kern | 6 | 42 | 43 | 7 | 76 |
| San Diego | 2 | 18 | 18 | 4 | 31 |
| Riverside | 78 | 18 | 14 | 0 | 140 |
| Sacramento | 1 | 5 | 5 | 5 | 5 |
| Santa Clara | 161 | 27 | 20 | 0 | 116 |
| San Bernardino | 6 | 19 | 12 | 0 | 66 |
| Stanislaus | 132 | 26 | 16 | 0 | 163 |
| San Joaquin | 70 | 13 | 5 | 0 | 109 |
| Contra Costa | 80 | 19 | 13 | 0 | 88 |
| Solano | 69 | 10 | 7 | 0 | 53 |
| Sonoma | 50 | 13 | 8 | 0 | 60 |
| Alameda | 81 | 15 | 7 | 0 | 110 |
| Merced | 19 | 16 | 4 | 0 | 103 |
| San Francisco | 55 | 12 | 5 | 0 | 69 |
| Tulare | 20 | 42 | 34 | 3 | 83 |
| Monterey | 29 | 29 | 18 | 1 | 96 |
| Santa Barbara | 39 | 32 | 26 | 0 | 88 |
| San Mateo | 15 | 24 | 21 | 0 | 63 |
| Ventura | 33 | 50 | 51 | 1 | 96 |
| Orange | 13 | 25 | 16 | 1 | 74 |
| Butte | 50 | 13 | 7 | 0 | 80 |
| San Luis Obispo | 9 | 34 | 25 | 1 | 82 |
| Kings | 3 | 23 | 9 | 8 | 51 |
| Madera | 5 | 38 | 43 | 5 | 68 |
| Yolo | 18 | 15 | 5 | 0 | 90 |
| Placer | 25 | 14 | 5 | 0 | 64 |
| Shasta | 22 | 14 | 10 | 0 | 70 |
| Santa Cruz | 8 | 38 | 36 | 6 | 76 |
| Humboldt | 23 | 8 | 4 | 0 | 37 |
| Lake | 23 | 24 | 12 | 0 | 185 |
| Sutter | 3 | 4 | 0 | 0 | 12 |
| Imperial | 8 | 44 | 28 | 6 | 95 |
| Marin | 12 | 7 | 4 | 0 | 23 |
| Yuba | 7 | 8 | 5 | 0 | 21 |
| El Dorado | 9 | 18 | 8 | 0 | 56 |
| Mendocino | 3 | 3 | 1 | 0 | 7 |
| Napa | 5 | 3 | 2 | 0 | 7 |
| Calaveras | 1 | 1 | 1 | 1 | 1 |

# Summary of Time From Packet Received to Approved at DSH Facilities, by County
## 12/16/13–9/22/17

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Siskiyou | 12 | 7 | 6 | 0 | 16 |
| San Benito | - | - | - | - | - |
| Trinity | 2 | 15 | 15 | 2 | 28 |
| Del Norte | 2 | 10 | 10 | 1 | 18 |
| Nevada | 4 | 11 | 6 | 0 | 32 |
| Tuolumne | 2 | 1 | 1 | 1 | 1 |
| Tehama | 6 | 5 | 4 | 0 | 11 |
| Glenn | 1 | 0 | 0 | 0 | 0 |
| Amador | 4 | 25 | 14 | 3 | 69 |
| Lassen | - | - | - | - | - |
| Mariposa | - | - | - | - | - |
| Colusa | 2 | 43 | 43 | 0 | 86 |
| Inyo | - | - | - | - | - |
| Mono | - | - | - | - | - |
| Sierra | - | - | - | - | - |
| County not provided | - | - | - | - | - |
| **Total** | **2,311** | **22** | **15** | **0** | **209** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

Expert Report of Bruce C. Gage, M.D.

# Summary of Time From Packet Received to Approved
# at DSH Facilities, by Hospital
## Q1 2015–Q2 2017

| Hospital | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Atascadero | 366 | 30 | 22 | 0 | 163 |
| Metropolitan | 525 | 28 | 18 | 0 | 161 |
| Napa | 512 | 14 | 5 | 0 | 187 |
| Patton | 720 | 20 | 16 | 0 | 140 |
| **Total** | **2,123** | **22** | **15** | **0** | **187** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# Summary of Time From Packet Received to Approved
# at DSH Facilities, by County
## Q1 2015–Q2 2017

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Los Angeles | 948 | 24 | 17 | 0 | 187 |
| Fresno | 40 | 44 | 44 | 0 | 113 |
| Kern | 6 | 42 | 43 | 7 | 76 |
| San Diego | 2 | 18 | 18 | 4 | 31 |
| Riverside | 72 | 17 | 14 | 0 | 140 |
| Sacramento | 1 | 5 | 5 | 5 | 5 |
| Santa Clara | 150 | 27 | 19 | 0 | 116 |
| San Bernardino | 6 | 19 | 12 | 0 | 66 |
| Stanislaus | 127 | 26 | 16 | 0 | 163 |
| San Joaquin | 69 | 13 | 5 | 0 | 109 |
| Contra Costa | 68 | 19 | 12 | 0 | 88 |
| Solano | 63 | 10 | 7 | 0 | 47 |
| Sonoma | 48 | 13 | 8 | 0 | 60 |
| Alameda | 74 | 14 | 7 | 0 | 81 |
| Merced | 18 | 16 | 4 | 0 | 103 |
| San Francisco | 47 | 11 | 5 | 0 | 69 |
| Tulare | 20 | 42 | 34 | 3 | 83 |
| Monterey | 26 | 32 | 21 | 1 | 96 |
| Santa Barbara | 39 | 32 | 26 | 0 | 88 |
| San Mateo | 10 | 21 | 18 | 0 | 63 |
| Ventura | 32 | 50 | 52 | 1 | 96 |
| Orange | 13 | 25 | 16 | 1 | 74 |
| Butte | 43 | 11 | 6 | 0 | 80 |
| San Luis Obispo | 9 | 34 | 25 | 1 | 82 |
| Kings | 1 | 51 | 51 | 51 | 51 |
| Madera | 5 | 38 | 43 | 5 | 68 |
| Yolo | 18 | 15 | 5 | 0 | 90 |
| Placer | 23 | 14 | 5 | 0 | 64 |
| Shasta | 19 | 13 | 10 | 0 | 70 |
| Santa Cruz | 8 | 38 | 36 | 6 | 76 |
| Humboldt | 21 | 8 | 3 | 0 | 37 |
| Lake | 22 | 25 | 13 | 0 | 185 |
| Sutter | 3 | 4 | 0 | 0 | 12 |
| Imperial | 8 | 44 | 28 | 6 | 95 |
| Marin | 12 | 7 | 4 | 0 | 23 |
| Yuba | 6 | 9 | 8 | 0 | 21 |
| El Dorado | 8 | 14 | 5 | 0 | 48 |
| Mendocino | 3 | 3 | 1 | 0 | 7 |
| Napa | 4 | 2 | 2 | 0 | 2 |
| Calaveras | 1 | 1 | 1 | 1 | 1 |

# Summary of Time From Packet Received to Approved at DSH Facilities, by County

## Q1 2015–Q2 2017

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Siskiyou | 12 | 7 | 6 | 0 | 16 |
| San Benito | - | - | - | - | - |
| Trinity | 2 | 15 | 15 | 2 | 28 |
| Del Norte | 2 | 10 | 10 | 1 | 18 |
| Nevada | 3 | 12 | 5 | 0 | 32 |
| Tuolumne | 2 | 1 | 1 | 1 | 1 |
| Tehama | 5 | 5 | 1 | 0 | 11 |
| Glenn | 1 | 0 | 0 | 0 | 0 |
| Amador | 3 | 10 | 5 | 3 | 23 |
| Lassen | - | - | - | - | - |
| Mariposa | - | - | - | - | - |
| Colusa | - | - | - | - | - |
| Inyo | - | - | - | - | - |
| Mono | - | - | - | - | - |
| Sierra | - | - | - | - | - |
| County not provided | - | - | - | - | - |
| **Total** | **2,123** | **22** | **15** | **0** | **187** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

Expert Report of Bruce C. Gage, M.D.

# Summary of Time From Approval to Admission
# at DSH Facilities, by Hospital
## 11/5/13–10/5/17

| Hospital | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Atascadero | 1,274 | 21 | 15 | 0 | 201 |
| Metropolitan | 1,400 | 22 | 14 | 0 | 202 |
| Napa | 1,673 | 43 | 41 | 0 | 190 |
| Patton | 2,066 | 31 | 24 | 0 | 243 |
| **Total** | **6,413** | **30** | **22** | **0** | **243** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# Summary of Time From Approval to Admission
# at DSH Facilities, by County
## 11/5/13–10/5/17

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Los Angeles | 1,812 | 28 | 20 | 0 | 243 |
| Fresno | 341 | 25 | 20 | 1 | 162 |
| Kern | 279 | 25 | 18 | 1 | 93 |
| San Diego | 254 | 34 | 30 | 1 | 107 |
| Riverside | 234 | 32 | 18 | 1 | 202 |
| Sacramento | 252 | 40 | 36 | 3 | 184 |
| Santa Clara | 215 | 24 | 15 | 1 | 201 |
| San Bernardino | 231 | 25 | 17 | 0 | 144 |
| Stanislaus | 181 | 26 | 17 | 1 | 101 |
| San Joaquin | 169 | 36 | 33 | 0 | 91 |
| Contra Costa | 167 | 31 | 28 | 1 | 88 |
| Solano | 160 | 39 | 37 | 1 | 139 |
| Sonoma | 141 | 38 | 36 | 1 | 139 |
| Alameda | 161 | 36 | 30 | 2 | 91 |
| Merced | 131 | 45 | 36 | 1 | 190 |
| San Francisco | 123 | 38 | 35 | 1 | 91 |
| Tulare | 107 | 22 | 15 | 0 | 83 |
| Monterey | 103 | 22 | 14 | 1 | 78 |
| Santa Barbara | 110 | 20 | 15 | 1 | 87 |
| San Mateo | 100 | 40 | 41 | 0 | 85 |
| Ventura | 88 | 29 | 26 | 1 | 91 |
| Orange | 95 | 34 | 30 | 1 | 167 |
| Butte | 84 | 33 | 31 | 0 | 82 |
| San Luis Obispo | 64 | 19 | 8 | 0 | 105 |
| Kings | 59 | 16 | 10 | 0 | 76 |
| Madera | 54 | 20 | 13 | 2 | 112 |
| Yolo | 63 | 30 | 25 | 1 | 78 |
| Placer | 54 | 41 | 39 | 1 | 90 |
| Shasta | 60 | 44 | 41 | 2 | 159 |
| Santa Cruz | 50 | 21 | 16 | 1 | 68 |
| Humboldt | 53 | 28 | 21 | 1 | 69 |
| Lake | 38 | 38 | 31 | 5 | 115 |
| Sutter | 35 | 49 | 35 | 3 | 162 |
| Imperial | 29 | 23 | 17 | 2 | 82 |
| Marin | 27 | 37 | 36 | 2 | 79 |
| Yuba | 28 | 55 | 58 | 14 | 130 |
| El Dorado | 24 | 36 | 33 | 7 | 99 |
| Mendocino | 28 | 31 | 21 | 6 | 126 |
| Napa | 35 | 43 | 46 | 1 | 87 |
| Calaveras | 20 | 45 | 47 | 6 | 92 |

# Summary of Time From Approval to Admission at DSH Facilities, by County
## 11/5/13–10/5/17

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Siskiyou | 17 | 35 | 30 | 8 | 78 |
| San Benito | 15 | 24 | 14 | 3 | 77 |
| Trinity | 15 | 44 | 36 | 5 | 75 |
| Del Norte | 15 | 45 | 57 | 8 | 86 |
| Nevada | 15 | 32 | 26 | 0 | 84 |
| Tuolumne | 15 | 43 | 24 | 1 | 119 |
| Tehama | 11 | 34 | 41 | 4 | 58 |
| Glenn | 13 | 60 | 55 | 9 | 164 |
| Amador | 8 | 36 | 42 | 9 | 66 |
| Lassen | 7 | 38 | 14 | 5 | 169 |
| Mariposa | 9 | 50 | 41 | 6 | 155 |
| Colusa | 8 | 41 | 44 | 7 | 72 |
| Inyo | 2 | 11 | 11 | 7 | 14 |
| Mono | 1 | 6 | 6 | 6 | 6 |
| Sierra | 1 | 7 | 7 | 7 | 7 |
| County not provided | 2 | 12 | 12 | 6 | 18 |
| **Total** | **6,413** | **30** | **22** | **0** | **243** |

Source: PARTS DSH Data (AG00063723.xlsx)

Note: Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded. Inmates with conflicting Admission, Approved, or Discharge dates are excluded. Observations are limited to those with a "Scheduling Status" of Admitted.

