# EXHIBIT B

1    MICHAEL J. HADDAD (State Bar No. 189114)
     JULIA SHERWIN (State Bar No. 189268)
2    MAYA RODRIGUEZ SORENSEN (State Bar No. 250722)
     TERESA ALLEN (State Bar No. 264865)
3    HADDAD & SHERWIN LLP
     505 Seventeenth Street
4    Oakland, California 94612
     Telephone:    (510) 452-5500
5    Facsimile:    (510) 452-5510

6    Attorneys for Plaintiffs

7

8                        UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10

11   DAT THANH LUONG, DECEASED, through his Co-      )
     Successors in Interest, AI QIONG ZHONG,         )   Case No. 3:17-cv-06675-EMC
12   Individually and as mother and Next Friend for W.L., a )
     minor,                                          )
13                                                   )
14                  Plaintiffs,                      )
                                                     )   **DECLARATION OF TERRY A.**
15   vs.                                             )   **KUPERS, M.D., M.S.P.**
                                                     )
16   ALAMEDA COUNTY, a public entity; SHERIFF        )
     GREG AHERN; JAIL COMMANDER THOMAS              )
17   MADIGAN; DR. RINATA WAGLE, M.D.; ESTATE         )
     OF MOHINDER KAUR, M.D.; JACKSON & COKER        )
18   LOCUMTENENS, LLC; BONNIE COOK, MFT;             )
     DEPUTY BRANDEN MCBRIDE; SHERIFF'S               )
19   TECHNICIAN ROBERT LUEBKER; SHERIFF'S            )
     TECHNICIAN BRITANNI MARTINEZ; DEPUTY            )
20   SCOTT BRYNING; DEPUTY SHAWN                     )
     CHRISTIANSEN; NAPA STATE HOSPITAL,             )
21   CALIFORNIA DEPARTMENT OF STATE                  )
22   HOSPITALS, a public entity; PAM AHLIN; DOLLY    )
     MATTEUCCI; PATRICIA TYLER, M.D.; CINDY          )
23   BLACK; and DOES 10-20, Jointly and Severally,   )
24                                                   )
                                                     )
25                  Defendants.                      )
                                                     )
26                                                   )
                                                     )
27   _____        )

28

No. 3:17-cv-06675-EMC: TERRY A. KUPERS, M.D., M.S.P.                                        1

1  STATE OF CALIFORNIA    )

2  COUNTY OF ALAMEDA    )

3  I, Terry A. Kupers, M.D., M.S.P., declare as follows:

4      1.      I was retained as an expert witness by counsel for Plaintiffs in *Stiavetti v. Ahlin, et*

5  *al.*, Alameda County Case No. RG15779731.

6

7      2.      Attached hereto is a true and correct copy of my declaration dated March 9, 2018,

8  with a true and correct copy of my expert report dated January 24, 2018, submitted to the Court in

9  *Stiavetti v. Ahlin.*  My report contains my qualifications, opinions, information reviewed, and the

10  basis for my opinions.  The contents of my report are true and correct, and I could testify to the facts

11  and opinions stated in my report if called to do so.

12

13      3.      The facts stated herein are based on my own personal knowledge and if called to

14  testify to same, I am competent to do so.

15  I declare under penalty of perjury under the laws of the United States of America that the

16  forgoing is true and correct and that this Declaration was executed on July 23, 2019, in Berkeley,

17  California.

18

19

20

21                                                    _____

22                                                    Terry A. Kupers, M.D., M.S.P.

23

24

25

26

27

28

No. 3:17-cv-06675-EMC: TERRY A. KUPERS, M.D., M.S.P.                                                    2

20670827

1   Michael Temple Risher (SBN 191627)
    mrisher@aclunc.org
2   Micaela Davis (SBN 282195)
    mdavis@aclunc.org
3   American Civil Liberties Union
    Foundation of Northern California, Inc.
4   39 Drumm Street
    San Francisco, CA 94111
5   Telephone: (415) 621-2493
    Facsimile: (415) 255-8437
6
    Peter J. Eliasberg (SBN 189910)
7   peliasberg@aclusocal.org
    American Civil Liberties Union
8   Foundation of Southern California
    1313 West 8th Street
9   Los Angeles, CA 90017
    Telephone: (213) 977-9500
10
    Laura K. Oswell (SBN 241281)
11  oswelll@sullcrom.com
    Sullivan & Cromwell LLP
12  1870 Embarcadero Road
    Palo Alto, California 94303
13  Telephone: (650) 461-5600
    Facsimile: (650) 461-5700
14

15  *Attorneys for Plaintiffs*

16

17                        SUPERIOR COURT OF CALIFORNIA

18                              COUNTY OF ALAMEDA

19  STEPHANIE STIAVETTI, *et al.*,        CASE NO.: RG15779731

20              Plaintiffs,               ASSIGNED FOR ALL PURPOSES TO
                                          JUDGE WINIFRED SMITH
21        v.                              DEPARTMENT 21

22  PAMELA AHLIN, AS DIRECTOR OF THE      **DECLARATION OF TERRY A. KUPERS,**
    CALIFORNIA DEPARTMENT OF STATE        **M.D., M.S.P. IN SUPPORT OF**
23  HOSPITALS, *et al.*,                  **PLAINTIFFS' MOTION FOR**
                                          **PEREMPTORY WRIT OF MANDATE**
24              Defendants.
                                          Hearing Date:   March 29, 2018
25                                        Hearing Time:   9:00 A.M.
                                          Judge:          Winifred Smith
26                                        Department:     21
                                          RES ID:         R-1929086
27
                                          Action Filed:   July 29, 2015
28

    ─────────────────────────────────────────────────────────────
    DECLARATION OF TERRY A. KUPERS, M.D., M.S.P., CASE NO. RG15779731

1    I, TERRY A. KUPERS, M.D., M.S.P., declare as follows:

2        1.    I was retained by counsel for Plaintiffs in this action to provide expert opinions.  I

3    submit this Declaration in support of Plaintiffs' Motion for Peremptory Writ of Mandate.  I have

4    personal knowledge of the facts set forth in this Declaration and, if called upon, could testify to those

5    facts.

6        2.    Attached hereto is a true and correct copy of my Expert Report dated January 24,

7    2018, which was filed with the Court on January 25, 2018 as Exhibit 44 to the Declaration of Michael P.

8    Murtagh in Support of Plaintiffs' Motion for Peremptory Writ of Mandate.  My qualifications,

9    assignment, and opinions and the basis for my opinions are detailed in my expert report.  The contents of

10   my expert report are true and correct and, if called upon, I could testify to the facts and opinions

11   contained therein.

12       I declare under penalty of perjury under the laws of the State of California that the

13   foregoing is true and correct.

14   Executed this 9th day of March, 2018 in _Berkeley, California,_

15

16   _Terry A. Kupers_

17   Terry A. Kupers, M.D., M.S.P.

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF TERRY A. KUPERS, M.D., M.S.P., CASE NO. RG15779731

# EXHIBIT A

**Expert Report of Terry A. Kupers, M.D., M.S.P.**
*Stiavetti* v. *Ahlin*, Case No. RG15779731

# Table of Contents

I.      Background and Qualifications .................................................................. 1

II.      Preparation .............................................................................................. 3

III.      Summary of the Case .............................................................................. 4

IV.      Jail Mental Health Treatment .................................................................. 5

V.      Jail Conditions & Mental Health ........................................................... 13

VI.      State Hospitals ....................................................................................... 22

VII.      Community-Based Competency Restoration Treatment .......................... 28

VIII.      Summary of Opinions ............................................................................ 31

## I.    Background and Qualifications

I am a board-certified psychiatrist, Institute Professor Emeritus at the Wright Institute, Distinguished Life Fellow of the American Psychiatric Association, and an expert on correctional mental health issues. I received a B.A. in Psychology, with Distinction, from Stanford University in 1964. I received an M.D. from the UCLA School of Medicine in 1968, with election to Alpha Omega Alpha honor society. I completed a mixed Medicine/Pediatrics Internship at Kings County Hospital/Downstate Medical Center in Brooklyn in 1969. I completed a residency in psychiatry at the UCLA NeuroPsychiatric Institute (NPI) in 1972 with an elective year as registrar at The Tavistock Institute in London. I completed a Fellowship in Social & Community Psychiatry at the UCLA NPI in 1974 and I received an M.S.P. degree (Masters in Social Psychiatry) from UCLA in 1974.

I have testified more than thirty times in state and federal courts about the psychiatric effects of jail and prison conditions, the quality of correctional management and mental health treatment, and prison sexual assaults. I served as psychiatric expert witness and testified in *Trueblood v. Washington*,[1] about the effects of long wait periods for prisoners deemed incompetent being transferred from jail to state hospitals in Washington. I have served as a consultant to the U.S. Department of Justice and Human Rights Watch. I am author of <u>Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It</u> (University of California Press, 2017) and <u>Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It</u> (Jossey-Bass/Wiley, 1999), co-editor of <u>Prison Masculinities</u> (Temple University Press, 2001), and a Contributing Editor of <u>Correctional Mental Health Report</u>. I have authored and co-authored dozens of professional articles and book chapters, including "Schizophrenia, its Treatment and Prison Adjustment," in <u>Managing Special Populations in Jails and Prisons</u> (ed. Stan Stojkovic, Kingston, NJ: Civic Research Institute, 2005).

I served as consultant to the Connections Program in San Francisco, California, a collaboration between San Francisco Court Case Managers, San Francisco Jail Mental

---

[1] *Trueblood v. Washington State Department of Social & Health Services*, No. 2:14-cv-01178-MJP (W.D. Wash.).

Health Services and Community Mental Health agencies designed to provide alternatives to jail for mentally ill and substance-abusing offenders. I was a member of the California Department of Health Task Force to write "Health Standards for Local Detention Facilities" in 1976-77. I have served as consultant and staff trainer in several other jail departments of mental health, and in the course of my professional work I have inspected dozens of jails in urban centers as well as small, mainly rural counties in several states. I served as monitor of the *Presley v. Epps* consent decree (federal court) in Mississippi, involving prisoners with mental illness in isolated confinement at Mississippi State Penitentiary.[2] I have testified or consulted to the legal team in litigation involving conditions of confinement and mental health care in county jails in eight counties in California and one each in Washington and New York, and in preparation I toured those county jails. I was the recipient of the Exemplary Psychiatrist Award presented by the National Alliance on Mental Illness (NAMI) at the 2005 annual meeting of the American Psychiatric Association, and the William Rossiter Award for "global contributions made to the field of forensic mental health" at the 2009 Annual Meeting of the Forensic Mental Health Association of California. My *curriculum vitae* and a list of cases in which I have provided testimony as an expert in the past four years are attached to this report as Appendices A & B.

I have been retained by Plaintiffs' counsel to offer opinions about mental health treatment and conditions in the jails and how they differ from those in the state hospitals and other settings of competency restoration services. This report examines mental health treatment in the jails, jail conditions that tend to exacerbate psychiatric disorders, ways the conditions and treatment at state hospitals and other settings differ, and includes a summary of my opinions in this matter. I am also asked to offer opinions about the psychiatric effects and other harms of delays in transferring pre-trial detainees to State Hospitals in California for competency evaluations and competency restoration treatment. My fees are $250/hour for all work and travel time except testimony, and $450/hour for testimony at deposition and trial. My compensation is not contingent on the opinions that I offer, or on the outcome of the case. My work on this matter is ongoing. I reserve the

---

[2] No. 4:05-CV-00148-JAD (N.D. Miss.).

right to modify or supplement my report if additional analysis, discovery or testimony becomes available. I have agreed to testify at trial in this matter, and I will be sufficiently familiar with the action to provide meaningful deposition testimony concerning the substance of my opinions and the basis for them.

## II.   Preparation

In preparation for rendering opinions in this action, I reviewed the following: California Penal Code Sections 1367-1376; California Penal Code Section 2603; California Rule of Court 4.130; and Disability Rights California, Forensic Mental Health Legal Issues, Chapter 1, Incompetent to Stand Trial (IST) Commitment. I also reviewed the depositions in this matter of George Maynard, Deputy Director in the Hospital Strategic Planning and Implementation Division for DSH; Matthew Garber, Deputy Director of Forensic Services for DSH; Mark Grabau, Chief Psychologist for DSH; Patricia Tyler, Medical Director of Napa State Hospital; Stirling Price, Executive Director at Atascadero State Hospital; Amy Prothero, Supervising Registered Nurse of the Admissions Suite at Napa State Hospital; and two depositions of Dr. Michael Barsom, on November 1, 2017, during which Dr. Barsom offered testimony in his role as Executive Director of Metropolitan State Hospital, and on November 30, 2017, during which Dr. Barsom offered testimony in his role as Acting Executive Director of Patton State Hospital. A list of the documents I relied on in forming my opinions as set forth in this report is attached as Appendix C.

I requested tours of at least two state psychiatric hospitals as part of my investigation for testimony in the present matter, but Plaintiff's counsel informed me that the Defendants denied my request. While I would have liked to have toured state hospitals for the present matter, the tours are not necessary for me to compare the jail and hospital settings *vis-a-vis* competency restoration treatment. I have been in state hospitals repeatedly in my 40 years of psychiatric practice. For example, I have repeatedly visited and toured Napa State Hospital. I presented twice at Grand Rounds at Napa State Hospital; on November 30, 2001 I presented on "Madness and the Forensic Hospital," and I was invited back on June 26, 2007 to present on "The Disturbed/Disruptive Patient in the State Psychiatric Hospital." On October 2, 2014, I did a half-day training workshop for psychiatric and mental health staff at Napa State

Expert Report of Terry A. Kupers, M.D., M.S.P. – page 3 of 34

Hospital, "Ethical Care in Managing and Treating the Disturbed/Disruptive Patient." For several hours prior to that October 2 training I toured several wards, program areas and the entire grounds of the hospital in the company of the Medical Director and the psychologist who had arranged the training. California's state hospitals share architectural plans and programs to a great extent with state hospitals in other states. In recent years I have thoroughly toured state hospitals in Washington and Utah as part of my preparation for expert testimony in litigation concerning the wait period for prisoners deemed incompetent by the courts in those two states.

On July 5, 2017 I toured the Los Angeles County Jail, Twin Towers Correctional Facility, along with Dr. Melissa Warren and counsel and an analyst from Cornerstone Research. At Twin Towers, I spoke to mental health staff and interviewed four inmates on the mental health caseload. That same day, I also visited, with counsel and an analyst from Cornerstone Research, a residential treatment facility that is part of the Misdemeanor Incompetent to Stand Trial Community-Based Restoration program in the Los Angeles Community. On July 6, 2017 we toured the Century Regional Detention Facility and the Los Angeles County Men's Central Jail along with Dr. Melissa Warren, counsel and an analyst from Cornerstone Research. On July 7, 2017 I toured the San Diego Central Jail along with Dr. Melissa Warren, counsel and an analyst from Cornerstone Research, and spoke at length with a ranking custody officer, the Medical Director, the head of nursing, the psychologist and a psychotherapist. On November 27, 2017 I toured the Solano County Jail with a social worker and ranking officer. And, on November 28, 2017, I toured the Lake County Jail along with Dr. Melissa Warren and counsel and an analyst from Cornerstone Research. Over the years of my career I have toured approximately eight or ten additional California county jails as part of my investigations for expert testimony.

## III.   Summary of the Case

California State Hospitals are, by state law, sites of treatment for competency restoration of individuals accused of a crime whose competency is brought into question in the pre-trial period. I am asked to opine about the effects of delays in transferring defendants to a state hospital or other institutional setting for competency restoration services when the incompetent defendant waits in jail for the transfer. Competency

Restoration Treatment requires both the treatment of the underlying illness that causes incompetence and education about the legal proceedings and training for participation in one's own defense. Thus, if an individual has decompensated, i.e. is acutely psychotic or so depressed that focus, concentration on task and judgement are seriously impaired, the underlying mental illness must be treated to render the individual capable of taking part in the competency restoration classes and training. Thus adequate competency restoration treatment can only occur in a setting conducive to mental health treatment.

## IV.   Jail Mental Health Treatment

Jails, or local detention facilities, are typically designated for pre-trial detainees and inmates who will serve less than a year behind bars. Since California's 2011 criminal justice realignment – a change in law that shifted responsibility for low-level felony offenders from the state to the counties – the length of stay in the jails can be significantly longer.[3]

The prevalence of serious mental illness among jail prisoners is estimated between 15 for men or 30% for women, and 64%.[4] Typically, a prisoner with mental illness is screened upon admission to the jail, and seen by a medical nurse if there are indications on the screening instrument that he or she has an acute need for treatment, or the inmate is housed in an Observation Cell (a cell with little in the way of appliances and amenities, with a window through which a suicidal inmate can be constantly observed by staff or observed at regular intervals, for example every 15 minutes). If the prisoner had been prescribed psychotropic medications prior to arrest, there must be some mechanism for those medications to be continued. In large urban jails, a psychiatrist is on hand much of the week to see prisoners and prescribe and monitor medications. In smaller jails, a

---

[3] (Stats 2011, ch. 15, § 482 (AB 109), operative October 1, 2011.); Cal. Pen. Code § 1170(h).

[4] National epidemiological studies until recently had placed the prevalence of serious mental illness in jails and prisons between approximately 15% and 30%. But the 2006 Special Report from the Federal Bureau of Prison Statistics, Mental Health Problems of Prison and Jail Inmates, concludes that 64% of jail inmates suffer from a significant mental health problem, as measured by a structured interview (not necessarily a clinician's diagnosis). James, D. & Glaze, L. (September 2006) (available at <http://bjs.gov/content/pub/pdf/mhppji.pdf>). The wide range of estimated prevalence likely results from somewhat different subgroups being measured and different criteria for establishing the presence of mental illness. Thus, the 15%-30% estimate is offered by correctional clinicians who are reflecting the size of their caseload, while the 64% figure results from questionnaires filled out by prisoners.

psychiatrist comes in less frequently to monitor medications. In some smaller jails, there is no psychiatrist in the facility, or a psychiatrist is available by phone to consult with the mental health nurse, or a psychiatrist performs tele-psychiatry interviews with prisoners and prescribes medications. For example, in Lake County, no psychiatrist is present in the jail. The medical nurse can consult by phone with a psychiatrist, and another psychiatrist provides tele-psychiatry meetings. The mental health nurse told us during our visit on November 28, 2017 that it takes two weeks to schedule a prisoner for a tele-psychiatry appointment with a psychiatrist.

