UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAT THANH LUONG, et al.,

          Plaintiffs,

    v.

NAPA STATE HOSPITAL, et al.,

        Defendants.

Case No. 17-cv-06675-EMC

**ORDER GRANTING IN PART AND DENYING IN PART STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Docket Nos. 183, 181

      Plaintiffs in this case are (1) the successors in interest to decedent Dat Thanh Luong (namely, his wife and minor son); (2) Mr. Luong's wife, Ai Qiong Zhong; and (3) Mr. Luong's minor son, W.L.[1] Mr. Luong was diagnosed with schizophrenia in or about 2001. *See* Haddad Decl., Ex. 2 (N. Luong Depo. at 27-28). In January 2016, he was arrested and booked into Alameda County's Santa Rita Jail. *See* Prothero Decl., Ex. A (arrest report). In July 2016, a state court ordered that Mr. Luong be committed to Napa State Hospital ("NSH") or "any other Hospital" because he was mentally incompetent within the meaning of California Penal Code § 1368. Defs.' RJN, Ex. G (Order at 1). By September 2016, Mr. Luong still had not been transferred to NSH or any other hospital, thus prompting a state court to issue an order directing the Director of the California Department of State Hospitals ("DSH") to transport Mr. Luong or to

---

[1] Mr. Luong's mother, Mai Chai, is also a named plaintiff; however, she has dismissed all of her claims against the State Defendants, *see* Docket No. 55 (stipulation and order), and the only defendants left in the case are the State Defendants. Thus, for purposes of the pending motions, Ms. Chai is not a relevant plaintiff.

show cause re contempt. *See* Defs.' RJN, Ex. H (order). Despite the court orders, Mr. Luong was never transferred. Pending the transfer that never came, he was killed in jail in October 2016 after his cellmate strangled him.

At this juncture, the only defendants remaining in the case are the State Defendants. They are as follows:

(1) DSH;

(2) Pam Ahlin (the Director of DSH during the relevant time);

(3) NSH;

(4) Dolly Matteucci (the Executive Director of NSH during the relevant time);

(5) Patricia Tyler (the Medical Director at NSH during the relevant time); and

(6) Cindy Black (the Clinical Administrator at NSH during the relevant time).

Currently pending before the Court are (1) the State Defendants' motion for summary judgment or, in the alternative, summary adjudication and (2) Plaintiffs' motion for partial summary judgment. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the State Defendants' motion and **DENIES** Plaintiffs' motion.

## I.     FACTUAL & PROCEDURAL BACKGROUND

Both parties have submitted evidence in conjunction with their motions. The evidence reflects as follows. Where there are disputes of fact, they are so noted.

A.     General Process re Incompetent-to-Stand-Trial ("IST") Defendants

"DSH was created in 2012 to manage and operate the state psychiatric hospital system." Maynard Decl. ¶ 12.[2] It is "comprised of five state hospitals, four of which serve IST defendants," including NSH. Maynard Decl. ¶ 12. In fiscal year 2016-17, DSH had an "average daily census of 1,524 IST defendants." Maynard Decl. ¶ 12.

When a state court commits an IST defendant to the care of DSH, it does so at a hearing in

---

[2] Mr. Maynard is the Deputy Director of Administrative Services for DSH. He has held the position since July 2018. *See* Maynard Decl. ¶ 1. He was designated the 30(b)(6) deponent for the State of California.

which DSH is not a participant. *See* Black ¶ 7. "When the court orders that the defendant be committed to a State Department of State Hospitals facility or other public or private treatment facility, the court shall provide," *inter alia*, a copy of the commitment order to DSH or other facility prior to the admission of the defendant. Cal. Pen. Code § 1370(a)(3). Pursuant to California Penal Code § 1370(a)(3), the "admission packet" for an IST defendant also includes, *e.g.*, "[c]ourt-ordered psychiatric examination or evaluation reports" and "[m]edical records." *Id.* Prior to September 2016, "some counties failed to include adequate medical records or any records at all." Black Decl. ¶ 9 (adding that this "was a factor in DSH promulgating regulations [in September 2016] requiring [that] full medical records be included in admission packets").

During the relevant period, NSH had an Admissions Suite that received the commitment order and admission packet from the county/court. *See* Black Decl. ¶ 8. Upon receipt, the patient's name was placed on a wait list. *See* Black Decl. ¶ 10; Prothero Decl. ¶ 5.[3] Like all state hospitals, NSH had, during the relevant time, a wait list for admission. *See* Black Decl. ¶ 11. There were wait lists because "[e]ach state hospital has reached its maximum licensing, functional, or statutory capacity." Maynard Decl. ¶ 4; *see also* Maynard Decl. ¶ 6 (testifying that "[a]ll State Hospitals are licensed and regulated by the California Department of Health" and "[e]ach hospital has limitations on bed space and bed usage"; NSH's "total number of beds is limited by its license" and, "until June, 2016, [NSH] was limited to 980 beds for patients whose placement was required pursuant to the Penal Code").

The NSH Admissions Suite had an Admissions Coordinator – at the relevant time, Dana White, a registered nurse – who would initially review the admission packet "looking for any history of escape, violence, sex offender status, or specific medical need, so that the IST defendant could be placed in the proper hospital with the proper resources available when he . . . arrived." Prothero Decl. ¶ 3; *see also* Haddad Decl., Ex. 14 (White Depo. at 27) (testifying that, from 2005 to May 2019 (when she left NSH), she was the only person at NSH who reviewed the admission packets). After the Admissions Coordinator completed her review, she would "release the packet

---

[3] Ms. Prothero is the Supervising Registered Nurse in the Admissions Suite at NSH. She has held the position since December 2015. *See* Prothero Decl. ¶ 1.

to an analyst in her office who checked the packet for completeness." Prothero Decl. ¶ 3; *see also* Black Decl. ¶ 8; Haddad Decl., Ex. 13 (Black Depo. at 25) (testifying that the packet was reviewed for completeness and accuracy by an analyst and not medical staff); Haddad Decl., Ex. 14 (White Depo. at 25) (testifying that analysts do not, *e.g.*, have a nursing license). If information was missing, either the Admissions Coordinator or an analyst would contact the county, *see* Prothero Decl. ¶ 3, and "facilitate the process of completing the packet with the required documents." Black Decl. ¶ 9. After the admissions packet was complete, "the IST defendant's status on the wait list was changed to 'ready' to schedule admission."[4] Black Decl. ¶ 10.

It appears that, prior to the enactment of regulations in September 2016, a defendant's place on the wait list was – as a general matter – dependent on his commitment date. *See* Prothero Decl. ¶ 5 (testifying that, "[i]n 2016, because of concerns arising out of the fairness of some counties in [NSH's] catchment area having standing orders, the Admissions staff continued to place all IST Defendants on the . . . wait list, once their packet was complete, according to commitment date").[5]

It also appears that, prior to September 2016, a defendant could be immediately placed at a hospital – *i.e.*, in spite of the wait list – if the defendant had an acute psychiatric need. *See* Haddad Decl., Ex. 13 (Black Depo. at 46). Usually, NSH would be told by the county jail that the defendant had such a need (although anyone could tell NSH, including the defendant's attorney or any one concerned about the defendant), and then the referral would be reviewed by the Clinical Administrator (Ms. Black) and the Medical Director (Dr. Tyler). *See* Black Decl. ¶¶ 10, 12; *see*

---

[4] It appears that processing of admission packets is now largely done by the Patient Management Unit ("PMU") instead of each state hospital. *See* Defs.' Mot. at 6 n.3 (stating that "DSH centralized the referral process by way of the [PMU]"); Maynard Decl. ¶ 15 (testifying that processing by PMU is done for 46 counties and "[a]ll remaining counties are at various stages of implementation").

[5] In September 2016, the enacted regulations formally "provided a rule that each IST Defendant's position on a wait list would be based on his . . . commitment date." Black Decl. ¶ 12; *see also* 9 Cal. Code Regs. § 4710(a) (providing that, "[i]n scheduling the admission of individuals judicially committed to the [DSH] as Incompetent to Stand Trial, the Department shall admit each individual to a state hospital according to the date the court committed the individual to the Department").

*also* Prothero Decl. ¶ 7. "Based on the review of the available records and discussion with staff treating the defendant, the Medical Director [would] determine[] if the patient needed immediate placement due to [his] psychiatric condition." Black Decl. ¶ 10.[6]

There is evidence that DSH/NSH did not have a practice of routinely informing the state courts issuing commitment orders, medical staff at the jails, the prosecution, or defense counsel that a psychiatric acuity review could get an IST defendant admitted on a priority basis. *See, e.g.*, Haddad Decl., Ex. 13 (Black Depo. at 54-55) (testifying that she could not recall a specific instance of the above being told "on a routine basis"); *see also* Haddad Decl., Ex. 18 (Ahlin Depo. at 106) (testifying that she is "not aware of a formal notification" to county jail doctors or admissions that they can request psychiatric acuity review); Haddad Decl., Ex. 19 (Tyler Depo. at 172) (testifying that she has "never sent out a letter to jail staff saying they can ask" for a psychiatric acuity review for a patient); Blakely Decl. ¶ 7 (testifying that, while he was a public defender, he "was never informed that the Department of Mental Health or [DSH] allows for psychiatric acuity reviews upon request, to provide an IST criminal Defendant with priority admission to [NSH] based on the severity or acuity of his mental illness").