Expert Report of Bruce C. Gage, M.D.

# Summary of Time From Approval to Admission
# at DSH Facilities, by Hospital
## Q1 2015–Q2 2017

| Hospital | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Atascadero | 1,154 | 20 | 15 | 0 | 105 |
| Metropolitan | 1,281 | 22 | 13 | 0 | 181 |
| Napa | 1,524 | 42 | 42 | 0 | 184 |
| Patton | 1,846 | 30 | 23 | 0 | 196 |
| **Total** | **5,805** | **29** | **21** | **0** | **196** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# Summary of Time From Approval to Admission
# at DSH Facilities, by County
## Q1 2015–Q2 2017

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Los Angeles | 1,637 | 27 | 19 | 0 | 196 |
| Fresno | 300 | 24 | 18 | 1 | 162 |
| Kern | 266 | 26 | 19 | 1 | 93 |
| San Diego | 225 | 36 | 33 | 1 | 107 |
| Riverside | 203 | 25 | 14 | 1 | 154 |
| Sacramento | 231 | 41 | 38 | 3 | 184 |
| Santa Clara | 195 | 21 | 15 | 1 | 87 |
| San Bernardino | 200 | 24 | 15 | 0 | 144 |
| Stanislaus | 168 | 25 | 17 | 1 | 101 |
| San Joaquin | 161 | 36 | 33 | 0 | 91 |
| Contra Costa | 152 | 32 | 29 | 1 | 88 |
| Solano | 148 | 40 | 37 | 2 | 139 |
| Sonoma | 134 | 37 | 36 | 1 | 82 |
| Alameda | 141 | 34 | 28 | 2 | 91 |
| Merced | 118 | 40 | 35 | 1 | 114 |
| San Francisco | 107 | 39 | 35 | 1 | 91 |
| Tulare | 100 | 22 | 15 | 1 | 83 |
| Monterey | 94 | 19 | 14 | 1 | 78 |
| Santa Barbara | 104 | 20 | 15 | 1 | 87 |
| San Mateo | 89 | 41 | 45 | 0 | 85 |
| Ventura | 83 | 28 | 23 | 1 | 91 |
| Orange | 88 | 34 | 30 | 1 | 167 |
| Butte | 74 | 34 | 33 | 0 | 82 |
| San Luis Obispo | 52 | 17 | 7 | 0 | 105 |
| Kings | 55 | 16 | 10 | 0 | 76 |
| Madera | 50 | 20 | 12 | 2 | 112 |
| Yolo | 59 | 31 | 27 | 1 | 78 |
| Placer | 50 | 39 | 38 | 1 | 90 |
| Shasta | 51 | 44 | 40 | 2 | 159 |
| Santa Cruz | 45 | 20 | 17 | 1 | 57 |
| Humboldt | 49 | 27 | 21 | 1 | 69 |
| Lake | 36 | 37 | 30 | 5 | 115 |
| Sutter | 27 | 38 | 30 | 3 | 92 |
| Imperial | 28 | 23 | 17 | 2 | 82 |
| Marin | 25 | 37 | 36 | 2 | 79 |
| Yuba | 25 | 53 | 57 | 14 | 97 |
| El Dorado | 22 | 35 | 30 | 7 | 99 |
| Mendocino | 27 | 27 | 21 | 6 | 90 |
| Napa | 32 | 46 | 48 | 1 | 87 |
| Calaveras | 17 | 44 | 43 | 6 | 92 |

# Summary of Time From Approval to Admission
# at DSH Facilities, by County
## Q1 2015–Q2 2017

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Siskiyou | 17 | 35 | 30 | 8 | 78 |
| San Benito | 15 | 24 | 14 | 3 | 77 |
| Trinity | 15 | 44 | 36 | 5 | 75 |
| Del Norte | 15 | 45 | 57 | 8 | 86 |
| Nevada | 13 | 26 | 15 | 0 | 84 |
| Tuolumne | 13 | 32 | 21 | 1 | 94 |
| Tehama | 10 | 33 | 36 | 4 | 58 |
| Glenn | 11 | 51 | 54 | 9 | 98 |
| Amador | 7 | 36 | 46 | 9 | 66 |
| Lassen | 6 | 16 | 13 | 5 | 29 |
| Mariposa | 6 | 33 | 31 | 6 | 72 |
| Colusa | 4 | 43 | 44 | 13 | 72 |
| Inyo | 2 | 11 | 11 | 7 | 14 |
| Mono | - | - | - | - | - |
| Sierra | 1 | 7 | 7 | 7 | 7 |
| County not provided | 2 | 12 | 12 | 6 | 18 |
| **Total** | **5,805** | **29** | **21** | **0** | **196** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

January 25, 2018                              Expert Report of Bruce C. Gage, M.D.                                    B-61

# Summary of Time From Admission to Discharge
# at DSH Facilities, by Hospital
## 11/19/14–10/16/17

| Hospital | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Atascadero | 1,046 | 124 | 103 | 5 | 365 |
| Metropolitan | 1,145 | 128 | 112 | 0 | 653 |
| Napa | 1,196 | 101 | 77 | 4 | 364 |
| Patton | 1,595 | 99 | 77 | 3 | 602 |
| **Total** | **4,982** | **111** | **91** | **0** | **653** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded. Inmates with missing "Discharge Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# Summary of Time From Admission to Discharge
# at DSH Facilities, by County
## 11/19/14–10/16/17

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Los Angeles | 1,414 | 111 | 91 | 0 | 653 |
| Fresno | 270 | 120 | 98 | 15 | 364 |
| Kern | 223 | 97 | 77 | 14 | 364 |
| San Diego | 205 | 109 | 84 | 7 | 365 |
| Riverside | 183 | 111 | 84 | 7 | 364 |
| Sacramento | 166 | 114 | 92 | 7 | 356 |
| Santa Clara | 161 | 132 | 113 | 5 | 350 |
| San Bernardino | 153 | 118 | 102 | 9 | 361 |
| Stanislaus | 143 | 101 | 85 | 13 | 350 |
| San Joaquin | 141 | 89 | 77 | 7 | 306 |
| Contra Costa | 126 | 108 | 87 | 12 | 335 |
| Solano | 124 | 110 | 87 | 12 | 510 |
| Sonoma | 122 | 87 | 79 | 8 | 343 |
| Alameda | 110 | 142 | 135 | 11 | 354 |
| Merced | 103 | 95 | 78 | 14 | 335 |
| San Francisco | 90 | 124 | 97 | 12 | 357 |
| Tulare | 89 | 114 | 90 | 20 | 354 |
| Monterey | 87 | 118 | 100 | 25 | 346 |
| Santa Barbara | 83 | 109 | 92 | 7 | 350 |
| San Mateo | 75 | 111 | 93 | 8 | 351 |
| Ventura | 69 | 132 | 121 | 24 | 357 |
| Orange | 69 | 122 | 105 | 21 | 338 |
| Butte | 61 | 111 | 107 | 6 | 357 |
| San Luis Obispo | 56 | 103 | 88 | 12 | 276 |
| Kings | 52 | 123 | 90 | 28 | 360 |
| Madera | 47 | 106 | 84 | 14 | 302 |
| Yolo | 46 | 106 | 74 | 13 | 299 |
| Placer | 42 | 124 | 97 | 4 | 357 |
| Shasta | 42 | 123 | 109 | 16 | 359 |
| Santa Cruz | 41 | 105 | 91 | 8 | 261 |
| Humboldt | 38 | 105 | 93 | 14 | 261 |
| Lake | 32 | 94 | 68 | 10 | 302 |
| Sutter | 30 | 114 | 100 | 11 | 278 |
| Imperial | 25 | 126 | 105 | 32 | 352 |
| Marin | 24 | 96 | 74 | 19 | 350 |
| Yuba | 25 | 96 | 83 | 21 | 303 |
| El Dorado | 23 | 110 | 103 | 19 | 293 |
| Mendocino | 23 | 103 | 72 | 14 | 295 |
| Napa | 23 | 121 | 118 | 19 | 282 |
| Calaveras | 17 | 83 | 63 | 11 | 273 |

# Summary of Time From Admission to Discharge
# at DSH Facilities, by County
## 11/19/14–10/16/17

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Siskiyou | 16 | 112 | 113 | 21 | 266 |
| San Benito | 15 | 86 | 78 | 32 | 162 |
| Trinity | 12 | 91 | 83 | 15 | 218 |
| Del Norte | 12 | 135 | 117 | 37 | 252 |
| Nevada | 11 | 134 | 121 | 17 | 349 |
| Tuolumne | 11 | 119 | 88 | 36 | 328 |
| Tehama | 10 | 98 | 88 | 13 | 216 |
| Glenn | 9 | 129 | 146 | 41 | 236 |
| Amador | 8 | 112 | 83 | 43 | 347 |
| Lassen | 7 | 94 | 69 | 36 | 252 |
| Mariposa | 7 | 112 | 73 | 17 | 320 |
| Colusa | 6 | 144 | 115 | 39 | 279 |
| Inyo | 1 | 280 | 280 | 280 | 280 |
| Mono | 1 | 155 | 155 | 155 | 155 |
| Sierra | 1 | 56 | 56 | 56 | 56 |
| County not provided | 2 | 60 | 60 | 26 | 94 |
| **Total** | **4,982** | **111** | **91** | **0** | **653** |

Source: PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded. Inmates with missing "Discharge Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

## Distribution of Time from Packet Received to Packet Complete
### 12/16/13–9/22/17



Source: PARTS DSH Data (AG00063723.xlsx)

Note: Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded. Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded. Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded. Inmates for which "Date Completed" is missing or before "Date Received" are excluded. Inmates with conflicting Admission, Approved, or Discharge dates are excluded. Observations are limited to those with a "Scheduling Status" of Admitted. Time intervals greater than 100 days are grouped into the 100 day bucket.

January 25, 2018                                 Expert Report of Bruce C. Gage, M.D.                                 B-65

# Summary of Time From Packet Received to Admission
## at DSH Facilities, by Hospital
### 12/16/13–9/22/17

| Hospital | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Atascadero | 393 | 52 | 43 | 5 | 223 |
| Metropolitan | 561 | 50 | 42 | 1 | 320 |
| Napa | 560 | 59 | 57 | 3 | 202 |
| Patton | 797 | 53 | 49 | 1 | 210 |
| **Total** | **2,311** | **53** | **49** | **1** | **320** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# Summary of Time From Packet Received to Admission at DSH Facilities, by County
## 12/16/13–9/22/17