Title 15 of the California Code of Regulations contains minimum standards set by the California Board of State and Community Corrections for local detention facilities and the state audits jails to insure compliance.[5] Standards for the provision of mental health services in jails are published by the National Commission on Correctional Health Care (NCCHC).[6] Accreditation by the NCCHC is elective, but the standards published by the NCCHC reflect a consensus in the correctional mental health field regarding the minimum services required in jails. Many jails struggle with great difficulty to meet even the very basic requirements outlined in Title 15.[7]

In many jails, the county or local government provide mental health services in the jail and either the Sheriff's Department or the local county mental health department is responsible for such services, but in quite a few California jails, mental health (and medical) services are provided per contract with private companies such as the California Forensic Medical Group (CFMG).[8]

---

[5] Title 15 Minimum Standards for Local Detention Facilities, BSCC California (April 1, 2107) (available at <http://www.bscc.ca.gov/downloads/Adult%20Titles%2015%20-%20Effect%204%201%2017.pdf>).
[6] Described and can be ordered at <https://www.ncchc.org/jail-prison-standards>.
[7] See, e.g., Report on Inspection of Sonoma County Main Adult Detention Facility, Disability Rights California (May 16, 2015) (available at
<http://www.disabilityrightsca.org/Documents/DRCReportAndSonomaCountyResponse20160516.pdf>).
[8] There is an ethical requirement that clinicians providing treatment in the jails not be the ones determining the mental state (sanity) or competence of defendants, the assumption being their doing so would constitute a conflict of interest. American Academy of Psychiatry and The Law, Ethics Guidelines (2005) (available at <http://www.aapl.org/ethics.htm>) ("The forensic evaluation and the credibility of the practitioner may also be undermined by conflicts inherent in the differing clinical and forensic roles. Treating psychiatrists should therefore generally avoid acting as an expert witness for their patients or performing evaluations of their patients for legal purposes."); Report of Neutral Expert Dr. Richard Hayward regarding Review of Mental Health Care at the Monterey County Jail, available at: Declaration of Gay Grunfeld ISO Mot. for

The quality and intensity of mental health programming in jails varies from county to county in California. In urban centers, there tends to be relatively more intensive mental health treatment and a psychiatrist is at the jail several days per week, while in smaller counties, especially rural counties, very little mental health treatment is provided and the psychiatrist appears only a few hours per week or is limited to tele-psychiatry visits (tele-psychiatry involves the use of video for meetings between prisoners and a psychiatrist who is not at the jail). In many jails, a large proportion of inmates in treatment for mental illness spend almost all of their time in a cell by themselves, or in a crowded dormitory where they are mostly idle, and, though there may be some groups, have little opportunity to participate in group meetings.

Los Angeles County, which has the largest jail system in California, is a good starting point for a discussion of jail conditions and mental health services. In preparation for expert testimony in this matter, I visited three County Jail facilities in Los Angeles County on July 5 and 6, 2017, with Dr. Melissa Warren and counsel and an analyst from Cornerstone Research.[9] Across from Men's Central Jail near downtown Los Angeles is Twin Towers Correctional Facility, the site of a 40-bed psychiatric inpatient unit as well as High Observation and Medium Observation intermediate care units. The Medical Director told us that if a prisoner already in the jail requires inpatient admission for acute psychosis or suicide risk, there is a one month waiting period to be admitted to the inpatient unit in Twin Towers, so that prisoner will likely be consigned to High Observation while awaiting an inpatient bed/cell. He also told me that prisoners with serious mental illness who are agitated or act out tend to be consigned to a single cell in the jail. On the Medium Observation Unit, there were bunks set up in what would otherwise be a dayroom; we were told this was because the jail population was high at the time of our tour. Thus this space designed for daytime activities was filled with beds and not available for daytime programs or even informal activities. During our tour all

---

Class Certification, Exh. M, Docket No. 49-7, *Hernandez, et al. v. County of Monterey, et. al.*, 5:13-cv-02354-PSG (N.D. Cal. Apr. 29, 2014) (expert discusses conflict in having the CFMG psych staff both conducting competency evaluations and providing general mental health services at Monterey County Jail).
[9] See Appendix D for a full account of my tours of L.A. County jails and jails in San Diego, Solano and Lake Counties.

prisoners, except a few attending a class, were confined to their cells or to their bunk bed and its environs.

The mental health treatment program at the Twin Towers is relatively high quality for a local detention facility – most jails do not have inpatient units and intermediate treatment units – the problem is that it is very oversubscribed. There simply are not enough beds at each level of treatment intensity to serve the population adequately. I commented about that problem in a 2008 expert report. I had served as a psychiatric expert witness in *Rutherford v. Pitchess*, a class action lawsuit brought by the ACLU of Southern California in the 1970s challenging conditions of confinement (massive crowding) and inadequate medical and mental health care.[10] That litigation remained under court supervision until 2008 when I was asked to tour Men's Central Jail and Twin Towers, interview staff and prisoners, and submit a report assessing developments since my court testimony in the 1970s.[11] In my 2008 Report, I write:

> While mental health services at Los Angeles County Jail have improved in recent years in many regards, there are large gaps in services, the jail has become massively overcrowded, and there is disturbing evidence of custodial abuse of prisoners with serious mental illness. A major problem is the large number of prisoners entering the jail who suffer from serious mental disorders and the relative shortage in mental health treatment resources. The large census in the facility, and resultant crowding and idleness at every level, further exacerbate the problems. A very frequent occurrence is the discharge of prisoners with serious mental illness from the mental health housing units in the Twin Towers and their transfer to general population, disciplinary housing or administrative segregation at Central Men's Jail or elsewhere, where there is severe crowding, almost no mental health treatment aside from psychotropic medications, very little out-of-cell time and almost no programming, and in too many cases victimization by other prisoners and/or significant abuse at the hands of custody staff.[12]

The U.S. Department of Justice (Civil Rights Division) sued L.A. County regarding unconstitutional conditions at the L.A. County Jail.[13] The settlement requires

---

[10] *Rutherford v. Pitchess*, 457 F. Supp. 104 (C.D. Cal. 1978).
[11] Kupers, T., Report on Mental Health Issues at Los Angeles County Jail (June 27, 2008) (available at <https://www.aclu.org/files/pdfs/prison/lacountyjail_kupersreport.pdf>).
[12] Kupers, T., Report on Mental Health Issues at Los Angeles County Jail, p.44 (June 27, 2008).
[13] See summary of 2015 settlement at The United States Department of Justice, Justice Department Reaches Agreement with Los Angeles County to Implement Sweeping Reforms on Mental Health Care and Use of Force Throughout the County Jail System, Press Release Number 15-971 (August 5, 2015) (available at

that L.A. County greatly improve mental health services at the jail, including through the provision of improved staff training, better documentation, better communication between custody and mental health staff (especially regarding management of suicidal prisoners), improvements in suicide prevention, increased out-of-cell time for prisoners with serious mental illness, and improvements in terms of use of force, especially against prisoners with serious mental illness.

Other counties have much thinner services than Los Angeles. In most jails, there is very little if anything in the way of psychotherapy or psychiatric rehabilitation. Psychotherapy is a clinical intervention, provided individually or in groups, where a therapist spends appointed times with a patient to talk about the patient's emotional problems and condition. Psychiatric rehabilitation is a collection of programs, including vocational training, art and recreational therapy, case management and so forth, aimed at improving and sustaining the quality of life of individuals with mental illness. Case management involves the assignment of a clinician to each patient to track their progress in treatment and keep abreast of their progress in jail. In most jails, especially in small counties, there is little or no case management. And typically mental health clinicians are tasked with supervising a relatively large caseload, so they cannot spend any significant time with each of their patients. The smaller counties cannot afford the level of staffing the larger counties enjoy, mental health programming is very thin, and inmates with mental illness are often relegated to isolation in their cells most of the time.[14] For example, in Lake County there is no psychiatrist in the jail (*see* Appendix D).

Many other county jails in California have been subject to litigation and external investigations and found to be the sites of massive crowding, too much solitary confinement, inadequate mental health services, and abusive practices on the part of staff. Thus, correctional psychiatry expert Dr. Pablo Stewart filed a declaration on April 29,

---

<https://www.justice.gov/opa/pr/justice-department-reaches-agreement-los-angeles-county-implement-sweeping-reforms-mental>).

[14] *See* Stamm, H. (ed.), Rural Behavioral Health Care: An Interdisciplinary Guide (American Psychological Association, 2003); Mental Health Services in Rural Jails, Muskie School of Public Health (2009) (available at <http://muskie.usm.maine.edu/Publications/rural/pb/mental-health-services-rural-jails.pdf>).

2014, in *Hernandez v. County of Monterey*,[15] where he pointed out dreadful conditions at Monterey County Jail, including massive overcrowding and over-utilization of solitary confinement, especially with prisoners suffering from serious mental illness, and very inadequate mental health treatment for prisoners with serious mental illness in the jail. Similarly, a Grand Jury investigation of the Orange County Jail reflects very inadequate mental health services.[16] In the Executive Summary of their report, the Orange County Grand Jury reports:

> Orange County jails house approximately 6,000 inmates at any given time. Approximately 20% (1,200) of those inmates have some type of documented mental health diagnosis. According to the Orange County Health Care Agency, from January 2015 through October 2015, 10,586 persons who entered the Orange County Jail system were identified as having a mental health diagnosis. An additional 2,962 inmates were diagnosed with acute mental illness, for a staggering total of 13,548 mentally ill inmates moving through the Orange County jails over a 10 month period. Despite this high number, only one of the Orange County Jails, the Intake and Release Center, contains a designated mental health unit for male inmates. Approximately 89% of male inmates with a diagnosed mental illness are housed in the general jail population. They may receive prescribed medication to help stabilize and/or alleviate their psychiatric symptoms, but they do not receive therapeutic treatment specific to their mental illness through structured programs.

The Marin County Grand Jury, in its June 8, 2017 Report on the Care of Mentally Ill Inmates in Marin County Jail,[17] concludes:

> In 2010 and 2012 the Marin County Jail and Department of Health and Human Services commissioned reviews of the care received by the mentally ill in the Jail. These reviews suggested that numerous changes be made in the Jail to raise the level of care of mentally ill inmates to meet community standards. The Grand Jury's investigation found that the Jail and the Department of Health and Human Services have only recently begun to implement some of the changes recommended in these reports. These changes, however, have not yet resulted in

---

[15] Declaration of Pablo Stewart ISO Mot. for Class Certification, Docket No. 51, *Hernandez, et al. v. County of Monterey, et. al.*, 5:13-cv-02354-PSG (N.D. Cal. Apr. 29, 2014).
[16] Our Brothers' Keeper: A Look at the Care and Treatment of Mentally Ill Inmates in Orange County Jails, Orange County Grand Jury (2015-2016) (available at <http://www.ocgrandjury.org/pdfs/2015_2016_GJreport/2016-06-09_Website_Report.pdf>); *see also* Investigation of the Orange County Jail, U.S. Department of Justice (March 4, 2014) (available at <https://www.justice.gov/sites/default/files/crt/legacy/2014/03/26/ocj_investletter_3-4-14.pdf>).
[17] (available at <https://www.marincounty.org/~/media/files/departments/gj/reports-responses/2017/care-of-mentally-ill-inmates.pdf?la=en>).

adequate improvement of conditions. Furthermore, some practices in the Jail, particularly the isolation of mentally ill inmates and the placement of inmates in safety cells for extended periods of time, might be judged to be cruel and unusual punishment, potentially violating the constitutional rights of these individuals.

There are two main problems here. First, the individual with serious mental illness is not receiving adequate mental health treatment, and the longer someone with an acute exacerbation of serious mental illness goes without adequate treatment, the worse the eventual prognosis. Second, the conditions of confinement in the jail are exceedingly harmful to the individual suffering from serious mental illness and make adequate mental health treatment difficult if not impossible, even with increased mental health staffing. Indeed, when individuals deemed incompetent wait in jail for competency restoration treatment, they become more difficult to restore to competency because of harsh and punitive jail conditions, and because of the delay in instituting adequate treatment.

Administrators and experts in California are often quite forthcoming about deficiencies in jail mental health programs. For example, Dr. Patricia Tyler, Medical Director of Napa State Hospital, was asked during her deposition in this matter about jail-based competency restoration programs. She testified:

> Unfortunately, in my view, many jails, including Napa County Jail, do not treat mental illnesses in a way that I think best meets those patients' needs, principally because they are either not -- have chosen not to become certified or don't -- have chosen not to spend the money or issues along that line to provide involuntary medications to patients who need them, and also the number of hours that a psychiatrist might be available to treat those patients. The entire population is so limited that it does not necessarily provide patients with the care that most people would think is a community standard of care for mental disorders.[18]

Further on, Dr. Tyler testified: "But in my view, most jails, with some exceptions, are not providing what mental health patients are constitutionally entitled to, which is adequate care consistent with the community standard of care."[19]

There is a large amount of clinical research showing that, when an individual is experiencing an acute psychotic episode, a manic state or a depressive or suicidal crisis,

---

[18] Tyler Deposition, pp. 113-114.

[19] Tyler Deposition, pp. 137-138.

the longer that individual is left untreated or inadequately treated, the worse the prognosis.[20] This is an important point, and to make it more clear, I will compare the fate of an individual suffering from a serious mental illness who is fortunate enough to enjoy a friendly and growth-inducing environment with the fate of one who is tormented and abused. On one hand, individuals suffering from mental illness who receive adequate treatment and spend their time in friendly circumstances (for example, a loving home or a halfway house where they are encouraged to study, form healthy relationships, and accomplish the steps they need to traverse if they are ever to enjoy meaningful employment and quality relationships) have a decent chance to keep their illness under control, be as productive as they can be given their illness, and live a relatively quality life. On the other hand, the equivalent individual (i.e., someone who suffers from the same mental illness) who is repeatedly traumatized, perhaps is raped, has no stable residence nor gainful pursuits, and is shuffled from one relatively uncaring service provider to another will suffer a worsening mental disability and will have a much bleaker future (likely including incarceration). In other words, the neglected and traumatized individual with serious mental illness has a much more dire prognosis than the individual who enjoys a supportive environment and adequate treatment. It is in this sense that the harsh conditions of overcrowded jails and inadequate mental health treatment cause great and permanent damage.[21]

The presence in the jails of a large proportion of inmates suffering from serious mental illness, and the fact that mental health services are, on average, relatively skimpy, means that there is a huge amount of untreated or inadequately treated mental illness in the jails, and the high suicide rate continues to be a big problem. Besides, when there are a significant proportion of inmates suffering from inadequately treated psychosis in the

---

[20] See, for example, Kupers, T., "Schizophrenia, its Treatment and Prison Adjustment," in Managing Special Populations in Jails and Prisons, 9-4 (ed. Stan Stojkovic, Kingston, NJ: Civic Research Institute, 2005); and Mendel, W., Treating Schizophrenia (San Francisco: Jossey-Bass, 1989).

[21] See Serious Mental Illness and Homelessness, Treatment Advocacy Center (September, 2016) (available at <http://www.treatmentadvocacycenter.org/evidence-and-research/learn-more-about/3629-serious-mental-illness-and-homelessness>); Bronson, J. & Berzofsky, M., Indicators of Mental Health Problems Reported by Prisoners and Jail Inmates, 2011-2012, Special Report, U. S. Bureau of Justice Statistics (June, 2017) (available at <https://www.bjs.gov/content/pub/pdf/imhprpji1112.pdf>).

population, the jail population becomes more agitated on the whole and more difficult for staff to manage.

## V.    Jail Conditions & Mental Health

Compounding the problem of relatively inadequate mental health treatment in the jails, there are conditions that exacerbate or worsen mental disorders and disabilities. I will focus on three: crowding (often referred to as overcrowding in the literature); the use of force and restraint by custody staff; and the problem of isolation.

**Crowding**. In recent decades, jail populations have swollen geometrically and there is a significant amount of overcrowding.[22] There has been a seven-fold multiplication of the jail and prison population nationally since 1970, and meanwhile the proportion of jail inmates with serious mental illness has been rising. A recent report by the Treatment Advocacy Center and National Sheriffs' Association concludes that there are ten times as many individuals suffering from serious mental illness behind bars than there are in the mental hospitals.[23] With jail crowding, cells designed for one or two inmates contain two or four, and dormitories are filled with far greater numbers of prisoners than their design capacity. A review of a robust research literature concludes that with crowding there is a significant rise in the rates of violence, psychiatric breakdown, suicide, and medical illnesses that are highly sensitive to stress (such as hypertension and asthma).[24] Quite a few county jails in California have been the focus of reports and lawsuits claiming that the jails are too crowded and the mental health care is inadequate.[25]

---

[22] *See* Lamb, H. R., et al., Treatment Prospects for People with Severe Mental Illness in an Urban County Jail, Psychiatric Services, Vol. 58(6) (June 2007).

[23] The Treatment of Persons with Mental Illness in Prisons and Jails: A State Survey, Treatment Advocacy Center, at 6 (April 8, 2014) (available at <http://tacreports.org/storage/documents/treatment-behind-bars/treatment-behind-bars.pdf>).

[24] Thornberry, T. & Call, J., Constitutional Challenges to Prison Overcrowding: The Scientific Evidence of Harmful Effects, Hastings Law Journal, Vol. 35(2), 313-353, at 330-350 (1983).

[25] *See, e.g. U.S. v. County of Los Angeles, et. al.*, 2:15-cv-05903 (C.D. Cal.); *Chavez et. al. v. County of Santa Clara*, 1:15-cv-05277 (N.D. Cal.); *Gray v. County of Riverside*, 5:13-cv-00444 (C.D. Cal.); *Hernandez, et al. v. County of Monterey, et. al.*, 5:13-cv-02354 (N.D. Cal.); *Hall v. County of Fresno*, 1:11-cv-02047 (E.D. Cal.). I should note that jail populations vary, and some jails are not crowded, their current population might even be below design capacity. This is partly due to seasonal fluctuations in population, and partly because different counties handle the influx of prisoners under "realignment" (see the paragraph

Crowding of California jails is a big problem, which was amplified when low level felony offenders began serving their sentences in county jails following the state's enactment of criminal justice realignment in 2011 (*see* footnote 3, above).[26]  Thus, besides the crowded conditions and deficiencies in mental health services I have already noted at Los Angeles, Monterey, Orange, and Marin County Jails (*see* Section IV, Mental Health Treatment, above), there have also been reports and complaints about crowding at other county jails.[27]  For example, the 2015-2016 Report of the Santa Clara Grand Jury states: "The population of SMI [seriously mentally ill inmates] in the Main Jail far exceeds the number of beds allocated for this population."[28]  In San Luis Obispo, the Grand Jury writes in their 2016-2017 report about the county jail that the reduced inmate population at the local state prison due to realignment legislation "corresponded with an increase in individuals placed at County Jail from January 2011 through 2014.  The average daily population grew from 555 in 2011 to 697 in 2013.  It also resulted in a change in the nature of the population, namely individuals serving longer sentences and for more serious crimes."[29]  The first finding of the grand jury is: "There is inadequate physical space to conduct programming for male inmates.  This lack of space restricts the amount of programming offered, as well as inmate participation."[30]

Crowded jails are dangerous and the site of many psychiatric breakdowns and suicides.  A 2010 study on suicide in jail reflects that the suicide rate (completed suicides,

---

that follows) differently, with some counties opting to grant lower security prisoners probation while others crowd the jails with referrals from the CDCR.

[26] Although realignment resulted in an increase in average jail populations statewide beginning in October 2011, there have been other legal developments in California that have alleviated some of the resulting jail crowding. For example, California's Prop 47, approved by voters in November, 2014, reclassified a number of property and drug crimes from felonies to misdemeanors and resulted in a dip in average jail populations statewide. Still, at the end of 2016, 28 county jails had populations in excess of their rated capacities.  See Lofstrom, M. & Martin, B. California's County Jails, Public Policy Institute of California, (2017) (available at <http://www.ppic.org/publication/californias-county-jails/>).

[27] *See* Disability Rights California reports about crowding and shortfalls in mental health care in Sonoma, Sacramento and Santa Barbara County Jails (available at <http://www.disabilityrightsca.org/JailsReports/>).

[28] 2015-2016 Santa Clara County Civil Grand Jury Report,16 (available at <http://www.scscourt.org/court_divisions/civil/cgj/2016/MentalIllnessJail.pdf>).

[29] 2016-2017 Report on San Louis Obispo County Jail, 6 (available at <http://slocourts.net/downloads/grand_jury/reports/2016/2017_County_Jail_Report.pdf>).

[30] 2016-2017 Report on San Louis Obispo County Jail, 12.

not attempts) is much higher than that in the community.[31]  The problem has been alleviated somewhat by the measures put into effect in the intervening years,[32] but the jail suicide rate remains several times higher than that in the larger community.