In addition, there is evidence that DSH/NSH did not have a practice of automatically subjecting IST defendants to psychiatric acuity reviews before they were placed on the wait list – *i.e.*, there was no attempt to "triage." *See, e.g.*, Haddad Decl., Ex. 13 (Black Depo. at 48, 58) (testifying that "[w]e do not do a triage for admission" – *i.e.*, NSH does "not triage patients to determine their psychiatric acuity before putting them on the waiting list"); Haddad Decl., Ex. 17 (Maynard Depo. at 63) (testifying that "[t]here is not a standard that I am aware of while I have

---

[6] With the enactment of regulations in September 2016, an exception to the wait list was formally made "for those who were psychiatrically acute." Black Decl. ¶ 12; *see also* 9 Cal. Code Regs. § 4710(a)(2) (providing that "[a]ctual date of admission may change upon consideration of any of the following factors . . . (2) Whether the individual exhibits psychiatric acuity which may indicate the need for admission to the facility, notwithstanding the date the court committed the individual to the [DSH]"); *id.* § 4717(a) (providing that "[a]n individual shall be admitted to a state hospital notwithstanding the date the court committed the individual to the [DSH] if the [DSH] determines that the individual is psychiatrically acute"); *id.* § 4717(c) (providing that, "[t]o request a psychiatric acuity review of an individual, the committing county's clinician who is responsible for the individual's clinical assessment or its designee shall contact the Department's medical director or designee about the individual's psychiatric acuity and the psychiatric acuity needs of the individual").

been with DSH to triage and evaluate every patient prior to placement on the wait list"). However, there is some evidence indicating that the Admissions Suite nurse of a state hospital would do a limited kind of psychiatric acuity review at or about the time that the admission packet was sent to the hospital. *See, e.g.*, Haddad Decl., Ex. 17 (Maynard Depo. at 39-40) (testifying that, at the time of referral, "[t]he patient referral information provided by the county is reviewed by a nurse in each of the hospitals, or the patient management unit, for specific placement issues which could be related to psychiatric acuity" or other matters such as "the type of offense" and "medical conditions"); Haddad Decl., Ex. 14 (White Depo. at 39, 41) (testifying that "[w]e have medical records before they go on the waiting list" such that, "if anything sticks out in those medical records that call to us to ask the jail for further information, we do call the jail"; "sometimes, to me, I'll read something and think: Wow, this person needs to get in a hospital now" so "I'll ask the [Admissions] [S]uite to make a phone call to the jail to see if they are suicidal right now or if things have changed or how the person's doing now, right that moment"). According to Plaintiffs, it was feasible to do a more systematic psychiatric acuity review for all IST defendants because there is evidence that "it takes Dr. Tyler only about an hour to do one on an ad hoc basis." Pls.' Opp'n at 8; *see also* Haddad Decl., Ex. 19 (Tyler Depo. at 171-72) (stating that the time to do a psychiatric acuity review "can vary, but I would say less than an hour"; this includes reviewing available medical records).

The State Defendants, however, note that "the numbers of IST defendants that counties [have] referred to DSH . . . have experienced tremendous growth over the last several years. For example, the number of county IST referrals to DSH systemwide increased from 1,859 in Fiscal year (FY) 2013-14 to over 3,400 in FY 2016-17." Maynard Decl. ¶ 10. Although DSH has been able "to increase admissions and numbers of IST defendants served," Black Decl. ¶ 11; *see also* Maynard Decl. ¶ 12 (testifying that, in "the last four years, DSH has added 970 new beds to its overall treatment system of state hospital beds and Jail Based Competency (JBCT) Program beds"[7]), "the number of county referrals continue to outpace the rate of admissions." Maynard

---

[7] "The JBCT Program was created in 2011 to establish competency restoration in specialized jail-based programs. Competency restoration is offered to participating counties and the programs are

Decl. ¶ 10; *see also* Maynard Decl. ¶ 13.

Given the above, it is not surprising that state courts often had to issue orders to show cause ("OSCs") because an IST defendant had not been transferred to a hospital as required by a court commitment order. When a state court issues an OSC "for disobeying a court order of commitment, it may be directed to the Director of DSH [*e.g.*, Ms. Ahlin] in [her] official capacity." Maynard Decl. ¶ 8. The OSC, however, "does not [actually] go to the Director of DSH and instead [is] routed directly to the DSH legal department for handling." Maynard Decl. ¶ 8; *see also* Carson Dec., Ex. A (Ahlin Depo. at 42); Ahlin Decl. ¶ 4. "[I]n fiscal year 2016, DSH received 1,975 OSCs." Maynard Decl. ¶ 8.

B.    Process Specific to Mr. Luong as an IST Defendant

On January 26, 2016, Mr. Luong was arrested for assault after he allegedly attacked a person with a mallet. *See* Prothero Decl., Ex. A (arrest report). Mr. Luong was eventually placed in custody in the Santa Rita Jail in Alameda County.

In February 2016, medical staff at the jail assessed Mr. Luong with schizophrenia and/or psychosis. *See, e.g.*, Haddad Decl., Ex. 6 (PLF 617, 620). He was prescribed the antipsychotic drug Risperdal. *See* Haddad Decl., Ex. 6 (PLF 627).

On March 7, 2016, the state court in the criminal proceeding related to the assault appointed an alienist (Victoria Campagna) pursuant to California Penal Code § 1368 to assess Mr. Luong's competency. *See* Defs.' RJN, Ex. A (order).

Shortly thereafter, medical staff at the Santa Rita Jail made note that Mr. Luong was refusing to take his medication. *See, e.g.*, Haddad Decl., Ex. 6 (PLF 629-31). Risperdal continued to be prescribed. *See, e.g.*, Haddad Decl., Ex. 6 (PLF 634, 636, 638).

On April 5, 2016, Dr. Campagna (the court-appointed alienist) opined that Mr. Luong was competent to stand trial. This was based on, *inter alia*, an interview with Mr. Luong on the preceding day. *See* Prothero Decl., Ex. A (Campagna report).

---

established and paid for by DSH." Maynard Decl. ¶ 14. "DSH must have the cooperation and agreement of county officials in order for a program to be created." Maynard Decl. ¶ 14. "Alameda County declined to participate in the JBCT Program." Maynard Decl. ¶ 14.

1        On April 6, 2016, the state court appointed another alienist (Martin Blinder) to assess Mr.

2   Luong's competency.  *See* Defs.' RJN, Ex. C (order).

3        On May 7, 2016, Dr. Blinder (the court-appointed alienist) opined that Mr. Luong was not

4   competent to stand trial.  This was based, *inter alia*, on an interview with Mr. Luong on May 3,

5   2016.  *See* Prothero Decl., Ex. A (Blinder report).

6        In mid- to late May 2016, Mr. Luong's condition began to deteriorate, with medical

7   records indicating, *e.g.*, that he had been refusing to eat and drink and that he was delusional.  *See,*

8   *e.g.*, Haddad Decl., Ex. 6 (PLF 639, 641, 643).

9        On June 1, 2016, medical staff at the Santa Rita Jail noted that Mr. Luong refused to take

10   his anti-psychotic medication and determined that Mr. Luong's condition had deteriorated to the

11   point where he was a danger to self and had a grave disability, thus prompting a detention for

12   evaluation and treatment at the John George Psychiatric Pavilion pursuant to California Welfare &

13   Institutions Code § 5150.[8]  *See* Haddad Decl., Ex. 6 (PLF 646).

14        On June 2, 2016, the state court appointed another alienist (David Echeandia) to assess Mr.

15   Luong's competency.  *See* Defs.' RJN, Ex. E (order).

16        On or about June 10, 2016, Mr. Luong returned to the jail from the John George

17   Psychiatric Pavilion.  *See* Haddad Decl., Ex. 6 (PLF 649); *see also* Haddad Decl., Ex. 7 (hospital

18   records from the John George Psychiatric Pavilion).

19        Beginning in late June 2016 and continuing into July 2016, Mr. Luong began to refuse to

20   take his anti-psychotic medication again.  *See, e.g.*, Haddad Decl., Ex. 6 (PLF 656, 660).

21        On July 5, 2016, Dr. Echeandia (the court-appointed alienist) opined that Mr. Luong was

22

23   _____

[8] Section 5150 provides in relevant part:

24

25              When a person, as a result of a mental health disorder, is a danger to
              others, or to himself or herself, or gravely disabled, . . . [a]
              professional person in charge of a facility designated by the county

26              for evaluation and treatment . . . or professional person designated
              by the county may, upon probable cause, take, or cause to be taken,

27              the person into custody for a period of up to 72 hours for
              assessment, evaluation, and crisis intervention . . . .

28   Cal. Wel. & Inst. Code § 5150(a).

1    not competent to stand trial.  This was based, *inter alia*, on an interview on July 1, 2016.  *See*

2    Prothero Decl., Ex. A (Echeandia report).

3           On July 8, 2016, the state court found Mr. Luong mentally incompetent within the meaning

4    of § 1368.  The court ordered Mr. Luong to be referred to the Conditional Release Program (also

5    known as "CONREP") for an examination and a recommendation for placement pursuant to

6    California Penal Code § 1370.  *See* Defs.' RJN, Ex. F (order).  CONREP is a program

7    overseen/administered by DHS.  *See* Cal. Wel. & Inst. Code § 4360(a) (providing that DSH "shall

8    provide mental health treatment and supervision in the community for judicially committed

9    persons" and that "[t]he program established and administered by [DSH] under this chapter to

10   provide these services shall be known as the Forensic Conditional Release Program [or

11   CONREP]").

12          On or about July 29, 2016, Alameda County, with whom DSH had contracted to provide

13   CONREP services, *see id.* § 4360(b) (providing that DSH "may provide directly, or through

14   contract with private providers or counties, for these services"), recommended to the state court

15   (via a letter) that the court place Mr. Luong at NSH and that the court authorize the use of

16   involuntary medication.  *See* Prothero Decl., Ex. 1 (CONREP letter).

17          On July 22, 2016, the state court ordered Mr. Luong to be committed to NSH "or any other

18   Hospital" pursuant to § 1370.[9]  Defs.' RJN, Ex. G (Order at 1).  The court also ordered that "the

19   treatment facility may administer antipsychotic medication to [Mr. Luong] involuntarily when and

20   as prescribed by a treating physician."[10]  Defs.' RJN, Ex. G (Order at 2).  (The local jail did not

21   have the authority to administer medication involuntarily.  *See* Hayward Rpt. at 6 (noting that "the

22   Alameda County jail had no statutory authorization to involuntarily treat Mr. Luong even after the

23   court had issued an involuntary medication order").)  Finally, the court ordered that, "within

24   ninety (90) days of this commitment and thereafter at no less than six months intervals, the

25   Executive Director of the Hospital or facility where [Mr. Luong] is housed shall make a written

26

27   [9] Although the order is dated July 22, 2016, the order was not formally filed until August 2, 2016.

28   [10] In her deposition, Ms. Black estimated that about 30 to 50% of the court orders provided for
     involuntary medication.  *See* Haddad Decl., Ex. 13 (Black Depo. at 39-40).

report to this Court . . . concerning [his] progress toward recover of . . . mental competence." Defs.' RJN, Ex. G (Order at 1).