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Los Angeles | 1,033 | 52 | 46 | 1 | 320 |
| Fresno | 50 | 71 | 70 | 11 | 132 |
| Kern | 6 | 81 | 87 | 42 | 98 |
| San Diego | 2 | 70 | 70 | 53 | 87 |
| Riverside | 78 | 50 | 35 | 4 | 210 |
| Sacramento | 1 | 68 | 68 | 68 | 68 |
| Santa Clara | 161 | 49 | 42 | 5 | 223 |
| San Bernardino | 6 | 45 | 47 | 1 | 83 |
| Stanislaus | 132 | 50 | 40 | 8 | 170 |
| San Joaquin | 70 | 56 | 58 | 13 | 123 |
| Contra Costa | 80 | 54 | 51 | 8 | 131 |
| Solano | 69 | 52 | 51 | 3 | 112 |
| Sonoma | 50 | 49 | 48 | 13 | 111 |
| Alameda | 81 | 51 | 49 | 9 | 126 |
| Merced | 19 | 65 | 64 | 28 | 112 |
| San Francisco | 55 | 54 | 57 | 12 | 95 |
| Tulare | 20 | 70 | 75 | 22 | 106 |
| Monterey | 29 | 53 | 53 | 7 | 105 |
| Santa Barbara | 39 | 59 | 56 | 13 | 122 |
| San Mateo | 15 | 60 | 67 | 20 | 91 |
| Ventura | 33 | 77 | 77 | 7 | 114 |
| Orange | 13 | 62 | 52 | 9 | 105 |
| Butte | 50 | 48 | 44 | 7 | 104 |
| San Luis Obispo | 9 | 72 | 84 | 17 | 107 |
| Kings | 3 | 38 | 42 | 10 | 63 |
| Madera | 5 | 58 | 63 | 12 | 107 |
| Yolo | 18 | 49 | 48 | 7 | 91 |
| Placer | 25 | 69 | 76 | 20 | 95 |
| Shasta | 22 | 65 | 63 | 20 | 159 |
| Santa Cruz | 8 | 70 | 82 | 17 | 98 |
| Humboldt | 23 | 38 | 35 | 13 | 70 |
| Lake | 23 | 66 | 58 | 19 | 198 |
| Sutter | 3 | 51 | 36 | 35 | 83 |
| Imperial | 8 | 66 | 61 | 22 | 105 |
| Marin | 12 | 49 | 54 | 13 | 65 |
| Yuba | 7 | 71 | 63 | 40 | 132 |
| El Dorado | 9 | 52 | 43 | 20 | 90 |
| Mendocino | 3 | 51 | 51 | 27 | 76 |
| Napa | 5 | 52 | 50 | 24 | 72 |
| Calaveras | 1 | 64 | 64 | 64 | 64 |

# Summary of Time From Packet Received to Admission at DSH Facilities, by County
## 12/16/13–9/22/17

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Siskiyou | 12 | 41 | 39 | 13 | 78 |
| San Benito | - | - | - | - | - |
| Trinity | 2 | 56 | 56 | 40 | 71 |
| Del Norte | 2 | 70 | 70 | 58 | 82 |
| Nevada | 4 | 45 | 47 | 26 | 62 |
| Tuolumne | 2 | 19 | 19 | 15 | 22 |
| Tehama | 6 | 54 | 51 | 47 | 69 |
| Glenn | 1 | 72 | 72 | 72 | 72 |
| Amador | 4 | 64 | 65 | 19 | 106 |
| Lassen | - | - | - | - | - |
| Mariposa | - | - | - | - | - |
| Colusa | 2 | 76 | 76 | 59 | 93 |
| Inyo | - | - | - | - | - |
| Mono | - | - | - | - | - |
| Sierra | - | - | - | - | - |
| County not provided | - | - | - | - | - |
| **Total** | **2,311** | **53** | **49** | **1** | **320** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

Expert Report of Bruce C. Gage, M.D.

# Summary of Time From Packet Received to Admission
# at DSH Facilities, by Hospital
## Q1 2015–Q2 2017

| Hospital | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Atascadero | 366 | 51 | 42 | 5 | 170 |
| Metropolitan | 525 | 50 | 42 | 1 | 320 |
| Napa | 512 | 58 | 56 | 3 | 202 |
| Patton | 720 | 51 | 48 | 1 | 204 |
| **Total** | **2,123** | **52** | **48** | **1** | **320** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# Summary of Time From Packet Received to Admission
# at DSH Facilities, by County
## Q1 2015–Q2 2017

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Los Angeles | 948 | 51 | 44 | 1 | 320 |
| Fresno | 40 | 75 | 72 | 35 | 132 |
| Kern | 6 | 81 | 87 | 42 | 98 |
| San Diego | 2 | 70 | 70 | 53 | 87 |
| Riverside | 72 | 43 | 35 | 4 | 141 |
| Sacramento | 1 | 68 | 68 | 68 | 68 |
| Santa Clara | 150 | 46 | 37 | 5 | 118 |
| San Bernardino | 6 | 45 | 47 | 1 | 83 |
| Stanislaus | 127 | 51 | 40 | 8 | 170 |
| San Joaquin | 69 | 56 | 59 | 13 | 123 |
| Contra Costa | 68 | 55 | 51 | 8 | 131 |
| Solano | 63 | 51 | 51 | 3 | 112 |
| Sonoma | 48 | 48 | 46 | 13 | 111 |
| Alameda | 74 | 49 | 49 | 9 | 99 |
| Merced | 18 | 67 | 65 | 28 | 112 |
| San Francisco | 47 | 53 | 53 | 14 | 95 |
| Tulare | 20 | 70 | 75 | 22 | 106 |
| Monterey | 26 | 54 | 51 | 7 | 105 |
| Santa Barbara | 39 | 59 | 56 | 13 | 122 |
| San Mateo | 10 | 62 | 67 | 25 | 91 |
| Ventura | 32 | 76 | 76 | 7 | 114 |
| Orange | 13 | 62 | 52 | 9 | 105 |
| Butte | 43 | 46 | 41 | 7 | 92 |
| San Luis Obispo | 9 | 72 | 84 | 17 | 107 |
| Kings | 1 | 63 | 63 | 63 | 63 |
| Madera | 5 | 58 | 63 | 12 | 107 |
| Yolo | 18 | 49 | 48 | 7 | 91 |
| Placer | 23 | 67 | 75 | 20 | 91 |
| Shasta | 19 | 64 | 64 | 20 | 159 |
| Santa Cruz | 8 | 70 | 82 | 17 | 98 |
| Humboldt | 21 | 36 | 34 | 13 | 70 |
| Lake | 22 | 66 | 60 | 19 | 198 |
| Sutter | 3 | 51 | 36 | 35 | 83 |
| Imperial | 8 | 66 | 61 | 22 | 105 |
| Marin | 12 | 49 | 54 | 13 | 65 |
| Yuba | 6 | 61 | 59 | 40 | 78 |
| El Dorado | 8 | 47 | 42 | 20 | 88 |
| Mendocino | 3 | 51 | 51 | 27 | 76 |
| Napa | 4 | 59 | 57 | 49 | 72 |
| Calaveras | 1 | 64 | 64 | 64 | 64 |

# Summary of Time From Packet Received to Admission at DSH Facilities, by County
## Q1 2015–Q2 2017

| County | Count of Inmates | Average Wait Time (days) | Median Wait Time (days) | Minimum Wait Time (days) | Maximum Wait Time (days) |
|---|---|---|---|---|---|
| Siskiyou | 12 | 41 | 39 | 13 | 78 |
| San Benito | - | - | - | - | - |
| Trinity | 2 | 56 | 56 | 40 | 71 |
| Del Norte | 2 | 70 | 70 | 58 | 82 |
| Nevada | 3 | 40 | 38 | 26 | 55 |
| Tuolumne | 2 | 19 | 19 | 15 | 22 |
| Tehama | 5 | 54 | 52 | 47 | 69 |
| Glenn | 1 | 72 | 72 | 72 | 72 |
| Amador | 3 | 50 | 54 | 19 | 76 |
| Lassen | - | - | - | - | - |
| Mariposa | - | - | - | - | - |
| Colusa | - | - | - | - | - |
| Inyo | - | - | - | - | - |
| Mono | - | - | - | - | - |
| Sierra | - | - | - | - | - |
| County not provided | - | - | - | - | - |
| **Total** | **2,123** | **52** | **48** | **1** | **320** |

Source:  PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", or "Approved Date" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with missing "Date Received" or multiple distinct "Date Received" are excluded.  Inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date" are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.

# DSH Facilities
## Date of Packet Completion Analysis
### 11/5/13–10/5/17

| Stage | Sample Size | Min. (Days) | 5th Percentile (Days) | 25th Percentile (Days) | Median (Days) | Mean (Days) | 75th Percentile (Days) | 95th Percentile (Days) | Max. (Days) |
|---|---|---|---|---|---|---|---|---|---|
| Packet Received to Completion | 2,271 | -1,094 | 0 | 5 | 14 | 22 | 28 | 84 | 209 |
| Packet Completion to Approval | 6,284 | -153 | -26 | 0 | 0 | 0 | 0 | 17 | 1,096 |

Source: PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", "Approved Date", or "Date Completed" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.  For "Packet Received to Completion", inmates with missing "Date Received" or multiple distinct "Date Received" are excluded, as are inmates for which "Date Received" is before "Earliest Commitment Date" or after "Approved Date".

Expert Report of Bruce C. Gage, M.D.

# Porterville Developmental Center
# Distribution of Wait Time from Commitment to Admission
## 2017

| Stage | Sample Size | Min. (Days) | 5th Percentile (Days) | 25th Percentile (Days) | Median (Days) | Mean (Days) | 75th Percentile (Days) | 95th Percentile (Days) | Max. (Days) |
|---|---|---|---|---|---|---|---|---|---|
| Commitment to Admission | 41 | 13 | 24 | 43 | 52 | 53 | 68 | 82 | 105 |

Source:  DDS Data (AG00065453.xlsx)

Note: Wait time is calculated as the number of days between commitment date ("Date of Order") and admission date ("Admission Date (if applicable)") to Porterville Developmental Center. Records for which commitment date or admission date are missing are excluded from this analysis.  Data after 9/20/17 are excluded.

Expert Report of Bruce C. Gage, M.D.

# DSH Facilities
# Distribution of Wait Time from Commitment to Admission
## 2017

| Stage | Sample Size | Min. (Days) | 5th Percentile (Days) | 25th Percentile (Days) | Median (Days) | Mean (Days) | 75th Percentile (Days) | 95th Percentile (Days) | Max. (Days) |
|---|---|---|---|---|---|---|---|---|---|
| Commitment to Admission | 1,382 | 9 | 38 | 60 | 85 | 84 | 100 | 130 | 223 |

Source: PARTS DSH Data (AG00063723.xlsx)

Note:  Inmates with missing "Earliest Commitment Date", "Scheduled Admission Date", "Approved Date", or "Date Completed" and inmates for which "Earliest Commitment Date", "Approved Date", "Scheduled Admission Date", and "Discharge Date", if available, are not in chronological order are excluded.  Inmates with conflicting Admission, Approved, or Discharge dates are excluded.  Observations are limited to those with a "Scheduling Status" of Admitted.  The data contain no commitments after 10/5/17.

# XVI APPENDIX C

_This appendix includes more detailed information on California programs._

# XVII.        CALIFORNIA TREATMENT SERVICES

## A.    DSH Treatment Services

The document DSH 2014-15 May Revision Estimate: Future Fiscal Issues reported that "...the current staffing ratio for treatment providers inadequately supports the forensic workload." [AG00009423 at AG00009423].  Subsequent documents did not speak directly to this issue but this suggests treatment capacity is insufficient.

In deposition, Michael Barsom spoke to the availability of general psychiatric treatment available at Metropolitan and Patton [Deposition of Michael Barsom 11/1/17, pp. 47-53], [Deposition of Michael Barsom 11/30/17, pp. 94-104.  It is likely that this is available in all state hospital settings.

Napa has mock trials.  [_See_ 2016 DSH Bed Utilization Study, AG000013834 at AG00013873].  Patricia Tyler testified that there is group and individual psycholegal education [Deposition of Patricia Tyler, pp. 104-105].

Per the deposition of Michael Barsom, there are mock trials, competency restoration groups, and individual competency restoration treatment at Metropolitan and Patton [Deposition of Michael Barsom 11/1/17, pp. 47-59], [Deposition of Michael Barsom 11/30/17, pp. 24-25, 106-109].  No program manuals or curricula were included in the documents provided.

Stirling Price testified that they have mock trials and individual treatment for competency training, "coping with their mental illness and their symptoms and improving symptoms, medication management, trying to help them maintain taking their medications," art therapy, music therapy, and occupational groups at Atascadero [Deposition of Stirling Price, pp. 31, 37-38].

DSH hospitals are accredited by the Joint Commission on Accreditation of Healthcare Organizations so must provide basic psychiatric and medical treatment services.

## B.    DDS Treatment Services

PDC clearly provides an array of services targeted at the needs of the ID.

The draft document entitled Statutory, Regulatory and Programmatically Required Functions of California's Regional Centers made no mention of competency restoration treatment.  Per Dawn Percy, Porterville has a "competency training module" [Deposition of Dawn Percy, p. 50] and she stated that "...Porterville has increased their competency training during the week." [Deposition of Dawn Percy, p. 147].  Sherrie Molina stated there were "14 components" to competency training but could only recall "understanding pleas...understanding courtroom personnel." [Deposition of Sherrie Molina, p. 178].  Theresa Billeci stated that competency treatment addresses "...what occurs in court, what the court process is, how to work with your attorney, what's the role, responsibility of the

various people in the courtroom.  They will do a mock trial….  They will go through different court proceedings, what can occur in court, in criminal court, what are your charges, what do those charges mean.  They'll discuss…what different kind of pleas are.  … Quizzes are done on a weekly basis." [Deposition of Theresa Billeci, p. 138].  PDC also uses games to teach competency material [Deposition of Theresa Billeci, p. 153].  DDS materials did not specify the content or capacity of these programs.