The research finding that crowding correlates with increased violence, psychiatric breakdown and suicide makes sense.  With crowding, people get on each other's nerves, and tempers flare.  When a dayroom is converted to a crowded dormitory (as in the Medium Observation Unit at Los Angeles' Twin Towers, *see* Appendix D) and thus the room cannot be used for activities, prisoners sit around much of the day often getting into arguments with each other.  Consider the line to use the phone.  The longer the line, the more likely someone in the line will get angry at the person on the phone and belligerently demand he end his call.  Fights erupt.  Also, in crowded dormitories or in locked, windowless cells with solid metal doors and two prisoners inside, officers are not really able to detect many of the altercations and sexual assaults that occur, and vulnerable prisoners are not provided a safe place to await trial or serve their time.

With crowding and increased violence, some of the prisoners with mental illness become the victims while others, their emotions out of control on account of their mental illness, become the perpetrators of impulsive acts of violence against others or against themselves.  Mental illness makes one very vulnerable in jail.  First, there is great stigma accompanying mental illness in jail, and other prisoners laugh at those with visible signs of mental illness, take advantage of them and attack them.  If a prisoner is intent on perpetrating a physical or sexual attack on another prisoner, he wants to be careful to choose someone without friends.  If he attacks a prisoner with friends, especially one with ties to a gang, he risks retaliation from the friends or gang members.  So he chooses a loner to attack. Prisoners with serious mental illness are, on average, loners with few if

---

[31] Hayes, L.,  National Study of Jail Suicide: 20 Years Later, National Center on Institutions and Alternatives, NIC Accession Number 024308 at xiii (2010).  *See also* Knoll, JL, Suicide in Correctional Settings: Assessment, Prevention and Professional Liability, J Correct Health Care, Vol. 16(3) (2010); Hayes, L.  Prison Suicide: An Overview and Guide to Prevention, The Prison Journal, Vol. 75, 431-456 (1995).
[32] *See supra* n. 26..

any friends. Therefore they are easy targets and are attacked more often and sexually assaulted more often than other prisoners.[33]

Jails are simply not a safe place, especially for individuals suffering from mental illness. Thus, the San Luis Obispo Grand Jury Report for 2016-2017 contains this tragic report about the county jail:

> DEATHS AT THE COUNTY JAIL Three individuals under the care of the County Jail died in circumstances that raised broadly reported public concern. •
> On September 20, 2016, a 36-year-old male inmate (____names redacted____) committed suicide while in custody. The inmate had been provided a safety razor to shave in preparation for a court appearance. Subsequently he used that razor to slash his arm and died from loss of blood.... • On January 22, 2017, a 36-year-old male inmate (_____) died in County Jail due to a pulmonary embolism. Prior to his death, he had been strapped in a restraint chair for 46 hours, while awaiting transfer to a mental health facility.... • On April 13, 2017, a 60-year-old male inmate (_____) died while in custody shortly after he complained of shoulder pain. He was later found unresponsive and could not be revived. The preliminary autopsy report indicated the inmate died of a heart attack. Shoulder pain is listed by the American Heart Association as a common warning sign of an impending heart attack.[34]

**Use of Force and Restraint**. Besides being victims of violence and sexual assault, individuals with mental illness tend to have problems following generally-applicable jail rules. In jail, the rules are many and very strict, and punishment with solitary confinement for breaking those rules is widespread. It is no surprise that prisoners with serious mental illness are disproportionately represented in the punitive detention areas of the jail.

In addition, prisoners with serious mental illness are disproportionately the object of officers' use of force, and of excessive and abusive force. In a 2015 report, Human Rights Watch uncovers the massive abuse. The Introduction to that report states:[35]

> Corrections officials at times needlessly and punitively deluge them with chemical sprays; shock them with electric stun devices; strap them to chairs and

---

[33] For a general discussion of this dynamic, see T. Kupers, "Rape and the Prison Code," in Prison Masculinities, pp. 111-117 (eds. Sabo, D., Kupers, T. & London, W., Temple University Press, 2001).
[34] San Luis Obispo County 2016-2017 Grand Jury Report ( available at <http://slocourts.net/downloads/grand_jury/reports/2016/2017_County_Jail_Report.pdf>).
[35] Fellner, Jamie, Callous and Cruel: Use of Force Against Inmates with Mental Disabilities in U.S. Jails and Prisons, Human Rights Watch (2015) (available at <https://www.hrw.org/report/2015/05/12/callous-and-cruel/use-force-against-inmates-mental-disabilities-us-jails-and>).

beds for days on end; break their jaws, noses, ribs; or leave them with lacerations, second degree burns, deep bruises, and damaged internal organs. The violence can traumatize already vulnerable men and women, aggravating their symptoms and making future mental health treatment more difficult. In some cases, including several documented in this report, the use of force has caused or contributed to prisoners' deaths.... Experts consulted for this report say that the misuse of force against prisoners with mental health problems is widespread and may be increasing. Among the reasons they cite are deficient mental health treatment in corrections facilities, inadequate policies to protect prisoners from unnecessary force, insufficient staff training and supervision, a lack of accountability for the misuse of force, and poor leadership.

The means of restraining prisoners in jail is often quite anti-therapeutic. Thus, during our tour of Lake County Jail on November 28, 2017 (see Appendix D for a report of the tour), the Captain explained that when a prisoner is acutely disturbed and meets criteria for 5150 civil commitment (i.e., the person is likely to cause harm to self or others or unable to care for self), he or she can be transferred to a local psychiatric hospital, likely the Sutter Hospital. Sheriff's deputies accompany him or her and stay in the hospital, maintaining restraints for the entire time the hospital treatment proceeds. Then, one wonders why the need to put prisoners in a "safety cell" at the Lake County Jail, a cell with no furniture, no toilet or sink, and a hole in the center of the floor for bathroom purposes, and leave the prisoner there for 72 hours with no mattress to sleep on and only a gown/blanket to wrap himself. (I observed a very similar safety cell during my tour of the Solano County Jail, *see* Appendix D.) Prisoners who pose a threat of suicide, prisoners who are acutely psychotic, and prisoners who cannot conform their behavior to jail rules are consigned to safety cells. And at the jail for women we toured in South Central Los Angeles, some of the women were handcuffed to the metal table in the dayroom while being interviewed.

Restraint chairs are another example of the use of force and restraint that too often causes harm. Restraint chairs are devices wherein a badly behaving prisoner can be strapped. There are guidelines and policies in most jails that limit the amount of time an individual can be strapped in the chair and that require frequent checks to see if the individual is safe. But these policies are too often ignored. Thus, there was the January 22, 2017 death in custody in the San Luis Obispo Jail where the prisoner who died suffered from pulmonary embolism, but "was strapped in a restraint chair for 46 hours

while awaiting transfer to a mental health facility."[36]  An article in the Los Angeles
Times describes that death in custody:

> For 46 hours, Andrew Holland's legs and arms were shackled to a chair in the San
> Luis Obispo County jail.  The inmate, who suffered from schizophrenia, was left
> in his own filth, eating and drinking almost nothing.  He was naked, except for a
> helmet and mask covering his face and a blanket that slipped off his lap, exposing
> him to jail staff who passed by his glass-fronted cell.  When he was finally
> unbound, guards dumped him to the floor of a nearby cell.  Within 40 minutes, he
> had stopped breathing.[37]

The situation with excessive force became so bad in Los Angeles that the
Department of Justice, acting on the Civil Rights of Institutionalized Persons Act
("CRIPA"), sued Los Angeles County complaining of massively excessive force against
prisoners, including those suffering from serious mental illness.[38]

**Solitary Confinement**.  Prisoners with serious mental illness are often consigned
to punitive segregation or solitary confinement as punishment for rule-breaking or
assaultiveness, even if their unacceptable behaviors were clearly expressions of their
mental illness.

Haney, Weill, Bakshay and Lockett (2015) point out that isolation is used more in
jails than in prisons, that prisoners with serious mental illness in jail are very likely to
spend time in punitive segregation, and that the isolation causes great harm.  They review
the recent history of widespread solitary confinement at Rikers Island, the jail for New
York City, and the litigation aimed at diminishing the use of solitary confinement there,
concluding: "This is precisely why the long-ignored and largely overlooked practice of
jail isolation needs to be more carefully studied, independently monitored, effectively
regulated, and legally controlled in local jails across the country.[39]

---

[36] See Report of San Luis Obispo Grand Jury, above, and at
<http://slocourts.net/downloads/grand_jury/reports/2016/2017_County_Jail_Report.pdf>.
[37] St. John, Paige, Naked, Filthy and Strapped to a Chair for 46 Hours: A Mentally Ill Inmate's Last Days,
Los Angeles Times, (August 24, 2017)  (available at <http://www.latimes.com/local/california/la-me-jails-
mentally-ill-20170824-story.html>).
[38] *See* Joint Settlement Agreement Regarding the Los Angeles County Jails, *U.S. v. County of Los Angeles*,
CV No. 15-5903, p. 5 (C.D. Cal. 2015) (available at <https://www.justice.gov/opa/file/705491/download>).
[39] Haney, C, Weill, J., Bakhshay, S. & Lockett, T., Examining Jail Isolation: What We Don't Know Can Be
Profoundly Harmful,  The Prison Journal, 1-26, at 22 (2015).

But punitive segregation is not the only way prisoners with serious mental illness wind up in solitary confinement in jail. In fact, many of the Sheriffs and Jail Commanders I have spoken to report that, with some exceptions usually related to crowding, they house jail prisoners suffering from serious mental illness in a cell by themselves (referred to as a "single cell"). This is to avoid the kind of trouble that regularly obtains in dormitory settings, and to protect the disabled prisoner. But then, even though these prisoners with serious mental illness are allowed to exit their cells when they are scheduled to take part in programs or have free time in the dayroom or on the yard, they nonetheless tend to remain in their cell by themselves. (Typically, at the beginning of the time slot when prisoners are permitted to exit their cells and go to the dayroom, prisoners can choose to remain in their cells.) In other words, there is a great degree of *de facto* solitary confinement for jail prisoners with serious mental illness even if that is not the intention of staff.

Then there are isolative settings that are not even termed isolation, and often are not even meant to be punitive. "Observation," a place where a suicidal inmate is placed, is essentially an isolation cell. The inmate alone therein has no amenities and is usually not even released from the Observation Cell to go to recreation. Of course the staff member assigned to monitor the suicidal inmate comes by to check on the inmate at regular intervals. But, too often, nobody really talks to that suicidal inmate.[40] And most jails are not rich enough in staffing to permit much close observation, so they simply place the suicidal or psychotic inmate in a cell by him- or herself, presumably so that the disturbed inmate will not get into further trouble. But the result is that inmates with serious mental illness or suicidal inclinations tend to spend a large amount of time in isolation in the jail.

Disability Rights California ("DRC") inspects jails with particular reference to the jail experience and mental health treatment of prisoners with serious mental illness. In

---

[40] In their 2010 *National Study of Jail Suicides*, the National Institute of Corrections writes: "Facility staff must use various communication skills with the suicidal inmate, including active listening, staying with the inmate if immediate danger is suspected, and maintaining contact through conversation, eye contact, and body language…. A lack of respect, personality conflicts, and boundary issues often lead to problems with communication." (p. 50) (available at <https://s3.amazonaws.com/static.nicic.gov/Library/024308.pdf>).

DRC's report of its 2015 inspection of the Sacramento Jail, there is a section on

Excessive Use of Isolation and Solitary Confinement.  DRC's conclusions include:

> We observed widespread overuse of isolation throughout the Sacramento Jail. Conditions in isolation units in the Jail were characterized by inadequate exercise, extreme social isolation and inadequate mental health monitoring.  Many prisoners and many categories of prisoners were locked in small cells alone or with a cellmate for 22 to 24 hours per day.... This isolation occurs in areas that were designed to permit indirect supervision and easy access to dayrooms for most of every day, but are instead operated to restrict prisoners to small cells for extended periods.[41]

Still another form of isolation is called a "lockdown."  When there is violence in

the jail or evidence of an escape attempt, and deputies do not know who is responsible for

the violence, all of the prisoners are locked into their cells and dormitories and are not

free to go to the dayroom or participate in programs.  The lockdown can last for weeks.

Even in the absence of a lockdown, the usual situation in jail is that prisoners remain

locked in their cells or dorms.  Thus the Medical Director in San Diego County's main

jail, told us during our tour that even in the mental health pods, where competency

restoration services are located, prisoners spend many waking hours in their cells.

Besides the jail housing situations that obviously constitute solitary confinement,

there is a tendency for jails that are crowded and relatively thinly staffed to keep

prisoners in their cells or dormitories for most of each day simply to make management

of the facility easier.  Thus, even in general population housing situations, the prisoners

often remain in their cells or dorms all but one or two hours each day (we observed this

regimen at Lake County Jail, *see* Appendix D), or in some cases they are permitted one or

two hours out of their cells in the morning and again in the afternoon.  This is why, when

one tours a jail during the daytime, one sees hallways, dayrooms and yards with no

prisoners occupying them, and sees prisoners sleeping or laying on their beds in the

middle of the day.  In other words, the jail milieu trends toward solitary confinement,

isolation, and idleness even in general population settings.

---

[41] Report on the Inspection of Sacramento County Jail, Disability Rights California,  at pp. 5-6 (August 4, 2015) (available at <http://www.disabilityrightsca.org/pubs/702701.pdf>).

In California, with long delays before inmates are sent to the state hospital for competency restoration services, many of those designated for transfer spend the long waiting period in some form of isolation, which makes their psychiatric condition worse and their prognosis more dire. Solitary confinement causes psychological damage. There has been a substantial amount of research into the harmful effects of isolated confinement, especially if the prisoner thus confined suffers from a serious mental illness or is vulnerable to mental illness.[42] It is predictable that prisoners' mental state deteriorates in isolation. Human beings require at least some social interaction and productive activities to establish and sustain a sense of identity and to maintain a grasp on reality.[43] In the absence of social interactions, unrealistic ruminations and beliefs cannot be tested in conversation with others, so they build up inside and are transformed into unfocused and irrational thoughts. Disorganized behaviors emerge. Internal impulses linked with anger, fear and other strong emotions grow to overwhelming proportions. Prisoners in this kind of segregation do what they can to cope. Many pace relentlessly, as if this nonproductive action will relieve the emotional tension. Those who can read books and write letters do so.

The tendency to suffer psychiatric breakdown and become suicidal is made even worse by sleep deprivation, which is a frequent occurrence among prisoners in isolated confinement. There are noises at night as other prisoners, for example those suffering from serious mental illness, cry out. Then, besides the slamming of doors, officers yell out orders on the unit. Then, the lights are usually on all night. Loss of sleep intensifies psychiatric symptoms by interfering with the normal diurnal rhythm (the steady

---

[42] Kupers, T., "Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?," in The Routledge Handbook of International Crime and Justice Studies, pp. 213-232 (eds. Arrigo, B. & Bersot, H., Oxford: Routledge, 2013); Scharff-Smith, P., The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, Crime and Justice, Vol. 34(1), 441-528 (2006); Kupers, T., Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It (Berkeley, University of California Press, 2017). In their amicus brief in Wilkinson v. Austin, 545 U.S. 209 (2005), leading mental health experts summarize the clinical and research literature about the effects of prolonged isolated confinement and conclude: "No study of the effects of solitary or supermax-like confinement that lasted longer than 60 days failed to find evidence of negative psychological effects" (p. 4).

[43] Sensory deprivation is not total in jail isolation settings; there is the intermittent slamming of steel doors and there is yelling (one has to yell in order to be heard by anyone from within one's cell), but this kind of noise does not constitute meaningful human communication.

alternation of day and night that provides human beings with orientation as to time), and the resulting sleep loss creates fatigue and magnifies cognitive problems, memory deficits, confusion, anxiety, and sluggishness. It is under these extreme conditions that psychiatric symptoms begin to emerge in previously healthy prisoners. Of course, in less healthy ones, (and individuals who would be designated for competency evaluation or restoration are in this group,) there is psychosis, mania or compulsive acts of self-abuse or suicide. A stunning statistic, born out in research around the country, is that fully 50% of all successful jail and prison suicides (not attempts, though the percentage would likely be comparable if we measured the much higher prevalence of attempts) occur among the 3% to 7% of prisoners who are in isolated confinement (segregation).[44]

Regarding the length of time it takes for the harmful effects of jail isolation to surface, there is no single length of time that accurately fits the situation of all affected individuals. I have observed some relatively stable-appearing prisoners break down and become psychotic or seriously suicidal after being in solitary confinement for only a few days. The United Nations Special Rapporteur on Torture, Juan Méndez, issued a proclamation that indefinite and prolonged solitary confinement in excess of 15 days is a human rights violation and should be subject to an absolute prohibition.[45] In any case, the longer the time an incompetent prisoner spends in solitary confinement in jail, the greater the risk of suicide and other harms that result from prolonged isolation.

## VI.  State Hospitals

California's state hospitals are the traditional site of competency restoration treatment in the state, although in recent years some jail-based and community-based

---

[44] Mears, D.P. & Watson, J., Towards a Fair and Balanced Assessment of Supermax Prisons, Justice Quarterly, Vol. 23(2), 232-270 (2006); Way, B., Miraglia, R., Sawyer, D., Beer, R., & Eddy, J., Factors Related to Suicide in New York State Prisons, International Journal of Law and Psychiatry, Vol. 28(3), 207-221 (2005); and Patterson, R.F. & Hughes, K., Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004, Psychiatric Services, Vol. 59(6), 676-682 (2008).
[45] See Solitary Confinement Should be Banned in Most Cases, UN Expert Says, UN News Centre (Oct. 18, 2011) (available at
<https://www.un.org/apps/news/story.asp?NewsID=40097&;Cr=torture&Cr1=%20ForceRecrawl:%200#.V19dyb6x2L0>).

competency restoration services have been established.  The environment and programs at state hospitals are quite different than what exists in the jails.

I will begin with my perceptions of Napa State Hospital.  There are some differences between Napa and the other hospitals, but generally the use of space, the staffing levels and the programs available in the state hospitals are much more similar than they are different.  At Napa there are expansive grounds covered with grass and there are gardens.  The wards contain large dayrooms that are full of patients during the day.  Patients sit on comfortable seats watching television, talk to each other and meet with nurses and other mental health staff informally in the dayrooms and in adjoining offices.  The patients can enter and leave their rooms on their own volition; for the most part the doors are not locked (there are exceptions for patients who are disruptive, but the staff enhance treatment for these individuals with the treatment goal of preparing them to participate peacefully in ward activities and have their doors unlocked).  Visiting with patients' family and friends at Napa involves contact, and there usually are no windows and phones to limit the contact (there are a few non-contact visiting rooms in various hospitals for the rare moments of behavioral dyscontrol).

Groups and individual treatment and rehabilitation meetings are frequent at Napa, taking place multiple times each day.  On the forensic unit for patients receiving competency restoration services there are relevant classes each day.  Psychiatrists are on duty and meet with patients frequently.  There are relatively more professionally qualified staff compared to the jails, including psychiatrists (available daily and on call at all times), nurses, social workers, vocational therapists and occupational therapists, psychologists, psychiatric technicians, and trainees from the various disciplines.  Every patient has a treatment team wherein the psychiatrist is in charge.  Nursing staff are in close contact with the treatment teams.  And security is mostly provided by nurses and technicians who are available in sufficient numbers to manage the population of patients quite safely and effectively.  At Napa State Hospital, there are also security officers in a

nearby building, who ride around the grounds in marked cars and can be summoned quickly for emergencies.[46]

Patients at Napa are encouraged to attend activities. If a patient elects to remain in his or her room instead of attending the milieu meeting, a psychotherapy group or a competency restoration class, staff go to the room and gently encourage the patient to come out of the bedroom and attend the activity. The reason for this is that many psychiatric illnesses include the symptom of isolation -- depression is a prime example, schizophrenia as well -- and it is an important part of the treatment for the treatment staff to encourage and facilitate the patient's participation in formal and informal congregate activities. This in stark contrast to the average jail situation, where officers selectively assign prisoners with serious mental illness to a single cell and if the prisoner elects to remain in that cell even when permitted out-of-cell, nothing is done to encourage the individual to participate in congregate activities.