In late July 2016, medical staff at the Santa Rita Jail described Mr. Luong as "catatonic," Haddad Decl., Ex. 6 (PLF 664, 666), noted that he was refusing to take his medication, and indicated that he would be detained again for a § 5150 evaluation at the John George Psychiatric Pavilion. *See* Haddad Decl., Ex. 6 (PLF 666, 668) (indicating that Mr. Luong had been "decompensating since clinician last saw him on 7/7/16").

On or about August 3, 2016, Mr. Luong was returned to the jail from the John George Psychiatric Pavilion. *See* Haddad Decl., Ex. 6 (PLF 669-70).

On August 22, 2016 – approximately a month after the state court issued the order placing Mr. Luong at NSH – Alameda County transmitted the commitment order and admission packet for Mr. Luong to NSH.[11] *See* Prothero Decl. ¶ 10; *see also* Haddad Decl., Ex. 14 (White Depo. at 24) (testifying that, although the commitment order issued in late July 2016, it took time for NSH to approve Mr. Luong for admission because it took time for the court to generate the admission packet and send it to NSH). "The [admission] packet was reviewed and completed on August 26, 2016." Prothero Decl. ¶ 10. Because no beds for IST defendants were available at that time, "Mr. Luong was placed on the waiting list according to his date of [c]ommitment." Prothero Decl. ¶ 12.

Mr. Luong's admission packet included (1) three psychological and psychiatric reports regarding competency to stand trial (as ordered by the state court); (2) a letter from CONREP regarding placement (as ordered by the state court); and (3) medical records. More specifically, these documents indicated as follows:

- *Psychological report by Dr. Campagna, dated April 5, 2016.* Dr. Campagna opined that, "at the present time, Mr. Luong is competent to stand trial." Prothero Decl., Ex. A (Campagna Rpt. at 1) (emphasis omitted). She noted, however, that, according to Mr. Luong's sister, he "functions well when he takes his medication"

---

[11] In their papers, Plaintiffs contend that DSH/NSH had notice of Mr. Luong earlier than August 22, 2016. However, as discussed below, the date that any State Defendant had notice of Mr. Luong specifically is not particularly relevant given that Plaintiffs' theories of liability do not depend on any knowledge of Mr. Luong specifically.

10

but not when he does not take his medication, and "[t]his is what appears to have happened in this instance." Prothero Decl., Ex. A (Campagna Rpt. at 2). She recommended that, when Mr. Luong "is released to the community, . . . he be ordered to investigate the appropriateness of a long-lasting injectable psychiatric medication to treat his schizophrenia, and if his physicians feel this is an option for him, that he be court-ordered to avail himself of this treatment." Prothero Decl., Ex. A (Campagna Rpt. at 2) (emphasis omitted).

- *Psychiatric report of Dr. Blinder, dated May 7, 2016.* Dr. Blinder opined that Mr. Luong has "[i]ntermittent psychosis, etiology to be determined." Prothero Decl., Ex. A (Blinder Rpt. at 3). He also opined that Mr. Luong was not competent to stand trial: "I find this gentleman's commerce with reality impaired sufficient[ly] to negate any likelihood of rational participation in forthcoming legal proceedings." Prothero Decl., Ex. A (Blinder Rpt. at 3). Dr. Blinder added that Mr. Luong was "currently receiving appropriate medications which, though thus far not curative, have doubtless brought him closer to remission," and "it is entirely possible that several months hence he may be psychiatrically equal to his day in court. . . . [¶] [S]o long as he continues to take his medication he constitutes little danger to self or others." Prothero Decl., Ex. A (Blinder Rpt. at 3).

- *Psychological report of Dr. Echeandia, dated July 5, 2016.* Notably, Dr. Echeandia stated that, during his interview with Mr. Luong, Mr. Luong's "mental state appeared to deteriorate more and more" and "[t]oward the end of the interview, [he] decompensated to an acute psychotic state." Prothero Decl., Ex. A (Echeandia Rpt. at 3). Dr. Echeandia also took note that medical records "revealed that [Mr. Luong] had been treated with antipsychotic drugs for psychotic symptoms . . . over a period spanning the past 15 years or so. Other medical records provided diagnoses of Schizophrenia, Paranoid Type and/or Psychotic Disorder NOS, and described treatment with antipsychotic medications, as well as several psychiatric hospitalizations, the most recent in 2015. During his current incarceration, he was

11

also transported to John George [Psychiatric Pavilion] for psychiatric reasons."
Prothero Decl., Ex. A (Echeandia Rpt. at 5).  Dr. Echeandia opined that Mr. Luong
was not competent to stand trial and that "treatment with antipsychotic medications
both medically appropriate and necessary to restore [his] mental competence, given
the evidence of his acutely psychotic behavior during the interview."  Prothero
Decl., Ex. A (Echeandia Rpt. at 5).  Dr. Echeandia stated that, based on the assault
that resulted in Mr. Luong's arrest, he was "inclined to believe that Mr. Luong may
continue to represent a danger to others unless adequate treatment in the form of
more effective psychiatric medication and therapy is provided."  Prothero Decl.,
Ex. A (Echeandia Rpt. at 6).

- *CONREP letter, dated July 19, 2016*.  CONREP stated that it was evaluating Mr.
Luong for placement as ordered by the state court.  CONREP noted that
Mr. Luong has a serious mental illness, Schizophrenia"; that, pursuant to California
Welfare & Institutions Code § 5150, he had been detained for evaluation and
treatment at John George Psychiatric Pavilion ("JGPP") in October 2015 (*i.e.*, a
few months before his arrest in January 2016); and that he had been hospitalized
for nine days at JGPP in June 2016 (*i.e.*, several months after his arrest).  Prothero
Decl., Ex. A (CONREP Letter at 1).  (CONREP did not mention the second
hospitalization at JGPP in late July/early August 2016 because that hospitalization
took place after the date of the CONREP letter.)  CONREP also stated that it
appeared Mr. Luong "generally does well when he takes his anti-psychotic
medications" but that he "was not taking his medications at the time of the alleged
offenses"; that he "is currently refusing to take" an anti-psychotic drug prescribed
at the jail; and that, without "consistent treatment to keep his psychotic symptoms
under control," he "is at high risk for deterioration."  Prothero Decl., Ex. A
(CONREP Letter at 1).  CONREP recommended to the state court that it place Mr.
Luong at NSH and that it authorize the use of involuntarily medication.

- *Medical records*.  The medical records consisted of two pages.  The first page was

12

a "Medical Information Transfer Form" from the Alameda County Sheriff's Office. It indicated that Mr. Luong had a "mental disorder" for which he was being prescribed, *inter alia*, Risperdal (which is an antipsychotic drug) as of August 2016. Prothero Decl., Ex. A (Medical Information Transfer Form). The second page was a form from the Santa Rita Jail indicating that a skin test for tuberculosis had been applied to Mr. Luong in February 2016. *See* Prothero Decl., Ex. A (PPD Skin Test). Alameda County did not transfer the full medical records from the Santa Rita Jail, nor did it transfer the medical records from Mr. Luong's two hospitalizations at the John George Psychiatric Pavilion (*i.e.*, while he was in custody in June and late July/early August 2016). *See* Defs.' Mot. at 11.

In late August 2016, medical staff at the Santa Rita Jail noted that Mr. Luong was once again not compliant with his medication. *See* Haddad Decl., Ex. 6 (PLF 678).

On September 7, 2016 – after receiving notice from the public defender that Mr. Luong was still at Santa Rita Jail and had not been transferred to NSH – the state court issued an order to Ms. Ahlin, the Director of DSH, instructing her to comply with the order to transport Mr. Luong or to show cause why she should not be held in contempt. A hearing was set for September 12, 2016. *See* Defs.' RJN, Ex. H (order).

It appears that a hearing was held on September 12, 2016, as reflected by a state court minute order. The minute order indicates that, at the hearing, a September 20, 2016, progress report was canceled. *See* Defs.' RJN, Ex. I (order).

On or about October 7, 2016, the Santa Rita Jail staff assigned Aref Popal to be Mr. Luong's cellmate. *See* SAC ¶ 81.

On October 11, 2016, NSH's Admissions Suite "was notified that a bed would become available for the next IST Defendant on the wait list," which was Mr. Luong. Prothero Decl. ¶ 13. The Admissions Suite called the Santa Rita Jail to arrange for Mr. Luong's transport and was subsequently told that Mr. Luong had died. *See* Prothero Decl. ¶¶ 13-14. Mr. Luong had been killed by his cellmate on the same date. *See* Haddad Decl., Ex. 4 (autopsy report for Mr. Luong) (indicating death from asphyxiation/strangulation).

According to Plaintiffs, at least twelve inmates have died awaiting transfer to a state hospital.[12]  *See* Pls.' Opp'n at 11-12.  Plaintiffs also maintain that multiple inmates have waited for as long as 100-300 days for transfer to a state hospital.  *See* Pls.' Opp'n at 12; Haddad Decl., Ex. 32 (Plaintiffs' chart on "Longest Waits on Direct Admission Wait List").  *But see* Defs.' Opp'n at 22-23 (asserting that there were reasons for these wait times).

C.    Plaintiffs' Experts

Plaintiffs have provided expert evidence in support of their opposition to the State Defendants' summary judgment motion.  There are four experts in total:

(1) Dr. Terry Kupers.  The expert report from Dr. Kupers was technically submitted in a different case, *Stiavetti v. Ahlin*, No. RG15779731 (Alameda Superior Court).  However, Plaintiffs indicate that they will be using Dr. Kupers as an expert in their case as well.  In his report, Dr. Kupers states, *inter alia*, as follows.

    a.    "Adequate competency restoration treatment can only occur in a setting conducive to mental health treatment."  Kupers Rpt. at 31.

    b.    "Jail is not a setting conducive to mental health treatment nor to competency restoration treatment, absent major alterations in milieu, staffing, and programming.  Jail crowding, the threat of violence, the culture of punishment that permeates the facilities, and the relative inadequacy of programs and treatments have a very detrimental effect on the mental status of incompetent prisoners, and on the ability to participate effectively in competency restoration."  Kupers Rpt. at 31-32.

    c.    "Jails are violent places.  Prisoners with serious mental illness are disproportionately victims of violence, or lose control of their temper and get involved in altercations."  Kupers Rpt. at 32.

    d.    "[S]ixty days is far too long for incompetent individuals to remain in harmful

---

[12] The Court **GRANTS** the request to seal DSH's amended responses to Plaintiffs' interrogatories (Set No. 1).  *See* Docket Nos. 195, 200 (motions).  In the interrogatories, Plaintiffs ask for information about other IST defendants who died before being admitted to a state hospital.