PDC is licensed by the California Department of Public Health to provide general acute medical services, skilled nursing services, and intermediate care services.

### C.    CONREP Treatment Services

CONREP has services in all counties.  [*See* DSH, 2013-14 November Estimate:  Forensic Conditional Release Program (CONREP), AG00009307 at AG00009307-AG00009309].  Services include "…individual and group therapies, collateral contact, home visits, substance abuse screenings and psychological assessments." [AG00009307 at AG00009307.]  The CONREP manual mentioned competency classes but no content or capacity were specified.  In deposition, Mark Grabau stated they do not do competency training groups because there are too few patients but do weekly individual competency restoration training [Deposition of Mark Grabau, p. 65].  He noted that housing is available for some IST patients, though there is no requirement to provide housing.  [See Deposition of Mark Grabau, pp. 26-27, 53-54].  Some locations have access to psychiatric hospitals and chemical dependency treatment.  [Deposition of Mark Grabau, pp. 27-28].  CONREP does not provide involuntary medication services but includes medication compliance as a condition of program participation when indicated.

### D.    JBCT Program Treatment Services

Based on the description of the JBCT program at San Bernardino in the paper by Rice & Jennings, the program appears to include adequate competency restoration programming and sufficient treatment capacity [See Rice & Jennings, 2014 at 63].  No other JBCT programs provided information.  Mark Grabau stated that patients get three types of groups:  "recreation groups, there's social mental stimulation groups, and then there's groups that are focusing on trial competency training." [Deposition of Mark Grabau, p. 102]. He stated that patients could expect to "get four to five hours of group work every day;" [[Deposition of Mark Grabau, p. 102]. This is greater than the 2.7 average hours in a published study [Rice & Jennings, 2014 at 66]. He stated that CONREP was planning to standardize the treatment expectations across JBCT programs based on the original request for proposals from 2007. [Deposition of Mark Grabau, pp. 103-104]. Services are rendered by the JBCT staff during normal business hours. After hours, services are delivered by jail staff but may include telephone call by a psychiatrist.

# XVIII     CALIFORNIA LOS AND RESTORATION

The average LOS is an indirect measure of adequacy of services; it should be comparable to other systems.  A review of all studies shows variation, but mean LOS is typically 5-7 months [Renner, et al., 2017 at 23].  In a recent study of one system, the average LOS was 116.3 days [Colwell & Gianesini, 2011].

## A.      DSH LOS

A 2017 study of all patients admitted for IST in CA found the average LOS from 7/1/03 to 2/17/16 was 29.94 weeks (210 days) [approximately Renner, et al., 2017 at 24], at the upper end of average.  The same study found wide variation in LOS for different hospitals.

Consistent with findings in the Renner study, the LOS varied substantially between hospitals for 2014-15 but the report revealed no clear reason.  [*Compare* 2016 DSH Bed Utilization Study at AG00013874 with Renner, et al., 2017].  This may reflect differences in population, differences in treatment, or other differences but deserves greater scrutiny.  The average LOS for each hospital was:

- Patton – 137 days
- Atascadero – 160 days
- Metropolitan – 183 days
- Napa – 267 days

[2016 DSH Bed Utilization Study AG00013833 at AG00013874].  The DSH: Incompetent to Stand Trial - July, 2016 Memo reported that the average LOS for all IST patients in 2014-15 was 178.2.  [AG000043162 at AG000043162].  Further, average LOS decreased from 203.9 to 155.8 (24%) in the five years prior to July 2016.  [AG000043162 at AG00043168].

However, George Maynard stated in deposition that the "ADT" (Admission, Discharge, and Transfer) system tracks transfers and any release from a DSH hospital as a discharge [Deposition of George Maynard pp. 72-74].  So, many who were counted as discharged were actually transferred and some may have gone back to jail and returned on the same case number, still incompetent.  As a result, the LOS data will underestimate actual LOS.  Thus, it is clear that the true LOS is longer than reported but it is uncertain by how much, though likely not a great deal.

The document DSH 2014-15 May Revision Estimate: Future Fiscal Issues reported that because of an inadequate staffing model "there is a significant gap in coverage causing DSH clinicians difficulty in maintaining their patient caseload, submitting timely reports and being fully prepared for court testimony.  If the workload specific to forensic evaluation reporting can be separated from the treatment providers, the gap in coverage will be addressed and DSH will achieve efficiencies that will result in a shorter length of stay." [AG00009423 at AG00009423].

It is important to note that JBCT programs are treating those easily restored and transferring the difficult to restore (see JBCT Program LOS).  This and the three-year maximum commitment time make it likely that DSH facilities are unlikely to be able to realize substantial reductions in LOS.

## B.      DDS LOS

A sample of 35 IST patients who attained competency between July 2011 and December 2014 showed an average LOS of 0.82 years (299.3 days) [Dwayne LaFon Exhibit 4,

AG00055096 at AG00055096.].  In his deposition, Mr. LaFon stated that he expected that the LOS had gone down since that time [Deposition of Dwayne LaFon, pp. 157-160].

## C.     CONREP LOS and Additional Performance Data

CONREP performs more poorly than most other state's community-based competency restoration programs.  [*See* Gowensmith, et al.].  Only 35% restored to competence compared to an average of 70%.  12% were determined unrestorable, slightly lower than the average of 20.3%.  The length of time to restoration was 320 days, much longer than the average of 149 days.  [Gowensmith, et al., 2016 at 299]

The rate of negative incidents (arrests, elopements, acute decompensations, and serious rule violations) was 30%, higher than the average of 16.7%.  73% of all states' negative incidents "…were due to acute psychiatric decompensation of clinically driven problems that necessitated a return to an inpatient setting," 27% to rule violations.  This is important in that adverse outcomes tended to be clinical rather than violent, criminal, or other problems related to public safety.  Cost was higher than average, though cost figures may have excluded some ancillary services and thus may not be reliable.  [Gowensmith, et al., 2016 at 299]

## D.     JBCT Program LOS

The Sacramento program provided some data that was too limited and incomplete to interpret.  The email From Andrea Javist to Matthew Garber, et al. dated 1/5/16 and the associated Letter from Andrea Javist to Matthew Garber and Mark Grabau dated 1/5/16 includes a statement that the average LOS from admission to competency restoration for the Sacramento JBCT program was 44 days; however, inspection of the underlying data shows that of the 22 patients admitted 10/15-12/15, only 6 were restored, and their average LOS was 31 days.  [*See* AG00017794 at AG00017794-AG00017795].  But of the remaining 16, 7 already had a LOS of more than 60 days.  In short, it is not clear what the actual LOS is for this program.

The only interpretable data available for JBCT programs comes from San Bernardino and Riverside Counties.

A published study of the San Bernardino JBCT showed that 55% were restored in an average of 57 days [Rice & Jennings, 2014 at 59].  The Virginia program it was modeled on showed that 83% were restored in an average of 77 days [Jennings & Bell, 2012].  There was no examination of characteristics that differentiated those restored from those not restored though the authors noted that the program "maximizes resources by distinguishing patients who can be restored in a short-term program while conserving state hospital beds for patients who require long-term or indefinite treatment." [Rice & Jennings, 2014 at 60].  The authors had no explanation for the low rate of restoration but offered, "If competency cannot be restored in the near future in the [JBCT program], the individual is typically referred to the state hospital for restoration." [Rice & Jennings, 2014 at 61].

57/126 psychotic patients were restored and 69 were sent to a state hospital.  [Rice & Jennings, 2014 at 64].  35/42 of other diagnoses were restored and only 7 were sent to a

state hospital. [Rice & Jennings, 2014 at 64]. This demonstrates the limitations of a jail setting for restoring the most mentally ill. But it also may explain the apparent poorer performance than the Virginia program discussed above [Jennings & Bell, 2012] in that more seriously ill patients were more promptly transferred to a hospital.

The document JBCT and State Hospital Comparison Data (undated and unattributed but seems to be DSH data) found an average length of stay at the San Bernardino JBCT Program of 89 days and 90% "restored within 90 days" for the 4th quarter of FY 2014-15. [AG00014709 at AG00014709]. This is difficult to reconcile with the above peer-reviewed study. The document does not report on methodology, transfers to state hospitals (and how these transfers were included in the analysis), or whether restoration was determined by a court, a forensic examiner, or the JBCT program clinicians. This data is cast in further doubt by the document CA-ROC West Valley Detention Center Weekly Census Report for the week of 8/10/15 which includes a list of patients discharged from that program from 1/2/15 to 8/3/15; of the 52 discharged, 27 were discharged as competent to stand trial (presumably, the opinion of the treating clinicians or a forensic examiner) and 25 were transferred to a state hospital. [AG00016058 at AG00016063-AG00016064]. This is much more in line with the data from the San Bernardino. Liberty Healthcare Corp also produced a series of reports from Riverside and San Bernardino JBCT programs through November 2015. The following table summarizes the findings:

|  | San Bernardino | Riverside |
|---|---|---|
| Total number admitted to program | 416 | 166 |
| Number transferred to state hospital | 167 | 69 |
| Average daily population | 18 | 17 |
| Average time to receiving packet of information | 11 days | 10 days |
| Average time on wait list for JBCT program | 19 days | 15 days |
| Average LOS of those restored by the JBCT program | 58 days | 60 days |
| Average LOS in JBCT program prior to transfer (wait time from referral to transfer in parentheses) | 90 (32) days | 105 (44) days |
| Of those discharged, the percentage restored | 57% | 49% |
| Of those discharged, the percentage transferred to a state hospital | 43% | 51% |

From this table, about half of those admitted to the JBCT programs are not restored there but sent to a state hospital. Of those restored, the average LOS is about two months. Given that the average LOS prior to recommending transfer is about the same, it is clear that the more difficult to restore patients are being sent to the state hospital, artificially inflating the success rate of these programs. But again, it is appropriate for JBCT programs to rapidly transfer those that are not quickly restored; the point is that it is incorrect to say that these programs do a better job of restoring competence to stand trial than hospitals.

It bears noting that when testifying about tracking those in JBCT, George Maynard stated that the Forensic Services Division would "...never cease tracking any patient that's committed to our system that we're treating." [Deposition of George Maynard, p. 71].

However, the data produced by DSH does not reflect that level of tracking, which should be able to provide LOS, waiting lists, and transfers related to JBCT programs.

### E.    Interpreting LOS Data

While the LOS data is valuable, the more important data point is success in restoration. Neither DSH nor DDS collect data on their rate of successful restoration. The literature only provides this information for CA misdemeanant IST restoration, CONREP, and the San Bernardino JBCT program, which all showed lower than average success at restoration, as did the Liberty Healthcare data cited in the previous section.

# XIX  CALIFORNIA FORENSIC EVALUATIONS

Forensic evaluations may contribute to increased LOS. One element to consider is timeliness of evaluations. Each day evaluations of those that have been restored to competency are not completed adds a day to LOS.

Periodic evaluation is a part of a comprehensive competency restoration program. Not only does it result in prompt return of those restored to competency, it also provides feedback to the treatment team on progress towards restoration and helps identify treatment targets [Noffsinger, 2001; Mossman, et al., 2007]. DSH has begun to develop a process for treatment teams to evaluate progress monthly, beginning at Metropolitan and intended for expansion to Patton, including use of a competency assessment instrument, often the Fitness Interview Test - Revised [e.g., Deposition of Michael Barsom 11/30/17, pp. 74-90]. This is an important process but does not take the place of an independent, formal forensic evaluation.

The document DSH Clinical Staffing Study, Staffing Methodology Proposal, Forensic Services Department dated September 2015 addressed the staffing of forensic evaluators. It included an assumption in table 3.1 that forensic evaluations of those found IST will only be done every six months as required by statute, thus not providing for timely evaluation by a forensic evaluator (alienist). [AG00013155 at AG00013172]. Correspondingly, Michael Barsom noted in deposition that treating clinicians render opinions regarding competency restoration rather than forensic evaluators [Deposition of Michael Barsom 11/1/17, p. 19], which is inconsistent with best practice [Mossman, et al., 2007].