Then, at Napa and the other state hospitals, there are phases to the inpatient treatment, and incremental levels of freedoms and amenities that patients earn successively as they accomplish their treatment goals and act appropriately. For example, a disturbed or suicidal patient might be required to stay on a locked ward at first, until his or her behavior and inclinations can be assessed. Then, the patient is advanced to a higher level where he or she can be on an unlocked ward. Eventually he or she, if there is sufficient improvement in symptoms and behaviors, is permitted to leave the ward in the company of staff. And eventually, some of the most advanced patients are granted permission to roam the yards of the hospital unaccompanied.

The other state hospitals have approximately equivalent staffing and programming. Dr. Michael Barsom, Executive Director at Metropolitan State Hospital, testified in deposition that every patient, including those undergoing competency restoration treatment at the hospital, is in individual psychotherapy, and most are in group psychotherapy once or more daily.[47] Milieu therapy involves the use of the hospital

---

[46] Of course state hospitals are not problem-free, and often have difficulties filling all staff positions, but here I am merely contrasting the treatment at Napa State Hospital with the situation in the jails.

[47] (Barsom Deposition on November 1, 2017 "Barsom I," pp. 51-52.)

milieu to advance the treatment.[48]  Thus, patients meet informally in the dayroom to play chess or checkers, and this supports their social skills.  Milieu meetings occur, where the patients meet with the staff to discuss administrative issues on the ward, but staff view these "milieu meetings" as part of the treatment.  Dr. Barsom testified that milieu therapy, including milieu groups, is going on all the time in the hospital.[49]

Dr. Barsom describes in his deposition a richly staffed hospital ward where patients can do art and movement therapy, go to the patio, a large space, and participate in bicycle riding, volleyball, basketball and other non-sports outdoor activities.  Besides rich vocational and art therapy programming inside the ward, patients go to the patio approximately twice daily.[50]  He explains management of patients who act out, which is handled by clinical staff except in rare cases where staff have to call in outside security personnel.[51]  Much more typically, the acting-out patient is put on "one-to-one" observation on the ward as long as needed.  If the unacceptable behavior is not controlled by "one-on-one" supervision, the patient is placed in "seclusion," following requirements in the field of psychiatry that include short periods of seclusion and review by the psychiatrist ordering the seclusion in a matter of hours.[52]

In terms of managing the patient who wants to remain in his or her room and avoid milieu and congregate activities, Dr. Barsom was asked if the treatment team typically encourages the patient to come out into the communal area of the ward if they want to stay only in their room all the time, and he testified:

> Answer: Yes, absolutely, treatment team, nursing staff, everybody gets involved in trying to bring the patient out into the milieu.

> Question: The milieu.  And you said it's in their best interest to not be isolated.  Is that because it's beneficial to be in the milieu?

---

[48] (Barsom I, pp. 53-54.)

[49] (Barsom I, p. 53.)

[50] (Barsom I, pp. 83-89)

[51] (Barsom I, pp. 116-117.)

[52] (Barsom I, pp. 96-101).

Answer: It is beneficial.[53]

Atascadero State Hospital, unlike Napa and Metropolitan, is considered a high security facility. According to Dr. Stirling Price, the Executive Director, "the whole milieu is treatment."[54] When asked what group sessions entail, Dr. Price testifies: "It would be a combination  of -- you know, it might be substance abuse, it might be coping skills, it might be rehabilitative type of groups, could be outside yard, could be any number of kinds of therapeutic groups."[55]  Asked whether the psychotherapy is aimed at competency training issues, Dr. Price testified: "It would be steered towards that but also, in these patients, coping with their mental illness and their symptoms and improving symptoms, medication management, trying to help them maintain taking their medications."[56]  And, when asked what staff do when a patient isolates himself, for example remaining in his room, Dr. Price testified: "Well, typically they would always encourage the patient to come out and socialize with other patients and be part of the treatment milieu and day room and activities groups, individual groups, so we try not to -- try to keep people from isolating too much."[57]

Dr. Barsom, the acting Executive Director of Patton State Hospital, described in his November 30, 2017 deposition the environment and treatment program at Patton State Hospital.  He had previously been deposed regarding his administrative role at Metropolitan State Hospital, and in his November 30 deposition he testified that the treatment regimen, the treatment teams, the broad variety of treatment modalities, the milieu, visiting policies and procedures, and the discipline and security arrangements are very much like those at Metropolitan State Hospital.  Patton is a high security institution, like Atascadero, and this means that California Department of Corrections and Rehabilitation officers and police are available at the perimeter of the hospital, but not on

---

[53] (Barsom I, p. 113)

[54] (Price Deposition, p. 29)

[55] (Price Deposition, p. 37).

[56] (Price Deposition, p. 36-37)

[57] (Price Deposition, p. 49).

the wards, and they are only called in emergencies.  Clinical staff handle most of the disciplinary problems, and do so within the context of the treatment plan.[58]

Nowhere is the stark contrast between jail and hospital more dramatic than in regard to restraint and use of force.  In the jails, as reported above, the use of force and restraint is a matter of custodial management; prisoners are restrained in handcuffs, or in more difficult situations with shackles, are almost always locked into their cells or, in the one or two or four hours they are permitted out of their cells, the common areas where they are permitted are locked and officers have control of the locks.  When they are suicidal, they are placed in very restrictive confinement such as the safety cells I observed at Lake County and Solano County Jails, or in restraint chairs.  In contrast, at Napa and the other state hospitals, except in the rare exception when a patient is out of control and violent, it is nurses and technicians and other members of the treatment team who "take down" an unruly patient.  When the patient must be restrained or placed in a seclusion room essentially for a "time out," the procedure is carried out in compliance with standards in psychiatry that require a doctor (or other high level clinician) to first examine the patient being restrained or secluded and order the restraint or seclusion.  Then after every few hours the doctor must return and re-examine the patient and re-order the seclusion or restraint if it is still required.  The seclusion or restraint must be utilized only when less restrictive measures have been tried and failed, and must be the minimum to achieve safety and be terminated in the shortest possible time.[59]

In summary, the environment and programs in the state hospitals are a stark contrast to those in the jails.  In jail, Sheriff's deputies control prisoners, there are many rules and many levels of punishment for their violation, and isolation is commonplace for prisoners with serious mental illness.  Even if prisoners with serious mental illness are consigned to multiple occupancy cells or dorms, they are vulnerable to violence, sexual abuse and, too often, use of force by staff.  And the use of force can be excessive, including spraying with immobilizing gas, physical take-downs by officers, handcuffs,

---

[58] (Barsom November 30, 2017 Deposition "Barsom II," pp. 93-123).

[59] (See, e.g., Barsom I, pp. 103-104, 110-111.)

restraint chairs, and so forth.  There is a culture of punishment that permeates the facilities and makes it very difficult for mental health treatment to occur.  Prisoners who isolate themselves as a symptom of their mental illness are mostly not encouraged to come out of the cell and take part in congregate activities.  Most jail cells and pods have no windows to the outdoors.  When one walks through a jail in the middle of the day, on average, the dayrooms, yards, and hallways are mostly empty; most prisoners are in their cell or dorm, many lying on their beds or bunks; and the only human beings one sees who are not locked in a cell or dorm are officers.  There is relatively little in the way of mental health staff, and there are relatively few group therapies, classes or rehabilitation opportunities.  Visits are non-contact, in stark and uncomfortable environments.

At state hospitals, on the other hand, security is handled by mental health staff except in serious emergencies, the patients are in the dayroom or yard or even on the grounds much of the day, the mental health staffing is richer and patients see psychiatrists, therapists, and case managers much more frequently.  Classes and group sessions, including competency restoration classes, are more frequent than in the jails, even when the jail is designated the site of competency restoration services.  Suicidal patients receive greater staff attention and monitoring and are not automatically put in safety cells.  Seclusion and restraint are much less frequent than in jails, and when initiated they are effected pursuant to psychiatric standards that are much more humane than practices in the jails.  When a patient elects to remain in his or her room and miss groups and classes, staff visit the patient in the room and encourage the patient to exit the bedroom and attend events.  There are contact visits in comfortable settings.

Because of the many differences between the state hospitals and jails in terms of the mental health treatment available, use of isolation, use of force, and living conditions, California's state hospitals are much more conducive to treating patients' mental illnesses and providing competency restoration treatment than county jail facilities in California.

## VII.     Community-Based Competency Restoration Treatment

Community-based competency restoration programs are very promising as an alternative to state hospital programs because it is possible to attain a therapeutic

environment in the community.[60]  Before turning attention to community-based competency restoration programs, I will briefly discuss the trend toward diversion and community-based services.  Diversion is the term applied to various efforts to transfer individuals suffering from serious mental illness and substance abuse from correctional settings to community-based treatment and recovery programs.  Diversion is often monitored by a Behavioral Health Court or Drug Court, where the court has the authority to place the individual in a non-carceral community program with the understanding that failure to adhere to the court-approved treatment or recovery regimen can result in the individual doing jail time (or standing trial).

Diversion from the court or jail into community-based programs is very robust today in many California counties.  The Behavioral Health Court or Substance Abuse Court uses mild coercion – the prospect of going to jail – in order to convince defendants to adhere to their treatment regimen.  Then the defendants must periodically reappear in court and the judge can either permit them to remain out of jail because they have adhered to treatment, remained clean and sober and/or their condition has vastly improved; or the judge can order they stand trial or, if they pled guilty prior to accepting the court's offer of diversion and treatment, they can then be sentenced to serve time.

Behavioral health courts have proved very effective, both in improved mental health condition and sobriety, and in lowered recidivism rates.[61]  Many other studies echo the positive outcomes.[62]  Diversion from jail to community-based recovery and mental health treatment programs has a doubly positive effect.  First, individuals suffering from serious mental illness are "diverted" into treatment and recovery programs where the

---

60 Gowensmith, W. Neil, Frost, Lynda E., Speelman, Danielle W., & Therson, Danielle E.,  Lookin' for Beds in All the Wrong Places: Outpatient Competency Restoration as a Promising Approach to Modern Challenges,  Psychology, Public Policy, and Law, Vol. 22(3), 293-305 (2016).

[61] McNiel, Dale E. & Binder, Renée L.,  Effectiveness of a Mental Health Court in Reducing Criminal Recidivism and Violence, American Journal of Psychiatry, Vol. 164, 1395–1403 (2007).

[62] Trupin, E & Edwards, H, Seattle's Mental Health Courts: Early Indicators of Effectiveness, Int. J. Law Psychiatry,Vol. 26(1), 33–53 (2003); Herinckx, HA, Swart, SC, Ama, SM, Dolezal, CD & King, S., Rearrest and Llinkage to Mental Health Services Among Clients of the Clark County Mental Health Court Program, Psychiatric Services, Vol. 56(7), 853–857 (2005); Monahan, J, et al., , Use of Leverage to Improve Adherence to Psychiatric Treatment in the Community, Psychiatric Services,  Vol. 56(1), 37–44 (2005); Redlich, AD, et al., The Second Generation of Mental Health Courts, Psychology and Public Policy Law,  Vol. 11(4), 527–538 (2005); Rivas-Vazquez, Rafael A., et al.,, A Relationship-Based Care Model for Jail Diversion, Psychiatric Services, Vol. 60(6), 766–771 (2009).

conditions foster treatment success and the treatment is rich enough to make success attainable. Secondly, the diversion reduces the jail population and crowding, and thus serves to ameliorate the very conditions that make the jail environment so dangerous, harmful, and unsupportive of effective mental health treatment.

Diversion can serve as a model for more recently evolving community-based competency restoration efforts. Reports of outcomes from community-based competency restoration programs are only beginning to appear, but the outcomes we have are very equivalent to outcomes from studies of diversion and behavioral health courts. The bottom line is that treatment in the community is far better than in jail for individuals with serious mental illness. Gowensmith, Frost et al. surveyed progress with community-based competency restoration services nationwide and concluded, "In summary, outpatient competency restoration programs (OCRPs) are a recent but rapidly developing alternative to traditional inpatient restoration. Through a comparison of existing OCRPs, we believe OCRPs show preliminary but promising outcomes in terms of high restoration rates, low program failure rates, and substantial cost savings."[63]

Halfway 360, a community-based competency restoration facility in South Central Los Angeles, illustrates how this approach works. On July 5, 2017, I visited (with counsel) the house in South Central where the supported residential program serves individuals facing misdemeanor charges who are ruled incompetent, and I talked with the staff working in the house and the director of the MIST CBR program (Misdemeanor Incompetent to Stand Trial – Community Based Rehabilitation) of which the house is a part. The MIST CBR program accepts referrals from the Sheriff's Department and the Courts of individuals who are currently incompetent to stand trial. Department 95 in Los Angeles plays a big role, referring incompetent defendants to MIST CBR instead of consigning them to jail (in other words they are "diverted"). The house has 19 beds, there are staff present all the time, and individual treatment plans and frequent staff meetings guide each resident's management and treatment. The staff take a "harm

---

[63] Gowensmith, W. Neil, Frost, Lynda E., Speelman, Danielle W., & Therson, Danielle E., Lookin' for Beds in All the Wrong Places: Outpatient Competency Restoration as a Promising Approach to Modern Challenges, Psychology, Public Policy, and Law, Vol. 22(3), 293-305 (2016).

reduction" approach to substance abuse, they do not test their residents for alcohol or drugs, and they are reportedly very successful at providing rehabilitation to this population.

When I asked the staff how they work with the residents, they reported that they form therapeutic relationships and foster trust. For example, they try to impress on residents the importance of following rules such as the rule to keep the house clean. I asked how they handle violence in the program, and the staff responded with a very effective plan, including the need to see in advance the dissatisfaction and anger, before they mount to where a physical altercation would occur. Their focus is on housing. They have organized an incremental progression from the jail to a residential program, and then on to more permanent supported housing or, in very successful cases, to independent living. Their feeling is that the more "settled" a person feels in a supported living situation, the more amenable he or she is to treatment for mental illness and recovery programs for addictions. The program director and the staff of the house report they have "diverted" (approximately, kept out of jail) 419 individuals.

In this residential program residents are free to interact with each other and leave the premises, and they participate in far more programming, but there is no need for the kind of enhanced security and omnipresent discipline that prevails at the jail. Community-based competency restoration services show great promise.

## VIII.   Summary of Opinions

1. Competency Restoration Treatment has two main parts, one is treatment of the underlying illness that causes incompetence and the other is education about the legal proceedings and training for participation in one's own defense. Thus, if an individual has decompensated, i.e. is acutely psychotic or so depressed that focus, concentration on task and judgement are seriously impaired, the underlying mental illness must be treated to render the individual capable of taking part in the competency restoration classes and training.

2. Adequate competency restoration treatment can only occur in a setting conducive to mental health treatment.

3. Jail is not a setting conducive to mental health treatment nor to competency restoration treatment, absent major alterations in milieu, staffing, and

programming. Jail crowding, the threat of violence, the culture of punishment that permeates the facilities, and the relative inadequacy of programs and treatment have a very detrimental effect on the mental status of incompetent prisoners, and on the ability to participate effectively in competency restoration.

4. Solitary confinement for inmates with mental illness is simply the average and usual situation in jail, either because they have trouble following the rules, or, more often, because custody staff do not want them to be victimized or cause problems in congregate housing situations such as multiple occupancy cells or dormitories, so they are consigned to isolation "for their own good." And solitary confinement is very harmful for individuals suffering from serious mental illness.

5. Jails are violent places. Prisoners with serious mental illness are disproportionately victims of violence, or lose control of their temper and get involved in altercations. Of course there is some violence at state hospitals, but much less than in the jails.

6. Studies and reports conclude that jail officers use more force and more excessive force, and that there are more human rights abuses in circumstances involving prisoners suffering from serious mental illness. In contrast, at state hospitals, clinical staff generally handle discipline problems with treatment goals in mind, and rarely call security officers.

7. Under Penal Code 1370 and Welfare and Institutions Code 4100, the possible sites for competency restoration services are: a Department of State Hospital facility (which includes jail-based restoration programs), a public or private treatment facility, including a community-based residential treatment system, or outpatient treatment. But as I have explained above, if competency restoration treatment is to occur in an institution and be effective, the state mental hospitals are the appropriate setting. (If relevant standards of care are affected, it is possible that other institutional settings could be made appropriate.) Community-based residential programs and outpatient programs can also be very effective and beneficial for the population.

8. At the hospital, in contrast to jail settings, there is much less crowding, more humane conditions, less violence, richer staffing, better mental health treatment

Expert Report of Terry A. Kupers, M.D., M.S.P. – page 32 of 34

and more classes and training events for competency restoration.  There are windows that permit natural light and views of the environment, and there are contact visits in the hospitals, but neither is available in the jails, for the most part.

9.   It is my understanding that it is not uncommon for pre-trial detainees in California to wait 60 to 90 days or more to be transferred to a state hospital for their mandated competency restoration treatment after the order of commitment. Litigation involving a single county, Contra Costa County, resulted in the requirement that prisoners who are adjudged incompetent be transferred to the state hospital within sixty days.[64]  It is my understanding the Department of State Hospitals, partly in response to that litigation, is currently attempting to reach a 60 day limit to the wait for patients to be transferred from jails to a state hospital.[65] But sixty days is far too long for incompetent individuals to remain in harmful jail conditions with limited mental health treatment.

10. Because of crowding, violence, isolation, the frequent use of force by staff and relatively inadequate mental health treatment and rehabilitation programs, individuals with serious mental illness are at risk of harm while incarcerated in the jail.

11. I conclude to a reasonable degree of medical certainty that the longer an individual suffering from serious mental illness is consigned to jail, likely including time in isolation, and is not provided adequate mental health treatment, the worse his or her condition, disability and prognosis, and therefore the less likely there will be a restoration of competence (or, in a certain proportion of cases, the longer it will take for competence to be restored.)

---

[64] *In re Loveton*, 244 Cal.App.4th 1025 (2016).
[65] George Maynard Deposition, pp. 179-181.

Respectfully submitted,

*Terry A. Kupers*

Terry A. Kupers, M.D., M.S.P.

January 24, 2018

Curriculum Vitae

Terry Allen Kupers, M.D., M.S.P.