1  jail conditions with limited mental health treatment." Kupers Rpt. at 33.

2  (2) Dr. Bruce Gage. The expert report from Dr. Gage was also technically submitted in a

3  different case, *Stiavetti v. Ahlin*, No. RG15779731 (Alameda Superior Court).

4  However, as above, Plaintiffs indicate that they will be using Dr. Gage as an expert in

5  their case as well. In his report, Dr. Gage states, *inter alia*, as follows.

6      a. DSH has an "unwieldy admissions process[] that demand[s] excessive

7         information from the counties and other local entities." Gate Rpt. at 1.

8      b. The process is "not currently causing delay in DSH" but "only because DSH

9         capacity to treat this population is so limited that the delays caused by lack of

10         capacity mask the inefficiencies of the admission process." Gage Rpt. at 1.

11      c. "Once placement is determined, two weeks gives ample time to conduct

12         medical and short-term risk assessment, communicate with the jails for

13         clarification of packet information, identify the appropriate facility, provide the

14         information to the receiving facility, and arrange transportation. To accomplish

15         this most efficiently, central control of the admissions process is essential.

16         Standardization of admission screening is also essential." Gage Rpt. at 7.

17      d. "Because the clinical needs of the acutely ill patient should outweigh forensic

18         needs and institutional convenience, acute admissions should be handled

19         differently, as recognized by current policy but poorly implemented and

20         tracked. Only information essential to safely admit the patient should be

21         required; additional packet information can be obtained subsequently." Gate

22         Rpt. at 7.

23  (3) Dr. Michael Freeman. In his report, Dr. Freeman states, *inter alia*, as follows.

24      a. "It is . . . well established that inmates who are mentally ill are more likely to be

25         victimized than the general population in correctional settings." Freeman Rpt.

26         at 9.

27      b. "In addition to increased risk of inmate-on-inmate violence, mentally ill

28         prisoners are more likely to be subjected to inconsistent medical evaluations

15

and unreliable monitoring of medication, food, and water intake as they would be outside of prison such as in a hospital or care facility." Freeman Rpt. at 9.

   c. "Mr. Luong's death would have been avoided[] had Mr. Luong been transferred to a hospital, per court order, sooner than the 81 days he was left to languish with inadequate medical care in a cell with a homicidal cellmate." Freeman Rpt. at 10.

(4) Dr. Richard Hayward. In his report, Dr. Hayward states, *inter alia*, as follows:

   a. "The State of California and [DSH] contributed to [Mr. Luong's] death by failing to provide Mr. Luong with prompt treatment after he was found to be IST on July 8." Hayward Rpt. at 4.

   b. "[T]he Alameda County jail had no statutory authorization to involuntarily treat Mr. Luong even after the court had issued an involuntary medication order. . . . For Mr. Luong[,] the state hospital remained the only resource that could provide the involuntary antipsychotic medication necessary to reduce his psychotic symptoms. Also, the state hospital would be the only option that could provide the necessary therapeutic milieu including daily access to mental health clinicians . . . ." Hayward Rpt. at 6.

   c. "[T]he State of California and [DSH] contributed to Mr. Luong's death by failing to expand bed capacity for IST's at the state hospitals since at least 2005." Hayward Rpt. at 6.

   d. "[I]t is obvious that . . . jail based [competency] programs cannot replace the comprehensive competency restoration and therapeutic milieu treatment provided at a state hospital." Hayward Rpt. at 7.

   e. "[T]he State of California has encoded into Penal Code 1370 a requirement for all IST defendants to be evaluated by the Community Program Director or a designee," who "almost always recommend[s] treatment in a state hospital IST bed except for several counties that have a Jail-Based Competency Treatment unit. The evaluation and recommendation of the Community Program Director

16

is redundant and serves no critical purpose" and further "results in an additional delay." Hayward Rpt. at 7.

f. "California and [DSH] need to add a sufficient number of state hospital beds to reduce the wait time for an IST hospital bed to no more than one week following the court determination that a defendant is Incompetent to Stand Trial." Hayward Rpt. at 9.

g. "There is no evidence that DSH ever attempted to routinely assess psychiatric acuity of IST's in the county jails that were waiting for a state hospital bed. Acuity was not assessed unless some advocate at the county jail knew to contact the state hospital and request a priority admission. . . . A routine assessment of psychiatric acuity by DSH would have flagged Mr. Luong as psychiatrically acute and in need of a priority admission." Hayward Rpt. at 13.

h. "California and [DSH] failed to provide training to the top administrative staff from DSH regarding the constitutional rights of defendants found to be Incompetent to Stand Trial." Hayward Rpt. at 15.

D.   Plaintiffs' Causes of Action

Plaintiffs have asserted the following causes of action against the State Defendants:

(1) Violation of 42 U.S.C. § 1983, predicated on individual liability, against Ms. Ahlin (the Director of DSH), Ms. Matteucci (the Executive Director of NSH), Dr. Tyler (the Medical Director at NSH), and Ms. Black (the Clinical Administrator at NSH). As discussed below, the § 1983 claim is predicated on various constitutional rights.

(2) Violation of § 1983, predicated on supervisory liability, against Ms. Ahlin, Ms. Matteucci, and Dr. Tyler.[13]

(3) Violation of Titles II and III of the Americans with Disabilities Act ("ADA") and violation of the Rehabilitation Act ("RA") against DSH and NSH.

---

[13] Ms. Black is *not* a named defendant for this claim. At the hearing, Plaintiffs indicated for the first time that this was an administrative error. The parties should meet and confer to determine whether they can reach agreement on adding Ms. Black as a defendant for this cause of action.

(4) Violation of California Civil Code § 52.1 against Ms. Ahlin, Ms. Matteucci, Dr. Tyler, and Ms. Black.  Similar to above, the § 52.1 claim is predicated on various constitutional rights (both federal and state).

(5) Negligence against Ms. Ahlin, Ms. Matteucci, Dr. Tyler, and Ms. Black.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only by pointing to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (stating that, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor") (emphasis omitted).

Where a plaintiff moves for summary judgment on claims that it has brought (*i.e.*, for which it has the burden of proof), it "must prove each element essential of the claims . . . by undisputed facts." *Cabo Distrib. Co. v. Brady*, 821 F. Supp. 601, 607 (N.D. Cal. 1992).

**III.**      **STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

A.      Section 1983 Claim: Individual Liability

     1.      Multiple Constitutional Rights

Plaintiffs have asserted two § 1983 claims. The first § 1983 claim is for individual liability; the second § 1983 claim is for supervisory liability. This section addresses the § 1983 claim for individual liability, which is asserted against Ms. Ahlin, Ms. Matteucci, Dr. Tyler, and Ms. Black.

As an initial matter, the Court must take into consideration how the § 1983 claim for individual liability is pled in the complaint. The § 1983 claim is predicated on a violation of a number of constitutional rights, namely:

(1) The right to be free from an ongoing seizure.

(2) The right to be free from deliberate indifference to serious medical need.

(3) The right to be free from reckless disregard to safety.

(4) The right to freedom from incarceration and the right to restorative treatment.

(5) The right to be free from government interference with familial relationships and the right to companionship, society, and support.

*See* SAC ¶ 118.

Although there are multiple constitutional rights implicated in the § 1983 claim for individual liability, the individual defendants do not address either (1) or (5) in their motion. In light of this fact, the Court does not address them either.

As for the remaining constitutional rights (*i.e.*, (2)-(4)), to the extent Plaintiffs claim that they are based on the Fourth Amendment, the Court rejects that claim as Plaintiffs do not seem to have relied on any Fourth Amendment authority in their papers. Therefore, for the remainder of this order, the Court focuses on the constitutional rights as predicated on the Fourteenth Amendment, in particular, substantive due process.

     2.      Deliberate Indifference or Conscious Indifference

Although the constitutional rights in (2)-(4) are all based on substantive due process, there is some lack of clarity in the law as to what is the standard for holding an individual liable where

each constitutional right is allegedly violated.

For a pretrial detainee's right to be free from deliberate indifference to serious medical need,[14] the Ninth Circuit has held that an objective standard applies. That is,

> the elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, *even though a reasonable official in the circumstances would have appreciated the high degree of risk involved* – making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'"

*Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (emphasis added). *Compare Castro v. Cty. of L.A.*, 833 F.3d 1060, 1068 (9th Cir. 2016) (noting that, under the Eighth Amendment which applies to a claim brought by a convicted prisoner (as opposed to a pretrial detainee), an "official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference[;] [i]in other words, the official must demonstrate a subjective awareness of the risk of harm") (internal quotation marks and emphasis omitted).

For a pretrial detainee's right to be free from reckless disregard to safety, the applicable standard is either: (1) objective deliberate indifference, *see id.* at 1067, 1071 (stating that "Castro – a pretrial detainee who had not been convicted of any crime – had a due process right to be free from violence from other inmates" and that, for deliberate indifference, "a pretrial detainee need not prove [the] subjective elements about [an] officer's actual awareness of the level of risk"); or (2) "conscious indifference amounting to gross negligence." *Estate of Conners v. O'Connor*, 846 F.2d 1205, 1208 (9th Cir. 1988) (holding that this was essentially the standard established by the Supreme Court in *Youngberg v. Romeo*, 457 U.S. 307, 310 (1982), where the plaintiff asserted, *inter alia*, unsafe conditions of confinement because he was injured on multiple occasions, in

---

[14] A pretrial detainee's rights are different from that of a convicted prisoner.

some instances from violence from other residents). It is not clear whether these standards differ and, if so, how. For purposes of the instant case, there may not be any material difference between the two standards as a practical matter.