The CONREP Policy and Procedure Manual provides for competency assessment. Competency assessments are to be done "... at admission and periodically thereafter to determine if the individual has regained competency. If an individual has not regained competency within six months of admission, other tests may be indicated to determine the prognosis for recovery, such as intelligence and neuropsychological tests." [AG00000474 at AG00000479.] Elsewhere, it notes that such assessment may be done as needed rather than on a schedule. It does not state who is to conduct such assessments.

Unfortunately, the state does not appear to track timeliness of forensic evaluations, so it is not possible to determine if this is contributing to LOS.

There is no provision for a jail to secure a competency evaluation for those on the waiting list but not in a JBCT program who may have been restored to competency while waiting, resulting in needless hospitalizations.

The other important element of forensic evaluations is quality, i.e., whether they meet standards.  Nationally, 27.5% of those evaluated for CST are found IST [Pirelli, Gottdeiner, & Zapf, 2011 at 28].  The analyses of forensic evaluations provided did not report this statistic.

Evaluations must consistently address competency to stand trial, appropriateness of medications, whether medications are likely to restore competence, side effects of medications, alternative treatments, capacity to consent to medications, dangerousness, and unrestorability. In a study of Napa forensic evaluations [quoted in Incompetent to Stand Trial – Meeting the Demand], McDermott found that forensic evaluations were often incomplete.  She found the following percentages of each component [Note:  Dusky 1 refers to a defendant's understanding of the proceedings and Dusky 2 to ability to work with their attorney.]:

- Dusky 1 – 83%
- Dusky 2 – 91.8%
- Relationship of mental disorder to competence – 14.2%
- Appropriateness of medications – 80%
- Whether medications are likely to restore competence – 68.5%
- Side effects of medications – 37.3%
- Possible alternative treatments to medications – 37.1%
- Capacity to consent to medications – 65.7%
- Dangerousness – 55.6%

Dr. McDermott's statewide report [quoted in Incompetent to Stand Trial – Meeting the Demand], which covered a subset of required elements, found the following:

- Dusky 1 – 74%
- Dusky 2 – 83%
- Both Dusky elements – 72.5%
- Overall competence – 87.9%
- Capacity to consent to medications – 65.7%

[AG00063070 at AG00063109-AG00063110, AG00063123]. These studies demonstrate clear room for improvement. It is difficult to assess the magnitude of the impact these deficiencies have on the waiting list and LOS, but they cannot be helpful.

DSH noted it should "[e]stablish minimum education and/or training standards for a psychiatrist or licensed psychologist to be considered for appointment to perform competency evaluations for a court. UC Davis research at DSH Napa indicates that current alienist evaluations are producing a consistent 15 to 17 % rate of IST malingerers improperly determined to be incompetent and admitted to DSH for competency restoration treatment. This research also showed that in 2014-15 malingerers had an average length of stay of 109 days. Last fiscal year's IST admissions totaled 2,800. Elimination of malingerers could eliminate approximately 400 unnecessary IST admissions annually." [DSH:

Incompetent to Stand Trial - July, 2016 Memo, AG00043162 at AG00043172]]. However, this rate of detection is already better than typical rate of 20-30% malingerers found in studies of the incompetent to stand trial population [Gottfried, et al., 2017 at 232]. It is unrealistic to expect all malingerers to be detected during the initial forensic evaluation.

In response to deficiencies in forensic evaluation, Penal Code section 1369(h) requires DSH to "...adopt guidelines for education and training standards for court-appointed psychiatrists and psychologists by July 1, 2017." [*See* Penal Code Section 1369(h)(1)].

The 2016 DSH Bed Utilization Study noted that "[c]ompetency assessment varies across hospitals in terms of the extent to which patient assessment is standardized, and who is responsible for submitting forensic evaluations." [AG00013833 at AG00013877]. At that time, only Atascadero had a dedicated forensic team that conducted evaluations of IST patients. The document DSH 2014-15 May Revision Estimate: Future Fiscal Issues also speaks to the broad establishment of forensic services teams. [AG00009423]. This will allow forensic evaluations to be conducted by dedicated evaluators rather than treating clinicians, bringing DSH in line with professional ethical standards and likely improving the quality and consistency of evaluations. In line with this, Patricia Tyler testified that as of July, 2017, court reports were being done by "forensic staff," presumably dedicated evaluators [Deposition of Patricia Tyler, p. 109].

In DDS, Theresa Billeci stated that a psychologist made competency determinations [Deposition of Theresa Billeci, p. 139]. It was not clear whether this was a treating psychologist or a forensic evaluator.

January 25, 2018                Expert Report of Bruce C. Gage, M.D.                Page D-1

# XX   APPENDIX D

This appendix includes summaries of the literature on competency restoration services and identifying those that are unrestorable.

# XXI  RESTORATION SERVICES

## A.      Hospital-Based Competency Restoration

Treatment in a hospital is the most common approach to restoration to competency. [Miller, 2003, at 382-84]. Consistent with the model program, routine, basic mental health treatment, including medications, is a component of any competency restoration program. [Roesch & Zapf, 2011, at 45.]  Involuntary medication for those who refuse must be obtained timely, requiring adequate assessment of need and prompt referrals to court or other relevant authority. While not necessary for all, psychiatric rehabilitative services that reduce mental health symptoms bearing on competency need to be available, both in groups and individual treatment. [Bertman, et. al, 2003].

Psychoeducational services and experiential learning modalities that promote understanding of the legal process may be delivered in groups and/or individually and have been used in a variety of hospitals [Pendleton L, 1980; Davis, 1985; Siegel & Elwork, 1990; Brown, 1992; Bertman, et. al, 2003.]  Examples were summarized in a table by Scott [Scott C, 2003, at 38.]

| Program | Legal Educational Didactic Groups | CST Assessment Instrument | Written Examination of Patients | Mock Trial Experience | Individualized/Augmented Programming | Average Length of Stay |
|---|---|---|---|---|---|---|
| Atascadero State Hospital | Patients attend a competency education class | Competency to Stand Trial Assessment Instrument | Passing score of 70% required | Used real judges and attorneys | Individualized treatment program developed to address specific deficits | Not described |
| Forensic Unit Central Ohio Psychiatric Hospital | Patients assigned to groups related to specific deficits; frequency of groups not described | Competency to Stand Trial Assessment Instrument | Not described | Patients role play in mock trials | Patients divided into five groups with specific programming for each group; some patients received individual programming | Not described |
| Alton Mental Health and Developmental Center | Group led by psychologist (5 days a week); seven discrete modules focusing on legal education with several daily sessions | Not described | Patients given written test at end of each module | Uses mocked trial and videotaped trial training | Meet individually as needed with program manager | Not described |
| North Coast Behavioral System | Educational module presented by various staff; | Not described | Not described | Defendants role play various courtroom | Specific modules to provide anxiety management skills | 80 days |

|  | other modules focusing on legal issues; 15 hours of weekly contact time |  |  | participants |  |  |
|---|---|---|---|---|---|---|
| FFF Standard Hospital Treatment | Four legal rights education groups presented by social worker | Georgia Court Competency Test | Not described | Not described | Not described | Not described |

Research shows some impact of hospital-based psychoeducational services on competency restoration, but studies are small and use varying methods to study different treatment programs. They show variable results and do not clearly demonstrate what types or components work for different populations. [Siegel & Elwork, 1990; Bertman, et. al, 2003; Advokat, et al., 2012]. Specialized curricula and approaches have been developed for the intellectually disabled. [Anderson & Hewitt, 2002; Wall, Krupp, & Guilmette, 2003.]

#### Average Length of Stay

A 2011 study found the average length of stay (LOS) for patients found IST in hospital settings is about 116.3 days [Colwell & Gianesini, 2011] but a review of available studies found that 5-7 months is more representative of the whole literature, though this includes some less recent studies that tend to show longer LOS. [Renner, et al., 2017, at 23.]

#### Effective for Restoring Competency

Time to restoration has been examined in a number of studies. For example, a study of 1475 Indiana state hospital admissions found that 72.3% were restored within 6 months and 83.9% within 1 year. [Morris & Parker, 2008, at 528-29.]  In a study of 268 Ohio cases, Mossman found 75% were restored. [Mossman, 2007, at 34, 38.].. A study of 71 Connecticut defendants, 76% were restored. [Colwell & Gianesini, 2011, at 301.]  In a broad review of competency restoration, Zapf and Roesch found that about 75% are restored within 6 months. [Zapf & Roesch, 2011, at 43.]

## B.    Jail-Based Competency Restoration

These programs are a recent development. They have not been well-studied and what studies there are have focused on length of stay and efficacy of competency restoration; studies have not looked at other important outcome variables such as restraint, use of force, self-injury, assault, reentry, and clinical improvement generally.

#### Jails Are Not Therapeutic Environments

In AB 720, the CA legislature included the following language. "Jails are not therapeutic environments and were not intended or designed to be mental health facilities."  [AB-720 section 1(c).]  The legislature further added, "It is the policy of the State of California to prevent persons with mental health disabilities from inappropriate involvement with the criminal justice system. As part of an effort to decriminalize the treatment of persons with mental health disabilities, individuals should be treated whenever and wherever possible

in community treatment settings and not in jails." [AB-720 section 1(d).]  The purpose of this legislation is to "[r]educe the length of time persons with mental health disabilities remain in jail, and assure that appropriate treatment is available to them while in jail." [AB-720 section 1(e)(3).]

Those in jail-based competency treatment (JBCT) programs are pretrial defendants that have not been convicted of a crime and need treatment. This raises serious questions about the practice of JBCT, especially in the case of minor charges where the practice effectively increases time in jail for the mentally ill. [Kapoor, 2011, at 312.]

Jails are highly restrictive settings and thus treatment in these settings does not align with the goal of providing treatment in the least restrictive setting. The community and DSH and DDS facilities are less restrictive than jails as well as being more therapeutic.

The jail setting limits efficacy generally but specifically for some patients. Not surprisingly, "restrictive and under-resourced" conditions in psychiatric hospitals are noted to be associated with patient aggression [e.g., Cornaggia, et al., 2011]. Such conditions are present in jail settings.

<u>Variable Programs and Limited Outcome Studies</u>

Nine states have JBCT programs. [Gowensmith, et al., 2016, at 298.]  Unlike California's, most are designed to serve those awaiting hospital or community placement, though many in California were ultimately hospitalized in 2014. [Rice & Jennings, 2014.]

Such programs are only feasible in larger jails that have the space and staffing resources to develop a formal program. Programs are highly variable [Gownsmith, Murrie, &Packer, 2014; Kapoor, 2011]. Differences include the setting, availability of routine treatment, provision of competency-specific treatment, varying (and often highly restricted) formularies, and obtaining and safely administering involuntary medications.

The San Bernardino JBCT program includes all the essential elements of a competency restoration program except, historically, involuntary medications. [Rice & Jennings, 2014, at 63.]  There are regular individual and group meetings, including twice daily individual meetings and 3.5-5.5 hours of "group-based psychosocial rehabilita[tion]...." [Rice & Jennings, 2014, at 62.]  Actual average hours were 2.7 hours per day of group and 1.6 individual contacts per day. [Rice & Jennings, 2014, at 66.]  Treatment includes competency restoration, mental illness and medication management, mental/social stimulation, physical/social stimulation. Groups are at two cognitive levels. 13% of participants refused medications. [Rice & Jennings, 2014, at 66.]

The Virginia JBCT showed 83% restoration in an average of 77 days. [Jennings & Bell, 2012, at 84.]  The San Bernardino program, which was based on the Virginia program, showed 55% restoration in an average of 57 days. [Rice & Jennings, 2014, at 64.]  These are very limited findings and, as noted above, do not constitute an adequate information base to declare JBCT effective, especially since they are similar programs. More research is needed.