Office Address:
*484 Lake Park Ave, #338, Oakland, California 94610*
phone: 510-654-8333      email: kupers@igc.org

Institute Professor, Emeritus, Graduate School of Psychology, The Wright Institute
2728 Durant Avenue, Berkeley, California 94704

Born:  October 14, 1943, Philadelphia, Pennsylvania

Education:
B.A., With Distinction, Psychology Major, Stanford University, 1964
M.D., U.C.L.A. School of Medicine, 1968
M.S.P. (Masters in Social Psychiatry), U.C.L.A., 1974

Training:
Intern (Mixed Medicine/ Pediatrics/ Surgery), Kings County Hospital/Downstate Medical
Center, Brooklyn, New York, 1968-1969.
Resident in Psychiatry, U.C.L.A. Neuropsychiatric Institute, Los Angeles, 1969-
1972
Registrar in Psychiatry, Tavistock Institute, London (Elective Year of U.C.L.A.
Residency) 1971-1972
Fellow in Social and Community Psychiatry, U.C.L.A. Neuropsychiatric Institute, 1972-
1974

License: California, Physicians & Surgeons, #A23440, 1968-

Certification: American Board of Psychiatry and Neurology (Psychiatry,
#13387),  1974-

Honors:
Alpha Omega Alpha, U.C.L.A. School of Medicine,1968.
Distinguished Life Fellow, American Psychiatric Association; Fellow, American
Orthopsychiatric Association.
Listed: Who's Who Among Human Services  Professionals (1995-); Who's Who in
California (1995-);  Who's Who in The United States  (1997-);  Who's Who in
America (1998-); International Who's Who in  Medicine (1995-);  Who's Who in
Medicine and Healthcare (1997-);  The National Registry of Who's Who (2000-);
Strathmore's Millennial Edition, Who's Who; American Biographical Institute's
International Directory of Distinguished Leadership; Marquis' Who's Who in the
World (2004-); Marquis' Who's Who in Science and Engineering, (2006-); Who's
Who Among American Teachers & Educators (2007-); The Global Directory of

Who's Who (2012-); International Association of Healthcare Professionals' The
Leading Physicians (2012-).
Helen Margulies Mehr Award, Division of Public Interest (VII), California Psychological
Association, Affiliate of American Psychological Association, March 30, 2001.
Stephen  Donaldson Award, Stop  Prisoner Rape, 2002.
Exemplary Psychiatrist Award, National Alliance for the Mentally Ill, 2005
William Rossiter Award for "global contributions made to the field of forensic mental
health," Annual Meeting, Forensic Mental Health Association of California,
March 18,2009, Monterey, California
Albert Nelson Marquis Lifetime Achievement Award, Marquis Who's Who, 2018


Clinical Practice:
Los Angeles County, SouthEast Mental Health Center, Staff Psychiatrist,  1972-1974
Martin Luther King, Jr. Hospital, Department of  Psychiatry, Los Angeles, Staff
Psychiatrist and Co-Director, Outpatient Department,  1974-1977.
Contra Costa County, Richmond Community Mental Health Center, Staff Psychiatrist
and Co-Director, Partial Hospital, 1977-1981
Private Practice of Psychiatry, Los Angeles and Oakland,  1972 to present

Teaching:
Assistant Professor, Department of Psychiatry and Human Behavior, Charles Drew
Postgraduate Medical School, Los Angeles,  and Assistant Director, Psychiatry
Residency Education, 1974-1977.
Institute Professor, Graduate School of Psychology, The Wright Institute, Berkeley,
1981 to present
Courses Taught at:  U.C.L.A. Social Science Extension, California School of
Professional Psychology (Los Angeles), Goddard Graduate School (Los
Angeles), Antioch-West (Los Angeles),  New College Graduate School of
Psychology (San Francisco).

Prof'l Organizations:
American Psychiatric Association (Distinguished Life Fellow); Northern California
Psychiatric Society;  East Bay Psychiatric Association (President, 1998-1999);
American Orthopsychiatric Association (Fellow); American Association of
Community Psychiatrists; Physicians for Social Responsibility; American
Academy of Psychiatry and the Law.

Committees and Offices:
Task Force on the Study of Violence, Southern  California Psychiatric Society, 1974-
1975
Task Force on Psychosurgery, American Orthopsychiatric Association, 1975-1976
California Department of Health Task Force to write "Health Standards for Local
Detention Facilities," 1976-77
Prison/ Forensic Committee, Northern California Psychiatric Society,  1976-1981;
1994-

Psychiatry Credentials Committee, Alta Bates Medical Center, Berkeley, 1989-1994
(Chair, Subcommittee to Credential Licensed Clinical Social Workers)
President, East Bay Chapter of Northern California Psychiatric Society, 1998-1999
Co-Chair, Committee on Persons with Mental Illness Behind Bars of the American
Association of Community Psychiatrists, 1998-2003

Consultant/Staff Trainer:
Contra Costa County Mental Health Services; Contra Costa County Merrithew
Memorial Hospital Nursing Service; Bay Area Community Services, Oakland;
Progress Foundation, San Francisco; Operation Concern, San Francisco; Marin
County Mental Health Services; Berkeley Psychotherapy Institute; Berkeley
Mental Health Clinic; Oregon Department of Mental Health; Kaiser Permanente
Departments of Psychiatry in Oakland, San Rafael, Martinez and Walnut Creek;
Human Rights Watch, San Francisco Connections collaboration (Jail Psychiatric
Services, Court Pre-Trial Diversion, CJCJ and Progress Foundation); Contra
County Sheriff's Department Jail Mental Health Program; Consultant to
Protection & Advocacy, Inc., re Review of State Hospital Suicides

Forensic Psychiatry (partial list):
Testimony in Madrigal v. Quilligan, U.S. District Court, Los Angeles, regarding
informed consent for surgical sterilization, 1977
Testimony in Rutherford v. Pitchess, Los Angeles Superior Court, regarding conditions
and mental health services in Los Angeles County Jail, 1977
Testimony in Hudler v. Duffy, San Diego County Superior Court, regarding conditions
and mental health services in San Diego County Jail, 1979
Testimony in Branson v. Winter, Santa Clara County Superior Court, regarding
conditions and mental health services in Santa Clara County Jail, 1981
Testimony in Youngblood v. Gates, Los Angeles Superior Court, regarding conditions
and mental health services in Los Angeles Police Department Jail, 1982
Testimony in Miller v. Howenstein, Marin County Superior Court, regarding conditions
and mental health services in Marin County Jail, 1982
Testimony in Fischer v. Geary, Santa Clara County Superior Court, regarding
conditions and mental health services in Santa Clara County Women's
Detention Facility, 1982
Testimony in Wilson v. Deukmejian, Marin County Sup Court, regarding conditions and
mental health services at San Quentin Prison, 1983
Testimony in Toussaint/Wright/Thompson v. Enomoto, Federal District Court in San
Francisco, regarding conditions and double-celling in California State Prison
security housing units, 1983
Consultant, United States Department of Justice, Civil Rights Division, regarding
conditions and mental health services in Michigan State Prisons, 1983-4
Testimony in Arreguin vs. Gates, Federal District Court, Orange County, regarding
"Rubber Rooms" in Orange County Jail, 1988
Testimony in Gates v Deukmejian, in Federal Court in Sacramento, regarding
conditions, quality of mental health services and segregation of inmates with
HIV positivity or AIDS at California Medical Facility at Vacaville, 1989

Testimony in Coleman v. Wilson, Federal Court in Sacramento, regarding the quality of
mental health services in the California Department of Corrections' statewide
prison system, 1993

Testimony in Cain v. Michigan Department of Corrections, Michigan Court of Claims,
regarding the effects on prisoners of a proposed policy regarding possessions,
uniforms and classification, 1998

Testimony in Bazetta v. McGinnis, Federal Court in Detroit, regarding visiting policy
and restriction of visits for substance abuse infractions, 2000

Testimony in Everson v. Michigan Department of Corrections, Federal Court in Detroit,
regarding cross-gender staffing in prison housing units, 2001

Testimony in Jones 'El v. Litscher, Federal Court in Madison, Wisconsin, regarding
confinement of prisoners suffering from severe  mental  illness in supermax,
2002

Testimony in Russell v. Johnson, Federal Court in Oxford, Mississippi, regarding
conditions of confinement and treatment prisoners with mental illness on Death
Row at Parchman, 2003

Testimony in Austin v. Wilkinson, Federal Court in Cleveland, Ohio, regarding
proposed transfer of Death Row into Ohio State Penitentiary (supermax),
August, 2005

Testimony in Roderick Johnson v. Richard Watham, Federal Court in Wichita Falls,
Texas, regarding staff responsibility in case of prison rape, September, 2005

Testimony in Presley v. Epps, No. 4:05CV148-JAD, N.D., Oxford, Mississippi, 2005 &
2007, involving conditions in Supermax Unit 32 at Mississippi State Penitentiary
and Treatment of Prisoners with Serious Mental Illness.

Testimony in DAI, Inc. v. NYOMH, Federal Court, So. Dist. NY, April 3,
2006,  regarding mental health care in NY Dept. of Correctional Services

Testimony in Neal v. Michigan DOC, State of Michigan, Circuit Court for the County of
Washtenaw, January 30, 2008, File No. 96-6986-CZ, regarding custodial
misconduct & sexual abuse of women prisoners

Testimony in Hadix v. Caruso, No. 4:92-cv-110, USDistCt, WDistMichigan, Grand
Rapids, Michigan, regarding mental health care in prison, April 29, 2008

Testimony in John Doe v. Michigan D.O.C., Detroit, 2014.

Testimony in A.B. v. WA State Dept Soc'l & Health Services, USDistCtWDistWA, No.
14-cv-011 78-MJP, Seattle, March 17, 2015, regarding Competency Evaluations
and Competency Restoration Treatment

Testimony (deposition) in Ashker v. Governor of California, USDistCtNoDistCA,
Oakland, No. C 09-05796 CW, 2015, regarding confinement in excess of 10
years in Security Housing Unit at Pelican Bay State Prison.

Journal Editorial Positions:
Men and Masculinities, Editorial Advisory Panel (in the past)
Juvenile Correctional Mental Health Report, Editorial Board (in the past)
Correctional Mental Health Report, Contributing Editor (current)

Presentations and Lectures (partial list):

"Expert Testimony on Jail and Prison Conditions." American Orthopsychiatric Association Annual Meeting, San Francisco, March 30, 1988, Panel 137: "How Expert are the Clinical Experts?

"The Termination of Psychotherapy." Psychiatry Department Grand Rounds, Mills/Peninsula Hospitals, Burlingame, February 24, 1989.

"Big Ideas, and Little Ones." American Psychiatric Association Annual Meeting, San Francisco, April, 1989.

"Men in Psychotherapy." Psychiatry Department Grand Rounds, Mills/Peninsula Hospitals, Burlingame, September 29, 1989.

"Psychodynamic Principles and Residency Training in Psychiatry." The Hilton Head Conference, Hilton Head Island, South Carolina, March 15, 1991.

Panelist: "The Mentally Ill in Jails and Prisons," California Bar Association Annual Meeting, Anaheim, 1991.

"The State of the Sexes: One Man's Viewpoint." The Commonwealth Club of California, San Mateo, March 25, 1992.

Keynote Address: "Feminism and the Family." 17th National Conference on Men and Masculinity, Chicago, July 10, 1992.

Panel Chair and Contributor: "Burnout in Public Mental Health Workers." Annual Meeting of the American Orthopsychiatric Association, San Francisco, May 22, 1993.

Panel Chair and Contributor: "Socioeconomic Class and Mental Illness." Annual Meeting of the American Psychiatric Association, San Francisco, May 26, 1993.

"Public Mental Health." National Council of Community Mental Health Centers Training Conference, San Francisco, June 12, 1993.

Psychiatry Department Grand Rounds: "Men's Issues in Psychotherapy." California Pacific Medical Center, San Francisco, February 24, 1993.

"The Effect of the Therapist's Gender on Male Clients in Couples and Family Therapy." Lecture at Center for Psychological Studies, Albany, California, April 15, 1994.

"Pathological Arrhythmicity and Other Male Foibles." Psychiatry Department Grand Rounds, Alta Bates Medical Center, June 7, 1993.

Roger Owens Memorial Lecture:-"Prisons and Mental Illness." Department of Psychiatry, Alta Bates Medical Center, March 6, 1995.

Keynote Address: "Understanding Our Audience: How People Identify with Movements and Organizations." Annual Conference of the Western Labor Communications Association, San Francisco, April 24, 1998.

"Men in Groups and Other Intimacies." 44th Annual Group Therapy Symposium, University of California at San Francisco, November 6, 1998.

"Men in Prison." Keynote, 24th Annual Conference on Men and Masculinity, Pasadena, July 10, 1999.

"Trauma and Posttraumatic Stress Disorder in Prisoners" and "Prospects for Mental Health Treatment in Punitive Segregation." Staff Training Sessions at New York State Department of Mental Health, Corrections Division, at Albany, August 23, 1999, and at Central New York Psychiatric Institution at Utica, August 24.

"The Mental Health Crisis Behind Bars." Keynote, Missouri Association for Social
        Welfare Annual Conference, Columbia, Missouri, September 24, 1999.

"The Mental Health Crisis Behind Bars." Keynote, Annual Conference of the
        Association of Community Living Agencies in Mental Health of New York State,
        Bolton Landing, NY, November 4, 1999.

"Racial and Cultural Differences in Perception Regarding the Criminal Justic
        Population." Statewide Cultural Competence and Mental Health Summit VII,
        Oakland, CA, December 1, 1999.

"The Criminalization of the Mentally Ill," 19th Annual Edward V. Sparer Symposium,
        University of Pennsylvania Law School, Philadelphia, April 7, 2000.

"Mentally Ill Prisoners." Keynote, California Criminal Justice Consortium Annual
        Symposium, San Francisco, June 3, 2000.

"Prison Madness/Prison Masculinities," address at the Michigan Prisoner Art Exhibit,
        Ann Arbor, February 16, 2001.

"The Mental Health Crisis Behind Bars," Keynote Address, Forensic Mental Health
        Association of California, Asilomar, March 21, 2001.

"Madness & The Forensic Hospital," grand rounds, Napa State Hospital, 11/30/01.

Commencement Address, The Wright Institute Graduate School of Psychology, June
        2, 2002.

"Mental Illness & Prisons: A Toxic Combination," Keynote Address, Wisconsin
        Promising Practices Conference, Milwaukee, 1/16/02.

"The Buck Stops Here: Why & How to Provide Adequate Services to Clients Active in
        the Criminal Justice System," Annual Conference of the California Association
        of Social Rehabilitation Agencies, Walnut Creek, California, 5/2/02.

Keynote Address, "Mental Illness in Prison," International Association of Forensic
        Psychotherapists, Dublin, Ireland, May 20, 2005

Invited Testimony (written) at the Vera Institute of Justice, Commission on Safety and
        Abuse in America's Prisons, Newark, NJ, July 19, 2005

Invited Testimony at the National Prison Rape Elimination Commission hearing in San
        Francisco, August 19, 2005

Lecture, Prisoners with Serious Mental Illness: Their Plight, Treatment and Prognosis,"
        American Psychiatric Association Institute on Psychiatric Services, San Diego,
        October 7, 2005

Grand Rounds, "The Disturbed/Disruptive Patient in the State Psychiatric Hospital,"
        Napa State Hospital, June 26, 2007

Lecture, "Our Drug Laws Have Failed, Especially for Dually Diagnosed Individuals," 19th
        Annual Conference, California Psychiatric Association, Huntington Beach, CA,
        October 6, 2007

Panel: "Mental Health Care and Classification," Prison Litigation Conference, George
        Washington University Law School, Washington, D.C., March 28, 2008.

Keynote Address: "Winning at Rehabilitation," Annual Meeting of the Forensic Mental
        Health Association of California, Monterey, California, March 18, 2009

Panel: "Construction of Masculinity and Male Sexuality in Prison," UCLA Women's Law
        Journal Symposium, Los Angeles, April 10, 2009

Panel: "Solitary Confinement in America's Prisons," Shaking the Foundations
        Conference, Stanford Law School, October 17, 2009.

Commencement Address, San Francisco Behavioral Health Court Graduation
Ceremony, October 21, 2009.

Panel:  "Negotiating Settlements of Systemic Prison Suits," Training & Advocacy
Support Center, Protection & Advocacy Annual Conference, Los Angeles, June
8, 2010.

Grand Rounds, "Recidivism or Rehabilitation in Prison?," Alta Bates Summit Medical
Center, November 1, 2010

Keynote Address: "Prison Culture & Mental Illness: a Bad Mix," University of Maryland
Department of Psychiatry Cultural Diversity Day, Baltimore, Maryland, March 24,
2011.

Grand Rounds, "The Role of Misogyny & Homophobia in Prison Sexual Abuse," Alta
Bates Summit Medical Center, October 17, 2011

Special Guest, "Offering Hope and Fostering Respect in Jail and Prison," 2011 ZIA
Partners UnConvention, Asilomar Conference Center, October 24, 2011.

Invited Lecture, "Suicide Behind Bars: The Forgotten Epidemic," 2011 Institute on
Psychiatric Services, American Psychiatric Association, San Francisco, October
28, 2011.

Lecture: "How Can We Help Persons with Mental Illness in the Criminal Justice
System?," Solano County Re-entry Council, Fairfield, CA, January 15, 2012.

Lecture:  "The Prison System in the U.S.A.: Recent History and Development,
Structure, Special Issues," Conference of the American Bar Association Rule of
Law Initiative, Cross-National Collaboration: Protecting prisoners in the US and
Russia, Moscow, Russia, January 20, 2012.

Continuing Medical Education (CME) Presentation: "Correctional Psychiatry Overview,"
The Center for Public Service Psychiatry of Western Psychiatric Institute and
Clinic (co-sponsored by the American Association of Community Psychiatrists),
national videoconference originating in Pittsburg, PA, February 2, 2012.

Grand Rounds, "Mental Health Implications of the Occupy Movement," Alta Bates
Summit Medical Center, October 8, 2012

Invited Speaker: "Solitary Confinement: Medical and Psychiatric Consequences,"
Session: Multi-Year Solitary Confinement in California and the Prisoner Hunger
Strikes of 2011-2012, American Public Health Association Annual Meeting,
Moscone Convention Center, San Francisco, October 29, 2012.

Keynote Address:  "Solitary Confinement and Mental Health," Conference of the
Midwest Coalition for Human Rights, Northeastern Illinois University, Chicago,
November 9, 2012.

Symposium Presentation: "The Experience of Individuals with Mental
Illness in the Criminal Justice System," American Psychiatric Association Annual
Meeting, Moscone Center, San Francisco, May 20, 2013.

Presentation:  Incarceration and Racial Inequality in the U.S., Roundtable on the Role
of Race and Ethnicity Among Persons Who Were Formerly Incarcerated,
California Institute for Mental Health, Sacramento, California, February 28, 2014.

Testimony at Nevada Advisory Commission on the Administration of Justice on
Isolated Confinement, Las Vegas, Nevada, March 5, 2014.

Lecture, "The Death Penalty and Mental Health," General Assembly of the World
Coalition Against the Death Penalty, San Juan, Puerto Rico, June 21, 2014.

Staff Training: "Ethical Care in Managing and Treating the Disturbed/Disruptive Patient,"
Napa State Hospital, October 2, 2014.

Lecture: "The Multiple Traumas of Youth in Detention," American Psychiatric
Association Institute on Psychiatric Services, San Francisco, November 1, 2014.

Guest Expert: Community Psychiatry Forum: "The Social, Economic and Political
Impact of Incarceration.";  The Center for Public Service Psychiatry at the
University of Pittsburg, and the American Association of Community
Psychiatrists, video-conference from Pittsburg, March 12, 2015.

Lecture: "The Struggles of People with Mental Illness in Jails," The Mental Health
Board of San Francisco, San Francisco Department of Public Health,
September 16, 2015.

Lecture: "A Psychoanalytic Response to the Effects of Forced Isolation in the Age of
Mass Incarceration, Northern California Society for Psychoanalytic Psychology,
Scientific Meeting, San Francisco, April 2, 2016.

Panel: "Mental Health, Neuroscience and the Physical Environment," Academy of
Neuroscience for Architecture Conference, September 23, 2016, Salk Institute,
University of California at San Diego.