Finally, for an IST defendant's right to freedom from incarceration and right to restorative treatment, the applicable standard is "conscious indifference amounting to gross negligence." *Estate of Conners*, 846 F.2d at 1208 (construing *Youngberg*); *see also Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003) (applying *Youngberg* in a case where IST defendants sued the Supervisor of the Oregon State Hospital and the Director of Oregon's Department of Human Services – in their official capacities only (*i.e.*, no damages were sought) – because there was a delay in their being admitted to the state hospital). The Court rejects the State Defendants' suggestion that a "shock-the-conscience" standard applies – although even they seem to admit that, in nonemergency situations, shock the conscience essentially means deliberate indifference. *See* Defs.' Opp'n at 12. Under *Estate of Conners*, the applicable standard is equivalent to gross negligence.

In summary, for the constitutional rights at issue, the standard of review is either deliberate indifference or conscious indifference amounting to gross negligence.

### 3. Theories of Liability

Having established the legal standard(s) applicable to Plaintiffs' § 1983 claim, the Court now turns to Plaintiffs' theories of liability. Although not always articulated with clarity in Plaintiffs' SAC or papers, Plaintiffs fleshed out their theories at the hearing on the parties' motions (upon prompting by the Court). According to Plaintiffs, the individual defendants were deliberately indifferent or acted with conscious indifference amounting to gross negligence in the following ways:

(1) Failing to expand capacity at DSH/NSH.

(2) Not doing a psychiatric acuity review for each IST defendant before putting him or her on the wait list (*i.e.*, not doing a triage and instead waiting for someone to make a request for a psychiatric acuity review).

(3) Not doing psychiatric acuity reviews for at least those IST defendants who, per their

commitment orders, could be involuntarily medicated while committed.

(4)  Not notifying relevant actors – such as the superior courts, county jail clinicians, defense counsel, or prosecutors – that a psychiatric acuity review could be requested for an IST defendant which could thereby affect his or her placement on the wait list.

As should be clear from the descriptions above, none of these theories of liability turns on whether the individual defendants actually had knowledge of Mr. Luong specifically.  Rather, Plaintiffs' point is that, without having a policy or practice on the above, it should have been obvious a pretrial detainee like Mr. Luong would suffer injury.  The facts of Mr. Luong's case and his medical record (that would have been considered had safeguards been in place) may, on the other hand, go to causation.

### a.    Having a Wait List for Admission

Plaintiffs' first theory of liability is that the individual defendants acted with deliberate or conscious indifference to Mr. Luong's constitutional rights by not expanding capacity at DSH/NSH, which would thereby reduce the wait list.  *See, e.g.*, Hayward Rpt. at 6 ("[T]he State of California and [DSH] contributed to Mr. Luong's death by failing to expand bed capacity for IST's at the state hospitals since at least 2005."); Hayward Rpt. at 9 ("California and [DSH] need to add a sufficient number of state hospital beds to reduce the wait time for an IST hospital bed to no more than one week following the court determination that a defendant is Incompetent to Stand Trial.").

On this theory of liability, the Court grants the individual defendants' motion for summary judgment.  In order for a jury to find that the individual defendants were deliberately or consciously indifferent by failing to expand capacity at DSH/NSH, Plaintiffs must first make a showing that the individual defendants actually had the ability to expand capacity.  Plaintiffs have failed to provide any evidence indicating that the individual defendants did have the ability to expand capacity and thus effect shorter wait times.  Indeed, the only evidence before the Court actually indicates to the contrary.  The individual defendants could not expand capacity because of feasibility constraints; "[e]ach state hospital has reached its maximum licensing, functional, or statutory capacity."  Maynard Decl. ¶ 4; *see also* Maynard Decl. ¶ 6 (testifying that "[a]ll State

Hospitals are licensed and regulated by the California Department of Health" and "[e]ach hospital has limitations on bed space and bed usage"; NSH's "total number of beds is limited by its license" and, "until June, 2016, [NSH] was limited to 980 beds for patients whose placement was required pursuant to the Penal Code").

Plaintiffs protest that, under *Mink*, "'[l]ack of funds, staff or facilities cannot justify the State's failure to provide [such persons] with [the] treatment necessarily for rehabilitation.'" *Mink*, 322 F.3d at 1121. However, *Mink* was not a case where (as here) individuals were sued in their personal capacities for damages; rather, in *Mink*, the plaintiffs sued individuals in their official capacities for injunctive relief only. This distinction is important. As the Ninth Circuit explained in *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc), "[l]ack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing [constitutional] violations"; but "[w]hat resources were available is highly relevant" for a claim for damages, which are retrospective in nature, because that "define[s] the spectrum of choices that officials had at their disposal." *Id.* at 1082-83.[15] Accordingly, based on the record presented to the Court, the individual defendants cannot be held liable based on a failure to expand capacity at DSH/NSH.

Moreover, even if the above was not a sufficient basis to grant summary judgment in favor of the individual defendants, the individual defendants would still be entitled to summary judgment based on qualified immunity.

> "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" It "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," and, "[w]hen properly applied, [] protects 'all but the plainly incompetent or those who knowingly violate the law.'"

*Capp v. Cty. of San Diego*, No. 18-55119, 2019 U.S. App. LEXIS 26407, at *10 (9th Cir. Aug. 30,

---

[15] *Peralta* is an Eighth Amendment case about the rights of a convicted prisoner, and not (as here) a Fourteenth Amendment case about the rights of a pretrial detainee. Nevertheless, that distinction – while relevant in other contexts (*e.g.*, objective or subjective deliberate indifference) – is not relevant here.

23

2019).

For purposes of the instant case, there is qualified immunity based on *Youngberg*. In *Youngberg*, a plaintiff who was subject to involuntary commitment under civil proceedings sued the director of the facility as well as two supervisors for, *e.g.*, failing to provide safe conditions of confinement. The Supreme Court noted that, "[i]n an action for damages against a professional in his individual capacity . . . , the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity [*i.e.*, qualified immunity] would bar liability." *Youngberg*, 457 U.S. at 323. In *Ammons v. State Department of Social & Health Services*, 648 F.3d 1020 (9th Cir. 2011), the Ninth Circuit adopted a similar approach, noting that, in a prior case, it had found "the lower-level supervisors qualifiedly immune due to their compliance with hospital regulations and supervisory guidance and directives (to the extent such directives were issued), and because their conduct was reasonable in light of practical considerations." *Id.* at 1030. Because, as indicated above, the evidence indicates that the individual defendants did not have the ability to expand capacity at DSH/NSH, *see, e.g.*, Maynard Decl. ¶ 4 (testifying that there were wait lists because "[e]ach state hospital has reached its maximum licensing, functional, or statutory capacity"), qualified immunity is another basis supporting dismissal of Plaintiffs' first theory of liability.

b.    Not Doing Psychiatric Acuity Reviews for All IST Defendants

Plaintiffs' second theory of liability is that the individual defendants exhibited deliberate or conscious indifference to Mr. Luong's constitutional rights because they failed to implement a policy under which a psychiatric acuity review would automatically be done for each IST defendant before putting him or her on the wait list. (As noted above, the evidence indicates that a psychiatric acuity review was done only if a request for such was made – *e.g.*, by a county clinician or a defense attorney.)

For this theory of liability, summary judgment in favor of the individual defendants is also appropriate. Similar to above, Plaintiffs have not provided sufficient evidence that it was feasible to implement such a policy, and, without feasibility, the individual defendants cannot be said to have acted with deliberate or conscious indifference.

24

1       According to Plaintiffs, such a policy was feasible because "it takes Dr. Tyler only about

2   an hour to do one [psychiatric acuity review] on an ad hoc basis." Pls.' Opp'n at 8; *see also*

3   Haddad Decl., Ex. 19 (Tyler Depo. at 171-72) (stating that the time to do a psychiatric acuity

4   review "can vary, but I would say less than an hour"; this includes reviewing available medical

5   records). But Plaintiffs have not provided any evidence as to how many hours it would have taken

6   to do psychiatric acuity reviews for *all* IST defendants who were referred for commitment.

7   Tellingly, Plaintiffs have submitted no evidence as to the number of IST defendants for whom

8   reviews would have had to have been conducted. Furthermore, evidence submitted by the

9   individual defendants indicates that the number of reviews would have been substantial – *e.g.*,

10  during the relevant period, "the number of county IST referrals to DSH systemwide [was] over

11  3,400" per year.[16] Maynard Decl. ¶ 10 (addressing FY 2016-17). While the number of referrals to

12  NSH specifically would necessarily have been smaller (as one of four state hospitals that serve

13  IST defendants), the number would likely have been significant. The point is there is no evidence

14  in the record that NSH could have accommodated reviews with respect to the IST defendants

15  referred to it.

16      At the hearing, Plaintiffs argued still that it was feasible to do psychiatric acuity reviews of

17  all IST defendants because the individual defendants

18              could have hired several clinicians to routinely visit the IST's in the
                jails to evaluate their acuity level. They also could have used the
19              jail's telepsychiatry equipment to conduct a remote evaluation of the
                inmate-patients. Even one or two clinicians might have been
20              sufficient to phone the jail mental health clinicians to request
                information about the IST inmate-patients' clinical status.
21

22  Hayward Rpt. at 14. But Plaintiffs have failed to provide evidence that DSH/NSH had the budget

23  to hire more employees; that, even if it did, the individual defendants had the authority to hire new

24  employees; and that the individual defendants could compel the jails to cooperate with them. *Cf.*

25  Maynard Decl. ¶ 14 (noting that "Alameda County declined to participate in the JBCT Program"

26

27  _____
    [16] At the hearing, the individual defendants indicated that there are approximately 6,000
    commitments to DSH each year, with NSH specifically having approximately 1,800-2,000 of
28  those commitments. However, the Court was not able to find support for these figures in the
    record before it, particularly for the relevant time period.

that "was created in 2011 to establish competency restoration in specialized jail-based programs"). To the extent Plaintiffs suggested that no budgetary changes needed to be made if the individual defendants simply readjusted priorities, they offered no evidence as to what that readjustment would entail and whether such readjustment would be feasible, particularly in light of the fact that, "[i]n FY 2016-17, DSH served over 4600 IST patients." Maynard Decl. ¶ 11. In short, Plaintiffs have failed to present any evidence of feasibility of the systemic practice they have proposed. Where damages are sought, the resources available to a defendant is "highly relevant" under *Peralta*. As the burden of proof lies with Plaintiffs in establishing a claim, the failure to present sufficient evidence from which a jury could reasonably infer liability warrants grant of summary judgment.