A thorough examination of the practice of JBCT concluded:

> "Challenges include limited jail formularies, transportation of defendants, the
> limited capabilities of correctional facilities to provide adequate mental health care,

and perhaps most importantly, significant concerns regarding civil liberties and least restrictive settings for mental health treatment. ... The mentalcompetency.org resource center does not describe jail-based restoration as an unqualified best practice. Jail-based restoration is recommended only if community-based programs and services are not available, and even then recommendations are tempered by the challenges described above. For example, a recent report from the Hogg Foundation for Mental Health (2013) recommends that Texas pursue outpatient restoration instead of jail-based restoration, and suggests that jail-based restoration only be considered when outpatient restoration programs are not available – and only when mental health staffing is adequate at the facilities. Many stakeholders with whom we spoke also commented that jail-based restoration would essentially lengthen the time that persons with mental illness spend behind bars in a correctional institution, rather receiving access to services at a mental health facility. Given the paucity of data, as well as the significant challenges associated with jail-based mental health services, jail-based competency restoration is not a national best practice model at this time." [Gowensmith, Murrie, & Packer, 2014, at 31; *see also* Graziani, et al. 2015].

<u>Transfer to Hospital-Level of Care</u>

Certain clinical situations demand transfer to a hospital setting, including danger to self or others or grave disability due to mental illness or intellectual disability. These patients should be hospitalized just as similar patients are hospitalized through civil commitment. If the jail is unable to provide necessary treatment (including involuntary medications), transfer is indicated. Health care acuity or complexity beyond the capacity of the jail (medical, dental, and/or psychiatric) must prompt hospitalization. Those who respond poorly to treatment in the jail setting must also be transferred.

## C.    Community-Based Competency Restoration

Community-based competency restoration is a recently developed and growing method of competency restoration. While also not well-studied, there are more studies of larger populations than for JBCT programs. These programs also embody the principle of treatment in the least restrictive setting.

<u>Limited to Low Risk and Likely Treatment Participation</u>

Patients directed to community-based restoration should represent a low risk of violence to the community. This should be based on violence risk assessment, criminal history, prior hospitalizations, and/or clinical presentation [Graziani, et al., 2015, at 9-10; Gowensmith, Murrie, & Packer, 2014.] Analysis of data from states with available data confirms the population being served is low risk. [Gowensmith, et al., 2016, at 300.]

Patients should also have a history of and current disposition towards adherence to treatment [Gowensmith, Murrie, & Packer, 2014 (referencing mentalcompetency.org.)] Those with multiple hospitalizations are unlikely to be good candidates. [Graziani, et al., 2015, at 19-20, 23-24.]  Again, state data confirms this is the population served [Gowensmith, et al., 2016.].

January 25, 2018            Expert Report of Bruce C. Gage, M.D.                    Page D-5

They should also represent low elopement risk [Gowensmith, Murrie, & Packer, 2014, at 28], have housing, and not be abusing drugs [Gowensmith, Murrie, & Packer, 2014, at 30 (referencing mentalcompetency.org.)], though states vary in their willingness to address substance use in community-based restoration programs. [Gowensmith, et al., 2016, at 298.]

<u>Highly Variable Programs</u>

There is substantial variability in these programs [Graziani, et al., 2015; Gowensmith, Murrie, & Packer, 2014]. The treatment setting may be residential, a community mental health center, an outpatient treatment center at state hospitals, or a private office; most are first hospitalized, then transferred to community-based restoration. [Gowensmith, et al., 2016, at 298-300.]

Typical components include [Gowensmith, et al., 2016, at 298, 300]:

- Psychological assessment
- Provision of competency-specific education
- Medication
- Case management
- Therapy – individual, group, and family
- Drug screening

<u>Are Effective in Restoring Competency</u>

Most research has shown positive results [Graziani, et al., 2015; Gowensmith, Murrie, & Packer, 2014; Gowensmith, et al., 2016]. About 77% of patients are restored to competency. [Gowensmith, Murrie, & Packer, 2014, at 29.]

Average time to restoration is slightly longer than for inpatient hospitals at about 150 days. [Gowensmith, Murrie, & Packer, 2014, at 29.]  Research on Texas programs found that longer time in treatment was associated with greater restoration, but the rate of success decreased after 21 weeks. [Graziani, et al., 2015, at 2, 22, 23.]

Program features associated with efficacy are poorly researched. There can be significant program variability in outcome. [Graziani, et al., 2015.]  But, unlike JBCT, more different types of programs have been examined and studies include far greater numbers of subjects, giving more confidence that such an approach is viable.

Patient features associated with successful restoration are similar to those from inpatient programs, such as a history of fewer hospitalizations. [Graziani, et al., 2015, at 2, 19-20, 23-24.]

Results from other types of jail diversion programs for the mentally ill suggest community-based treatment is safe and effective [Heilbrun, et al., 2012.]  As Gowensmith, et al. conclude, "[T]his study seems to indicate that [outpatient competency restoration programs] show generally positive results, including financial savings, increased inpatient bed capacity, maintenance of public safety, and high rates of restoration."  [Gowensmith, et al., 2016, at 300.]

<u>Transfer to Hospital-Level of Care</u>

The National Judicial College has suggested the following parameters for hospitalization:

Danger to self or others or grave disability due to mental illness
The pathology of the individual is unclear and requires close clinical observation to assess and treat
A thorough evaluation for malingering is required
The individual lacks the capacity to consent to psychotropic medications and is likely to require the involuntary administration of medication for restoration to competency
Emergency mental health or medical services are likely to be needed.
Poor response to treatment should also prompt transfer.

# XXII.        SUMMARY OF RESEARCH ON RESTORABILITY

Studies on the percentage of IST restored vary in their results. This is in part due to varying duration of maximum commitment for competency restoration in different jurisdictions and for different types of crimes. Other sources of variance include setting and types of restoration programs (as discussed above) as well as a host of other factors not well studied or difficult to study such as judicial variation, differences in state laws and case law, quality of competency evaluations, differences in the referral base, and so on.

It is important to understand that unrestorability is a low base rate event (i.e., the vast majority are restored) making it inherently difficult to predict. [Zapf & Roesch 2011.]  In the same meta-analytic study of 51 studies and 5856 defendants cited above, 81% were eventually restored to competency. [Gowensmith, et al., 2016, at 294 (citing a large meta-analytic study by Pirelli & Zapf following up their 2011 study that was presented 3/20/15 at the annual meeting of the American Psychology – Saw Society, San Diego, CA).]  These results are similar to previous studies and expert examinations of the literature [e.g., Melton, et al., 2007]. Note that while the percentage of the intellectually disabled restored is much lower, at about 24% to 33% [Anderson & Hewitt, 2002; Wall, Krupp, & Guilmette, 2003; Scott, 2003], they constitute a small fraction of the overall IST population and thus have little impact on overall restoration figures.

Early research demonstrated limited ability to predict who will be restored [Carbonell, Heilbrun, & Friedman, 1992; Nicholson & McNulty, 1992; Nicholson, Barnard, Robbins, & Hankins, 1994; Hubbard, Zapf, & Ronan, 2003.]  Some gains have been made since. Those with violent charges and previous criminal history or serious charges [Hubbard, Zapf, & Ronan, 2003, at 135, 137; Colwell & Gianesini, 2011; Morris & DeYoung, 2014, at 82, 87], non-psychotic disorders and violent criminal histories [Hubbard, Zapf, & Ronan, 2003, at 135, 137; Colwell & Gianesini, 2011], or mood disorder [Morris & Parker, 2008, at 522, 528-29, 531] are more likely to be restored.

Those less likely to be restored have misdemeanor charges [Mossman, 2007, at 34, 39-40], long-standing psychotic disorders or irremediable cognitive disorder [Pinals, 2005; Mossman, 2007,at 34]; Morris & Parker, 2008, at 522, 528-30; Colwell & Gianesini, 2011, at 297-304], prior episodes of incompetence [Colwell & Gianesini, 2011, at 209, 304], longer lengths of stay [Mossman, 2007, at 34], been prescribed more medications [Colwell & Gianesini, 2011, at 297, 304], or are older and have difficulty understanding legal

information [Hubbard, Zapf, & Ronan 2003, at 137; Morris & Parker, 2008; Morris & DeYoung, 2014, at 522, 529]

As noted above, a minority of those with intellectual disability are restored, though one small study showed a 61.1% success rate with a with an intensive treatment program designed specifically for the ID and implemented both in inpatient and community-based settings; this contrasted with a 16.7% success rate for treatment as usual (which included competency psychoeducation). [Wall & Christopher, 2012, at 366, 369].

# XXIII    APPENDIX E

This appendix is a listing of source materials for this report.

## A.    Database

This includes all documents and materials reviewed other than statutes, case law, and regulations publicly available. The first section includes all depositions reviewed. The second section includes those documents cited within the body of the report in order of their first citation. The third section includes those documents reviewed but not specifically cited.

Depositions

1. Dawn Percy dated 9/13/17
2. George Maynard dated 10/17/17
3. Michael Barsom dated 11/1/17
4. Michael Barsom dated 11/30/17
5. Amy Prothero dated 10/26/.17
6. Mark Grabau dated 11/7/17
7. Matthew Garber dated 10/13/17
8. Janna Lowder-Blanco dated 12/7/17
9. Patricia Tyler dated 10/4/17
10. Stirling Price dated 11/3/17
11. Theresa Billici dated 9/19/17
12. Sherrie Molina dated 11/14/17
13. Dwayne LaFon dated 9/29/17
14. John Doyle dated 12/6/17

Documents Cited

1. DSH: Incompetent to Stand Trial - July, 2016 Memo, AG00031262, Maynard Ex. 8.
2. The California Department of State Hospitals Annual Report 2016, Barsom 1/11,17, Ex. 8.
3. Slides of presentation entitled Incompetent to Stand Trial – Meeting the Demand, presented 10/27/17 at the Head Public Defenders Meeting, AG00063070.
4. DSH Clinical Staffing Study, Staffing Methodology Proposal, Forensic Services Department dated September 2015, AG00013155
5. DSH Bed Utilization Study by Helen Braithwaite and Theresa Lavery dated 2/29/16 AG00009460, Maynard Ex. 11.
6. DSH 2015-16 November Estimate, Program Update, Population and Personal Services Adjustments, AG00009369, Maynard Ex. 21.
7. DSH 2015-16 May Revision Estimate, Program Update, Population and Personal Services Adjustments, AG00009460, Maynard Ex. 22.

8. Declaration of George Maynard in Support of DSH's Brief RE Loveton Decision, dated 4/15/16, Maynard Ex. 6.

9. Response to Order to Show Cause and Request for Extension of Time dated 9/1/17 in Alameda County Superior Court, Case No. 17-MH-012444, Maynard Ex. 13.

10. Email from Galina Semeryuk to Alice Lee, et. al dated 1/7/15, including an attachment entitled Weekly Pending Placement Report, dated 1/5/15, Maynard Ex. 18.

11. DSH 2014-15 May Revision Estimate: Future Fiscal Issues, AG00009423.

12. DSH IST - Pending Placement List Analysis, Data as of January 5, 2015, AG00039848, Maynard Ex. 5.

13. DSH IST Pending Admission Analysis, Patient Data as of 8/8/16, AG00012150, Maynard Ex. 4.

14. Defendant Santi Rogers' Amended Responses to Plaintiff's Request for Admission (Set One) regarding Alameda County Superior Court Case No. RG15779731, verified by Dawn Percy on 11/2/16, Percy Ex. 14.

15. Email from Sandra Regan to Brandon Jones dated 5/17/16, including an attachment entitled PDC 4418.7 Referral Process & Templates, AG00039336.

16. Email from Brigitte Martins to Angie Smith, et. al dated 8/30/16, including an attachment entitled Porterville Regional Project Statewide DCL Meeting Minutes, dated 8/15/16, AG00036960-64, Billeci Ex. 5,

17. Electronic spreadsheet file AG00012522-R.xlsx

18. Electronic spreadsheet file AG000063723.xlsx

19. Department of State Hospitals, Initial Statement of Reasons for adopting Article 7, Sections 4700, 4710, 4711, 4712, 4713, 4714, 4715, 4716, and 4717, 2017, available at http://www.dsh.ca.gov/About_Us/docs/Regulations/Initial_Statement_Reasons_01 132017.pdf.

20. Declaration of Amy Prothero in Support of DSH's Brief on Remand in Response to Courts Questions, dated 5/4/16, *In re Osburn*, *et seq*., Case No. 0509064, Sacramento County superior court, AG00009737-40, Prothero Ex. 2.