Paper presentation: "Gender and Domination in Prison," Law Review Symposium on
Gender and Incarceration, Western New England School of Law, Springfield,
MA, October 14, 2016.

Presentation, " Working with Experts: An Expert and Lawyer Conversation," with
Rachel Higgins, New Mexico Criminal Defense Lawyers' Association, Solitary
Confinement & Prisoner Civil Rights, Albuquerque, New Mexico, May 5, 2017.

Keynote Address: "Corrections, Solitary Confinement and Prisoner Mental Health,"
Conference on Supporting Prisoner Mental Health, Vancouver, British Columbia,
June 2, 2017.

Webinar, "The Humane Imperative: Ending Solitary Confinement.  SAMHSA & NAMI,
July 27,2017.

Lecture, "Masculinity Behind Bars: Violence on the Yards, Terror in Isolation," Center
for the Study of Men and Masculinities, SUNY Stony Brook, delivered at
Fordham University, Manhattan, October 24, 2017.

Panel, "Solitary Confinement," Georgetown University, January 16, 2018


Books Published:

Public Therapy: The Practice of Psychotherapy in the Public Mental Health Clinic.  New
York:  Free Press/ MacMillan, 1981.  Re-published as e-Book, 2015, at
<http://www.freepsychotherapybooks.org/product/208-public-therapy-the-
practice-of-psychotherapy-in-the-public-mental-health-clinic/category_pathway-
14>

Ending Therapy: The Meaning of Termination.   New York: New York University Press,
1988. Re-published as e-Book, 2014, at
<http://freepsychotherapybooks.org/product/118-ending-therapy-the-meaning-
of-termination>

(Editor):  Using Psychodynamic Principles in Public Mental Health.    New Directions
for Mental Health Services, vol. 46.  San Francisco: Jossey-Bass, 1990.

<u>La Conclusione della Terapia: Problemi, metodi, consequenze</u>.  Rome: Casa Editrice
      Astrolabio, 1992. (trans. of <u>Ending Therapy</u>.)
<u>Revisioning Men's Lives: Gender, Intimacy and Power</u>.  New York: Guilford
      Publications, 1993.  (trans. into Chinese, 2000; re-published as e-Book, 2014, at
      <http://www.freepsychotherapybooks.org/product/117-revisioning-men-s-lives-
      gender-intimacy-and-power/category_pathway-14)>
<u>Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About
      It</u>.  San Francisco: Jossey-Bass/Wiley, 1999.
(Co-Editor): <u>Prison Masculinities</u>.  Philadelphia: Temple University Press, 2001.
<u>Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It</u>.  Berkeley,
      CA: University of California Press, 2017.


Other Publications:
"The Depression of Tuberculin Delayed Hypersensitivity by Live Attenuated Mumps
      Virus," <u>Journal of Pediatrics</u>, 1970, 76, 716-721.
Editor and Contributor, <u>An Ecological Approach to Resident Education in Psychiatry</u>,
      the product of an NIMH Grant to the Department of  Psychiatry and Human
      Behavior, Drew Medical School, 1973.
"Contact Between the Bars  -  A Rationale for Consultation in Prisons," <u>Urban Health,</u>
      Vol. 5, No. 1, February, 1976.
"Schizophrenia and History," <u>Free Associations,</u> No. 5, 1986, 79-89.
"The Dual Potential of Brief Psychotherapy,"  <u>Free Associations</u>, No. 6, 1986, pp. 80-99.
"Big Ideas, and Little Ones,"  Guest Editorial in <u>Community Mental Health Journal,</u>
      1990, 26:3, 217-220.
"Feminist Men," <u>Tikkun,</u> July/August, 1990.
"Pathological Arrhythmicity in Men," <u>Tikkun,</u> March/April, 1991.
"The Public Therapist's Burnout and Its Effect on the Chronic Mental Patient." <u>The
      Psychiatric Times,</u> 9,2, February, 1992.
"The State of the Sexes: One Man's Viewpoint," <u>The Commonwealth,</u> 86,16, April,
      1992.
"Schoolyard Fights." In Franklin Abbott, Ed., <u>Boyhood.</u>  Freedom, California: Crossing
      Press, 1993; Univeristy of Wisconsin Press, 1998.
"Menfriends." <u>Tikkun,</u> March/April, 1993
"Psychotherapy, Neutrality and the Role of Activism." <u>Community Mental Health
      Journal,</u>1993.
"Review: <u>Treating the Poor </u>by Mathew Dumont." <u>Community Mental Health Journal,</u>
      30(3),1994, 309-310.
"The Gender of the Therapist and the Male Client's Capacity to Fill Emotional
      Space." <u>Voices</u>, 30(3), 1994, 57-62.
"Soft Males and Mama's Boys: A Critique of Bly."  In Michael Kimmel, Ed., <u>The Politics
      of Manhood: Profeminist Men Respond to the Mythopoetic Men's Movement
      (And Mythopoetic Leaders Respond).</u>  Philadelphia: Temple University Press,
      1995.
"Gender Bias, Countertransference and Couples Therapy." <u>Journal of Couples
      Therapy,</u> 1995.

"Jail and Prison Rape." TIE-Lines, February, 1995.

"The Politics of Psychiatry: Gender and Sexual Preference in DSM-IV." masculinities, 3,2, 1995, reprinted in Mary Roth Walsh, ed., Women, Men and Gender, Yale University Press, 1997.

"What Do Men Want?, review of M. Kimmel's Manhood in America." Readings, 10, 4, 1995.

Guest Editor, issue on Men's Issues in Treatment, Psychiatric Annals,2,1, 1996.

"Men at Work and Out of Work," Psychiatric Annals, 2,1, 1996.

"Trauma and its Sequelae in Male Prisoners." American Journal of Orthopsychiatry, 66, 2, 1996, 189-196.

"Consultation to Residential Psychosocial Rehabilitation Agencies." Community Psychiatric Practice Section, Community Mental Health Journal, 3, July, 1996.

"Shame and Punishment: Review of James Gilligan's Violence: Our Deadly Epidemic and its Causes," Readings, Sept., 1996.

"Community Mental Health: A Window of Opportunity for Interracial Therapy," Fort/Da, 2,2,1996.

"Men, Prison, and the American Dream," Tikkun, Jan-Feb., 1997.

"Dependency and Counter-Dependency in Couples," Journal of Couples Therapy, 7,1, 1997, 39-47. Published simultaneously in When One Partner is Willing and the Other is Not, ed. Barbara Jo Brothers, The Haworth Press, 1997, pp. 39-47.

"Shall We Overcome: Review of Jewelle Taylor Gibbs' Race and Justice," Readings, December, 1997.

"The SHU Syndrome and Community Mental Health," The Community Psychiatrist, Summer, 1998.

"Review of Jerome Miller's Search and Destroy," Men and Masculinities, 1, 1, July, 1998.

"Will Building More Prisons Take a Bite Out of Crime?," Insight, Vol. 15, No. 21, June 7, 1999.

"The Mental Health Crisis Behind Bars," Harvard Mental Health Letter, July, 2000.

"Mental Health Police?," Readings, June, 2000.

"The Men's Movement in the U.S.A.," in Nouvelles Approches des Hommes et du Masculine, ed. Daniel Weizer-Lang, Les Presses Universitaires du Mirail, Toulouse, France, 2000.

"Symptoms, Meanings and Social Progress," Voices, 36, 4, 2000.

"Psychotherapy with Men in Prison," in A New Handbook of Counseling & Psychotherapy Approaches for Men, eds. Gary Brooks and Glenn Good, Jossey-Bass, 2001.

"A Very Wise Decision by the Montana Supreme Court," Correctional Mental Health Report, 5,3, 35-36, Sept./Oct, 2003.

"Review of William Roller's The Dead are Dancing," Psychiatric Services, 54,11,1660-1661, 2003.

"The Future of Correctional Mental Health," Correctional Mental Health Report, 6,1, May/June, 2004.

"Foreword," David Jones (ed.): Working with Dangerous People: The Psychotherapy of Violence, Oxon, UK: Radcliffe Medical Press Ltd., 2004.

"Malingering in Correctional Settings," <u>Correctional Mental Health Report</u>, 5, 6, 81-, March/April, 2004.

"Prisons," in Michael Kimmel & Amy Aronson (eds.), <u>Men & Masculinities: A Social, Cultural, and Historical Encyclopedia</u>, Santa Barbara, CA & Oxford, GB, ABC Clio, pp. 630-633, 2004.

"Mental Illness," in Michael Kimmel & Amy Aronson (eds.), <u>Men & Masculinities: A Social, Cultural, and Historical Encyclopedia</u>, Santa Barbara, CA & Oxford, GB, ABC Clio, pp. 537-539, 2004.

"Toxic Masculinity as a Barrier to Mental Health Treatment in Prison,<u>" Journal of Clinical Psychology</u>, 61,6,1-2, 2005.

"Posttraumatic Stress Disorder (PTSD) in Prisoners," in <u>Managing Special Populations in Jails and Prisons</u>, ed. Stan Stojkovic, Kingston, NJ: Civic Research Institute, 2005.

"Schizophrenia, its Treatment and Prison Adjustment," in <u>Managing Special Populations in Jails and Prisons</u>, ed. Stan Stojkovic, Kingston, NJ: Civic Research Institute, 2005.

"The Prison Heat Issue,"  <u>Correctional Mental Health Report</u>, 7,2, July/August, 2005.

"How to Create Madness in Prison," in <u>Humane Prisons</u>, Ed. David Jones, Oxford: Radcliffe Publishing, 2006.

"Conditions on death row, Terrell Unit, Texas," in M. Mulvey-Roberts (Ed.), <u>Writing for their lives: Death Row USA</u> (pp. 69-77). Carbondale: University of Illinois Press, pp. 69-77, 2006.

"Prison madness in Mississippi," in M. Mulvey-Roberts (Ed.), <u>Writing for their lives: Death Row USA</u>, Carbondale: University of Illinois Press, pp. 281-287, 2006.

"Working with Men in Prison,"  In <u>International Encyclopedia of Men and Masculinities</u>, 1 vol., eds. M. Flood, J.K. Gardiner, B. Pease, and K. Pringle. London & New York: Routledge, 2007.

"Post-Incarceration Civil Commitments and Public Mental Health: An Essay," Correctional Mental Health Report, 9,4, 2007.

"Violence in Prisons, Revisited," Hans Toch & Terry Kupers, <u>Journal of Offender Rehabilitation</u>, 45,3/4, 49-54, 2007.

"Posttraumatic Stress Disorder in Prisoners," <u>Correctional Health Care Report</u>, Vol. 9, Nos. 2 & 3, January/February, 2008

"Prison and the Decimation of Pro-Social Life Skills," in <u>The Trauma of Psychological Torture</u>, Editor Almerindo E. Ojeda, Vol 5 of <u>Disaster and Trauma Psychology Series</u>, Series Editor Gilbert Reyes, Westport, Connecticut: Praeger, 2008

"What To Do With the Survivors?: Coping With the Long-Term Effects of Isolated Confinement." <u>Criminal Justice and Behavior,</u> Vol. 35 No. 8, August 2008, pp. 1005-1016

"Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs," T.A. Kupers, T. Dronet, M. Winter, et al., <u>Criminal Justice and Behavior</u>, October, 2009.

"Mutual Respect and Effective Prison Management," in <u>Transforming Corrections:</u>
<u>Humanistic Approaches to Corrections and Offender Treatment</u>, Editors David
Polizzi & Michael Braswell, Durham: Carolina Academic Press, pp. 121-134,
2009.

"Preparing an Expert's Report," <u>Correctional Mental Health Report</u>, 12,1, 2010

"Treating Those Excluded from the SHU," <u>Correctional Mental Health Report</u>, 12,4,
2010.

"The Role of Misogyny and Homophobia in Prison Sexual Abuse," <u>UCLA Women's</u>
<u>Law Journal</u>, 18,1, 2010.

Stuart Grassian & Terry Kupers, "The Colorado Study vs. the Reality of Supermax
Confinement," <u>Correctional Mental Health Report</u>, Vol. 13, No. 1, May/June,
2011

"Preparing an Expert's Report," in <u>Practical Guide to Correctional Mental Health and</u>
<u>the Law</u>, by Fred Cohen (with Terry Kupers,) Kingston, NJ: Civic Research
Institute, 2011

"The Role of Psychiatry in Correctional Settings: A Community Mental Health Model,"
<u>Correctional Mental Health Report</u>, Vol. 13, No. 3, September/October, 2011

"Testimony of Terry Kupers, M.D., at August 23, 2011 Hearing of California Assembly
Public Safety Committee Regarding Conditions at Pelican Bay State Prison
Security Housing Units," <u>Correctional Law Reporter</u>, Vol XXIII, No. 4,
December/January 2012

"A Community Mental Health Model for Corrections," <u>Correctional Mental Health</u>
<u>Report</u>, Vol. 13, No. 5, January/February, 2012

"Programming Cells are Neither the Problem nor the Solution," <u>Correctional Mental Health</u>
<u>Report</u>, 2012

"Isolated Confinement: Effective Method for Behavior Change or Punishment for
Punishment's Sake?," <u>The Routledge Handbook of International Crime and</u>
<u>Justice Studies</u>, Eds. Bruce Arrigo &
Heather Bersot, Oxford: Routledge, 2013, pp. 213-232.

"The Psychiatrist's Obligation to Report Patient Abuse: A Dialogue with Fred Cohen,"
<u>Correctional Mental Health Report</u>, Vol 15, No. 5, Jan/Feb 2014

"Safety, Yes; Near Total Isolation and Idleness, No," <u>Correctional Law Reporter</u>, XXVI,
No. 1, June/July 2014.

"A Community Mental Health Model in Corrections," <u>Stanford Law & Policy Review</u>, 26,
119-158, Spring, 2015.

Co-signatory, Brief of Amici Curiae, *Alfredo Prieto v. Harold C. Clarke,* Supreme Court
of the U.S.A., No. 15-31, 2015.

Committee Member, Group for the Advancement of Psychiatry (GAP), *People With*
*Mental Illness in the Criminal Justice System: A Cry for Help,* Washington, D.C.:
American Psychiatric Association Press, 2016.

"How to Create Madness in Prison," in <u>Hell is a Very Small Place</u>, Editors Jean
Casella, James Ridgeway & Sarah Shourd, New Press, 2016, pp. 163-178.

"The SHU Post-Release Syndrome," <u>Correctional Mental Health Report</u>, 17, 6,
March/April, 2016.

"Alternatives to Long-Term Solitary Confinement," *Correctional Law Reporter*, Vol. XXVIII, No. 3, Oct. – Nov., 2016.

"Gender and Domination in Prison." *Western New England Law Review,* 39, 2017.

"The Asylum, The Prison and the Future of Community Mental Health," chapter in *Community Mental Health: Challenges for the 21st Century*, Editors  Jessica Rosenberg and Samuel J. Rosenberg, New York & London: Taylor & Francis/Routledge, 2017.

"Waiting Alone to Die,' In *Living on Death Row: The Psychology of Waiting to Die*, edited by Hans Toch, James Acker and Bonventre.  American Psychological Association, 2018.

# Depositions and Court Testimony in Past Four Years by Terry A. Kupers, M.D., M.S.P.

Testimony in Court Hearing re Doe v. Michigan Department of Corrections, Case No. 13-14356 RHC-RSW (E.D. Mich. 2014), case involving the incarceration of juveniles in Michigan's adult correctional facilities.

Deposition in Ashker v. Brown, 4:09-cv-05796-CW (N.D. Cal. 2015), case involving long-term solitary confinement at Pelican Bay State Prison.

Deposition & Trial Testimony in Trueblood v. Washington State Dept. of Social and Health Services, Case No. C14-1178-MJP (W.D. Wash. Mar. 17, 2015), regarding length of wait for transfer to state hospital for individuals deemed incompetent by the court.

Deposition in James Kluppelberg v. Burge, No. 13 CV 3963 (N.D. Ill. Sept. 8, 2015), civil case re wrongful conviction.

Testimony at trial in State of Ariz. v. Dennis Michael Levis, No. S-0700-CR-2013002559 (Ariz. Super. Ct., Maricopa Cty. 2016), sentencing phase of death penalty trial.

Deposition in Frank O'Connell v. J.D. Smith, No. 2:13-cv-01905 (C.D. Cal. Mar. 20, 2017), re exoneration following false conviction.

Testimony about Jason Peterson, San Mateo Sup. Ct., Redwood City, June 29, 2017, regarding re-sentencing.

Testimony about Walter Cruz, San Francisco Immigration Court, Dec. 18, 2017.

**References for Expert Report of Terry A. Kupers, M.D., M.S.P.**
*Stiavetti v. Ahlin*, Case No. RG15779731

I.      **Cases and Court Documents**

1.  Brief of Professors and Practitioners of Psychology and Psychiatry as Amicus Curiae in Support of Respondent, *Wilkinson v. Austin*, 545 U.S. 209 (2005).

2.  *Chavez et. al. v. County of Santa Clara*, 1:15-cv-05277 (N.D. Cal.).

3.  Declaration of Pablo Stewart ISO Mot. for Class Certification, Docket No. 51, *Hernandez, et al. v. County of Monterey, et. al.*, 5:13-cv-02354-PSG, N.D. Cal. (Apr. 29, 2014).

4.  *Gray v. County of Riverside*, 5:13-cv-00444 (C.D. Cal.).

5.  *Hall v. County of Fresno*, 1:11-cv-02047 (E.D. Cal.).

6.  *Hernandez, et al. v. County of Monterey, et. al.*, 5:13-cv-02354 (N.D. Cal.).

7.  *In re Loveton*, 244 Cal. App. 4th 1025 (2016).

8.  Joint Settlement Agreement Regarding the Los Angeles County Jails, *U.S.A. v. County of Los Angeles*, CV No. 15-5903 (available at <https://www.justice.gov/opa/file/705491/download>).

9.  Kupers, T., Report on Mental Health Issues at Los Angeles Jail (June 27, 2008) (available at <https://www.aclu.org/files/pdfs/prison/lacountyjail_kupersreport.pdf>).

10. *Presley v. Epps*, No. 4:05-CV-00148-JAD (N.D. Miss., 2005 & 2007).

11. Report of Neutral Expert Dr. Richard Hayward regarding Mental Health Care at the Monterey County Jail, available at: Declaration of Gay Grunfeld ISO Mot. for Class Certification, Exh. M, Docket No. 49-7, Hernandez, et al. v. County of Monterey, et. al., 5:13-cv-02354-PSG, N.D. Cal. (Apr. 29, 2014).

12. *Rutherford v. Pitchess*, 457 F. Supp. 104 (C.D. Cal. 1978).

13. *U.S. v. County of Los Angeles, et. al.*, 2:15-cv-05903 (C.D. Cal.).

II.     **Statutes**

1.  Cal. Pen. Code § 1170(h).

2.   Stats 2011, ch. 15, § 482 (AB 109), operative October 1, 2011.

III.   **Books, Articles, and Academic Publications**

1.   American Academy of Psychiatry and The Law, Ethics Guidelines (2005) (available at <http://www.aapl.org/ethics.htm>).

2.   Anastasia Cooper, The Ongoing Correctional Chaos in Criminalizing Mental Illness: The Realignment's Effects on California Jails, 24 Hastings Women's Law Journal 339-362 (2013).

3.   Bronson, J. & Berzofsky, M., Indicators of Mental Health Problems Reported by Prisoners and Jail Inmates, 2011-2012, Special Report, U. S. Bureau of Justice Statistics (June 2017) (available at <https://www.bjs.gov/content/pub/pdf/imhprpji1112.pdf>).