Furthermore, the Court notes that based on the record herein, no reasonable jury could find the individual defendants deliberately or consciously indifferent when there is no indication that all or most IST defendants were, or likely were, psychiatrically acute. That is, a criminal defendant who was found incompetent to stand trial may have been psychiatrically acute but that was not necessarily or likely to be the case – at least there is no evidence in the record of such. In particular, Plaintiffs presented no evidence about the percentage of IST defendants who are psychiatrically acute. Based on the lack of evidence on the number of IST defendants who are psychiatrically acute *and* the lack of evidence on feasibility discussed above, no reasonable jury could find that the individual defendants acted with deliberate or conscious indifference by not having psychiatric acuity reviews done for all IST defendants.

Finally, similar to above, qualified immunity provides an independent basis for summary judgment on the second theory of liability. As noted above, qualified immunity protects a government official from liability for damages if her conduct does not violate a clearly established right. *See Capp*, 2019 U.S. App. LEXIS 26407, at *10. Here, it cannot be said that the individual defendants' violated Mr. Luong's clearly established rights given *Youngberg*'s statement that qualified immunity obtains where a professional is "unable to satisfy his normal professional standards because of budgetary constraints." *Youngberg*, 457 U.S. at 323. Moreover, for a right to be clearly established, there need not be a case directly on point but "'existing precedent must

have placed the statutory or constitutional question beyond debate,'" *Capp*, 2019 U.S. App. LEXIS 26407, at \*22, or, in some cases, "'the constitutional right at issue [must be] defined by a standard that is so "obvious" that [a court] must conclude . . . that qualified immunity is inapplicable, even without a case directly on point.'" *Jessop v. City of Fresno*, No. 17-16756, 2019 U.S. App. LEXIS 26674, at \*10-111 (9th Cir. Sep. 4, 2019). Here, Plaintiffs have not pointed to existing precedent that puts the constitutional question before the Court beyond debate; nor have they shown that the constitutional right at issue is defined by a standard such that there are facts that make the violation so obvious that qualified immunity may not apply. *Mink*, for example, is not dispositive authority because it does not address any contention that a "triage" approach was necessary with respect to admission to a state hospital. Moreover, as noted above, *Mink* does not address under what circumstances an individual defendant could be held personally liable for damages; it involved injunctive relief. *Cf. Horton v. City of Santa Maria*, 915 F.3d 592, 600 (9th Cir. 2019) (noting that "the qualified immunity inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition'" and so it is "critical whether our case law had, at the time of the events in this case, sufficiently clarified when a detainee's imminent risk of suicide was substantial enough to require immediate attention").

c. <u>Not Doing Psychiatric Acuity Reviews for IST Defendants Subject to Involuntary Medication Orders</u>

In their third theory of liability, Plaintiffs assert that the individual defendants were deliberately or consciously indifferent by not having a policy where psychiatric acuity reviews were automatically done for a subset of the IST defendant population – more specifically, those IST defendants who were subject to involuntary medication orders (as specified on the commitment orders issued by the state superior courts). In essence, Plaintiffs take the position that, if a state superior court made a finding that the IST defendant could or should be involuntarily medicated, then he or she stood a good chance of being psychiatrically acute and thus in need of prompt review for transfer.

The Court grants the motion for summary judgment on this theory of liability for several reasons. First, Plaintiffs never clearly articulated this theory of liability, either in the operative

SAC or in the briefs that they filed as part of the summary judgment proceedings. Rather, the first time Plaintiffs articulated this theory was (with prompting from the Court) at the hearing on the summary judgment motions. Because Plaintiffs never clearly made this theory of liability a part of their case, they cannot interject it at this late stage of proceedings.

Second, as discussed above, in order for the individual defendants to be held liable for deliberate or conscious indifference, Plaintiffs must first make some showing that their proposed policy (*i.e.*, of doing psychiatric acuity reviews for those IST defendants subject to involuntary medication orders) was feasible. Plaintiffs have offered no evidence on feasibility. Admittedly, there is evidence in the record that approximately 30 to 50% of all IST defendants are subject to involuntary medication orders. *See* Haddad Decl., Ex. 13 (Black Depo. at 39-40) (estimating that about 30 to 50% of the court orders provided for involuntary medication). But beyond the fact that this number is smaller than the entire IST population, Plaintiffs have submitted no evidence regarding the individual defendants' ability to implement psychiatric acuity reviews for this subset of the IST population.

Third, Plaintiffs have essentially assumed that an IST defendant who is subject to an involuntary medication order is or is likely to be psychiatrically acute but they have not offered any concrete evidence to support this assumption. *Cf. Youngberg*, 457 U.S. at 323 (stating that "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment"). The fact that the medication to be involuntarily administered is *antipsychotic* medication is, in and of itself, not enough to support psychiatric acuity (that warrants immediate admission to a hospital such as NSH).

Indeed, there is some evidence in the recording suggesting that not all IST defendants who are subject to an involuntary medication order are psychiatrically acute. For example, the form commitment order provides as follows regarding involuntary medication.

> . . . THE COURT ORDERS that the treatment facility may administer antipsychotic medication to the defendant involuntarily when and as prescribed by a treating physician pursuant to Penal

Code section 1370(a)(2)(B)(iii) based upon the following finding:

> □ Defendant lacks capacity to make decisions regarding antipsychotic medication and that defendant's mental disorder requires medical treatment with antipsychotic medication and that, if not so treated, it is probable that serious harm to the physical or mental health of the patient will result.

> □ Defendant is a danger to others in that defendant has inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm on another either while in custody or such that it resulted in his being taken into custody, and defendant presents, as a result of mental disorder or defect, a demonstrated danger of inflicting substantial physical harm on others.

> □ Defendant does not meet the requirements of either of the two preceding paragraphs but has been charged with a serious crime against persons or property; involuntary administration of antipsychotic medication is substantially likely to render defendant competent to stand trial; the medication is unlikely to have side effects that interfere with defendant's ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner; less intrusive treatments are unlikely to have substantially the same results; and antipsychotic medication is in the patient's best medical interest in light of his/her medical condition.

Defs.' RJN, Ex. G (commitment order). The form commitment order suggests that not all IST defendants subject to involuntary medication orders are psychiatrically acute for purposes of immediate admission to a state hospital. Under the third category in which the state court placed Mr. Luong, the state's purpose of involuntary medication is to restore competency to stand trial, not to safeguard against immediate risk and harm. Hence, although a close call, Plaintiffs' constitutional claim on this theory cannot be established based on the record presented.

Finally, even if a viable constitutional claim were presented, summary judgment is warranted based on qualified immunity. Assuming there was a plausible claim based on the theory that IST defendants subject to involuntary medication orders must be afforded automatic psychiatric acuity review, the law establishing that constitutional rule was not clearly established. No case so holds on even remotely similar facts. Furthermore, application of the general legal standards applicable under, *e.g.*, *Youngberg* to the record facts in the instant case does not establish an obvious constitutional violation.

d.    Failing to Notify Relevant Actors That a Psychiatric Acuity Review Could Be Requested

Plaintiffs' final theory of liability is that the individual defendants were deliberately or consciously indifferent to Mr. Luong's constitutional rights by failing to notify relevant actors – such as the superior courts, county jail clinicians, defense counsel, or prosecutors – on a systemic basis that a psychiatric acuity review could be requested for an IST defendant.[17]

Here, the Court denies the individual defendant's motion for summary judgment because a reasonable jury could find that it was feasible for the individual defendants to give some kind of systemic or routine notice and, thus, by failing to give such notice, the individual defendants were deliberately or consciously indifferent. As a practical matter, giving notice is obviously more feasible than undertaking systemic psychiatric acuity reviews for all (or a substantial portion of) IST defendants. The Court does not have before it undisputed evidence that would prevent a jury from finding such notice was feasible. And given that acuity reviews currently are made only when requested, notice of the availability of such review plays a critical role in the effectiveness of DSH/NSH's triage.

Accordingly, qualified immunity cannot be granted at this stage of proceedings. The fact that there is no case directly on point factually does not require a finding of qualified immunity. *See Jessop*, 2019 U.S. App. LEXIS 26674, at *11. If Plaintiffs can establish that it should have been obvious to the individual defendants that there was a significant risk that some psychiatrically acute IST defendants would suffer harm because they were not getting transferred promptly to the state hospitals, and that it was feasible to give notice to address this problem, then it would have been clear to any reasonable hospital official with responsibility that the failure to give notice would constitute deliberate or conscious indifference. *Cf., e.g., Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1245 (9th Cir. 2010) (holding that defendant was not entitled to qualified immunity because the evidence (taken in the light most favorable to plaintiffs) indicated

---

[17] The Court acknowledges that this theory of liability was not pled in Plaintiffs' SAC. However, Plaintiffs sufficiently put the individual defendants on notice of this theory in their opposition to the State Defendants' motion for summary judgment – even submitting the Blakeley declaration in support.

that defendant knew the decedent was at a substantial risk of serious harm), *overruled in part by Castro*, 833 F.3d at 1060; *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (noting that "a resolution of the factual issues may well relieve the prison officials of any liability in this case, [but] if the prisoners' version of the facts were to prevail at trial, a jury might conclude that the officers were deliberately indifferent to such [medical] needs during the four-hour period after the incident" and "[v]arious supervisory officials may also have been deliberately indifferent to obvious risks of injury[;] [u]nder such circumstances, the officials' actions are not protected by qualified immunity"); *accord Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002) (in discussing an Eighth Amendment claim for deliberate indifference, stating that qualified immunity would apply where "a reasonable prison official[,] understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high").

Finally, to the extent the individual defendants argue for summary judgment because there is no genuine dispute of fact that they did not cause Mr. Luong any injury, the Court does not agree and finds that there are questions of fact that make summary judgment inappropriate. If a prompt acuity review had been undertaken, the evidence suggests Mr. Luong would have been transferred earlier and thus would not have been murdered. The Court acknowledges that the individual defendants have raised a fair argument, particularly with respect to whether they were a legal (or proximate) cause of Mr. Luong's death; nevertheless, even here, the Court cannot say that no reasonable jury could find in favor of Plaintiffs on causation given the evidence of record. *See, e.g.*, Kupers Rpt. at 32 ("Jails are violent places. Prisoners with serious mental illness are disproportionately victims of violence, or lose control of their temper and get involved in altercations."); Freeman Rpt. at 9 ("It is . . . well established that inmates who are mentally ill are more likely to be victimized than the general population in correctional settings.").