21. Email from Sherrie Molina to Sandra Regan dated 4/28/15 (string included), with attachments including forms entitled Information Checklist, dated 7/27/12 and Referral for Placement Services for Persons with Developmental Disabilities, dated 4/2007 AG00031396-404, Molina Ex. 3.

22. PDC admission packets:

    a. Heavily redacted admission packet to PDC for Marc Carr including a cover letter from Melanie Fowler to Sherrie Molina dated 8/28/15, AG00030274.

    b. Heavily redacted admission packet to PDC for Eduardo Jose Salazar, Jr. including a cover letter from Lance Bohn, Ph.D. to PDC dated 7/7/15, AG00031069.

    c. Heavily redacted admission packet to PDC for Dmarrhae Martin including a cover letter from Jessica Gewirz to PDC dated 8/17/16, AG00058836.

    d. Heavily redacted admission packet to PDC for Oscar Bahena including a cover letter from Megan Mitchell to Sherrie Molina dated 9/16/15, AG00049103

    e. Heavily redacted admission packet to PDC for Keaghan Rivers including a cover letter from Daphne Wood to Sherrie Molina dated 10/13/14, AG00056866

23. Redacted Jail Psychiatric Services Jail Based Competency Treatment Program Screening Assessments for seven defendants from October 2015, AG00014786-92.

24. San Bernardino County Sheriff Department Jail-Based Competency Treatment (JBCT) Program IST Transfer and Admission Assessment, AG00014406.

25. Email from Kevin Rice to Mark Grabau dated 12/16/15, Bates AG00014404–05.

26. Draft document entitled Statutory, Regulatory and Programmatically Required Functions of California's Regional Centers, dated September 2016, AG00017335-94.

27. DSH, 2013-14 November Estimate:  Forensic Conditional Release Program (CONREP) ), AG00009307–09.

28. Email from Andrea Javist to Matthew Garber, et al. (string included) dated 1/5/16, AG00017793.

29. Letter from Andrea Javist to Matthew Garber and Mark Grabau dated 1/5/16, AG00017794–96.

30. JBCT and State Hospital Comparison Data (undated, no author) , AG00014709.

31. 15CA-ROC West Valley Detention Center Weekly Census Report, dated August 10, 2015, AG00016058–64.

32. Liberty Healthcare Corp reports:

    a. Liberty Healthcare Corp Restoration of Competency Program (ROC): Riverside Co. – Robert Presley Detention Center and San Bernardino Co. – West Valley Detention Center monthly report from December 2014, dated 1/8/15, Bates AG00015944–75, Grabau Ex. 3.

    b. San Bernardino County Sheriff Department Jail-Based Competency Treatment (JBCT) Program monthly report from October 2015, dated 11/17/15, AG00025798–806.

    c. Liberty Healthcare Corp Restoration of Competency Program (ROC): Riverside Co. – Robert Presley Detention Center and San Bernardino Co. – West Valley Detention Center monthly report from October 2015, dated 11/16/15, AG00025808–45.

    d. Liberty Healthcare Corp Restoration of Competency Program (ROC): Riverside Co. – Robert Presley Detention Center and San Bernardino Co. – West Valley Detention Center monthly report from November 2015, dated 12/10/15, AG00025736–72.

   e. San Bernardino County Sheriff Department Jail-Based Competency
      Treatment (JBCT) Program monthly report from November 2015, dated
      12/10/15, AG00025773–82.
   f. Liberty Healthcare Corporation Restoration of Competency and Jail-Bas,
      AG00038337–38.ed Competency Treatment Programs Annual Program
      Summary for 2015

33. Email from Christian Jones to Pam Ahlin, dated 1/14/15, AG00043021–22,
    including an attachment entitled Weekly Census with Fiscal Year 2014 – 15
    Allotment Population for 1/12/15 for DSH Hospitals (AG00043023–27) and
    CONREP Patient Participation, AG00043028.
34. Second Declaration of George Maynard in Support of Department of State Hospital's
    Renewed Motion to Set Aside Hofman Order, dated 10/3/17, Maynard Ex. 7.
35. Table entitled DSH Bed Capacity Data as of April 1, 2016, AG00009259–63.
36. DSH System Wide Weekly Pending Placement Report, dated 9/25/17.

Additional Documents Reviewed

1. Contract between DSH and Shreya Medical Group Incorporated, Agreement No. 14-
   78005-000, including Exhibits A through F
2. Policy and procedure manual for the Conditional Release Program (CONREP)
3. Redacted materials regarding John Gradin Pote
4. Letter from David M. Schneider, Ph.D. to the Hon. Arthur Wick dated March 15, 2016
5. Superior Court of California, County of Sonoma: 1368 Forced Medication Evaluation
   regarding John Gradin Pote dated April 22, 2016
6. Arrest report and police discovery regarding John Gradin Pote dated February 8,
   2016.
7. Jail records regarding John Gradin Pote from February 2016
8. DSH State Hospital Population Estimate, 2013-14 November Estimate, Program
   Update, Population and Personal Services Adjustments
9. DSH – Napa, Administrative Directive:  Involuntary Administration of Psychotropic
   Medication to Incompetent to Stand Trial (PC 1370) Commitments. Number: 796.
   Effective 2/17/15
10. DSH – Napa, Administrative Directive:  Involuntary Administration of Psychotropic
    Medication to Incompetent to Stand Trial (PC 1370) Commitments. Number: 796.
    Effective 2/16/16
11. Examples of IST commitment orders from Los Angeles County Superior Court
12. Declaration of George Maynard in Support of Department of State Hospitals'
    Response to Order to Show Cause and Request for Extension of Time, dated
    8/25/17
13. Form entitled 1370 Packet Checklist (1Case Only)
14. Redacted letter from Dana White, RN to Community Program Director (presumably
    the CONREP Program Director) dated July 20, 2015

15. Redacted legal packet of David G. Loflin, in Solano County Superior Court, Case No. FCR316252
16. Examples of heavily redacted forensic evaluations
17. Case no. BA 414277-01 from Los Angeles County Superior Court by Edward F. Fischer, Ph.D. Dated 3/4/14
18. Case no. BA 414277 from Los Angeles County Superior Court by Timothy D Collister, Ph.D. dated 10/26/13
19. Email from Brigitte Martins to Angie Smith, et. al dated 1/13/16, including an attachment entitled Porterville Regional Project Statewide DCL Meeting Minutes, dated 8/20/15
20. Email from Alice Lee to Eric May dated 9/27/16 with attached JBCT Materials
21. Email from Matthew Garber to Sherry Gold and Derric Johnson (string included) dated 11/24/15
22. Email from Lorena Becerra to eariaz@Riversidesheriff.org, et al. (string included) dated 2/5/15
23. Email from Johanna Allard to Alisha Johnson, et al. dated 1/15/16
24. Email from Vicki Dela Cruz to Terry Fillman dated 8/12/15
25. Email from Andrea Javist to Mark Grabau, Matthew Garber, and Sierra Bishop dated 10/12/15
26. Email from Kevin Rice to David Jones, et al. dated 11/18/15
27. Email from Kevin Rice to David Jones, et al. dated 11/17/15
28. Email from Kevin Rice to David Jones, et al. dated 12/10/15
29. Email from Jason Kenney to ELRODSA@dshs.wa.gov
30. Email from Mike Hanna to Nancy Bargmann dated 7/15/16
31. Email from David Jones to jnbianco@lacourt.org, et al. dated 6/5/15
32. Email from Andrea Javist to Matthew Garber, et al. dated 1/5/16
33. Documents prepared by Disability Rights California regarding IST
34. Placement of Individuals Found Incompetent to Stand Trial: A Review of Competency Programs and Recommendations, publication #CM52.01
35. Forensic Mental Health: Legal Issues, Chapter 1, Incompetent to Stand Trial (IST) Commitment
36. DRC Recommendations: Incompetent to Stand Trial
37. Memorandum from Jeanette Hawn to Anne Hadreas and Rebecca Cervenak regarding Positive Features of Community-Based Competency Restoration Programs Outside CA dated 7/21/16
38. Second Amended Notice of Deposition upon Oral and Videotaped Examination of Department of State Hospitals (C.C.P. section 2025.230) in the Alameda County Superior Court, case no. RG15779731
39. Objections and Responses to Second Amended Notice of Deposition upon Oral and Videotaped Examination of Department of State Hospitals in the Alameda County Superior Court, case no. RG15779731

40. DSH Document Entitled Unlikely and Holdover Log Rollup with data as provided by the Legal Services Division, undated but with data from 2013 to March 16, 2016
41. DSH Regulations Unit regarding emergency regulation notification, dated 8/26/16
42. Investigations of Improper Activities by State Agencies and Employees, produced by the California State Auditor, dated February 2016
43. Defendant Pamela Ahlin's Responses to Plaintiff's Specially Prepared Interrogatories, set three, in Alameda County Superior Court, Case No. RG15779731
44. Defendant Pamela Ahlin's Second Amended Responses to Plaintiff's Interrogatories (set 1) Nos. 2 and 3 in Alameda County Superior Court, Case No. RG15779731
45. DSH PaRTS Data Dictionary, undated
46. DSHS ADT Data Dictionary, undated
47. Jennings Jl, Bell J. The "ROC" model:  psychiatric evaluation, stabilization and restoration of competency in a jail setting. In L L'Abate (ed.), Mental Illnesses: Evaluation, treatments and implications. (pp 75-88) New York, NY.
48. Electronic spreadsheet file AG00013971.xlsx
49. Electronic spreadsheet file AG00034246.xlsx
50. Slides of presentation entitled Department of State Hospitals – Metropolitan: 1370 Project, March 2012 – Present by Alisha Johnson, Psy.D.; Alisa Lite, Psy.D.; David Niz, M.D.; Michael Barsom, M.D.
51. DSH document 2013-2014 Governor's Budget Highlights
52. DSH document 2017-2018 Governor's Budget Highlights
53. Letter from Andrea Javist to Matthew Garber and Mark Grabau dated 12/3/15
54. State of California Standard Agreement STD 213 between DSH and Thomas C. Lester, M.D., Inc. for 2015 (including exhibits)
55. Liberty Healthcare Corporation California Conditional Release Program Annual Program Summary for 2015
56. Liberty Healthcare Corporation Illinois Conditional Release Program Annual Program Summary for 2015
57. Statutory, Regulatory and Programmatically Required Functions of California's Regional Centers – draft dated September 2016

## B.    References

1. AAPL Practice Guideline for the Forensic Psychiatric Evaluation of Competence to Stand Trial (2007).
2. Advokat CD, Guidry D, Burnett DMR, Manguno-Mire G, Thompson JW. Competency restoration treatment: differences between defendats decluared competent of incompetent to stand trial. Journal of the American Academy of Psychiatry and the Law 40: 89-97, 2012.
3. Anderson KK, Voineskos A, Mulsant BH, George TP, McKenzie KJ. The role of untreated psychosis in neurodegeneration:  a review of hypothesized mechanisms of neurotoxicity in first-episode psychosis. Canadian Journal of Psychiatry 59: 513-17, 2014.

4.  Anderson SD, Hewitt J. The effect of competency restoration training on defendants with mental retardation found not competent to proceed. Law and Human Behavior 26: 343-51, 2002.

5.  Bertman L, Thompson JW Jr, Waters WF, Estupinan-Kane L, Martin JA, Russell L. Effect of an individualized treatment protocol on restoration of competency in pretrial forensic inpatients. Journal of the American Academy of Psychiatry and the Law 31: 27-35, 2003.

6.  Brown DR. A didactic group program for persons found unfit to stand trial. Hospital and Community Psychiatry 43:732–3, 1992

7.  California Legislative Analyst's Office. An Alternative Approach:  Treating the incompetent to stand trial. *Legislative Analyst*, Retrieved from http://www.lao.ca.gov/reports/2012/hlth/ist/incompetent-stand-trial-010312.pdf on 11/22/2017, 2012.

8.  Carbonell JL, Heilbrun K, Friedman FL. Predicting who will regain trail competency: initial promise unfulfilled. Special issue: psychopathology and crime. Forensic Reports 5: 67-76, 1992.

9.  Chang WC, Hui CLM, Tang JYM, Wong GHY, Chan SKW, Lee EHM, Chen EYH. Impacts of duration of untreated psychosis on cognition and negative symptoms in first-episode schizophrenia: a 3-year prospective follow-up study. Psychological Medicine 43: 1883-93, 2013.