4.   Fellner, Jamie, Callous and Cruel: Use of Force Against Inmates with Mental Disabilities in U.S. Jails and Prisons, Human Rights Watch (2015) (available at <https://www.hrw.org/report/2015/05/12/callous-and-cruel/use-force-against-inmates-mental-disabilities-us-jails-and>).

5.   Gowensmith, W.N., Frost, L.E., Speelman, D.W. & Therson, D.E., Lookin' for Beds in All the Wrong Places: Outpatient Competency Restoration as a Promising Approach to Modern Challenges, Psychology, Public Policy, and Law, Vol. 22(3), 293-305 (2016).

6.   Haney, C., Weill, J., Bakhshay, S. & Lockett, T., Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful, The Prison Journal, 1-26 (2015).

7.   Hayes, L., National Study of Jail Suicide: 20 Years Later, National Center on Institutions and Alternatives, NIC Accession Number 024308 (2010).

8.   Herinckx, H.A., Swart, S.C., Ama, S.M., Dolezal, C.D. & King, S., Rearrest and Linkage to Mental Health Services Among Clients of the Clark County Mental Health Court Program, Psychiatric Services, Vol. 56(7), 853–857 (2005).

9.   Knoll, J.L., Suicide in Correctional Settings: Assessment, Prevention and Professional Liability, Journal of Correctional Health Care, Vol. 16(3) (2010).

10. Kupers, T., "Rape and the Prison Code," in Prison Masculinities, 111-117 (eds. Sabo, D., Kupers, T. & London, W., Temple University Press, 2001).

11. Kupers, T., "Schizophrenia, its Treatment and Prison Adjustment," in Managing Special Populations in Jails and Prisons (ed. Stan Stojkovic, Kingston, NJ: Civic Research Institute, 2005).

12. Kupers, T., Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?, in The Routledge Handbook of International Crime and Justice Studies (eds. Arrigo, B. & Bersot, H., Oxford: Routledge, 2013).

13. Kupers, T., Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It (Berkeley, University of California Press, 2017).

14. Lamb, H. R., et al., Treatment Prospects for People with Severe Mental Illness in an Urban County Jail, Psychiatric Services, Vol. 58(6) (June 2007).

15. McNiel, D.E. & Binder, R.L., Effectiveness of a Mental Health Court in Reducing Criminal Recidivism and Violence, American Journal of Psychiatry, Vol. 164, 1395–1403 (2007).

16. Mears, D.P. & Watson, J., Towards a Fair and Balanced Assessment of Supermax Prisons, Justice Quarterly, Vol. 23(2), 232-270 (2006).

17. Mendel, W., Treating Schizophrenia (San Francisco: Jossey-Bass, 1989).

18. Mental Health Services in Rural Jails, Muskie School of Public Health (2009) (available at <http://muskie.usm.maine.edu/Publications/rural/pb/mental-health-services-rural-jails.pdf>).

19. Monahan J., Redlich A.D., Swanson, J., Robbins, P.C., Appelbaum, P.S., Petrila, J., Steadman, H.J., Swartz, M., Angell, B. & McNiel, D.E., Use of Leverage to Improve Adherence to Psychiatric Treatment in the Community, Psychiatric Services, Vol. 56(1), 37–44 (2005).

20. Noordsy, D. L. & C. O'Keefe, Effectiveness of Combining Atypical Antipsychotics and Psychosocial Rehabilitation in a Community Mental Health Center Setting, Journal of Clinical Psychiatry, Vol. 60, 47-53 (1999).

21. Patterson, R.F. & Hughes, K., Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004, Psychiatric Services, Vol. 59(6), 676-682 (2008).

22. Redlich, A.D., Steadman, H.J., Monahan, J., Petrila, J. & Griffin, P.A., The Second Generation of Mental Health Courts, Psychology and Public Policy Law, Vol. 11(4), 527–538 (2005).

23. Rivas-Vazquez, R.A., Sarria, M., Rey, G., Rivas-Vazquez, A.A., Rodriguez, J. & Jardon, M.E., A Relationship-Based Care Model for Jail Diversion, Psychiatric Services, Vol. 60(6), 766–771 (2009).

24. Scharff-Smith, P., The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, Crime and Justice, Vol. 34(1), 441-528 (2006).

25. Serious Mental Illness and Homelessness, Treatment Advocacy Center (September, 2016) (available at <http://www.treatmentadvocacycenter.org/evidence-and-research/learn-more-about/3629-serious-mental-illness-and-homelessness>).

26. Solitary Confinement Should be Banned in Most Cases, UN Expert Says, UN News Centre (Oct. 18, 2011) (available at <https://www.un.org/apps/news/story.asp?NewsID=40097&;Cr=torture&Cr1=%20ForceRecrawl:%200#.VI9dyb6x2L0>).

27. St. John, Paige, Naked, Filthy and Strapped to a Chair for 46 Hours: A Mentally Ill Inmate's Last Days, Los Angeles Times (August 24, 2017) (available at <http://www.latimes.com/local/california/la-me-jails-mentally-ill-20170824-story.html>).

28. Stamm, H. (ed.), Rural Behavioral Health Care: An Interdisciplinary Guide (American Psychological Association, 2003).

29. Thornberry, T. & Call, J., Constitutional Challenges to Prison Overcrowding: The Scientific Evidence of Harmful Effects, Hastings Law Journal, Vol. 35(2), 313-353 (1983).

30. Trupin, E. & Edwards, H., Seattle's Mental Health Courts: Early Indicators of Effectiveness, International Journal of Law and Psychiatry, Vol. 26, 33–53 (2003).

31. Way, B., Miraglia, R., Sawyer, D., Beer, R. & Eddy, J., Factors Related to Suicide in New York State Prisons, International Journal of Law and Psychiatry, Vol. 28(3), 207-221 (2005).

## IV.   Jail Reports and Jail-Related Documents

1. 2010 National Study of Jail Suicides, National Institute of Corrections (available at <https://s3.amazonaws.com/static.nicic.gov/Library/024308.pdf>).

2. 2015-2016 Santa Clara County Civil Grand Jury Report, Addressing Mental Illness in Santa Clara County Jails (June 20, 2016) (available at <http://www.scscourt.org/court_divisions/civil/cgj/2016/MentalIllnessJail.pdf >).

3. 2016-2017 Marin County Civil Grand Jury, Care of Mentally Ill Inmates in Marin County Jail (June 8, 2017) (available at <https://www.marincounty.org/~/media/files/departments/gj/reports-responses/2017/care-of-mentally-ill-inmates.pdf?la=en>).

4. 2016-2017 Report on San Luis Obispo County Jail, Incarceration in San Luis Obispo County: Inmate Health and Safety at the County Jail (available at <http://slocourts.net/downloads/grand_jury/reports/2016/2017_County_Jail_R eport.pdf>).

5. Investigation of the Orange County Jail, U.S. Department of Justice (March 4, 2014) (available at <https://www.justice.gov/sites/default/files/crt/legacy/2014/03/26/ocj_investle tter_3-4-14.pdf>).

6. James, D. & Glaze, L., Mental Health Problems of Prison and Jail Inmates, 2006 Special Report, Federal Bureau of Prison Statistics (September 2006) (available at <http://bjs.gov/content/pub/pdf/mhppji.pdf>).

7. Lofstrom, M. & Martin, B., California's County Jails, Public Policy Institute of California (2017) (available at <http://www.ppic.org/publication/californias-county-jails/>).

8. National Commission on Correctional Health, Standards for Health Services in Jails (2014) (described and can be ordered at <https://www.ncchc.org/jail-prison-standards>).

9. Our Brothers' Keeper: A Look at the Care and Treatment of Mentally Ill Inmates in Orange County Jails, Orange County Grand Jury (2015-2016) (available at <http://www.ocgrandjury.org/pdfs/2015_2016_GJreport/2016-06-09_Website_Report.pdf>).

10. Report on Inspection of Sonoma County Main Adult Detention Facility, Disability Rights California (May 16, 2015) (available at <http://www.disabilityrightsca.org/Documents/DRCReportAndSonomaCount yResponse20160516.pdf>).

11. Report on Inspection of the Santa Barbara County Jail, Disability Rights California (April 2, 2015) (available at <http://www.disabilityrightsca.org/pubs/702801.pdf>).

12. Report on the Inspection of the Sacramento County Jail, Disability Rights California (August 4, 2015) (available at <http://www.disabilityrightsca.org/pubs/702701.pdf>).

13. The Treatment of Persons with Mental Illness in Prisons and Jails: A State Survey, Treatment Advocacy Center (April 8, 2014) (available at <http://tacreports.org/storage/documents/treatment-behind-bars/treatment-behind-bars.pdf>).

14. Title 15 Minimum Standards for Local Detention Facilities, State of California, Board of State and Community Corrections (April 1, 2107) (available at <http://www.bscc.ca.gov/downloads/Adult%20Titles%2015%20-%20Effect%204%201%2017.pdf>).

15. Justice Department Reaches Agreement with Los Angeles County to Implement Sweeping Reforms on Mental Health Care and Use of Force Throughout the County Jail System, United States Department of Justice, Press Release Number 15-971 (August 5, 2015) (available at <https://www.justice.gov/opa/pr/justice-department-reaches-agreement-los-angeles-county-implement-sweeping-reforms-mental>).

## V.   Depositions

1.  Deposition Transcript of Patricia Tyler, October 4, 2017, Medical Director at DSH-Napa.

2.  Deposition Transcript of George Maynard, October 17, 2017, DSH Deputy Director in the Hospital Strategic Planning & Implementation Division.

3.  Deposition Transcript of Michael Barsom, November 1, 2017, Acting Executive Director of DSH-Patton.

4.  Deposition Transcript of Stirling Price, November 3, 2017, Executive Director of DSH-Atascadero.

5.  Deposition Transcript of Michael Barsom, November 30, 2017, Acting Executive Director of DSH-Patton.

**Appendix D to Expert Report of Terry A. Kupers, M.D., M.S.P.**
*Stiavetti v. Ahlin*, **Case No. RG15779731**

In this Appendix I will record my notes, including recollections and observations, from tours I conducted of California Jails in connection with the above-referenced matter. On July 5, 2017 I toured the Los Angeles County Jail, Twin Towers facility along with Dr. Melissa Warren, counsel and an analyst from Cornerstone Research. I spoke to mental health staff and interviewed four inmates suffering from mental illness. On July 6, 2017 I toured the Los Angeles County Century Regional Detention Facility along with Dr. Melissa Warren, counsel and an analyst from Cornerstone Research, where I spoke with a ranking custody officer and a mental health clinician and interviewed four inmates. Also on July 6, 2017 I toured the Los Angeles County Men's Central Jail along with Dr. Melissa Warren, counsel and an analyst from Cornerstone Research. We were accompanied by the medical director of jail mental health and spoke to several officers. On July 7, 2017 I toured the San Diego Central Jail along with Dr. Melissa Warren, counsel and an analyst from Cornerstone Research, and spoke at length with a ranking custody officer, the Medical Director, the head of Nursing, the Director of San Diego County's jail-based competency restoration program, the psychologist and a psychotherapist. On November 27, 2017, I toured the Solano County Jail with a social worker in the mental health program and a ranking officer. And on November 28, 2017, I toured the Lake County Jail along with Dr. Melissa Warren, counsel and an analyst from Cornerstone Research, and had extensive conversations with the Captain, the mental health counselor and a classification officer.

## I.    Los Angeles County Jails

We toured three facilities in Los Angeles County: Twin Towers, Century Regional Detention Facility and Men's Central Jail. The Los Angeles jail system is the largest in the country with a population that often exceeds 20,000 prisoners.[1] At the central site near downtown Los Angeles, there are two large facilities, Men's Central Jail

---

[1] Austin, James et al., JFA Institute, Evaluation of the Current and Future Los Angeles County Jail Population, 23 (April 10, 2012) (available at https://www.aclu.org/sites/default/files/field_document/austin_report_20120410.pdf).

and, across the street, Twin Towers.  Men's Central has been condemned, and there is a plan to demolish it and build a smaller "mental health jail" in a few years.[2]  Century Regional Detention Facility, the primary jail facility for women inmates in Los Angeles County, is located several miles to the south of the central site.

### Twin Towers (July 5, 2017)

The Medical Director and a psychologist who runs the misdemeanor competency restoration program (mainly housed in the Medium Observation units) took us around to see the facility and talked with us about the programs in the jail.  The most intensive mental health treatment at the central site occurs in a 40-bed inpatient unit in Twin Towers that meets criteria for L.P.S. (Lanterman-Petris-Short, accredited to handle involuntary civil commitments).  The inpatient unit houses male and female prisoners who are acutely disturbed or suicidal.  Most are in single cells with a solid metal door, and at the time of our tour the halls and dayroom contained no prisoners and all prisoners were locked in their cells. There is a nursing station in the in-patient unit.  Involuntary medications can be administered to patients who are court-ordered to receive competency restoration services.

The Medical Director stated that he believes the current waiting period for transfer to the state hospital was three months at the time of our tour.  He also confided that if a prisoner already in the jail requires inpatient admission for acute psychosis or suicide risk, there is a one month waiting period to be admitted to the inpatient unit in the Twin Towers, so that prisoner will likely be consigned to High Observation while awaiting an inpatient bed/cell.  The Medical Director told me that prisoners with serious mental illness who are agitated or act out tend to be consigned to a single cell.

After visiting the inpatient unit, we went to the Moderate/Medium Observation unit.  The Moderate/Medium and High Observation units (described below) house patients being discharged from the inpatient unit, among others.  We were told that most of the individuals deemed incompetent and facing misdemeanor charges are confined in Medium Observation until they return to court, and that Medium Observation is also the

---

[2] Sharp, Steven, Los Angeles Times, Men's Central Jail Replacement Could Include Two 400-Foot Towers, (October 25, 2017) (available at https://urbanize.la/post/mens-central-jail-replacement-could-include-two-400-foot-towers).

location of competency restoration treatment for misdemeanor defendants. The Moderate/Medium Observation unit we visited contains 3 pods, with each pod consisting of 16 cells built with a bunk bed, so at capacity each pod would contain 32 prisoners. There are transparent Lexsan panels separating the three pods of the unit from the central area where the custody staff for the unit are located, and each pod has cells along the exterior wall surrounding a common space in the center of the pod. At the time of our visit, at least one pod also contained bunk beds pretty much filling the common space. We were told the population in the jail is high right now, and that is why bunks are set up in what would otherwise serve as a dayroom. In any case, almost all prisoners were confined to their cells or to their bunk bed and its environs.

The cells in the Moderate/Medium Observation units are equipped to hold two prisoners, but often a prisoner is "single-celled" to avoid trouble. Prisoners remain in their housing quarters, except that they are permitted to go to the recreation yard once or twice a week and come out of the pod for programs and activities - but there are very few activities and mostly the prisoners remain in their cell or on their bunk. There are no windows to the outside in the pods or in the cells. There are substance abuse groups, and we viewed one in progress, taking place in the central area that is shared by all the pods within the unit but outside the prisoners' living spaces.

We then visited the High Observation unit, which has the same architecture as the Medium Observation unit. There were no bunk beds in the dayroom of one pod we observed, but there were bunk beds in the dayroom of the pod dedicated to prisoners with developmental disabilities. As in the Moderate/Medium Observation unit, all cells are equipped to hold two prisoners, but the Medical Director explained that if a prisoner has trouble being celled with others, he is placed in a single cell. We were told that there is an organized group meeting during weekday day shifts, and another on the evening shift. Where prisoners on the Moderate Observation Unit were seen every three weeks by a clinician for an individual treatment session, on the High Observation Unit such visits occur weekly.

The High Observation unit looks very like the Moderate/Medium Observation unit except that more of the prisoners are in single cells. But almost all prisoners are

confined to their cells much of the time.  One pod on this unit is designated for prisoners prone to self-harm.

We then toured Module 121, which is a disciplinary area filled with single segregation cells.  This unit provides disciplinary segregation to prisoners from Men's Central Jail, and prisoners with serious mental illness, including those found incompetent to stand trial, are not permitted in the segregation cells.  There has been a policy in place for a few years not to transfer prisoners with serious mental illness to punitive segregation – a.k.a. "the hole" – but rather to discipline them within the treatment setting where they are housed.  Thus, if they are retained in the inpatient unit or in medium or maximum observation, they can be punished for rule-breaking with deprivation of privileges such as phone calls and canteen, or even consigned to cell or dormitory and denied the group meetings and programs occurring on the unit.  At the time of our visit, however, one individual who was on the incompetent list maintained by the jail staff was isolated in the punitive segregation unit in the Twin Towers.

We were told that in all of the Twin Tower units, visiting is non-contact.  To make a phone call, prisoners are brought out of their cells to the phone in the dayroom, and they are cuffed by one wrist to the table.  Legal visits are also non-contact, occurring in a booth through a Lexsan window.  And we viewed metal grid booths in one area, called "cages," that are used for recreation and meetings (such as medical and mental health contacts) where the prisoner is somewhat difficult to manage.

### Century Regional Detention Facility (July 6, 2017)

We visited the Century Regional Detention Facility, a subdivision of the Los Angeles County Jail, in South Central L.A.  This is a women's facility (there are a few males because the facility also serves as the local police lock-up) and includes a jail-based competency restoration program.  The population on the day of our tour was 2,024 prisoners, which staff explained is somewhat higher than usual.  A mental health clinician and a ranking custody officer accompanied us on our tour.

We visited pods designated for prisoners at different levels of dysfunction and different security levels.  There are Medium/Moderate and High Observation Units very much like that at Twin Towers and stepdown units for women transitioning from High To Medium/Moderate Observation, and in general women progress to less restrictive settings

as their emotional disturbance settles down. Women at high risk of suicide might be housed anywhere in mental health housing, there is no dedicated "suicide observation" area, but they are placed on observation status wherever they are, usually 15 minute checks. Women requiring inpatient level of care are transferred to the inpatient unit at the Twin Towers (described above).

At all levels, staff say they attempt to house prisoners two to a cell and release the women from their cells into congregate areas for much of the day, but quite a few times the women are too hostile or disturbed and they must be single-celled and restricted to their cells. In the High Observation unit, we were told that the women generally come out of their single cells only for showers and cleaning of the cells. The staff explained that the more stable the women seem, the more time they are released from their cells.

At the jail, 90% of prisoners are offered some kind of educational program, and 65% accept the offer. There are "coping skills classes" and substance abuse recovery groups. The mental health counselor told us that she tries to meet regularly with each prisoner who suffers from serious mental illness. There are regular "huddle" or interdisciplinary staff meetings, including custody staff.

Staff explained that there was a 3 to 6 month wait for women to be transferred to the state hospital for competency restoration services at the time of our tour. As we toured the facility, it was striking how few prisoners were out of their cells in the middle of the day. In High Observation, as in the men's facility, women are cuffed to a table when they meet individually with staff or use the phone.

## Men's Central Jail (July 6, 2017)

During the afternoon of the second day of our tour of the Los Angeles County Jails, we walked through Men's Central Jail in the company of the Medical Director and custody staff. We viewed many housing units, many with dormitories filled to overflowing. We viewed the medical area, including isolation cells along one hallway. Then, on the 7000 and 8000 units, we saw many smaller dormitory cells, some for prisoners with physical disabilities and some for prisoners in general population. I talked to several prisoners along the way, and they reported they hardly ever get to the yard (the roof) and there really aren't any other programs or group events. They reported spending nearly all their time in their cell or their dormitory. During the entire tour of Men's

Central Jail, I did not see any staff-facilitated group activities, but I saw a lot of men locked into a cell or a dormitory, many lying on their bunks covered by a sheet or blanket in the middle of the day.