### 4. Summary

For the foregoing reasons, the Court grants in part and denies in part the individual defendants' motion for summary judgment on the § 1983 individual liability claim. The motion is granted with respect to Plaintiffs' first, second, and third theories of liability but denied with

respect to Plaintiffs' fourth theory of liability.

B.    Section 1983 Claim: Supervisory Liability

As noted above, Plaintiffs have asserted a § 1983 claim based on not only individual liability but also supervisory liability. Per the SAC, the only individual defendants against whom supervisory claims are made are Ms. Ahlin, Ms. Matteucci, and Dr. Tyler – *i.e.*, Ms. Black is not identified as a defendant. As stated in footnote 13, the parties are to meet and confer regarding naming Ms. Black as a defendant in this claim for relief.

As a practical matter, the analysis for the supervisory liability claim is the same as that for the individual liability claim. This is because Plaintiffs are seeking to hold Ms. Ahlin, Ms. Matteucci, and Dr. Tyler liable based on their own actions, and not, *e.g.*, the actions of their subordinates. *See Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) ("A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'").

Accordingly, the motion for summary judgment is granted in part and denied in part on the supervisory liability claim. Plaintiffs may proceed with their fourth theory of liability, but not their first, second, and third.

C.    ADA and RA Claims

The ADA and RA claims are brought against DSH and NSH only, and not the individual defendants.

1.    Title II v. Title III of the ADA

As an initial matter, the Court takes note that, per the SAC, Plaintiffs have brought claims under both Title II and Title III of the ADA. Title II provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title III provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, advantages, or accommodations of any place of public accommodation by any person who owns,

leases (or leases to), or operates a place of public accommodation." *Id.* § 12182(a).

To the extent Plaintiffs are asserting a Title III claim, the Court finds summary judgment in favor of DSH and NSH proper. Public entities are subject to Title II but they do not appear to be proper defendants under Title III. The ADA regulations indicate that only private entities are subject to Title III. *See, e.g.*, 28 C.F.R. § 36.104 (providing that "[p]ublic accommodation means a private entity that owns, leases (or leases to), or operates a place of public accommodation" and that "[p]lace of public accommodation means a facility operated by a private entity whose operations affect commerce and fall within at least one of the following categories"). *See also* 42 U.S.C. § 12181(7) (providing that "[t]he following private entities are considered public accommodations for purposes of this title [42 U.S.C. § 12181 *et seq.*], if the operations of such entities affect commerce – (A) an inn, hotel, motel, or other place of lodging . . . ; (B) a restaurant, bar, or other establishment serving food or drink; (C) a motion picture house, theater, stadium, or other place of exhibition or entertainment," etc.). Cases are in accord. *See, e.g.*, *Sandison v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1036 (6th Cir. 1995) (stating that "Title III protects disabled individuals from unequal enjoyment of 'places of public accommodation' [a]nd § 12181(7) and § 36.104 make clear that public accommodations are operated by private entities, not public entities"); *DeBord v. Bd. of Educ.*, 126 F.3d 1102, 1106 (8th Cir. 1997) (stating that "Title III of the ADA applies to private entities providing public accommodations, however, not to public entities"); *Bloom v. Bexar Cty.*, 130 F.3d 722, 726-27 (5th Cir. 1997) (citing, *inter alia*, *Sandison* and *DeBord* for the proposition that Title III is inapplicable to public entities); *see also Hernandez v. Cty. of Monterey*, 70 F. Supp. 3d 963, 973 (N.D. Cal. 2014) (noting that "Title II and Title III are 'parallel provisions' with Title II covering only public entities and Title III covering only private entities," although "'[t]here are many situations . . . in which public entities stand in very close relation to private entities that are covered by title III'"); *Ward v. Cty. of Siskiyou*, No. 2:17-cv-00519-JAM-DMC, 2019 U.S. Dist. LEXIS 18619, at *14 (E.D. Cal. Feb. 4, 2019) (stating that "[p]ublic entities, like the County, are covered by Title II of the ADA," and, "[a]lthough an individual may bring a claim under Title II against a public entity, actions under Title III are

limited to private entities").[18]

Moreover, Title III provides for limited remedies: "Only injunctive relief is available under Title III." *Disabled Rights Action Comm.*, 375 F.3d at 867 n.4; *see also* 42 U.S.C. § 12188(a) (providing that [t]he remedies and procedures set forth in section 204(a) of the Civil Rights Act of 1964 (42 U.S.C. 2000a-3(a)) are the remedies and procedures this title [42 U.S.C. § 12181 et seq.] provides to any person who is being subjected to discrimination on the basis of disability in violation of this title"); *id.* § 2000a-3(a) (providing that "a civil action for preventive relief, including an action for a permanent or temporary injunction, restraining order, or other order, may be instituted"); *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 905 (9th Cir. 2011) (in discussing Title III claim, stating that "a private plaintiff can sue only for injunctive relief (i.e., for removal of the barrier). And notably, here, Plaintiffs do not seem to have asked for injunctive relief in the SAC, *see* SAC ¶ 143 – presumably because they lack standing to seek such relief.

Accordingly, to the extent Plaintiffs assert a Title III claim (as opposed to Title II), that claim is dismissed.

2.    Title II and RA: "Because of" Disability

There is no dispute that, for the Title II and RA claims, there must be discrimination *because of* disability in order for liability to obtain. *See, e.g.*, 42 U.S.C. § 12132 (providing that "no qualified person with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity,

---

[18] In *Disabled Rights Action Committee v. Las Vegas Events, Inc.*, 375 F.3d 861, 875 n.12 (9th Cir. 2004), the Ninth Circuit took note of the DOJ's *Title II* Technical Assistance Manual. The manual notes that, "'[i]n many situations . . . public entities have a close relationship to private entities that are covered by title III, with the result that certain activities may be at least indirectly affected by both titles.'" *Id.* at 875 n.12. For example:

> ILLUSTRATION 2: A city owns a downtown office building occupied by its department of human resources. The building's first floor, however, is leased to a restaurant, a newsstand, and a travel agency. The city, as a public entity and landlord of the office building, is subject to title II. *As a public entity, it is not subject to title III, even though its tenants are public accommodations that are covered by title III.*

*Id.* (emphasis added).

or be subjected to discrimination by any such entity"); 29 U.S.C. § 794(a) (providing that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of his or her disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance") (emphasis added). Even where a plaintiff's theory is a failure to provide reasonable accommodations under the ADA or RA, there must still be discrimination *on the basis* of disability. *See Weinreich v. L.A. Cty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997) (stating that "[t]he duty to provide 'reasonable accommodations' under the ADA and the Rehabilitation Act arises only when a policy discriminates on the basis of disability") (emphasis omitted).

In the instant case, DSH and NSH argue for dismissal of the Title II and RA claims on the ground that there is no genuine dispute of material fact that their actions or inactions were not based on Mr. Luong's disability (*i.e.*, his mental impairments). According to DSH and NSH, Mr. Luong was not immediately transferred from the Santa Rita Jail to a hospital only because there was a waiting list and an IST defendant's placement on the list was based on his commitment date.

Previously, at the 12(b)(6) stage, the Court denied DSH and NSH's motion to dismiss the Title II and RA claims even though they argued – similar to here – that Plaintiffs had failed to allege that Mr. Luong was not admitted "because of" his disability. *See* Docket No. 54 (Order at 13). The Court noted that "[t]he allegations in the complaint regarding discriminatory intent are fairly conclusory," but "Plaintiffs have essentially alleged that Mr. Luong was *completely denied* medical services for his mental disability, and so one could reasonably infer that that denial was so arbitrary and capricious given Mr. Luong's serious medical need that there must have been a discriminatory motive." Docket No. 54 (Order at 13) (emphasis in original).

In assessing the motion for summary judgment, the Court is not bound by its earlier 12(b)(6) ruling since it now must consider evidence under Rule 56. Given the evidence presented, there does not appear to be anything from which one could reasonably infer that DSH and NSH acted or failed to act *because* of Mr. Luong's disability. Plaintiffs suggest that there has been disparate treatment of disabled and nondisabled persons because IST defendants have not been given "the same access to the criminal justice system" (*i.e.*, as they have not been given

competency restoration services).  Pls.' Opp'n at 30; *see also* Docket No. 54 (Order at 13 n.5)

(noting that Plaintiffs "allege no facts demonstrating disparate treatment relative to others

similarly situated").  But even if disparate treatment might ordinarily give rise to an inference of

discrimination, DSH and NSH have provided evidence that their actions/inactions were not based

on disability, and Plaintiffs have not pointed to anything suggesting that the reason given by

DSH/NSH for its actions/inactions was pretextual or that DSH/NSH, in not transferring Mr.

Luong, purposefully treated IST defendants less favorably than others needing mental health

placement.  Indeed, it would appear that all those referred for competency restoration services are

presumptively disabled.

   The Court therefore grants DSH/NSH's motion for summary judgment on the ADA and

RA claims, both Title III and Title II.

D. <u>Section 52.1 Claim</u>

   Under § 52.1,

> [a]ny individual whose exercise or enjoyment of rights secured by
> the Constitution or laws of the United States, or of the rights secured
> by the Constitution or laws of this state, has been interfered with, or
> attempted to be interfered with, as described in subdivision (a), may
> institute and prosecute in his or her own name and on his or her own
> behalf a civil action for damages . . . .

Cal. Civ. Code § 52.1(c).  Subdivision (a) refers to interference or an attempt to interfere "by

threat, intimidation, or coercion."  *Id.* § 52.1(a).  Section 52.1, however, does not require that "the

'threat, intimidation or coercion' element of the claim . . . be transactionally independent from the

constitutional violation alleged."  *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir.

2018) (citing *Cornell v. City and Cty. of San Francisco*, 17 Cal. App. 5th 766, 799-800 (2017)).