10. Christy A, Otto R, Finch J, Ringhoff D, Kimonis ER. Factors affecting jail detention of defendants adjudicated incompetent to proceed. Behavioral Sciences and the Law 28: 707-16, 2010.

11. Cochrane RE, Herbel GL; Reardon ML; Lloyd KP. The Sell effect:  involuntary medication treatment is a "clear and convincing" success. Law and Human Behavior 37: 107-16, 2013.

12. Colwell LKH, Gianesini J.  Demographic, Criminogenic, and Psychiatric Factors that predict competency restoration. Journal of the American Academy of Psychiatry and the Law 39: 297-306, 2011.

13. Cornaggia CM, et al. Aggression in psychiatry wards: a systematic review. Psychiatry Research 189(1): 10-20, 2011.

14. Davis DL. Treatment planning for the patient who is incompetent to stand trial. Hospital and Community Psychiatry 36: 268-71, 1985.

15. Dusky v. United States, 362 U.S. 402, 1960.

16. Gerbasi JB, Scott CL. Sell v. U.S.: involuntary medication to restore trial competency—a workable standard? Journal of the American Academy of Psychiatry and the Law 32: 83-90, 2004.

17. Gottfried ED, Hudson BL, Vitacco MJ, Carbonell JL. Improving the detection of feigned knowledge deficits in defendants adjudicated incompetent to stand trial. Assessment 42: 232-43, 2017.

January 25, 2018            Expert Report of Bruce C. Gage, M.D.            Page E-8

18. Gowensmith WN, Frost LE, Speelman DW, Therson DE. Lookin' for beds in all the wrong places: outpatient competency restoration as a promising approach to modern challenges. Psychology, Public Policy, and Law 22: 293-305, 2016.
19. Gowensmith WN, Murrie DC, Packer IK. Forensic Mental Health Consultant Review Final Report. Prepared for the State of Washington's Department of Social and Health Services. June 30, 2014.
20. Graziani C, Guzman MR, Mahometa M, Shafer A. Evaluation report: Texas Outpatient Competency Restoration Programs. Hogg Foundation for Mental Health, 2015.
21. Grisso T. Competency to Stand Trial Evaluations: A Manual for Practice. Sarasota, FL: Professional Resource Exchange, 1988.
22. Heilbrun K, Dematteo D, Yashura K Brooks-Holliday S, Shah S, King C, Dicarlo AB, Hamilton D, Laduke C. Community-based alternatives for justice-involved individuals with severe mental illness: review of the relevant research. Criminal Justice and Behavior 39: 351- 419, 2012.
23. Hubbard KL, Zapf PA, Ronan KA. Competency restoration: an examination of the differences between defendants predicted restorable and not restorable to competency. Law and Human Behavior 27: 127-39, 2003.
24. Jackson v. Indiana, 406 U.S. 715, 1972.
25. Jennings JL, Bell JD. The "ROC" Model: Psychiatric Evaluation, Stabilization and Restoration of Competency in a Jail Setting, Mental Illnesses – Evaluation, Treatments and Implications, Prof. Luciano Labate (Ed.), ISBN: 978-953-307-645-4, InTech, Available from: http://www.intechopen.com/books/mental-illness-evaluation-treatments-and-implications/the-roc-model-psychiatric-evaluation-stabilization-and-restoration-of-competency-in-a-jail-setting, 2012.
26. Johnson, NR and Candilis, PJ, 2015. Outpatient competence restoration: A model and outcomes. World Journal of Psychiatry June 22; 5(2): 228-233
27. Kapoor R. Commentary: Jail-Based Competency Restoration. *Journal of the American Academy of Psychiatry and the Law*, 39 (3), 311-315, September 2011.
28. Kelly M; Dunbar S; Gray JE; O'Reilly R. Treatment delays for involuntary psychiatric patients associated with reviews of treatment capacity. Canadian Journal of Psychiatry 47: 181-5, 2002.
29. Lamb HR, Weinberger LE. The sift of psychiatric inpatient care from hospitals to jails and prisons. Journal of the American Academy of Psychiatry and the Law 33: 529-34, 2005.
30. Liberty Healthcare Corporation. San Bernardino County Sheriff's Department Awarded the 2013 COMIO Best Practices Award for New Jail-Based Mental Health Program. Available at http://www.libertyhealthcare.com/wp-content/uploads/2015/02/COMIO-2013-Best-Practice-Award.pdf. Accessed on 11/22/2017.

31. Lieberman JA, Perkins DO, Jarskog LF. Neuroprotection: a therapeutic strategy to prevent deterioration associated with schizophrenia. CNS Spectrums 12(3 Suppl 4): 1-13, 2007.

32. Lutterman T, Shaw R, Fisher W, Manderscheid R. Trend in Psychiatric Inpatient Capacity, United States and Each State, 1970 to 2014. National Association of State Mental Health Program Directors, August 2017.

33. Marshall M, Lewis S, Lockwood A, Drake R, Jones P, Croudace T. Association between duration of untreated psychosis and outcome in cohorts of first-episode patients: a systematic review. Archives of General Psychiatry 62: 975-83, 2005.

34. Melton GB, Petrila J, Poythress NG, Slobogin C. Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers (3rd ed.). New York, NY: Guilford Press, 2007.

35. Melton, G. B., Petrila, J., Poythress, N. G., & Slobogin, C. (2007). *Psychological evaluations for the courts: A handbook for mental health professionals and lawyers* (3rd ed.). New York, NY: Guilford Press

36. Mikolajewski, AJ, et al. Patient Characteristics and Outcomes Related to Successful Outpatient Competency Restoration. Behavioral Sciences and the Law 35: 225–238, 2017.

37. Miller RD. Hospitalization of criminal defendants for evaluation of competence to stand trial or for restoration of competence: clinical and legal issues. Behavioral Science and Law 21: 369-91, 2003.

38. Morris DR, DeYoung, NJ. Long-term competence restoration. Journal of the American Academy of Psychiatry and the Law 42: 81-90, 2014.

39. Morris DR, Parker GF. Jackson's Indiana: state hospital competence restoration in Indiana. Journal of the American Academy of Psychiatry and the Law 36: 522-34, 2008.

40. Mossman D, Noffsinger SG, Ash P, Frierson R, Gerbasi J. Hackett M, Lewis CF, Pinals DA, Scott CL, Sieg KG, Wall BW, Zonana HV. Practice guideline: forensic psychiatric evaluation of competence to stand trial. Journal of the American Academy of Psychiatry and the Law 35(4) suppl: S1-S72, 2007.

41. Mossman D. Predicting restorability of incompetent criminal defendants. Journal of the American Academy of Psychiatry and the Law 35: 34-43, 2007.

42. Nicholson R, Barnard G, Robbins L, Hankins G. Predicting treatment outcome for incompetent defendants. Bulletin of the American Academy of Psychiatry and the Law 22: 367-77, 1994

43. Nicholson RA, Kugler KE. Competent and incompetent criminal defendants: a quantitative review of comparative research. Psychological Bulletin 109: 355-70, 1991.

44. Nicholson T, McNulty J. Outcome of hospitalization for defendants found incompetent to stand trial. Behavioral Science and Law 10: 371-83, 1992.

January 25, 2018                    Expert Report of Bruce C. Gage, M.D.                    Page E-10

45. Noffsinger SG. Restoration to competency practice guidelines. International Jounal of Offender Therapy and Comparative Criminology 45: 356-62, 2001.
46. Oregon Advocacy Center v. Mink, 322 F.3d 1101 (9th Cir. 2003).
47. Pendleton L. Treatment of persons found incompetent to stand trial. American Journal of Psychiatry 137:1098 –100, 1980
48. Perkins DO, Gu H, Boteva K, Lieberman J. Relationship between duration of untreated psychosis and outcome in first-episode schizophrenia: a critical review and meta-analysis. American Journal of Psychiatry 162: 1785-1804, 2005.
49. Pinals D. Where two roads met: restoration of competence to stand trial from a clinical perspective. New England Journal of Civil and Criminal Confinement 31: 81-108, 2005.
50. Pirelli G, Gottdiener WH, Zapf PA. A meta-analytic review of competency to stand trial research. Psychology Public Policy and the Law 17: 1-53, 2011.
51. Renner M, Newark C, Bartos BJ, McCleary R, Scurich N. Length of stay for 25,791 California patients found incompetent to stand trial. Journal of Forensic and Legal Medicine 51: 22-6, 2017.
52. Rice K, Jennings JL. The ROC program:  accelerated restoration of competency in a jail setting. Journal of Correctional Health Care 20: 56-69, 2014.
53. Rotter M, Greenspan M. Commentary: competency restoration research—complicating an already complex process. Journal of the American Academy of Psychiatry and the Law 39: 307-10, 2011.
54. Samuel, S and Michals, J in: Handbook of Forensic Assessment: Psychological and Psychiatric Perspective (2011); pp. 79-96.
55. Scott CL. Commentary: a road map for research in restoration of competency to stand trial. Journal of the American Academy of Psychiatry and the Law 31: 36-43, 2003.
56. Sell v. United States, 539 U.S. 166, 2003.
57. Siegel AM, Elwork A. Treating incompetence to stand trial. Law and Human Behavior 14: 57-65, 1990.
58. Siegel AM, Elwork A. Treating incompetence to stand trial. Law and Human Behavior 14:57– 64, 1990
59. Standards for Health Services in Jails. National Commission on Correctional Health Care, 2014.
60. Taylor M. An Alternative Approach: Treating the Incompetent to Stand Trial. California Legislative Analyst's Office, 2012. Retrieved from http://lao.ca.gov/Publications/Detail /2549.
61. Trueblood v. Washington State DSHS, 822 F.3d 1037 (9th Cir. 2016).
62. Wall BW, Christopher PP. A training program for defendants with intellectual disabilities who are found incompetent to stand trial. Journal of the American Academy of Psychiatry and the Law 40: 366-73, 2012.

63. Wall BW, Krupp BH, Guilmette T. Restoration of competency to stand trial: a training program for persons with mental retardation. Journal of the American Academy of Psychiatry and the Law 31: 189-210, 2003.

64. Warren JI, Chauhan P, Kois L, Dibble A, Knighton J. Factors influencing 2,260 opinions of defendants' restorability to adjudicative competency. Psychology, Public Policy, and Law 16: 498-508, 2013.

65. Warren JI, Murrie DC, Stejskal W, et al. Opinion formation in evaluating the adjudicative competence and restorability of criminal defendants:  a review of 8,000 evaluations. Behavioral Science and the Law 24: 113-32, 2006.

66. Wik A, Hollen V, Fisher WH. Forensic Patients in State Psychiatric Hospitals: 1999-2016. National Association of State Mental Health Program Directors, August 2017.

67. Wortzel H, Binswanger IA, Martinez R, Filley CM, Anderson CA. Crisis in the treatment of incompetence to proceed to trial: harbinger of a systemic illness. Journal of the American Academy of Psychiatry and the Law 35: 357-63, 2007.

68. Zapf P. Standardizing Protocols for Treatment to Restore Competency to Stand Trial: Interventions and Clinically Appropriate Time Periods (Document No. 13-10-1901). Olympia: Washington State Institute for Public Policy, 2013.

69. Zapf PA, Roesch R. Future directions in the restoration of competency to stand trial. Current Directions in Psychological Science 20: 43-47, 2011.

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action.  My business address is Sullivan & Cromwell LLP, 1888 Century Park East, Los Angeles, California  90067-1725.

On March 12, 2018, I served the foregoing documents described as:

**DECLARATION OF BRUCE C. GAGE, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PEREMPTORY WRIT OF MANDATE**

on the interested parties in this action by transmitting the documents to the following persons:

> Susan Carson
> Susan.Carson@doj.ca.gov
> Julia Clayton
> Julia.Clayton@doj.ca.gov
> Carolyn Tsai
> Carolyn.Tsai@doj.ca.gov
> Maryam Berona
> Maryam.Berona@doj.ca.gov

[]   BY MAIL:  I caused such envelope to be deposited in the mail at Los Angeles, California.  The envelope was mailed with postage thereon fully prepaid.

I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing.  It is deposited with U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[X]   BY E-MAIL OR ELECTRONIC TRANSMISSION:  I caused the documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable amount of time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[X]   STATE:  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 12, 2018, at Los Angeles, California.

SHANE M. PALMER