The dormitories in the 5000 block were larger than those in the 7000 and 8000 units. For example, we saw a very large indoor dormitory filled with double bunks, with approximately 150 prisoners being confined in that dorm. We entered an observation booth elevated four or more feet off the ground outside this dormitory, separated from the dorm by a large Lexsan window, where officers sat to supervise the dorm. From the booth I could not view all the areas of the dormitory. It is obvious that much can go on in the large dormitory, where many spaces are obscured by sheets and blankets hanging from the bunk beds, and the officers supervising the dorm would not be able to visually see what is occurring or hear much over the din of the busy dorm. The observation booth also had visual access to another dorm that contained far fewer prisoners. We were told this other dorm is the "Hope Dorm," and is designated for prisoners on the mental health caseload who are chronically or recurrently self-harming. They were as inactive as the men in the large general population dorm, but they were not as crowded and were wearing only robes of indestructible material.

## Summary of Observations in Los Angeles County Facilities

In summary, at Twin Towers, Century Regional Detention Facility and Men's Central Jail, one gets the sense of a large number of idle prisoners crammed into small spaces, remaining in their cells or dormitory much of the time, with relatively little programming going on. Even in the units designated for prisoners with mental illness and developmental disabilities, there is crowding, much idle time, and very little organized programming. The bunk beds filling the dayroom in Medium Observation at Twin Towers and the very large dormitory in the 5000 block of Men's Central were the worst examples of crowding, idleness and lack of supervision. The mental health care at Twin Towers is much better than at Men's Central, but still the prisoners are mainly idle, and the more disturbed prisoners are usually left alone in a cell or dormitory for long hours.

## II.   San Diego Central Jail (July 7, 2017)

On July 7, 2017 I toured the San Diego Central Jail along with Dr. Melissa Warren, counsel and an analyst from Cornerstone Research. The population of the entire jail system of San Diego County is around 4,500. We were told that prisoners being treated for mental health issues in the San Diego Central Jail can be housed in the jail's inpatient unit, in the dedicated mental health pods on the sixth floor, or in general population. We were told that within the overall mental health program at San Diego Central Jail, there has for some time been a jail-based competency restoration program for prisoners facing misdemeanor charges. Recently, beginning in March, 2017, competency restoration services have been provided for individuals facing felony charges. We were told by mental health staff that 60% of patients discharged from San Diego's jail-based competency treatment program are declared competent to stand trial.

The 30 bed inpatient PSU or Psychiatric Services Unit (qualified as an L.P.S. facility) on the third floor of the jail, which is separated from other prisoners, provides mental health treatment to inmates in an inpatient facility. Patients in the inpatient unit are seen by the mental health counselor individually at least once per week in a booth where clinician and patient are separated by a lexsan "glass" panel. There is 24-hour nursing coverage, there are cameras in the rooms, and staff check hourly on the status of each patient.

Incompetent prisoners facing felony charges and receiving treatment in the jail-based competency restoration program in San Diego County are housed on the sixth floor on a dedicated pod. According to the Medical Director of San Diego Central Jail, the jail-based competency restoration program is not as good as the program at the state hospital, but because there is a long delay sending prisoners to the state hospital, he told us that "the jail-based program is better than nothing." I asked him to elaborate on that statement, and he explained that in the jail, sheriff's deputies are omnipresent, patients must be transported in handcuffs and must be seen by clinicians through a lexsan window, and in spite of the fact that the deputies who staff the program have had some training in managing prisoners with mental illness, the environment is still a jail and the participants are not permitted the comforts, programs and freedoms they receive in a state hospital. The Medical Director further explained that in the hospital, clinical staff have

unfettered contact with patients, whereas in the jail there are always officers present, the prisoners are punished frequently for breaking rules, and the ambience is very different and less conducive to mental health treatment than at the state hospital.

In addition to the pod for competency restoration, the sixth floor contains three additional pods for other prisoners with mental health needs, with a total capacity of 120 beds across the three pods. For all prisoners on the sixth floor, there are four scheduled groups per day. For those on the competency restoration pod, this includes competency restoration classes up to five times per week. We were told that, although ideally all scheduled groups would take place each day, in practice there are frequent lockdowns and somewhat fewer group meetings as a result.

The cross-disciplinary treatment team at San Diego Central Jail meets weekly. We were told that sheriff's deputies working on the mental health unit on the sixth floor have been accredited for that work and have undergone special training on mental health issues. We were told that the sixth floor unit involves more congregate learning and treatment opportunities than does the inpatient unit on the 3rd floor.

We were told that, at the time of our visit, prisoners declared incompetent by the court in late April or early May (2 months prior to our tour) were currently being admitted to the state hospital from San Diego County.

### Summary of Observations in San Diego County Jail

We toured all types of units where prisoners deemed incompetent are likely to be housed. At the time of our tour, in almost all pods, the prisoners were locked in their cells (mostly 2-person cells) and the hallways were empty except for a few officers. Staff assured us that the reason prisoners were idle during our tour was because we were touring during the hour everyone is locked in their cells; we were told they had been in congregate activities earlier in the morning and would do so again after the midday break. But still, the impression one gets is of empty halls with occasional staff members present, and most prisoners being confined to cells much of the time. We were not permitted to interview prisoners at this facility, but I had the distinct impression that had we interviewed them, the prisoners would have told us they spend much more time alone in their cell (or with a cellmate) than the staff indicated. For example, any time there is a

disruption such as a rule violation or any kind of physical aggression, prisoners are confined to their cells for long periods in a lockdown.

## III.   Solano County Jail (November 27, 2017)

On November 27, 2017 I toured the Solano County Jail on Union Street in Fairfield, in the company of an Officer and social worker. I also had a meeting with the Captain and Jail Commander. The capacity of the three facilities that make up the Solano County Jail Complex is approximately 1,400, and there were approximately 1,000 inmates on the day of my tour. The Social Worker estimates that 350 of them are prescribed psychotropic medications. There is no competency restoration treatment at the jail, and I was told that inmates deemed incompetent by the court wait two months or longer to be transferred to Napa State Hospital for restoration services.

I toured the main jail in the Complex. There is another jail, Claybank, where sentenced inmates who are stable and low security serve their time, but inmates with mental illness tend to remain in the main jail, where there are far fewer treatment and rehabilitation programs. The Captain, the Officer and the Social Worker all agreed that when an inmate suffers from serious mental illness, including those declared incompetent, he or she is probably going to be housed in a single cell to prevent trouble.

I toured the first floor of the jail, which is utilized for admission processing and contains offices. I also toured a women's pod and several men's pods on the second and fourth floors of the jail. The jail contains one or two-person cells; there are no larger cells and no dorms. Cells throughout most of the jail have no windows and have solid metal doors with a vertical "window" that does not open. The impression one gets is of severe isolation, even for prisoners designated general population status.

I also viewed unoccupied observation cells, which have solid metal doors and are entirely devoid of furniture. They have a vertical window in the door and another on one wall through which staff can view the inhabitants. There is no video monitoring. At least one of the observation cells has no toilet except a hole in the floor. There are also ten "separation cells" in the jail, which I viewed during my tour. These cells look exactly like the types of cells that are called "segregation cells" in other counties. Prisoners in the separation cells remain in their cells almost 24 hours per day, and when they are released for approximately one half hour per day, they are permitted to be in the hallway

alone or, with permission, go to the recreation yard alone.  The yards are essentially large rooms with cinder block and concrete walls and a covered ceiling.  Part of the ceiling is covered by link fence material but gives the inmate a bit of fresh air.

The general population pods have a dayroom containing minimal amenities: there are metal tables and stools attached to the floor, phones and showers.  Depending on their security level, inmates are permitted out of their cells and into the dayroom or recreation area one or two hours twice per day.  There is also a room on the second floor of several pods that serves as the library and is used for groups.  The groups might be an educational class, a recovery program or a mental health treatment group.  I met a teacher who explained to me that the educational programs do not prepare inmates for the G.E.D., but rather help them complete high school.

As I toured the jail in the mid-morning, in the medium and high security units, most spaces – including the dayrooms on the pods, the libraries and the recreation yards – were empty or contained a few inmates, and a large majority of inmates were locked in their cells.  Many seemed to be asleep in their beds.

Visiting for all inmates is non-contact, across a lexsan window using phones.  There are cubicles where the inmate sits on one side, and the visitor sits on the other.  There are also small walled-off cubicles for legal visits, and those spaces have a slot under the glass where papers can be passed.

The social worker explained that mental health treatment in the jail is very sparse.  He told me that he runs some group therapies.  There is a psychiatrist present two hours per day, 5 days per week.  There is also 24 hour medical nursing.  The social worker told me that he is not able to transfer inmates with acute and severe mental breakdown to the county hospital, and if he tries to transfer them to Napa State Hospital for urgent care they are usually refused.  So he has to manage the acute crisis in the jail with minimum programming, though he can apply to the county mental health department to proceed with civil commitment proceedings.

### Summary of Observations in Solano County Jail

Solano's is a very well-run county jail, and the staff take pride in their work.  Nonetheless, the atmosphere is entirely jail-like, with officers in charge, little in the way of mental health and rehabilitation programs, and most inmates locked in their

windowless cells most of the time.  There are "safety cells" where a hole in the floor serves as the toilet; and the hallways are mostly empty in the middle of the day except for the officers who walk through them.

## IV.   Lake County Jail (November 28, 2017)

On November 28, 2017, I spent four hours in the Lake County Jail, accompanied by Dr. Melissa Warren, counsel and an analyst from Cornerstone Research.  The Captain gave us a tour and spoke frankly about his work and the jail.  The jail, a single facility for the county, has a capacity of 286 prisoners, and the daily population averages between 270 and 300.  There are approximately 50 women.  The Captain estimates that 20% of the population suffers from serious mental illness.

All prisoners in the jail wear jail uniforms, with white background and stripes of different colors.  Prisoners on all units have access to staff via intercom that is answered by an officer in the control booth.  None of the cells or dorms that I viewed contain windows to the outside.

We began our tour in the minimum security units for men and women.  Prisoners in minimum security unit are housed in small dormitories that remain open to the day room and yard.  We were told that some have jobs.  Prisoners must be sentenced to less than two years and stable to be housed there.  The unit we viewed is pleasant and peaceful; there was a ping pong table and couches in the common area, and prisoners are free to go to the concrete yard where we saw a few sitting in the sun.  We were told that prisoners with mental health issues can be housed in minimum security, but only if they are very stable, meet behavioral criteria, and are sentenced to less than two years.  The Captain told us this means that no prisoners deemed incompetent by the court are housed in minimum security.

We next visited H Unit, which is for women.  There is a mixture of minimum and medium security prisoners in H Unit, and there is a chain link fence inside the dayroom separating the two security classifications.  The dayroom has space for programs such as GED classes and parenting classes.  Housing is in small dorms connected with the dayroom.  We saw several women in each classification category sitting together at the tables in the dayroom, and quite a few others were in their bunks in the dorms.  We were told that staff are present on the unit 24 hours every day.

Next we visited C Unit, which is a disciplinary unit. Prisoners in this unit are locked in their cells and are usually double celled, though staff might single cell an especially disruptive prisoner. The prisoners in C Unit have few amenities and spend almost 24 hours per day in their cells. Prisoners with serious mental illness, including those deemed incompetent by the court, can be confined here. We also visited a Protective Custody Unit, which was architecturally like the other medium/maximum security general population units (described below), but we were told that the prisoners in that unit can be out of their cells four hours per day.

We then toured G Unit, which we were told is the preferred housing assignment for all prisoners with serious mental illness. We were told that even prisoners that are minimum security classification are still housed there if they have a significant mental health issue. Thus all prisoners deemed incompetent, with few exceptions, are housed in G Unit.

G Unit is the first unit we visited in the Lake County Jail where the doors are opened and closed remotely by officers in a second floor control booth (Minimum security and H Unit have doors opened with keys that the officers carry). G Unit contains two floors of cells looking out upon a common air space dayroom. The very small dayroom, containing two tables and very few chairs, was entirely empty at the time of our tour, and the prisoners were in their cells, many of them sleeping in midday at the time of our tour. The cells house two prisoners, or some house four. We were told that the prisoners in G Unit are permitted a minimum of 2 hours per day out of their cells. There is a single television screen in the dayroom, controlled by an officer in the control booth, but it was not on during our tour, and it seems obvious that most prisoners who are in their cells cannot hear it. Prisoners in G Unit eat meals in their cells, or they can eat at the tables in the dayroom. They have a yard, which is a large room with concrete floor and a covered ceiling, part of which permits fresh air exposure.

There is a safety cell in G Unit for self-destructive prisoners; it has no sink or toilet except a hole in the middle of the floor for bathroom functions. The prisoner is housed in the cell without possessions or even a mattress, but is given a gown that doubles as a blanket. We were told that a prisoner can be in the cell for 72 hours, meaning he sleeps on the concrete floor with no mattress, wrapped in his

blanket/garment. The Captain told us that if staff needs to keep a prisoner in a safety cell for longer than 72 hours, county mental health will be called and that prisoner will likely be sent to an outside psychiatric hospital.

F Unit is adjacent to and very much like G Unit, but is for general population prisoners with medium or maximum security classification who do not suffer from serious mental illness. D Unit is for prisoners who have accumulated a lot of jail time, many of whom are gang affiliated. E Unit is for newer prisoners who have not spent much time in jail or prison. The Captain tells us that the staff assign prisoners to housing without reference to their race, but the prisoners tend to segregate themselves in the day rooms. Again, on Units F and D, we were told that prisoners are kept in their cells except for a minimum of two hours spent out of cell each day, in the day room or the yard.

Prisoners in minimum security have contact visits in a large visiting room with tables and chairs. Prisoners in medium and maximum security units, which includes the prisoners with serious mental illness and competency issues in G Unit, are not permitted "contact visits," but must see visitors through a Lexsan window, where they communicate on phones. The jail plans to have video visits in the near future, not as an alternative to non-contact visits but to supplement visits for family who cannot come to the facility.

We also toured the booking area as part of our tour. Here there are a variety of single cells. Four of them are called dress rooms, and serve to house incoming prisoners. But they also serve as temporary segregation cells for prisoners involved in altercations or serious rule violations. They are "dry cells," meaning they do not contain a sink or toilet. They have solid metal doors that have a vertical window, but there is a solid tiny cover that can be closed over the window, leaving the prisoner entirely isolated in a windowless cell. There is also an observation or "safety cell" in the booking area, similar to the safety cell contained in G Unit. That cell is devoid of toilet, sink or table, and it is entirely empty with a hole in the middle of the floor for use as a toilet – also known as a Turkish toilet. We were told that prisoners who are suicidal or some who have serious behavioral problems are placed in this safety cell for as long as 72 hours or longer. As with prisoners housed in the safety cell in G Unit, prisoners in this safety cell in the booking area have no mattress but are provided a blanket-like security gown. We were

Appendix D to Expert Report of Terry A. Kupers, M.D., M.S.P.– page 13 of 15

told that the usual protocol is for custody staff to check on prisoners in this safety cell every 15 minutes, and the nurse comes to see them less often.

The Captain described the mental health services in the jail, and we also met with the mental health nurse who told us more about those services. We were told that mental health services in the Lake County Jail are provided by California Forensic Medical Group (CFMG), and there is a mental health nurse working full time five days per week. There is 24 hour medical nursing coverage. We were told that there is a psychiatrist who consults by phone but does not come to the jail, and that the jail has a tele-psychiatry arrangement with a psychiatrist who sees prisoners. The Captain told us it takes two weeks to set up a tele-psychiatry consultation with a prisoner. He also told us that when a pre-trial prisoner is deemed incompetent by the court, it takes two to three months for him or her to be transferred to a state hospital for competency restoration treatment.

We were told that CFMG's clinicians come to the jail twice a week and offer some counseling. There are groups run by various volunteers and contracted practitioners, including groups for anger management, alcohol abuse, parenting, etc. We were told that there are GED classes offered in the jail. The mental health nurse told us she works fulltime, weekday regular shifts, and tries to get around to see all prisoners with mental health problems, especially those on G Unit. She does a socialization group for an hour on Tuesday afternoons for prisoners with mental illness who are not on disciplinary restriction. She provides some bridge services to prisoners about to be released, establishing contact for them with community mental health providers or probation officers. She told us that she recommends psychotropic medications as indicated, and the medical physician or psychiatrist on tele-medicine will prescribe them.

We also spoke to a Classification Officer who explained how prisoners are classified and assigned to housing. When a prisoner is acutely disturbed and meets criteria for a 5150 civil commitment (that is, the prisoner poses a threat of harm to him- or herself or others or is unable to care for him- or herself), he or she can be transferred to a local psychiatric hospital, likely the Sutter Hospital. Sheriff's deputies accompany the prisoner and stay in the hospital, maintaining restraints while the treatment proceeds. The Captain explained that the officers accompanying the prisoner are responsible for periodically removing restraints so the prisoner can get range of motion movements.

Appendix D to Expert Report of Terry A. Kupers, M.D., M.S.P.– page 14 of 15

### Summary of Observations in Lake County Jail

The staff at Lake County Jail were very courteous and seemed professional. The jail is well-run, but one gets the impression that except for the minimum security unit (which the Captain told us does not house any incompetent prisoners), idleness and cell confinement are the rule, and there is little in the way of congregate programming. This impression is felt especially in G Unit, where prisoners with serious mental illness and those deemed incompetent are housed. As at Solano County Jail, there are safety cells with a hole in the floor for toilet purposes, and one sees very few prisoners in the hallways and even in the dayrooms in the middle of the day. There is very little in the way of psychiatric coverage, and a psychiatrist sees prisoners in need via tele-psychiatry but does not spend time at the jail.

1  **PROOF OF SERVICE**

2  I am employed in the County of Los Angeles, State of California.
   I am over the age of 18 and not a party to the within action.  My business address
3  is Sullivan & Cromwell LLP, 1888 Century Park East, Los Angeles, California  90067-1725.

4  On March 12, 2018, I served the foregoing documents described as:

5

6  **DECLARATION OF TERRY A. KUPERS, M.D., M.S.P. IN SUPPORT OF
   PLAINTIFFS' MOTION FOR PEREMPTORY WRIT OF MANDATE**

7

8  on the interested parties in this action by transmitting the documents to the following persons:

9        Susan Carson
         Susan.Carson@doj.ca.gov
10       Julia Clayton
         Julia.Clayton@doj.ca.gov
11       Carolyn Tsai
         Carolyn.Tsai@doj.ca.gov
12       Maryam Berona
         Maryam.Berona@doj.ca.gov
13

14       []       BY MAIL:  I caused such envelope to be deposited in the mail at Los
   Angeles, California.  The envelope was mailed with postage thereon fully prepaid.
15
         I am "readily familiar" with this firm's practice of collection and processing
16 correspondence for mailing.  It is deposited with U.S. postal service on that same day in the
   ordinary course of business.  I am aware that on motion of party served, service is presumed
17 invalid if postal cancellation date or postage meter date is more than one day after date of deposit
   for mailing in affidavit.

18
         [X]      BY E-MAIL OR ELECTRONIC TRANSMISSION:  I caused the
19 documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within
   a reasonable amount of time after the transmission, any electronic message or other indication
20 that the transmission was unsuccessful.

21
         [X]      STATE:  I declare under penalty of perjury under the laws of the State of
22 California that the foregoing is true and correct.

23       Executed on March 12, 2018, at Los Angeles, California.

24

25

26       _____
                  SHANE M. PALMER
27

28