   Plaintiffs' § 52.1 claim is brought against all of the individual defendants (*i.e.*, Ms. Ahlin,

Ms. Matteucci, Dr. Tyler, and Ms. Black).  The constitutional rights underlying the § 52.1 claim

come from both federal and state law – *e.g.*, the right to be free from an unreasonable ongoing

seizure, the right to be free from deliberate indifference to serious medical need, the right to be

free from reckless disregard to safety, the right to freedom from incarceration, and the right to

restorative treatment.  *See* SAC ¶ 145.  The individual defendants challenge the § 52.1 claim

largely because Plaintiffs have failed to show that there was interference or an attempt to interfere by threat, intimidation, or coercion.

At the 12(b)(6) phase, the Court found persuasive the argument that Plaintiffs failed to allege threat, intimidation, or coercion. It noted that, in cases cited by Plaintiffs, "it was the fact of detention [by the defendant] that gave rise to coercion, and, here, "[i]n the absence of detention by the [State] Defendants, there is no apparent basis for a claim of coercion." Docket No. 54 (Order at 16).

Plaintiffs acknowledge this ruling by the Court but argue that the individual defendants had custody of Mr. Luong – sufficient for § 52.1 purposes – because "treatment facilities have certain custodial duties under the Fourteenth Amendment with respect to [IST pretrial] detainees, which attach at the time the state court commitment order is issued." *Atayde v. NAPA State Hosp.*, 255 F. Supp. 3d 978, 992 (E.D. Cal. 2017). But in making this statement, the *Atayde* court was simply referring to the fact that California Penal Code § 1370 "imposes responsibilities onto the state hospital to which the incompetent defendant is being committed"; for example, it requires the state court to provide certain documents related to the detainee to the state hospital and also "requires the state hospital's medical director to make a written report regarding the detainee's progress toward recovery within ninety days of commitment." *Id.* Moreover, the *Atayde* court simply made the above statement in support of its conclusion that the individual defendants (including Ms. Matteucci) "owed a duty of care to decedent for Fourth Amendment purposes, and are properly subject to suit under § 1983 for failing to take steps to effect decedent's transfer to NSH." *Id.* The Court makes that same assumption here – § 1983 applies. The *Atayde* court did not, however, opine on § 52.1 and its requirement of threat, intimidation, or coercion. That the individual defendants' actions or inactions led to a prolonged incarceration of Mr. Luong does not mean that they thereby interfered with Mr. Luong's rights by threat, intimidation, or coercion under § 52.1.

Plaintiffs protest still that "two or more violations of rights also satisfy [§ 52.1's] coercion element. Here, Defendants[] knew that their policies and conduct denied IST inmates, like [Mr.] Luong, both timely restorative treatment and freedom from incarceration after the suspension of

37

criminal charges." Pls.' Opp'n at 32. In support of this statement, Plaintiffs cite *Bender v. County of Los Angeles*, 217 Cal. App. 4th 968 (2013). But *Bender* does not support the proposition that a "double violation of rights . . . satisfies [§ 52.1]." Pls.' Opp'n at 32. In *Bender*, the state court simply held that it did not have to decide whether § 52.1

> requires "threats, intimidation or coercion" beyond the coercion
> inherent in every arrest, or whether, when an arrest is otherwise
> lawful, a [§ 52.1] claim based on excessive force also requires
> violation of some right other than the plaintiff's Fourth Amendments
> rights. Where, as here, an arrest is unlawful *and* excessive force is
> applied in making the arrest, there has been coercion "independent
> from the coercion inherent in the wrongful detention itself."

*Bender*, 217 Cal. App. 4th at 978. Moreover, as indicated by the above, *Bender* clearly involved a detention – an arrest – which is not the same situation as here. Here, there is no evidence of "threats, intimidation or coercion" beyond the coercion inherent in the fact that Mr. Luong was in custody in the county jail during the pendency of the State Defendants' process of admitting him.

E.      Negligence Claim

Plaintiffs' negligence claim is brought against the individual defendants. The individual defendants move for summary judgment on the negligence claim largely based on the argument that they owed no duty to Mr. Luong; rather, any duty was owed by the County Defendants (with whom Plaintiffs have now settled). But this argument is unavailing because the state court clearly committed Mr. Luong to DSH/NSH, and there is no real argument that the individual defendants did not play some kind of role regarding admission. Given the Court's order of commitment, Defendants owed a duty to Mr. Luong under negligence law. *Cf. Atayde*, 255 F.Supp. at 992. *See generally Conte v. Wyeth, Inc.*, 168 Cal. App. 4th 89, 109, 85 Cal. Rptr. 3d 299, 316 (2008) ("[F]oreseeability is the principal determinant of duty where the risk created is one of personal injury.").

The individual defendants otherwise contend that the negligence claim is, in essence, "derivative of [the] constitutional claims [under § 1983]," Defs.' Reply at 17, and Plaintiffs do not materially dispute such. Thus, the analysis of the negligence claim parallels the analysis of the § 1983 claims above, and, accordingly, the Court grants in part and denies in part the motion for summary judgment on the negligence claim. Plaintiffs may proceed with their fourth theory of

liability, but not their first, second, and third. No reasonable jury could find in favor of Plaintiffs on the first, second, and third theories of liability given the lack of evidence of feasibility and/or authority. The Court acknowledges that qualified immunity is not a defense to a negligence claim (as opposed to a § 1983 claim). However, as discussed above, the first, second, and third theories of liability are not viable based on grounds independent of qualified immunity.

F.    Punitive Damages

Finally, the individual defendants move for summary judgment on the claim for punitive damages. Although the Court is not unsympathetic to the individual defendants' position, so long as the § 1983 claims are viable, then the issue of punitive damages shall be reserved for the jury. *See Smith v. Wade*, 461 U.S. 30, 56 (1983) ("hold[ing] that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others"; "this threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness"); *see also Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (indicating the same).

With respect to the negligence claim, "*ordinary* negligence is not sufficient to support an award of punitive damages" but

> the simple fact that [a] [p]laintiff has labeled its claim as one sounding in negligence does not conclusively preclude the possibility that punitive damages may be awarded. Punitive damages may be awarded where the facts demonstrate that the defendant had the intent to vex, annoy, and injure. This showing may be met by demonstrating that the defendant's conduct is "so recklessly disregardful of the rights of others, so as to be characterized as wanton or willful conduct." Thus, even where the claim formally sounds in negligence, if the plaintiff can make a showing that defendant's conduct goes beyond gross negligence and demonstrates a knowing and reckless disregard, punitive damages may be available.

*Simplicity Int'l v. Genlabs Corp.*, No. CV 09-6146 SVW (RCx), 2010 U.S. Dist. LEXIS 148159, at *7 (C.D. Cal. Apr. 21, 2010) (emphasis added and omitted).

# IV.    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The Court now turns to Plaintiffs' motion for partial summary judgment.

As noted above, two of the constitutional rights on which the § 1983 individual liability claim are the right to freedom from incarceration and the right to restorative treatment. The Ninth Circuit deemed both of these rights liberty interests in *Mink*. For this part of the § 1983 claim, Plaintiffs move for partial summary judgment. In particular:

> At this time, Plaintiffs do not seek a declaration and finding from this Court that any of the State Defendants personally violated Mr. Luong's rights with deliberate indifference, lack of objectively reasonable professional judgment, or other appropriate level of individual culpability, as those standards would require a jury to weigh each individual's culpability and responsibility for the violation of Mr. Luong's due process rights. . . . Plaintiffs seek a finding and declaration from this Court that Mr. Luong's due process rights were violated when, after he was committed to DSH, he was denied admission to a state or other hospital for more than seven days after the commitment order, or alternatively, when he was denied admission to a state or other hospital for 81 days until he died in jail.

Pls.' Mot. at 2. The 81 days refer to the time between the July 22, 2016, commitment order and Mr. Luong's October 11, 2016, date of death. In their reply brief, Plaintiffs argue that there is still a constitutional violation even if the period were shortened to 50 days (*i.e.*, from August 22, 2016, when the commitment order and admission packet were sent to DSH, to October 11, 2016).

The Court denies Plaintiffs' motion because *Mink* does not lend sufficient support to Plaintiffs' argument that due process rights are violated when a transfer does not happen in seven days. In *Mink*, the Ninth Circuit did hold that the district court did not "abuse[] its discretion in imposing a seven-day time limit," *Mink*, 322 F.3d at 1122 n.13, but the court never held that seven days was what was constitutionally required. Furthermore, the Ninth Circuit indicated that the seven-day mark was appropriate given that "[t]he district court set the time limit . . . based in part on the Oregon legislature's choice of that time limit in the now-superseded version of the relevant state statute." *Id.* Admittedly, the Ninth Circuit also stated that the time limit should be "reasonably short"; however, the precise parameters of what is "reasonably short" were never established. *Id.* Moreover, the Court bears in mind that the Ninth Circuit's analysis was predicated on a request for injunctive relief and not, as here, a request for damages.

Plaintiffs' contention that 81 days, or even 50 days, constitutes a constitutional violation of due process is a stronger argument in light of the "reasonably short time limit" referred to in *Mink. Id.* Nevertheless, the Ninth Circuit still did not give a concrete time frame. *See also id.* at 1122 (stating that "[h]olding incapacitated criminal defendants in jail for weeks or months violates their due process rights because the nature and duration of their incarceration bear no reasonable relation to the evaluative and restorative purposes of which courts commit those individuals"). Because the Ninth Circuit did not state with any precision what was constitutionally permissible or impermissible, and the context before the Ninth Circuit was a request for injunctive relief rather than a request for damages (where feasibly available resources are likely relevant to establish damages), the Court concludes that the individual defendants have qualified immunity based on a lack of clearly established law on the amount of time that an IST defendant may be kept in a jail rather than being transferred to a state hospital. *See Jessop*, 2019 U.S. App. LEXIS 26674, at *10-11.

## V. **CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part the State Defendants' motion for summary judgment and denies Plaintiffs' motion for partial summary judgment.

The Court sets a Status Conference at **9:30 a.m., September 26, 2019**, so that the parties may address with the Court the trial length, trial dates, settlement discussions, Ms. Black's status as a defendant for the § 1983 supervisory liability claim, and any other non-merits-related trial matters. A Joint Status Conference statement shall be filed by **September 19, 2019**.

This order disposes of Docket Nos. 181, 183, 195, and 200.

**IT IS SO ORDERED**.

Dated: September 12, 2019

_____
EDWARD M. CHEN
United States District Judge